# DECLARATION OF BRIAN FONSECA

I, Brian Fonseca, declare the following:

## *Introduction*

1. South American and Middle Eastern terrorist and narco-terrorist groups have formed an alliance in the form of an interconnected illicit trafficking and money laundering network in which each actor plays an instrumental role that aids and abets the activities of the others. The Flores Drug Trafficking organization, Sinaloa Cartel, Cartel Jalisco New Generation, Waked Money Laundering Organization, and Joumaa Organization each played, and some continue to play, a role in this larger global illicit trafficking network. There are direct links between these organizations, and they played a significant role in bolstering Colombian, Mexican, and Middle Eastern armed groups and rogue states involved in illicit activity and terrorism, including FARC, Hezbollah, Iran, Al Qaeda, the Haqqani Network, and the Taliban. Groups such as Hezbollah, which is linked to Iran, Al Qaeda, the Taliban, and Haqqani network depend on financial schemes that take place in Latin America where trafficking operations and illicit trafficking thrives. Overlapping interests tie the Middle Eastern terrorist networks and South American narco-terrorist and money laundering organizations. As will be explained more thoroughly herein, through both money laundering and trafficking activities, Waldemar Lorenzana Lima provided instrumental assistance to the Colombian and Mexican drug organizations allied with the FARC and Middle Eastern terrorist groups, and therefore is an agency and instrumentality of those groups, including Al Qaeda, the Taliban, and the Haqqani Network.

## *Qualifications to Give Specific Opinion on this Case*

2. I currently serve as the director of the Institute for Public Policy at Florida International University's Steven J. Green School of International and Public Affairs. I also serve as an adjunct professor in the Latin American and Caribbean Studies Center and the

Department of Politics and International Relations. Florida International University (FIU) designates me as expert on Latin American security.[1]

3. From 2007-2011, I led a U.S. Department of Defense security analysis program based at FIU. In that program, I spearheaded two seminal studies on Islam and Latin America. The first, titled *Muslim Identities in Latin America,* focused on understanding the history and composition of Muslim communities throughout Latin America, from the tri-border area to Ecuador, Chile, Colombia, Central America, Cuba, and the English-speaking Caribbean (Jamaica and Trinidad and Tobago). The second study, titled *Middle East— Latin American Relations,* examined the economic, security, cultural, and political ties between the various Middle Eastern and Latin American countries.

4. In 2009, I authored a study titled *Human Smuggling and the Terrorist-Criminal Nexus*. In that study, I developed a new analytic framework to study the convergence or nexus of terrorist and criminal organizations. The framework assessed three dominant areas of convergence: network organizational structures, fusing of illicit activities, use of corruption nodes to facilitate operations, and the proliferation of alternatively governed spaces.

5. I left Florida International University for two years to serve fulltime in the U.S. intelligence community from 2011-2013 in support of the Defense Intelligence Agency enterprise at United States Southern Command (USSOUTHCOM). During that period, I authored numerous classified products on a wide range of security themes in Latin America. I returned to FIU in 2013 to assume a leadership position at the Applied Research Center.

6. I served in the United States Marine Corps Reserves from 1997-2005. I was deployed to North Africa to work with the Egyptians in October 2001 in support of U.S. military operations in Afghanistan and North Africa. I was deployed to the Middle East in March 2003 as part of Operation Iraqi Freedom.

7. I have spent more than a decade studying politics and security in Latin America with a focus on Colombia and Venezuela. I have published numerous writings that explore

---

[1] FIU's list of Venezuela experts can be found at https://news.fiu.edu/2017/07/venezuela-experts/112976

Colombia and Venezuela's socioeconomic, political, and security landscapes. I conducted field research in Venezuela during surges in political violence (2007 and 2014). In 2007, my research focused on Iran—Venezuela relations. Shortly after that trip I authored one of the first deep studies examining the considerations and characteristics of the relationship. I have also spent significant time working with Colombian war colleges and universities in Colombia.

8. I routinely engage the media and provide expert analysis at conferences around the world. Most recently in 2018, I served as a keynote speaker alongside Organization of American States' Secretary General Luis Almagro and political opposition member Antonio Ledezma at the first annual Youth and Democracy Forum sponsored by FIU and the Organization of American States. The event centered on challenges and opportunities in the mobilization of youth in Venezuela. In summer 2019, I delivered remarks at Colombia's Military University (*Universidad Militar Nuevo Granada*) about the evolving security situation in the Americas.

9. Since 2010, I have taught courses on the politics and international relations of Latin America, with elements focusing on transnational organized crime. I have averaged three courses per year over the last 10 years, with each course averaging 4 months in length. Since returning to FIU in 2013, I have served as subject matter expert supporting United States Southern Command and routinely provide expert analysis on Latin America.

10. I published extensively on Venezuela, including several contributions supporting U.S. policymakers. In 2014, I published a book chapter entitled "Organized Chaos: Venezuela's Prison Crisis" in the text *Prisons in the Americas in the Twenty-First Century*.[2] My contribution focused on the overpopulation, widespread corruption and high levels of violence taking place in Venezuela's prisons as well as the overall failure of the Venezuelan judicial system. I argue that prisons serve as incubators for growing criminality and transnational organized crime taking place in Venezuela. Since 2014, those conditions have worsened.

---

[2] Jonathan Rosen, *Prisons in the Americas in the Twenty-First Century*, Lexington Press, 2015. (https://www.amazon.com/Prisons-Americas-Twenty-First-Century-Security/dp/1498508901)

11. Between 2016 and 2018, I authored several important peer reviewed studies examining security in Venezuela and Colombia. In 2016, I served as the lead author in a groundbreaking study titled "Venezuela Military Culture."[3] The study examines the role of the Venezuela's National Bolivarian Armed Forces (FANB) in contemporary Venezuela. My conclusions are that the Venezuelan military is increasingly becoming tied to the survival of the Maduro regime and increasingly more likely to use violence to repress civil unrest—as later seen in 2017. I also authored a policy piece for the Center for American Progress that examined the security situation in Colombia in the wake of peace negotiations. In 2017, I served as the lead author and editor in a text titled *Culture and National Security in the Americas*—with a chapter dedicated to the decay of Venezuela.[4] Its thesis is that in the absence of external security threats, governments have focused security policy largely on preserving domestic stability. I published pieces on Venezuela in *Foreign Policy*, *American Interests*, *Military Review* and *Diálogo*.

12. Since 2019, I published several articles in prominent outlets that examine the crisis in Venezuela, including *A Mutating Virus: How Organized Crime Groups Are Evolving, and What Governments Can Do About It* (Americas Quarterly, 2021), *It's Not the 1970s Again for Latin America's Militaries. Here's Why* (Americas Quarterly, 2020), *Two Nations, One Revolution: The Evolution of Contemporary Cuba-Venezuela Relations* (Wilson Center, 2020), *Venezuela isn't Syria: Why the US shouldn't overreact to Putin's Bluff* (CNN, 2019), *Are China and Russia on the Cyber Offensive in Latin America and the Caribbean?* (New America, 2019)

13. I routinely provide analytic support to the Departments of Defense and State on security in Venezuela. I frequently appear on BBC Worlds News, CNN, Univision, CBS, and I have been cited by the Washington Post, Bloomberg, NBC, and various other national and international media outlets.

---

[3] Brian Fonseca, Harold Trinkunas, and John Polga-Hecimovich, "Venezuela Military Culture," Florida International University, 2016. (http://gordoninstitute.fiu.edu/policy-innovation/military-culture-series/brian-fonseca-john-polga-hecimovich-and-harold-trinkunas-2016-venezuelan-military-culture.pdf)

[4] Brian Fonseca and Eduardo Gamarra, Culture and National Security in the Americas, Lexington Books, 2017. (https://www.amazon.com/Culture-National-Security-Americas-Twenty-First/dp/149851958X)

14. Most recently, on March 3, 2021, I testified before the United States Congress, House Foreign Affairs Committee about the crisis in Venezuela and the role of Russia, China, and others external state and non-state actors in Venezuela.[5]

### Convergence of Criminal and Terrorist Groups

15. After 9/11, the United States aggressively pursued the elimination of traditional terrorist financial networks. In successfully doing so, the U.S. inadvertently drove terrorist organizations toward financing their operations vis-à-vis illicit activities. Terrorist organizations turned to organized crime for guidance and engaged in various illicit activities such as arms and narcotics smuggling, human smuggling, trafficking in persons, extortion, kidnapping, piracy, counterfeiting, credit theft, armed robbery, and money laundering. This has brought organizations like Al Qaeda, the Taliban, and the Haqqani Network into the same illicit commercial sphere as Colombia's Fuerzas Armadas Revolucionarias de Colombia (FARC), Brazil's Primeiro Comando da Capital (PCC), El Salvador's Mara Salvatrucha, Mexico's Zetas, and other Latin American criminal organizations. My research indicates that these groups "travel together" and both compete and collaborate to evade international law enforcement, global counter drug and terrorist efforts, and raise funding for survival.

16. Another important characteristic of the post-9/11 illicit commercial sphere is that terrorist organizations and drug trafficking groups adopted decentralized and networked forms of organizational structures that facilitate a broad range of engagements with likely and unlikely collaborators. Network organizational approaches enable terrorist and criminal organizations to adapt rapidly to changes in international law enforcement trends and to be more impervious to attacks than large, consolidated organizations. More importantly, relationships among terrorist and criminal groups can range from ad-hoc to long-term strategic alliances. The decentralization of operational components has led to collaboration and cooperation among terrorist and criminal organizations from the Middle East and Latin America. At the same time, it has made it more difficult to track

---

[5] A Way Forward for Venezuela: The Humanitarian, Diplomatic, and National Security Challenges Facing the Biden Administration. https://foreignaffairs.house.gov/hearings?ID=F5A326A6-B9F6-47D7-A901-ECD631AC8B1F

institutional relationships largely because cooperation and coordination is conducted at the individual level or through intermediaries.

17. Globalization and international pressures to combat global terrorism and transnational organized crime has forced terrorist and criminal groups to internationalize operations and networks all over the world, again, bringing Middle East terrorist organizations into the same illicit sphere as Latin America criminal groups.

***18.*** Additionally, these illicit groups comprise complex networks that often rely on the same suppliers—from document forgers, and smuggling rings, to arms sellers and drug producers. For example, international criminals have been willing to sell weapons to terrorist organizations, including the Taliban and the FARC, which enables opportunities for both networks to share arms dealers and capabilities. In 2011, arms dealer and former KGB officer, Viktor Bout, was sentenced to 25 years in prison after going on trial in New York for trafficking weapons to Al Qaeda, the Taliban, and for intended weapons sales to the FARC.[6]

### Al Qaeda and the FARC

19. Al Qaeda is a Sunni Islamic terrorist organization started by Osama bin Laden in 1988 and designed a Foreign Terrorist Organization (FTO) by the United States Government in 1999. Al Qaeda's organizational structure has evolved from a highly centralized command and control structure to a broad group of affiliates that operate all over the world under the Al Qaeda banner. Al Qaeda engages in a wide range of criminal activities from trafficking in drugs, weapons, and people, to cigarette smuggling, credit card theft, and insurance fraud.

20. The Revolutionary Armed Forces of Colombia (FARC) is a Marxist–Leninist oriented insurgency/illicit trafficking organization based in Colombia with operations all over the world. The FARC is one of the largest drug trafficking organizations in the world.

21. My research indicates that Al Qaeda's presence in Latin America goes back to at least the 1990s. Al Qaeda's presence focused on fund raising and planning attacks. In fact, Al

---

[6] Traficante de armas Viktor Bout es juzgado en Nueva York, 2011. https://www.dw.com/es/traficante-de-armas-viktor-bout-es-juzgado-en-nueva-york/a-15381713; Detenido en Bangkok el mayor traficante de armas, 2008. https://elpais.com/diario/2008/03/07/internacional/1204844404_850215.html

Qaeda's Khalid Sheikh Mohammad, architect of 9/11, travelled to Brazil in 1995 on behalf of Al Qaeda to engage and solicit support from Brazil's Arab community residing in the Tri-border area where Argentina, Brazil, and Paraguay meet.[7] Some observers argue that this was the starting point of Al Qaeda's operations in Latin America.

22. In 1998, Mohamed Abed Abdel Aal, a leader of the Al Qaeda-affiliated Egyptian Islamic Jihad, was arrested in Colombia for working with Colombian guerrillas in the movement of arms, drugs, and money. Reporting about Al Qaeda affiliated individuals living in Brazil began in 2011. One of Al Qaeda's chief propagandists, a Lebanese man named Khaled Hussein Ali, has reportedly lived in Brazil since 1998. Although Brazilian police arrested Ali in March 2009, he was released less than a month later.

23. In 2001, United States Federal Bureau of Investigation and Central Intelligence Agency concluded that the tri-border area was Al Qaeda's base of operations in Latin America, according to media outlets in Brazil. Based on media reports, operations included soliciting political and financial support from Al Qaeda sympathizers and fundraising through illicit trafficking activities, including drug trafficking.

24. Additionally, Al Qaeda, during this period, was evaluating potential targets. In 2004, Al Qaeda was also collaborating with human smuggling rings in Paraguay.[8] Other reports indicate that Al Qaeda was plotting bombings at American embassies in Uruguay and Argentina. Nuclear physicist Adlene Hicheur—who communicated with an Al Qaeda member in 2009 over an Al Qaeda terror plot in France—also lived in Brazil after he was released from prison in 2013. Hicheur worked at the Federal University of Rio de Janeiro until July 2016, when he was deported back to France. In July 2016, Al Qaeda-linked extremists on social media reportedly called for lone wolf attacks at the Olympic Games in Rio de Janeiro and encouraged operatives to obtain Brazilian visas and obtain weapons from Brazil's slums. Additionally, there are reports that Al Qaeda operatives have been

---

[7] CNN, "Police: Mohammed visited Brazil in 1995," 2003.
http://www.cnn.com/2003/WORLD/americas/03/08/mohammed.brazil/index.html
[8] Joseph Farah, "Al-Qaida South of the Border," World Net Daily, February 16, 2004.
www.worldnetdaily.com/news/article.asp?ARTCILE_ID=37133

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 7 of 632

smuggled using vessels passing through the Panama Canal and then linked up with MS-13 cliques to move by ground through Central America.[9]

25. Still, Al Qaeda presence in tri-border likely created opportunities for Al Qaeda and FARC associates to connect. The tri-border area is also an important operating environment for Colombian drug trafficking organizations, such as the FARC. FARC trafficking in the tri-border area also goes back to at least the 1990s. In fact, one of the FARC's largest safe havens is located in Brazil, less than 100 miles from where Khalid Sheikh Mohammad visited in 1995. Based on my research, the FARC uses the tri-border area to move drug shipments from Andean producing countries (Colombia, Bolivia, and Peru) through Argentina and Brazil to West Africa for markets in Europe.[10]

26. Based on intelligence gathered at Osama bin Laden's compound, Al Qaeda sought to exploit Mexican drug trafficking routes into the U.S.

27. Numerous incidents point to the presence of Middle Eastern actors in Colombia and FARC-controlled territory. An Egyptian terrorist belonging to al-Gama'a al-Islamiyya, who was wanted in connection with the 1997 massacre of Western tourists at Luxor, entered Colombia illegally in 1998 to hold talks with the FARC. He was arrested and turned over to the U.S. via Paraguay. According to a 2006 CNN report, the former Al Qaeda frontman, Ayman Al-Zawahiri, announced that Al Qaeda and al-Gama'a Islamiyya would form "one line to face enemies."[11]

28. Another clear indication that Al Qaeda has worked with the FARC is the abundance of evidence pointing towards their drug trafficking collaboration in Africa. My research indicates that Al Qaeda in the Islamic Maghreb agreed with the FARC to provide protection for drugs being transited across northern Africa. Several arrests and convergence in Africa confirm that Al Qaeda and the FARC have sought out

---

[9] McNicolas. Michaels "*Maritime Security: An Introduction,*" Butterworth-Heinemann, Pages 253-258, 2007; Mateo, Joanna. "Gang Violence in Central America: The Case of Honduras. Identifying a Role for USSOUTHCOM." Western Hemisphere Security Analysis Center, April 2008.

[10] "Terrorist and Organized Crime Groups in The Tri-Border Area (Tba) Of South America," Library of Congress, July 2003, https://www.loc.gov/rr/frd/pdf-files/TerrOrgCrime_TBA.pdf

[11] Al-Zawahiri: Egyptian Militant Group Joins Al Qaeda, CNN, August 2006. http://edition.cnn.com/2006/WORLD/meast/08/05/zawahiri.tape/index.html; Beyond al-Qaeda: The Outer Rings of the Terrorist Universe, Rand Corporation, 2006. https://www.rand.org/content/dam/rand/pubs/monographs/2006/RAND_MG430.pdf

collaborative activities over the years. In 2009, the United States Drug Enforcement Administration (DEA) arrested Oumar Issa, Harouna Toure, and Idriss Abelrahman in Ghana on drug trafficking charges. The men claimed that they were transporting cocaine through West and North Africa on behalf of Al Qaeda and the FARC.[12] In 2010, independently, several investigative journalists reported on FARC-Al Qaeda coordination of cocaine traveling to West Africa, often from Venezuelan airfields (but also from Brazil and Argentina). Reuters investigation found that FARC-produced cocaine was flowing into the hands of Al Qaeda factions in Guinea-Bissau.[13] The Christian Science Monitor cited the "Coca Cola" plane's frequency in Mali. Several U.S. and international authorities cited the rise of cocaine flowing to West Africa.[14] In 2013, the U.S. arrested one alleged member of the FARC along with three alleged members of Al Qaeda in Algeria on drug trafficking charges.[15] According to the 2013 annual report by Inter-Governmental Action Group Against Money Laundering in West Africa, terrorist financing in West Africa was largely driven by illicit drug trafficking from Latin America through West Africa to Europe and the Middle East by Al Qaeda, the FARC, and other criminal organizations.[16]

29. Most recently, in late 2019 and early 2020, three Al Qaeda-linked Syrian terrorists crossed the border from Zulia, Venezuela to La Guajira, Colombia en route to the U.S. The Zulia-La Guajira border area is a well-known FARC and ELN narcotrafficking infested area and it is highly likely that the Al Qaeda-linked individuals relied on their support networks to move from Venezuela to Colombia and obtain documents needed for transit into the U.S.

---

[12] "Malian Man Sentenced in Manhattan Federal Court To 57 Months in Prison for Conspiring to Provide Material Support to Terrorists," March 2012.
https://www.justice.gov/archive/usao/nys/pressreleases/March12/issaoumarsentencing.html
[13] Tim Gaynor and Tiemoko Diallo, "Al Qaeda linked to rogue aviation network," 2010.
https://www.reuters.com/article/us-drugs-security-aviation/al-qaeda-linked-to-rogue-aviation-network-idUSTRE60C3E820100113
[14] Scott Baldauf, "Air Al Qaeda: Are Latin America's drug cartels giving Al Qaeda a Lift?," 2010.
https://www.csmonitor.com/World/2010/0115/Air-Al Qaeda-Are-Latin-America-s-drug-cartels-giving-Al Qaeda-a-lift
[15] James Bargent, "Arrests Point to FARC Ties to Al Qaeda in North Africa," 2013. https://insightcrime.org/news/brief/arrests-point-to-farc-ties-to-al-qaeda-in-north-africa/; Roberto Godoy, "As FARC usam Brasil para abrigar elite da guerrilha" [FARC uses Brazil to shelter the guerrilla elite], O Estado de São Paulo, http://www.estado.estadao.com.br/editorias/2003/03/01/pol024.html
[16] FATF Report: Terrorist Financing in West Africa, October 2013. http://www.fatf-gafi.org/media/fatf/documents/reports/tf-in-west-africa.pdf

*Hezbollah and the FARC (and the PCC)*

30. There is significant evidence of FARC and Hezbollah relations dating back to Operation Titan in 2008.[17] Operation Titan was a two-year investigation by U.S. and Colombian authorities between 2006 and 2008. The investigation resulted in the arrest of over 130 suspects and $23 million in seizures. The operation found that Hezbollah associate Chekry Mahmoud Harb operated a cocaine smuggling and money laundering operation in Colombia that funneled significant revenues to Hezbollah operations. The FARC and the Northern Valley Cartel were Harb's main suppliers. Harb was convicted and placed on U.S. Treasury's Specially Designated Narcotics Traffickers list.[18]

31. Hezbollah helped to turn Venezuela into a hub for the convergence of transnational organized crime and international terrorism. Hezbollah is also reportedly responsible for facilitating Maduro's relationship with Iran. [19]

32. My research indicates that Hezbollah has also coordinated and collaborated with Brazilian criminal organizations, namely the Primeiro Comando da Capital (PCC). Hezbollah also touches the FARC through the PCC by recruiting FARC dissidents that are uninterested in adhering to the Colombian peace process. The PCC has helped Hezbollah with acquiring explosives and smuggling weapons. In 2017, Colombia's Defense Ministry asserted that the PCC was recruiting FARC dissidents to expand its drug trafficking operations.[20] Political analysts state that FARC dissidents also share an alliance with Brazilian gang Família do Norte (FDN).

33. Additionally, Assad Ahmad Barakat is a U.S.-designated key Hezbollah financier who has operated in the tri-border area. Barakat, who has close ties with Hezbollah's leadership, was the group's chief of military operations and fundraising in the tri-border

---

[17] BBC, "Colombia Hails End of Drugs Ring," 2008. http://news.bbc.co.uk/2/hi/americas/7684128.stm; Kraul, Chris and Sebastian Rotella. "Drug Probe Finds Hezbollah Link," Los Angeles Times. October 22, 2008. Document can be found at http://articles.latimes.com/2008/oct/22/world/fg-cocainering22

[18] U.S. Department of Treasury Press Center, "Treasury Designates Medellin Drug Lord Tied to Oficina de Envigado Organized Crime Group," Press Release, July 9, 2009. https://www.treasury.gov/press-center/press-releases/Pages/tg201.aspx

[19] The Atlantic, "How Iran-backed Networks Prop up the Venezuelan Regime," October 2019. https://www.atlanticcouncil.org/in-depth-research-reports/issue-brief/the-maduro-hezbollah-nexus-how-iran-backed-networks-prop-up-the-venezuelan-regime/

[20] InSight Crime, "Brazil's PCC is Recruiting FARC Dissidents: Colombia Defense Minister," February 2017. https://insightcrime.org/news/brief/brazil-pcc-recruiting-farc-dissidents-colombia-defense-minister/

area in the 1990s—during the same period as Al Qaeda and the FARC.[21] It is likely that Barakat knew Al Qaeda and FARC operatives residing in the same geographic area. Barakat led Hezbollah's financial network in the region and facilitated money laundering activities to generate funds for the group. In August 2018, Brazil's supreme court authorized Barakat's arrest after Paraguay issued an arrest warrant. On September 21, 2018, Brazilian police announced they had arrested Barakat in Foz do Iguaco, Brazil, near the border with Paraguay and Argentina. Barakat was extradited to Paraguay in July 2020.

***FARC, Hezbollah Part of a Broader Global Illicit Trafficking and Terrorist Financing Network that Includes Al Qaeda, the Taliban, and Others***

34. FARC—Hezbollah networks include a wide range of illicit non-state and state actors from Al Qaeda, the Taliban, Los Zetas, Cartel de Soles, the Sinaloa Cartel, and others to state-sponsors such as Iran and Venezuela. Evidence indicates that all these organizations are in the broader FARC—Hezbollah illicit trafficking and terrorist financing network.

35. There are and have been Al Qaeda, Hamas, and Hezbollah operators, supporters, and sympathizers in Brazil, according to Counter Extremism Project, a non-profit organization led by former world leaders with a united goal of countering radicalization.[22]

36. There is also evidence of Hezbollah and Al Qaeda collaboration around illicit trafficking. Despite the ideological differences and deep distrust between Sunni and Shia Islamic groups, they share common and often converging interests. In the mid-1990s, representatives of Al Qaeda met with Hezbollah leadership and toured training camps in Lebanon, according to two independent Al Qaeda operatives Jamal Ahmed al Fadl and Ali Mohamed. In fact, Ali Mohamed was among those responsible for a meeting between Osama bin Laden (Al Qaeda) and Imad Mugniyeh (Hezbollah) in Sudan to discuss collaboration. Mugniyeh committed to providing Al Qaeda with training in exchange for

---

[21] Counter Extremism Project, "Assad Ahmad Barakat," https://www.counterextremism.com/extremists/assad-ahmad-barakat
[22] Counter Extremism Project, "Brazil: Extremism & Counter-Extremism," 2020. https://www.counterextremism.com/countries/brazil

financial support. According to Mohamed's 2000 testimony, Hezbollah provided Al Qaeda explosives and other technical support.

37. Hamza, Osama bin Laden's son, sheltered in Iran and even got married there, according to declassified CIA reports. The reports also mention negotiations between Al Qaeda and the Revolutionary Guards in Tehran on funding and arming the Sunni terror outfit so it could strike at American targets.[23]

38. The New York Times reported that Al Qaeda and Hezbollah operatives have been killed in Iran. According to the report, "Some terrorism experts suggested that keeping Al Qaeda officials in Tehran might provide some insurance that the group would not conduct operations inside Iran. American counterterrorism officials believe Iran may have allowed them to stay to run operations against the United States, a common adversary."[24]

39. Another important angle to the network is the relationship between the Taliban, Iran, and Hezbollah. Hezbollah is also considered a surrogate of Iran. Iranian relations with the Taliban are growing and Iran has also engaged with Al Qaeda factions in recent years. Based on my research, relations between Iran and the Taliban are strengthening. Dialog between the Taliban and Iran has increased in recent years. In November 2019, the Taliban's Mullah Abdul Ghani Baradar met with Iranian Foreign Minister Mohammad Javad Zarif in Tehran, Iran. On January 31, 2021, Zarif hosted Taliban political chief Mullah Abdul Ghani Baradar in Tehran to discuss deepening relations. Scholars argue that rapprochement between the Taliban and Iran occurred in the aftermath of U.S policies.

40. Based on my research, the FARC, Sinaloa Cartel, and Afghan drug traffickers comprise a common and likely interconnected illicit network. For example, Marlon Marin, nephew of FARC leader Jesus Santrich, asserts that FARC leaders Iván Márquez and Santrich sanctioned collaboration with the Mexico-based Sinaloa Cartel in global money laundering and drug trafficking operations. In January 2011, Mexican authorities

---

[23] The Atlantic, "Al Qaeda has Rebuilt Itself with Iran's Help," November 2017.
https://www.theatlantic.com/international/archive/2017/11/al-qaeda-iran-cia/545576/
[24] New York Times, "Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran." November 2020.
https://www.nytimes.com/2020/11/13/world/middleeast/al-masri-abdullah-qaeda-dead.html

reported that the Sinaloa cartel was working with other narcotics traffickers in Afghanistan. Insight Crime also reported on Sinaloa Cartel's drug trafficking operations in Afghanistan in 2011. According to the report, field research in Afghanistan conducted by crime analyst Edgardo Buscaglia revealed the Sinaloa Cartel's dealings with global criminal organizations in Afghanistan.

*FARC, Sinaloa Cartel, Los Zetas, Jooumaa Network, Waked Money Laundering Organization, and individual SDN Lorenzana-Lima acting as their agents*

41. In 2015, the DEA provided evidence that the FARC and Mexican drug trafficking including the Sinaloa Cartel, Cartel Jalisco New Generation, and Los Zetas, created an alliance to transport cocaine to the United States.[i] Shortly before that, in 2014, Hermes Alirio Casanova was arrested for his ties to the U.S. Treasury Designated Significant Foreign Narcotics Trafficker Fernain Rodriguez Vazquez and his network. The Fernain Rodriguez Vazquez network provided clear evidence of the partnership between Colombia's FARC, the Sinaloa Cartel, and the Zetas.[ii]

42. Shortly after, in 2017, the U.S. Department of the Treasury Office of Foreign Asset Control (OFAC) designated Raul Flores Hernandez and the Flores Drug Trafficking Organization, its leadership, and facilitators as Specially Designated Nationals for supporting Sinaloa Cartel and Cartel Jalisco New Generation drug trafficking operations.

43. Raul Flores Hernandez and his organization used associates, family, and various companies for money laundering in support of its alliances with the Sinaloa Cartel and Cartel Jalisco New Generation.[iii]

44. In February 2020, Waldemar Lorenzana-Lima was sentenced to 23 years in prison by the U.S. District Court for the District of Columbia for his involvement in international drug trafficking. According to the U.S. Department of Treasury's Office of Foreign Asset Control, Waldemar Lorenzana-Lima was designated as Specially Designated Narcotics Trafficker for his role in international narcotics trafficking and his ties to the Sinaloa Cartel.[iv] U.S. Department of Treasury provides evidence that Waldemar Lorenzana-Lima

used his businesses in Guatemala as a front for the illicit trafficking flows moving north into the U.S. [25]

45. Also, part of the alliance with the FARC, the Zetas Cartel worked with Ayman Saied Joumaa, a Colombian- Lebanese drug trafficker and money launderer.[26] In 2011, the Justice Department and DEA charged Joumaa and his associates with drug dealing and money laundering. According to DEA reports, Joumaa shipped an estimated 85,000 kilograms of cocaine into the U.S. and laundered more than $850 million in drug proceeds through front companies and The Lebanese Canadian Bank. Joumaa and his associates also engaged in financing activities with Hezbollah, and U.S. Treasury sanctioned Waked Money Laundering Organization.[27, 28] According to Joumaa's indictment, the network coordinated money laundering activities in the United States, Lebanon, Benin, Panama, Colombia, and the Democratic Republic of Congo.

46. Joumaa's business network revealed a common Panama-based entity between his organization and the Waked Money Laundering Organization. Moises Levy served as director of Joumaa's firms, C & D Cargo, S.A. and Zona Libre International, and served as business partner of Abdul Mohamed Waked Fares, a leader in the Waked Money Laundering Organization.[29]

47. In the mid-2000s, executives from the Grupo Wisa, particularly Abdul Mohamed Waked Fares and Nidal Ahmed Waked Hatum, leaders of the Waked Money Laundering Organization, established partnerships with the Sinaloa Cartel, Ayman Saied Joumaa, and other armed Colombian organizations, including the FARC.[30] As such, the individual members of these various groups effectively became agents of the FARC. According to court documents, the group began illicit activities in the 1980s with the Medellin Cartel.

[25] U.S. Department of Treasury, "Treasury Designates Lorenzana Family Members and Businesses Allied with the Sinaloa Cartel," November 2012. https://www.treasury.gov/press-center/press-releases/pages/tg1767.aspx
[26] ABC News, "Lebanese Drug Lord Charged in US: Links to Zetas and Hezbollah," December 14, 2011. https://abcnews.go.com/blogs/politics/2011/12/lebanese-drug-lord-charged-in-us-links-to-zetas-and-hezbollah/
[27] ABC News, "Lebanese Drug Lord Charged in US: Links to Zetas and Hezbollah," December 14, 2011. https://abcnews.go.com/blogs/politics/2011/12/lebanese-drug-lord-charged-in-us-links-to-zetas-and-hezbollah/
[28] InSight Crime; https://insightcrime.org/wp-content/uploads/2017/10/OFAC_October_Summary_WAKED_CASE.pdf
[29] La Prensa, "Construiran Torre de 48 Pisos en Vieja Sede del Disa," July 15, 2006. https://www.prensa.com/impresa/economia/Construiran-torre-pisos-vieja-Disa_0_1790071082.html
[30] InSight Crime; https://insightcrime.org/wp-content/uploads/2017/10/OFAC_October_Summary_WAKED_CASE.pdf

The group would use a variety of schemes to move illicit funds, including duty free zones, foreign banks, and fund transfers to China.[31] In one scheme, the Waked Money Laundering Organization transported millions of dollars in bulk cash from drug trafficking using commercial aircrafts to Tocumen, Panama for the Sinaloa Cartel.[32] The Waked Money Laundering Organization, under Grupo Wisa, served as board of directors at the Tocumen airport.[33] It is also alleged that the group used its surviving firm, Balboa Bank and Trust, in its schemes.

48. In 2016, U.S. Department of Treasury designated the Waked Money Laundering Organization and its leaders as Specially Designated Narcotics Traffickers. U.S. Department of Treasury also sanctioned key Panama-based companies used by the Waked Money Laundering Organization for laundering drug and other illicit proceeds in support of Colombian and Mexican drug trafficking organizations.[34] Sanctioned companies tied to the Waked Money Laundering Organization include Vida Panama (Zona Libre) S.A.,Grupo Wisa S.A., Soho Panama S.A. and related entities, a luxury mall and real estate development in downtown Panama City, Balboa Bank & Trust, and the Strategic Investors Group Inc.[35]

### Al Qaeda, the Taliban, and the Haqqani Network

49. Al Qaeda, the Taliban, and the Haqqani Network have a long history of close operational ties, at times becoming deeply interconnected. All three groups are considered Sunni Islamic extremist organizations that are involved in global illicit trafficking, money laundering, and terrorist activities.

50. The Haqqani Network is a Sunni Islamic Afghan Pakistani insurgency that originated in the 1970s. It was founded by Jalaluddin Haqqani. The U.S. government officially

---

[31] Insight Crime, https://insightcrime.org/wp-content/uploads/2017/10/OFAC_October_Summary_WAKED_CASE.pdf
[32] Critica, Corte Falla Contra Waked, Perso Sus Abagados Apelan, April 14, 2017. https://www.pressreader.com/panama/critica/20170414/282076276737188
[33] El Economista, Waked, Un Imperio del Perfume Que Huele a Supuesto Lavado de Dinero, May 2016. https://www.eleconomistaamerica.com/empresas-eAm-colombia/noticias/7546762/05/16/Waked-un-imperio-del-perfume-que-huele-a-supuesto-lavado-de-dinero-.html
[34] Attacking Hezbollah's Financial Network: Policy Option, Hearing Before the Committee On Foreign Affairs House of Representatives, June 8, 2017, Serial No. 115–51
[35] U.S. Department of Treasury, Treasury Sanctions the Waked Money Laundering Organization, May 5, 2016. https://www.treasury.gov/press-center/press-releases/Pages/jl0450.aspx

designated the Haqqani Network as a Foreign Terrorist Organization (FTO) in 2012 because of its close relationship to both the Taliban and Al Qaeda.[36]

51. The Haqqani Network is considered by many experts as an arm of the Taliban. In 1996, Haqqani was given a cabinet level position in the Taliban government after it violently seized control over Afghanistan. The Haqqani Network has maintained its allegiance to the Taliban ever since. The Haqqani Network and the Taliban have a history of conducting joint operations. In June 2011, the Haqqani Network and the Taliban jointly attacked the Kabul Intercontinental Hotel. In 2015, Sirajuddin Haqqani, the Haqqani Network founder's son, was appointed as deputy to the Taliban Leader Mullah Akhtar Mohammed Mansur. The Haqqani Network finances its operations through illicit trafficking activities, often in concert with the Taliban. For example, in 2019 the U.S. extradited Haji Abdul Satar Abdul Manaf to the U.S. where he faces charges for attempting to import heroin into the United States, narco-terrorism, and attempted narco-terrorism on behalf of the Taliban and the Haqqani Network.[37]

52. The Haqqani Network maintains a strong relationship with Al Qaeda. In the 1970s, the Haqqani Network and Al Qaeda aligned it their fight against the Soviet forces in Afghanistan. The Haqqani played an important role in Al Qaeda's expansion in the 1980s. Ever since, the Haqqani Network and Al Qaeda have maintained close contact. In 2016, Afghanistan's Interior Minister Spokesperson, Sediq Seddiqi, asserted that the Haqqani Network and Al Qaeda were "two different names for the same organization."[38] Seddiqi also stated that the Haqqani Network was in control of Taliban forces. Additionally, as recently as late 2020, the Haqqani Network and Al Qaeda discussed formation of a joint operational unit, according to the U.S. Department of Treasury.[39]

---

[36] National Counter-Terrorism Center, Directorate of National Intelligence, Haqqani Network, https://www.dni.gov/nctc/groups/haqqani_network.html#:~:text=The%20US%20Government%20in%202012%20d esignated%20the%20Haqqani,of%20its%20ties%20to%20the%20Taliban%20and%20al-Qa%E2%80%98ida.
[37] United States Department of Justice, Manhattan U.S. Attorney Announces Extradition Of OFAC- Sanctioned Afghan Man for Narco-Terrorism Offenses, January 2019. https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-extradition-ofac-sanctioned-afghan-man-narco-terrorism
[38] Voice of America, Afghan Officials: Haqqani Network Controls Taliban Command, May 9, 2016. https://www.voanews.com/east-asia-pacific/afghan-officials-haqqani-network-controls-taliban-command
[39] The Telegraph, Taliban's Haqqani network have considered joint al-Qaeda force claims US Treasury, January 2021. https://www.telegraph.co.uk/news/2021/01/26/talibans-haqqani-network-have-considered-joint-al-qaeda-force/

53. Independently of the Haqqani Network, Al Qaeda maintains a strong relationship with the Taliban and regularly provides the Taliban leadership with technical assistance and financial support.[40] Based on my research, despite persistent U.S. pressures and a U.S.—Taliban Peace Deal in February 2020, the Taliban and Al Qaeda continue to maintain relations with Al Qaeda.[41]

**Conclusions**

54. In preparing this report, I consulted the documents in the attached appendix and interviewed professional contacts in the field in Latin America, Africa, and the Middle East. I also drew from my experience working these issues over the last fifteen years.

55. It is my professional opinion within a high degree of certainty that the FARC has allied itself with Al Qaeda, the Taliban, and the Haqqani Network to achieve their mutual goals. It is further my professional opinion within a high degree of certainty that these South American and Middle Eastern terrorist and narco-terrorist groups formed an alliance with regional money laundering organizations with global reach in the form of an illicit trafficking and money laundering network in which each actor plays an instrumental role that aids and abets the activities of the others. The individual actor Waldemar Lorenzana Lima played a crucial role in this global illicit trafficking network, and as such, it is my professional opinion that he is an agency and instrumentality of the FARC, Al Qaeda, the Taliban, and the Haqqani Network.

I declare and state under penalty of perjury under the laws of the United States of America that the foregoing is trust and correct 28 U.S.C. 1746.

Brian Fonseca

---

[40] U.S. Department of Treasury, Office of Inspector General, Memo: Operation Inherent Resolve - Summary of Work Performed by the Department of the Treasury Related to Terrorist Financing, ISIS, and Anti-Money Laundering for First Quarter Fiscal Year 2021, January 2021. https://oig.treasury.gov/sites/oig/files/2021-01/OIG-CA-21-012.pdf

[41] U.S. Signs Peace Deal with Taliban Agreeing to Full Withdrawal of American Troops from Afghanistan, Washington Post, February 2020. https://www.washingtonpost.com/world/asia_pacific/afghanistan-us-taliban-peace-deal-signing/2020/02/29/b952fb04-5a67-11ea-8efd-0f904bdd8057_story.html

Brian Patrick Fonseca

Florida International University | 11200 SW 8th Street, LC 220, Miami, FL 33199
Tel: (305) 348-7420 | Email: Fonsecab@fiu.edu

CURRICULUM VITAE

## BIOGRAPHICAL SKETCH

Brian Fonseca is Director of the Jack D. Gordon Institute for Public Policy at Florida International University's (FIU) Steven J. Green School of International and Public Affairs where oversees research and educational programming in the areas of Latin America and Caribbean security and governance and U.S. national security. He serves as an Adjunct Professor in the Department of Politics and International Relations teaching courses on the Politics of Latin America and International Relations of Latin America, and he is a Cybersecurity Policy Fellow at the D.C.-based think tank New America. His analysis has been featured in national and international media. Recent publications include two edited volumes titled Culture and National Security in the Americas (Lexington Books, 2017) with Eduardo A. Gamarra and Democracy and Security in Latin America (Routledge, forthcoming 2021) with Orlando Perez and Gabriel Marcella, and he is co-author of The New US Security Agenda: Trends and Emerging Threats (Palgrave, 2017) with Jonathan Rosen. Brian holds degrees in International Business and International Relations from Florida International University in Miami, Florida, and he has attended Sichuan University in Chengdu, China, and National Defense University in Washington D.C. From 1997 to 2004, he served in the United States Marine Corps and facilitated the training of foreign military forces in both hostile theaters and during peacetime operations.

## PROFESSIONAL EXPERIENCE

**Florida International University**
*Director of the Jack Gordon Institute for Public Policy*                    **November 2015—Present**
- Lead the university's public policy institute, including academic, research, and professional education programming.
- Led 700% growth during first 4-year appointment as director.
- Serve as Principal Investigator for more than $6M in federal funding.
- Serve as a subject matter expert in the areas of Central and South American security, U.S. national security, and cybersecurity policy.

*Executive Director of Cybersecurity@FIU*                    **January 2019—Present**
- Serve as the university lead for the emerging preeminent program Cybersecurity@FIU.
- Lead the development and implementation of university-wide strategy in growing cybersecurity programming at FIU.
- Led the development of cybersecurity capacity building programming in Latin America.

*Adjunct Professor in the Department of Politics and International Relations*        **August 2010—Present**
- Current courses include International Relations of Latin America, Politics of Central America, Global Cybersecurity Policy, Cyber and the Arts, U.S. Diplomacy Lab, Fundamentals of National Security, Topics in Globalization, and Effective Governmental Communications.

18

**United States Southern Command**                                April 2013—Present
*Consultant Support for Socio-Cultural Analysis*
- Provide expertise on Latin America and Caribbean to support USSOUTHCOM all-source intelligence analysts.
- Support in developing USSOUTHCOM's approach to tactical, operational, and strategic indications and warnings.
- Represent USSOUTHCOM in the IC-wide socio-cultural analysis community of practice— presentations, working groups, host conferences, etc.

**New America**                                                 December 2017—Present
*Cybersecurity Fellow*
- Support New America's Cybersecurity Initiative.
- New America is a top 25 think tank based in Washington DC.

PAST PROFESSIONAL EXPERIENCE

**Florida International University**
Applied Research Center (ARC)                          May 2013—November 2015
*Director of Operations*
- Provided leadership in development of ARC's strategic planning to include development and monitoring of key objective areas, and analysis of progress.
- Led ARC's social science programs and initiatives; Principal Investigator for ARC's Socio-Cultural and Social Sciences Projects.
- Served as the central point of contact within the ARC for industry and business.
- Assisted in developing programs with the Department of Defense, Department of Energy, Department of Homeland Security, and other federal agencies, as well as business and industry as required for ARC and FIU.
- Provided leadership in the respective area of research specialization and executes work on related grants and contracts as assigned.
- Aided the Executive Director in the planning, development and implementation of proposals and contracts. Coordinates interaction between the Applied Research Center and its technology vendors and serves as a liaison for existing and prospective partners.
- Published and/or presented technical programs within the area of specialization at national or international level to enhance and promote the goals and reputation of the Applied Research Center.

**Florida International University**
Applied Research Center (ARC)                          November 2003—April 2011
*Senior Political & Security Analyst*
- Managed programs, to include personnel and resources in excess of US$1 million annually.
- From 2009 to 2011 was awarded US$1,750M to develop the FIU-SOUTHCOM Academic Partnership in support of SOUTHCOM's Socio-Cultural Dynamics program. Oversaw the production of 17 strategic culture studies of countries throughout Latin America and the

Caribbean and developed a network consisting of more than 50 academic institutions and over 300 scholars in Latin American and Caribbean discourse.

- From 2007 to 2010 was awarded approximately US$150K by the United States Army War College to plan and host the 2007, 2008, 2009, and 2010 editions of the Western Hemisphere Security conference series, the preeminent Latin America security conference series established in 1997.
- In 2007 and 2008, helped create the Western Hemisphere Security Analysis Center (WHEMSAC) in cooperation with United States Southern Command; an academic program dedicated to United States Southern Command's research requirements. Total funding US$2.6M since 2007.
- From 2003 to 2007, acted as the lead liaison between senior U.S. and Latin America military personnel for the Western Hemisphere Information Exchange Program (WHIX); a program funded by the Assistant Secretary of the Army. During this period, he developed relations with Argentine, Chilean, Dominican, Honduran, Peruvian and Salvadoran military institutions. Total funding approximately US$12M since 2003.

EDUCATION

- **Ph.D. in Political Science**, Florida International University; Miami, FL. (expected 2022). Currently in year two of the coursework.
- **Master of Arts in International Business**, Florida International University; Miami, FL. 2010.
- **Bachelor of Arts in International Relations**, Florida International University; Miami, FL. 2006.
- **Executive Certificate in Cybersecurity: The Intersection of Policy and Technology**, Harvard Kennedy School, July 2020.
- **Executive Certificate in Cybersecurity Leadership & Strategy**, Florida International University; Miami, FL. 2016.
- **Professional Certificate in Transnational Democracy, Stability, and Security**, National Defense University; Washington, D.C. 2008.
- **Undergraduate Certificate in Asian Studies**, Florida International University; Miami, FL. 2006.
- **Study Abroad**, Sichuan University; Chengdu, Peoples Republic of China, 2001-2002.

TEACHING EXPERIENCE

- **Introduction to Latin American Studies**, Kimberly Green Latin American and Caribbean Center, Florida International University; Miami, FL. 2013-Present.
- **International Relations of Latin America**, Steven J. Green School of International and Public Affairs: Department of Politics and International Relations, Florida International University; Miami, FL. 2010-Present.
- **Comparative Politics of Central America**, Steven J. Green School of International and Public Affairs: Department of Politics and International Relations, Florida International University; Miami, FL. 2010-Present.

- **Global Cyber Policy**, Steven J. Green School of International and Public Affairs, Florida International University; Miami, FL. 2018-Present.
- **Fundamentals of National Security**, Steven J. Green School of International and Public Affairs: Department of Politics and International Relations, Florida International University; Miami, FL. 2016-Present.
- **Honors Seminar V: U.S. Department of State's Diplomacy Lab**, Honors College, Florida International University; Miami, FL. 2014-Present.

## AWARDS/GRANTS/FELLOWSHIPS

- US Department of Commerce's National Institute for Standards and Technologies: Principal Investigator, National Initiative for Cybersecurity Education. 2018 through 2022. $1,250,000.00.
- US Department of Defense: Principal Investigator, Critical Technologies Studies Program. 2018-2021. $2,000,000.00.
- USSOUTHCOM: Principal Investigator, FIU-SOUTHCOM Academic-Defense Partnership. 2013-Present. $1,000,000.00.
- INL: Co-Principal Investigator, Gang Phenomena in El Salvador. March 2016. $175,000.00.
- USSOUTHCOM: Co-Principal Investigator, FIU-SOUTHCOM Academic-Defense Partnership. 2009-2011. $2,000,000.00.
- US Army War College: Principal Investigator, Western Hemisphere Security Colloquium. 2007-2009. $150,000.00.
- United States Marine Corps: U.S. Marine of the Year, 2000.
- United States Navy, Navy and Marine Corps Achievement Medal. 1998, 2000.
- United States Marine Corps: Marine of the Quarter, 1998.
- United States Marine Corps: Honor Graduate, 1997.

## PUBLICATIONS

**Books**

- Gabriel Marcelo, Orlando Perez and Brian Fonseca (Eds), *Democracy and Security in Latin America* (Routledge, Forthcoming 2021).

- Brian Fonseca and Eduardo Gamarra (Eds), *Culture and National Security in the Americas* (Lexington Books, 2017).

- Brian Fonseca and Jonathan D. Rosen, *The New US Security Agenda: Trends and Emerging Threats* (Palgrave Macmillan, 2017).

**Book Chapters**

- Brian Fonseca and Randy Pestana, "A Symptom of Crisis in Honduras: Drug Trafficking," in *Cooperation and Drug Policies in the Americas: Trends in the Twenty-First Century*, by Roberto Zepeda and Jonathan D. Rosen (Eds.) (Lexington: Lexington Books, 2015), 119-134.

- Brian Fonseca and Pamela Pamela, "Organized Chaos: Venezuela's Prison Crisis," in *Prisons in the Americas in the Twenty-First Century*, by Jonathan S. Rosen and Marten W. Brienen (eds.) (Lexington: Lexington Books, 2015), 115-128.

- Brian Fonseca and Fred A. Quintana, "Globalizacao e Contrabando de Seres Humanos no Hemisferio," in *Seguranca e Governanca nas Americas*, Marcos Aurelio Guendas de Oliveria (ed.) (Olinda: Luciana Bello Guedes, 2009) 235-250.

- Juan M. del Aguila, Frank O. Mora, and Brian Fonseca, "Cuba: Revolution in the Balance," in *Latin American Politics and Development*, 9th edition. Harvey F. Kline, Christine J. Wade and Howard J. Wiarda (eds.) (Westview Press, 2018) 345-368.

**Congressional Testimonies**

- Brian Fonseca, "Dollar Diplomacy or Debt Trap? Examining China's Role in the Western Hemisphere," Before the House Foreign Affairs Committee | Subcommittee on Western Hemisphere, Civilian Security, and Trade, May 9, 2019.

**Articles**

- Fabiana Sofia Perera and Brian Fonseca, "Security and Defense In A Post-Authoritarian Context." Florida International University, Forthcoming January 2021.

- Brian Fonseca and Jose Miguel Cruz, "A Mutating Virus: How Organized Crime Groups Are Evolving, and What Governments Can Do About It." Guess Who's Having a Good Pandemic: How COVID-19 is Changing Organized Crime, Americas Quarterly, January 2021.

- Frank Mora and Brian Fonseca, "It's Not the 1970s Again for Latin America's Militaries. Here's Why." Special Report on Latin America's 21st Century Militaries, *Americas Quarterly*, December 2019. https://www.americasquarterly.org/content/new-role-latin-americas-militaries

- Brian Fonseca and John Polga-Hecimovich, "Two Nations, One Revolution: The Evolution of Contemporary Cuba-Venezuela Relations," *Woodrow Wilson Center for International Scholars*, December 2019. https://www.wilsoncenter.org/sites/default/files/media/uploads/documents/Venezuela-Cuba%20FINAL.pdf

- Robert Morgus, Brian Fonseca, Kieran Green, Alexander Crowther, "Are China and Russia on the Cyber Offensive in Latin America and the Caribbean?," *New America*, July 2019, https://www.newamerica.org/cybersecurity-initiative/reports/russia-china-cyber-offensive-latam-caribbean/#authors.

- Brian Fonseca, David Kramer, and Frank Mora, "Venezuela isn't Syria: Why the US shouldn't overreact to Putin's Bluff," *CNN*, February 2019, https://www.cnn.com/2019/02/01/opinions/venezuela-isnt-syria-and-putin-is-bluffing-fonseca-kramer-mora/index.html.

- Brian Fonseca and Vladimir Rouvinski, "The Russians of Latin America: Moscow's Bid for Influence Over Russian-Speaking Communities in the Region," *Military Review: The Professional Journal of the U.S. Army*, November-December 2018,

  https://www.armyupress.army.mil/Journals/Military-Review/English-Edition-Archives/November-December-2018/Fonseca-Russia-Latam/.

- Brian Fonseca, "To meet the need for cybersecurity skills, higher educational institutions, industry and government agencies must work together," *The Miami Herald*, October 2018, https://www.miamiherald.com/latest-news/article220653140.html.

- Brian Fonseca and David J. Kramer, "China and Russia: A Strategic Alliance in the Making?" *The American Interest*, September 2018, https://www.the-american-interest.com/2018/09/11/a-strategic-alliance-in-the-making/.

- Brian Fonseca, "Russian Deceptive Propaganda Growing Fast in Latin America," *Dialogo Digital Military Magazine*, July 2018, https://dialogo-americas.com/en/articles/russian-deceptive-propaganda-growing-fast-latin-america.

- Brian Fonseca, "The Perils of a Putsch in Venezuela," *Foreign Policy Magazine*, May 2018, https://foreignpolicy.com/2018/05/04/the-perils-of-a-putsch-in-venezuela/.

- Brian Fonseca, Frank Mora and Brian Latell, "Argentine Military Culture," *Florida International University,* , April 2016, https://gordoninstitute.fiu.edu/policy-innovation/military-culture-series/frank-mora-brian-fonseca-and-pablo-atencio-2017-argentine-military-culture.pdf.

- Brian Fonseca, John Polga-Hemocivich and Harold Trinkunas, "Venezuelan Military Culture," *Florida International University*, May 2016, https://gordoninstitute.fiu.edu/policy-innovation/military-culture-series/brian-fonseca-john-polga-hecimovich-and-harold-trinkunas-2016-venezuelan-military-culture.pdf.

- Brian Fonseca, José Miguel Cruz, Eduardo Gamarra, Jonathan D. Rosen, Daniela Campos and Randy Pestana, "An Analysis of Colombian Perceptions: Internal and External Actors and the Pursuit of Peace," *Florida International University*, April 2016, https://drive.google.com/file/d/0BwmN-lVj82wiUG5XSVI5QXF0TUVXbnlsVENpd1EybFc3dEhn/view.

- Frank Mora, Brian Fonseca, and Brian Latell, "Cuban Military Culture," *Florida International University*, April 2016, https://gordoninstitute.fiu.edu/policy-innovation/military-culture-series/frank-mora-brian-fonseca-and-brian-latell-2016-cuban-military-culture.pdf.

- Brian Fonseca, "In Mexico It's Institutions, Stupid," *Huffington Post*, March 2016, https://www.huffpost.com/entry/in-mexico-its-institution_b_9523684.

- Brian Fonseca, "The key to combating cyber insecurity: changing behavior, training the workforce," *The Miami Herald*, November 2016, https://www.miamiherald.com/news/business/biz-monday/article114587488.html.

- Dan Restrepo, Frank Mora, Brian Fonseca, and Jonathan D. Rosen, "The United States and Colombia: From Security Partners to Global Partners in Peace," *Center for American Progress*, February 2016, https://www.americanprogress.org/issues/security/reports/2016/02/02/130251/the-united-states-and-colombia-from-security-partners-to-global-partners-in-peace/.

- Brian Fonseca and G. Alexander Crowther, "Toward a modern security policy in the Western Hemisphere," *Global Americans Smart News & Research for Latin America's Changemakers*, February 2016, https://theglobalamericans.org/2016/02/toward-a-modern-security-policy-in-the-western-hemisphere/.

- Brian Fonseca, "Reversing Colombia's Security Deficit: Plan Colombia," *Huffington Post*, November 2015, https://www.huffpost.com/entry/reversing-colombias-secur_b_8614106?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAHnvlAbMqNC9jnb-6f4XclEyYTo5S9S_ylpGJ8Oy3jW_FQ2CTPaEsr70KVKx9yAikLKyWZ8SwDOoLju1FFLXYUyBk-S3jrVqhrVlOvNvPZ0JnwpHiZZbWtxSY1rnc8jPyHilcasejbb6zZQrT0fS36sUtef2i93m-ufFWORUEWMf.

- Frank Mora and Brian Fonseca, "United States Policy Towards in the Hemisphere: Influencing the State and Beyond," *PRISM*, November 2015, https://cco.ndu.edu/Portals/96/Documents/prism/prism_5-4/United%20States%20Policy%20in%20Hemisphere.pdf.

- Frank Mora and Brian Fonseca, "Introduction: Links between Terrorist and Criminal Organizations," *DIALOGO*, September 2015.

- Frank Mora and Brian Fonseca, "Latin America's High-Tech Warriors," *Americas Quarterly*, April 2015, https://www.americasquarterly.org/content/latin-americas-high-tech-warriors.

- Joseph S. Tulchin and Brian Fonseca, "Peruvian Strategic Culture," *Florida International University*, August 2010, https://www.scribd.com/document/204270743/Peruvian-Strategic-Culture-Joseph-Tulchin-and-Brian-Fonseca.

- Brian Fonseca, "Domestic Politics in the Dominican Republic after the Earthquake in Haiti," *Western Hemisphere Security Analysis Center*, June 2010, https://digitalcommons.fiu.edu/whemsac/52/.

- Eduardo Gamarra and Brian Fonseca, "Haitian Strategic Culture," *Florida International University*, September 2009, http://library.avemaria.edu/title/haitian-strategic-culture/oclc/773510535.

- Brian Fonseca, "Human Smuggling and the Terrorist-Criminal Nexus," *Western Hemisphere Security Analysis Center*, January 2009 (Research paper No. 15).

- Brian Fonseca, "Identifying Opportunities for US-Cuba Military Cooperation," *Western Hemisphere Security Analysis Center*, December 2008 (Research Paper No. 13).

- Brian Fonseca and Evan Ellis, "Emerging Relationships: China and Latin America," *Western Hemisphere Security Analysis Center*, May 2008 (Research Paper No. 6).

- Brian Fonseca, "Emerging Relationships: Iran & Latin America," *Western Hemisphere Security Analysis Center*, February 2008.

- Brian Fonseca, "Energy Outlook: Brazil," *Western Hemisphere Security Analysis Center*, January 2008 (Research Paper No. 16).

## SELECT PRESENTATIONS

- **Speaker**, The Changing Role of The F.A. And Its Possibilities to Mitigate and Address New Threats," InterAmerican Defense Board, April 28, 2021, https://www.youtube.com/watch?v=KNFr6u6jhRM (talk begins at 4:42)
- **Panelist**, 3rd Annual Security Conference on Latin America and the Caribbean, Johns Hopkins University, February 25, 2021.
- **Panelist**, China-Latin America, Johns Hopkins University, November 2020.
- **Panelist**, Department of Defense Roundtable, "Americas Quarterly Launch: Back in the Spotlight: A Special Report on Latin America's 21st Century Military," Miami, Florida: February 12, 2020.
- **Panelist, "**Venezuela Crisis," FIU's State of the World 2020, Miami, Florida: January 10, 2020
- **Panelist**, "Russian Media in Latin America and the Caribbean," International Studies Association South, Memphis, Tennessee: October 5, 2019.
- **Panelist**, Discussion on national security, featuring Army Brigadier General Timothy D. Brown, Director of Intelligence, US Southern Command, "The US Intelligence Community After 9/11," Miami, FL: September 11, 2019.
- **Speaker**, Defense Intelligence Agency Roundtable, "Russia in Latin America," Washington, DC: July 2019.
- **Speaker**, "Chinese Engagement in Latin America," Department of State, Washington, DC: June 2019.
- **Speaker**, "The Venezuelan Military Culture," U.S. Department of State, Washington, DC: March 2019
- **Panelist**, Russian Diaspora in the Americas," International Studies Association, Toronto, Canada: March 2019.
- **Speaker**, "Cybersecurity and Water Infrastructure," UNESCO, Florida International University:
- **Speaker**, Global Connections, WorldCity Event, "Cybersecurity: Understanding the Threats," Miami, FL: July 28, 2017.

- **Speaker**, Defense Intelligence Agency Roundtable, "Russia in Latin America," Washington, DC: July 27, 2017.
- **Speaker**, Congressional Hispanic Leadership Initiative, "International Careers Panel," Washington, DC: July 20, 2017.
- **Speaker,** Latin American Studies Association, Annual Congress, LASA at 50, "Security and Defense Policy," Lima, Peru: May 1, 2017.
- **Moderator**, Moderated discussion with former DEA Agent Steve Murphy, "Narcos: The Real Story Behind Taking Down Pable Escobar," Miami, FL: April 2017.
- **Facilitator**, Executive Certificate in Cybersecurity Leadership and Strategy, a 2-Day cyber policy program, Washington, DC: April 6-7, 2017.
- **Moderator**, United States Southern Command, "Exernal State Actor Influence in the Western Hemisphere," Miami, FL: April 5-6, 2017.
- **Moderator /Discussant**, Russian Cyber Warfare,
- **Moderator/Discussant**, Greater Miami Chamber of Commerce, "Doing Business in Cuba," Miami, FL: March 7, 2017.
- **Speaker**, Monday Group, CEOs working group in South Florida, Miami, FL
- **Moderator/Discussant**, United States Southern Command, "US Influence in the Western Hemisphere," Miami, FL: December , 2017.
- **Facilitator**, Executive Certificate in Cybersecurity Leadership and Strategy, a 2-Day cyber policy program, Miami, FL: October 11-12, 2016.
- **Speaker**, Oversees Security Advisory Council, Latin American Regional Council, US Department of State, "Future Scenarios in Venezuela," Miami, FL: September, 2017.
- **Moderator**, United States Southern Command, "Future Scenarios in Venezuela," Miami, FL: August 15, 2016.
- **Speaker**, United States Southern Command, "Venezuelan Military Cultures," Miami, FL: June 2016.
- **Speaker**, Americas Council, "Venezuelan Military Cultures," Washington, DC: June 2016.
- **Chair**, Latin American Studies Association, Annual Congress. LASA at 50, "Citizen (In) Security and Drug Policy." New York Hilton Midtown; New York City, NY: May 27-30, 2016.
- **Chair/Presenter**, Latin American Studies Association, Annual Congress. LASA at 50. "Culture and National Security in the Americas." New York Hilton Midtown; New York City, NY: May 27-30, 2016.
- **Presenter**, Steven J. Green School of International and Public Affairs. Geopolitical Summit, "The Dark Side of the Web: Challenges to security prosperity and privacy. Cyberterrorism and National Security," Miami, FL: March 8, 2016.
- **Moderator**, Jack D. Gordon Institute for Public Policy's 2016 Hemispheric Security Conference: Emerging Threats, "*US Security Policy in the Western Hemisphere*" Frost Art Museum, Miami, FL: March 30, 2016.

- **Presenter**, Jack D. Gordon Institute for Public Policy's 2016 Hemispheric Security Conference: Emerging Threats, "*Energy Security, Climate Change and Illegal mining in Peru*" Frost Art Museum, Miami, FL: March 30, 2016.
- **Presenter**, St. Thomas, Intercultural Human Rights Law Review, 11th Annual Symposium, The Power of Voice: Rewriting Policy and Implementing Changes Through Protest Movements, "*Militarization of Policing in Central America*," Miami, FL: November 13, 2015.
- **Presenter**, After the Fall: Energy Security, Sustainable Development and the Environment, "*Challenges for Exporters and Opportunities for Importers in Latin America Presenter*," University of Miami, Miami, FL: October 19-20, 2015.
- **Presenter**, Mexican International Studies Association (*Asociacion Mexicana de Estudios Internacionales*) Annual Congress, "*US Security Policy in the Western Hemisphere*," Cancun, Mexico: October 15-17, 2015.
- **Discussant**, Tri-University Research Conference, "Latin America in the 21st Century," Miami, FL: March 2015.
- **Keynote Speaker**, 1st Annual Caribbean Technology Regional Summit, "Liquid Caribbean: Where Miami and the Caribbean Become Cross Regional Partners," Miami, FL: March 2015.
- **Presenter**, Hemispheric Security and Defense Studies, "Bringing the State Back into the Analysis on Crime and Violence in Latin America," Catholic University and TADEO, Buenos Aires, Argentina: December 2014.
- **Discussant**, Americas Barometer Release, "US Military Influence in Latin America and the Caribbean," Miami, FL: April 2014.
- **Presenter**, TECHO Poverty Conference, "Poverty in Latin America," Miami, FL: March 2014.
- **Presenter**, Intelligence Directorate Indications and Warning Roundtable, "Socio Conflict and Social Media Analysis in I&W," Joint Chiefs of Staff, Washington, DC: Febraury 2013.
- **Presenter**, World Wide Human Geography Conference, "Socio-Cultural Analysis in Latin America and the Caribbean," National Geospatial Intelligence Agency, Washington, DC: June 2012.
- **Presenter**, 8th Annual Cuba and Cuban American Studies Conference, "Understanding Opportunities for US-Cuba Military Relations," Miami, FL: January 2010.
- **Presenter**, US Army Directed Studies Office, "Iran-Venezuela Relations," Washington DC: June 2008.
- **Presenter**, "Iranian Penetration of Latin America," Hudson Institute, Washington DC: June 2008.

MEDIA

- Analysis on Cuba and Venezuela featured on ABC, BBC, CBS, CNN, FOX, NBC, and various other national and international media outlets. Provided live TV and radio.
- Serve as the Political Analyst for local Channel 7 News; covered the 2016 national primary and general elections, 2018 midterm elections and the 2020 national primary elections.

LANGUAGES

- English (Native)
- Spanish (Intermediate)
- Mandarin (Conversational)

## PROFESSIONAL ASSOCIATIONS

- American Political Science Association (APSA), 2014-Present
- International Studies Association (ISA) 2018-Presnet
- Latin American Studies Association (LASA), 2013-Present
- National Society of Collegiate Scholars

## MILITARY

- United States Marine Corps Reserves, Sergeant, Forward Observer, 1997-2005. Deployments include:
  - Trained personnel from Canada, Egypt, Germany, Greece, Norway and Poland in Fire Support coordination techniques and NATO standards. Conducted Joint Task Force Operations with DEA and Caribbean Police Forces.
  - Participated in military operations and exercises in more than 13 countries and led teams in hostile theaters such as Kosovo, Northern Africa and the Middle East.

## INTERNATIONAL ELECTION OBSERVER DELEGATIONS, CONSULTING, ASSIGNMENTS AND RELATED EXPERIENCES

- Organized and Led Greater Miami Chamber of Commerce Trade Mission to China: Beijing, Guangzhou, Hong Kong, Shanghai, and Tianjin, May 2017.
- Election Observer in Guyana, Carter Center (Part of former US President Jimmy Carter's Delegation), May 2015.
- Advisory Board Member, Jack Gordon Institute for National Security Studies, 2014-2015.
- Consultant to Defense Intelligence Agency, 2013-Present.
- Annual US-Turkey Faculty Exchange Program funded by the Istanbul Center in the United States, 2010.
- Served as the Chairperson of the Americas Linkage Committee at the Greater Miami Chamber of Commerce from June 2016—June 2018

---

i https://www.milenio.com/policia/zetas-carteles-sinaloa-jalisco-aliados-farc-dea

ii https://www.treasury.gov/press-center/press-releases/Pages/jl2295.aspx

iii U.S. Department of the Treasury; "Treasury Sanctions Longtime Mexican Drug Kingpin Raul Flores Hernandez and His Vast Network"; DOI: 9 August 2017; https://www.treasury.gov/press-center/press-releases/Pages/sm0144.aspx

iv Leader of Guatemalan Drug Trafficking Organization Sentenced to 23 Years in Prison, U.S. Department of Justice, February 24, 2020. https://www.justice.gov/opa/pr/leader-guatemalan-drug-trafficking-organization-sentenced-23-years-prison

# Appendix to Brian Fosenca's Affidavit
## TABLE OF CONTENTS

| | |
|---|---:|
| FOOTNOTE 6(A) | 1 |
| FOOTNOTE 6(A) TRANSLATED TO ENGLISH | 5 |
| FOOTNOTE 6(B) | 9 |
| FOOTNOTE 6(B) TRANSLATED TO ENGLISH | 16 |
| FOOTNOTE 7 | 23 |
| FOOTNOTE 8 | 25 |
| FOOTNOTE 9 | 34 |
| FOOTNOTE 10 | 36 |
| FOOTNOTE 11(A) | 123 |
| FOOTNOTE 11(B) | 125 |
| FOOTNOTE 12 | 341 |
| FOOTNOTE 13 | 343 |
| FOOTNOTE 14 | 370 |
| FOOTNOTE 15(A) | 378 |
| FOOTNOTE 15(B) | 382 |
| FOOTNOTE 16 | 387 |
| FOOTNOTE 17(A) | 435 |
| FOOTNOTE 17(B) | 437 |
| FOOTNOTE 18 | 447 |
| FOOTNOTE 19 | 449 |
| FOOTNOTE 20 | 477 |
| FOOTNOTE 21 | 481 |
| FOOTNOTE 22 | 487 |
| FOOTNOTE 23 | 502 |
| FOOTNOTE 24 | 511 |
| FOOTNOTE 25 | 520 |
| FOOTNOTE 26 | 522 |
| FOOTNOTE 27 | 522 |
| FOOTNOTE 28 | 524 |
| FOOTNOTE 29 | 530 |
| FOOTNOTE 29 TRANSLATED TO ENGLISH | 534 |
| FOOTNOTE 30 | 524 |
| FOOTNOTE 31 | 524 |
| FOOTNOTE 32 | 538 |
| FOOTNOTE 33 | 539 |
| FOOTNOTE 33 TRANSLATED TO ENGLISH | 540 |
| FOOTNOTE 34 | 541 |
| FOOTNOTE 35 | 574 |
| FOOTNOTE 36 | 576 |
| FOOTNOTE 37 | 578 |
| FOOTNOTE 38 | 581 |
| FOOTNOTE 39 | 588 |
| FOOTNOTE 40 | 593 |
| FOOTNOTE 41 | 598 |



ACTUALIDAD / POLÍTICA

Publicidad

POLÍTICA

# Traficante de armas Viktor Bout es juzgado en Nueva York

El juicio a Viktor Bout, presunto traficante de armas, comienza en Nueva York. Se lo acusa de venta de armas a las FARC colombianas y a los talibanes de Afganistán.



Viktor Bout: "Uno de cientos".

Las consecuencias de los negocios de Viktor Bout se extienden desde Afganistán hasta Colombia. Se lo acusa de presunto tráfico de armas durante casi dos décadas a algunos de los países más pobres del mundo, contribuyendo así a llevar a cabo guerras devastadoras. Según se informó, Bout también transportó a cascos azules de la ONU a Somalia, voló aviones de carga a Irak para EE. UU. y entregó cargamentos de flores desde Sudáfrica hasta Dubai.

Por lo general, los traficantes de armas no poseen una determinada ideología ni alianzas duraderas. Tampoco creen en grandes causas políticas, sino que representan un nihilismo que busca consuelo en el dinero, obtenido por cualquier medio, ya sea legal o ilegal, moral o inmoral.

Viktor Bout fue arrestado en Tailandia  después de haber intentado vender armas a agentes secretos de EE. UU. que se hacían pasar por miembros de las FARC colombianas. Finalmente, Bout fue extraditado a los EE. UU., con el consecuente disgusto de las autoridades rusas, dado que el presunto traficante de armas es de nacionalidad rusa. Ahora se enfrenta a un tribunal estadounidense en Nueva York.

## Armas: la ley de la oferta y la demanda

Durante la Guerra Fría, la disputa entre EE. UU. y la Unión Soviética le dio a los conflictos en los países pobres –al menos superficialmente– un marco ideológico común. "Hasta 1989, un rebelde de un país en desarrollo averiguaba, básicamente, con quién estaba aliado el gobierno para el cual estaba luchanndo y llamaba a la KGB, a la CIA o a los Servicios Secretos británicos", explica Nicholas Marsh, experto en tráfico de armas de bajo calibre del Instituto de Investigación para la Paz de Oslo, a Deutsche Welle. "A menudo, podían obtener armas sin tener que pagarlas", agrega.

Luego del colapso de la Unión Soviética y del fin del conflicto Este-Oeste, las dos principales superpotencias perdieron su interés en el mundo en desarrollo y finalizaron sus generosas entregas de armamento. Pero los derramamientos de sangre no terminaron. En muchos países, el beneficio económico remplazó a la persuasión ideológica como factor impulsor de los conflictos. Eso transformó a la guerra en una empresa

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 30 of 632

sometida a los dictámenes del mercado con una demanda importante de armas de bajo calibre.

Mientras tanto, los ex países comunistas, altamente militarizados, fueron cayendo en el caos social. Sus reservas de armamento, destinadas originalmente a ser usadas contra los ejércitos occidentales, ya no tenían una función práctica. Y los oficiales militares, mal pagados y desilusionados ideológicamente, hicieron dinero vendiendo armas que eran propiedad estatal.



Viktor Bout, que sirvió a la Fuerza Aérea Soviética y, como él, otros traficantes de armas, vieron allí una oportunidad de unir la oferta con la demanda. Aprovecharon esa oportunidad y comenzaron a construir una red ilegal de vendedores de armas.

Comercio de armas en Mogadishu.

"Es un negocio global como cualquier otro, en el que rigen las leyes de la oferta y la demanda", dice Hugh Griffiths, experto en armas de bajo calibre del Instituto Internacional de Estocolmo para la Investigación de la Paz (SIPRI), a Deutsche Welle. "Viktor Bout tiene razón al decir que él es sólo un hombre de negocios. Y no mintió al decirlo. Hay más de 30 o 40 individuos como él", añade el experto.

Los traficantes a menudo comparten características comunes: son ex pilotos, tienen vínculos con el ejército, son buenos en matemática y hablan varios idiomas. "Son jugadores, personalidades atractivas y divertidas", dice Griffith, quien ya entrevistó a traficantes de armas durante sus trabajos de campo para la ONU, la Unión Europea y numerosos gobiernos. "Han trabajado en África, por lo cual poseen un punto de vista diferente acerca de la vida humana, al contrario de los cómodos europeos que no comprenden que, a veces, una vida no vale nada", acota Griffith.



Amnistía Internacional: Protesta contra el comercio con armamento.

### Una zona gris dentro de la legalidad

"Es una mezcla de legalidad, semi-legalidad o ilegalidad que puede aportar una enorme cantidad de armas", señala Michael Ashkenazi, experto en venta de armas de bajo calibre del Centro Internacional de Bonn para la Conversión, a Deutsche Welle. "Es un mercado muy diverso, muy dinámico, muy difícil de rastrear. Y tratar de es muy difícil comprender cómo funciona en su totalidad, a no ser en términos generales", dice Ashkenazi.

Las armas compradas legalmente abandonan, a menudo, las reservas estatales a través de sobornos. Para eso se falsifican los certificados de usuario final, que son los que documentan quién usará, en definitiva, esas armas. Los traficantes transportan las armas manipulando los controles laxos en el tráfico aéreo de los países pobres. Los aviones son desviados o simplemente se cambian los nombres de la nave y su matrícula.

"La cuestión es, para decirlo sin rodeos, que una escalada en la espiral de armamento en un país o sociedad frágil de por sí tiende a crear un conflicto que producirá muchas víctimas", explica Ashkenazi. "No es que las armas en sí creen el problema. Pasa que, si el problema ya existe y llegan las armas, entonces se transformará en un asunto sangriento."

### Viktor Bout, uno entre cientos

Mientras la mayoría de los países reconoce el impacto desestabilizador de las armas de bajo calibre en sociedades frágiles, los expertos sospechan que los Estados son cómplices del mismo problema que denuncian.

Aunque EE. UU. y la Unión Europea poseen leyes de exportación relativamente estrictas, países productores de segunda clase, como Serbia,

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 31 of 632

Ucrania, China, Turquía e Irán, frecuentemente tienen menos escrúpulos. Pero incluso EE. UU y Rusia tolerarán a los Bout del mundo hasta tanto sigan manteniendo un perfil bajo.

De hecho, Washington no había puesto la mira en Viktor Bout hasta que surgieron acusaciones con respecto a que éste había entregado armas a los talibanes. Fue la gota que colmó el vaso, ya que Bout ya se había cruzado antes con los intereses estadounidenses al intentar vender armas al grupo rebelde colombiano FARC, considerado por el Gobierno de EE. UU. como un grupo terrorista.



"Pero fue atrapado porque disgustó a los estadounidenses, y no porque alguien haya pensado que era un tipo malo", afirma Ashkenazi. "Todo el mundo sabía que era un tipo malo, pero, de pronto, dio un paso en falso. Remplace ahora a Bout por Mr. XZY, multiplíquelo por cien y tendrá la cantidad existente de traficantes de armas", ejemplifica.

Se acusa a Bout de intentar vender armas a las FARC.

Entretanto, Moscú ha criticado la extradición de Bout diciendo que tiene motivaciones políticas, y ha solicitado su retorno a Rusia. "Es un asunto de imagen nacional el no querer ver a un ciudadano de perfil alto siendo juzgado en el extranjero", dice Marsh. "Hay rumores de que Bout está estrechamente vinculado a los servicios secretos rusos, pero no sé hasta donde son fundados. Si ese fuera el caso y se juzgase a Bout, probablemente eso saldría a la luz", subraya.

Pero Bout no se enfrentará a la justicia porque, supuestamente, haya vendido armas, sino porque, si lo hizo, se las vendió a la persona incorrecta en el momento inapropiado. "Es una necesidad de mercado", dice Griffith. "Ese es el mercado que hemos creado, y esa gente está cumpliendo un servicio y una función que una amplia cantidad de actores y agencias creen que es necesario cumplir."

Autor: Spencer Kimball/ Cristina Papaleo

Editora: Emilia Rojas-Sasse

## DW RECOMIENDA

### "Europa observa con preocupación relaciones ruso-venezolanas"

Sergei Lavrov, el ministro ruso de RR. EE., viaja a Lima; después irá a Caracas. Deutsche Welle habló con expertos sobre la gira latinoamericana del emisario del Kremlin y sobre los intereses de Moscú en la región. (23.08.2011)

### El factor petróleo en la guerra de Libia

El apoyo de Occidente a los rebeldes libios no estuvo motivado sólo por los ideales de libertad y democracia, sino también por claros intereses económicos, es decir, por el acceso al petróleo, analizan expertos. (22.08.2011)

### Venta de tanques: "Gobierno alemán debe dar explicaciones"

El escándalo por la venta de tanques 'Leopard' alemanes a Arabia Saudí demuestra una grave dicotomía entre valores e intereses económicos en el Gobierno alemán, opinan editorialistas. (07.07.2011)

### Polémica en Alemania por venta de tanques a Arabia Saudí

Los planes de venta de 200 tanques alemanes "Leopard" a Arabia Saudí serán discutidos ahora también en el seno del Bundestag. Las críticas al trato armamentista provienen no sólo de la oposición. (05.07.2011)

### Grupos de crimen organizado son "corporaciones multinacionales"

Trabajo flexible en redes y relaciones interdependientes con otros grupos en todo el mundo son algunas de las características del crimen organizado transnacional actual. Su combate es un desafío global, dicen expertos. (06.06.2011)

### Gadafi arroja bombas de racimo "Hechas en Europa"

El que las granadas de mortero MAT-120 que las fuerzas de Gadafi hicieron explotar sobre Misrata sean españolas atiza la discusión sobre la venta de armas europeas y estadounidenses a regímenes autoritarios en el mundo. (16.04.2011)

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 32 of 632

## Exportación de armamento: "hipocresía" en la política exterior alemana

El Gobierno alemán se negó a participar en la acción militar contra el líder libio Muamar al Gadafi. No obstante, vender armas a ambas partes del conflicto no parece ser un problema para Berlín. (21.04.2011)

---

**Fecha** 12.09.2011

**Temas** Kabul, Hamid Karsai, Juan Manuel Santos, Talibanes, América Latina, Colombia, FARC, Irak, Armas, Nueva York

**Palabras clave** tráfico, armas, viktor bout, nueva york, farc, colombia, talibanes, afganistán, áfrica, asia, américa latina, ee. uu., irak, mercado, oferta, demanda, criminales, guerras

**Imprimir** Imprimir esta página

**Enlace permanente** https://p.dw.com/p/12XU9

---

Usamos cookies a fin de mejorar nuestro servicio. Encontrará más información en nuestras Políticas de privacidad.        Más información    OK



Advertisement

POLITICS

# Arms dealer Viktor Bout is tried in New York

The trial of Viktor Bout, an alleged arms dealer, begins in New York. He is accused of selling weapons to the Colombian FARC and the Taliban of Afghanistan.



Viktor Bout: "One of hundreds."

The consequences of Viktor Bout's business extend from Afghanistan to Colombia. He is accused of alleged arms trafficking for almost two decades to some of the poorest countries in the world, thus contributing to devastating wars. Bout reportedly also transported UN blue helmets to Somalia, flew cargo planes to Iraq for the United States. U.S. and delivered shipments of flowers from South Africa to Dubai.

In general, arms traffickers do not have a certain ideology or lasting alliances. Nor do they believe in great political causes, but represent a nihilism that seeks comfort in money, obtained by any means, whether legal or illegal, moral or immoral.

Viktor Bout was arrested in Thailand after trying to sell weapons to U.S. secret agents. U.S. who posed as members of the Colombian FARC. Finally, Bout was extradited to the U.S. With the consequent disgust of the Russian authorities, given that the alleged arms dealer is of Russian nationality. Now he faces an American court in New York.

## Weapons: the law of supply and demand

During the Cold War, the dispute between the United States. The United States and the Soviet Union gave conflicts in poor countries - at least superficially - a common ideological framework. "Until 1989, a rebel from a developing country basically found out with whom the government for which he was fighting was allied and called the KGB, the CIA or the British Secret Services," Nicholas Marsh, an expert on low-caliber arms trafficking at the Oslo Peace Research Institute, tells Deutsche Welle. "Often, they could get weapons without having to pay for them," he adds.

After the collapse of the Soviet Union and the end of the East-West conflict, the two main superpowers lost their interest in the developing world and ended their generous arms deliveries. But the bloodshed was not over. In many countries, economic benefit replaced ideological persuasion as a driver of conflicts. That transformed the war into a company subject to market opinions with a significant demand for low-

caliber weapons.

Meanwhile, the former communist countries, highly militarized, were falling into social chaos. Their weapons reserves, originally intended to be used against Western armies, no longer had a practical function. And the military officers, poorly paid and ideologically disappointed, made money selling weapons that were state-owned.

Viktor Bout, who served the Soviet Air Force and, like him, other arms traffickers, saw there an opportunity to unite supply with demand. They took advantage of that opportunity and began to build an illegal network of arms sellers.



Arms trade in Mogadishu.

"It is a global business like any other, in which the laws of supply and demand govern," Hugh Griffiths, an expert in low-caliber weapons at the Stockholm International Peace Research Institute (SIPRI), tells Deutsche Welle. "Viktor Bout is right to say that he is just a businessman. And he didn't lie when he said it. There are more than 30 or 40 individuals like him," the expert adds.

Traffickers often share common characteristics: they are former pilots, have ties with the army, are good at mathematics and speak several languages. "They are players, attractive and fun personalities," says Griffith, who already interviewed arms traffickers during his field work for the UN, the European Union and numerous governments. "They have worked in Africa, so they have a different point of view about human life, unlike comfortable Europeans who do not understand that, sometimes, a life is worth nothing," Griffith says.



Amnesty International: Protest against the arms trade.

### A gray area within the law

"It is a mixture of legality, semi-legality or illegality that can contribute a huge amount of weapons," Michael Ashkenazi, an expert in the sale of low-caliber weapons at the Bonn International Center for Conversion, tells Deutsche Welle. "It is a very diverse market, very dynamic, very difficult to track. And trying to do is very difficult to understand how it works in its entirety, except in general terms," says Ashkenazi.

Legally purchased weapons often leave state reserves through bribes. For that purpose, end-user certificates are falsified, which are those that document who will ultimately use those weapons. Traffickers transport weapons by manipulating lax controls on air traffic in poor countries. The planes are diverted or simply the names of the ship and its license plate are changed.

"The point is, to put it bluntly, that an escalation in the spiral of armaments in a fragile country or society in itself tends to create a conflict that will produce many victims," Ashkenazi explains. "It's not that the weapons themselves create the problem. It happens that, if the problem already exists and the weapons arrive, then it will become a bloody matter."

## Viktor Bout, one in hundreds

While most countries recognize the destabilizing impact of low-caliber weapons on fragile societies, experts suspect that States are complicit in the same problem they denounce.

Although the United States. The United States and the European Union have relatively strict export laws, second-class producing countries, such as Serbia, Ukraine, China, Turkey and Iran, often have less scruples. But even the United States. The United States and Russia will tolerate the Bout of the world until they continue to maintain a low profile.

In fact, Washington had not targeted Viktor Bout until accusations arose that he had given weapons to the Taliban. It was the straw that broke

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 35 of 632

the camel's back, since Bout had already crossed paths with U.S. interests before when trying to sell weapons to the Colombian rebel group FARC, considered by the U.S. Government. U.S. as a terrorist group.



"But he was caught because he upset the Americans, and not because someone thought he was a bad guy," Ashkenazi says. "Everyone knew he was a bad guy, but suddenly, he took a false step. Replace Bout now with Mr. XZY, multiply it by one hundred and you will have the existing number of arms traffickers," he exemplifies.

Bout is accused of trying to sell weapons to the FARC.

Meanwhile, Moscow has criticized Bout's extradition saying that he is politically motivated, and has requested his return to Russia. "It is a matter of national image not to want to see a high-profile citizen being tried abroad," says Marsh. "There are rumors that Bout is closely linked to the Russian secret services, but I don't know how far they are founded. If that were the case and Bout were judged, that would probably come to light," he stresses.

But Bout will not face justice because he allegedly sold weapons, but because, if he did, he sold them to the wrong person at the wrong time. "It's a market necessity," says Griffith. "That is the market that we have created, and those people are fulfilling a service and a function that a wide number of actors and agencies believe is necessary to fulfill."

Author: Spencer Kimball / Cristina Papaleo
Editor: Emilia Rojas-Sasse

## DW RECOMMENDS

### "Europe observes Russian-Venezuelan relations with concern"
Sergei Lavrov, the Russian Minister of RR. USA, travel to Lima; then it will go to Caracas. Deutsche Welle spoke with experts about the Kremlin emissary's Latin American tour and about Moscow's interests in the region. (23.08.2011)

### The oil factor in the Libyan war
The West's support for the Libyan rebels was not only motivated by the ideals of freedom and democracy, but also by clear economic interests, that is, by access to oil, experts analyze. (22.08.2011)

### Tank sale: "German government must give explanations"
The scandal over the sale of German Leopard tanks to Saudi Arabia demonstrates a serious dichotomy between values and economic interests in the German government, editorialists say. (07.07.2011)

### Controversy in Germany over the sale of tanks to Saudi Arabia
The plans to sell 200 German "Leopard" tanks to Saudi Arabia will now also be discussed within the Bundestag. Criticism of the arms treatment comes not only from the opposition. (05.07.2011)

### Organized crime groups are "multinational corporations"
Flexible networking and interdependent relationships with other groups around the world are some of the characteristics of today's transnational organized crime. Their combat is a global challenge, experts say. (06.06.2011)

### Gaddafi throws cluster bombs "Made in Europe"
The fact that the MAT-120 mortar shells that Gaddafi's forces exploded on Misrata are Spanish fuels the discussion about the sale of European and American weapons to authoritarian regimes in the world. (16.04.2011)

### Arms export: "hypocrisy" in German foreign policy
The German government refused to participate in the military action against the Libyan leader Muammar al Gaddafi. However, selling weapons to both parties to the conflict does not seem to be a problem for Berlin. (21.04.2011)

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 36 of 632

**Date** 12.09.2011

**Topics** Kabul, Hamid Karsai, Juan Manuel Santos, Taliban, Latin America, Colombia, FARC, Iraq, Weapons, New York

**Keywords** traffic, weapons, viktor bout, new york, farc, colombia, Taliban, afghanistan, Africa, asia, latin america, USA, Iraq, market, supply, demand, criminals, wars

**Print** Print this page

**Permanent link** https://p.dw.com/p/12XU9

We use cookies in order to improve our service. You will find more information in our Privacy Policies.

More information      OK



**Interview with a Mayo Clinic expert.**

A cancer expert answers questions about making treatment decisions & preparing for future when you have Breast Cancer

Sponsored By **Mayo Clinic**

ESP | **AME** | MEX | BRA | CAT | ENG

SUSCRÍBETE    INICIAR SESIÓN

INTERNACIONAL    SUSCRÍBETE    INICIAR SESIÓN

## INTERNACIONAL

EUROPA    EE UU    MÉXICO    AMÉRICA LATINA    ORIENTE PRÓXIMO    ASIA    ÁFRICA    FOTOS    OPINIÓN    ÚLTIMAS NOTICIAS

Te quedan **6** artículos gratis este mes

SUSCRÍBETE

# Detenido en Bangkok el mayor traficante de armas

El ruso Víktor Bout iba a realizar una venta a las FARC, según la policía



 

**AGENCIAS**
**Bangkok** 06 MAR 2008 - 18:00 EST

Víktor Bout, el *señor de la guerra* que Nicolas Cage interpretó en el cine, el hombre capaz de vender armas simultáneamente a dios y al diablo sin hacerse un solo rasguño, perdió finalmente su buena estrella en un hotel de lujo de Bangkok: la policía tailandesa detuvo ayer a Bout, de 41 años, uno de los más esquivos y famosos traficantes de armas del mundo, y probablemente será extraditado a Estados Unidos.

Este ciudadano ruso, ex oficial del KGB de la época soviética, se había erigido en una leyenda en el macabro sector del tráfico de armas, donde se le conocía como *Mercader de la muerte.* Su imperio cuenta con al menos 40 avionetas, que se han desplazado por medio mundo: a Afganistán cuando se enfrentaban talibanes y la Alianza del Norte -a ambos les vendió AK47 para que se liquidaran mutuamente-, a Angola para nutrir a UNITA, a Sierra Leona y Liberia para dar munición a Charles Taylor, a Líbano, a Filipinas... Desde 2002 pesaba sobre él una orden internacional de arresto, solicitado por Bélgica y expedido por la Interpol, y Estados Unidos llevaba años pisándole los talones. Siempre en vano. Hasta que llegó a Bangkok.

A la capital tailandesa llegó presuntamente a cerrar otro buen negocio, esta vez con las Fuerzas Armadas Revolucionarias de Colombia (FARC), la mayor guerrilla de América. Pero aterrizó en mala hora: el pasado sábado, una ofensiva del Ejército colombiano contra las FARC en tierra ecuatoriana provocó la muerte del *número dos* de la guerrilla, Raúl Reyes, y una

veintena de rebeldes. En la acción, que ha desencadenado una grave crisis diplomática entre Bogotá, Quito y Caracas, el Ejército de Colombia se incautó de ordenadores repletos de documentos secretos de las FARC. Los analistas coinciden en que de las *tripas* de estos portátiles salieron los hilos que condujeron hasta el hotel de lujo de Tailandia en el que discretamente había reservado Bout una habitación.









"[Bout] estaba en el país para intentar vender armas a las FARC", aseguró el general tailandés Pongpat Chayapan, quien añadió que la policía le seguía desde hace meses, aunque precisó que el traficante entró ayer mismo al país. Otras fuentes apuntan que llevaba en Tailandia desde enero y que iba cambiando de hotel periódicamente.

Según *The New York Times,* ayer mismo fue interrogado por agentes estadounidenses en Bangkok. EE UU impuso en octubre de 2006 sanciones específicas contra todas las empresas relacionadas con Bout, al que Amnistía Internacional considera "el hombre de negocios más prominente" relacionado con el tráfico de armas internacional.

Chayapan subrayó que Tailandia emprenderá acciones legales contra Bout, que nunca ha comparecido ante un tribunal por tráfico de armas, con independencia de que decida "deportarle a otro país, probablemente Estados Unidos".

Únete ahora a EL PAÍS para seguir toda la actualidad y leer sin límites

**SUSCRÍBETE AQUÍ**



El ex espía y traficante de armas ruso Víktor Bout, tras ser detenido ayer en Bangkok.  EFE

* Este artículo apareció en la edición impresa del jueves, 06 de marzo de 2008.

Se adhiere a los criterios de   **The Trust Project**

**Más información >**



 

**ARCHIVADO EN:**

Interpol   Tráfico Armas   Tailandia   Orden Público   Seguridad Ciudadana   Cooperación Policial   Detenciones   FARC   Sudeste Asiático   Delitos Orden Público   Seguridad Nacional   Colombia   Estados Unidos   Política Exterior   Sucesos   Defensa   Grupos Terroristas   Asia

**CONTENIDO PATROCINADO**

1 in 2 Mac Users Are Unaware of This Mac Trick

MACKEEPER

[Fotos] Adiós A Walmart, Todas Sus Tiendas Van A Cerrar En Este Año 2021

PLAYSSTAR

El costo de los planes complementarios de Medicare de 2021 podría sorprenderlo

MEDICARE PLANS | BUSCAR ANUNCIOS

**Y ADEMÁS...**

1 in 2 Mac Users Are Unaware of This Mac Trick

MACKEEPER

[Fotos] Adiós A Walmart, Todas Sus Tiendas Van A Cerrar En Este Año 2021

PLAYSSTAR

Aurah Ruiz posa con su 'nueva ilusión' tras su ruptura con Jesé Rodríguez

AS.COM

recomendado por

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 41 of 632



**NEWSLETTER**
Recibe el boletín de Internacional

---

**TE PUEDE INTERESAR**

Las nuevas variantes del coronavirus convierten la inmunidad de rebaño en una meta inalcanzable a corto plazo

Un aeropuerto y unos Juegos Olímpicos para salir de las trincheras del 'procés'

El gran informe científico sobre cambio climático responsabiliza a la humanidad del aumento de fenómenos extremos

El piloto acrobático al que le faltaron 10 metros

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 42 of 632

PRESERVAR EL PLANETA



Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 43 of 632



## La lucha contra las superbacterias de un microbiólogo saudí

Hosam Zowawi dirige un departamento de investigación en la universidad de Queensland (Australia) que analiza microbios que resisten a los fármacos

---

**LO MÁS VISTO EN...**

Top 50

| EL PAÍS | Internacional |
|---|---|

Los talibanes asestan un duro golpe a las fuerzas afganas con la conquista de la estratégica Kunduz

Guerra al K-pop: Kim Jong-un redobla su cruzada cultural contra Corea del Sur

Rebeca Andrade, una excepción en un país que no valora el deporte

Cientos de inmigrantes cruzan el canal de la Mancha: "No tengo nada que perder"

Londres endurece su legislación contra la inmigración irregular

Cuando la política se impone a las medallas

Ortega y Murillo liquidan el proceso electoral al cancelar al último partido opositor en Nicaragua

Los nuevos planes lejos de la política de Jared Kushner, el yerno de Trump

▶ "Ha sido el infierno, todo se ha quemado"

La policía italiana detiene a una jefa de la Camorra cuando iba a viajar a España

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 44 of 632



Interview with a Mayo Clinic expert.

A cancer expert answers questions about making treatment decisions & preparing for future when you have Breast Cancer

Sponsored By **Mayo Clinic**

SPA   **AME**   MEX   BRA   CAT   ENG

SUBSCRIBE    LOG IN

☰   INTERNATIONAL   SUBSCRIBE   LOG IN

INTERNATIONAL

EUROPE   USA   MEXICO   LATIN AMERICA   MIDDLE EAST   ASIA   AFRICA   PHOTOS   OPINION   LATEST NEWS

You have left **6** free articles this month   SUBSCRIBE

# The largest arms dealer arrested in Bangkok

Russian Viktor Bout was going to make a sale to the FARC, according to the police

 

**AGENCIES**
**Bangkok** · MAR 06, 2008 - 6:00 PM EST

Viktor Bout, the *warlord* that Nicolas Cage played in the movies, the man capable of selling weapons simultaneously to God and the devil without making a single scratch, finally lost his good star in a luxury hotel in Bangkok: the Thai police arrested yesterday Bout, 41, one of the most elusive and famous arms traffickers in the world, and will probably be extradited to the United States.

This Russian citizen, a former KGB officer of the Soviet era, had become a legend in the macabre arms trafficking sector, where he was known as *the Merchant of Death.* His empire has at least 40 planes, which have moved around the world: Afghanistan when they faced the Taliban and the Northern Alliance - both sold AK47 to liquidate each other -, Angola to nourish UNITA, Sierra Leone and Liberia to give ammunition to Charles Taylor, Lebanon, the Philippines ... Since 2002, he had an international arrest warrant, requested by Belgium and issued by Interpol, and the United States had been on his heels for years. Always in vain. Until he arrived in Bangkok.

In the Thai capital he allegedly closed another good business, this time with the Revolutionary Armed Forces of Colombia (FARC), the largest guerrilla in America. But it landed at a bad time: last Saturday, an offensive by the Colombian Army against the FARC on Ecuadorian soil caused the death of the *number two* guerrilla, Raúl Reyes, and about twenty rebels. In

the action, which has triggered a serious diplomatic crisis between Bogotá, Quito and Caracas, the Colombian Army seized computers full of secret FARC documents. Analysts agree that from the *guts* of these laptops came the threads that led to the luxury hotel in Thailand where Bout had discreetly booked a room.



"[Bout] was in the country to try to sell weapons to the FARC," said Thai General Pongpat Chayapan, who added that the police have been following him for months, although he specified that the trafficker entered the country yesterday. Other sources point out that he had been in Thailand since January and that he was changing hotels periodically.

According to *The New York Times,* just yesterday he was interrogated by American agents in Bangkok. In October 2006, the United States imposed specific sanctions against all companies related to Bout, whom Amnesty International considers "the most prominent businessman" related to international arms trafficking.

Chayapan stressed that Thailand will take legal action against Bout, who has never appeared in court for arms trafficking, regardless of whether he decides to "deport him to another country, probably the United States."

Join EL PAÍS now to follow all the news and read without limits

**SUBSCRIBE HERE**

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 46 of 632



Former Russian spy and arms dealer Viktor Bout, after being arrested yesterday in Bangkok.   EFE

* This article appeared in the printed edition of Thursday, March 6, 2008.

It adheres to the criteria of  The Trust Project

**More information >**



 

 **FILED IN:**

Interpol   Trafficking In Arms   Thailand   Public Order   Public Security   Police Cooperation   Detentions   FARC   Southeast Asia   Crimes Public Order   National Security   Colombia   United States   Foreign Policy   Events   Defense   Terrorist Groups   Asia

**SPONSORED CONTENT**

1 in 2 Mac Users Are Unaware of This Mac Trick

MACKEEPER

[Photos] Goodbye to Walmart, All Its Stores Will Close This Year 2021

PLAYSSTAR

The cost of Medicare supplemental plans for 2021 could surprise you

MEDICARE PLANS | SEARCH ADVERTISEMENTS

**AND ALSO...**

1 in 2 Mac Users Are Unaware of This Mac Trick

MACKEEPER

[Photos] Goodbye to Walmart, All Its Stores Will Close This Year 2021

PLAYSSTAR

Aurah Ruiz poses with her 'new illusion' after her break with Jesé Rodríguez

AS.COM

recommended by

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 48 of 632



NEWSLETTER
Receive the International newsletter

**YOU MAY LIKE**

New variants of coronavirus make herd immunity an unattainable goal in the short term

An airport and an Olympic Games to get out of the trenches of the 'process'

The great scientific report on climate change blames humanity for the increase in extreme events

The acrobatic pilot who was missing 10 meters

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 49 of 632

PRESERVE THE PLANET



Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 50 of 632



## The fight against superbacteria of a Saudi microbiologist

Hosam Zowawi heads a research department at the University of Queensland (Australia) that analyzes microbes that resist drugs

**THE MOST SEEN IN...**                                                                                    Top 50

EL PAÍS                                                          International

The Taliban deal a hard blow to Afghan forces with the conquest of the strategic Kunduz

War on K-pop: Kim Jong-un doubles his cultural crusade against South Korea

Rebeca Andrade, an exception in a country that does not value sport

Hundreds of immigrants cross the English Channel: "I have nothing to lose"

London tightens its legislation against irregular immigration

When politics prevails over medals

Ortega and Murillo liquidate the electoral process by canceling the last opposition party in Nicaragua

The new plans away from the policy of Jared Kushner, Trump's son-in-law

▶  "It has been hell, everything has burned"

Italian police arrest a Camorra chief when she was going to travel to Spain

# CNN.com./WORLD

SEARCH  ● The Web  ○ CNN.com  [ ]  [ Search ]

| | |
|---|---|
| Home Page | |
| World | |
| U.S. | |
| Weather | |
| Business | |
| Sports | |
| Politics | |
| Law | |
| Technology | |
| Science & Space | |
| Health | |
| Entertainment | |
| Travel | |
| Education | |
| Special Reports | |

**SERVICES**
**Video**
**E-mail Newsletters**
**CNNtoGO**
**SEARCH**

Web ○ CNN.com ○
[ ]
[ Search ]

advertisement

## Police: Mohammed visited Brazil in 1995

### Top al Qaeda suspect was in haven for terrorists

Sunday, March 9, 2003 Posted: 1:03 AM EST (0603 GMT)

**SAO PAULO, Brazil (CNN) -- Top al Qaeda suspect [Khalid Shaikh Mohammed](#) spent nearly three weeks in Brazil in December 1995, visiting a region with many Arabs, Brazilian police told CNN on Saturday.**

International and regional intelligence officials said the area Mohammed visited in Foz de Iguacu, along Brazil's porous border with Argentina and Paraguay, has been a source of funds and a haven for terrorist groups, including some believed to work closely with Osama bin Laden's al Qaeda network.

Police data show that Mohammed, the terror network's reputed operations chief, was in Brazil from December 4-25. He entered the country via Sao Paulo from Pakistan and left for Holland from Rio de Janeiro, police said.

Mohammed was captured March 1 in Rawalpindi, Pakistan. His arrest has been heralded as the biggest in the war on terror since it was launched after the terrorist attacks of September 11, 2001, in which about 3,000 people were killed. United States officials said he helped plan the attacks on New York and Washington.

A Brazilian police spokesman said investigators are trying to determine why Mohammed was in Brazil and where he went during his visit.

Leaders of the southern region's Arab community have denied links to terrorist groups and say they are being targeted unfairly because of their ethnic backgrounds.

There was no warrant out for Mohammed's arrest at the time of his visit to Brazil.

Police learned of his visit in June 1998, when U.S. authorities asked their Brazilian counterparts to watch for him. Police said they have no indication Mohammed has been back to Brazil since 1995.



This image is no longer available

Khalid Shaikh Mohammed is shown in these undated FBI handout photos.

---

**Story Tools**



SAVE THIS    E-MAIL THIS
PRINT THIS    MOST POPULAR

**RELATED**

• Profile: [Mohammed linked to Pearl killing, other attacks](#)

• TIME.com: [The architect of terror](#)

**SPECIAL REPORT**

## WAR AGAINST TERROR

• Interactive: [The hunt for al Qaeda](#)

• Audio slide show: [Bin Laden's audio message, 2/03](#)

• [Terror warning system](#)

• Special report: [Terror on tape](#)

• Special report: [War against terror](#)

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 52 of 632

**Story Tools**



SAVE THIS    EMAIL THIS

PRINT THIS    MOST POPULAR

advertisement

Subscribe to Time for $1.99



**WORLD**                    WORLD NEWS ▶

Iran poll to go to run-off

This image is no longer available

• U.N.: Truck bomb killed Hariri
• EU 'crisis' after summit failure
• U.S. House votes to keep U.N. dues

**TOP STORIES**                    CNN.com HOME PAGE ▶

**CNN/Money:** Security alert issued for 40 million credit cards

• Bin Laden deputy sends message
• U.S. House votes to keep U.N. dues
• Iran poll to go to run-off



**International Edition**    Languages    **CNN TV**    **CNN International**    **Headline News**    **Transcripts**    **Advertise With Us**    **About Us**

SEARCH    The Web ⦿  CNN.com ○    [                    ]  Search

© **2005 Cable News Network LP, LLLP.**
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us.

All external sites will open in a new browser. CNN.com does not endorse external sites.

✳ Denotes premium content.

XML  Add RSS headlines.

FRONT PAGE

# Al-Qaida southof the border



**By WND Staff**
**Published February 16, 2004 at 1:00am**

*Editor's note: Joseph Farah's G2 Bulletin is an online, subscription intelligence news service from the creator of WorldNetDaily.com – a journalist who has been developing sources around the world for the last 25 years.*

WASHINGTON – Pentagon officials have confirmed human smuggling rings in Latin America are attempting to sneak al-Qaida operatives into the U.S., information first reported in Joseph Farah's G2 Bulletin more than a year ago.

In a Defense Department briefing Friday about National Guardsman Ryan Anderson, suspected of trying to give al-Qaida information about U.S. capabilities and weaponry, reporters were also told to expect Defense Secretary Donald Rumsfeld to provide details on two other subjects: Guantanamo Bay prisoners freed only to rejoin al-Qaida and Taliban cells in Afghanistan and al-Qaida's Latin America connection.

No further announcements were forthcoming from the Pentagon, prompting some sources to wonder whether the administration was conflicted over this news – given President

Bush's political problems with his illegal-alien amnesty program.

Before the U.S.-led coalition attacked Iraq last year, the U.S. State Department offered congressional testimony that both al-Qaida and the Shiite terrorist group Hezbollah were taking firm hold in "America's backyard."

Mark F. Wong, the State Department's acting coordinator for counterterrorism, told the House International Relations Committee about the threat posed by both groups in Latin America.

Yet, then the matter seems to have been dropped – perhaps for diplomatic reasons, perhaps for political reasons.

But last November, G2 Bulletin reported authorities in Silvio Pettirosi International Airport in Asuncion, the Paraguayan capital, reported the arrival of a growing number of visitors carrying European passports, but undoubtedly appearing to be more Middle Eastern than anything else.

Some of these "Europeans" could not even speak the language of their so-called mother land.

A police officer in touch with a Middle Eastern embassy said he

had conducted a review trailing back on the moves of a certain Belgian, with a distinct Vallon name. This Belgian's trip began in Cairo on Egypt Air 203 en route to Milan. From there he continued to London on board a BA 209 flight, which continued to Miami where he boarded American flight 995 to Asuncion.

Details of the suspicious Vallon were passed on to the Paraguayan authorities and then to a number of western embassies and representatives of intelligence agencies. This case, described to G2B by a western diplomat, is a rare example. Due to the devious intricacy of such a trip the Paraguayan authorities cannot be absolutely sure how many of these "Europeans," speaking fluent Arabic, but just basic French, Spanish or English, had entered the country during the last few weeks. However, there was very little doubt most of these visitors went on to find their way to the triple border region where Argentina, Brazil and Paraguay meet. This region, often described as a lawless area, is nicknamed by some intelligence station agents as "The Muslim Triangle meeting zone."

Intelligence experts have been warning since the late 1990s they had noticed a tendency among Islamic terrorists to operate from Paraguay, a landlocked country in the heart of South America, with a territory slightly smaller than California, and with geographic extremes perfect for hiding illegal activities. Information surrounding such activities arrived in the U.S.

before 9/11 but failed to sound any alarms. Today dealing with Islamic terrorism in Latin America is still not considered to be of high importance and often even politically incorrect.

G2 Bulletin reported last fall the terrorists using Argentina are organized in active cells around the country with safe houses in neighboring Paraguay. An Argentinean document seen by G2B describes part of the drug-smuggling trail, as well as that of weapons and people. These elaborate trails run through a web of border crossings pointing also to the complex cooperation between various "smuggling experts." These belong to jihadi organizations such as al-Qaida, joining forces with local drug lords, developing and oiling their smuggling mechanism all the way to Mexico aiming ultimately to hit the U.S.

The Argentinean intelligence service assessment, privy among others, to European and Middle Eastern agencies, has reached a significant and grave conclusion, according to G2 Bulletin. It claims since 9/11 and the partial success in the war against terrorism, mainly in the Middle East, Afghanistan and Central Asia, the jihadi pendulum is tilting more and more toward South America. The reason terrorist cells in Paraguay, whether active or dormant, can continue to grow and flourish, is because of widespread corruption in South America.

Immigration is easy. There is a long tradition of harboring

criminals. Even Nazi war criminals were welcomed for years.

The lawlessness and disorder in Paraguay, enabled operatives of such terrorist groups as al-Qaida, Hezbollah, Islamic Jihad and Hamas to feel safe, even in the heart of Asuncion. These organizations, and probably more, turned Paraguay into a logistical base, as one local journalist told G2 Bulletin: "It's easy. At this stage our country is not engulfed in a civil war or guerrilla campaign and, therefore, security forces are more prone to financial kickbacks."

At this stage, G2 Bulletin sources say, the growing danger is that of militant Islam penetrating Mexico, a country with an increasing Muslim community, including Muslim converts. Some of them have ties to the Mexican community and to illegal immigrants' smugglers operating in American states bordering Mexico, especially those with connections in the greater Los Angeles area and other major cities.

Anti-terrorism experts say extremist cells tied to Hezbollah, Islamic Jihad and al-Qaida network are operating in Argentina, Ecuador, Honduras, Mexico, Nicaragua, Paraguay and Uruguay. Although cooperation between al-Qaida and Hezbollah has been known for some time, the two groups have formed a much closer relationship since al-Qaida was evicted from its base in Afghanistan, according to G2 Bulletin.

Representatives of the two groups recently met in Lebanon, Paraguay and an unidentified African country.

Both al-Qaida and Hezbollah were active in the common border area of Colombia, Peru and Ecuador, according to an earlier statement of Deputy Secretary of State Richard Armitage in hearings before the Foreign Appropriations Subcommittee of the House Appropriations Committee, cited in a report from Radio Free Europe/Radio Liberty.

Further to the south in Latin America, Hezbollah and the terrorist Islamic Resistance Movement (Hamas) are operating in the tri-border region of Paraguay, Argentina and Brazil. The suspected activities of these groups include counterfeiting U.S. currency and drug smuggling, with the area in which they function described as a "haven for Islamic extremists" by the administrator of the Drug Enforcement Administration, Asa Hutchinson, in testimony before the House International Relations Committee.

Egyptian intelligence experts active in combating Muslim militancy in Egypt and aware of the role of Egyptian militants in the ranks of al-Qaida and the Taliban, told G2 Bulletin last year that Islamic terrorists shifted their interest from training pilots in the U.S. to schools in South America, where they can study and train practically without any security agencies on their

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 59 of 632

heels.

In addition, another source al-Qaida also found Latin America to be more hospitable as an environment to build laboratories to manufacture non-conventional weapon systems, primarily biological agents, and for testing their effectiveness.

More recently, al-Qaida has become deeply involved in cocaine and heroine trafficking, arms and uranium smuggling, counterfeiting CDs and DVDs and money-laundering activities in the tri-border region of Argentina, Brazil and Paraguay. The tri-border region is known as the heart of Islamic activity in Latin America.

Of growing concern to some U.S. officials is the way the terrorists south of the border might use lax immigration standards to slip into the U.S.

Some 6 million people of Muslim descent live in Latin America and there are reports that many indigenous people are converting to Islam.

The terrorists even get some official support in Latin America, according to some sources. As WorldNetDaily reported, a Venezuelan military defector claims President Hugo Chavez developed ties to terrorist groups such as al-Qaida – even

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 60 of 632

providing it with $1 million in cash after Sept. 11, 2001.

Air Force Maj. Juan Diaz Castillo, who was Chavez's pilot, told WorldNetDaily through an interpreter that "the American people should awaken and be aware of the enemy they have just three hours' flight from the United States."

Diaz said he was part of an operation in which Chavez gave $1 million to al-Qaida for relocation costs, shortly after the Sept. 11, 2001, terrorist attacks on the United States.

Previous stories:

Terrorists active in U.S. 'backyard'

U.S. plans to disarm Hezbollah

Chavez forming axis with Cuba, Brazil?

Subscribe to Joseph Farah's G2 Bulletin.

# Submit a Correction

 **WND Staff**

| Summary | Recent Posts | Contact |

WND news editors compile reports for our readers.

Tags: FROM JOSEPH FARAH'S G2 BULLETIN

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 62 of 632



# MARITIME
# SECURITY

## An Introduction



Michael McNicholas

MS-13 from Panama north to Mexico and into the United States. (In mid-2006, representatives of Colon-based Muslim leaders met with a Honduras representative of MS-13 to establish an agreement for this "business.") The MS-13 *coyotes* seem to favor crossing into the United States in the area of Nuevo Laredo, Mexico.

Let's review some of the reporting of incidents and activities of Islamic terrorist migration from post-September 11, 2001 to early 2004, which highlight the important role played by commercial maritime transportation. [*Some sensitive information from the Phoenix Group Intelligence Reports is not detailed here for the protection of sources and methods.*]

- In October 2001, four Islamic terrorists were transported in a vehicle assigned to Lebanon's Consulate in Panama to the port of Colon Container Terminals, where they were met by a crew member of a cargo freighter docked there. The four men met with the captain and subsequently traveled onboard as passengers, disembarking in Havana, Cuba. This same ship, and others owned by the shipping line, made numerous trips to Cuba with "special Islamic passengers" over the following several years.

- In late 2002, the individual in Figure 7-35 was one of two men arrested at a domestic airport in Panama City, having arrived from a local airport in a small seaport town on the Colombian/Panamanian border. Subsequent investigation revealed that the two individuals were al Qaeda "couriers" and had arrived at the Panama border via a cargo freighter that departed a port in northeast Colombia.

- In early March 2003, four Palestinians described as Hamas members arrived in the port of Cristobal, Panama, from Cartagena, Colombia, onboard a container ship. After a few days of meetings in the Colon mosque with two suspected al Qaeda representatives, the four Hamas members stowed away onboard another commercial container ship and traveled to a specific south Florida port.

- In mid-2003, the coastal freighter Jaguar departed the port of Coco Solo, Panama, with a group of Colombian drug couriers and Islamic terrorists onboard—and with the complicity of the captain and crew. The "passengers" disembarked in Bluefields, Nicaragua. This ship had made several similar voyages with Islamic terrorists and drug couriers during the previous year, disembarking the passengers either in ports in Honduras or Nicaragua.

- In April 2003, the break-bulk cargo vessel Dona Julia Inez arrived in the port of Sambo Bonita (Colon) with three Islamic terrorists onboard. The captain was complicit in the transport of these passengers from Colombia to Panama. At the port, the terrorists were greeted by the Muslim owner of a business in the Colon Free Zone. The terrorists spoke no Spanish and had to communicate with the crew onboard the vessel via hand gestures.



# TERRORIST AND ORGANIZED CRIME GROUPS IN THE TRI-BORDER AREA (TBA) OF SOUTH AMERICA

*A Report Prepared by the Federal Research Division,*
*Library of Congress*
*under an Interagency Agreement with the*
*Crime and Narcotics Center*
*Director of Central Intelligence*

*July 2003*
*(Revised December 2010)*

Author:        Rex Hudson

Project Manager:  Glenn Curtis

**Federal Research Division**
**Library of Congress**
**Washington, D.C.  20540–4840**
Tel:        202–707–3900
Fax:        202–707–3920
E-Mail:      frds@loc.gov
Homepage:  http://loc.gov/rr/frd/

**★ 55 Years of Service to the Federal Government ★**
**1948 – 2003**

### PREFACE

This report assesses the activities of organized crime groups, terrorist groups, and narcotics traffickers in general in the Tri-Border Area (TBA) of Argentina, Brazil, and Paraguay, focusing mainly on the period since 1999. Some of the related topics discussed, such as governmental and police corruption and anti–money-laundering laws, may also apply in part to the three TBA countries in general in addition to the TBA. This is unavoidable because the TBA cannot be discussed entirely as an isolated entity.

Based entirely on open sources, this assessment has made extensive use of books, journal articles, and other reports available in the Library of Congress collections. It is based in part on the author's earlier research paper entitled "Narcotics-Funded Terrorist/Extremist Groups in Latin America" (May 2002). It has also made extensive use of sources available on the Internet, including Argentine, Brazilian, and Paraguayan newspaper articles. One of the most relevant Spanish-language sources used for this assessment was Mariano César Bartolomé's paper entitled *Amenazas a la seguridad de los estados: La triple frontera como 'área gris' en el cono sur americano* [Threats to the Security of States: The Triborder as a 'Grey Area' in the Southern Cone of South America] (2001). The selective bibliography includes books, journal articles, and other reports. Newspaper and magazine articles are footnoted. This report also includes an appendix containing brief profiles of five alleged operatives of Islamic fundamentalist groups in the TBA and a diagram of drug-trafficking routes in the region.

The information cutoff date used in this report is July 2003. Thus, it lacks any updated information about the individuals discussed in it. However, the study has been partially edited as of November 2010 to reflect the fact that Rajkumar Sabnani or Rajkumar Naraindas Sabnani, whose alleged fund-raising or money laundering on behalf of TBA extremists was reported in the original edition, has been completely exonerated of any involvement. Sabnani is a prominent and respected businessman residing in Hong Kong. Moreover, criminal proceedings against Sabnani's relatives and employees in Paraguay were officially closed, and all parties were acquitted and absolved of any guilt or punishment in July 2007. Therefore, the information about Sabnani and his associates has been removed from this version of the study.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 66 of 632

# TABLE OF CONTENTS

PREFACE ................................................................................................................................. i

EXECUTIVE SUMMARY ...................................................................................................... 1
    Islamic Terrorist Groups and Activities in the Tri-Border Area (TBA)................................ 1
    Organized Crime Groups and Activities in the TBA ............................................................. 2
    Efforts to Counter the Use of the TBA by Organized Crime and Terrorist Groups ................ 3

INTRODUCTION ................................................................................................................... 4

GEOGRAPHY, SOCIETY, AND ECONOMY ....................................................................... 6
    Geography ............................................................................................................................. 6
        *Ciudad del Este* ............................................................................................................. 6
        *Foz do Iguaçu* ............................................................................................................... 7
        *Puerto Iguazú* ............................................................................................................... 7
    Society .................................................................................................................................. 8
        *The General Population of the TBA* ............................................................................... 8
        *Muslim Population* ........................................................................................................ 9
    Economy ............................................................................................................................ 10

ILLICIT ACTIVITIES BY ISLAMIC TERRORIST GROUPS IN THE TBA ......................... 12
    Background ......................................................................................................................... 12
    The Islamic Terrorist Presence in the TBA, 1999-June 2003 ............................................. 14
    Terrorist Fund-Raising in the TBA .................................................................................... 24
        *Narcotics Trafficking* ................................................................................................. 24
        *Other Fund-Raising Activities* .................................................................................... 26
    TBA-Related Violence Against Local Officials .................................................................. 31
    Clandestine Terrorist Communications in the TBA ............................................................ 32
    TBA-Linked Islamic Terrorist Activities Elsewhere in the Southern Cone ......................... 34
        *Chuy, Uruguay, and Chuí, Brazil* ............................................................................... 35
        *Iquique, Chile* ............................................................................................................ 36

OTHER ORGANIZED CRIME ACTIVITIES IN THE TBA .................................................. 37
    Indigenous Organized Crime Groups ................................................................................ 38
        *Argentina* ................................................................................................................... 38
        *Paraguay* .................................................................................................................... 39
    Non-Indigenous Organized Crime Groups ........................................................................ 40
        *The Chinese* ............................................................................................................... 40
        *The Colombians* ......................................................................................................... 45
        *The Russians* .............................................................................................................. 46
    TBA-Related Governmental Corruption ............................................................................ 47
        *Argentina* ................................................................................................................... 47
        *Brazil* ......................................................................................................................... 47
        *Paraguay* .................................................................................................................... 48
    Money Laundering ............................................................................................................. 50

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 67 of 632

*TBA in General* ...............................................................................................50
*Ciudad del Este* ..............................................................................................52
*Foz do Iguaçu* ...............................................................................................53
Other Organized Crime Activities in the TBA ...........................................55
*Automobile Smuggling* ..................................................................................55
*Counterfeiting and Piracy of Products* .........................................................57
Argentina and Brazil ...............................................................57
Paraguay...................................................................................57
*Internet Crime* ................................................................................................59

COMBATING ORGANIZED CRIME AND TERRORIST GROUPS IN THE TBA ...............60
Security Forces...............................................................................................60
*Argentina*.......................................................................................................60
*Brazil* ............................................................................................................63
*Paraguay*.......................................................................................................65
The TBA's Immigration Control Problem.....................................................66

CONCLUDING POINTS .............................................................................................68
The TBA as a Haven and Base for Islamic Terrorist Groups .......................68
The TBA as a Center for Organized Crime ..................................................68
Efforts to Counter Organized Crime and Terrorism in the TBA ..................69

APPENDIX....................................................................................................................71
Alleged Operatives of Islamic Fundamentalist Groups in the TBA .............71
*Barakat, Assad Ahmad Mohamad (Hizballah)* .............................................71
*Fayad, Sobhi Mahmoud (Hizballah)*.............................................................72
*Mehri, Ali Khalil (Hizballah)*.......................................................................74
*Mukhlis, El Said Hassan Ali Mohamed (al-Gama'a al-Islamiyya)* ...............75
*al-Qadi, Marwan 'Adnan ("Marwan al-Safadi") (Hizballah)* ........................77

SELECTIVE BIBLIOGRAPHY .......................................................................................79

Figures

Figure 1. Drug-Trafficking Routes in the Tri-Border Area .......................................46
Figure 2. The FARC's Havens in Brazil....................................................................56
Figure 3. Tri-Border Area and Key Roads Leading to It from Major Cities ................78

Table

Table 1. Amounts of Money Reported Laundered in the Tri-Border Area (TBA), 1992-2001 ....51

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 68 of 632

**EXECUTIVE SUMMARY**

**Islamic Terrorist Groups and Activities in the Tri-Border Area (TBA)**

This review of the available open-source information on Islamic terrorist group activities in Tri-Border Area (TBA) during the 1999 to 2003 period provides substantial evidence for concluding that various Islamic terrorist groups have used the TBA—where Argentina, Brazil, and Paraguay meet—as a haven for fund-raising, recruiting, plotting terrorist attacks elsewhere in the TBA countries or the Americas in general, and other such activities. Islamic terrorist groups with a presence in the TBA reportedly include Egypt's Al-Gama'a al-Islamiyya (Islamic Group) and Al-Jihad (Islamic Jihad), al Qaeda, Hamas, Hizballah, and al-Muqawamah (the Resistance; also spelled al-Moqawama), which is a pro-Iran wing of the Lebanon-based Hizballah. Islamic terrorist groups have used the TBA for fund-raising, drug trafficking, money laundering, plotting, and other activities in support of their organizations. The large Arab community in the TBA is highly conducive to the establishment of sleeper cells of Islamic terrorists, including Hizballah and al Qaeda. Nevertheless, as many as 11,000 members of the Islamic community in the TBA may have moved since late 2001 to other less closely watched Arab population centers in South America.

Hizballah clearly derives a quite substantial amount of income from its various illicit activities in the TBA, in addition to financial support from the government of Iran and income derived from narcotics trafficking in Lebanon's Al Beqa'a Valley. Reports of Iranian intelligence agents being implicated in Hizballah-linked activities in the TBA since the early 1990s suggest direct Iranian government support of Hizballah activities in the region. Lebanese government political support of the sizeable Lebanese community in the TBA extends to Hizballah members in the region because of Hizballah's influence in Lebanon's politics and society.

News media reports in recent years of al Qaeda's presence in the TBA and of cooperation between Hizballah and al Qaeda in the region first surfaced in mid-1999, based on reported identification of al Qaeda operatives in the TBA by Argentine intelligence. The conventional thinking is that the Sunni-oriented al Qaeda and the Shi'ite-oriented Hizballah would never cooperate, but it seems more likely that the reported cooperation is emblematic of a larger

strategic alliance between the two organizations.[1] News media reports since 1999 of foiled terrorist plots against U.S. embassies and the arrest of several terrorists linked to al Qaeda—including Ali Khalil Mehri, El Said Hassan Ali Mohammed Mukhlis, Marwan 'Adnan al-Qadi ("Marwan al-Safadi"), and Mohamed Ali Aboul-Ezz Al-Mahdi Ibrahim Soliman (also spelled Mohamad Ali Abao-Ezz El-Mahdi Ibrahim Suliman)—suggest that al Qaeda has a presence in the region. Al Qaeda may have begun to establish a network in the TBA when Osama bin Laden and Khalid Sheikh Mohammed reportedly visited the area in 1995. Al Qaeda's activities in the TBA are reportedly linked to trafficking of arms, drugs, and uranium, as well as money laundering, in association with Chinese and Russian (Chechen) mafias.

If a Cable News Network (CNN) report is correct that an Islamic terrorist summit was held in the TBA in late 2002 to plan terrorist attacks against U.S. and Israeli diplomatic facilities in the South American region, then attacking these targets would appear to be a high priority for al Qaeda, Hizballah, and other Islamic terrorist groups that may have a presence in the TBA. Plotting by TBA-based terrorists linked to Hizballah and al Qaeda to blow up the U.S. Embassy in Asunción began in 1996. The embassy most likely remains one of the primary U.S. targets of Islamic terrorist groups in the region. In 2000-01, TBA-based al Qaeda operatives expanded their targeting to include the U.S. and Israeli embassies in Asunción and the U.S. embassies in Montevideo and Quito (Israel closed its embassy in Asunción in early 2002). The pattern of these foiled plots strongly suggests that TBA-based Hizballah and/or al Qaeda operatives will again attempt to carry out simultaneous terrorist attacks against two or more U.S. embassies or consulates in South America. Targets could also include hotels, tourism centers, airports, or multinational companies, especially those of Israeli, German, French, or U.S. origin.[2]

**Organized Crime Groups and Activities in the TBA**

In addition to Islamic terrorist groups, the TBA provides a haven that is geographically, socially, economically, and politically highly conducive for allowing organized crime and the

---

[1] Hisham al-Qarawi, "Has Bin-Ladin Made An Alliance With Mughanniyah in Latin America?" *Al-Arab al-Alamiyah* [London-based Libyan daily providing independent coverage of Arab and international issues with a strong pro-Libyan, Arab nationalist, and anti-United States editorial line], November 14, 2002, 2, as translated from the Arabic for FBIS, "Article Views Possibility of Al-Qa'ida-Hizballah Alliance in Latin America," November 14, 2002 (FBIS Document ID: GMP20021114000092).
[2] María Luisa Mac Kay, *Clarín* staff, *Clarín* (Internet version-www), October 18, 2002, as translated by FBIS Document ID: LAP20021018000021, "Argentina Put on Heightened Security Alert in View of Potential Terrorist Attack," October 18, 2002.

corrupt officials who accept their bribes or payoffs to operate in a symbiotic relationship that thrives on drug and arms trafficking, money laundering, and other lucrative criminal activities. As of 2001, money laundering in the TBA, aided by special CC-5 accounts for non-residents and other mechanisms, reportedly was averaging US$12 billion a year. Ciudad del Este and Foz do Iguaçu are the region's principal money-laundering centers. Ciudad del Este was generating US$12 to US$13 billion in cash transactions annually, making it the third city worldwide behind Hong Kong and Miami. However, that figure may have fallen since then as a result of stricter Argentine and Brazilian customs systems.

Numerous organized crime groups, including the Lebanese Mafia, are known to use the TBA for illicit activities such as smuggling, money laundering, and product piracy. Although it is unclear whether the Lebanese Mafia and Hizballah are basically synonymous or entirely separate entities, there is probably a close relationship between them. In any case, the Hizballah organization in the TBA is known to collaborate with various mafias, including the Hong Kong Mafia.

Indigenous crime groups operating in the TBA include the Argentine, Brazilian, and Paraguayan mafias. Non-indigenous mafias operating in the TBA reportedly include syndicates from Chile, China, Colombia, Corsica, Ghana, Libya, Italy, Ivory Coast, Japan, Korea, Lebanon, Nigeria, Russia, and Taiwan. However, a review of open-source news media found information indicating activities mainly by the Chinese, Korean, Lebanese, and Taiwanese mafias. The thriving business of importing counterfeit Compact Disks (CDs) and CD-ROMs from Asia is linked to organized crime in Korea, Lebanon, Libya, and Taiwan. The Hong Kong Mafia is particularly active in large-scale trafficking of pirated products from mainland China to Ciudad del Este and maintains strong ties with Hizballah in the TBA. Unspecified Chinese mafias in the TBA are reportedly seeking to expand into Argentina in order to establish themselves into the duty-free zone of San Luis Province. At least two Chinese mafia groups in the TBA—the Sung-I and Ming families—engage in illegal operations with the Egyptian al-Gama'a al-Islamiyya (Islamic Group).

## Efforts to Counter the Use of the TBA by Organized Crime and Terrorist Groups

Cooperative and individual national efforts of the Argentine, Brazilian, and Paraguayan security forces to fight illicit activities by organized crime and terrorist groups in the TBA appear

to have constrained these activities since late 2001, but by no means eliminated them. Their efforts have been hindered by endemic corruption within the police, criminal justice systems, and governments of the TBA countries; poor pay; inadequate training, equipment, funding, law-enforcement techniques, and penal codes; poor organization; human rights abuses; weak anti-money-laundering laws and enforcement thereof; and secrecy provisions of banking laws (with the exception of Paraguay, whose problem has more to do with not reporting suspicious financial activities).

**INTRODUCTION**

Several free-trade Latin American areas with large Middle Eastern populations allow Islamic terrorist groups, organized crime mafias, and corrupt officials to thrive in a mutually beneficial, symbiotic relationship. These areas include Colombia's Maicao, Venezuela's Margarita Island, Chile's Iquique, and the Tri-Border Area (TBA). This study focuses on the largest and most significant of these areas—the TBA, an enclave adjoining Argentina, Brazil, and Paraguay.



Map showing the Tri-Border Area in the circle.

*Source*: Nuclear Threat Initiative (NTI), October 2002, http://www.nti.org/e_research/e3_16b.html.

Estimates of how much organized crime and corrupt officials profit from these duty-free zones are unavailable, but it is estimated that Islamic fundamentalist groups in the TBA and similar areas in Latin America are sending between US$300 million and US$500 million a year in profits from drug trafficking, arms dealing, and other illegal activities, including money laundering, contraband, and product piracy, to radical Islamic groups in the Middle East.[3] The TBA's Islamic extremist support networks include, in addition to Margarita Island and Iquique, various other centers of Arab population in the region, such as the Paraguayan city of Encarnación, on the border with Argentina, and the Uruguayan town of Chuy, on the border with Brazil.

---

[3] "U.S. General: Islamic Rebels Get Cash from Latin America Gangs," *Orlando Sentinel*, March 10, 2003, A9, citing General James T. Hill, commander of the U.S. Southern Command in Miami.

Hizballah clerics and members of other violent Islamic groups reportedly began planting agents and recruiting sympathizers among Arab and Muslim immigrants in Latin America in the mid-1980s, at the height of the Lebanese civil war. Hizballah cells began to form in the TBA as a result of Hizballah proselytizing in the Lebanese communities. Islamic fundamentalist organizations such as the Islamic Resistance Movement (Harakat al-Muqawamah al-Islamiyya—Hamas), Hizballah, and al-Gama'a al-Islamiyya (Islamic Group) actively use the TBA as a support base, and al Qaeda reportedly has been establishing a presence in the region since at least the mid-1990s. By mid-2000, an estimated 460 Hizballah operatives were thought to be living and working in the TBA.[4] Numerous Lebanese and Palestinian extremists arrived in the TBA from Colombia in October 2000.[5]

With the help of organized crime and corrupt officials, these Islamic terrorist organizations use the TBA to raise revenues through illicit activities that include drug- and arms trafficking, counterfeiting, money laundering, forging travel documents, and even pirating software and music. In addition, they provide haven and assistance to other terrorists transiting the region. Al Qaeda reportedly also does considerable fund-raising in Ciudad del Este.[6]

Suspected Hizballah terrorists have also used the TBA as a base for carrying out two major terrorist attacks in Buenos Aires in the early 1990s—one against the Israeli Embassy on March 17, 1992; and the other against a Jewish community center on July 18, 1994. Since the 1994 attack, Islamic terrorists in the TBA have largely confined their activities to criminal fund-raising and other activities in support of their terrorist organizations, including plotting terrorist actions to be carried out in other countries.

This study has confirmed the likely close interrelation among Islamic terrorist fund-raising and money-laundering activities, organized crime, and corruption of public officials in the TBA. All of the TBA's terrorist and organized crime activities are facilitated by official corruption, which, in turn, is fueled by the profits of lucrative criminal activities, which are

---

[4] Harris Whitbeck and Ingrid Arneson, "Terrorists Find Haven in South America," CNN.com, November 8, 2001, http://www.cnn.com/2001/WORLD/americas/11/07/inv.terror.south.

[5] Their names, as published in the Paraguayan press, included: Abadia Abu Sakran, Ayman Taha, Baha El-Khatis, Samer Sweileh, Diban Abu Gamous, Asan Hamaida, Mohamed Minirouwi, Hamad Hamad, Ayman Abu Yin, Salah Tinme, Wael Nasser, Sharif Tahayna, Abbas Ouweiwi, Nasser Saha Ane, Muhammad Moussa Hassan Gadalah, Rafat Rahdan Salem Abio, Brahim Un-Karim Bani-Uda, Mahmud Zakar Rages Zatma Adnan, and Mahimud Jabber Alul. Bartolomé, 11, citing "Antiterroristas remiten las evidencias al fiscal" [Antiterrorists provide the judge with evidence], *Noticias*, December 5, 2000.

[6] Jeffrey Goldberg, "In the Party of God," *The New Yorker* 79, no. 32 (October 28, 2002).

conducted like business enterprises by organized crime and terrorist groups. In effect, a mutually beneficial nexus exists among these three sectors. The TBA serves as a microcosm for examining this relationship.

## GEOGRAPHY, SOCIETY, AND ECONOMY

### Geography

The TBA's porous borders are defined by three closely grouped population centers, one in each of three countries: the Argentine city of Puerto Iguazú, the Brazilian city of Foz do Iguaçu, and the Paraguayan city of Ciudad del Este (formerly Puerto Presidente Stroessner). The region's most famous landmark is Iguassú Falls (Port., Iguaçu Falls), which straddles the Argentina-Brazil border in Brazil's Paraná State and Argentina's Misiones Province.


Iguassú Falls

Source: BBC Mundo.com, September 3, 2002; photo: Convention and Visitors' Bureau, Iguazú.

In the early 1970s, when Brazil and Paraguay were seeking to exploit the energy-generating and tourist potential of Iguassú Falls and to promote regional trade, government planners established a free-trade zone in the rapidly growing boomtown city of Ciudad del Este, thereby allowing Argentines and Brazilians to purchase cheap electronic products there.[7] The TBA, with already more than half a million inhabitants, soon became a lawless jungle corner of Argentina, Brazil, and Paraguay.

### *Ciudad del Este*

Ciudad del Este, located 330 kilometers to the east of Asunción, is the capital of Paraguay's Upper Paraná Department and the country's second-largest city. In 2003 Ciudad del Este had an estimated population of 239,500.[8] Strategically located, Ciudad del Este is situated

---

[7] Sebastian Junger, "Terrorism's New Geography," *Vanity Fair*, no. 508 (December 2002), 196, citing Brazilian journalist Jackson Lima.
[8] Stefan Helders, "Paraguay," *The World Gazetteer*, 2003, http://www.world-gazetteer.com/c/c_py.htm#pl_37.

on the Pan American Highway, which runs from Asunción, Paraguay, to Curitiba, Brazil, located near the port of Paranaguá.

### Foz do Iguaçu

The Brazilian city of Foz do Iguaçu (formerly spelled Foz do Iguassú), Paraná State, has been recently described in news media as having a population of about 300,000. (According to the 1996 census, its population was 231,627.[9]) Many people leave Ciudad del Este at night and cross the 303-meter-long, concrete bridge, the Friendship International Bridge (Sp., Puente Internacional de la Amistad; or Port., Ponte Internacional da Amizade), to return to Foz do Iguaçu, where the quality of life is better than in Ciudad del Este. Nevertheless, violent crime is a serious problem in Foz do Iguaçu, where 180 homicides were reported in 2000, 243 in 2001, and 275 in 2002.[10] (By comparison, the number of homicides in the top-ranking U.S. city in 2002, Washington, D.C., with about 2 ½ times the population, was 262.)



The tri-border countries can be seen from the landing at Puerto Iguazú: Argentina to the left, Brazil to the right, and Paraguay in the background.
Source: Puerto Iguazú Prefecture. From *Military Review*, Command & General Staff College, March-April 2002.

### Puerto Iguazú

Argentina's Puerto Iguazú, with a population of approximately 29,000, is located at the confluence of the Paraná and Iguazú (Port., Iguassú) rivers in the northwest corner of Misiones

---

[9] Demographia: Brasil [Brazil]: Cities (Municipalities) Over 100,000 Population: 1996, http://www.demographia.com/db-brasil-city96.htm.
[10] "Homicide Rate Declines in Foz do Iguaçu," *A Gazeta do Iguaçu* [Foz do Iguaçu; independent, largest-circulation daily in the TBA; offers balanced reporting and daily editorial comment], citing data released by the Legal Medical Institute (IML), as translated by FBIS Document ID: LAP20030606000016, June 5, 2003.

Province. The Atlantic Ocean can be accessed from Puerto Iguazú using small freighters. Although Puerto Iguazú is isolated from Ciudad del Este by the Paraná, Puerto Iguazú has access to Brazil's Foz do Iguaçu across the Iguazú at the 489-meter-long Tancredo Neves International Bridge. The Arab immigrants of Foz do Iguaçu and Ciudad del Este generally avoid visiting Puerto Iguazú because they reportedly do not feel welcome there and are regarded suspiciously by Argentine security officials.[11]

## Society

### The General Population of the TBA

By 2001, the TBA had a highly heterogeneous population of more than 700,000, including the area outside the three cities.[12] Foz do Iguaçu's population includes an estimated 65 different nationalities.[13]

The three main ethnic communities in Ciudad del Este are the Chinese, Lebanese, and Korean.[14] In 2001, the city's largest ethnic group was the Chinese, with about 30,000 members, of whom only about 9,000 may be registered legally.[15] The Portuguese language predominates. Guaraní is generally spoken by the city's poor Paraguayan residents. Arabic is heard as much as, or perhaps more than, Spanish. Chinese and Korean are also commonly heard.[16] Ciudad del Este's Chinese residents, mostly from China's southern Canton region, prefer this city over Foz do Iguaçu.

---

[11] Franco Iacomini, "Fronteira sem lei: A divisa com o Paraguai é a dor de cabeça do Mercosul" [Lawless Border: The Division with Paraguay and Mercosul's Headache], *Veja* [São Paulo], no. 1541 (April 8, 1998), http://veja. abril.uol.com.br/080498/p_044.html.

[12] Mariano César Bartolomé, *Amenzas a la seguridad de los estados: La triple frontera como 'área gris' en el cono sur americano* [Threats to the Security of States: The Triborder Region as a 'Grey Area' in the American Southern Cone]. Buenos Aires, November 29, 2001, http://www.geocities.com/mcbartolome/triplefrontera1.htm; reprinted as Dr. Mariano César Bartolomé, "La triple frontera: Principal foco de inseguridad en el Cono Sur Americano" [The triborder: Principal focus of insecurity in the American southern cone], *Military Review*, July–August 2002 (Spanish edition), http://www-cgsc.army.mil/milrev/spanish/JulAug02/indxjasp.asp.

[13] Bartolomé, 3, citing a 2001 estimate by Brazil's Federal Police (Polícia Federal—PF).

[14] Ricardo Grinbaum, "In Paraguay, Smugglers' Paradise," *World Press Review*, 43, no.1 (January 1996): 25–26 (reprinted from *Veja*).

[15] Bartolomé, 7.

[16] Franco Iacomini, "Fronteira sem lei: A divisa com o Paraguai é a dor de cabeça do Mercosul" [Lawless Border: The Division with Paraguay and Mercosul's Headache], *Veja* [São Paulo], no. 1541 (April 8, 1998), http://veja.abril. uol.com.br/080498/p_044.html.

*Muslim Population*

The TBA has one of the most important Arab communities in South America. Of the Arab population in Ciudad del Este and Foz do Iguaçu, an estimated 90 percent is of Lebanese origin.[17] Estimates of the size of the Arab community of immigrants in the TBA (mainly in Ciudad del Este and Foz do Iguaçu) range from 20,000 to 30,000, with most residing in Foz do Iguaçu.[18] Of these general figures, Foz do Iguaçu's Arab population accounts for 10,000 to 21,000 Arabs of Palestinian and Lebanese descent.[19]

The Arab community in the TBA is tightly knit, with its own schools and clubs, making outside penetration very difficult. Most Arab immigrants in Foz do Iguaçu live in gated condominiums.[20] The cultural and social demographics of Ciudad del Este and Foz do Iguaçu make an ideal operations base for Arabic-speaking terrorist or criminal groups. A few extremists can get together, form a highly secure cell, carry out their mission, and return with alibis backed up by many in the community. Sympathizers of al Qaeda have allegedly been active in the TBA for these reasons.



A view of a mosque in Foz do Iguaçu, Brazil
Source: *Istoé* [São Paulo], August 11, 2001.

---

[17] Bartolomé, 4.

[18] The *New York Times* reports that "more than 20,000 Middle Eastern immigrants, most from Lebanon and Syria, live in the area." See Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32. *Jane's* notes that the region's 629,000 population includes 23,000 Arabs of Palestinian and Lebanese descent. See John Daly, "The Suspects: The Latin American Connection," *Jane's Terrorism & Security Monitor*, October 1, 2001. The 30,000 figure is cited by Marc Perelman, *U.S. Joining Terrorism Probe Along Lawless Brazil Border: Hezbollah, Al Qaeda Links Sought*. The Lebanese Foundation for Peace (LFP), December 13, 2002, http://www.free-lebanon.com/LFPNews/2002/terrorprobe/terrorprobe.html.

[19] *A Gazeta do Iguaçu* [Foz do Iguaçu], "Muslims Prevail Among Small Religions in Foz," February 3, 2003, as translated for FBIS, "Highlights From the Tri-Border Press for the Week 3-7 February," February 11, 2003 (FBIS Document ID: LAP20030211000124).

[20] "Argentina, Paraguay, Brazil Step Up Search for "terrorists" in Triborder Area," BBC Monitoring Service [UK], September 15, 2001.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 77 of 632

Argentina's total Muslim population is known to be approximately three times as large as its Jewish population. Estimates of the former range from 700,000 to 900,000, with the lower figure considered by some researchers to be more likely.[21] The number of Jews living in Argentina is estimated to be about 250,000, of whom about 80 percent live in Buenos Aires.[22] Argentina's Jewish population has been the target of terrorism by Islamic fundamentalists and neo-Nazis.

Foz do Iguaçu reportedly has Brazil's second-largest Arab community (São Paulo may have the largest).[23] Nevertheless, Foz do Iguaçu's Arab population seems relatively small in comparison with a reported 1 million Muslims who have Brazilian citizenship and live in Brazil. Most Brazilian Muslims came from Lebanon, Syria, Palestine, Egypt, and other countries, but those in Foz do Iguaçu are mostly of Lebanese and Palestinian descent. Many members of the Arab population of Foz do Iguaçu and its surrounding hinterlands maintain commercial outlets in Ciudad del Este.

**Economy**

Ciudad del Este is an oasis for informants and spies; peddlers of contraband (largely cheap East Asian goods) and counterfeit products; traffickers in drugs, weapons, and humans (prostitutes, including women and children forced into prostitution); common criminals; mafia organizations; and undocumented Islamic terrorists. In Ciudad del Este, street merchants sell not only cheap trinkets and counterfeit products, but also items such as an AK-47 for US$375.[24] Despite its seedy appearance, Ciudad del Este is a world-class center of commerce in terms of cash transactions. Thanks to the presence of organized crime, the city's retail economy ranked third worldwide—behind Hong Kong and Miami—in volume of cash transactions, peaking at

---

[21] Pedro Brieger and Enrique Herszkowich, "The Muslim Community of Argentina,"*The Muslim World* [Hartford], 92, nos. ½ (Spring 2002): 157–68.

[22] Jacob Kovadloff, *Crisis In Argentina*. American Jewish Community [New York], circa June 2002, http://www.ajc.org/InTheMedia/PublicationsPrint.asp?did=555.

[23] *Gazeta do Iguaçu* [Foz do Iguaçu], "Muslims Prevail Among Small Religions in Foz," February 3, 2003, as translated for FBIS, "Highlights From the Tri-Border Press for the Week 3-7 February," February 11, 2003 (FBIS Document ID: LAP20030211000124); and "Palestinian Community in Brazil," *Jornal do Iguaçu* [Foz do Iguaçu], September 27, 2002, as translated for FBIS, "Highlights: Brazil - Paraguay Triborder Press 23-27 Sep 02," September 30, 2002 (FBIS Document ID: LAP20020930000045).

[24] Jeffrey Goldberg, "In the Party of God," *The New Yorker* 79, no. 32 (October 28, 2002).

US$12 billion in 1994.[25] In 2001 the estimated annual turnover in Ciudad del Este made the city's economy larger than that of the rest of Paraguay.[26] The relatively small Arab community in Ciudad del Este is among Latin America's most prosperous and influential.

The region's main economic dynamic is business between Ciudad del Este and Foz do Iguaçu. On normal days, an estimated 30,000 to 40,000 people and 20,000 vehicles cross the Friendship Bridge between Brazil and Paraguay. Residents and tourists in Ciudad del Este also regularly cross between Paraguay and Brazil on foot, often without documents. Border checks by authorities have generally been limited to simple spot-checks, and less than 10 percent of personal baggage or vehicle loads are checked. The traditional status of the TBA as a source of cheap goods has been severely restricted, however, by new regulations issued by Argentina and Brazil. After



An estimated 40,000 people cross the Friendship Bridge (Ponte da Amizade) daily.
Source: Claudio Rossi, *Veja* [São Paulo], no. 1541 (April 8, 1998).

Brazil implemented an integrated customs system to combat smuggling, commerce between Ciudad del Este and Foz do Iguaçu reportedly decreased by 90 percent.[27] However, according to Mauro de Brito, head of the Federal Revenue Secretariat office in Foz do Iguaçu, it will take several years for the customs integration between Paraguay and Brazil to yield the expected

---

[25]Sebastian Rotella, "Jungle Hub for World's Outlaws," *Los Angeles Times*, August 24, 1998, 1; and Ricardo Grinbaum, "In Paraguay, Smugglers' Paradise," *World Press Review*, 43, no.1 (January 1996), 25–26 (reprinted from *Veja*).
[26] Larry Rohter, "Terrorists Are Sought in Latin Smugglers' Haven," *New York Times*, September 27, 2001, A3.
[27] "Commerce between Ciudad del Este and Foz do Iguacu Drops by 90 Percent," *Vanguardia* [highest circulation daily in Ciudad del Este; aligned with the national daily *ABC Color*, it offers moderate and balanced reporting and editorial comment, but is occasionally sensationalistic], December 3, 2002, as translated for FBIS, "Brazil-Paraguay Triborder Press Highlights: November 25-29, 2002," December 3, 2002 (FBIS Document ID: LAP20021203000105).

results. Referring to Paraguay's "bribe culture," de Brito attributed this delay to differences in legislation and in "culture" of customs agents.[28]

In an attempt to curb the loss of tax revenues, Argentina imposed limits of US$100 per month on nondurable merchandise and US$150 per month on durables that can be purchased in the region. In a similar measure, Brazilian authorities reduced from US$500 to US$150 the monthly amount that the *sacoleiros* (small-time Brazilian importers) can spend in the region.[29] As a result of these and other measures, such as increased security, commercial activity in Ciudad del Este has declined considerably.[30]

Although Argentina's Puerto Iguazú traditionally has had the least economic activity of the three TBA cities, the greatly reduced traffic across the Tancredo Neves Bridge during the 1999-2000 period is also indicative of the economic downturn.[31] From 3.4 million people crossing in 1999, the number dropped to 1.4 million in 2000, while total vehicle passages declined from 350,751 in 1999 to 242,669 in 2000.[32] Argentine sources estimated in October 2001 that 120,000 people annually, or 4,000 daily, were crossing the Tancredo Neves Bridge.[33]

## ILLICIT ACTIVITIES BY ISLAMIC TERRORIST GROUPS IN THE TBA

### Background

The TBA cities of Ciudad del Este and Foz do Iguaçu have served as a base and a haven for Islamic terrorists for plotting and occasionally succeeding in carrying out terrorist attacks elsewhere in the Americas. Among the various Islamic fundamentalist groups reported to have a presence in the region are extremist cells tied to al Qaeda, Hizballah, Al-Jihad (Egyptian Islamic Jihad), and al-Muqawamah.

---

[28] "Brazil, Paraguay Border Customs Integration Facing Problems," *Vanguardia*, April 11, 2003, as translated by FBIS, "Highlights: Argentina-Brazil- Paraguay Triborder Media, April 11, 2003 (FBIS Document ID: LAP20030411000098).

[29] Bartolomé, 2.

[30] Bartolomé, 2.

[31] Bartolomé, 4, citing "Em Puerto Iguazú, a segurança é reforçada" [In Puerto Iguazú, Security Is Reinforced], *O Estado de São Paulo*, September 17, 2001.

[32] Mendel, William W., Foreign Military Studies Office (FMSO). "Paraguay's Ciudad del Este and the New Centers of Gravity," *Military Review* 82, no. 2 (March–April 2002), 51—58.

[33] Bartolomé, 2.

Case 3:20-mc-00206-FDW-DSC　Document 10-1　Filed 08/10/21　Page 80 of 632

The bombing of the Israeli Embassy in Buenos Aires on March 17, 1992, followed by the bombing of a Jewish community center, the Argentine-Israeli Mutual Association (Asociación Mutual Israeli-Argentina—AMIA), a Jewish community center, in Buenos Aires on July 18, 1994, focused the attention of the TBA countries, Israel, and the United States on the TBA because the investigation into both attacks led back to Hizballah operatives in the TBA.[34] Since

the Israeli Embassy bombing in 1992, Imad Mughniyah (also spelled Mughanniyah or Mugniyeh; alias 'Hajji'), a Lebanese national and the head of the security service of Al-Jihad (Egyptian Islamic Jihad), which is linked to the pro-Iranian Party of God, or Hizballah, has been a fugitive. In May 2003, Argentine prosecutors linked both Ciudad del Este and Foz do Iguaçu to the AMIA bombing and issued arrest warrants for two Lebanese citizens, Assad Ahmad Barakat (see Barakat, Assad Ahmad Mohamad, Appendix) and Imad Fayed Mugniyah, who at the time of the bombing were living in Ciudad del Este.[35] According to the investigators handling the AMIA case in Buenos Aires, Barakat played a crucial role in financing the bombing because he reportedly had a cell that made arrangements to import all of the



Aftermath of the AMIA bombing in Buenos Aires, July 18, 1994
Source: AP, *BBC Mundo*, December 23, 2000.

materials related to the attack into the TBA. In the years since then, investigators have identified Barakat as not only Hizballah's military operations chief in the TBA, but also as its chief Southern Cone fund-raiser.[36]

It is not known what connection, if any, al Qaeda may have had with the AMIA attack, an action usually associated with Hizballah. Whether the AMIA bombing was collaboration

---

[34] Mario Daniel Montoya, "Israel Takes Special Interest in Triple Border Area," *Jane's Intelligence Review* 13, no. 12 (December 2001): 13–14; and Jack Epstein, "Where Tourism Meets Terrorism," *U.S. News & World Report* 117, no. 6 (August 8, 1994): 38.

[35] *ABC Color* [Internet version-www], May 28, 2003, as translated by FBIS Document ID: LAP20030528000104, "Argentine Prosecutors Link Tri-Border Hizballah Leaders to AMIA Attack," May 28, 2003.

[36] "Government Keeps Watchful Eye on Paraguay's Arab Community," October 13, 2001, EFE News Services (FBIS Rec. No. OEF2C4F9D99922F0).

between Hizballah and another group is unclear. Argentina's foreign ministry disclosed on October 18, 2001, that its embassy in Riyadh, Saudi Arabia, had received a telephone call on October 26, 2000, claiming responsibility for an unspecified "explosion" in Argentina. Argentine judicial sources believe that the callers to the Riyadh embassy were referring to the July 18, 1994, attack on the AMIA.[37] In late January 2003, Argentina's Secretariat for State Intelligence (Secretaría de Información del Estado—SIDE) presented President Eduardo Duhalde with a 500-page report on the AMIA bombing that confirms Hizballah's use of C4 plastic explosive, which arrived from Ciudad del Este along with the two or three suicide bombers, who came from Lebanon.[38] As of mid-2003, Argentine courts had resumed the investigation of the attacks on the AMIA and the Israeli Embassy in Buenos Aires and had determined that Assad Ahmad Barakat made suspicious trips to Teheran, Iran, between 1990 and 1991, and that he had also reportedly met with high-ranking officials of the Islamic Republic of Iran. On the same occasion, Barakat also traveled to Lebanon.[39]

**The Islamic Terrorist Presence in the TBA, 1999-June 2003**

There appears to be general agreement among U.S. counterterrorism officials that Islamic terrorist groups have a presence in the TBA, although some may be more skeptical than others that al Qaeda is included among these groups, much less cooperating with Hizballah in the region. Francis X. Taylor, the Department of State's coordinator for counterterrorism, told Congress on October 10, 2001, that the TBA has "...the longstanding presence of Islamic extremist organizations, primarily Hizballah, and, to a lesser extent, the Sunni extremist groups, such as the al-Gama'a al-Islamiyya (Egyptian Islamic Group) and Hamas."[40] Taylor noted that the activities of these organizations include fund-raising and proselytizing among the zone's Middle Eastern population, as well as document forging, money laundering, contraband

---

[37] "Al-Qaeda and Argentina," *Jane's Intelligence Digest*, October 26, 2001; Ed Blanche, "Al-Qaeda Link to Buenos Aires Bombings Emerges; Phone Call to Embassy in Riyadh Opens Can of Worms," *The Daily Star* [Beirut; Internet version-www], October 29, 2001, an transcribed by FBIS Document ID: GMP20011030000033, "Al-Qa'ida Link to Argentine Bombings Seen; Mughniyah 'Ordered out of Iran'," October 29, 2001.

[38] Raul Kollmann, "Report on Interview with an Unidentified 'Government Spokesman,'" *Pagina/12* [Buenos Aires; Internet version-www], January 19, 2003, as translated for FBIS, "Responsibility for Argentine-Jewish Center Bombing Attributed to Iran," January 19, 2003 (FBIS Document ID: LAP20030119000009).

[39] *ABC Color* [Internet version-www], June 9, 2003, as translated by FBIS Document ID: LAP20030609000051, "Paraguay: Argentine Courts Link Barakat to Iranian Leaders," June 9, 2003

[40] Anthony Faiola, "U.S. Terrorist Search Reaches Paraguay; Black Market Border Hub Called Key Finance Center for Middle East Extremists," *Washington Post*, October 13, 2001, A21.

smuggling, and weapons and drug trafficking. The U.S. Federal Bureau of Investigation (FBI) apparently shares that assessment. In the same hearing, a U.S. Congressman pointed out that "Open-source reporting indicates that the FBI claims that Islamic extremist cells linked with Hizballah, Islamic Jihad, and al Qaeda are operating in Paraguay, Uruguay, and Ecuador."[41] Mark Davidson, spokesman for the U.S. Embassy in Asunción, affirmed on May 22, 2002, that the TBA is indisputably an area from which Islamic terrorist groups are financed by means of money derived from illicit activities, but he, like Taylor, omitted mention of al Qaeda.



Al Qaeda reportedly has had an interest and a presence in the TBA since at least the mid-1990s. Osama bin Laden reportedly visited Foz do Iguaçu in 1995 (the specific month is unclear), according to *Veja*, a leading Brazilian newsweekly. *Veja*, citing an anonymous high official of the Brazilian Intelligence Agency (Agência Brasileira de Inteligência—Abin), reported that a 28-minute videotape shows bin Laden participating in meetings at a mosque in the area during his visit.[42] Al Qaeda's Khalid Sheikh Mohammed is also believed to have visited the TBA that December.[43] Mohammed also reportedly returned to the Foz do Iguaçu area in 1998.[44]

Osama bin Laden spent three days in Foz do Iguaçu.
Source: Reuters, from *Veja*, March 19, 2003.

There have been indications that terrorist elements with possible al Qaeda connections have used mosques in the TBA for plotting or recruitment purposes. CNN reported that two

[41] "Prepared Statement of Representative Cass Ballenger, Chairman, Subcommittee on the Western Hemisphere, U.S. House of Representatives." Transcript of House Western Hemisphere Subcommittee Hearing, October 10, 2001. Center for International Policy, Columbia Project, http://www.ciponline.org/colombia/101001.htm.
[42] "Bin Laden Reportedly Spent Time in Brazil in '95," *Washington Post*, March 18, 2003, A24; "Bin Laden esteve em Foz do Iguaçu e até deu palestra em mesquita [Bin Laden Was in Foz do Iguaçu and Even Gave A Lecture in A Mosque], *O Estado de São Paulo*, March 16, 2003. [Estadao.com: http://www.estado.estadao.com.br/editorias/2003/03/16/int026.html]; and Policarpo Junior, "Ele esteve no Brasil" [He Was in Brazil], *Veja* on-line, no. 1,794 (March 19, 2003), http://veja.abril.com.br/190303/p_058.html.
[43] Reuters, "Bin Laden Reportedly Spent Time in Brazil in '95," *Washington Post*, March 18, 2003, A24; and *O Estado de São Paulo* [Internet version-www], March 9, 2003, as translated for FBIS, "Brazil: Terrorist Khalid Sheikh Mohamed's Passage Through Brazil Reported," March 9, 2003 (FBIS Document ID: LAP20030308000052); and *A Gazeta do Iguaçu*, March 10, 2003, 2, as translated for FBIS, "Brazilian Police: Khalid Shaykh Visit to Tri-border in 1995 Unconfirmed," March 10, 2003 (FBIS Document ID: LAP20030311000123).
[44] Kevin G. Hall, "Accused al-Qaida Terrorist Spent time in Brazil, Police Say," Knight Ridder Tribune News Service, March 13, 2003, 1.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 83 of 632

mosques in Foz do Iguaçu and one in Ciudad del Este are reportedly suspected by international and regional intelligence sources of involvement in terrorist activity and serving as revolving doors for Islamic extremists.[45] Argentine intelligence documents show links between the mosques and various terror groups, including Hizballah and Egypt's al-Gama'a al-Islamiyya and Islamic Jihad.[46] Argentine security forces have identified Sheik Mounir Fadel, spiritual leader of Ciudad del Este's main mosque, as a senior Hizballah member.[47]

By mid-1999, the SIDE (Secretariat for State Intelligence) was investigating Islamic extremist groups in the TBA that allegedly were operating under the orders of Osama bin Laden.[48] The SIDE investigation resulted from a shared belief that Iran was no longer the only concern in regard to terrorist cells operating in Ciudad del Este and Foz do Iguaçu. That conviction was based on information from the SIDE's own files and from other intelligence services, which reported that bin Laden's al Qaeda had gained ground in the TBA as a result of Iran's partial withdrawal from the important Arab community in the area, thanks to Iranian President Mohamed Khatami.[49]

In 1999 SIDE agents began taping telephone calls made by Islamic extremists in Ciudad del Este and Foz do Iguaçu to the Middle East and secretly filming meetings of the Shi'ite and minority Sunni groups who were part of the huge Moslem population in the TBA.[50] As a result of this surveillance, the SIDE reported that al Qaeda agents had been identified in the TBA.[51] Coordinated police operations conducted in the three TBA cities on December 22, 1999, reportedly thwarted a plot by TBA-based terrorists under the control of Osama bin Laden and Hizballah leader Imad Mouniagh to stage simultaneous attacks on Jewish targets in Ciudad del Este, Buenos Aires, and Ottawa, Canada, in an attempt to undermine the Middle East peace

---

[45] Harris Whitbeck and Ingrid Arneson, "Sources: Terrorists Find Haven in South America," CNN, November 7, 2001, http://www.cnn.com/2001/WORLD/americas/11/07/inv.terror.south/index.html.
[46] Whitbeck and Arneson.
[47] Peter Hudson , "There Are No Terrorists Here," *Newsweek*, November 19, 2001.
[48] Daniel Santoro, *Clarín* [Buenos Aires; an Independent, tabloid-format daily; highest-circulation newspaper, Internet version], July 18, 1999, as translated for FBIS, "Bin Laden's Followers in Triborder Area Probed," July 19, 1999 (FBIS, WA1907180899).
[49] Santoro, *Clarín*.
[50] Daniel Santoro, *Clarín*, September 16, 2001, 8–9, as translated for FBIS, "Argentine Intelligence Services' 1999 Report on Usamah Bin-Ladin's Agents in Triborder Area Viewed," September 16, 2001 (FBIS LAP20010916000021).
[51] Mario Daniel Montoya, "War on Terrorism Reaches Paraguay's Triple Border," *Jane's Intelligence Review* 13, no. 12 (December 2001): 12; and Daniel Santoro, *Clarín*, September 16, 2001, 8–9, as translated for FBIS, "Argentine Intelligence Services' 1999 Report on Usamah Bin-Ladin's Agents in Triborder Area Viewed," September 16, 2001 (FBIS LAP20010916000021).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 84 of 632

process.[52] Individuals rounded up but later released included operatives of Hamas and Hizballah, as well as a suspected Iranian intelligence agent. In order to escape the SIDE investigation, the top alleged Hizballah and al Qaeda agents involved—Hezballah's Assad Ahmad Barakat and the Muslim Brotherhood's or Al-Gama'a al-Islamiyya's Mohamed Ali Aboul-Ezz Al-Mahdi Ibrahim Soliman—reportedly left Ciudad del Este and Foz do Iguaçu, but both were later arrested.[53]

The SIDE also reported a significant shift in the Muslim terrorist groups in the TBA after 1999.[54] Pro-Iranian Shi'ite terrorist organizations, such as the Islamic Jihad and the Lebanese Hizballah faction, who had normally worked separately from the orthodox Sunnites and followed instructions from Iran, had begun to cooperate and maintain contact.[55] This shift appeared to follow factional infighting among moderate and radical Hizballah adherents in the TBA and perhaps suggested that al Qaeda had taken advantage of the tensions to recruit new acolytes.[56] As some of the influence of the Iranians and Hizballah on the various Islamic groups in the TBA faded, the smaller groups, according to the SIDE, began supporting bin Laden by collecting funds, indoctrinating others, giving refuge to fugitives, and offering basic military training, such as how to build homemade bombs.[57] The SIDE's reports reportedly were received with skepticism by the U.S. Central Intelligence Agency (CIA) and Israel's Mossad.[58]

One of the smaller Shi'ite extremist groups operating in the TBA is Al-Muqawamah al-Islamiyah, or Islamic Resistance. The shadowy Al-Muqawamah appears to be a principal pro-Iran section of Hizballah whose members live normal lives in sleeper cells but become

---

[52] Special Correspondents Vladimir Jara Vera and Dany Ortiz, *ABC Color* [Asunción; Internet version; major daily, opposed to the González Macchi administration; owner Aldo Zuccolillo is an influential Oviedo Supporter of former General Oviedo], December 23, 1999, as translated for FBIS, "Police Conduct Operation to Intimidate Islamic Extremists,",December 23, 1999 (FBIS ID: FTS19991223001521).

[53] Jara Vera and Dany Ortiz, *ABC Color*.

[54] Tânia Monteiro, DPA, EFE, and Agence France Presse, "Tríplice fronteira tinha agentes sauditas, diz "Clarín" [TriBorder has Saudi agents, *Clarín* says], Estadão Web site, September 17, 2001.

[55] Daniel Santoro, *Clarín* [Internet version], July 18, 1999, as translated for FBIS, "Bin Laden's Followers in Triborder Area Probed," July 19, 1999 (FBIS, WA1907180899).

[56] Comp. A. William Samii, "Competition Among South American Hizballah Resumes," *Iran Report* [RFE/RL] 3, no. 27 ( July 17, 2000), citing *ABC Color*, July 12, 2000; *Iran Report* [RFE/RL], January 10, 2000; and "Competition Among South American Hizballah," RFE/RL, February 6, 2002, translating *ABC Color*, January 5, 2002, http://www.rferl.org/iran-report/2000/01/2-100100.html.

[57] Daniel Santoro, *Clarín*, September 16, 2001, 8–9, as translated for FBIS, "Argentine Intelligence Services' 1999 Report on Usamah Bin-Ladin's Agents in Triborder Area Viewed," September 16, 2001 (FBIS LAP20010916000021).

[58] Santoro.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 85 of 632

combatants when mobilized.[59] In early 2000, Brazilian and Paraguayan experts obtained photographs of Arab extremists taken at the Al-Mukawama training camp (see Fayad, Sobhi Mahmoud, Appendix), possibly located at a farm outside Foz do Iguaçu.[60] The men in the photos included several businessmen. They were photographed beside an Iranian flag and a flag from al-Muqawamah, a shadowy pro-Iran wing of Hizballah. Another photograph is said to show a Hizballah leader reading a letter from Imad Mounigh, presumably wanted Hizballah activist Imad Mughniyah.[61] Argentine intelligence officials reportedly believe that Hizballah runs weekend training camps on farms in the remote jungle terrain near Foz do Iguaçu, where young adults are recruited and given weapons training and children are indoctrinated in Hizballah ideology.[62]



In late 2000, at least one known TBA-based terrorist was involved in a plot to attack the U.S. and Israeli embassies in Asunción along with 30 other Islamic terrorists, who would carry out diversionary attacks elsewhere in the city in order to distract security forces.[63] On November 28, 2000, Paraguayan authorities arrested Salah Abdul Karim Yassine, a Palestinian and suspected Hamas explosives expert who had entered the country using false documents and was living in Ciudad del Este.[64] Yassine was being investigated for his suspected affiliation with an Egyptian terrorist organization.[65] It was found that he was involved in the plot, and he was sentenced

Salah Abdul Karim Yassine under arrest in Uruguay
Source: *Cromos* [Bogotá], September 24, 2001

---

[59] Sami G. Hajjar, *Hizballah: Terrorism, National Liberation, or Menace?* Carlisle, Pennsylvania: Strategic Studies Institute, U.S. Army War College, August 2002, http://216.239.57.100/search?q=cache:l1y-v-VhCqYJ:www.carlisle.army.mil/ssi/pubs/2002/hizbala/hizbala.pdf+al-Muqawamah&hl=en&ie=UTF-8.
[60] *ABC Color* [Internet version-www], January 16, 2002, as translated for FBIS, "Paraguay: Court Investigates Hizballah Base Photos" (FBIS, LAP20021116000091).
[61] London Bureau Roundup of Terrorism Issues/Developments in the Mideast/Islamic World and the Aegean derived from sources monitored by FBIS, "Latin America: Islamic Fundamentalists in Colombia, Paraguay," January 10, 2002 (FBIS GMP20020109000400).
[62] Jeffrey Goldberg, "In the Party of God," *The New Yorker* 79, no. 32 (October 28, 2002).
[63] Bartolomé, 11, citing "Un presunto jefe de grupo terrorista árabe fue detenido" [A presumed head of an Arab terrorist group was detained], *Noticias*, November 30, 2000.
[64] *Patterns of Global Terrorism, 2000*, Office of the Coordinator for Counterterrorism, April 30, 2001; Nelson Fredy Padilla, "Los hombres de Osama bin Laden en Colombia" [The Men of Osama bin Laden in Colombia] *Cromos*, No. 4, 364, September 24, 2001; and Pedro Doria, "Terrorismo aqui no lado" (Terrorism Here Next Door), www.No.com.br, November 30, 2000.
[65] Bartolomé, 11.

to a four-year prison term on charges of possessing false documents and entering the country illegally.

Despite increased surveillance by security forces in the region, the TBA is probably still used by Islamic terrorist groups as a fund-raising center and as a base for plotting, coordinating, or otherwise supporting terrorist attacks against U.S. and Israeli targets in the Americas. Al Qaeda operatives in the TBA reportedly were connected to a foiled al Qaeda plot to simultaneously attack the U.S. embassies in Montevideo, Uruguay, and Quito, Ecuador, in April 2001.[66] On October 10, 2001, a group of ten terrorists identified as belonging to a Lebanese

Hizballah cell was reportedly caught in Mexico City on its way to assassinate President Vicente Fox and carry out a terrorist attack in the Mexican Senate.[67] The terrorists reportedly reached Mexico from the TBA, following a training session. The description of one of the instructors resembled Imad Mughniyah, who, working from his bases in Iran and Hizballah-controlled areas of Lebanon, reportedly directs the activities of Islamic terrorists in South America, including the TBA, in coordination with al Qaeda.[68]



Intelligence sources say this mosque in Ciudad del Este is a revolving door for extremists.
Source: CNN.com, November 8, 2001

U.S. authorities expressed concern in late 2001 over the possibility that lax immigration procedures in various Latin American countries have allowed terrorist "sleepers" to adopt new identities and to infiltrate into the United

---

[66] Jose Meirelles Passos, "The Shadow of Bin Ladin in Latin America," *O Globo* [Rio de Janeiro; Internet version-www], October 29, 2001, as translated for FBIS, "Brazil: Daily Notes US Views Triborder as Al-Qa'idah Center for L.A.," October 29, 2001 (FBIS LAP20011029000036).

[67] DEBKAfile Exclusive, "New Direction in Search for Anthrax Culprit" [Jerusalem; DEBKAfile www], November 11, 2001, as transcribed by FBIS, "DEBKA Sources Say Iraqi Nuclear Devices Ready for Arming, View Bin Ladin Threat," November 11, 2001 (FBIS Document ID: MP20011111000147).

[68] Mike Boettcher, "South America's 'Tri-border' Back on Terrorism Radar," CNN, November 8, 2002, citing "coalition intelligence sources," http://www.cnn.com/2002/WORLD/americas/11/07/terror.triborder/. For discussions of al Qaeda-Hizballah links, see Yael Shahar, ICT Researcher, "Al-Qa'ida Links to Iranian Security Services," Herzliyya International Policy Institute for Counterterrorism [Tel Aviv; Internet version-www], January 20, 2003; and Lenny Ben-David, "Sunni and Shiite Terrorist Networks: Competition or Collusion?" *Jerusalem Issue Brief*, Jerusalem Center for Public Affairs [Jerusalem; Internet version-www], December 18, 2002, as transcribed by FBIS, "Israeli Expert Says International Terror Breaches Secular-Religious Divide," December 18, 2002 (FBIS Document ID: GMP20021225000066).

States, especially from Argentina. By 2001, investigators had come to believe that numerous Islamic terrorist "sleeper cells" had been established in Ciudad del Este and Foz do Iguaçu, as well as Uruguay's Chuy since the 1990s.[69] Based on an examination of telephone records, Argentine investigators in 2002 found "evidence of coordination between the TBA and sleeper cells in Buenos Aires." Two main centers of activity were cited: the principal mosque in Foz do Iguaçu and a travel agency there.[70]

Paraguay's Vice Interior Minister Mario Agustin Sapriza affirmed on May 3, 2001, that the TBA serves as a base of operations for dormant Islamic extremist cells linked to international terrorism.[71] Sapriza explained that Hizballah, Hamas, and other terrorist organizations use this region to plan their actions, to obtain supplies, and to live for a certain period of time before launching new attacks in other countries.

Argentina and Brazil have been less forthcoming in acknowledging the existence of sleeper cells in the TBA. Brazil's Justice Minister José Gregori said in October 2001 that he had no "conclusive information" on al Qaeda cells in Brazil.[72] However, Judge Walter Fanganiello Maierovitch, a money-laundering expert affiliated with the Giovanni Falconi Brazilian Criminal Sciences Institute, expressed an opposite viewpoint regarding al Qaeda in making the following points in a September 2001 *O Globo* interview:[73]

❖ al Qaeda is establishing a base in the Arab community near Ciudad del Este.

❖ bin Laden is attempting to establish a presence in the TBA because al Qaeda's terrorist activities are linked with the trafficking of arms, drugs, and uranium, as well as money laundering, in association with the Russian and Chinese mafias.

❖ bin Laden's goal is to use religious entities as fronts for training terrorists and provide a hiding place for Islamic fugitives.

---

[69] Bartolomé, 10, citing "Divergencias nas relações Brasília-Washington" (Differences in relations between Brasilia and Washington], *Zero Hora*, September 19, 2001; and *La Nación* [Buenos Aires], October 3, 2001, as translated for FBIS, "National Border Guard Commander: Tri-Border Area Hotbed of Sleeper Cells," October 3, 2001 (FBIS Docoument ID: LAP20011003000015).

[70] Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32.

[71] *ABC Color* [Internet version-www], May 4, 2001, as translated for FBIS, "Paraguay: Vice Interior Minister Confirms Presence of 'Dormant Islamic Terrorist Cells'" (FBIS Document ID: LAP20010505000002).

[72] José Meirelles Passos, "The Shadow of Bin Ladin in Latin America," *O Globo* [Internet version-www], October 29, 2001, as translated for FBIS, "Brazil: Daily Notes US Views Triborder as Al-Qa'idah Center for L.A.," October 29, 2001 (FBIS Document ID: LAP20011029000036).

[73]Germano Oliveira, *O Globo*, September 19, 2001, as translated for FBIS, "Brazil's Former Drug Czar: Bin-Ladin Establishing Al-Qa'idah Cell on Triborder," September 19, 2001 (FBIS Document ID: LAP200109119000051).

❖ bin Laden is recruiting members of the Hizballah group that bombed the Jewish community center (AMIA) in Buenos Aires in 1994.

In early 2002, further suggesting al Qaeda's presence in the TBA, the Paraguayan press reported that al Qaeda and other Islamic terrorist groups had established training camps and were



Mohamad Ali Aboul-Ezz Al-Mahdi Ibrahim Soliman being arrested on April 15, 2002, in Foz do Iguaçu

Source: *ABC Color*, July 8, 2002.

talking of holding a secret terrorist summit meeting in the TBA.[74] In early February, Paraguayan and foreign security forces as well as Brazilian, Argentine, Israeli, and U.S. agents searched the TBA, especially Ciudad del Este and Foz do Iguaçu, for five Afghan citizens who allegedly belong to the Taliban and are linked to al Qaeda, either as supporters or members.[75] Each of the individuals allegedly was carrying three or four sets of different identity documents. Adding to concerns that Osama bin Laden's operatives were among those operating in the TBA, a map of the TBA was recovered from an al Qaeda safehouse in Kabul, Afghanistan in 2002.[76]

One individual suspected of being linked to Osama bin Laden's al Qaeda is Egyptian citizen Al-Mahdi Ibrahim Soliman, who was arrested on April 15, 2002, in Foz do Iguaçu, where he had been

---

[74] Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32
[75] *ABC Color* Web site, February 5, 2002, as cited by "International Security Forces Search for Five Afghan Fugitives in Paraguay," BBC Monitoring Service [UK], February 5, 2002.
[76] Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 89 of 632

living for seven years.[77] He was arrested under charges filed by the Egyptian government that he is a member of a terrorist faction, namely Al-Gama'a al-Islamiyya, that carried out deadly attacks in several countries. Soliman earlier had been arrested in Foz do Iguaçu in 1999 on charges of dealing in contraband merchandise.[78]

In April 2002, Paraguayan reporters linked Assad Ahmad Barakat to Osama bin Laden by pointing out that Barakat was the owner of the Mondial (World) Engineering and Construction company, with offices in Ciudad del Este and Beirut. This company was suspected of having made contributions to al Qaeda, using money obtained from real estate fraud.[79] Barakat was allegedly using the company to collect funds for al Qaeda by selling apartments in Beirut.[80] For example, unidentified intelligence sources cited an authorization by Barakat, dated February 14, 2002, in Foz do Iguaçu ordering the transfer of an apartment for US$120,000 in Lebanon.[81] Other unspecified front businesses created by Barakat are reportedly designed to channel funds to Osama bin Laden, under the pretext of charitable contributions to orphanages. Journalist Sebastian Junger, citing unidentified Argentine intelligence sources, reported in late 2000 that Ramzi bin al-Shibh, the al Qaeda leader who was arrested in Pakistan in 2002, "has known, confirmed contacts with a Lebanese businessman working in Ciudad del Este, Paraguay, and in Foz do Iguaçu, Brazil."[82] Whether Ramzi bin al-Shibh, who is in U.S. custody, has identified this businessman as Assad Ahmad Barakat is not known.

In July 2002, the Paraguayan police arrested a pair of Lebanese men, Ali Nizar Darhoug, owner of two shops in Ciudad del Este, and his nephew, Muhammad Daoud Yassine, who were said to be raising funds for al Qaeda. Ali Nizar Darhoug's name was reportedly found in an address book belonging to Abu Zubaydah, one of the highest-ranking al Qaeda officials to be

---

[77] Mauri Konig, "Egípcio preso em Foz do Iguaçu" [Egyptian Arrested in Foz do Iguaçu], *O Estado de São Paulo*, April 16, 2002, http://www.estado.estadao.com.br/editorias/2002/04/16/int002.html; and Miriam Karam, *São Paulo Valor* [financial daily, published jointly by the Folha and Globo media conglomerates; Internet version-www], May 20, 2002, as translated for FBIS, "Brazil: Federal Police Denies Presence of Terrorist Cells in Foz do Iguaçu," (FBIS Document ID: LAP20020520000040).

[78] AJB, "Terrorismo: Egípcio é capturado pela PF" [Terrorism: Egyptian Is Captured by PF], *Correio Braziliense* [Brasília], April 16, 2002, http://www2.correioweb.com.br/cw/EDICAO_20020416/pri_ult_160402_259.htm.

[79] Bartolomé, 16, citing "Triple frontera: Empresa sería de Al-Qaeda" [Triborder: Company is linked to al Qaeda], *Ámbito Financiero*, April 30, 2002, 14.

[80] "Barakat Continues To Collect For Hizballah," *Última Hora* [Asunción], May 1, 2002, as translated by FBIS, "Highlights: Paraguay Press," May 1, 2002 (FBIS Document ID: LAP20020501000022).

[81] "Barakat Continues To Collect For Hizballah," *Última Hora* [Asunción], May 1, 2002.

[82] Sebastian Junger, "Terrorism's New Geography," *Vanity Fair*, no. 508 (December 2002): 196.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 90 of 632

captured by the United States.[83] Darhoug was wiring as much as US$80,000 each month to banks in the United States, the Middle East, and Europe.[84]

A spike in reports of al Qaeda in the TBA took place in October 2002. Argentina bolstered security measures in the region after several reports from Israel's intelligence service, the Mossad, warned of the presence of al Qaeda and Hizballah cells in Ciudad del Este.[85] In late October 2002, Argentine intelligence informed the United States of an al Qaeda-Hizballah meeting that was held in the TBA. A CNN report of November 8, citing "coalition intelligence



Imad Mughniyah, who reportedly has undergone radical plastic surgery.

Source: FBI and *ABC Color*, November 27, 2002.

sources," also disclosed that a "terrorist summit to plan attacks against U.S. and Israeli targets in the Western hemisphere" had taken place in Ciudad del Este and the surrounding area, and that the terrorists attending the meetings were representatives of Hizballah and organizations sympathetic to the al Qaeda network.[86] CNN's Middle East intelligence sources also indicated a new terrorist effort aimed at U.S. and Israeli interests and coordinated by Imad Mughniyah. CNN reported that Mughniyah, working from his bases in Iran and Hizballah-controlled areas of Lebanon, was directing the activities of terrorists in South America and planning to hit U.S. and Israeli targets if the United States attacked Iraq, or if Israel was drawn into the conflict. The Paraguayan government denied the CNN report.[87] Argentine intelligence sources reportedly also rejected the CNN report that the meeting was held in the TBA, claiming instead that it was held in another Latin American location.[88]

---

[83] Jeffrey Goldberg, "In the Party of God," *The New Yorker* 79, no. 32 (October 28, 2002).

[84] Goldberg; and Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32

[85] *Clarín* [Buenos Aires; Internet version-www], October 19, 2002, as translated by FBIS, "Argentina: Newspapers Publish Contradictory Reports On Possible Attacks In Tri-Border Area," October 19, 2002 (FBIS Document ID: LAP20021019000022).

[86] Mike Boettcher, with Ingrid Arnesen, "South America's 'Tri-border' Back on Terrorism Radar," CNN, November 8, 2002, http://www.cnn.com/2002/WORLD/americas/11/07/terror.triborder/.

[87] "Cabinet Members Refute TV Report and Deny Existence of Terrorist Activities," *Vanguardia* [Ciudad del Este], November 9, 2002, as translated for FBIS, "Highlights: Brazil - Paraguay Triborder Press 4-15 Nov 02," November 21, 2002 (FBIS Document ID: LAP20021121000006).

[88] *La Nación* [Buenos Aires], November 8, 2002, 3, as translated by FBIS, "Argentine Intelligence Services Dismiss Report on Terrorist Powwow as Inaccurate," November 8, 2002 (FBIS Document ID: LAP20021108000038).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 91 of 632

The potential for TBA-based terrorists acquiring powerful explosives was illustrated by an incident reported on June 4, 2003, when Alto Paraná Police recovered all nine boxes of dynamite stolen from a quarry in Hernandarias, a town neighboring Ciudad del Este, over the previous weekend. Police observed members of a well-known gang formed by Brazilian and Paraguayan criminals hanging around the neighborhood where four individuals were arrested. Given the destructive potential of the material, which was powerful enough to destroy the Friendship Bridge, police believed that the explosives could have been sold to terrorists.[89]

## Terrorist Fund-Raising in the TBA

### Narcotics Trafficking

A topic in itself, narcotics trafficking in the TBA, as it relates to the Lebanese Mafia, can only be briefly summarized here. It is clearly a major activity of the Islamic terrorist groups and organized crime syndicates operating in the region. With lax border controls and more than 100 hidden airstrips in the region, the TBA has long been popular with contraband smugglers, gunrunners, and drug traffickers. A large number of small airplanes take off from clandestine airstrips in Paraguayan territory and enter Brazilian air space. Many of them also cross Argentina's Misiones Province. The TBA is reportedly a conduit for the smuggling of some drugs through Argentina, Brazil, and Paraguay, which serve as transit countries for Andean cocaine (see Fig. 2, Drug-Trafficking Routes in the Tri-Border Area (TBA), Appendix).[90] One route on the Bolivia-Paraguay-Brazil corridor goes through Ciudad del Este and Foz do Iguaçu to the ports of Paranaguá, Santos, and Rio de Janeiro on the Atlantic coast of Brazil.[91]

Despite the significant smuggling activity in the region, the TBA's importance as a drug-smuggling conduit may have declined in recent years as a result of increased surveillance by security forces of the three TBA countries. The great majority of the cocaine smuggled out of Paraguay leaves the country through border towns to the north of the TBA (Pedro Juan Caballero

---

[89] "Police Recover Explosives, Robbers Arrested," *Vanguardia* [Ciudad del Este], June 4, 2003, as translated by FBIS, Tri-Border Media Highlights, June 4, 2003 (FBIS Document ID: LAP20030604000111).

[90] U.S. Department of State, *International Narcotics Control Strategy Report –2002*. Washington, DC: Bureau for International Narcotics and Law Enforcement Affairs, March 2003, http://www.state.gov/g/inl/rls/nrcrpt/2002/html/17952pf.htm. Paraguay is a transit country for between 40 and 60 metric tons of Colombian, Bolivian and Peruvian cocaine that traverses its territory destined for Argentina, Brazil, the United States, Europe, and Africa, according to the *International Narcotics Control Strategy Report –2002*, http://www.state.gov/g/inl/rls/nrcrpt/2002/html/17944.htm.

[91] "Brasil," http://www.ogd.org/rapport/gb/RP12_4_BRESIL.html.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 92 of 632

and Capitán Bado) and to the south of the TBA (Posadas). Apparently for this reason, drug-related border arrests at Puerto Iguazú have declined since 2000.[92] Capitán Bado is a center for the production of marijuana and distribution of cocaine. The marijuana is transported to Brazil by land; most of the cocaine is flown in clandestine flights aboard small aircraft.[93] Posadas is just across the Río Paraná from Encarnación, which has a large Arab population and is known as a main contraband center.

Despite the TBA's relatively limited role as a drug-smuggling conduit, there is no question that narcotics trafficking remains a major activity in the region, and the Hizballah network and the Lebanese Mafia in general are heavily involved in it. Lebanese citizen Ali Assi was captured at Beirut's airport with a 10-kilo shipment of cocaine in his two suitcases in May 2002. Assi had recently taken charge of running a coffee shop in the Islamic Welfare Center in Ciudad del Este.[94] Assi is the father-in-law of Ali Hassan Abdallah (also known as Ali Asan Abadia and "Alito"), who was, together with Assad Barakat, one of the principal coordinators of a Hizballah financial network in the TBA. Ali Hassan Abdallah had also been a trade partner in Ciudad del Este of convicted Hizballah figure Sobhi Mahmoud Fayad.[95] In May 2002, Ali Hassan Abdallah was considered a fugitive. By early March 2003, he had been expelled from Angola and was believed to be ordering electronic funds transfers (EFTs) to Islamic extremist groups in the Middle East through his nephew, Rayan Hussein Abdallah, in Ciudad del Este.[96]



Assad Ahmad Barakat under house arrest in Foz do Iguaçu

Source: *ABC Color*, December 20, 2002.

[92] Mendel, citing Gendarmería National, *Escuadrón 13 'Iguazú': Estadísticas del funcionamiento del escuadrón 13 'Iguazu'.* Puerto de Iguazú, Argentina: Gendarmería National, September 2001.

[93] Clarinha Glock, "Brazil-Paraguay: A Full Plate for Journalists," Inter American Press Association, July 19, 2001, http://www.impunidad.com/atrisk/brasil_paraguay7_19_01E.html.

[94] *ABC Color* [Internet version-www], May 28, 2002, as translated for FBIS, "Paraguay: Daily Reports More Evidence of Barakat's Contributions to Hizballah," May 28, 2002 (FBIS Document ID: LAP20020528000073).

[95] *Vanguardia* [Ciudad del Este; Internet version-www], May 23, 2002, "Paraguay: Triborder Daily Says US Has Not Shown Evidence Against Alleged Terrorist," May 23, 2002 (FBIS Document ID: LAP20020523000084); and "Paraguay: Lebanese Merchant Sought in Paraguay Expelled from Angola," BBC Monitoring Americas – Political [London], March 14, 2003, citing *ABC Color* Website, March 14, 2003.

[96] *ABC Color* [Internet version-www], March 14, 2003, citing "high-ranking" local police intelligence sources, in collaboration with their counterparts in Lebanon and the TBA, as translated by FBIS, "Paraguay Press Highlights," March 14, 2003 (FBIS Document ID: LAP20030314000106); and *ABC Color*, March 13, 2003, as translated by FBIS, "Angola Ousts Lebanese Fugitive Linked to Hizballah From Paraguay," March 13, 2003 (FBIS Document ID: LAP20030313000120).

Hizballah and the Lebanese Mafia continue to use Foz do Iguaçu and Ciudad del Este as transit points for smuggling Colombian cocaine. The arrest of an alleged Lebanese Mafia ringleader in São Paulo in January 2003 exposed an operation that was moving between 400 and 1,000 kilos of Colombian cocaine per month via Foz do Iguaçu, where it was then shipped to São Paulo.[97] A prominent Lebanese businessman, Bassam Naboulsi, who resides in the TBA and is a cousin of Assad Ahmad Barakat, was arrested on January 29, 2003, in São Paulo, Brazil. Bassam Naboulsi was accused of ties with a group of drug traffickers, one of whose members, also residing in Ciudad del Este, was arrested in Beirut the week before.[98] Bassam Naboulsi's brother, Hassan Naboulsi, owns Hassan Internacional, located in Ciudad del Este's Page shopping gallery. The operation led to the arrest of 14 men belonging to what the PF (Federal Police) refers to as the "Barakat clan," among them Akram Farhat, who is the brother-in-law of well-known Ciudad del Este businessman Samir Jebai. PF authorities believe that this group, led by Assad Barakat from within the Brasília prison, could be shipping cocaine to Middle Eastern and European markets.

On May 10, 2003, Hassan Abdallah Dayoub, a Lebanese merchant who lives in Ciudad del Este, was arrested at Asunción's Silvio Pettirossi Airport, while in possession of 2.3 kilos of cocaine hidden in an electric piano. High-ranking police sources connected with the investigation of Dayoub reportedly believe that his arrest constitutes overwhelming proof that Barakat's Hizballah clan has a "wing of narcotraffickers."[99] This is because Dayoub is a cousin of Barakat. Investigators believe that Barakat himself hired Dayoub as a "mule" to market the drug in Damascus, Syria. Once in the Argentine capital, Dayoub intended to transfer to an Iberia flight to Madrid, whence he would proceed on to his final destination of Damascus.

### Other Fund-Raising Activities

In addition to the estimated US$60 to US$100 million per year that it receives from Iran, Hizballah reportedly has also relied extensively on funding from the Shi'ite Lebanese Diaspora in

---

[97] Marcelo Godoy, *O Estado de São Paulo* [Internet Version-www], January 24, 2003, as translated by FBIS, "Brazil: Lebanese Mafia Members in São Paulo Arrested, Drugs Seized," January 24, 2003 (FBIS Document ID: LAP20030124000070).

[98] "Brazilian Police Arrest Lebanese Citizen," *ABC Color* [Internet version-www], January 30, 2003, as translated for FBIS, January 30, 2003 (FBIS Document ID: LAP20030130000073).

[99] *ABC Color* [Internet version-www], May 12, 2003, as translated by FBIS, "Paraguayan Police Make Arrest , Seize Cocaine From Tri-border Hizballah Head's Cousin," May 12, 2003 (FBIS Document ID: LAP20030512000065).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 94 of 632

West Africa, the United States, and most importantly the TBA.[100] Islamic money laundering in the TBA is concealed by the common practice of the local Arab community of remitting funds to relatives in the Middle East. Some of these remittances are suspected of being directed to Arab terrorist organizations, particularly Hizballah.[101] In late 2002, Argentine officials linked Lebanese terrorists in the TBA with money laundering, counterfeiting of U.S. dollars, and other illicit financial activities. As evidence, they cited "thousands of U.S. dollars bearing stamps from Lebanese currency exchange banks, tens of thousands of dollars in phony bills, and receipts from wire transfers made between the tri-border area and the Middle East."[102]

Argentina's Ramón Mestre, director of the Permanent Work Group (Grupo de Trabajo Permanente—GTP), founded to establish a coordinated common policy against terrorism in the countries that make up Mercosur (Common Market of the South), said in early December 2001 that the TBA had given "logistical support to terrorist organizations by providing money to groups that operate in other parts of the world." He said that activities such as the illegal traffic of immigrants and drug trafficking in the region "are elements that are in some way linked to terrorism…."[103]

Brazilian authorities have estimated that more than US$6 billion a year in illegal funds is laundered in the TBA. Every evening, a dozen armored trucks loaded with laundered money leave Ciudad del Este for Foz do Iguaçu, the Brazilian town on the opposite side of the border. Paraguay's Finance Ministry issued an order in January 2003 to suspend sending of dollars abroad, but a reporter found that it was apparently not being applied to armored vans or trucks leaving the TBA. One van known to be was carrying reais and dollars was observed crossing the Friendship Bridge into Brazil on January 20, 2003.[104]

During the 1999-2001 period, Islamic extremist groups, specifically Hizballah and Hamas, received a total of between US$50 million and US$500 million from Arab residents of

---

[100] Blanca Madani, "Hezbollah's Global Finance Network: The Triple Frontier," *Middle East Intelligence Bulletin* [a monthly publication of the United States Committee for a Free Lebanon] 4, no. 1 (January 2002).
[101] Bartolomé, 9.
[102] Mike Boettcher, with Ingrid Arnesen, "South America's 'Tri-border' Back on Terrorism Radar," CNN, November 8, 2002, http://www.cnn.com/2002/WORLD/americas/11/07/terror.triborder/.
[103] *El País* [Montevideo], December 1, 2001, translated in "Uruguay Press Highlights," December 3, 2001 (FBIS Document ID: LAP20011203000074).
[104] "Paraguay: Lack of Control System on Border with Brazil Allows Currency Flight," BBC Monitoring Americas – Political [London], January 23, 2003, 1, citing *ABC Color* Web site, January 22, 2003.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 95 of 632

Foz do Iguaçu through Paraguayan financial institutions.[105] An investigation begun in September 2001 also determined that a group of 42 Arabs in Ciudad del Este remitted abroad, mostly to Lebanon, approximately US$50 million, apparently during the 1997-2001 period. It is believed that these funds were derived from arms trafficking and other illicit activities.[106]

Argentine police and regional security organizations in general have described the Page shopping center, located in Ciudad del Este, as the regional command post for Hizballah. They have also linked Barakat to a Brazilian mosque that the police also described as a central Hizballah meeting place.[107] On September 12, 2001, a Paraguayan SWAT team raided Assad Ahmad Barakat's closet-sized shop, Casa Apollo, in this arcade. Barakat, who was away on business, escaped arrest. The police confiscated more than 60 hours of videotapes and CD-ROMs that show military marches and attacks with explosives in various parts of the world.[108] The confiscated material also included professional training courses for suicide bombers. The SWAT team also seized boxes containing financial statements totaling US$250,000 in monthly transfers to the Middle East and descriptions of at least 30 recent attacks in Israel and the Israeli-occupied territories.[109] The four principal individuals involved in the money remittance operations that were uncovered in September 2001 were Assad Ahmad Barakat and three of his principal Hizballah lieutenants in the Casa Apollo shop—Sobhi Mahmoud Fayad, Mazen Ali Saleh, and Salhed Mahmoud Fayad (Sobhi's brother).[110] Paraguayan prosecutor Carlos Cálcena noted that Barakat and Saleh sent money to international terrorist bank accounts in various countries. Specifically, they sent half a million dollars to Canada, Chile, and the United States (New York), and banks drafts of US$524,000 to Lebanon. Paraguayan Police found a letter from the Hizballah commander congratulating Barakat for financing activities in the Middle East.[111]

---

[105] Roberto Cosso, "Extremistas receberam US$50 mi de Foz do Iguaçu" (Extremists Received US$50 million from Foz do Iguaçu), *Folha de S. Paulo*, December 3, 2001.

[106] Bartolomé, 9, citing "Arabes envían US$50 milliones al exterior" [Arabs Send US$50 Million Abroad], October 3, 2001.

[107] Jose de Cordoba, "Is Jungle Junction a Terrorist Hideaway?—In Nexus of Latin Nations Is Casbah...and More, Say the Local Police," *Wall Street Journal*, November 28, 2001, A10.

[108] José Maschio, "Paraguayan Court Evidence Cited on Hizballah Link at Triborder," *Folha de São Paulo* [Internet version-www], November 26, 2001 (FBIS LAP20011126000074); and Stan Lehman, "Wanted by Paraguay, Hezbollah Supporter Is Free in Brazilian Town Across the Border," AP, December 12, 2001.

[109] Anthony Faiola, "U.S. Terrorist Search Reaches Paraguay; Black Market Border Hub Called Key Finance Center for Middle East Extremists," *Washington Post*, October 13, 2001, A21.

[110] Godoy, *O Estado de São Paulo*.

[111] Ricardo Galhardo Enviado, "Paraguai pede a prisão de libanês no Brasil" [Paraguay Sentences a Lebanese in Brazil to Prison], *O Globo*, November 6, 2001.

Argentine police also claimed that Barakat was involved in distributing US$60 million in counterfeit U.S. dollars printed in Colombia.[112]

On October 2, 2001, Mazen Ali Saleh and Salhed Mahmoud Fayad, both in their 20s, were arrested in Ciudad del Este, in possession of documents indicating regular remittances of between US$25,000 and US$50,000 to suspected Muslim radicals. Both were linked to Assad Ahmad Barakat.[113] The following day, Paraguayan police raided Casa Apollo for the second time in three weeks and this time arrested Barakat. Nevertheless, he escaped from prison and fled to Brazil, where, as a Brazilian citizen, he was not considered to be a security threat, at least until June 22, 2002, when he was arrested at his home in Foz do Iguaçu and imprisoned in Brasília. Barakat's business and Hizballah partner, Salman Reda, who fled jail on the same day in October 2001 as Barakat, was charged in Argentina with transporting explosives used against the Israeli Embassy in Buenos Aires in 1992.[114]

Sobhi Mahmoud Fayad was arrested in Ciudad del Este in late October 2001, after the prosecutor's office found documents at Barakat's shop indicating that Fayad had transferred large sums of money to banks in Lebanon and Canada.[115] Brazilian security agencies claimed that the financial aid offered in 2000 by groups in the TBA to Islamic and Middle Eastern terrorist organizations, such as Hizballah, Hamas, and the Islamic Jihad, totaled US$261 million.[116] Intelligence reports sent by Brazil to Paraguayan authorities between late 1999 and early 2000 reportedly mention three Hizballah leaders with whom Barakat allegedly met during trips to Lebanon that were at least annual.[117]

In late 2001, the Paraguayan intelligence services, which were collecting information on the activities of Lebanese citizens living in the TBA, reportedly found more evidence on how Barakat collected money for Hizballah. According to the evidence, he used blackmail and even

---

[112] Cordoba, *Wall Street Journal*.

[113] "Government Keeps Watchful Eye on Paraguay's Arab Community," October 13, 2001, EFE News Services (FBIS Rec. No. OEF2C4F9D99922F0).

[114] Roberto Godoy, *O Estado de São Paulo* [São Paulo; Internet version-www], November 12, 2001, as translated for FBIS, "Brazil: Foreign Intelligence Agents Spying on Triborder Mosques," November 12, 2001 (FBIS Document ID: LAP20011112000016).

[115] Kevin G. Hall, "Alleged Fund-Raiser for Hezbollah Arrested in Paraguay," Night Ridder/Tribune News Service, November 1, 2002, K7344.

[116] Riyadh Alam-al-Din, "Washington Begins the War on Hizballah in the Border Triangle," *Al-Watan al-Arabi* [Paris], December 21, 2001, 18–19, as translated for FBIS, "Report Says US Antiterror Campaign To Target Hizballah Network in S. America" (FBIS Document ID: GMP20011221000179).

[117] Roberto Cosso, "Brazil: $50 Million Remitted to Terrorist Groups from Triborder Area," *Folha de São Paulo* [Internet version-www], December 3, 2001, as translated by FBIS, December 3, 2001 (FBIS Document ID: LAP20011203000110.

death threats to force other Lebanese citizens to contribute to the Muslim fundamentalist group.[118] In 2001 a prosecutor in Ciudad del Este named Basilisa Vázquez Román investigated a US$100 million transfer from two Ciudad del Este bank branches to Lebanon. Vázquez Román told Brazilian media that 10 Lebanese citizens who own businesses in Ciudad del Este but live in Foz do Iguaçu sent the money through banks in Miami and New York to Lebanese banks.[119]

In addition to activities such as money laundering and drug trafficking, Barakat collected money for Hizballah by selling huge quantities of pirated software smuggled into the TBA from Hong Kong. At the end of 2001, Paraguayan agents confiscated, in the Chaco (a semi-arid region of Bolivia and Paraguay), a shipment of 5,000 pirated Nintendo CDs valued at US$160,000. The seizure uncovered a new route for pirated video games used by Barakat: one part of the shipment arrived by sea and another by air in the Chilean port city of Iquique, where Barakat has several businesses. From there, the merchandise was brought by land to the lower Chaco region, and sent to Barakat's shop, Casa Apollo, in Ciudad del Este.[120]

Another raid on October 31, 2002, in Ciudad del Este, found 4,600 falsified CDs and 80 copying machines capable of cloning up to 20,000 CDs per day in a clandestine lab operated by a Lebanese citizen known as "Samir."[121] The lab was located in the same building where Paraguayan authorities arrested Ali Khalil Mehri (see Mehri, Ali Khalil, Appendix) in his apartment in February 2000. Mehri was charged with piracy of computer programs and CDs and with selling millions of dollars of counterfeit software and funneling the proceeds to Hizballah.

---

[118] "Barakat Resorted to Blackmail To Get Money," *Última Hora* [Asunción, an independent, centrist daily, occasionally critical of the government, strongly anti-Oviedo], December 6, 2001, as translated for FBIS, "Report: Media on Efforts to Combat Terrorist Financial Activity in Triborder Area," December 10, 2001 (FBIS Document ID: LAP20011210000096).

[119] *ABC Color*, December 5, 2001, as translated for FBIS, "FBIS Report: Media on Efforts to Combat Terrorist Financial Activity in Triborder Area," December 10, 2001 (FBIS Document ID: LAP20011210000096).

[120] This incident is reported in *ABC Color* [Internet version-www], May 27, 2002, as translated for FBIS, "Paraguay: Authorities Uncover New Route Used by Hizballah Leader Bakarat," May 27, 2002  FBIS Document ID: LAP20020527000062).

[121] The Ciudad del Este Chamber of Commerce [http://www.pamcham.com.py/mem-cde.html] lists Samir Ali Jaber as the owner of Centro de Pioner Import Export, an electronics business located in the Hijazi Shopping. Center [tel: (595) 61 512-321 511-085 502-212; Fax: (595) 512321; e-mail: pioneer@newnet.com.py. However, confirmation that the arrested "Samir" and Samir Ali Jaber are one and the same individual is lacking. Also see "Arab Merchant Sells 'Incinerated' CD's," *Vanguardia* [Ciudad del Este], February 6, 2003, as translated for FBIS, "Highlights From the Tri-Border Press for the Week 3-7 February," February 11, 2003 (FBIS Document ID: LAP20030211000124); and "Allegedly Incinerated CD's Sold in CDE," *Vanguardia* [Ciudad del Este], January 31, 2003, as translated for FBIS, "Tri-Border Press for the Week of 23-31 January," Tri-Border Press Highlights, February 4, 2003 (FBIS Document ID: LAP20030204000134).

Barakat's fund-raising activities even reportedly included complicated swindling schemes together with Ali Hussein Abdallah ("Ali Tawil"). The two would use a new modus operandi in which modest imports of goods from Asia were established over time.[122] Once confidence was gradually gained with the importers, stings were done to the detriment of the wholesale merchants, who were cheated out of containers of merchandise valued at multimillion dollar sums.

**TBA-Related Violence Against Local Officials**

The governments of the three TBA countries and local TBA officials often emphasize that terrorism is not a problem in the region. For example, during the Third American Conference Against Terrorism, which met in El Salvador on January 22-24, 2003, representatives from Argentina and Brazil emphasized that no terrorist activity or dormant cells had been detected in the TBA.[123] TBA-based Islamic terrorist groups are not known to engage in acts of international terrorism within the TBA, which lacks high-profile targets other than foreign tourists visiting Iguaçu Falls.

However, unidentified groups have been carrying out unclaimed mafia- or Colombian-style attacks against local officials interfering in their fund-raising activities or against business people refusing to pay a "war tax," which is used in financing terrorist operations in various parts of the world. Many businessmen in the TBA reportedly pay what amounts to a war tax to the armed Arab groups in the region.[124] Others pay extortion to mafia groups. A number of businessmen who have refused to pay have been murdered. In one case, Armando Kassen, a Lebanese citizen who was president of the Paraguayan Arab Chamber of Commerce, fled to Beirut after being convicted of murdering a Ciudad del Este businessman, Ussein Mohamed Taiyen, who was president of the Ciudad del Este Chamber of Commerce.[125] On November 2, 2001, Hizballah leaders in the TBA, reportedly concerned not only about losing members and

---

[122] "Barakat Held in Same Prison as "Beira Mar" Drug Smuggler," *ABC Color*, June 24, 2002, as translated by FBIS, "Paraguay Press Highlights," June 24, 2002 (FBIS Document ID: LAP20020624000088).

[123] Horacio Verbitsky, *Pagina/12* [Buenos Aires; Internet version-www], January 26, 2003, as translated for FBIS, "Argentine Bill To Empower Military To Fight Domestic, Foreign Terrorism Viewed," January 26, 2003 (FBIS Document ID: LAP20030126000047).

[124] "Brazil: Report on Islamic Terrorism in Iguazu Triangle," *al-Watan al-'Arabi* [Paris], January 9, 1998, 22–24, as cited by *Estado de São Paulo*.

[125] "Mastermind of Taiyen's Murder Residing in Beirut," *Vanguardia* [Ciudad del Este], November 11, 2002, as translated for FBIS, "Highlights: Brazil - Paraguay Triborder Press 4-15 Nov 02," November 21, 2002 (FBIS Document ID: LAP20021121000006).

influence to al Qaeda, but also about pressure being increasingly applied on them by security forces in the region, issued a *fatwa* authorizing the use of physical violence against traitors or enemies of the jihad.[126]

More recently, on October 21, 2002, local mafia organizations involved with smuggling and piracy activities in the TBA sent a clear message of their power beyond the region to Uruguayan Customs Director Víctor Lissidini.[127] The TBA Mafia made telephone threats to Lissidini before he was shot at in his car by four armed gunmen on two motorcycles, in reprisal for the confiscation of a batch of counterfeit merchandise bound for Ciudad del Este.[128] The constant seizure of pirate merchandise by authorities in Uruguay apparently provoked the attack. Prior to the attack on his car, mafia operating out of Ciudad del Este and involved with smuggling and pirating CDs and possibly financing Islamic terrorist groups made cellular phone threats to Lissidini and his subordinates. The callers specifically demanded that 2 million confiscated blank CDs belonging to the Piscis Import-Export Company located in Ciudad del Este be released.[129] In another example, on February 24, 2003, two men riding a motorcycle in downtown Foz do Iguaçu shot and seriously wounded the president of the Foz do Iguaçu City Council.[130] It was unclear whether the perpetrators were linked to a particular ethnic group.

**Clandestine Terrorist Communications in the TBA**

There have been open-source indications that the Islamic terrorist network in the TBA has maintained telephone communications with operatives worldwide, including in the United States. The FBI reportedly traced several telephone calls between the United States and at least one of the TBA cities immediately following the September 11, 2001 terrorist attacks. Whether

---

[126] *Útima Hora*, November 5, 2001, as translated for FBIS, "FBIS Report: Media on Efforts to Combat Terrorist Financial Activity in Triborder Area," December 10, 2001 (FBISDocoument ID: LAP20011210000096).

[127] "Ciudad Del Este Linked To Customs Director Attack," Uruguay Radio Parque [Ciudad del Este], November 26, 2002, as translated for FBIS, "Brazil-Paraguay Triborder Press Highlights: November 25–29, 2002, December 3, 2002 (FBIS Document ID: LAP20021203000105).

[128] "Justicia investiga atentado" [Justice Investigates Attack], *El País* [Montevideo], November 21, 2002; and "Atentado a la colombiana contra vehículo de Lissidini" [Colombian-Style Attack Against the Car of Lissidini], *La República en La Red*, November 21, 2002, 12.

[129] "Threats to Lissidini Possibly Linked to Terrorism," *La República* [Montevideo; unofficial newspaper of Uruguay's largest political party, the leftist Broad Front; Internet version-www), November 21, 2002, as translated by FBIS, November 21, 2002 (FBIS Document ID: LAP20021121000104).

[130] "Foz City Council President Shot in Attack," Itapiru Radio "Segunda Entrega de Noticias" newscast [Ciudad del Este], February 24, 2003, as translated for FBIS, "Tri-Border Radio Highlights 24 Feb 03," Radio Parque [Ciudad del Este], February 24, 2003 (FBIS Document ID: LAP20030226000042).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 100 of 632

Islamic terrorists in the TBA played any role in the September 11 attacks in the United States is not known. Some al Qaeda operatives in the TBA may have known in advance about the September 11 attacks and discussed the plot in a mosque in Foz do Iguaçu. At least this is the contention of a Moroccan student, Gueddan Abdel Fatah, 27, who was arrested in early September 2001 in Brazil. Fatah maintains that he overheard Islamic extremists discussing the September 11 al Qaeda attacks against New York and Washington at a mosque in Foz do Iguaçu a week before the attacks took place. Brazilian press reports indicate that he contacted an attorney visiting his prison on September 5, 2001, and asked them to "urgently" deliver a letter to Brazilian, U.S., and Israeli authorities to warn them about an impending attack with "two explosions" that could take place in the United States.[131]

In 2001-02, Islamic terrorist groups reportedly were using the TBA as part of a clandestine communications network using a system known as PABX, which is designed to evade eavesdropping on telephone conversations by spy satellites by connecting various telephone networks. Calls from Saudi Arabia to Brazil, or from Brazil to Pakistan, for example, could be made without raising suspicions. In 2000 the Brazilian Police reportedly detected at least six clandestine communication bases near Foz do Iguaçu that were being used for making and receiving telephone calls to and from the Middle East and Afghanistan.[132] Before the September 11 attacks in the United States, Brazilian investigators were suspicious of what was thought to be merely illegal schemes to reduce the price of telephone calls. After September 11, however, suspicions shifted to possible terrorist links because the illegal calls went to countries like Afghanistan, Pakistan, and Lebanon.

Concerned about what it considered to be the action of Islamic extremist cells in the TBA, Brazil's PF began to operate under cover in the region. Within weeks, the PF discovered various clandestine telephone exchanges suspected of links with Islamic extremism.[133] In 2002,

---

[131] John Daly, "The Suspects: The Latin American connection," *Jane's Terrorism & Security Monitor*, October 1, 2001.

[132] Mario Daniel Montoya, "War on Terrorism Reaches Paraguay's Triple Border," *Jane's Intelligence Review* 13, no. 12 (December 2001): 13.

[133] Expedito Filho and Sílvio Ferreira, with Patrícia Cerqueira, "Rede de clandestinidade" [Clandestine Network], OnlineÉpoca Editora Globo], No. 179, October 22, 2001; João Naves de Oliveira, "Central telefônica leva três à prisão em MS" (Telephone Exchange Takes Three to Prison in MS), Estado.com.br, October 12, 2001; and "Árabes teriam financiado centrais telefônicas piratas no PR" (Arabs Had Financed Pirated Telephone Exchanges in PR), Estadao.com.br, terra.com.br, October 11, 2001.

the Brazilian police closed a dozen telephone switching operations in Foz do Iguaçu and in other nearby cities that could have been used to evade U.S. satellites monitoring telephone traffic.[134]

While living in Foz do Iguaçu in 1999-2001, Lebanese businessman Afif Najib Eid contracted operators of the equipment for clandestine telephone switching operations.[135] Eid, who owns an electronic products store in Ciudad del Este, migrated from Lebanon to Foz do Iguaçu in 1989. Phone records indicate that much of the traffic involved countries such as Afghanistan, Pakistan, and Saudi Arabia.[136] In late 2001, police in Foz do Iguaçu arrested at least one of the clandestine operators, a Lebanese named Muhamed Hassan Atwi and a Brazilian named Paulo César Caramori. Atwi was suspected of operating the illegal telephone services in Paraná State and another in Rio de Janeiro. In the apartment used by the two men, police found a computer and false passports (see Hassan, El Hadi Haha Mohamad).[137]

### TBA-Linked Islamic Terrorist Activities Elsewhere in the Southern Cone

The TBA's Islamic extremist and organized crime networks cannot be examined in isolation because they are linked to wider networks in the Latin American region and the world in general. Moreover, Islamic extremists who had been based in the TBA have been spreading out and establishing new support networks, apparently in places also popular with organized crime groups. In late 2002, unidentified TBA intelligence officials commented about two trends regarding the movements of Islamic extremists who had been based in the TBA.[138] It was noted that these extremists were dispersing to smaller towns within the region. For example, they had been seen in towns such Uruguaiana, a Brazilian town on the border with Argentina south of Ciudad del Este; Cascavel in Brazil's Ceará State; and Pedro Juan Caballero in Paraguay, renowned for its potent marijuana crops and scarcity of police.[139] The TBA's Islamic extremists, like mafia members and corrupt officials, also are being attracted to the money-laundering centers along the 1,290-kilometer-long Brazil-Paraguay border. These include, in Brazil, Ponta

---

[134] Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32.
[135] "O terror por aqui" (The terror at Home), OnLine Epoca, O Globo.com, No. 179, October 22, 2001.
[136] Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32.
[137] Rohter, *New York Times*.
[138] Larry Rohter, "South America Region Under Watch for Signs of Terrorists," *New York Times*, December 15, 2002, 1A, 32.
[139] Rohter, New York Times.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 102 of 632

Porã and Coronel Sapucaia in Mato Grosso do Sul State, as well as Cascavel; and, in Paraguay, Pedro Juan Caballero and Capitán Bado.[140]

Intelligence officials also noted that Islamic extremists were branching out into nearby countries with established Arab or Muslim communities, such as Iquique, Chile; Guayaquil, Ecuador; and Maracaibo, Venezuela. There are also indications that Islamic extremists are also moving to São Paulo. As a result of increased security measures implemented in the TBA in the 1999-2002 period, a so-called "second tri-border area" was reportedly developing in the region between Brazil, Bolivia, and Peru.[141]

### Chuy, Uruguay, and Chuí, Brazil

A month after the bomb attack against the AMIA building in Buenos Aires in July 1994, Brazilian government suspicion began focusing on the city of Chuí in the southern part of Brazil, at the border with Uruguay. Chuí is the other half of Chuy, which is on the Uruguayan side. It is easy to reach Buenos Aires from Chuí by sea, thereby avoiding border controls. The city has a total of about 1,500 Arab residents.

In about 1994, a Hizballah network reportedly was initially detected using the Chuí zone as a point of distribution of military weapons such as M-16 and AR-15, grenades, and rocket launchers.[142] These groups undoubtedly are linked to those in the TBA. More recently, in 2001, Uruguayan investigations uncovered a cocaine trafficking operation in Chuy that was linked to

---

[140] Clarinha Glock, "Brazil-Paraguay: A Full Plate for Journalists," July 19, 2001, Inter American Press Association [http://www.impunidad.com/atrisk/brasil_paraguay7_19_01E.html], citing PF (Federal Police) reports; and Pedro Oviedo, "En la Triple Frontera se lavan doce mil millones de dólares al año del narcotráfico, según un informe official" [In the Triple Border US$12 billion Is Laundered Per Year From Narcotics Trafficking, According to An Official Report], www.MisionesOnLine.net, no. 745, July 8, 2001, http://misionesonline.net/paginas/action.lasso?-database=noticias3&-layout=web&-response=noticia.html&id=11349&autorizado=si&-search, citing Dr. Guido Rauber *Lavado de Dinero: Triple Frontera—Work Paper Nº 1*, Prevención de Adicciones y Control de Drogas [Subsecretary of Drug Control and Prevention of Addictions], Ministry of Public Health of Misiones Province, Argentina, updated version of December 31, 2000 (original date, August 2, 1999).
[141] Marcio Aith, *Folha de São Paulo* [São Paulo; Internet version-www], November 8, 2002, as translated for FBIS, "Argentine Intelligence Chief Says Terrorism Seeking New 'Tri-border' Area," November 8, 2002 (FBIS Document ID: LAP20021108000025), citing Miguel Angel Toma, chief of Argentina's Secretariat for State Intelligence (Secretaría de Información del Estado—SIDE), in response to a telephone interview question.
[142] Brazilian Officials Warn Uruguay About Islamic Groups at Border," September 1, 1994, 16 (JPRS-TOT-94-036-L).

the Arab and Lebanese Mafias. A Brazilian Federal Police document reportedly states that, "The money obtained from the sale of the product would be used to finance international terrorism."[143]

The Chuí connection to the TBA came into clearer focus in 2001, when a Lebanese named Al-Sa'id Ali Hasan Mukhlis (also spelled Mokhles) was identified as having contacts with Saudi Arabian members of a group of Osama bin Laden militants in the TBA (see Mukhlis, El Sa'id Hassan Ali Mohamed (al-Gama'a al-Islamiyya), Appendix). The mayor of the Brazilian border town of Chuí, Mohammed Kasim (also spelled Kassem) Jomaa ("Mohamed Yoma"), allegedly helped al Said Hassan Hussein Mukhlis' family after Mukhlis was arrested in Chuí on February 27, 1999, following a call by the CIA to detain him on charges of having participated in the Luxor terrorist attack.[144] Mayor Jomaa has been described as the presumed chief of the emerging "Arab Mafia," an organization involved in arms and drug trafficking, money laundering, and exploitation of undocumented workers.[145]

### Iquique, Chile

Islamic terrorist ties are believed to exist between the TBA and Iquique in Chile.[146] Iquique is an attractive location for Islamic money launderers and smugglers operating in the TBA. The attraction is partly explained by the fact that Chile has become the fastest-growing hub in South America after Brazil for international narcotics transshipments and money-laundering enterprises.[147] In addition, as pressure from security authorities has increased in the TBA, a number of Islamic militants reportedly have moved to Iquique.

On November 8, 2001, the Chilean government confirmed that it was investigating an alleged Arab financial network with terrorist links that may be engaging in money laundering in Iquique, Chile.[148] It involved Assad Ahmad Barakat and his fellow countryman Kalil Saleh, who

---

[143] Sérgo Gobetti, "PF investiga ligação de prefeito con Bin Laden" (PF Investigates Mayor's Links with bin Laden"), Oestadao.com.br, September 12, 2001.

[144] John Daly, "The Suspects: The Latin American connection," *Jane's Terrorism & Security Monitor*, October 1, 2001.

[145] Enrique Medeot, "El alcalde brasileño que jura no ser amigo de Bin Laden" (The Brazilian Mayor Who Swears That He Isn't A Friend of bin Laden), Clarín.com, September 16, 2001; and *New York Times*, September 27, 2001

[146] Fernando Tejeda and Javier Méndez, "Nexo entre la Triple Frontera e Iquique" [Nexus between the Triple Frontier and Iquique], *El Mercurio* [Santiago], October 13, 2001, http://www.emol.com/noticias/detalle/ detalle_diario.asp?idnoticia=0113102001001A0050001.

[147] "New Drug Gangs Spreading in Colombia," *The Global Intelligence Report* (Stratfor), April 3, 2002, citing *El Tiempo*.

[148] *Estrategía* [a Santiago financial daily, Internet version-www], November 9, 2001, as translated for FBIS, "Chile Confirms Alleged Terrorist-Linked Financial Network Under Investigation," November 9, 2001 (FBIS Document

established two import and export firms in Iquique in early June 2001. Investigators confirmed that the money allegedly laundered in Iquique came from Ciudad del Este, and that Barakat's businesses were being used as fronts. The amount laundered was estimated to be several million dollars.

## OTHER ORGANIZED CRIME ACTIVITIES IN THE TBA

As suggested in the earlier discussion of TBA-related violence against local officials, Islamic terrorist group activities in the TBA and organized crime activities in the region often cannot be distinguished clearly. In the case of Hizballah, for example, the distinction between Hizballah and the Lebanese Mafia is not at all clear based on the limited amount of material covered in this study. If Hizballah and the Lebanese Mafia are not interconnected, then they probably at least cooperate closely. In addition to unclaimed acts of occasional violence against business people and local officials, the Islamic terrorist groups and organized crime groups in the region engage in illicit activities such as drug and arms trafficking, money laundering, and



*Sacoleiros* (bag carriers) carry contraband, such as cigarettes and fake watches, across the Friendship International Bridge.

Source: *Página/12*.com.ar, October 30, 2001.

product piracy. Instead of always pursuing these activities separately, however, the Islamic terrorist groups and organized crime groups in the TBA may collaborate whenever collaboration better serves their mutual interests. Examples of this reported collaboration in the TBA include Hizballah's ties with groups such as the Hong Kong Mafia and the Argentine "Local Connection," al Qaeda's ties with the Chechen and Chinese mafias, and the Egyptian al-Gama'a al-Islamiyya's ties with the Chinese Mafia.

In addition to Islamic terrorist groups and organized crime groups, a third type of group is found in the TBA: corrupt government or security force officials. Corruption at all levels of

ID: LAP20011109000089); "Chilean Police Investigate Terrorist Financial Network," *Santiago Times*, January 8, 2002; and Héctor Rojas and Pablo Vergara, *La Tercera de la Hora* [Santiago; a conservative, pro-business, top-circulation daily, Internet version-www], November 8, 2001, as translated for FBIS, "Chilian Police Examine Link to Alleged Triborder Hizballah Financial Network," November 8, 2001 (FBIS Document ID: LAP20011108000085).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 105 of 632

government allows the Islamic terrorist and organized crime groups to operate in the TBA and elsewhere in the TBA countries with considerable impunity (see TBA-Related Governmental Corruption).

## Indigenous Organized Crime Groups

### Argentina

Organized crime in Argentina reportedly is in an incipient stage and is regional rather than international in scope, thriving on the socioeconomic and political conditions prevalent in the country.[149] Furthermore, the only form of organized crime in Argentina that is linked to international cartels is said to be drug trafficking, although the narcotraffickers also traffic in children and women; smuggle and market stolen cars; and engage in tax evasion, embezzlement, fraud, insider trading, and financial swindles.[150] The TBA is of particular concern to the Argentine government in this regard because it serves as a gateway for organized crime to migrate south into the rest of the country.

The Islamic fundamentalists in the TBA reportedly are closely linked to a growing mafia in Argentina that provided important assistance in the 1992 bombing of the Israeli Embassy in Buenos Aires and the 1994 bombing of a Jewish community center (AMIA) in that capital. As the economic and political crisis in Argentina continued in 2002, a criminal group known as "Local Connection," made up of corrupt politicians and former members of the military regime, was reportedly prospering.[151] As a result of its unique organizational relationship between common criminals and public figures, the Local Connection, unlike other Argentine gangs, has enjoyed impunity. It reportedly controls much of what are now major industries in Argentina, including arms and drug trafficking, kidnappings, and Argentina's flourishing industry of dismantling stolen cars for spare parts. The Local Connection is organized like the Italian Mafia in small units, or families, linked to a boss, generally a corrupt police official or someone who served in the military regime. Its members are linked to the fundamentalist Islamic movements

---

[149] Hugo Antolin Almiron, "Organized Crime: A Perspective from Argentina." Chapter 14 in Jay S. Albanese, Dilip K. Das, and Arvind Verma, eds., *Organized Crime: World Perspectives* (Upper Saddle River, New Jersey: Prentice Hall, 2003), 320.
[150] Almiron, 329.
[151] This paragraph is based entirely on Carlos Wagner, special envoy in Buenos Aires, Zero Hora [Porto Alegre], November 10, 2002, as translated by FBIS, "Brazil: Argentine Crime Group "Local Connection" Said To Have Ties to Terrorists in Tri-Border," November 10, 2002 (FBIS Document ID: LAP20021111000047).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 106 of 632

that are active in the TBA. The Connection bosses use code names when contacting the fundamentalists in Foz de Iguaçu and Ciudad del Este.

In late 2001, a change of strategy in arms trafficking reportedly took place amid the political and economic crisis that overtook Argentina.[152] Until then, the Local Connection was involved only in big arms deals, such as providing military equipment to groups fighting civil wars, but in late 2001 it began to sell contraband. Since then, Argentina reportedly has been taking the place of Paraguay in smuggling weapons into Brazil, even arms used exclusively by the Argentine armed forces.

### Paraguay

Families that began smuggling activities in the TBA, particularly the Morel family, have developed ties with international mafias and have acquired increasing political power and influence in other regions of Paraguay. The Morel clan began a war with the organization of Luiz Fernando da Costa ("Fernandinho Beira-Mar"), when he moved into the Paraguayan border region with Brazil after escaping from prison in March 1997. The two Morel brothers were killed in January 2001, and the clan's patriarch was killed in a Brazilian jail a week later, reportedly at the orders of Beira Mar.[153] The Paraguayan drug families have branched out into lucrative activities such as arms trafficking, mainly to supply organized crime groups in Brazilian cities. Elvio Ramón Cantero Aguero, based in Pedro Juan Caballero, heads one criminal organization operating in the Ciudad del Este area.[154]

Brazilian and U.S. officials generally consider former General Lino César Oviedo to be head of the so-called Paraguay Cartel. He reportedly has amassed at least US$1 billion, including numerous properties in the TBA.[155] At the time of his arrest in June 2000, Oviedo was using Foz do Iguaçu and Ciudad del Este as a base of operations for laundering money.

---

[152] Wagner, "Local Connection."

[153] Mike Ceaser, "Libre comercio de drogas" [Free Trade of Drugs], Noticiasaliadas.org, November 15, 2002, http://www.lapress.org/Summ.asp?lanCode=2&couCode=19.

[154] "Tri-Border Press Highlights," December 2-6, 2002, as translated for FBIS, December 12, 2002 (FBIS Document ID: LAP20021212000099); Cesar Palacios and Oscar Florentín, *Noticias* [Asunción], December 6, 2002, as translated for FBIS, "Paraguay: Police Confiscate Arsenal from Gangster's Home," December 6, 2002 (FBIS Document ID: LAP20021206000030).

[155] This paragraph is based entirely on "El Caso Lino Oviedo y su conexión con la Argentina" [The Lino Oviedo Case and Its Connection with Argentina], *Página12* [Buenos Aires], 2001, citing an Argentine Chamber of Deputies report on money laundering, http://www.pagina12.com.ar/2001/suple/carrio/cap11.pdf.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 107 of 632

**Non-Indigenous Organized Crime Groups**

Crime syndicates from China, Colombia, Corsica, Ghana, Italy, Ivory Coast, Japan, Korea, Lebanon (see Islamic Terrorist Group Activities in the TBA), Mexico, Nigeria, Russia, and Taiwan are known to have operated in the TBA. A number of these groups are reportedly associated with corrupt Paraguayan business executives, politicians, and military officers tied to the ruling Colorado Party.[156] They even reportedly control some news media directors.[157] The influence in the TBA of non-indigenous organized crime networks reportedly is strengthening. These groups are active in Paraguay and along the drug-trafficking route from Colombia to the United States and Europe. Most of these clandestine operations reportedly take place in Ciudad del Este, which is considered a regional center for drug trafficking and arms smuggling. The transactions mostly involve bartering drugs for weapons from Colombian armed rebel groups.[158]

The Colombian, Italian, and Nigerian mafias have been singled out as the main transnational mafias operating in Brazil, but without headquarters in that country.[159] Brazil's Federal Police reported in late 1999 that the Nigerian Mafia operates in various Brazilian cities, including Foz do Iguaçu.[160] According to Uruguayan authorities, these and other principal organized crime groups, including the Japanese *yazuka* (the Japanese word for gangsters) all have a presence in Ciudad del Este, where they have an established criminal structure that is linked to international terrorism.[161] However, if the Italian and Nigerian mafias are active in the TBA there does not appear to be much news media reporting on their activities in the region.

*The Chinese*

The cultural and social demographics of Ciudad del Este make it an ideal city for the operations of Chinese-speaking criminal groups. In the 1990s, Chinese mafias such as Fuk

---

[156] Jack Sweeney, "DEA Boosts Its Role in Paraguay," *Washington Times*, August 21, 2001.

[157] "Dicen que directores de medios están vinculados con la mafia" [Some Media Directors Are Said To Be Linked to the Mafia], *ABC Color* [Paraguay], April 3, 2002, http://www.una.py/sitios/abc.

[158] Riyadh Alam-al-Din, "Washington Begins the War on Hizballah in the Border Triangle," *Al-Watan al-Arabi* [Paris], December 21, 2001, 18–19, as translated for FBIS, "Report Says US Antiterror Campaign To Target Hizballah Network in S. America" (FBIS Document ID: GMP20011221000179).

[159] Ruy Gomes Silva, Effective Measures to Combat Transnational Organized Crime in Criminal Justice Processes, December 2001, 165.

[160] *O Estado de Sao Paulo* [Internet version], November 23, 1999, as translated by FBIS, "Federal Police Links Local Companies With Nigerian Mafia," November 23, 1999 (FBIS Document ID: FTS19991123001608).

[161] "Ciudad del Este: Centro internacional de mafias, a una hora de vuelo de Uruguay" [Ciudad del Este: International Mafia Center, A One-Hour Flight from Uruguay], La Onda Digital, September 25, 2001, http://www.uruguay.com/laonda/LaOnda/Entrevistas/Diputado%20Alberto%20Scavarelli.htm.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 108 of 632

Ching, Big Circle Boys, Flying Dragons, and Tai Chen, mostly from mainland China, established a presence in Ciudad del Este in order to profit from the city's Asian imports.[162] They are considered by authorities to be especially dangerous because they are young groups that do not follow traditional rules, such as staying in their own world and not bothering authorities or diplomats.[163]

Some of these Chinese mafias are called Triads; they specialize in providing "protection" to local Chinese business people and in imposing "taxes" on the containers imported by the Chinese businesses from Asia. When the mafia directly imports goods from Asia, the Chinese business community is obligated to purchase that merchandise, or suffer the consequences of not doing so.[164] As of 2000, at least six Chinese Triads existed in the TBA and were vying for the 7,000 Chinese businesses in Ciudad del Este, from whom they collect up to US$30,000 a month by exporting "protection" money.[165] These groups reportedly originated in Hong Kong, Mainland China, and Taiwan.[166]

These groups can be summarized as follows:

❖ The members of the "Fuk Ching" (also spelled "Fuchien" or "Fu Chin") Triad came from China during the Stroessner regime.[167] They are headed by A. Sahi o Sain ("Mayo") or Feng Cheng Cui. In 2000 this was the most powerful group and consisted of 30 assassins of between 20 and 30 years of age, who also were operating in Foz do Iguaçu.[168] Fuk Ching monopolizes the umbrella market in the TBA.[169]

❖ "Pac Lun Fu" dominates electronics contraband and athletic items in the TBA. It is supported by Brazilian and Paraguayan delinquents who specialize in extorting "protection" money. Anyone who refuses to pay is likely to be murdered.

---

[162] Rotella.

[163] Rotella.

[164] Bartolomé, 7, citing XIV Seminario de Fronteras: Los Desafíos a la Seguridad y Delitos del Siglo XXI, Escuela Superior de Gendarmería, Buenos Aires, 1996, 13–16.

[165] Tripartitite Command of the Three Borders, *Base de Datos SER en el 2000* [Regional Strategic Sercurity Database in 2000], http://www.ser2000.org/protect/docs-sobresalientes/triplef.htm.

[166] Rotella, citing Paraguayan police archives.

[167] For background, see James O. Finckenauer, "Chinese Transnational Organized Crime: The Fuk Ching," (undated) National Institute of Justice International, U.S. Department of Justice, http://www.ojp.usdoj.gov/nij/international/ctoc.html, citing Chin, Ko-lin, *Chinatown Gangs* (Oxford: Oxford University Press, 1996).

[168] Tripartitite Command.

[169] "Taiwanese Mafia Boss Arrested," *Vanguardia* [Ciudad del Este], November 28, 2002, as translated for FBIS, "Brazil-Paraguay Triborder Press Highlights: November 25–29, 2002," December 3, 2002 (FBIS Document ID: LAP20021203000105).

❖ The "Tai Chen Saninh" Group originated in Hong Kong. It has been fighting to displace the other Triads in the TBA.[170] A Tai Chen boss in Ciudad del Este was shot to death in 1998 after attempting to extort US$200,000 from a Taiwanese immigrant building an industrial park in the city.[171]

❖ The "Continental" Group has been seeking to control the wall-clock market in the TBA.

❖ Along with the Chinese Triads and the Japanese *yakuza*, the Big Circle Boys is one of the most prominent types of groups involved in Asian-based transnational crime.[172] Big Circle Boys (Dai Huen Jai, or BCB) is a loosely affiliated group of gangs operating independently and cooperating only when necessary. Although not a Triad, the BCB's operations are considered to be nearly as sophisticated as those of the Triads. BCB members are active in drug trafficking, migrant smuggling and large-scale credit card forgery and fraud. BCB is believed to be working with a variety of transnational crime syndicates, including the Russian/Eastern European Mafia, and outlaw motorcycle gangs.[173]

❖ The Flying Dragons appears to be an affiliate of the same overall organization as New York's Flying Dragons, a vicious Chinese street gang, which is the enforcement sector of the Hip Sing Triad, a Fukienese Triad.[174]

Although the Chinese Mafia in the TBA is characterized by internecine rivalries, it is known to collaborate with the Islamic terrorist groups in the region. At least two organizations—the Sung-I and Ming families—have engaged in illegal operations with the Egyptian al-Gama'a al-Islamiyya.[175] The Sung-I family, which is based in the Paraguayan town of Hernandárias, used three photography and electronic businesses located in Ciudad del Este as fronts for its

---

[170] Tripartitite Command.

[171] Rotella.

[172] Canadian Security Intelligence Service (CSIS), "Transnational Criminal Activity," November 1998, http://www.fas.org/irp/threat/back10e.htm.

[173] For additional information, see Criminal Intelligence Service Canada (CSIS), "Asian-Based Organized Crime," 1998, http://www.cisc.gc.ca/AnnualReport1998/Cisc1998en/asian98.htm.

[174] Amy O'Neill Richard, "International Trafficking in Women to the United States: A Contemporary Manifestation of Slavery and Organized Crime," An Intelligence Monograph of the Director of Central Intelligence (DCI) Exceptional Intelligence Analyst Program, Center for the Study of Intelligence, Central Intelligence Agency, April 2000, U.S. Department of State Web site, http://usinfo.state.gov/topical/global/traffic/report/homepage. htm#contents, based on interview with INS, New York, May 1999.

[175] Bartolomé, 8; and *ABC Color*, February 24, 2003, as translated by FBIS, "Chinese Mafia Linked to Islamic Fundamentalists," in "Paraguay Press Highlights," February 25, 2003 (FBIS Document ID: LAP20030225000094).

activities. In December 2000, Sung-I sold a shipment of munitions to the Islamic Group, sending it to Egypt by ship as "medical equipment." The Cameroon-flagged vessel was intercepted in the Cypriot port of Limasol. The Ming family managed Islamic Group funds from Ciudad del Este in the financial circuit that includes Guyana and the Cayman Islands.[176] An example of collaboration between the Chinese Mafia and Islamic terrorist groups in the TBA is the distribution chain for counterfeit manufacture of mass-market items, such as toys, running from Hong Kong to Hizballah extremists.[177]

The Chinese community in Ciudad del Este has such a dynamic trade in illicit Asian contraband that the Taiwanese Chinatrust Bank established its only Latin American branch in the city.[178] The significance of the Chinese Mafia threat in the TBA appeared to be confirmed by the formal demand made in 2001 by a group of 15 Taiwanese industrialists who are members of Taiwan's Ministry of Economic Affairs. The industrialists conditioned their proposal for establishing their industries in the Eastern Industrial Park of Ciudad del Este on the eradication of the Chinese Mafia in the TBA by local authorities.[179]

Reportedly, the Hong Kong Mafia engages in large-scale trafficking in pirated products from mainland China to Ciudad del Este and maintains strong ties with the pro-Iranian Hizballah in the TBA.[180] Ayrton Nascimiento Vicente, who was chief of Brazil's TBA Command, an organization created by the governments of Argentina, Brazil, and Paraguay to control the zone, confirmed that Chinese and Korean mafias have been identified in the TBA, including in Foz do Iguaçu and Ciudad del Este.[181]

---

[176] Bartolomé, 8, citing Roberto Godoy, "Tríplice Fronteira é vigiada há 20 anos," *O Estado de São Paulo*, November 11, 2001.

[177] *ABC Color* (Internet version-www), November 22, 2002, as translated for FBIS, "Hong Kong Mafia Linked to Hizballah in Tri-Border Region" (FBIS Document ID: LAP20021122000047).

[178] Bartolomé, 7, citing  "The Bank in the Future of South America," *Taipei Today* 18, no. 2 (March–April 1999).

[179] Bartolomé, 8, citing "Empresarios taiwaneses piden erradicación de la mafia china," *Noticias*, November 18, 2001.

[180] *ABC Color* [Internet version-www], November 22, 2002, as translated for FBIS, "Paraguay: 'Strong Ties' Seen Between Hong Kong Mafia, Tri-border Based Hizballah," November 22, 2002 (FBIS Document ID: LAP20021122000059).

[181] Bartolomé, 5, citing "Afirman que es imposible la vigilancia en la Triple Frontera" [Affirmation That Vigilance in the Triborder Region Is Impossible], *La Nación* [Buenos Aires], April 2, 2000; and Aloisio Milani, "Máfia chinesa extorque e executa em São Paulo" [Chinese Mafia Extorts and Executes in São Paulo], Jornal-laboratório da Faculdade de Comunicação Social Cásper Líbero, no. 28 (December 2001), http://biondi.fcl.unb.br/facasper/ jornalismo/esquinas/noticia.cfm?secao=4&codigo=87]

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 111 of 632

As a result of the Chinese groups' ability to bribe Paraguayan judges, they have been able to operate with impunity, according to the consul general of Taiwan in Ciudad del Este.[182] In 2001 the Paraguayan government made an effort to neutralize the activities of the Chinese mafias, but only minor successes were reported. In July 2001, authorities in Ciudad del Este arrested Chinese citizen Wu Wen Huan, one of the mafia capos in the TBA. Local Chinese business people denounced him for his extortion tactics. Between 1997 and 2000, Wu Wen Huan's company, Floresta SA, had registered more than 600 untaxed imports.[183] And that October, Paraguayan police arrested Cheng Tin Tsang, one of the new Chinese Mafia capos in the TBA, along with two other Asian criminal suspects. The three were residing in Foz do Iguaçu



Erika Pai (right) handcuffed to Roberto Shih's son Victor Shih

Source: *ABC Color*, December 13, 2002.

and using North American and European passports to avoid being detained as Asians.[184]

Another alleged chief of Chinese organized crime in the TBA, a young woman named Chia Hui ("Erica") Pai, was arrested in late 2002. According to *ABC Color*, Chia Hui was accused of being the mastermind in the torture and attempted murder of Chinese businessman Guillermo Lin, who survived being shot in the head and thrown into the Río Paraná.[185] Lin later pressed charges and testified against his alleged torturers, among them Shih Soung Mou ("Roberto Shih").[186] People connected to the Chinese Mafia in Ciudad del Este reportedly paid US$12,000 to obtain the release of Chia Hui on bail.[187]

Instead of having their operations disrupted by these occasional arrests, the Chinese Mafia groups appear to be using the TBA as a base for expanding their thriving businesses into Argentina and Brazil. An investigation by Argentina's National Gendarmerie (Gendarmería Nacional), a paramilitary force, found that members of the Chinese mafias enter Argentine

---

[182] Bartolomé, 16, citing "Mafia, amparada por la justicia" [Mafia protected by justice], *ABC Color*, September 28, 2001.

[183] Bartolomé, 7–8, citing "Procesarán por evasion a supuesto capomafioso," *ABC*, September 17, 2001; "Trial Begins for 'Mafia Boss' Chinese Citizen," *ABC Color*, November 29, 2002, as translated for FBIS (FBIS Document ID: LAP20021129000064); and "Taiwanese Mafia Boss Arrested," *Vanguardia* [Ciudad del Este], November 28, 2002, as translated for FBIS, "Brazil-Paraguay Triborder Press Highlights: November 25–29, 2002," December 3, 2002 (FBIS Document ID: LAP20021203000105).

[184] Bartolomé, 8, citing "Detienen a chinos e indagan possible nexo con la mafia," *Noticias*, October 26, 2001.

[185] "Captured Chinese Mafia Boss To Be Freed," *ABC Color*, December 13, 2002, as translated by FBIS, "Highlights: Paraguay Press," December 13, 2002, (FBIS Document ID: LAP20021213000113).

[186] Ibid.

[187] Ibid.

territory with tourist visas issued by the Paraguayan consulates of the TBA's Puerto Iguazú or nearby Eldorado (an Argentine town in the department adjacent to Iguazú Department). The objective of these Chinese criminals is to establish themselves in the duty-free zone of Argentina's San Luis Province.[188]

### The Colombians

Although the Colombian drug cartels are known to have been operating in Brazil and Paraguay for years, information on their activities in the TBA is not readily available in news media. In the case of Colombia's principal guerrilla organization, the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia—FARC), there appears to be a direct connection between the TBA's function as a drug-trafficking outlet and the FARC. The FARC derives much of its operating funds from drug-related activities and is known to do business with the Brazilian, Colombian, and Russian mafias. Little substantive information on FARC activities in the TBA has been reported in news media, but links between crime syndicates in Ciudad del Este and the FARC reportedly date at least from the mid-1990s, when General Oviedo protected Brazilian drug trafficker Luiz Fernando Da Costa ("Fernandinho Beira Mar"). Da Costa was captured in southern Colombia in April 2001 in the company of FARC rebels.[189]

The FARC's guerrilla elite actually has a haven located not far from the TBA. Of three known FARC havens in Brazil, the biggest of them is located in the small city of Guaíra in the southern part of Brazil's Paraná State at the Paraguay border, only 100 miles (161 kilometers) north of Foz do Iguaçu (see Figure 1, The FARC's Havens in Brazil). It is located on a 6,000-hectare ranch belonging to businessman Ahmad Mohamad, a Lebanese naturalized in Paraguay and arrested by Brazil's Federal Police in September 2002.[190]

---

[188] Bartolomé, 8, citing "Investigan a la mafia china en Misiones," *La Nación* [Buenos Aires], October 24, 1999.
[189] Strafor Global Intelligence Update, "Paraguay Drug Trade and U.S. American Facilities, Personnel at Greater Risk," August 14, 2001, http://www.mapinc.org/drugnews/v01/n1499/a06.html.
[190] Roberto Godoy, "As Farc usam Brasil para abrigar elite da guerrilha" [FARC uses Brazil to shelter the guerrilla elite], *O Estado de São Paulo* [Internet version: Estadao.com.br], March 1, 2003, http://www.estado.estadao.com.br/editorias/2003/03/01/pol024.html.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 113 of 632

### The Russians

In about 1996, members of the Russian Mafia reportedly began exploring Paraguay, as they did Colombia, Argentina, and Brazil.[191] Russian Mafia groups reportedly were seeking out contacts with the mafia of countries belonging to the Southern Cone Common Market (Mercosur), principally those operating from the drug-trafficking zones of Pedro Juan Caballero-Ponta Porã and Ciudad del Este-Foz do Iguaçu on the Paraguay-Brazil border. The intention of the Russians reportedly would be to ally themselves with the capos of the South American mafias in order to maximize the distribution of cocaine in Europe. They began by seeking to oust the Brazilian and Nigerian cartels based in border towns such as Pedro Juan Caballero.[192] However, if the Russian Mafia has a growing presence in the region and is working with bin Laden in an attempt to establish an al Qaeda presence in the TBA, as claimed by Judge Walter Fanganiello Maierovitch in 2001, this is not evident from the very limited news media reports on the subject.[193]



Figure 1.  Map showing the locations of three of the FARC's Brazilian havens in Miranda, Mato Grosso do Sul State; the city of Boa Vista, Roraima State; and the city of Guaíra, Paraná State.

Source: Estadao.com.br, March 1, 3002

According to political scientist Bruce Michael Bagley, the Russian Mafia presence in Argentina, specifically Chechen gangs, has been linked primarily to the use of Argentina as a transit country for Andean cocaine shipments to Europe, arms trafficking to Brazil and Colombia, and money laundering. Bagley notes that Argentine intelligence sources have detected contacts between Chechen separatist groups and Islamic terrorists in the TBA and suspect Chechen use of these networks for arms-smuggling purposes.

---

[191] "Paraguay es uno de los países explorados por mafia rusa" [Paraguay is one of the countries explored by the Russian mafia], *ABC Color*, October 16, 1997.
[192] "Temen que mafia rusa ofrezca armas a cambio de cocaína en la frontera" [Fear that the Russian mafia offers arms in exchange for cocaine at the border], *ABC Color*, November 3, 1997; and Guaracy Mingardi, "Money and the International Drug Trade in São Paulo," *International Social Science Journal*, no. 169 (September 2001): 383.
[193] Germano Oliveira.

## TBA-Related Governmental Corruption

### Argentina

The convergence of interests among corrupt government officials and members of organized crime and terrorist groups operating in the TBA is illustrated by the revelations in July 2002 made by a witness in the case of the July 1994 bombing of the AMIA in Buenos Aires. The witness, Abdolghassem Mesbahi, a former Iranian intelligence officer, testified to Argentine investigators that the Iranian government organized and carried out the attack and then paid then-president Carlos Saúl Menem US$10 million to cover it up.[194] The charges against Menem have never been substantiated, and he vigorously denies them. However, Menem acknowledged that he has had a bank account in Switzerland since 1986.[195] As president, Menem, whose parents migrated to Argentina from Syria, appointed a Syrian army colonel to be customs overseer at Buenos Aires's Ezeiza International Airport, which has been described as "a major hub for smuggling in South America."[196]

### Brazil

A 1,198-page report by the Drug Traffic Investigating Commission of Brazil's Congress released in November 2000 accuses 827 individuals—including two federal deputies (congressmen), two former state governors, 15 state deputies, and scores of mayors, judges, police officers, lawyers, and even officials from the neighboring countries of Bolivia, Paraguay, and Suriname—of organized crimes ranging from drug trafficking to arms trafficking to tax evasion.[197] The report concluded that drug-related corruption is so widespread that it is impossible to clean up in the short term without calling in the military and restructuring and rearming the country's police. Another Brazilian congressional report released in mid-2002 on

---

[194] "Slow-Motion Justice in Argentina," *New York Times*, March 11, 2003, A24; and Larry Rohter, "Iran Blew Up Jewish Center In Argentina, Defector Says," *New York Times*, July 22 2002, A1, A6.

[195] Larry Rohter, "World Briefing Americas: Menem Acknowledges Swiss Account," *New York Times*, July 25, 2002, 9.

[196] Martin Edwin Andersen, "Al-Qaeda Across the Americas," *Insight on the News* 17, no. 44 (November 26, 2001): 20–21.

[197] Andrew Downie, "Corruption's Roots Deep and Wide-reaching in Brazil," *Christian Science Monitor*, December 14, 2000; "Investigation Shows Pervasive Impact of Drug Trade in Brazil," *America's Insider* 1, no. 9 (December 8, 2000): 6.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 115 of 632

the nationwide surge in highway robberies of truck cargo called for the indictment of 100 politicians, police, and entrepreneurs allegedly involved in the theft of cargo[198] As a money-laundering center, Foz do Iguaçu plays an important role in this widespread corruption (see Money Laundering, Foz do Iguaçu).

Mato Grosso mafia figure João Arcanjo Ribeiro, with US$50 million in Swiss banks and a hotel in Miami valued at US$50 million, was sought by the PF and Interpol in more than 100 countries on charges of heading a ring linked to arms trafficking and diamonds, money laundering, and a series of assassinations.[199] He has also been linked to the TBA-based CC-5 accounts scheme and to money-launderer Alberto Yussef.[200] Arcanjo Ribeiro was captured in Montevideo, Uruguay, in early April 2003, and subsequently was seeking to avoid extradition to Brazil.



Mato Grosso mafia figure João Arcanjo Ribeiro

Source: *Istoé* OnLine, no. 1740 (February 5, 2003)

### *Paraguay*

Corruption, an old tradition in Paraguay, has reached all the way up to the presidency. The former regime of Alfredo Stroessner was reportedly involved in drug trafficking.[201] More recently, President Raúl Cubas was forced to resign as a result of a drug-related scandal. It was widely believed in Paraguay that Cubas had a hand in the assassination of his political rival, Vice President Luis María Argãna, who was gunned down on the streets of the capital, Asunción, on March 23, 1999, by hired assassins in camouflage gear.[202] In October 2000, José Tomas

---

[198] Raymond Colitt, "Brazil Tracks Down the Real Culprits Behind Surge in Highway Robberies," *Financial Times* [London], May 2, 2002, 10.

[199] Source: *Istoé* OnLine, no. 1740 (February 5, 2003).

[200] Amaury Ribeiro Jr. e Sônia Filgueiras – Foz do Iguaçu (PR), "Ralo da impunidade" [Used-Up Impunity], *Istoé* OnLine, February 2, 2003.

[201] See, for example, Kai Bird and Max Holland, "Paraguay: the Stroessner Connection," *The Nation* 241 (tober 26, 1985), 401.

[202] Tim McGirk, "Assassination!," *Time International* 153, no. 13 (April 5, 1999): 34, http://www.time.com/time/magazine/intl/article/0,9171,1107990405-23175,00.html; "Paraguai: Estava no Brasil: General Oviedo é preso em Foz do Iguaçu" [Paraguay: He was in Brazil: General Oviedo Is Captured in Foz do Iguaçu], *Veja*, no. 1,654 (June 21, 2000), http://veja.abril.com.br/210600/p_055a.html; "Paraguay Vice-President's Killers Jailed," BBC News, October 25, 2000, http://news.bbc.co.uk/1/hi/world/americas/989401.stm; "Brasil amenaza extraditar a Lino

Centurion was sentenced to seven years in prison for corruption during his tenure as chief of the counternarcotics secretariat.[203]

Governmental, political, and diplomatic corruption in Paraguay and the TBA allows individuals associated with organized crime and terrorist groups to bribe judges, purchase entry visas, and engage in any number of other criminal activities that might overlap with legitimate economic activities. An investigation conducted by Paraguayan authorities found that an average of 570 foreigners annually enter the country through the Ciudad del Este Airport using irregular documents, after paying bribes averaging US$5,000.[204]

Reports of this criminal enterprise began surfacing in mid-1998, when Squadron 51 of Argentina's National Gendarmerie (Gendarmería Nacional) detained a Paraguayan woman in Chaco Province in possession of 13 false passports (seven Lebanese and six South Korean). She was also carrying an official Paraguayan "This visa was issued by judicial order" seal and visas applications.[205] Argentine and Paraguayan authorities determined that the interim Paraguayan consul in Salta, Juana Maidana de Villagra, belonged to an illicit group specializing in illegal documents. In six months, this consul issued more than 500 illegal visas, collecting US$900 for each.[206] She received a two-year prison sentence.

In early November 2001, Paraguay's judge Carlos Cálcena charged that some of Paraguay's consulates had been converted into veritable offices for falsifying documents.[207] That year, the Directorate of Legal Affairs in Paraguay's Ministry of Foreign Affairs also identified as "vulnerable" the consulates in Santa Cruz, Bolivia; Salta, Eldorado, and Buenos Aires, Argentina; Iquique, Chile; and São Paulo, Foz do Iguaçu, Ponta Porã, and Curitiba, Brazil.[208]

---

Oviedo" [Brazil Threatens to Extradite Lino Oviedo], *Clarín* [Buenos Aires], July 16, 2002, http://www.clarin.com/ultimo_momento/notas/2002/07/16/m-416641.htm; and "Oviedo Denies Ties To Brazilian Drug Smuggler," *Avance* [Ciudad del Este; Internet version-www], June 26, 2002, as translated for FBIS, "Paraguay Press Highlights," June 26, 2002 (FBIS Document ID: LAP20020626000113).

[203] "Paraguay: Political Rights and Civil Liberties," *Freedom in the World, 2001–2002*, Freedom House, 2002, http://freedomhouse.org/research/freeworld/2002/countryratings/paraguay2.htm.

[204] Bartolomé, 18, citing "Comando terroristas se refugian en la Triple Frontera" [Terrorist commandos seek haven in theTriborder Area], *El País*, November 9, 2001.

[205] Bartolomé, 17, citing "Apresan con pasaportes a una mujer" [Woman apprehended with passports], *La Nación* [Buenos Aires], June 24, 1998; and "Investigan si hay una red que tramita pasaportes a libaneses" [Existence of a network trafficking in Lebanese passports being investigated], *La Nación*, June 25, 1998.

[206] Bartolomé, 17, citing "Ordenan la captura de otros 17 árabes" [Another 17 Arabs ordered captured], *Noticias*, September 27, 2001.

[207] Bartolomé, 17–18, citing "Comandos terroristas se refugian en la Triple Frontera" [Terrorist commandos find safehaven in Triborder Area], *El País*, November 9, 2001.

[208] Bartolomé, 18, citing "La frontera es el punto clave" [The border is the key point], *Noticias*, October 7, 2001.

Post-September 11, 2001 investigations carried out in the TBA found that numerous Lebanese citizens residing in Ciudad del Este had entered Paraguay with illicit visas. The most well-known case was that of Assad Ahmad Barakat, who was able to enter Paraguay in 1989 using a visa obtained from the Paraguayan Consulate in Panama, which was not authorized to issue visas.[209] Until he was arrested and recalled on September 26, 2001, the Paraguayan consul in Miami, Carlos Weiss, had allegedly sold more than 300 passports, visas, and shipping documents to individuals heading to the TBA since June 1999. His customers for visas or passports included about 20 Lebanese, three of whom were on the FBI terrorist watch list, but who had never been in the United States, and terrorist suspects from Egypt and Syria, all of whom were planning to move to Ciudad del Este.[210]

## Money Laundering

### TBA in General

Although the extent of narcotics trafficking in the TBA is unclear, criminal elements in Ciudad del Este and Foz do Iguaçu specialize in the laundering of drug money. As of 2000-01, the amount of money being laundered in the TBA reportedly was averaging US$12 billion per year, but estimates of the amount of money laundering in the TBA vary widely and cannot be considered reliable (see Table 1).[211] Foz do Iguaçu appears to be the principal money-laundering center,



Ciudad del Este as seen from the Río Paraná

Source: CNN, November 8, 2002

followed by Ciudad del Este. In any case, the amounts laundered in the TBA probably are in the billions of dollars per year. Until about 2000, the most popular financial mechanism for laundering money in the TBA appeared to be the CC-5 account, which is an account that belongs

---

[209] Bartolomé, 17.
[210] Mendel, citing Bill Rogers, "Arabs Accuse Paraguay Police of Extortion," Voice of America (VOA.com), http://www.voanews.com (accessed October 18, 2001); and Larry Rohter, "Terrorists Are Sought in Latin Smugglers' Haven," *New York Times*, September 27, 2001, http://www.nytimes.com; and Bartolomé, 17, citing "Fiscala imputa a Weiss por la concesión irregular de visas" [Judge reprimands Weiss for the irregular issuance of visas], *ABC Color*, September 27, 2001.
[211] Oviedo, citing Dr. Guido Rauber *Lavado de Dinero: Triple Frontera —Work Paper N° 1*, Prevención de Adicciones y Control de Drogas [Subsecretary of Drug Control and Prevention of Addictions], Ministry of Public Health of Misiones Province, Argentina, updated version of December 31, 2000 (original date, August 2, 1999).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 118 of 632

to someone residing outside the country.[212] It is often opened with false identity documents, making investigations difficult (see TBA-Related Governmental Corruption, Brazil). By 2000 the TBA mafiosi—better known as dollar exchangers—reportedly were laundering billions of dollars through new mechanisms that had superceded the CC-5 accounts.[213]

Table 1. Amounts of Money Reported Laundered in the Tri-Border Area (TBA), 1992–2001 (in US dollars)

| Period | Amount | TBA Location of Activity |
|--------|--------|--------------------------|
| 2000–2001 | $12 billion per year[214] | TBA in general |
| 2000 | $25 billion[215] | TBA in general |
| 2000 | $5 billion annual average[216] | Ciudad del Este |
| 1998–99 | $12 billion total[217] | Foz do Iguaçu |
| 1996–97 | $18 billion total[218] | Foz do Iguaçu |
| 1992–98 | $70 billion total[219] | Foz do Iguaçu |
| 1992–98 | $30 billion total[220] | Foz do Iguaçu |

[212] The CC-5 account is a special account created by the Central Bank of Brazil, supposedly for foreigners, in order to allow Paraguayan money to be more cheaply and quickly converted to dollars and deposited on the same day in local Brazilian banks.

[213] Pedro Pablo Peñaloza, "Brasil prepara 'el mayor juicio del mundo'" [Brazil Prepares the World's Greatest Trial], talcualdigital.com, *ABC Color*, August 8, 2001, http://www.talcualdigital.com/ediciones/2001/08/08/p22s2.htm.

[214] Pedro Oviedo, "En la Triple Frontera se lavan doce mil millones de dólares al año del narcotráfico, según un informe official" [In the Triple Border US$12 billion Is Laundered Per Year From Narcotics Trafficking, According to An Official Report], www.MisionesOnLine.net, no. 745, July 8, 2001, http://misionesonline.net/paginas/action.lasso?-database=noticias3&-layout=web&-response=noticia.html&id=11349&autorizado=si&-search, citing Dr. Guido Rauber *Lavado de Dinero: Triple Frontera —Work Paper Nº 1*, Prevención de Adicciones y Control de Drogas [Subsecretary of Drug Control and Prevention of Addictions], Ministry of Public Health of Misiones Province, Argentina, updated version of December 31, 2000 (original date, August 2, 1999).

[215] Pedro Pablo Peñaloza, "Brasil prepara 'el mayor juicio del mundo'" [Brazil Prepares the World's Greatest Trial], talcualdigital.com, *ABC Color*, August 8, 2001, http://www.talcualdigital.com/ediciones/2001/08/08/p22s2.htm.

[216] "Paraguay: Lack of Control System on Border with Brazil Allows Currency Flight," BBC Monitoring Americas – Political [London], January 23, 2003, 1, citing *ABC Color* Web site, January 22, 2003.

[217] Policarpo Junior, "Tem famosos no meio: Polícia apura um bilionário esquema de remessa ilegal de dinheiro ao exterior e já tem nomes de gente graúda" [They Have Famous People Among Them: Police Expedite a Billion-Real Scheme for Remitting Illegal Money Abroad and Already Have the Names of Big-Shots], *Veja on-line*, no. 1,755 (June 12, 2002), http://veja.abril.com.br/120602/p_046.html.

[218] Amaury Ribeiro Jr. and Sonia Filgueiras, "Sieve of Impunity," *Istoé* [Internet version-www], February 5, 2003, as translated for FBIS, "Brazil: Federal Police, FBI Unveil $30 Billion Money Laundering Scheme," February 5, 2003 (FBIS Document ID: LAP20030203000075).

[219] This paragraph is based entirely on Oviedo, citing Dr. Guido Rauber *Lavado de Dinero: Triple Frontera —Work Paper Nº 1*, Prevención de Adicciones y Control de Drogas [Subsecretary of Drug Control and Prevention of Addictions], Ministry of Public Health of Misiones Province, Argentina, updated version of December 31, 2000 (original date, August 2, 1999).

[220] Marcelo Aguiar, with Mauri König, "Cascata de Dólares" [Cascade of Dollars], *Dinheiro* na Web [SãoPaulo], April 6, 2001, http://www.terra.com.br/dinheironaweb/189/financas/189_cascata_dolares.htm.

[220] "Quadrilha lava R$ 30 bilhões em dois anos" [Gang Launders 30 Billion Reais in Two Years], *Correiro Braziliense* [Brasília], November 16, 2000, http://www2.correioweb.com.br/cw/2000-11-16/mat_17077.htm.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 119 of 632

In comparison with Ciudad del Este and Foz do Iguaçu, Puerto Iguazú is not known as a major money-laundering center. Instead, the third most important money-laundering center in the TBA appears to be the popular tourist destination known as Iguaçu Falls, which has many foreign exchange bureaus. After receiving large deposits from various parts of Brazil, the exchange shops of Iguaçu Falls forward the money to nonresident CC-5 accounts in Paraguay. In mid-2001, Brazil's Public Prosecutor's Office, specifically the Organized Crime and Special Investigation Division of the Federal Police (Polícia Federal—PF), was investigating 212 cases involving capital flight from Iguaçu Falls totaling more than US$100 million.[221]

### Ciudad del Este

In the assessment of the U.S. Department of State, Paraguay is a principal money-laundering center. Money laundering in the country is facilitated by the fact that the multi-billion dollar contraband re-export trade is centered in Ciudad del Este, which is outside the government's regulatory scope.[222] There are no controls on the amount of currency that can be brought into or out of the country, and there are no cross-border reporting requirements. Little in the way of personal background information is required to open a bank account or to make financial transactions in Paraguay; therefore, there is a high incidence of money-laundering activities. Narcotics trafficking generates an estimated 40 percent of money laundering in Paraguay.



Iguaçu Falls

Source: *Correiro Braziliense*, October 30, 2002.

Carlos Altemburger, chief of Paraguay's antiterrorist unit, acknowledged in September 2002 that terrorists use the TBA to finance their operations by remitting large amounts of dollars from Ciudad del Este to the Middle East.[223] A minimum of US$5 billion, equivalent to 50 percent of Paraguay's gross domestic product, is reportedly laundered annually in Paraguay, practically all of it in Ciudad del Este.[224] Money laundering is facilitated in Ciudad del Este by the existence of more than 20 illegal foreign-exchange shops (Casas de Cambio, which are

---

[221] Clarinha Glock, "Brazil-Paraguay: A Full Plate for Journalists," Inter American Press Association, July 19, 2001, http://www.impunidad.com/atrisk/brasil_paraguay7_19_01E.html.
[222] This paragraph is based in part on U.S. Department of State, ISCSR-2002.
[223] "Entrevista: tráfico en la "triple frontera" [Interview: Traffic in the "Triple Border], BBCMundo.com, September 3, 2002, http://news.bbc.co.uk/hi/spanish/specials/2001_-_11_de_septiembre_2002/newsid_2234000/2234706.stm.
[224] Oviedo.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 120 of 632

concentrated near the Friendship Bridge).[225] At least half of them have no name, other than a sign "foreign exchange." The shops trade only dollars, reais, and guaranies. An estimated 50 percent of all banking transactions registered in Ciudad del Este belong to the category of illicit transactions, in violation of Law 1025.[226] US$3 billion is reportedly laundered annually in Ciudad del Este from five principal sources: contraband, fraud, assaults, tax evasion, and trafficking of drugs and weapons.[227]

### Foz do Iguaçu



Alberto Yussef, one of Brazil's major dealers, laundered money for "Fernandinho Beira-Mar" and was involved in the CC-5 Accounts Scheme.

Source: *Istoé* OnLine, no. 1740 (February 5, 2003).

The exchange-evasion model used by Brazilian money launderers in the TBA consists of making deposits in exchange houses in Foz do Iguaçu, from where they are distributed into CC-5-type accounts in exchange houses in Ciudad del Este.[228] Foz do Iguaçu reportedly had 13 exchange houses in late 2000, after 20 were closed on March 31, 2000, for operating illegally and engaging in laundering activities.

A Foz do Iguaçu prosecutor affirmed in early June 1999 that a mafia operates in Foz do Iguaçu, where 40 percent of the local companies are fronts created only to launder money and to send it abroad.[229] Brazil's PF found that Brazilian industrialist Sílvio Roberto Anspach, one of the biggest money launderers in Brazil's history, centered his money-laundering activities in Foz do Iguaçu.[230]

The TBA and its CC-5 accounts played a central role in a major money-laundering scheme uncovered by Brazilian and U.S. investigators in 2000 and involving many Brazilian

---

[225] "Paraguay: Lack of Control System on Border with Brazil Allows Currency Flight," BBC Monitoring Americas – Political [London], January 23, 2003, 1, citing *ABC Color* Web site, January 22, 2003.
[226] Bartolomé, 9.
[227] Bartolomé, 9, citing Camarasa and a statement made in 2000 by the head of Holland's ABN's bank branch in Ciudad del Este.
[228] Bartolomé, 9.
[229] Mario Osava, "Ciudades de América Latina/Brasil: Lavado y fuga de capitales en la frontera con Paraguay" [Cities of Latin America/Brazil: Laundering and Flight of Capital on the Border with Paraguay], Inter-Press Service, June 6, 1999, http://ips.org/Spanish/mundial/indices/Correo/cor0606051.htm.
[230] "Quadrilha lava," *Correiro Braziliense*.

government officials. In early 2002, a Brazilian police chief and two experts in Foz do Iguaçu money laundering traveled to the United States to investigate the Banestado bank.[231] At the end of the investigation, they had uncovered 135 accounts controlled by 12 Brazilian dealers who between 1996 and 1997 had remitted US$18 billion that were deposited into tax havens by means of 35,000 accounts. In the operation, known as the CC-5 accounts scheme, the investigators learned that the same account holders had sent more than US$12 billion to the same accounts in 1998 and 1999.[232]

One can easily use the CC-5 account to launder money by opening an account in Ciudad del Este in the name of a fictitious person and having the amount transferred back to Brazil. During the 1996-99 period, the scheme mounted by Banestado helped hundreds of politicians, traffickers, and smugglers to send, through the Brazilian dollar dealers, US$30 billion to Switzerland and other tax havens.

The Foz do Iguaçu CC-5 accounts scheme had six steps, as follows:[233]

❖ The individuals who wanted to send money abroad using irregular methods opened contact with a group of 12 money exchangers in Foz do Iguaçu;

❖ The 12 money exchangers, all of whom own exchange houses based in Paraguay, opened accounts in five banks in Foz do Iguaçu, depositing a total of 12 billion reais. The accounts were opened using about 2,000 phony names.

❖ From the five banks in Foz do Iguaçu, the money was remitted abroad through CC-5 accounts;

❖ In the Banestado branch in New York, the money was deposited in 137 accounts, all in the name of companies registered in off-shore havens;

---

[231] Amaury Ribeiro Jr. and Sonia Filgueiras, "Sieve of Impunity," *Istoé* [Internet version-www], February 5, 2003, as translated for FBIS, "Brazil: Federal Police, FBI Unveil $30 Billion Money Laundering Scheme," February 5, 2003 (FBIS Document ID: LAP20030203000075).

[232] Policarpo Junior, "Tem famosos no meio: Polícia apura um bilionário esquema de remessa ilegal de dinheiro ao exterior e já tem nomes de gente graúda" [They Have Famous People Among Them: Police Expedite a Billion-Real Scheme for Remitting Illegal Money Abroad and Already Have the Names of Big-Shots], *Veja on-line*, no. 1,755 (June 12, 2002), http://veja.abril.com.br/120602/p_046.html.

[233] Policarpo Junior, "Tem famosos no meio: Polícia apura um bilionário esquema de remessa ilegal de dinheiro ao exterior e já tem nomes de gente graúda" [They Have Famous People Among Them: Police Expedite a Billion-Real Scheme for Remitting Illegal Money Abroad and Already Have the Names of Big-Shots], *Veja on-line*, no. 1,755 (June 12, 2002), http://veja.abril.com.br/120602/p_046.html.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 122 of 632

❖ After closing the 137 accounts in New York, the money was remitted to the accounts of 35,000 final beneficiaries, most of them held by juridical people, also located in off-shore havens.

In early 2003, approximately 200 police inquiries into CC-5 accounts were frozen awaiting a decision as to who is competent to continue the investigations.[234] Of a total of about 700 police inquiries concerning money laundering, illegal remittances, and tax evasion, 500 cases remained within the jurisdiction of Foz do Iguaçu. Although the investigations focus on who are involved in the scheme, the ultimate objective is to trace some US$15 billion that left Brazil through CC-5 accounts in Foz do Iguaçu. Brazil's Office of the Attorney General estimates that more than 3,000 people are involved in the so-called Foz do Iguaçu CC-5 accounts scheme.

**Other Organized Crime Activities in the TBA**

*Automobile Smuggling*

Smuggling stolen cars is a booming business. Cars are stolen in Brazil and Argentina and taken to Paraguay, and then to Bolivia and beyond. In mid-2001, an Argentine security official stated that an average of 6,000 automobiles are illegally taken out of Argentina every year, and for the most part are sent to Bolivia and Paraguay, specifically Ciudad del Este.[235] The cars arrive in Ciudad del Este no more than 15 hours after being stolen in Buenos Aires. The business in stolen cars, most of which are luxury models, is facilitated not only by lax border controls but also by Paraguayan legislation. Private contracts are accepted as valid instruments under Paraguayan law and can be legalized through a letter-writing procedure, without any requirement for prior documentation. As a result, one can purchase a stolen Mercedes Benz worth US$50,000 for only US$10,000 in Ciudad del Este, or a BMW valued at US$40,000 for only US$7,000.[236] According to Paraguayan authorities, more than half of the 450,000 vehicles registered annually

---

[234] "Investigation on CC-5 Accounts Paralyzed," *Cascavel Hoje* [Foz do Iguaçu], February 5, 2003, as translated for FBIS, "Highlights From the Tri-Border Press for the Week 3-7 February," February 11, 2003 (FBIS Document ID: LAP20030211000124).
[235] Bartolomé, 6.
[236] Bartolomé, 6

in Paraguay were acquired illegally. In addition, automobile theft in Brazil is under the jurisdiction of the State Police, which apparently is not very effective in countering it.[237]

The TBA's two principal centers of reception of stolen vehicles and smuggled goods are Iguaçu Falls on the Brazilian side and Ciudad del Este. They are also a corridor for trafficking in drugs and arms. Some of the illicit cargo passes along an illegally opened road crossing the



Figure 2. Tri-Border Area and Key Roads Leading to It from Major Cities

Iguazú National Park, known as Rodavía del Colono.[238] The Asunción-Paranaguá Highway, which passes near the falls, is also presumably used by smugglers (see Figure 2, Tri-Border Area and Key Roads Leading to It from Major Cities).

[237] Silva, 163.
[238] Clarinha Glock, "Brazil-Paraguay: A Full Plate for Journalists," Inter American Press Association, July 19, 2001, http://www.impunidad.com/atrisk/brasil_paraguay7_19_01E.html.

### Counterfeiting and Piracy of Products

#### Argentina and Brazil

Argentina and Brazil are on the Priority Watch List of the copyright-oriented International Intellectual Property Alliance (IIPA) as a result of intellectual property (IP) infringements.[239] Both countries have had repeated problems with copyright protection and enforcement. Street vendors selling fake products and pirated copies of goods ranging from designer-label sneakers to auto parts have long been a part of life in Brazil in particular. More than half of the business software and music CD market in Brazil is pirated, and as much as 40 percent of the cigarettes consumed in Brazil come from the black market. Industry experts also estimate that one-fifth of the drugs on pharmacy shelves is produced illegally.[240] Many of the products being sold in Brazil are known to come into the country from the porous TBA.[241]

Brazilian officials have reported that the power behind the black market is organized crime and international terrorism. The Arab community in the TBA has been tied to the black market trade in pirated goods, particularly CDs. In a series of probes, Paraguayan prosecutors have alleged that pirated CDs were a main funding source for Islamic extremist groups, such as Hizballah and Hamas (see Hizballah Fund-Raising in the TBA, Software Piracy, below).[242]

#### Paraguay

Paraguay, with a thriving industry of pirated products, limited government support for enforcement, an obstructionist judiciary, and ineffective customs, is considered a nightmare for copyright and trademark owners. The International Anti-Counterfeiting Coalition (IACC) identified Paraguay as a priority foreign country in 1998. Since then, imports of counterfeit CDs and CD-ROMs from Hong Kong, Macau, Thailand, and Malaysia have only increased, making Ciudad del Este the pre-eminent route into Latin America for counterfeits. In February 2000, the IIPA identified Paraguay as the Latin American country causing the most serious problems

---

[239] James Nurton, "Goodbye to A Difficult Year: The World's Leading IP Practices," *Managing Intellectual Property* [London], June 2002, 56–70; *IIPA 2002 "Special 301" Recommendations*, http://www.tetratel.com/custom/downloads/2002_Feb14_PIRACY%20LOSSES.pdf.
[240] Patrice M. Jones, *Chicago Tribune,* "Pirated Goods Cripple Brazil's Economy, But Solutions Seen as Weak," Knight Ridder Tribune News Service, November 4, 2002, 1.
[241] Patrice M. Jones.
[242] Patrice M. Jones.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 125 of 632

relating to intellectual property (IP) infringements.[243] It became the only country to rank with China as an IP violator.[244] Paraguay earned this status because it serves as a major trans-shipment point for pirated visual media products from Asia and also produces pirated products, with organized crime elements controlling aspects of production and distribution. In 2000-02, the pirates' strategy changed, with increasing imports of blank recordable CDs and local burners. The IIPA estimates that 104 million recordable CDs were imported in 2001 alone. Many of these discs turn up as pirated music in Brazil.

Total losses from product piracy in Paraguay in 2002 amounted to an estimated US$223.2 million.[245] This figure reflects a nearly twofold increase since 1996, when U.S. companies lost US$117.1 million in 1996 in piracy of products in Paraguay. Much of this criminal activity has been linked to organized criminals based in Korea, Lebanon, Libya, and Taiwan, and the local press has uncovered numerous examples of corruption.

A significant part of the contraband in Ciudad del Este originates in Asia, especially Hong Kong, Taiwan, and Malaysia. These pirated products carry first-line brand names of U.S. or Japanese companies. Three levels of falsification are used depending on the hierarchy of the brand name concerned. For example, the same videocassette recorder can be purchased in Ciudad del Este under the names Panasonic, Sony, or Aiwa.[246] Most of the contraband merchandise leaves Ciudad del Este along the same air, ground, or water routes that were used to enter the city, that is, through Argentine and Brazilian territory. In the case of Brazil, one of the main smuggling routes is along the illegally opened Rodavía del Colono, which cuts through Iguazú National Park. Brazilian authorities have noted the existence of about 100 clandestine airstrips in Paraguay adjacent to the border that are used for contraband and other smuggling to Argentina and Brazil. An estimated US$1.5 billion worth of goods are moved annually.[247]

Contraband transported by boat toward Argentina and Brazil from Ciudad del Este crosses the Rio Paraná and Itaipú Reservoir, which is the 1,350 square-kilometer artificial lake

---

[243] James Nurton, "Goodbye to A Difficult Year: The World's Leading IP Practices."
[244] *IIPA 2002 "Special 301" Recommendations*, http://www.tetratel.com/custom/downloads/ 2002_Feb14_PIRACY%20LOSSES.pdf.
[245] STR 2002 "Special 301" Decisions and IIPA Estimated US Trade Losses Due to Copyright Piracy, http://www.iipa.com/pdf/2002_Jul11_Americas_LOSSES.pdf.
[246] Bartolomé, 6, citing Jorge Camarasa, "Declina la capital del contrabando," *La Nación* [Buenos Aires], April 2, 2000.
[247] Bartolomé, 6, citing *Global Crime: International and Regional Cooperation Among Governments and Gangs Alike*, Transnational Communities Programme, 1998.

on the Brazil-Paraguay border created by the Itaipú Dam. The contraband across the Paraná consists of general merchandise, whereas the contraband transported across the lake consists of stolen automobiles, drugs, and weapons.[248]

Many Brazilian tourists visit Ciudad del Este to purchase cheap consumer goods. Although an estimated 90 percent of the products sold in Ciudad del Este, such as CDs and videos, are counterfeit, their cheap prices make them popular. Contraband and counterfeiting of products in the TBA is centered on about a dozen categories, including electronic equipment, music CDs, videos, computers, athletic shoes, soft drinks, games, jewelry, textiles, perfume, and cigarettes.[249] By 1999, São Paulo tobacco companies had lost an estimated US$600 million as a result of counterfeiting and contraband in Ciudad del Este of Brazilian cigarettes.[250]

The pirating and commercialization of contraband merchandise in Ciudad del Este is facilitated by Paraguayan legislation, which permits the patenting in the National Brand Register of international brand names that are not based in the country.[251] For example, a former minister of industry and commerce patented "aspirin" under his own name and sued the multinational Bayer company when it used the word.[252]

### Internet Crime

According to a survey done by the British consulting firm mi2g, a company that serves large banks and insurance companies by monitoring the actions of hackers on the worldwide network of computers, in November 2002 Brazil became the world's largest "exporter" of Internet crimes, including identity theft, credit card fraud, violations of intellectual property (piracy), and the invasion of sites for political protests.[253] Foz do Iguaçu is regarded by Brazilian authorities as one of the main centers of Brazilian Internet crime.[254]

---

[248] Bartolomé, 6.

[249] Bartolomé, 5.

[250] Bartolomé, 5, citing "Brasil, inquieto por el contrabando" [Brazil: Concerned About Contrabando], *La Nación* [Buenos Aires], March 4, 2000.

[251] Bartolomé, 6, citing Jorge Camarasa, "Declina la capital del contrabando," *La Nación* [Buenos Aires], April 2, 2000.

[252] Bartolomé, 6, citing Jorge Camarasa.

[253] Marcelos Starobinas, Text *Folha de São Paulo* [São Paulo; Internet version-www; a center-left daily, critical of government in general; top-circulation newspaper], November 20, 2002, as translated for FBIS, "Study Reveals That Brazil is World Leader in Internet Crimes," November 20, 2002 (FBIS Document ID: LAP20021120000057).

[254] International Intellectual Property Alliance, *2003 Special 301 Report: Brazil*, 2003, 62, http://www.iipa.com/rbc/2003/2003SPEC301BRAZIL.pdf.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 127 of 632

## COMBATING ORGANIZED CRIME AND TERRORIST GROUPS IN THE TBA

The general security forces of Argentina, Brazil, and Paraguay have all been involved in efforts to counter the use of the TBA by organized crime and terrorist groups. On May 31, 1996, the three TBA nations established a "Tripartite Command of the Tri-Border" in an effort to better control commerce and the large transient international population. The command draws on members of the Paraguayan National Police, Argentina's National Gendarmerie or border patrol, Coast Guard (Prefectura Naval), and Federal Police units, as well as representatives from the SIDE, the Argentine Consul's Office in Foz do Iguaçu, the National Aeronautical Police, and the Misiones Provincial Police; and the PF (Brazilian Federal Police), Mountain Infantry Battalion no. 34, the State Intelligence Department, and the Brazilian Consul's Office in Ciudad del Este. In 1998 the Tripartite Command was augmented with a security agreement among the three countries to intensify their fight against terrorism, smuggling, money laundering and drug trafficking.[255]

Despite this joint force, efforts by the TBA governments to counter organized crime and terrorist groups in the TBA have been hindered by institutional problems of corruption, inadequate funding and investigative capabilities, poor training, lack of motivation, inadequate penal codes, and so forth. These factors, which are summarized below, help to explain how organized crime and terrorist groups have operated so profitably in the TBA.

### Security Forces

#### *Argentina*

Argentina's principal law enforcement agency is the Argentine Federal Police, which is under the jurisdiction of the Ministry of Interior and is involved in countering drugs.[256] The mission of the Argentine National Gendarmerie includes combating drug trafficking, organized

---

[255] Mendel, citing Gendarmería Nacional, *Escuadrón 13 'Iguazú': Estadísticas del funcionamiento del Escuadrón 13 'Iguazú.'* (Puerto de Iguazú, Argentina: Gendarmería Nacional, September, 2001); and "Argentina, Paraguay and Brazil Sign Border Agreement," Press Summary, March 27, 1998, International Policy Institute for Counter-Terrorism, Interdisciplinary Center Herzlia, http://www.ict.org.il; and RLG's Eureka World Law Index, http://eureka.rlg.org/cgi-bin/zgate2.prod.

[256] Scott D. Tollefson, "National Security," Chapter 5 in Rex A. Hudson, ed., *Argentina: A Country Study* (Washington, DC: Library of Congress, Federal Research Division, 1999), unpublished.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 128 of 632

crime, and terrorism.[257] The SIDE (Secretariat for State Intelligence) also appears to play a key role in countering terrorist activities. Traditionally, the fight against organized crime is carried out by a special operations unit within the security police and the Judicial Police.[258] The latter operates under the authority of the court prosecutor in each province.[259]

As a highly bureaucratic organization within the executive branch of government, with the exception of the Judicial Police, Argentina's police system, including the special unit, is generally inefficient, and its investigative function is relegated to second place, after maintenance of public order.[260] Lacking, in addition, any special incentives, the police are ineffective in combating organized crime. Even the relatively autonomous but inadequately trained Judicial Police have been unsuccessful in the fight against organized crime.

Occasional combined forces operations in the TBA appear to have caused only a temporary inconvenience for organized crime. For example, in February 2000, Argentina's Secretariat of Internal Security sent 1,000 police officers and four boats of the Naval Prefecture to the TBA to combat contraband.[261] The next month, the Argentine Air Force conducted a surveillance operation that confirmed, within only three days, at least 15 illegal airstrips in the northern Argentine provinces of Misiones and Corrientes. In addition, about 30 unidentified flights mostly coming from Paraguay were detected.[262] Apparently, none were intercepted.

A 28-member Financial Intelligence Unit (Unidad de Información Financiera—UIF), under the Ministry of Justice and Human Rights, began operating in June 2002 as an additional interagency unit to prevent, control, and fight illegal asset laundering activities related to drug and arms trafficking.[263] The establishment of the UIF and the strengthening of anti-money-laundering mechanisms better positioned Argentina to prevent and combat money laundering more effectively, in the assessment of the U.S. Department of State.[264] Despite these measures,

---

[257] The Argentine National Gendarmerie Web site, http://www.gendarmeria.gov.ar/ingles/texto/ing2.htm.
[258] Antolin Almiron, 320.
[259] Kozameh, Ernesto Nicolás, Julio O. Trajtenberg, C.P. Nicolás Kozameh Jr., and Ezequiel Trajtenberg. *Guide to the Argentine Executive, Legislative and Judicial System*, July 15, 2001, http://www.llrx.com/features/argentina.htm.
[260] This paragraph is based in part on Antolin Almiron, 322–27.
[261] Bartolomé, 7.
[262] Bartolomé, 7.
[263] "Ley 25246 Creación de la Unidad de Información Financiera" [Law 25246, Creation of the Financial Information Unit], *Boletín Oficial* [Buenos Aires], May 10, 2000, http://www.imolin.org/argtlaw2.htm.
[264] U.S. Department of State, *International Narcotics Control Strategy Report –2002* (INCSR-2002). Washington, DC: Bureau for International Narcotics and Law Enforcement Affairs, March 2003 (U.S. Department of State, ISCSR-2002), http://www.state.gov/g/inl/rls/nrcrpt/2002/html/17952pf.htm.

however, the Central Bank reportedly has been totally ineffective in prosecuting money laundering.[265]

Corruption is a serious problem at all levels of the Argentine Police.[266] Police are poorly paid, with a starting salary of around US$400 (400 pesos) a month rising to about US$2,000 (2,000 pesos) a month for a captain. For the past 20 years, the Argentine police reportedly have been involved in organized crime. For example, the white van used in the AMIA attack was traced to Police Commissioner Juan José Ribelli, who had long been suspected of using his position to traffic in stolen automobiles to Paraguay.[267] In 2002, a lawyer at the Center for the Prevention of Police Repression (Coordinadora Contra la Represión Policial e Institucional—Correpi), stated that "in the last decade, there has not been any major illegal business without police participation, from prostitution to gambling, robbery, or kidnapping."[268]

The inadequacy of Argentina's penal code for combating organized crime seems typical of the three TBA countries. Argentina's Penal Code has not defined organized crime legally; its penal law is, in fact, "typical," meaning that criminal behavior must be exactly defined in the Penal Code.[269] Judicial and legal analogy in penal matters is forbidden. The Penal Code lacks the necessary doctrine of "illicit association," which defines organized crime, such as a conspiracy by three or more persons to commit offenses through an organization. With the exception of laws related to drug matters, Argentina does not have special laws to fight against organized crime.[270]

---

[265] Pedro Oviedo, "En la Triple Frontera se lavan doce mil millones de dólares al año del narcotráfico, según un informe oficial" [In the Triple Border US$12 billion Is Laundered Per Year From Narcotics Trafficking, According to An Official Report],www.MisionesOnLine.net, no. 745 (July 8, 2001), http://misionesonline.net/paginas/action.lasso?-database=noticias3&-layout=web&-response=noticia.html&id=11349&autorizado=si&-search; and "The Fight Against Money Laundering," *La Nación* [Buenos Aires; Internet version-www], February 24, 2003, as translated for FBIS, "Argentina: Daily Calls for Full Support of Agency Created to Fight Money Laundering," February 24, 2003 (FBIS Document ID: LAP20030224000052),.

[266] This discussion is based in part on U.S. Department of State, "Argentina," *Country Reports on Human Rights Practices – 2001* (Washington, DC: Bureau of Democracy, Human Rights, and Labor, U.S. Department of State, March 4, 2002), http://www.state.gov/g/drl/rls/hrrpt/2001/wha/8278.htm.

[267] Junger, 199.

[268] "Delinquent; Politics in Argentina (Argentina's Crime Wave)," *The Economist* [London], October 5, 2002.

[269] This paragraph is based in part on Hugo Antolin Almiron, "Organized Crime: A Perspective from Argentina." Chapter 14 in Jay S. Albanese, Dilip K. Das, and Arvind Verma, eds., *Organized Crime: World Perspectives* (Upper Saddle River, New Jersey: Prentice Hall, 2003), 318–19.

[270] Antolin Almiron, 327.

*Brazil*

Public security in Brazil is largely the responsibility of state governments. In contrast with its Argentine counterpart, Brazil's PF (Federal Police) force is very small and primarily investigative.[271] It plays only a minor role in routine law enforcement. Its purpose is to investigate criminal offenses of an interstate or international nature; to prevent and suppress illicit traffic in narcotics and related drugs; to perform the functions of a coast guard (enforcement only), air police, and border patrol; and to perform the functions of the judicial police.[272] A task force made up of the Civil and Military Police, the PF, the Federal Highway Police, the Municipal Guard, and, in some cases, the Armed Forces has operated in Foz do Iguaçu since April 2001.[273] The frequency of money laundering around the region of Foz de Iguaçu is of concern to the Brazilian government because of the TBA's high occurrences of intellectual property violations and illicit commerce, and because the TBA is believed to be a haven for smuggling and arms trafficking.[274]

Although some Brazilian police forces are known to be highly professional, a December 2000 Argentine report indicates that a supposed connection has been established between the Civil Police of Foz do Iguaçu and a narcotics network that operates in the Brazilian and Paraguayan parts of the TBA. The chief of Civil Police of Foz do Iguaçu, who has been suspended, was involved.[275] The effectiveness of Brazil's police forces in fighting organized crime and terrorist groups in the TBA is hindered by a general lack of respect for human rights (which makes much of the population fear the police at least as much as most Brazilians fear the criminals), widespread corruption and involvement in crime, and a general failure of the Brazilian government to address its serious problems.

---

[271] This discussion is based in part on Scott D. Tollefson, "National Security," Chapter 5 in Rex A. Hudson, ed., *Brazil: A Country Study* (Washington, DC: Library of Congress, Federal Research Division, 1998), 400–402; and U.S. Department of State, "Brazil," *Country Reports on Human Rights Practices – 2001* (Washington, DC: Bureau of Democracy, Human Rights, and Labor, U.S. Department of State, March 4, 2002), http://www.state.gov/g/drl/rls/hrrpt/2001/wha/8305.htm.

[272] Silva, 169.

[273] Miriam Karam, *São Paulo Valor* [financial daily, published jointly by the Folha and Globo media conglomerates; Internet version-www], May 20, 2002, as translated for FBIS, "Brazil: Federal Police Denies Presence of Terrorist Cells in Foz do Iguaçu" (FBIS Document ID: LAP20020520000040).

[274] U.S. Department of State, *International Narcotics Control Strategy Report –2002* (Washington, DC: Bureau for International Narcotics and Law Enforcement Affairs, March 2003), http://www.state.gov/p/inl/rls/nrcrpt/2002/html/17952pf.htm.

[275] Oviedo, citing Dr. Guido Rauber *Lavado de Dinero: Triple Frontera —Work Paper N° 1*, Prevención de Adicciones y Control de Drogas [Subsecretary of Drug Control and Prevention of Addictions], Ministry of Public Health of Misiones Province, Argentina, updated version of December 31, 2000 (original date, August 2, 1999).

The Brazilian government's attitude toward the existence of a terrorist problem in the TBA is also a factor. The government has insisted that there is no evidence of terrorist financing in the area, and it has been generally dismissive of reports of terrorists operating in the area.[276] Nevertheless, Article 4 of Decree 3,755, issued on February 19, 2001, blocks all funds from being sent from Brazil to Osama bin Laden or to companies, associations, or people linked to him. At least three of the decree's articles refer to the Arab terrorist threat.[277]

In March 1998, Brazil's Congress adopted a law authorizing the shooting down of intercepted airplanes that fail to obey signals of the intercepting pilots who patrol the border with Paraguay, but the measure has yet to be implemented. In May 2001, in an effort to interdict contraband, the PF established an air base in Foz do Iguaçu, from where its aircraft patrol the Rio Paraná and the Itaipú Reservoir.[278] On August 22, 2002, in an effort to strengthen border controls, the PF began suppressing illegal activities in the TBA's Friendship Bridge area, specifically along the Paraná.[279] The operation was aimed at preventing smugglers and traffickers from using the river for their operations after customs officers increased the traffic control on the head of the bridge. Joaquim Mesquita, chief of the Foz do Iguaçu PF, reported that the main PF drug enforcement actions in 2002 in the TBA included the confiscation of 12.7 tons of marijuana and of 30 kilograms of cocaine mostly coming from Bolivia and



Special policemen on patrol in Ciudad del Este

Source: *New York Times*, September 27, 2001.

---

[276] For example, see "Brazil: Minister Denies Existence of Terrorist Cell in Triborder Area," BBC Monitoring Americas—Political [London], November 9, 2002, citing text of report by Edson Luiz published by Brazil's Agencia Estado, November 9, 2002; Carmen Gentile, UPI, "Brazil Denies Terror Groups in Region," *The Washington Times*, November 11, 2002, http://www.washingtontimes.com; Hala Kilani and Cilina Nasser, "Brazil Dismisses US-Israeli Terror Claims; Ambassador Says 'Tri-border Area' Is Well Policed," *The Daily Star* [Independent Beirut paper; Internet version-www], February 14, 2003, as transcribed for FBIS, "Brazilian Ambassador to Lebanon Denies Terrorist Activities in Tri-Border Area," February 14, 2003 (FBIS Document ID: GMP20030214000022).

[277] Edson Luiz, "Brasil bloqueou bens de Bin Laden antes dos EUA" [Brazil Blocks bin Laden Funds Before the USA], Oestadao.com, Setembro 24, 2001, http://www.estadao.com.br /agestado/noticias/2001/set/24/305.htm.

[278] Bartolomé, 7.

[279] "Brazilian Federal Police (PF) Launches Gigantic Operation—Ciudad del Este," *Vanguardia* [Ciudad del Este], August 26, 2002, as translated for FBIS, "Highlights: Brazil - Paraguay Triborder Press 26-30 Aug 02," Tri-Border Press Highlights, September 2, 2002 (FBIS Document ID: LAP20020902000038).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 132 of 632

Colombia.[280] Undoubtedly, those seizures constitute only a small fraction of the drug traffic. In late 2002, Brazilian authorities reinforced security controls in the Friendship Bridge area by installing two 360-degree panoramic vision surveillance posts (POVs) and by posting 70 agents to the area.[281]

## *Paraguay*

Information on capabilities of the 200-member Paraguayan police force in Ciudad del Este is lacking, but it is clearly not an effective force, and it is suspected of corruption.[282] A general lack of confidence in the local police may be reflected by the fact that the city's 6,000 shops, 36 banks, and 15 money exchanges all have their private guards. By October 2001, as authorities in Paraguay increased surveillance of the country's Arab immigrants, there were charges that police were extorting large sums of money from some merchants in the TBA in return for not detaining them.[283]

At the national level, the Secretariat for Prevention and Investigation of Terrorism in Paraguay (Secretaría de Prevención e Investigación del Terrorismo de Paraguay—Seprinte) has been in the forefront of operations and arrests carried out in the Paraguayan sector of the TBA since the September 11, 2001 attacks in the United States. This relatively small antiterrorist organization is a department of the police and works with anti-money-laundering agencies, including the Financial Analysis Unit (Unidad de Análisis Financiera—UAF).[284] The establishment of the UAF under the Attorney General's office in July 2002 was expected by the U.S. Department of State to enhance cooperation at the working level and to improve the Attorney General's ability to investigate money laundering and terrorist financing.[285] The UAF,

---

[280] "Federal Police's Annual Report," *A Gazeta do Iguacu* [Foz do Iguaçu], January 24, 2003, as translated for FBIS, "Tri-Border Press for the Week of 23-31 January," Tri-Border Press Highlights, February 4, 2003 (FBIS Document ID: LAP20030204000134).

[281] "Surveillance System on Friendship Bridge," A Gazeta do Iguaçu, November 6, 2002, as translated for FBIS, "Highlights: Brazil - Paraguay Triborder Press 4-15 Nov 02," November 21, 2002 (FBIS Document ID: LAP20021121000006).

[282] This paragraph is based in information from Ricardo Grinbaum, "In Paraguay, Smugglers' Paradise," *World Press Review* 43, no.1 (January 1996): 25–26 (reprinted from *Veja*).

[283] Bill Rogers, "Arabs Accuse Paraguay Police Of Extortion," *Middle East News Online* [Durham, North Carolina], October 4, 2001.

[284] Location: Juan E. O'Leary 165, esq Benjamín Constant, Asunción (Tel.: (+595) 21 452 411/412; Fax: (+595) 21 451 635; E-Mail: seprelad@conexion.com.py).

[285] This paragraph is based in part on U.S. Department of State, ISCSR-2002.

which is recognized by the U.S. government and the Egmont Group as a financial intelligence unit, has purview only over financial institutions.[286]

In addition to establishing the UAF, the Paraguayan government has carried out limited efforts to combat terrorist financing. Nevertheless, Paraguay has limited resources to investigate and prosecute money-laundering cases. Investigations are carried out by a small financial crimes investigative unit, the Unit for Investigating Financial Data (Unidad de Investigación de Datos Financieros—UIDF). Because there are only about 200 prosecutors nationwide for a population of 5.5 million, money-laundering investigations in Paraguay are assigned to a single prosecutor. Furthermore, government corruption is an ongoing problem related to Paraguay's money laundering and money-laundering investigations.[287]

Other than the draft Antiterrorist Law that was introduced in the Chamber of Deputies in 2002 and remains under consideration, the Paraguayan government currently has no specific laws criminalizing terrorism or terrorist financing.[288] Paraguay has adopted provisions to cover conduct that would be considered terrorist acts, but most of these acts do not carry a sentence of more than five years, nor are they considered predicate offenses for money laundering. Although some existing legislation allows for counterterrorist police operations, the lack of any legislation specifically targeting terrorist activities has greatly impeded the efforts of the Paraguayan Antiterrorist Police. Paraguay also lacks the investigative capabilities to track the terrorists' financial transactions.

**The TBA's Immigration Control Problem**

The TBA is known for its lax immigration controls. It is common knowledge that anyone in the region can easily obtain a false passport, birth certificate, driver's license, and other documents through corrupt officials. Relatively few members of the Asian, Arab, and other ethnic communities in the TBA are believed to be legally registered. Paraguay's Vice Interior Minister Mario Agustin Sapriza pointed out on May 3, 2001, that the Immigrations Department

---

[286] This paragraph is based in part on U.S. Department of State, ISCSR-2002.
[287] This paragraph is based in part on U.S. Department of State, ISCSR-2002.
[288] "Paraguay: US Official Says Tri-border Area Source of Islamic Terrorism Funding,"
BBC Monitoring Americas – Political [London], May 25, 2002, citing *ABC Color* Web site, May 23, 2002.

is where most difficulties are found in preventing the TBA from being used by Islamic extremists.[289]

Arrests in Ciudad del Este in 2001 showed how typical it is for suspected Islamic extremists in the TBA to be without valid identity documents. One individual arrested in May by Paraguay's Federal Police at the Ciudad del Este Airport had 17 fake Lebanese passports in his possession.[290] On September 21, Paraguayan police carried out two operations in Ciudad del Este and nearby Encarnación in which 17 Arabs were arrested, all of whom had false identity documents and had no entry documents registered by the Department of Immigration.[291] The FBI identified three of arrested individuals as having close ties to Hamas and the Lebanese Al-Kaffir group. Reportedly, they collected funds for these terrorist groups to support terrorist plots against the United States.[292] Another who escaped the police round-up in Encarnación is the Egyptian Khaled Ta Qe El Din, who is an important figure in the Arab community of Foz do Iguaçu and Ciudad del Este and believed to be a bin Laden follower and a member of an Egyptian terrorist organization.[293]

In early October 2001, high-level sources in Argentina's Ministry of Interior called Brazil's immigration control system for the TBA a problem.[294] Argentina places its emphasis on immigration control at the border crossings, while Brazil's control operations are located somewhat deeper inside its territory. In 2002, Brazilian authorities established controls on the roads several kilometers from Foz do Iguaçu.

---

[289] *ABC Color* [Internet version-www], May 4, 2001, as translated for FBIS, "Paraguay: Vice Interior Minister Confirms Presence of 'Dormant Islamic Terrorist Cells'" (FBIS Document ID: LAP20010505000002).

[290] Mario Daniel Montoya, "War on Terrorism Reaches Paraguay's Triple Border," *Jane's Intelligence Review* 13, no. 12 (December 2001): 13; and "Policiais viajam em vôos internos argentinos" [Police fly on internal Argentine flights], Oestado.com.br, September 19, 2001, http://www.estadao.com.br/agestado/noticias/2001/set/19/207.htm.

[291] James Mack, Deputy Assistant for International Narcotics and Law Enforcement Affairs, "Providing Support to Counternarcotics and Other Anti-Crime Efforts," Testimony Before the House Committee on International Relations Subcommittee on the Western Hemisphere, Washington, DC, October 10, 2001, http://www.state.gov/g/inl/rls/rm/2001/sep_oct/6215.htm; and Bartolomé, 14, citing "Juez confirmó la prisión de los 13 árabes" [Judge Confirms Prison for the 13 Arabs], *Noticias*, September 25, 2001. According to the list released to the press, the 11 who were charged included: Mohamed Jassin, Yehya Hamed Kaddoura, Abdel Nasser Waked, Assen Mohammed Waked, Yazzed Khalil Abu El Hawa, Rateb Ahmad Ayoub, Samir Nazih Jbara, Jehya Fallez Hussein, Hassan Abdalah Halawi, Kassen Mohamed Fawaz, and Sufián Asfour Mahamad Asfour.

[292] Bartolomé, 15, citing "Paraguay lanza operativo contra el terrorismo" [Paraguay launches operation against terrorism], *El Nuevo Herald* [Miami], September 23, 2001.

[293] Bartolomé, 15, citing "Egipcio está sendo investigado pela PF" [Egyptian is being investigated by PF], *O Estado de São Paulo*, September 24, 2001.

[294] *La Nación* [Buenos Aires], October 3, 2001, as translated for FBIS, "National Border Guard Commander: Tri-Border Area Hotbed of Sleeper Cells," October 3, 2001 (FBIS Document ID: LAP20011003000015).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 135 of 632

## CONCLUDING POINTS

### The TBA as a Haven and Base for Islamic Terrorist Groups

This assessment of open sources pertaining to the TBA during the 1999-June 2003 period concludes that:

- ❖ various Islamic terrorist groups, including the Egyptian Al-Jihad (Islamic Jihad) and Al-Gama'a al-Islamiyya (Islamic Group), Hamas, Hizballah, and al Qaeda, probably have a presence in the TBA;

- ❖ Hizballah and al Qaeda are probably cooperating in the region, but definitive proof of this collaboration, in the form of a specific document, did not surface in this review;

- ❖ Islamic terrorist groups are using the TBA for purposes of safe haven, fund-raising, money laundering, recruitment, training, plotting, and other terrorist-related activities;

- ❖ terrorism within the TBA by Islamic terrorist groups has been limited to selective, mafia-like assassinations of business or community leaders who may be opposing their interests;

- ❖ the Islamic fundamentalist groups' activities in the TBA are in support of their international organizations and the Islamic jihad against the United States and U.S. allies;

- ❖ Hizballah has reaped hundreds of millions of dollars in profits from narcotics and arms trafficking, product piracy, and other illicit activities in the TBA;

- ❖ a substantial number of members of the Islamic terrorist groups in the TBA have probably moved out of the region since late 2001 to other areas of South America, such as Chile, Uruguay, and Venezuela, where they may be under less pressure by security forces than in the TBA; and

- ❖ if TBA-based Hizballah and al Qaeda operatives are plotting any anti-U.S. terrorist attacks, their most likely targets would be U.S. embassies and consulates in South America.

### The TBA as a Center for Organized Crime

This assessment also concludes that:

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 136 of 632

- ❖ the TBA is highly popular with other organized crime groups, which use the region to launder billions of dollars every year and to earn multi-million-dollar profits by engaging in narcotics and arms trafficking and other illicit activities;

- ❖ an informal tripartite alliance exists among the Islamic terrorist groups, the organized crime mafias, and the many corrupt government or police officials in the TBA and elsewhere in the TBA countries;

- ❖ this informal alliance appears to be primarily oriented toward reaping multi-million-dollar profits from illicit activities;

- ❖ various Chinese Mafia groups operate in the TBA and are attempting to expand their activities into Argentina and elsewhere;

- ❖ the Chinese and Russian (Chechen) mafias reportedly are collaborating with the Islamic terrorist groups in the region, especially with al Qaeda;

- ❖ the Hong Kong Mafia, which has close relations with the Hizballah network in the TBA, is particularly active in the product-piracy business; and

- ❖ indigenous Argentine, Brazilian, and Paraguayan mafia groups are also actively involved in the TBA.

**Efforts to Counter Organized Crime and Terrorism in the TBA**

This assessment also concludes that:

- ❖ widespread corruption at all levels of government and police in the three TBA countries is facilitating the activities of the Islamic terrorist groups and organized crime in the TBA;

- ❖ the capabilities of the security and investigative forces in the TBA are inadequate for ridding the region of the Islamic terrorist groups, organized crime mafias, and corrupt officials who do business with them; and

- ❖ laws for combating terrorist fund-raising, money laundering, organized crime activities in general, and official corruption are also inadequate.

# APPENDIX

## Alleged Operatives of Islamic Fundamentalist Groups in the TBA

### *Barakat, Assad Ahmad Mohamad (Hizballah)*

Assad Mohamed Barakat, 37, is generally identified as Hizballah's military (i.e., terrorist) operations chief in the TBA, as well as its chief fund-raising officer in the Southern Cone. The U.S. Department of State has also reportedly identified him as connected to the al-Gama'a al-Islamiyya (Egyptian Islamic Group).[295] He is also believed to be heavily involved in Hizballah



Assad Barakat awaiting extradition to Paraguay

Source: *ABC Color*, June 9, 2003

funding operations in the region. Following the September 11, 2001, terrorist attacks in the United States, an international arrest warrant was issued for his arrest, and as a result Barakat fled the TBA in October 2001. He was indicted in Paraguay on charges of association for criminal purposes, abetment of crime, and tax evasion.[296] Brazilian authorities arrested Barakat in Foz do Iguaçu on June 22, 2002, and imprisoned him in Brasília, where he has been awaiting a decision from the Federal Supreme Court on an extradition request from Paraguay.[297] In mid-December 2002, the plenum of the Brazilian Federal Supreme Court ruled to extradite Barakat to Paraguay.[298]

[295] "Barakat To Be Extradited: Slippery Barakat Caught by Federal Police Hands," *Última Hora*, June 24, 2002, as translated by FBIS, "Highlights: Paraguay Press," June 24, 2002, (FBIS Document ID: LAP20020624000088).

[296] "Another Serious Charge Pending Against Barakat," *Vanguardia* [Ciudad del Este; Internet version-www], June 26, 2002, as translated for FBIS, "Paraguay Press Highlights," June 26, 2002 (FBIS Document ID: LAP20020626000113); and Héctor Rojas and Pablo Vergara, *La Tercera de la Hora* [Santiago; a conservative, pro-business, top-circulation daily, Internet version-www], November 8, 2001, as translated for FBIS, "Chilean Police Examine Link to Alleged Triborder Hizballah Financial Network," November 8, 2001 (FBIS Document ID: LAP20011108000085).

[297] Jose Maschio, reporting on telephone interview between Assad Ahmad Barakat and Agencia Folha on November 18, 2002, from his prison cell in Brasília, *Folha de São Paulo* (Internet version-www), November 19, 2002, as translated for FBIS, "Brazil: Barakat Denies Involvement in Terrorism; Views 'Economic Plot' Against Him" (FBIS Document ID: LAP20021119000039).

[298] "Brazilian Federal Supreme Court Rule To Extradite Barakat," *ABC Color* [Internet version-www], December 20, 2002, as translated for FBIS, December 20, 2002 (FBIS Document ID: LAP20021220000015).

A Lebanese by birth, Barakat left civil-war-torn Lebanon at age 17 and emigrated to Paraguay with his father. After a few years as a street peddler, he opened Apollo Import-Export, a stall in the Page shopping gallery in Ciudad del Este. Since then, he reportedly has accumulated numerous companies, including the Mondial (World) Engineering and Construction company,

with offices in Ciudad del Este and Beirut, as well as numerous properties. Ahmad is the brother of priest Akraam Ahmad Barakat, who reportedly is also a high-ranking leader of Iran's Hizballah.[299]



Barakat's Paraguayan passport reportedly indicates that he was last in the United States in April 2000. His visa was revoked after his name appeared on the U.S. Department of State's list of "suspected terrorists." Barakat has acknowledged owning businesses in Chile and the United States (Miami and New York).[300]

Barakat at home in Foz do Iguaçu

Source: *Istoé* August 11, 2001

### Fayad, Sobhi Mahmoud (Hizballah)

Sobhi Mahmoud Fayad, who claims to be a Lebanese businessman but is widely reported to be a key Hizballah operative, was arrested at the Page shopping gallery in Ciudad del Este on November 8, 2001, on charges of being an alleged member of an organization that remits funds to the Islamic Middle East armed struggle.[301] Documents found at the Apollo shop owned by Assad Ahmad Barakat allegedly incriminate Sobhi Fayad. On the basis of the documents, it was alleged that Sobhi Fayad, who had not paid taxes since 1992, was sending large sums of money to banks in Lebanon almost daily. He remained under arrest in the Special Operations Police Force unit in Asunción, together with his brother Salhed Fayad, until he was released on bail in early October 2002. On November 21, 2002, Sobhi Mahmoud Fayad submitted to public trial for

---

[299] Special Correspondents Vladimir Jara Vera and Dany Ortiz, *ABC Color* [Internet version], December 23, 1999, as translated for FBIS, "Police Conduct Operation to Intimdate Islamic Extremists," December 23, 1999 (FBIS Document ID: FTS19991223001521).

[300] *La Tercera de la Hora* [Internet version-www], November 14, 2001, as translated for FBIS, "Hizballah-Linked Businessman Acknowledges Having Businesses in Chile, US," November 14, 2001 (FBIS Document ID: LAP20011114000075200).

[301] *ABC Color* [Web site], November 9, 2001, as cited by "Paraguay: Lebanese Man with Alleged Hezbollah Links Arrested in Ciudad del Este," BBC Monitoring, November 9, 2001.

tax evasion. He was indicted for running a business without accounting books, using falsified public documents, and tax evasion in 1998 and 1999.[302]

Paraguayan authorities reportedly believe that Sobhi Fayad, along with Barakat and fugitive Ali Hassan Abdallah, are the coordinators of a Hizballah financial network in the TBA. In addition, Fayad is a brother of an important Hizballah member in Lebanon. Authorities regard Fayad as one of the main Hizballah chiefs assigned to the TBA.[303] Police found in his possession documents for funds sent to Canada and Lebanon. Fayad's influence within the Lebanese community in the TBA was emphasized by reports that he was seen in the company of the new Lebanese ambassador in Paraguay, Hicham Hamdam, who presented his credential in Asunción in October 2001, on various occasions when the diplomat attended local activities. A letter that Fayad received from Lebanon allegedly proves that in 2000 alone he sent more than US$3.5 million to the "Martyr" Social Beneficent Organization, which is linked to the Hizballah and which looks after children whose parents died at the service of the Hizballah and who are considered martyrs.[304] Investigators confirmed the presence of Fayad at an Al-Mukawama operations center. According to Interior Ministry sources, he appears in one of the surveillance photos chatting with Iman Tareb Khasraji (on left in photo) in early November 2001.[305]



Alleged Hizballah leader Sobhi Mahmoud Fayad (right) talks with Iman Tareb Khasraji at an Al-Mukawama base in Brazil.

Source: *ABC Color* [Asunción]; cropped image; January 16, 2002.

Fayad initially became a fugitive in October 1998.[306] Paraguayan authorities had arrested him in 1998, while he was

---

[302] *ABC Color* [Internet version-www], November 22, 2002, as translated for FBIS (FBIS Document ID: LAP20021122000047).

[303] Libanês preso no Paraguai é "peso pesado" do Hezbollah, diz polícia" (Lebanese Imprisoned in Paraguay Is a Hizballah Heavyweight, Police Say), estadao.com.br [Website of *O Estado de São Paulo*], November 9, 2001.

[304] Roberto Cosso, "Extremistas receberam US$50 mi de Foz do Iguaçu" (Extremists Received US$50 million from Foz do Iguaçu), *Folha de S. Paulo*, December 3, 2001; and *ABC Color* [Internet version-www], May 28, 2002, as translated for FBIS, "Paraguay: Daily Reports More Evidence of Barakat's Contributions to Hizballah," May 28, 2002 (FBIS Document ID: LAP20020528000073).

[305] *ABC Color* [Internet Version-www], January 16, 2002, as translated for FBIS, "Paraguay: Court Investigates Hizballah Base Photos" (FBIS, LAP20020116000091).

[306] Bartolomé, 15.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 140 of 632

observing the U.S. Embassy in Asunción, either before or after requesting an appointment in the facility. He was later released after cooperating with authorities.[307] In October 1999, Fayad was again arrested in front of the U.S. Embassy in Asunción, after having requested a visa. On that occasion, he was questioned on the basis of the suspicions of U.S. officials, but he was later again released for lack of evidence against him.

### Mehri, Ali Khalil (Hizballah)

The relationship between the TBA underworld and Middle East terrorism became clearer in February 2000, when Paraguayan authorities arrested Ali Khalil Mehri, 32, a newly naturalized Paraguayan citizen born in Lebanon. Considered one of the principal Hizballah fund-raisers in the TBA, Mehri was arrested during a police raid of his apartment at the Panorama II building in Ciudad del Este on February 25, 2000. Shortly thereafter, he escaped and has eluded Interpol's attempt to capture him.[308] At the time that Mehri disappeared, Argentine authorities were interested in questioning him in connection with the two unsolved bombings of Israeli targets in Buenos Aires in the early 1990s—that of the Israeli Embassy on March 17, 1992, and a Jewish community center (AMIA) on July 18, 1994.[309]



Aftermath of the bombing of the Argentine-Israeli Mutual Association (AMIA), Buenos Aires, July 18, 1994

Source: www.terra.com, AP

Reportedly, Merhi had access codes to restricted Web sites that promote international terrorism, and when they raided his apartment, police found software that he allegedly was distributing to raise money for Al-Muqawamah.[310] The software features film footage of terrorist attacks and interviews with suicide bombers before they died. It also provides a bank account number in Lebanon, where money could be sent to support Al-Muqawamah. In a certified

---

[307] "Libanês preso no Paraguai."
[308] *ABC Color*, November 5, 2001, as translated for FBIS, "Barchini's Calls Under Scrutiny, New Antiterrorist Officials," November 5, 2001 (FBIS Document ID: LAP20011105000019).
[309] Kevin G. Hall, "Officials Link Pirated Goods in Paraguay to Terrorism: Money Sent on to Hezbollah," *San Diego Union –Tribune*, April 15, 2001, A19.
[310] Hall, *San Diego Union –Tribune*.

translation of the CD's Arabic contents, an unidentified radical leader exhorts listeners to strike at the United States and Israel.[311]

Other documents seized during the raid included fund-raising forms for a group in the Middle East named Al-Shahid, ostensibly dedicated to "the protection of families of martyrs and prisoners," as well as documents of money transfers to Canada, Chile, Lebanon, and the United States of more than US$700,000.[312] British intelligence subsequently identified Mehri as a potential al Qaeda financier.[313] Paraguayan authorities charged Mehri with piracy of computer programs and CDs and with selling millions of dollars of counterfeit software and funneling the proceeds to Hizballah. Apparently aided by his large campaign contributions to powerful members of Paraguay's ruling Colorado Party, Mehri escaped from prison in June 2000 and fled to Syria.[314] In late September 2001, he was located in Syria, and Paraguay asked Interpol to arrest him, but he managed to escape.[315]

### Mukhlis, El Said Hassan Ali Mohamed (al-Gama'a al-Islamiyya)

Argentina's Secretariat for State Intelligence (SIDE) has investigated the Egyptian Al-Sa'id Ali Hasan Mukhlis (also spelled Mokhles), 31, who has been identified as having contacts with Saudi Arabian members of a group of Osama bin Laden militants in the TBA. Mukhlis, an Egyptian who had trained in Afghanistan and lived in Saudi Arabia and was a member of the Islamic fundamentalist group al-Gama'a al-Islamiyya, was suspected of participating in the massacre of 62 foreign tourists at Luxor, Egypt, on November 17, 1997. A native of the coastal city of Port Said, Mukhlis left Egypt in the early 1990s, fearing random arrests of Al-Gama'a members.

---

[311] Hall, *San Diego Union –Tribune.*

[312] "Comandos terroristas se refugian en la triple frontera" (Terrorist "Commandos" Hide in the Triborder Region), *El País* [Colombia], November 9, 2001.

[313] Roslyn A. Mazer, "From T-Shirts to Terrorism: That Fake Nike Swoosh May Be Helping to Fund Bin Laden's Network," *Washington Post*, September 30, 2001, B2. The U.S. Embassy cancelled the visa issued to Deputy Angel Ramón Barchini to enter the United States because of his alleged links with suspicious Arab extremists, including Mehri, whose escape he allegedly abetted. See *ABC Color*, November 5, 2001, as translated for FBIS, "Barchini's Calls Under Scrutiny, New Antiterrorist Officials," November 5, 2001 (FBIS Document ID: LAP20011105000019).

[314] Roslyn A. Mazer, "From T-Shirts to Terrorism: That Fake Nike Swoosh May Be Helping to Fund Bin Laden's Network," *Washington Post*, September 30, 2001, B2.

[315] Bartolomé, 11, citing "Detectan en Siria presencia de megapirata libanés prófugo" [Lebanese megapirate fugitive detected in Syria], *ABC*, September 27, 2001.

Argentine security suspected that the detonators used in the 1994 AMIA attack were secured in the TBA and linked Mukhlis to that operation. Argentine security believed that Mukhlis established terrorist cells in Foz do Iguaçu to raise funds, to manufacture counterfeit documents, and to maintain contact with Hamas and Hizballah sympathizers. After living with his family in Foz do Iguaçu in 1998, Mukhlis was arrested at a border control station in El Chuy, Uruguay, on the Brazilian-Uruguayan border on January 26, 1999, as he tried to leave Brazil using a fake Malaysian passport. Contacted by border-control authorities, the CIA reportedly requested that he be detained on charges of having participated in the 1997 terrorist attack that killed 62 U.S. and European tourists in Luxor. At the time of his arrest, Mukhlis was allegedly en route to Europe for a meeting with another al Qaeda terrorist. Egypt immediately began a lengthy legal struggle to extradite Mukhlis. In mid-1999 Egypt demanded that Uruguay extradite Mukhlis on the accusation in absentia of having participated in the Luxor attack. Uruguay's Supreme Court approved the extradition request in early May 2003.



El Said Hassan Ali Mohamed Mukhlis

Source: *CANAL 10* [Montevideo], Edición Internet, March 22, 1999.

Mukhlis' wife, Sahar (Sarrah) Mohamed Hassam Abud Hamanra, was arrested along with her husband in 1999 but immediately released. At the time of her arrest in Uruguay, Hamanra produced Brazilian documentation that Brazil's Federal Police (PF), which had already investigated her for one month, declared false. She is on the list of 100 people that the FBI wanted to interview after September 11. Just hours after the hijacked planes crashed into the World Trade Center and the Pentagon, the FBI reportedly requested South American security services to intensify efforts to locate Mukhlis' wife. Law enforcement sources were quoted in the report as saying that Hamanra could be the contact between al Qaeda and the Arab community in the TBA.[316]

According to official sources, citing the SIDE, Mukhlis received military training in Afghanistan from Al-Jama'at al-Islamiyah in the 1980s. He was later sent to Foz do Iguaçu by bin Laden. In that Brazilian city, Mukhlis allegedly "formed terrorist cells to collect funds for the

---

[316] Martin Arostegui, "Search for Bin Laden links looks south," www.autentico.org [UPI via COMTEX], October 12, 2001.

Middle East and to conduct logistical support activities, such as forging passports or other documents. That false documentation was meant for activists in the Islamic Jihad." Furthermore, officials asserted that "he had a mission to make contact with Hamas and Hizballah sympathizers" in Ciudad del Este, Foz do Iguaçu, and São Paulo.

In a ruling made public on October 5, 2001, an Uruguayan appeals court approved the extradition of Mukhlis, conditioning its approval on commitments from Egypt to not apply the death penalty, to respect due process, and to not try him on the charge of falsification of documents, for which he was already convicted in Uruguay. However, an appeal of the ruling to the Supreme Court was expected to take another 12 months. The appeals court reportedly indicated that Mukhlis was trained in Afghan camps commanded by Osama bin Laden.[317]

### al-Qadi, Marwan 'Adnan ("Marwan al-Safadi") (Hizballah)

Marwan 'Adnan al-Qadi ("Marwan al-Safadi"), 40, participated in the bombing of the World Trade Center on February 26, 1993. He was arrested in November 1996 in connection with a plot by Islamic groups in the TBA to blow up the U.S. Embassy in Paraguay that month. Police who raided his apartment in Ciudad del Este found it filled with explosives, pistols equipped with silencers, double-barreled rifles, false Canadian and U.S. passports, and a large amount of cash. Al-Qadi fled to Asunción, where Paraguayan police detained him. Two days later, U.S. officials escorted him to the United States.[318]

Although extradited to the United States and sentenced to 18 months in prison, al-Qadi was deported to Canada, where he received a nine-year prison sentence for drug trafficking. Al-Qadi escaped from Canada's prisons three times and finally succeeding in escaping from prison in Montreal, with the help of Hizballah elements in that area, and fleeing to South America with a false passport. Arrested by Brazilian authorities, he again escaped three times from prison in Brazil before reaching Ciudad del Este.[319]

---

[317] *El Nuevo Herald* [Miami], October 6, 2001, from AFP; *New York Times*, November 27, 2001, citing a report published on October 5, 2001, in the Uruguayan daily *El Observador*.
[318] Humberto Trezzi, "EUA pressionam Brasil a colaborar" [USA pressures Brazil to collaborate], *Zero Hora*, September 19, 2001.
[319] Trezzi, *Zero Hora*.



Figure 3. Drug-Trafficking Routes in the Tri-Border Area (TBA), 2002

*Source*: http://www.igeo.ufrj.br/fronteiras/pesquisa/drogafoz.htm.

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 145 of 632

## SELECTIVE BIBLIOGRAPHY

"Al-Qaeda and Argentina," *Jane's Intelligence Digest* [London], October 26, 2001.

Albanese, Jay S., Dilip K. Das, and Arvind Verma, eds., *Organized Crime: World Perspectives*. Upper Saddle River, New Jersey: Prentice Hall, 2003.

Almiron, Hugo Antolin. "Organized Crime: A Perspective from Argentina." Chapter 14 in Jay S. Albanese, Dilip K. Das, and Arvind Verma, eds., *Organized Crime: World Perspectives*. Upper Saddle River, New Jersey: Prentice Hall, 2003, 317–29.

Anderson, Martin. "Al-Qaeda Across the Americas," *Insight on the News*, November 26, 2002, 20-22.

Argentina. "Ley 25246 Creación de la Unidad de Información Financiera" [Law 25246, Creation of the Financial Information Unit]. *Boletín Oficial* [Buenos Aires], May 10, 2000. http://www.imolin.org/argtlaw2.htm.

Bagley, Bruce Michael. *Globalization and Transnational Organized Crime: The Russian Mafia in Latin America and the Caribbean*, October 31, 2001. http://www.mamacoca.org/feb2002/art_bagley_globalization_organized_crime_en.html#fn1.

Bartolomé, Mariano César. *Amenzas a la seguridad de los estados: La triple frontera como 'área gris' en el cono sur americano* [Threats to the Security of States: The Triborder as a 'Grey Area' in the Southern Cone of South America]. Buenos Aires, November 29, 2001. http://www.geocities.com/mcbartolome/triplefrontera1.htm.

Berdal, Mats, and Mónica Serrano, eds. *Transnational Organized Crime & International Security: Business as Usual?* Boulder, Colorado: Lynne Rienner, 2002.

Brieger, Pedro, and Enrique Herszkowich. "The Muslim Community of Argentina." *The Muslim World* [Hartford] 92, nos. 1, 2 (Spring 2002): 157–68.

Canadian Security Intelligence Service (CSIS). "Transnational Criminal Activity," November 1998. http://www.fas.org/irp/threat/back10e.htm.

Cliffe, Lionel, and Robin Luckham. "Complex Political Emergencies and the State: Failure and the Fate of the State." *Third World Quarterly* [London] 20, no. 1 (February 1999): 27–50.

Cooke, Melinda Wheeler. "National Security," Chapter 5 in Dennis M. Hanratty and Sandra W. Meditz, eds., *Paraguay: A Country Study*. Washington, DC: Library of Congress, Federal Research Division, 1990, 201–44.

Criminal Intelligence Service Canada (CSIS). "Asian-Based Organized Crime." 1998. http://www.cisc.gc.ca/AnnualReport1998/Cisc1998en/asian98.htm.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 146 of 632

Daly, John. "The Suspects: The Latin American Connection," *Jane's Terrorism & Security Monitor* [London], October 1, 2001.

de Morais, Machado, and Andrea Frota. *Money Laundering in Brazil*. Washington, DC: School of Business and Public Management, Institute of Brazilian Business and Management Issues, George Washington University, Fall 2000. http://216.239.51.100/search?q=cache:Ms30X17JQ_YC:www.gwu.edu/~ibi/minerva/Fall 2000/Andrea.Morais.pdf+cc-5+brasil+paraguay&hl=en&ie=UTF-8.

Delpirou, Alain, and Eduardo Mackenzie. *Les cartels criminels: Cocaïne et heroine: Une industrie lourde en Amérique latine*. Paris: Presses Universitaires de France, 2000.

Fayt, Carlos. *Criminalidad del terrorismo sagrado: El atentado a la embajada de Israel en Argentina*. La Plata, Argentina: Editorial Universitaria de La Plata, 2001.

Fields, Jeffrey. Center for Nonproliferation Studies, Monterey Institute of International Studies. "Islamist Terrorist Threat in the Tri-Border Region." October 2002. http://www.nti.org/e_research/e3_16b.html.

Filho, Expedito, and Sílvio Ferreira, with Patrícia Cerqueira. "Rede de clandestinidade" [Clandestine Network], OnlineÉpoca Editora Globo, no. 179 (October 22, 2001).

Finckenauer, James O. "Chinese Transnational Organized Crime: The Fuk Ching" (undated). National Institute of Justice International, U.S. Department of Justice, citing Chin, Ko-lin, *Chinatown Gangs*. Oxford: Oxford University Press, 1996. http://www.ojp.usdoj.gov/nij/international/ctoc.html.

Friedman, Robert I. *Red Mafiya: How the Russian Mob Has Invaded America*. Boston: Little, Brown, 2000.

Goldberg, Jeffrey. "In the Party of God," *The New Yorker* 79, no. 32 (October 28, 2002): 75–83.

Herrera, Eduardo Wills, and Nubia Urueña Corté, with Nick Rosen. "South America." Pages 103–14 in Transparency International, *Global Corruption Report 2003*. Berlin: TI, 2002. http://www.globalcorruptionreport.org/.

Hudson, Rex A. "Narcotics-Funded Terrorist/Extremist Groups in Latin America." Pages 11–39 in Rex A. Hudson, ed., *A Global Overview of Narcotics-Funded Terrorist and Other Extremist Groups*. Washington, DC: Federal Research Division, Library of Congress, May 2002.

Inter-American Development Bank. *Development Beyond Economics: Economic and Social Progress in Latin America - 2000 Report*. Washington, DC: Johns Hopkins University Press and The Inter-American Development Bank, 2000.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 147 of 632

International Intellectual Property Alliance. *2003 Special 301 Report: Brazil*, 2003. http://www.iipa.com/rbc/2003/2003SPEC301BRAZIL.pdf.

Jordan, David C. *Drug Politics: Dirty Money and Democracies*. Norman, Oklahoma: University of Oklahoma Press, 1999.

Junger, Sebastian. "Terrorism's New Geography," *Vanity Fair*, no. 508 (December 2002): 194, 196, 198–200, 202, 205–6.

Junior, Policarpo. "Tem famosos no meio: Polícia apura um bilionário esquema de remessa ilegal de dinheiro ao exterior e já tem nomes de gente graúda" [They Have Famous People Among Them: Police Expedite a Billion-Real Scheme for Remitting Illegal Money Abroad and Already Have the Names of Big-Shots], *Veja on-line*, no. 1,755 (June 12, 2002). http://veja.abril.com.br/120602/p_046.html.

Klebnikov, Paul. *Godfather of the Kremlin: Boris Berezovsky and the Looting of Russia*. New York: Harcourt Brace, 2000.

Korzeniewicz, Roberto P. "The Society and Its Environment." Chapter 2 in Rex A. Hudson, ed., *Argentina: A Country Study*. Unpublished manuscript draft. Washington, DC: Library of Congress, Federal Research Division, 1999.

Kovadloff, Jacob. *Crisis In Argentina*. American Jewish Community [New York], circa June 2002. http://www.ajc.org/InTheMedia/PublicationsPrint.asp?did=555.

Kozameh, Ernesto Nicolás, Julio O. Trajtenberg, C.P. Nicolás Kozameh Jr., and Ezequiel Trajtenberg. *Guide to the Argentine Executive, Legislative and Judicial System*. July 15, 2001. http://www.llrx.com/features/argentina.htm.

Madani, Blanca. "Hezbollah's Global Finance Network: The Triple Frontier," *Middle East Intelligence Bulletin* [a monthly publication of the United States Committee for a Free Lebanon] 4, no. 1 (January 2002).

Madani, Blanca. "New Report Links Syria to 1992 Bombing of Israeli Embassy in Argentina." *Middle East Intelligence Bulletin* 2, no. 3 (March 2000).

Mahan, Sue. *Beyond the Mafia: Organized Crime in the Americas*. Thousand Oaks, CA: Sage, 1998.

Mendel, William W., "Paraguay's Ciudad del Este and the New Centers of Gravity," *Military Review* 82, no. 2 (March–April 2002): 51–58.

Mingardi, Guaracy. "Money and the International Drug Trade in São Paulo," *International Social Science Journal*, no. 169 (September 2001): 379–86.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 148 of 632

Montoya, Mario Daniel. "Israel Takes Special Interest in Triple Border Area," *Jane's Intelligence Review* [London] 13, no. 12 (December 2001): 13–14.

Montoya, Mario Daniel. "War on Terrorism Reaches Paraguay's Triple Border," *Jane's Intelligence Review* [London] 13, no. 12 (December 2001): 12–15.

Neto, Paulo de Mesquita. *Crime, Violence and Democracy in Latin America*. New Mexico: University of New Mexico, Integration in the Americas Conference, April 5, 2002. http://www.unm.edu/~laiinfo/conference/mesquita.html.

Nurton, James. "Goodbye to a Difficult Year: The World's Leading IP Practices," *Managing Intellectual Property* [London], June 2002, 56–70.

O'Balance, Edgar. *Islamic Fundamentalist Terrorism, 1979-95: The Iranian Connection*. New York: New York University Press, 1997.

Oviedo, Pedro. "En la Triple Frontera se lavan doce mil millones de dólares al año del narcotráfico, según un informe official" [In the Triple Border US$12 Billion Is Laundered Per Year From Narcotics Trafficking, According to An Official Report], www.MisionesOnLine.net, No. 745, July 8, 2001. http://misionesonline.net/paginas/action.lasso?-database=noticias3&-layout=web&-response=noticia.html&id=11349&autorizado=si&-search.

Padilla Fredy, Nelson. "Los hombres de Osama bin Laden en Colombia" [The Men of Osama bin Laden in Colombia], *Cromos*, no. 4,364 (September 24, 2001).

Rauber, Guido. *Lavado de Dinero: Triple Frontera —Work Paper Nº 1*, Prevención de Adicciones y Control de Drogas [Subsecretary of Drug Control and Prevention of Addictions], Ministry of Public Health of Misiones Province, Argentina, updated version of December 31, 2000 (original date, August 2, 1999).

Ribeiro Jr., Amaury, and Sonia Filgueiras. "Sieve of Impunity," *Istoé* [Internet Version-www], February 5, 2003, as translated for FBIS, "Brazil: Federal Police, FBI Unveil $30 Billion Money Laundering Scheme," February 5, 2003 (FBIS Document ID: LAP20030203000075).

Richard, Amy O'Neill. "International Trafficking in Women to the United States: A Contemporary Manifestation of Slavery and Organized Crime." An Intelligence Monograph of the Director of Central Intelligence (DCI) Exceptional Intelligence Analyst Program, Center for the Study of Intelligence, Central Intelligence Agency, April 2000, U.S. Department of State, http://usinfo.state.gov/topical/global/traffic/report/homepage.htm#contents (based on interview with INS, New York, May 1999).

Richards, James R. *Transnational Criminal Organizations, Cybercrime, and Money Laundering: A Handbook for Law Enforcement Offices, Auditors, and Financial Investigators*. Boca Raton, Florida: CRC Press LLC, 1999.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 149 of 632

Robinson, Jeffrey. *The Laundrymen: Inside Money Laundering, The World's Third-Largest Business*. New York: Arcade, 1996.

Rogers, Bill. "Arabs Accuse Paraguay Police Of Extortion," *Middle East News Online* [Durham, North Carolina], October 4, 2001.

Serrano, Mónica. "Transnational Crime in the Western Hemisphere." Pages 87–112 in Jorge I. Domínguez, ed., *The Future of Inter-American Relations*. An Inter-American Dialogue Book Series. New York and London: Routledge, 2000.

Serrano, Mónica, and María Celia Toro. "From Drug Trafficking to Transnational Organized Crime in Latin America." Chapter 12 in Mats Berdal and Mónica Serrano, eds., *Transnational Organized Crime & International Security: Business as Usual?* Boulder, Colorado: Lynne Rienner, 2002, 155-82.

Silva, Ruy Gomes. *Effective Measures to Combat Transnational Organized Crime in Criminal Justice Processes*. Participants' Papers, 116th International Training Course, Resource Material Series no. 58. Tokyo: Asia and Far East Institute for the Prevention of Crime and the Treatment of Offenders (UNAFEI), December 2001, 160–70. http://www.unafei.or.jp/pdf/58-00.pdf.

Takeyh, Ray, and Nikolas Gvosdev. "Do Terrorist Networks Need a Home?" *Washington Quarterly* 25, no. 3 (2002): 97–108.

Timmerman, Kenneth R. "Likely Mastermind of Tower Attacks: Imad Mugniyeh," *Insight on the News* 17, no. 49 (December 31, 2001): 18–21.

Tollefson, Scott D. "National Security," Chapter 5 in Rex A. Hudson, ed., *Argentina: A Country Study*. Unpublished manuscript draft. Washington, DC: Library of Congress, Federal Research Division, 1999.

United States. Department of State. "Argentina," *Country Reports on Human Rights Practices, 2001*. Washington, DC: Bureau of Democracy, Human Rights, and Labor, March 4, 2002. http://www.state.gov/g/drl/rls/hrrpt/2001/wha/8278.htm.

United States. Department of State. "Brazil," *Country Reports on Human Rights Practices - 2001*. Washington, DC: Bureau of Democracy, Human Rights, and Labor, March 4, 2002.

United States. Department of State. *International Narcotics Control Strategy Report, 1999*. Washington, DC: Bureau for International Narcotics and Law Enforcement Affairs, 2000.

United States. Department of State. *International Narcotics Control Strategy Report, 2002*. Washington, DC: Bureau for International Narcotics and Law Enforcement Affairs, March 1, 2003. http://www.state.gov/g/inl/rls/nrcrpt/2002/html/17952pf.htm.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 150 of 632

United States. Department of State. Office of the Coordinator for Counterterrorism. *Patterns of Global Terrorism, 2001*. Washington, DC, May 21, 2002. http://www.state.gov/s/ct/rls/pgtrpt/2001/html/10246.htm.

Webster, William H., Arnaud de Borchgrave, Robert H. Kupperman, Erik R. Peterson, Gerard P. Burke, and Frank J. Cilluffo. *Russian Organized Crime: A Report of the Global Organized Crime Task Force*. CSIS Panel Report Series. Washington, DC: Center for Strategic and International Studies, 1997.

Wilcox, Jr., Philip C. "International Terrorism in Latin America." Testimony to the U.S. House of Representatives, Committee on International Relations, September 28, 1995.

Wills Herrera, Eduardo, and Nubia Urueña Corté, with Nick Rosen. "South America" in Transparency International, *Global Corruption Report 2003*. Berlin: TI, 2002. http://www.globalcorruptionreport.org/.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 151 of 632



U.S. Edition

Member Center: **Sign In** | **Register**

MAKE CNN.com YOUR HOME PAGE

**SEARCH**    ○ **THE WEB** ○ **CNN.com**     [ ]   SEARCH

Home Page
Asia
Europe
U.S.
World
**Africa**
**Americas**
Middle East
World Business
Technology
Science & Space
Entertainment
World Sport
Travel
Weather
Special Reports
Video
I-Reports

**ONLY ON CNN**

CNN Pipeline
What's On
Art of Life
Business Traveller
Future Summit
Inside the Mideast
Principal Voices
Quest
Revealed
Talk Asia
Untold Stories

[ Services ▼ ]
[ Languages ▼ ]

# WORLD

## Al-Zawahiri: Egyptian militant group joins al Qaeda

### Group linked to Luxor tourist slaughter, Sadat assassination

Saturday, August 5, 2006 Posted: 2239 GMT (0639 HKT)

**(CNN) -- Al Qaeda has joined forces with the long-quiet Egyptian militant group Al-Jamaa Islamiya, according to a videotaped message from Osama bin Laden's top lieutenant that aired Saturday.**

Ayman al-Zawahiri said in the message that the two groups will form "one line, facing its enemies."

"May God give us victory with his help," the Egyptian-born al-Zawahiri said on the tape. It aired on the Arabic-language network Al-Jazeera.

It was unclear how many members of Al-Jamaa Islamiya would join al Qaeda's ranks.

In September 2003 Egypt freed more than 1,000 members of the group because of the group's stated "commitment to rejecting violence," then-Interior Minister Habib el-Adli told Al-Jazeera at the time. Egypt released another 900 members of the group, including founder Najeh Ibrahim, in April 2006.

Among those set free in 2003 was the group's leader, Karam Zuhdi, who expressed regret for conspiring with Egyptian Islamic Jihad in the 1981 assassination of Egyptian President Anwar Sadat, according to the Council on Foreign Relations.

Al-Zawahiri is the founder of present-day Egyptian Islamic Jihad and worked in the 1970s to overthrow Sadat and establish an Islamic state. In 1981 he was jailed on conspiracy charges in the Sadat assassination, but was later acquitted.

Al-Jamaa Islamiya renounced bloodshed in 1998 after a wave of violence that claimed about 1,300 lives. Included was a 1997 terror attack against tourists in Luxor in which 71 were killed.

According to the Web site trackingthethreat.com, which describes itself as "a database of open-source information about the al Qaeda terrorist network," Al-Jamaa Islamiya emerged during the 1970s, forming in Egyptian jails and later in some Egyptian

advertisement


story.zawahiri.aj.jpg

In a videotaped statement, Ayman al-Zawahiri said al Qaeda is joining forces with an Egyptian militant group.

YOUR E-MAIL ALERTS

| Egypt | ○ |
| Acts of terror | ○ |
| Al Qaeda | ○ |

[ ACTIVATE ] or **Create Your Own**

**Manage Alerts** | **What Is This?**

universities.

**Story Tools**



advertisement

Click Here to try 4 Free
Trial Issues of Time!

---

## TOP STORIES

Home Page

[Get up-to-the minute news from CNN](#)

CNN.com gives you the latest stories and
video from the around the world, with in-
depth coverage of U.S. news, politics,
entertainment, health, crime, tech and
more.

## TOP STORIES

Home Page

[Get up-to-the minute news from CNN](#)

CNN.com gives you the latest stories and
video from the around the world, with in-
depth coverage of U.S. news, politics,
entertainment, health, crime, tech and
more.



© 2007 Cable News Network LP, LLLP.
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us. Site Map.

External sites open in new window; not endorsed by CNN.com
Pay service with live and archived video. Learn more
Download audio news  |  Add RSS headlines



PROJECT AIR FORCE

THE ARTS

CHILD POLICY

CIVIL JUSTICE

EDUCATION

ENERGY AND ENVIRONMENT

HEALTH AND HEALTH CARE

INTERNATIONAL AFFAIRS

NATIONAL SECURITY

POPULATION AND AGING

PUBLIC SAFETY

SCIENCE AND TECHNOLOGY

SUBSTANCE ABUSE

TERRORISM AND
HOMELAND SECURITY

TRANSPORTATION AND
INFRASTRUCTURE

WORKFORCE AND WORKPLACE

This PDF document was made available from www.rand.org as a public service of the RAND Corporation.

Jump down to document ▼

The RAND Corporation is a nonprofit research organization providing objective analysis and effective solutions that address the challenges facing the public and private sectors around the world.

## Support RAND

Purchase this document

Browse Books & Publications

Make a charitable contribution

## For More Information

Visit RAND at www.rand.org

Explore RAND Project AIR FORCE

View document details

### Limited Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law as indicated in a notice appearing later in this work. This electronic representation of RAND intellectual property is provided for non-commercial use only. Permission is required from RAND to reproduce, or reuse in another form, any of our research documents.

This product is part of the RAND Corporation monograph series. RAND monographs present major research findings that address the challenges facing the public and private sectors. All RAND monographs undergo rigorous peer review to ensure high standards for research quality and objectivity.

# Beyond al-Qaeda

PART 2

## The Outer Rings of the Terrorist Universe

Angel Rabasa • Peter Chalk • Kim Cragin • Sara A. Daly • Heather S. Gregg
Theodore W. Karasik • Kevin A. O'Brien • William Rosenau

Prepared for the United States Air Force

Approved for public release, distribution unlimited



PROJECT AIR FORCE

The research described in this report was sponsored by the United States
Air Force under Contract F49642-01-C-0003. Further information may
be obtained from the Strategic Planning Division, Directorate of Plans,
Hq USAF.

**Library of Congress Cataloging-in-Publication Data**

Beyond al-Qaeda. Part 2. The outer rings of the terrorist universe / Angel Rabasa
    ... [et al.].
        p. cm.
    "MG-430."
    Includes bibliographical references.
    ISBN-13: 978-0-8330-3932-3 (pbk. : alk. paper)
    1. Qaida (Organization) 2. Terrorists. 3. Terrorism—Government policy—United
States. 4. Terrorism—United States—Prevention. 5. War on Terrorism, 2001–
I. Rabasa, Angel.

    HV6431.B4932 2006
    363.325'12—dc22
                                                        2006025206

The RAND Corporation is a nonprofit research organization providing
objective analysis and effective solutions that address the challenges
facing the public and private sectors around the world. RAND's
publications do not necessarily reflect the opinions of its research clients
and sponsors.

**RAND**® is a registered trademark.

© Copyright 2006 RAND Corporation

All rights reserved. No part of this book may be reproduced in any
form by any electronic or mechanical means (including photocopying,
recording, or information storage and retrieval) without permission in
writing from RAND.

Published 2006 by the RAND Corporation
1776 Main Street, P.O. Box 2138, Santa Monica, CA 90407-2138
1200 South Hayes Street, Arlington, VA 22202-5050
4570 Fifth Avenue, Suite 600, Pittsburgh, PA 15213-2665
RAND URL: http://www.rand.org/
To order RAND documents or to obtain additional information, contact
Distribution Services: Telephone: (310) 451-7002;
Fax: (310) 451-6915; Email: order@rand.org

# Preface

The September 11, 2001, terrorist attacks and the U.S. response—the global war on terrorism—have changed the world, and the terrorist enterprise that we know as al-Qaeda has changed with it. The current status of al-Qaeda's network remains unclear, but it is certain that it and other terrorist groups continue to threaten the lives and well-being of Americans, at home and abroad, and the security of our friends and allies. This continuing danger leads to ongoing U.S. and international efforts to monitor, disrupt, and dismantle terrorist groups before they can cause large-scale destruction to our people or our interests.

The objective of this RAND Corporation study, undertaken as part of a project entitled "Beyond al-Qaeda: Countering Future Terrorist and Other Nontraditional Threats to U.S. Security," is to understand the shape of future threats to the United States and U.S. security interests from terrorist and other extremist organizations. We do this through analyses that draw together the various threat strands that are informing current U.S. thinking in the war on terror. The study looks specifically at four sources of threats:

1. *Al-Qaeda.* We examine how al-Qaeda has changed since September 11, the loss of its operating base in Afghanistan, and the death or capture of key operatives; and we assess what forms the al-Qaeda threat to the United States and U.S. interests take now and might take in the future.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 158 of 632

2. *Terrorist groups that may not be formally part of al-Qaeda but that have assimilated al-Qaeda's worldview and concept of mass-casualty terrorist attacks.* This, we believe, is where the center of gravity of the current global terrorist threat lies.

3. *Violent Islamist and non-Islamist terrorist and insurgent groups without known links to al-Qaeda.* These groups threaten U.S. regional interests, friends, and allies, as well as other nontraditional threats.

4. *The nexus between terrorism and organized crime.* In each case, we examine how the presence of these threats affects U.S. security interests, and we identify distinct strategies that the United States and the U.S. Air Force may take to neutralize or mitigate each of these threats.

The results of the study are reported in two volumes. This book is the seccond of the two; the first, by Angel Rabasa, Peter Chalk, Kim Cragin, Sara A. Daly, Heather S. Gregg, Theodore W. Karasik, Kevin A. O'Brien, and William Rosenau, is entitled *Beyond al-Qaeda: Part 1, The Global Jihadist Movement.*

This research builds on previous RAND Project AIR FORCE work on counterterrorism, notably the following:

- Angel Rabasa, Cheryl Benard, Peter Chalk, Christine Fair, Theodore Karasik, Rollie Lal, Ian Lesser, and David Thaler, *The Muslim World After 9/11,* MG-246-AF, 2004
- Nora Bensahel, *The Counterterror Coalitions*: *Cooperation with Europe, NATO, and the European Union*, MR-1746-AF, 2003
- Kim Cragin and Sara Daly, *The Dynamic Terrorist Threat: An Assessment of Group Motivations and Capabilities in a Changing World,* MR-1782-AF, 2004
- Lynn Davis, Steven Hosmer, Sara Daly, and Karl Mueller*, The U.S. Counterterrorism Strategy*: *A Planning Framework to Facilitate Timely Policy Adjustments,* DB-426-AF, 2004
- David Ochmanek, *Military Operations Against Terrorist Groups Abroad: Implications for the United States Air Force,* MR-1738-AF, 2003.

This research was sponsored by the Deputy Chief of Staff for Air and Space Operations, U.S. Air Force (A3/5), and conducted in the Strategy and Doctrine Program of RAND Project AIR FORCE. Research for this project was completed in September 2004. This book should be of value to the national security community and to interested members of the general public, especially those with an interest in combating the blight of international terrorism.

## RAND Project AIR FORCE

RAND Project AIR FORCE, a division of the RAND Corporation, is the U.S. Air Force's federally funded research and development center for studies and analyses. PAF provides the Air Force with independent analyses of policy alternatives affecting the development, employment, combat readiness, and support of current and future aerospace forces. Research is performed in four programs: Aerospace Force Development; Manpower, Personnel, and Training; Resource Management; and Strategy and Doctrine.

Additional information about PAF is available on our Web site at http://www.rand.org/paf.

# Contents

**Preface** ................................................................ iii
**Figure and Tables** ................................................ xi
**Summary** ............................................................ xiii
**Acknowledgments** ............................................ xxxi
**Abbreviations** ................................................ xxxiii

CHAPTER ONE
**Introduction** ....................................................... 1
Anaytical Framework ............................................. 2

CHAPTER TWO
**Hezbollah and Hamas** ........................................ 5
Hezbollah, Party of God ........................................ 5
   Ideological Foundation ................................... 8
   Strategic and Operational Objectives .............. 11
   Environmental Factors ................................. 13
Hamas: The Islamic Resistance Movement ............ 15
   Ideological Foundation ................................. 17
   Strategic and Operational Objectives .............. 19
   Environmental Factors ................................. 21
   Epilogue .................................................... 22

CHAPTER THREE
**Other Islamist Groups Outside the al-Qaeda Network** ........ 25
The Armed Islamic Group ...................................... 25

Ideological Foundation.................................................. 26
Strategic and Operational Objectives...................................... 27
Environmental Factors ...................................................29
Al-Gama'a al-Islamiyya.................................................. 30
Ideological Foundation...................................................31
Strategic and Operational Objectives...................................... 32
Environmental Factors ...................................................35
Al-Wa'ad.............................................................. 35
Strategic and Operational Objectives...................................... 36
South Africa: People Against Gangsterism and Drugs ......................37
Ideological Foundation.................................................. 38
Strategic and Operational Objectives...................................... 40
Environmental Factors .................................................. 42
Eritrean Islamic Jihad/Eritrean Islamic Reform Movement ............... 44
Ideological Foundation...................................................47
Strategic and Operational Objectives...................................... 48
Environmental Factors .................................................. 49
Other Groups Across the Horn of Africa .................................... 50

**CHAPTER FOUR**
**The Iraqi Insurgency** .................................................... 51
Ideological Foundation .................................................... 53
Strategic and Operational Objectives....................................... 54
Environmental Factors .................................................... 56
Future Trajectory of the Insurgency ........................................58

**CHAPTER FIVE**
**Non-Islamist Groups**.................................................. 61
Categories of Non-Islamist Groups and Insurgencies ....................... 61
The Revolutionary Armed Forces of Colombia and National
    Liberation Army............................................... 61
Ideological Background ..................................... 61
Strategic and Operational Objectives....................................... 62
Environmental Factors .................................................. 64
Maoist Insurgencies...................................................... 65
Ideological Foundation...................................................65

Strategic and Operational Objectives..........................................66
Environmental Factors.................................................................67
Liberation Tigers of Tamil Eelam ..............................................68
    Background and Ideological Foundation ...................................68
    Operations and Tactics.............................................................71
    Environmental Factors.............................................................77
Basque Fatherland and Liberty ...................................................78
    Ideological Foundation.............................................................78
    Strategic and Operational Objectives........................................79
    Environmental Factors.............................................................80
Some Conclusions Regarding Groups Outside the al-Qaeda Universe....80
    Potential Dangerous Shifts Ahead...........................................82

**CHAPTER SIX**

**Antiglobalization Movements**.....................................................85
Anarchism, the "New, New Left," and the Extreme Right in Western
    Europe and North America......................................................86
    Anarchists................................................................................86
    The "New, New Left" ..............................................................90
    The Extreme Right...................................................................92
    An Extreme Right–Islamist Alliance?.......................................93
Neo-Marxist and Radical Populist Movements in Latin America.........94
    Radical Indigenous Peoples' Movements in the Andean Region.........97

**CHAPTER SEVEN**

**The Convergence of Terrorism, Insurgency, and Crime**................101
The Tamil Tigers' Widespread International Criminal Network .........103
    Human Smuggling ..................................................................103
    Drug Trafficking.....................................................................104
    Gunrunning.............................................................................106
    Rationale for Convergence with Organized Crime ....................108
The Abu Sayyaf Group: An Islamic Terrorist-Criminal Group ...........111
    Piracy......................................................................................112
    Kidnapping..............................................................................115
    Gunrunning.............................................................................117
    Rationale for Convergence with Organized Crime......................120

Colombia: The Synergy of Drugs and Insurgency .......................... 122

    The Drug Trade ................................................................. 125

    Kidnappings for Ransom and Extortion .................................. 130

    Rationale for Convergence with Organized Crime ...................... 132

Al-Qaeda and Hezbollah in Africa: The Conflict Diamonds Nexus ..... 137

    Hezbollah and Africa .......................................................... 146

Hezbollah and Crime in North America .................................... 149

    Hezbollah in Canada .......................................................... 149

    The Hezbollah Criminal Nexus in the United States and Mexico ...... 151

The Middle Eastern Terrorist-Criminal Nexus in the Tri-Border

    Area of South America ....................................................... 153

    Smuggling, Black Market Activities, and Money Laundering

        Operations .................................................................. 157

    Drug Trafficking and Arms Smuggling .................................... 158

    Rationale for Convergence with Organized Crime ...................... 159

**CHAPTER EIGHT**

**Conclusions and Recommendations** ........................................ 161

Implications for the U.S. Military and the U.S. Air Force ................. 164

**Bibliography** ................................................................... 167

# Figure and Tables

## Figure

7.1.   Tri-Border Region, with Access to the River Plate.............. 154

## Tables

5.1.   Prominent LTTE Suicide Attacks, 1987–2002 ................. 74
5.2.   Categories of Groups Outside the Global Jihadist
       Movement ............................................................ 81
7.1.   FARC Profits from Drug-Related Activity ..................... 126

190

# Summary

The "al-Qaeda universe" does not incorporate the entirety of the terrorist or extremist threat facing the United States. Clearly, Osama bin Laden and other al-Qaeda leaders hope that their efforts will persuade other Islamic militant groups to join the global jihad. But what about the terrorist or extremist groups that are not part of the al-Qaeda network and do not adhere to its agenda? The temptation for policymakers is to set aside groups that have not chosen to join al-Qaeda as less dangerous. Yet these Islamist groups, non-Islamist terrorists, and criminal organizations still pose a threat to the United States, its interests, and its allies. This volume, therefore, addresses the threats outside the al-Qaeda universe.

## Islamist Groups

The first category of groups examined in this part of the study consists of terrorist groups that articulate an Islamist agenda for their own country but are not part of the global jihadist movement. Two considerations guide the analysis of these groups: the threat that they pose to U.S. friends and allies and U.S. regional interests, and the conditions under which they could rise to the level of global threat.

Of the groups in this category, Lebanese Hezbollah is perhaps the best known and the most capable. This group was responsible for the 1983 suicide attack against the U.S. Marine barracks in Beirut, which inaugurated the era of mass-casualty terrorism, and for two terrorist attacks in the Western hemisphere, both in Buenos Aires: the 1992

bombing of the Israeli embassy and the 1994 bombing of the Jewish Community Center. In addition, since the early 1980s, Hezbollah has established a far-flung financial network, stretching from the tri-border area of South America (where the borders of Brazil, Argentina, and Paraguay intersect), to North America, to West Africa, and Southeast Asia. So Hezbollah has the potential to inflict damage on U.S. interests and allies across the globe. Yet this group remains relatively detached from the al-Qaeda network and has not directly threatened the United States since the 1983 attack. Today, Hezbollah projects an image of political legitimacy in Lebanon. At the same time, the group maintains its terrorist network of 20,000–25,000 members, conducting some limited attacks on Israeli forces and supplying military aid to Palestinian groups.

Although Hezbollah is predominantly a Shi'ite group, its leaders articulate a universalistic view of the Muslim community, the *umma,* that incorporates Shi'ites, Sunnis, and even secularists. Hezbollah's universalism is tempered by pragmatism. The ideological foundations of Hezbollah, therefore, explain at least part of the group's reluctance to join the al-Qaeda network. Its leadership might feel some spontaneous sympathy with wider pan-Islamist, Sunni agendas, but these movements do not necessarily align with Hezbollah ideologically. However, just because Hezbollah does not align with other Islamist groups ideologically, it may still coordinate with them. Despite the ideological disparities between Hezbollah and the al-Qaeda network, some parallel interests exist. In particular, Hezbollah historically has opposed "Western domination" of the Muslim world and the United States specifically. So although the ideological background of Hezbollah might explain its lack of affiliation with the al-Qaeda network, Hezbollah's strategic objectives pave the way for possible cooperation in the future. (See pp. 5–15.)

After Hezbollah, the most capable of the groups in this category is the Islamic Resistance Movement, known by its acronym, Hamas. Hamas's fundamental objective is to establish a Palestinian Islamic state in Israel proper, the West Bank, and Gaza. To achieve its strategic objectives, Hamas has followed a two-pronged strategy: One part of the strategy, designed to secure a Palestinian state, involves a terror

campaign against the Israeli government and citizens. A key tactic in this campaign is suicide bombings. Although Hamas was not the first Palestinian terrorist group to adopt the tactic of suicide bombings, it has made the most extensive use of this tactic—even though at times the wider Palestinian community has been highly critical of it. The second part of the Hamas strategy requires the group to pursue its Islamic agenda vis-à-vis al-Fatah and the Palestinian Authority.

Like many Islamic movements in the Arab world, Hamas's ideology is firmly grounded in the teachings of Egypt's Muslim Brotherhood. One key ideological difference between the Brotherhood and Hamas is that Hamas believes in the use of violence in addition to religious proselytizing and political activity. In addition, Hamas's ideology is strongly nationalistic, in contrast to the Brotherhood's pan-Islamism.

Hamas presents an interesting contradiction in strategic and operational objectives, especially when it comes to potential shifts. On the one hand, an assessment that the U.S.-Israeli relationship is the center of gravity of its opponent might encourage Hamas to take on a more global agenda, attacking the United States and U.S. targets overseas. On the other hand, Hamas's leadership appears to be pragmatic enough to realize that widening the conflict may alienate its own support base, bring in a strong U.S. response, and jeopardize its political advances. After the the January 2006 Palestinian elections in which Hamas won an outright majority in the Palestinian Legislative Council, the group was warned by al-Qaeda's deputy leader, Ayman al-Zawahiri, to continue the struggle against Israel, and was criticized in jihadi forums for participating in elections and not pursuing an Islamist agenda. The jihadist criticism lays bare the rift between the global jihadist movement, with its supra-national goals, and local groups and organizations that have more limited objectives and are open to tactical use of the political process. (See pp. 15–24.)

Other Islamist groups examined include Algeria's Armed Islamic Group, known by its French acronym, GIA; Egypt's al-Gama'a al-Islamiyya and al-Wa'ad; South Africa's People Against Gangsterism and Drugs (PAGAD); and the Eritrean Islamic Jihad–Islamic Reform Movement. The GIA saw the establishment of an Islamic government in Algeria as its primary goal; to that end, the group employed meth-

ods so extreme and brutal that they went beyond those employed by some of the most virulent terrorist organizations operating today. As a result, the GIA alienated its potential support base. Unlike its splinter faction, the Salafist Group for Preaching and Combat (GSPC), the GIA never established a solid relationship with al-Qaeda outside the few members who were veterans of the Afghan war and who knew or had met bin Laden in that context. The GIA has not conducted any attacks outside Algeria since 1996. (See pp. 25–30.)

Egypt's al-Gama'a al-Islamiyya, like other Islamist terrorist groups, began as an offshoot of the Muslim Brotherhood. Al-Gama'a gained a renewed sense of purpose after the return of its members from the Afghan jihad. Al-Gama'a leaders were energized by what they believed was a moral victory of Islamism in Afghanistan and were convinced that they could accomplish in Egypt what the mujahidin achieved in Afghanistan by ousting the "illegitimate" governing power. As a result, al-Gama'a put its theories into practice in Egypt by attacking a wide variety of targets—including Coptic Christians, banks, police, politicians, tourists, and the media—with the goal of undermining Egyptian state power, secular institutions, and the economy. Al-Gama'a's operational leader, Rifa'i Taha Musa, signed bin Laden's 1998 declaration of war against "Jews and Crusaders." However, Taha Musa was unable to recruit many of his cadre to support bin Laden and join the global jihad. Al-Gama'a witnessed how the Egyptian Islamic Jihad had suffered significant setbacks because of its decision to join al-Qaeda. In 1999, the group's historic leadership declared a unilateral ceasefire and in 2002 issued a statement renouncing the use of violence.

Al-Wa'ad ("the Promise") is a shadowy Islamic extremist organization based in Egypt about which not much is known. According to press reports of the recent trials of al-Wa'ad members in Egypt, the group is rather small and made up largely of Egyptian citizens with dual nationality, including Russians (Chechens), Dutch, Germans, Canadians, and reportedly even Americans. The group was accused in a 2001 indictment of raising money for international jihadist causes, including Palestinian and Chechen groups. Although the arrests may have eliminated or reduced the potential al-Wa'ad threat, some press reports indicate at least two new terrorist groups have formed in Egypt

as of this writing—the Jihad Group for the Victory of Muslims at Home and Abroad and Jundullah, a faction of the Egyptian Islamic Jihad. The Egyptian investigation of Jundullah's activities found that it had ties to al-Zawahiri and was in contact with leaders in other extremist organizations in Europe, Pakistan, and Afghanistan. (See pp. 30–37.)

People Against Gangsterism and Drugs (PAGAD) was formed in 1996 as a community anticrime group to fight drugs and violence in South Africa. By early 1998, PAGAD had also become violently antigovernment and anti-Western. It is closely associated, if not intertwined, with a South African Iranian-inspired Islamic group, Qibla. In addition to the few hundred estimated criminal victims of PAGAD's targeted violence, PAGAD's bombing targets have included South African authorities, moderate Muslims, synagogues, gay nightclubs, tourist attractions, and Western-associated restaurants. There are indications that South Africa could become a haven for jihadists from other parts of the world and a source for radicalizing Muslim youth to mobilize against Western interests globally. (See pp. 37–44.)

The last group examined in this category is the Eritrean Islamic Reform Movement (EIRM), also known as the Islamic Salvation Movement, a Sunni Islamist group. The group has been active in the Horn of Africa in various guises since the mid-1970s and seeks the violent overthrow of Eritrea's secular government and its replacement with an Islamic government. The leadership of the ERIM and of the umbrella organization to which it belongs, the Eritrean National Alliance (ENA), has indicated that it sees its struggle against Eritrea's government within the wider context of a push for a new Islamic caliphate, but the focus of the group remains firmly fixed on overthrowing the government. There is a possibility that the EIRM could become involved with other like-minded Islamic organizations throughout the Horn of Africa to promote common interests and perhaps seek to establish an Islamic federation in the Horn. (See pp. 44–49.)

## The Iraqi Insurgency

The nonaffiliated part of the Iraqi insurgency—that is, the component that is outside of the al-Qaeda and al-Zarqawi networks—is diverse and widespread, and composed of groups of both nationalist and religious provenance. In response to the insurgents, both the Shi'ite and Kurdish communities have continued to rally around their new national leaders and have apparently refused to engage in sectarian revenge. (However, Shi'ite revenge killings against Sunnis have been on the rise since the bombing of the al-Askari mosque in Samarra on February 22, 2006.)

This section focuses on the Sunni insurgents. We do not place the Shi'ite militiamen associated with Muqtada al-Sadr in the same category, because—even though al-Sadr's militiamen, organized in the so-called "Mahdi's Army," share the Sunnis' hostility toward the United States and have certainly engaged in violent activities—these activities generally do not rise to the level of Sunni terrorism. Moreover, al-Sadr must operate within the broader framework of Shi'ite politics in Iraq. (Other Shi'ite and Kurdish militias are in fact the military arms of political organizations that are part of Iraq's legitimate political spectrum. Nevertheless, we discuss them here because they are outside of the Iraqi government's control and could become engines of sectarian conflict.) (See pp. 51–60.)

At least 28 different insurgent groups have formed from 2003 through 2005. Some—but not all—are based in the Sunni triangle north and west of Baghdad. The danger of bloodshed is intensified because some of these groups increasingly embrace tactics imported by foreign fighters, such as the car bombings of civilian targets. It goes without saying that the universe of insurgent groups in Iraq is both dynamic and fluid. Groups appear, change, merge, divide, and disappear, operate under different names and sometimes under no name at all.

This insurgency, certainly one of the most complex and challenging ever faced by the United States, presents no single coherent enemy against which the United States can mass its superior military strength. The insurgency's various components, generally characterized more by their heterogeneity than by their homogeneity, fight for their

own unique reasons and have little in common other than a desire to remove the U.S. and coalition presence from the country. In general, they seek to create a crisis between the Iraqi government and the Iraqi people in the hopes that outside support for the government will wane, forcing the withdrawal of foreign forces.

The strategic and operational objectives of these groups vary widely. The jihadists, as discussed in the first volume of this study, are seeking to foment a religious war between Sunnis and Shi'ites, who—until the February 2006 bombing of the al-Askari mosque in Samarra—largely refrained from engaging in sectarian revenge. Former regime loyalists believe that they have no option but to continue fighting and are also convinced that the United States and its coalition partners will tire long before they do. These groups are trying to apply the experiences of other guerrilla and terrorist organizations to their operations. Their objective is to restore the former Ba'ath party establishment to power. Nationalists do not necessarily support the return of the Ba'ath—some actively oppose it—but they resent what they consider to be the occupation of Iraq and are angered by the coalition's failure to restore order and security. Iraqi Islamists have emerged after decades of suppression by the Ba'thist regime but have the experiences of Islamist organizations in other countries to help them. Their objective is the establishment of an Islamic state in Iraq. (See pp. 54–56.)

As of the time of this writing, the Iraqi insurgency is in a transitional stage. It is evolving in response to transcendent political events in Iraq—the January 2005 elections, the approval of a new Iraqi constitution, and the January 2006 elections for a permanent Iraqi government—which center, of course, on the rise of the Shi'ites and the Kurds to a dominant position in the state. (See pp. 58–60.) In the end, terror alone cannot guarantee success for the insurgents. The insurgency can continue to wreak havoc but will become an exercise in political futility. In these circumstances, three general scenarios are possible:

In the most benign case, significant elements of the Sunni community realize that a return of the status quo ante is no longer viable and accept a minority role within a democratic Iraq. The Sunnis might find a common interest with the Kurdish parties in balancing

Shi'ite predominance, and a rough balance of power could develop, allowing for what we called in another study "democracy with Iraqi characteristics."

In the second scenario, the representatives of the Sunni community are too alienated or terrorized to enter into a political arrangement with the Shi'ites and the Kurds. The insurgency could continue, perhaps at high levels of violence, but would be unable to transcend its narrow social base or to prevent the nascent government from gradually consolidating its control over the country.

In the third scenario, if the new government is unable to contain the insurgents and terrorists, or to win broad support among the diverse ethnic and religious communities in Iraq, it will be no match for local warlords and will have to contend with the growth of terrorist infrastructures. A failure of central authority could lead to a formal or de facto partition of the country.

The wild card in Iraq's political evolution is external interference. There is the potential for non-Iraqi state and nonstate actors—particularly Iran—to interfere more actively in Iraqi politics. The activities of Iranian operatives in Iraq suggest a long-term strategy by Tehran to create an Iranian sphere of influence in southern Iraq. Matters are complicated by the existence of Iraqi Shi'ite political parties that have varying degrees of loyalty to Iran. The key question is whether they will identify themselves as Shi'ites first, united with their Iranian brethren, or as Iraqis, threatened by Iranian encroachment. The answer may not become clear for years.

## Non-Islamist Threats

U.S. friends and allies and regional interests are not threatened by Islamist extremist and terrorist groups alone, of course. There are several capable non-Islamist insurgent and terrorist groups seeking to overthrow governments friendly to the United States or to carve out separate ethnic-based states. (See pp. 61–84.) These groups include the following:

- *The Liberation Tigers of Tamil Eelam (LTTE) in Sri Lanka, one of the world's most innovative and successful terrorist-insurgent groups.* It is one of the few that has institutionalized a permanent, highly trained martyr wing—the Black Tigers—as a formal component of its overall organizational structure. Although the LTTE does not presently threaten the United States, it does provide a benchmark of the sophistication that a substate insurgency can achieve given the right combination of circumstances. (See pp. 68–78.)

- *Basque Fatherland and Liberty* (Euskadi ta Askatasuna, *or ETA), a Marxist group that uses terrorism in hopes of forming an independent* Basque state in parts of northern Spain and southwest France. Although the ETA has not targeted U.S. interests, an increasingly anti-American tenor within the ETA after Operation Iraqi Freedom and connections with Abu Musab al-Zarqawi's terror network could make U.S. citizens and interests an ETA target in Europe. (See pp. 78–80.)

- *The Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), Marxist armed groups that have operated in Colombia since the 1960s.* The FARC, the most important of the two, has not deviated from its original strategy of "protracted people's war," a strategy based on Maoist and Vietnamese precepts that involves gradually extending the organization's presence and control in the countryside and eventually isolating the government forces in the major cities. This strategy of territorial control is linked to the FARC's involvement in the cocaine drug trade that generates much of the revenues that fund the organization's operations, together with extortion and kidnapping. (See pp. 61–65.)

- *Maoist insurgencies.* This rubric refers to the "People's Army" phenomena found in Peru (Shining Path), Nepal (Communist Party of Nepal), India (Naxalites), Bhutan (Ngolops), and the Philippines (Communist Party of the Philippines/New People's Army). These groups are Marxist-Leninist-Maoist entities that practice the "vanguard" philosophy, which holds that a small armed group (sometimes through the employment of extreme violence) will lead the proletariat in establishing a worker's utopia. Although not a direct

threat to the United States, these groups are terrorists inherently hostile to the international order and may find common interests with al-Qaeda and associates. They are also increasingly participating in drug trafficking to fund their activities. Factors that could move the Maoists to become a larger threat include U.S. support for governments under attack by Maoists, spillover effects from insurgency, and recruitment and indoctrination of native peoples against urban elites and governments. (See pp. 65–68.)

To complete the picture of the universe of terrorism, actual and potential, this study provides an overview and assessment of anarchist groups, the "New, New Left" and right-wing extremists in Europe and North America; movements in Latin America; and ecoterrorists and other niche extremists on the even farther fringe of the movement. In the context of this analysis, we examine the possibility of a tactical alliance between non-Islamic fringe extremist groups and Islamist extremists. Al-Qaeda, according to some accounts, has shown some interest in reaching out to non-Islamic militant groups, with anti-Semitism, anti-Americanism, and anti-Westernism serving as a common ground. The possibility of tactical alliances cannot be discounted and warrants carefully watching. However, although neo-Nazis, Islamists, and the New, New Left share an anti-Zionist stance (and a deep well of anti-Semitism), opposition to Israel remains a relatively minor component of the non-Islamic extremists' agenda, and so is unlikely to serve as the foundation for any real partnership. (See pp. 85–99.)

## The Convergence of Terrorism and Crime

An analysis of the future of terrorism cannot be complete without a discussion of the convergence of terrorism and crime. Criminals generally seek economic gain through illicit means, while terrorists seek political or ideological goals and use criminal means to achieve those ends. Nevertheless, the important fact is that these two sets of actors are joining forces against the state and society. This phenomenon is growing because similar conditions give rise to both terrorism and

transnational crime and because terrorists and organized criminals use the same strategies to promote their operations and sometimes engage in strategic alliances.

During the Cold War, many of the insurgent and terrorist organizations were largely dependent on great-power support. The end of the Cold War brought an effective end to external support for these groups. The Soviet Union disappeared, and the United States simply lost interest in the fate of many of its former clients. The post–Cold War survival strategies of these groups hinged on their ability to generate new sources of revenue to support their operations. Some groups were unable to make the transition and disbanded or made peace with the governments that they were seeking to overthrow, as in the case of the Salvadoran and Guatemalan rebels. Other groups, however, tapped into locally available sources of revenue and grew in strength. The most successful in making the transition were those that operated in countries that produced high-value commodities, legal or otherwise—for example, diamonds in West Africa, minerals in Central Africa, cocaine and heroin in Colombia, and opium and heroin in Southwest Asia and the "Golden Triangle" of Southeast Asia.

Other groups were able to fund themselves successfully from smuggling and arms trafficking, kidnapping and extortion, piracy, compact disc counterfeiting, and a variety of other criminal activities. These commodities provided easy targets of opportunity for terrorist or rebel movements. The groups had the firepower to deal themselves into the trade. They could trade the commodities themselves, as in the case of the Liberia-backed Revolutionary United Front of Sierra Leone and "conflict diamonds"; or protect and "tax" them, which is the preferred approach of the Revolutionary Armed Forces of Colombia (FARC); or set themselves up as middlemen in human and arms trafficking.

This transition from more conventional forms of financing to crime has also been a feature of the evolution of al-Qaeda. Al-Qaeda's effort to hide assets and capitalize on trade in West African conflict diamonds appears to date from September 1998, following international efforts to freeze al-Qaeda and Taliban accounts after the August 1998 bombings of the U.S. embassies in Tanzania and Kenya. As mentioned previously, Lebanese Hezbollah is known to maintain a global network

to support fundraising and operational and logistical requirements for its operations abroad. Hezbollah has raised significant amounts of funds through drug trafficking and diamond sales from Sierra Leone, and through smuggling, black market activity, and money-laundering operations in the tri-border area of South America. We examine several other case studies of the convergence of insurgent and terrorist organizations and crime in this study.

The criminal activities of these groups tend to weaken and corrupt political and social institutions, particularly when trafficking in a lucrative and social destructive commodity such as cocaine is involved. To the extent that they are successful, these groups also displace state and government institutions, usually weak to begin with, in the areas where they establish a foothold. Unchecked, the groups will expand their resource base, increase their recruiting pool, and generate greater capacity at the expense of the state. Therefore, there is a high correlation between the development of these groups and failed or failing states. (See pp. 101–160.)

## Conclusions and Recommendations

From a policy perspective, the first-order question is whether the trajectory of insurgent and terrorist groups outside the global jihadist movement will bring them closer to that movement. To answer this question, we examine what factors could affect this outcome and what the U.S. policy response should be. The second-order question is what level of threat these groups represent for U.S. regional interests, including the security of U.S. friends and allies, and what the U.S. policy response should be. (See pp. 161–166.)

With regard to convergence with al-Qaeda, the groups that generate the greatest concern are the Islamist groups that share aspects of al-Qaeda's worldview. Of the groups examined, only two—Egypt's al-Wa'ad and the Iraqi insurgents—have developed since bin Laden's notorious 1998 Khost fatwa against "Jews and Crusaders." The other groups were well established and active, and had articulated their own agendas prior to al-Qaeda's emergence in the international arena.

Therefore, they can be assumed to be less receptive to al-Qaeda's ideology of global jihad than the groups that have emerged since that time. Among these groups, the majority interpret their jihad much more narrowly than groups affiliated or associated with al-Qaeda. Hezbollah's interests center on Lebanon and its immediate vicinity; Hamas is focused on the Palestinian issue; and the GIA on overthrowing the Algerian government. In the groups for which association with al-Qaeda might be operationally attractive, external and internal factors have held such tendencies in check. For example, Hezbollah appears to be influenced by its ties to Syria and Iran, as well as by its involvement in Lebanese politics. Al-Gama'a al-Islamiyya appears to be concerned about carving out some political space to operate in Egypt.

Even some of the non-Islamist groups could also decide to cooperate with al-Qaeda or other Islamist groups for their own reasons. For example, many of these militant groups now maintain representatives in the criminal and black market world. This interconnectivity allows terrorists to acquire weapons as necessary, perhaps even to expand their capabilities. It is also important to stress that some terrorist groups could shift their worldview, thus adopting an agenda similar to al-Qaeda's. Alternatively, others could simply capitalize on a perceived anti-U.S. trend, shifting the focus of their attacks toward U.S. targets to increase their own potential through alliances with more capable al-Qaeda affiliated groups or simply to gain greater recognition.

A recent RAND study analyzed factors that caused terrorist groups to adjust their intentions (e.g., ideology or worldview) and their capabilities. Specifically, the study isolated the following three key factors that cause terrorist groups to shift from their chosen paths: (1) counterattacks by security forces; (2) external support from states or other militant organizations; and (3) gain or loss of popular support. To those, we add a fourth: general shifts in the international security environment—such as that brought about by the U.S.-led global war on terrorism. Some extremist organizations, such as the Moro Islamic Liberation Front (MILF), have tried to distance themselves from al-Qaeda to reduce their exposure to the global war on terrorism. Similarly, according to a well-informed Sri Lankan source, the global

war on terrorism has reduced international tolerance of LTTE terrorism and influenced the LTTE's decision to enter into peace negotiations with the Sri Lankan government.

A potentially dangerous shift can be seen in the emerging Hamas-Hezbollah nexus, as seen in the March 14, 2004, attack in the Israeli port of Ashdod. The significance of this attack was not the number of casualties; indeed, Hamas has killed many more in single suicide bombing attacks. But rather, it demonstrated—especially to Israeli counterterrorism experts—Hamas's ability to hit more strategic targets.

Given the qualitative leap in Hamas's efforts, it might not be a surprise that Hezbollah financed and, indeed, allegedly planned this attack. Yet this degree of aid and coordination is greater than anything seen before in the Hamas-Hezbollah relationship. From an Israeli viewpoint, some security officials have stated that this attack motivated the government to assassinate Sheikh Ahmad Yasin. But the Ashdod attack also holds other, more global implications for the war on terrorism. First, it demonstrates that Sunni and Shi'ite militants *will* work together, given a mutual enemy. In this case, the enemy is Israel, but this does not preclude cooperation between Sunni and Shi'ite militants against the United States. Second, up to this point, Hamas was facing significant counterterrorism pressure from the Israeli government. Thus, it could have been more willing to take strategic guidance from Hezbollah: not just aid, but actual suggestions for types of attacks and targets. Parallel counterterrorism efforts by the United States and its allies in the war on terrorism could provoke other nonaffiliated terrorists to accept guidance from al-Qaeda in the future, as Hamas did from Hezbollah. Finally, in the case of Hezbollah, one potential explanation for the shift in its aid is that Hezbollah may be struggling to sustain attention and support now that Israel has pulled out of southern Lebanon. Greater involvement in the Palestinian resistance could help Hezbollah increase its momentum and support. It is therefore possible that Muslim anger at the U.S. presence in Iraq could similarly provoke shifts in the agenda of Hezbollah or other groups vis-à-vis the United States, as these groups continue to vie for local recruits and support.

The bottom line is that these groups have political aspirations as opposed to outright murder and mayhem. Because of their political agendas, they are more likely to accept political rules and social norms acceptable to a majority than are al-Qaeda and its affiliates.

Beyond the question of convergence, it is important to keep in mind that just because some of these groups have not joined the global jihadist movement, they should not be dismissed as unthreatening. Some represent deadly threats to the states that they seek to subvert; others, like Hezbollah, could suddenly emerge as global threats.

## Implications for the U.S. Military and the U.S. Air Force

In Part 1, we discussed the use of air power as an option to attack terrorists in difficult or inhospitable terrain, as well as the use of air transport in counterterrorist or counterinsurgency operations in countries with widely dispersed populations and poor land transportation infrastructure. These considerations apply as well to many of the cases discussed in this volume, with the difference that, with the exception of the Iraqi insurgency, the United States is not—and as a general principle should not—be involved in direct military operations against these groups. (See pp. 164–166.)

Therefore, the emphasis should be on strengthening the capabilities of friendly governments to confront insurgents, terrorists, and other extremist groups. U.S. Air Force Special Operations Forces (active duty, Reserve and National Guard units)—at approximately 11,000 personnel, second only to Army SOF at 29,000—can be particularly pertinent for the counterinsurgency and counterterrorism training role required by the new environment.

The judgment in Part 1 of the study—that these local wars must be fought and won by the local governments and security forces with the United States in a supporting role—is even more valid in the case of local conflicts, some of which are driven by legitimate (or at least rational) grievances and in which the rebel movements enjoy significant support. By the same token, because some of these groups have limited political agendas, under the right circumstances they can become part

of a negotiating process leading to a political solution of the conflict—a major difference from groups that are part of the global jihadist movement, which have to be destroyed or forced to leave the field.

To develop effective strategies against insurgent and terrorist groups, it is important to look at these groups in a broad context, even if they operate locally, because the migration of tactics, techniques, and procedures (TTPs) is creating a globalization of violence. They are learning what works and adopting best practices. Their tactical models contribute to the proliferation of effective styles of unconventional warfare throughout different zones of conflict. Innovations include the use of improvised explosive devices (IEDs) and their evolution into sophisticated weapons designed to interrupt supply lines by Hezbollah. Hamas has been known to use ambulances as a cover for bombs or logistical support. Man-portable air defense systems (MANPADS) and now suicide bombers with suicide vests, first used against Israeli targets in Israel and in the Palestinian territories, are now used as mass casualty weapons by Chechens against Russian military and civilian jets.

The first implication for the U.S. military and the Air Force is that they must understand clearly that the tactics, techniques, and procedures used by all groups, whether part of the global jihad or not, are beginning to mimic each other. This means that, from a tactical standpoint, U.S. military doctrine must anticipate the dissemination of these tactics across theaters in the war on terror.

The second implication is that, although the United States has a supporting role in opposing the groups in the "al-Qaeda universe," the potential role for the United States in countering those extremist groups beyond al-Qaeda is even more indirect. The challenge for the U.S. military is to be prepared either to provide increased levels of support to key allies should they require it or to engage these extremist groups should they shift their attention toward the United States, while at the same time avoiding direct involvement in these conflicts. This strategic challenge has particular relevance to the U.S. Air Force. Understanding the circumstances that might stimulate change in extremist groups, for example, may require the allocation of intelligence, surveillance, and reconnaissance resources. It may also neces-

sitate broad global readiness, incorporating regions such as Southeast Asia and Latin America in addition to the Middle East, in the war on terrorism.

For the U.S. military and the U.S. Air Force in particular, there are tools for targeting terrorist groups that can also be used in cooperation and coordination with host state operations against terrorist, insurgent, and criminal groups. It is important to note that the criminal transport of narcotics, arms, illegal migrants, explosives, etc., occurs in hubs and spokes concurrent or collocated with terrorist groups. This argues for the "dual use" of U.S. security assistance for both counterterrorism and counternarcotics purposes. Older aircraft with high-tech intelligence-collection capabilities can be used to mitigate both terrorist havens and criminal nodes. In addition, air support for host country coast guard operations in and around waterways that harbor terrorists or criminal activity is a critical component of coastal and riverine surveillance and interdiction of smuggling routes.

# Acknowledgments

The authors of this report wish to thank all those who made this study possible. First, we thank our sponsors in the U.S. Air Force and particularly Lt Col John Jerakis, our point of contact in the Office of Regional Plans and Issues (USAF HQ A5XX); Terrence M. Doyle, Office of Plans and Policies (USAF HQ A5XS); and the staff of the U.S. embassies and Defense Attaché Offices that facilitated our work overseas. In this regard, we thank Col James Tietjen, former U.S. Air Attaché in Singapore; Lt Col Benjamin Coffey, U.S. Assistant Air Attaché in London; and Maj Guermantes Lailari, U.S. Assistant Air Attaché in Tel Aviv and an astute analyst of Islamic extremist movements.

We owe a great debt to the reviewers of this manuscript, Brian M. Jenkins, Rohan Gunaratna, and Thomas A. Marks, and to Lieutenant Commander Youssef Aboul-Enein of the Office of the Secretary of Defense, whose comments greatly improved the manuscript. Any shortcomings are entirely the responsibility of the authors. We also express the appreciation for the collaboration that we received in our work on this study from the State Intelligence Agency of Indonesia (BIN), the National Intelligence Agency of Thailand, the Security and Intelligence Division of the Ministry of Defence of Singapore, the Intelligence Service of the Armed Forces of the Philippines, the Joint Terrorism Analysis Center of the United Kingdom, and other agencies.

We are also indebted for invaluable insights into terrorist networks to Zachary Abuza, Martin Kramer, Elie Karmon of the International Policy Institute for Counter-Terrorism (ICT), Herzliya, Israel; the staff

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 186 of 632

of the International Center for Political Violence and Terrorism Studies of the Institute of Defence and Strategic Studies of Singapore; Carolina Hernandez and the Institute for Strategic and Development Studies of the Philippines; and Thailand analysts Paul Quaglia of PSA Asia and Anthony Davis.

Within RAND we cannot fail to acknowledge the important contributions to our understanding of al-Qaeda finances made by the RAND Air Force Fellow, Lt Col Steve Kiser, and the work on the charts illustrating the links between terrorism and crime by the RAND Navy Fellow LCDR Mark Edwards. We also thank Andrew Hoehn and Alan Vick, the Director and former Acting Director of the RAND Project AIR FORCE Strategy and Doctrine Program, under whose auspices this research was conducted; David Shlapak; and many other colleagues such as John Parachini, Brian Jackson, and John Baker, who—although not part of this project—contributed to the cross-fertilization of ideas. We thank our assistants Colleen O'Connor and Natalie Ziegler, and Ursula Davies and Thomas Young, RAND Cambridge summer interns, for their assistance with mapping jihadist networks in Europe and Africa and Douglas Farah and Alexandra Zavis for work on jihadist activities in West, Central, and Southern Africa.

Finally, we acknowledge the invaluable contributions of our editor, Miriam Polon; our production editor, Todd Duft; Project AIR FORCE editor Phyllis Gilmore, for her help with the summary; and our marketing director, John Warren.

# Abbreviations

| | |
|---|---|
| ANSWER | Act Now to Stop War and End Racism Coalition |
| ASG | Abu Sayyaf Group (Philippines) |
| AUC | United Self-Defense Forces of Colombia |
| BfV | *Bundesamt für Verfassungsschutz* [Office for the Protection of the Constitution] (Germany) |
| CBRN | Chemical, biological, radiological, and nuclear |
| CID | Criminal Investigation Department (Sri Lanka) |
| CPA | Coalition Provisional Authority (Iraq) |
| CPN(M) | The Communist Party of Nepal (Maoist) |
| CPP | Communist Party of the Philippines |
| CSIS | Canadian Security Intelligence Service |
| DEA | (U.S.) Drug Enforcement Agency |
| EIJ | Egyptian Islamic Jihad |
| EIJM | Eritrean Islamic Jihad Movement |
| EIRM | Eritrean Islamic Reform Movement |
| ELN | National Liberation Army (Colombia) |
| ENA | Eritrean National Alliance |

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 188 of 632

| ETA | Euskadi ta Askatasuna (Basque Fatherland and Liberty) (Spain) |
| EU | European Union |
| FARC | Revolutionary Armed Forces of Colombia |
| FIS | Islamic Salvation Front (Algeria) |
| FLN | Front de Libération Nationale (Algeria) |
| FMLN | Farabundo Marti National Liberation Front (El Salvador) |
| FTAA | Free Trade Area of the Americas |
| GIA | Armed Islamic Group (Algeria) |
| GSPC | Salafist Group for Preaching and Combat (Algeria) |
| Hamas | Islamic Resistance Movement |
| HIDTA | High Intensity Drug Trafficking Area (California) |
| IDF | Israel Defense Forces |
| IED | improvised explosive device |
| IIB | Internal Intelligence Bureau (Sri Lanka) |
| IID | Internal Intelligence Directorate (Sri Lanka) |
| INR | Bureau of Intelligence and Research, U.S. Department of State |
| JI | Jemaah Islamiyah  (Southeast Asia) |
| KFR | kidnappings for ransom |
| LRPG | Long Range Patrol Group (Sri Lanka) |
| LTTE | Liberation Tigers of Tamil Elam (Sri Lanka) |
| MANPADS | man-portable air defense systems |
| MAS | Movement Toward Socialism (Bolivia) |

| | |
|---|---|
| MILF | Moro Islamic Liberation Front (Philippines) |
| MIP | Pachakuti Indian Movement (Andes) |
| MNLF | Moro National Liberation Front (Philippines) |
| NDFB | National Democratic Front of Bodoland (India) |
| NPA | New People's Army (Philippines) |
| PAGAD | People Against Gangsterism and Drugs (South Africa) |
| PFDJ | Popular Front for Democracy and Justice (Eritrea) |
| PIRA | Provisional Irish Republican Army |
| PLO | Palestine Liberation Organization |
| RCMP | Royal Canadian Mounted Police |
| RIM | Revolutionary Internationalist Movement |
| RPG | rocket-propelled grenade |
| RUF | Revolutionary United Front (Sierra Leone) |
| SCIRI | Supreme Council for the Islamic Revolution in Iraq |
| SL | Sendero Luminoso–Shining Path (Peru) |
| SLAF | Sri Lankan Armed Forces |
| SLNS | Sri Lankan naval ship |
| SOF | Special Operations Forces |
| TNT | Tamil New Tigers |
| TTPs | tactics, techniques, and procedures |
| UK | United Kingdom |
| ULFA | United Liberation Front of Asom (India) |

| UNITA | National Union for the Total Independence of Angola |
| ZDI | Zimbabwe Defense Industries |

# Introduction

Part 1 of this study describes and analyzes what has become of al-Qaeda after the removal of its safe haven in Afghanistan and the death or capture of a significant part of its leadership, as well as what we call the "al-Qaeda nebula." This concept includes affiliated or associated militant groups that have adopted al-Qaeda's worldview and vision of a global jihad and its methodology of mass-casualty terrorist attacks.[1]

Yet the "al-Qaeda universe" does not incorporate the entirety of the terrorist threat or potential threat. A number of other militant groups threaten U.S. regional interests or allies and pose a potential direct threat to the United States. We did not include these groups in Part 1 because they neither share al-Qaeda's view of a global jihad nor rise to the level of a global threat.

Clearly, Osama bin Laden and other leaders of al-Qaeda hope that their efforts will persuade other Islamic militant groups to join the

---

[1]  As discussed in Part 1 of the study, the global jihad has a universal goal—the reconquest of Muslim lands usurped by infidels and the eventual global expansion of Islam—and incorporates groups and cells that no longer consider themselves bound to concrete territories and populations. Although jihadist ideology is full of atavistic elements, the global jihad is a modern phenomenon that reflects what Oliver Roy calls "globalized Islam," a "universal" Islam valid in any cultural context and detached from the cultures in which Islam has been historically embedded. This reformulation of an imaginary universal *umma* leads also to the reformulation of the jihad as a cataclysmic confrontation between the Islamic world and the West. Of course, in the view of jihadists, these two objectives—the global jihad and the toppling of "apostate" Muslim regimes—are closely interrelated. For al-Qaeda and the groups that share its ideology, governments in the Muslim world primarily exist because of U.S. support; their destruction thus is contingent on removing that support by expelling the United States from the region.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 192 of 632

global jihad. Moreover, it would seem logical that terrorists with similar ideological beliefs would be inclined to enter into a cooperative relationship with al-Qaeda or other elements in the global jihadist movement, since such cooperation could enhance their own capabilities. But what about the terrorist group that is not part of the al-Qaeda network and does not adhere to its agenda? The temptation for policymakers is to set aside terrorist groups that have not chosen to join al-Qaeda as less dangerous. Yet these groups still pose a threat to the Unites States, its interests, and its allies.

This volume, Part 2 of the study, focuses on three categories in this "second circle" of terrorist groups: (1) terrorist groups that articulate an Islamist agenda for their own country but are not directly linked to the global jihadist movement; (2) Muslim terrorist groups whose agendas are primarily separatist or ethno-nationalist but that present a threat to the stability or territorial integrity of U.S. allies, although not to the United States directly; and (3) highly capable, non-Islamist terrorist groups. By examining these groups, we hope to establish a framework for evaluating the threat that these groups currently pose and assessing the likelihood and the conditions under which some of them could evolve into regional or global threats. We also examine antiglobalization threats. Some of these groups have risen to the level of terrorism; others have not, but could. Finally, we discuss the nexus between terrorism, insurgency, and crime.

## Anaytical Framework

We begin with the assumption that terrorist groups move along the same path—sustaining their ideology, objectives, and tactics—until some outside force causes them to shift. Our analysis, therefore, requires that we first classify terrorist groups' current paths and then determine what factors might affect change. Four characteristics can be said to influence terrorists' strategic choices: ideology and leadership mindset, lack of internal restraint, opportunity, and technical capacity. This framework provides a starting point for the analysis in this section. Because we are interested in how these categories of terrorists

might threaten the United States in the future, it is important to determine which characteristics are the most likely to indicate a change in behavior or strategic path. Part 1 of this study provides an overview of terrorist groups in the tier below the al-Qaeda "nebula," their ideological foundations, their strategic and operational objectives, and the key environmental factors that have shaped their evolution.

Because of the potential of some antiglobalism movements to pose a violent threat to the political, economic, and social order, we identify and analyze antiglobalization threats and their convergence with terrorist groups. Our evaluation takes into account the local context in which these groups develop and linkages among the groups and with other extremist and terrorist organizations and rogue states.

The last chapter of this volume addresses the connections between terrorism, insurgency, and crime. We examine a number of specific case studies in areas ranging from the tri-border region of South America to the southern Philippines to identify the characteristics of this nexus across regions and different types of terrorist and insurgent movements, the conditions that give rise to this phenomenon, and its implications for counterterrorism policy.

# Hezbollah and Hamas

## Hezbollah, Party of God

Hezbollah is perhaps the best known and the most capable of the Islamist militant organizations that employ terrorism yet are not affiliated with al-Qaeda. This group was responsible for the 1983 suicide attack against the U.S. Marine barracks in Beirut, which killed 241 U.S. and 58 French servicemen who were part of a multinational peacekeeping force in Lebanon at that time. In addition, since the early 1980s, Hezbollah has established a far-flung financial network, stretching from the tri-border area of Argentina, Paraguay, and Brazil to the United States and to Southeast Asia—Indonesia, Thailand, and the Philippines. Hezbollah thus has the potential to inflict damage on U.S. interests and allies across the globe. Yet this group remains relatively detached from the al-Qaeda network and has not directly threatened the United States since the 1983 attack. It therefore represents an interesting and important case study.[1]

From September 1970 to August 1982, the Palestinian Liberation Organization (PLO) used Lebanon as its political and military base of operations.[2] Around that same time, the minority Shi'ite population was engaged in a struggle for national power with the country's Maronite Christians. In this local struggle, the Israeli military

---

[1]  For more information on Hezbollah's criminal activities, see Chapter Seven.

[2]  See Black and Morris (1991); and Bickerton and Klausner (1995).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 196 of 632

sometimes sponsored or provided support to the Maronites, while the PLO helped train and equip Shi'ite militias in southern Lebanon.[3] These militias were the precursor to Hezbollah.

After the Israeli invasion of Lebanon in 1982, the Shi'ite militias shifted their focus from internal rivalries to Israeli forces. Hezbollah was aided, in part, by Iran. Approximately 1,500 Iranian Revolutionary Guards helped to train and organize the Shi'ite militias, which allowed Hezbollah to expand its activities and its capabilities.[4] Despite frequent assassinations and attacks by Israeli forces, Hezbollah continued to expand its influence and presence in southern Lebanon throughout the 1980s and 1990s.[5] In May 2000, in part as a result of Hezbollah's continued guerrilla campaign, the Israeli military pulled out of southern Lebanon.[6] Many Islamist terrorist groups—especially the Palestinians—view the Hezbollah campaign as a model. In a 2001 interview, Marwan Barghouti, a key leader of the militant branch of the Palestinian Liberation Organization, al-Fatah, said,

> To be candid, I must say that Israel's withdrawal from Lebanon was indeed one contributing factor to the [al-Aqsa] Intifada. I won't say that it was the single reason, but the Palestinians looked on carefully as the army pulled out of Lebanon. They asked how could it be that Israel was able to withdraw from an entanglement of nearly 20 years—all in one night. Not one soldier remained behind. So I say that if that was accomplished literally overnight in Lebanon, the retreat from Ramallah to Tel-Aviv should require no more than three nights at most.[7]

---

[3]   Jaber (1997), p. 17.

[4]   For information on the impact of the Iranian Revolution on the Shi'ite militias, see Saad-Ghorayeb (2002), pp. 14–15. See also, "Baalbek Seen as Staging Area for Terrorism," *The Washington Post*, January 9, 1984; and Wege (1994), pp. 151–164.

[5]   Black and Morris (1991), pp. 394–399.

[6]   Some counterterrorism experts in Israel suggest that the Israeli reluctance simply to pull out of the Gaza Strip, without inflicting significant damage on Palestinian terrorist groups, is, in part, a result of their experience in southern Lebanon. Cragin interview, Israeli counterterrorism experts, April 2004.

[7]   Marwan Barghouti, quoted in "Hizballah Lends Its Services to the Palestinian Intifada" (2001).

Today, Hezbollah has obtained a degree of political legitimacy in Lebanon—its political party won eight seats in the 1992 parliamentary elections, and in 2000 it won nine affiliated and three nonaffiliated seats.[8] At the same time, the group maintains its armed wing, conducting some limited attacks on Israeli forces and supplying military aid to Palestinian groups.

With the advent of the second (al-Aqsa) intifada[9] (2000–2004), Hezbollah also appeared to take a greater—or at least more direct—role in the Palestinian conflict with Israel. Although Hezbollah had provided weapons and training in the past, some believe it was also beginning to provide some strategic direction to Palestinian groups as well as helping various factions match needs with skills. To illustrate this point, some Israeli counterterrorism experts point to the March 2004 Ashdod attack. Two Hamas suicide bombers hid in a commercial container, which allowed them to exit the tightly guarded Gaza Strip and travel to Ashdod. Upon arriving at the port, one of the suicide bombers managed to enter the guarded compound, detonating his explosives among a number of workers near a warehouse. The second bomber detonated outside the port's security fence. In total, the attack killed 10 Israelis and wounded an additional 18. The significance of this attack was not the number of casualties; indeed, Hamas has killed

---

[8]  For an overview of Hezbollah and Lebanese elections, see Usher (1997).

[9]  *Intifada* literally means "throwing off."

many more in single suicide bombing attacks. Rather, it demonstrated (1) Hezbollah's willingness to help Hamas pick its targets and plan its attacks, and (2) Hamas's ability to hit more strategic targets.[10]

**Ideological Foundation**

Hezbollah articulates a universalistic view of the Muslim community, the *umma*, which incorporates Shi'ite, Sunnis, and even secularists.[11] In 1995 the *Journal of Palestine Studies* published an interview with the spiritual leader of Hezbollah, Sheikh Muhammad Husayn Fadlallah. In the interview, Sheikh Fadlallah stated:

> The Muslims are having difficulty bringing forth the kind of Islamic resistance to which they aspire. . . . Speaking in general terms, you could say they are seeking what could be termed a concrete expression of Islamic reality—a movement, a way of life, a political position in particular. There is a visceral Muslim identity, even among secularists who may not be consciously aware of it. This involves a spontaneous identification with other Muslims—in Bosnia, Chechnya, Afghanistan, wherever—irrespective of the merits of the case.[12]

---

[10] Usher (1997) and Cragin interviews, Israeli counterterrorism experts, April 2004. The research for this book was conducted immediately following the March 2004 Ashdod attack. That attack spurred more counterterrorism analysts within Israel to focus on the nexus between Hezbollah and Palestinian militants. Since that time more information has come to light. What has been discovered is that Hamas has been reluctant to allow Hezbollah too much foothold in the Palestinian Territories. But the al-Aqsa Martyrs' Brigades has accepted more and more help from Hezbollah. For example, in March 2004, Israel's Ministry of Foreign Affairs issued a press release on the arrest of Shadi Abu Alhatzin, the leader of an al-Aqsa Martyrs' Brigades cell in Khan Yunis (Gaza Strip). The release stated that Alhatzin had revealed to Israeli security officials that a Hezbollah representative came to Khan Yunis in 2003 to provide training in communications security. "ISA arrests head of Gaza Strip Hezbollah cell," Israel Ministry of Foreign Affairs, http://www.mfa.gov.il (as of March 10, 2004). Similarly, subsequent interviews with Israeli security officials suggest that Qeis Ubeid, an Israeli Arab from Taibeh associated with Hezbollah, aided the al-Aqsa Martyrs' Brigades cell in Nablus. Interview with authors, Israeli security official, June 2005.

[11] For more on the ideology of Hezbollah, see Saad-Ghorayeb (2002), pp. 69–87.

[12] Soueid (1995), p. 61.

Some have argued that this universalism is somewhat paradoxical, given that Hezbollah is a Shi'ite group and that clear divisions exist between the minority Shi'ites and majority Sunnis in the Muslim world. To a degree, this argument holds true. Since its inception, Hezbollah has maintained its belief that the Ayatollah Khomeini was the divinely inspired ruler of the umma and that his successor, Ali Khameini is the true "Legal Guardian of the Muslims" today.[13] This concept, referred to as *Velayat al-Faqih,* places Iran's religious leader at the center of Hezbollah's religious and pan-Islamic worldview—a position that Sunnis oppose. Additionally, it is important to note that Hezbollah combines this Islamic outlook with strong Lebanese nationalistic rhetoric. In this sense, Hezbollah is not purely pan-Islamic in its outlook.

Hezbollah may publicly sympathize with Islamic revolutions in countries such as Algeria, but it has not adopted these movements into its lexicon of "our umma." Indeed, the only Muslim community that in Hezbollah's view requires a pan-Islamic jihad on its behalf is the Palestinians.[14] The universalism of Hezbollah's ideology, therefore, appears to have pragmatic overtones that allow the group to pick and choose the Islamic movements with which it publicly associates, such as the 1979 Iranian Revolution and the Palestinian national movement.

Hezbollah's adoption of the Palestinian movement is also fairly complex. Palestinians are predominantly Sunnis, not Shi'ites. Moreover, the PLO contributed to the chaos and civil war that afflicted Lebanon for much of the 1970s and 1980s. Hezbollah appears to justify its support for the Palestinian movement by rationalizing that the Israeli occupation of Jerusalem, rather than Palestinian nationalism per se, is the epitome of a pan-Islamic cause. Thus, Jerusalem is a symbol of the umma itself, and its liberation is a Muslim duty, not a Palestinian duty.[15] This justification allows Hezbollah to support the Palestinian jihad but not other Muslim struggles.

---

[13]  Saad-Ghorayeb (2002), pp. 64–65.

[14]  Saad-Ghorayeb (2002), pp. 75–76.

[15]  Saad-Ghorayeb (2002), p. 73.

Not all the help that Hezbollah provides the Palestinians, however, can be tied directly to the status of Jerusalem. For example, in February 2004, Hezbollah successfully negotiated a prisoner swap with the Israeli government—the return of Israeli soldiers (or their remains) for the release of Hezbollah and Palestinian prisoners. By including Palestinian terrorists in its negotiations, Hezbollah gained legitimacy with the sympathetic Lebanese and Palestinian population. Similarly, Hezbollah has reportedly encouraged Hamas and the Palestinian Islamic Jihad to shift its attacks toward more strategic targets (such as the Israeli port in Ashdod).[16] So Hezbollah's ideological base for support clearly gives way to more pragmatic purposes at times.

The ideological foundations of Hezbollah, therefore, explain at least part of the group's reluctance to join the al-Qaeda network. Its leadership might feel some spontaneous sympathy with wider pan-Islamist, Sunni agendas, but these movements do not necessarily align with Hezbollah ideologically. Sheikh Fadlallah continues in the afore-mentioned interview to say:

> Despite this strong identity, the Islamic world is suffering from a lack of clear and objective understanding of the true situation of Islam and Islamic thought. This is evident from the proliferation of Islamic movements, some reactionary, wanting to live as if it were five hundred or six hundred years ago, some archaic, some resorting to violence in situations when peaceful means can be pursued, some with a sound grasp of reality and whose tactics, whether violent or peaceful, are guided by objective analyses.[17]

In this interview, Sheikh Fadlallah is strongly critical of many Islamic movements. Yet he does not name specific deviant groups. Part of the reason for this reluctance to criticize other movements may be strategic. Even though Hezbollah does not align with other Islamist groups ideologically, it may still coordinate with them. We will discuss the issue of pragmatic strategies in other chapters. Here, we empha-size merely that, despite the ideological disparities that appear evident

---

[16] Cragin interview, Israeli counterterrorism experts, April 2004.

[17] Soueid (1995), p. 62.

between Hezbollah and the al-Qaeda network, some parallel interests exist. In particular, Hezbollah has historically opposed "Western domination" of the Muslim world in general and U.S. influence specifically. According to Sheikh Nassan Nasrallah, Secretary-General of Hezbollah, "They are primarily responsible for all Israeli crimes."[18] So while the ideological background of Hezbollah might explain its lack of affiliation with the al-Qaeda network, Hezbollah's strategic objectives pave the way for cooperation.[19]

**Strategic and Operational Objectives**

Until May 2000, Hezbollah's primary objective was to remove the Israeli military presence from southern Lebanon. In addition, Hezbollah has gradually expanded its support base in Lebanon in order to gain political legitimacy and power. Yet unlike many of the Islamist militant groups, Hezbollah's terrorist and guerrilla campaigns are directed outward toward Israel, rather than at its political adversaries inside Lebanon. This pattern is likely due to Syria's strong influence both with Hezbollah and more generally in Lebanon.[20] Hezbollah's support for the Palestinian movement represents a final strategic objective. Indeed, in April 2001, Sheikh Nasrallah made this statement at a conference on the Palestinian intifada in Tehran:

---

[18] Quoted in "Lo, the Party of God Still Vows Victory," *Time*, August 9, 1993, p. 33.

[19] In August 2003, CNN reported that U.S. intelligence officials were concerned about a potential alliance between Imad Mugniyah and Mussab al-Zarqawi in Iraq. Mugniyah has been linked with Hezbollah since the early 1980s, while Zarqawi has been linked with al-Qaeda. At the time of writing, this link does not appear to be a strategic alliance, rather a practical arrangement between two individuals. "New Terrorism Alliance Suspected in Iraq," CNN, 13 August 2003, http://edition.cnn.com/2003/WORLD/meast/08/13/iraq.terror (as of Mach 10, 2006).

[20] In the late 1980s, Hezbollah and Amal (another Shi'ite insurgent group) fought for supremacy in Lebanon. Syria stepped in and forced a truce between the groups. See "Syria Troops Enforce South Beirut Truce; Inter-Shiite Fighting Ends," *World News Digest*, LexisNexis, June 3, 1988.

> We should look at the Intifada as the spearhead of the nation that
> needs our support. The Palestinians are defending our nation as
> well as its dignity and holy shrines.[21]

Hezbollah's militant activities follow its strategic objectives closely.
For example, Hezbollah conducted the bulk of its suicide bombings
against U.S., French, and Israeli targets from the spring of 1983 to the
summer of 1985. After the summer of 1985, Hezbollah began to move
toward more guerrilla-like warfare against Israeli troops in southern
Lebanon. This shift appears to be the result of Syria's intervention in
the Lebanese civil war in 1988 and 1989. At this time, Hezbollah's
main competitor, Amal,[22] was forced to give up its weapons, while
Hezbollah negotiated to keep its weapons as long as they were used to
dislodge the Israeli military presence in southern Lebanon. Yet even
though Hezbollah radically decreased its use of suicide bombings in
the summer of 1985, it did not lose its capabilities to conduct such
attacks. Indeed, after Israeli forces assassinated the group's leader, Abbas
Musawi, in February 1992, Hezbollah apparently retaliated with a sui-
cide attack against the Israeli embassy in Buenos Aires. Two years later,
Hezbollah apparently conducted a similar attack against the Jewish
Cultural Center in that same city (see Chapter Seven).[23]

Israeli experts submit that Hezbollah conducted the attacks in
Argentina only after it appeared to be losing ground in the fight against
Israel.[24] For the most part, however, Hezbollah has remained focused
on its regional agenda. Hezbollah is also known for launching Katyusha

---

[21]  Taken from the Hezbollah Web site, http://www.hizballah.org  (as of January 19, 2003).

[22]  The Amal movement was established in 1975 by Imam Musa as Sadr, an Iranian-born
Shi'ite cleric of Lebanese ancestry. It is a fierce competitor of Hezbollah for leadership of the
Lebanese Shi'ite community.

[23]  Hezbollah is generally accepted as responsible for these two attacks, but it has not
claimed them. After a long investigation by officials in the Argentine Supreme Court, secu-
rity authorities issued a warrant for the arrest of Imad Mugniyah in 1999, for ordering the
1992 attack in Buenos Aires. For more information, see "Argentina Issues Warrant in Israeli
Embassy Bombing," *International Counterterrorism Center*, September 4, 1999, http://www.
ict.org.il/spotlight/det.cfm?id=318 (as of March 10, 2006).

[24]  Cragin interviews, Israeli counterterrorism experts, April 2004.

rockets across the border into northern Israel and for kidnapping Israeli soldiers along the border. Throughout most of its guerrilla campaign, Hezbollah was able to keep one step ahead of the Israeli military.[25] Some argue that this ability was due to the nature of the Israeli military position, which was predominantly defensive and static.

**Environmental Factors**

The degree of influence that Syria and Iran have over Hezbollah's behavior is still in question. Clearly, Syria has played a significant role in the development of Hezbollah. But the benefits that Hezbollah derives from its relationship with Syria are more than just the sum total of weapons and money received. Hezbollah has been able to utilize support from Syria in its escalation-counterescalation warfare with the Israeli military. For example, the Israel Defense Forces (IDF) noticed in the early 1990s that Hezbollah forces had begun to use remotely detonated explosive devices in southern Lebanon. Guerrillas would plant these bombs along the roads and detonate them as IDF patrols drove by. In response, the IDF began to detonate the bombs early, using the same radio frequency as Hezbollah. Rather than give up the tactic, Hezbollah went back to Syria to obtain a weapons upgrade. The result was a remote-detonated bomb with scrambling devices as well as a bomb detonated by a computer that provided multiple-frequency transmissions.[26] Additionally, analysts point out that Syria "checked" Hezbollah's guerrilla activities in southern Lebanon during peace talks between Syria and Israel in the late 1990s. Syria has also acted as arbitrator between Hezbollah and the rival Shi'ite movement Amal in the past.[27] These examples appear to demonstrate significant Syrian influence over Hezbollah's activities.

---

[25]  See, for example, the 1998 interviews with IDF officials published in the *Jerusalem Report*. Leslie Susser, "IDF Plans to Beef Up Lebanon Intelligence," *The Jerusalem Report*, LexisNexis, September 14, 1998.

[26]  For more information, see "Hizballah and Israelis Wage Electronic War in South Lebanon" (1995).

[27]  Jaber (1997), pp. 210–211.

With regard to Iran, the hierarchical nature of Hezbollah is the result of its ties to Iran. For example, each unit has a "fighting cleric." Trained in religious and military warfare, these clerics derive their authority from Hezbollah's Shura Council and, to a certain extent, Iran.[28] Thus Hezbollah's core leadership can be assured that its orders will be followed, as ground units receive both spiritual and operational oversight. In addition, Fadlallah has strong ties with Iranian clerics. The strategic relationship between Iran and Hezbollah is perhaps best illustrated by the fact that Hezbollah followed Iran's example in its reaction to the 9/11 attacks, denouncing these attacks but continuing to support Palestinian terrorism.[29] Iran and Syria therefore appear to be the most significant external factors that influence Hezbollah's behavior.

Hezbollah also has demonstrated sensitivity to its support community in southern Lebanon. During the Israeli occupation, the IDF attempted to disconnect Hezbollah from its supporters by penalizing the latter. The IDF reasoned that the Shi'ite community would blame Hezbollah for its situation and reduce its support for the group. While this counterinsurgency strategy worked initially, Hezbollah soon developed an extensive relief and charity network in southern Lebanon.[30] Since May 2000, Hezbollah has used this network to strengthen its political base. In this context, Hezbollah's lack of Islamist-like goals within Lebanon could be attributed to attempts to broaden its support community. Lebanon, with a population of 3.5 million, has 18 different religious sects. The result is a fragmented society. To expand its support base to include Christians and Sunni Muslims, therefore, Hezbollah must tone down its Shi'ite ideology and rhetoric and emphasize its social and charitable activities. Nizar Hamzeh, a terrorism expert at the American University in Beirut, offered this explanation in 2000,

---

[28] Cragin interview, Hezbollah expert, Tel Aviv, April 2004.

[29] Sobelman (2001).

[30] Wege (1994), pp. 157–159; Saad-Ghorayeb (2002), pp. 7–33; and Bruce W. Nelan, "What's Peace Got to Do with It?" *Time,* August 9, 1993, pp. 32–33.

"Hizballah is pragmatic and has decided to perform a contract with the wicked, but the achievement of an Islamic state will always be there as a goal."[31]

## Hamas: The Islamic Resistance Movement

The Islamic Resistance Movement, known by its acronym Hamas, has its organizational roots in Gaza's al-Mujamma al-Islami, also known as the Islamic Centre, which the late Sheikh Ahmad Yasin began in 1973. Sheikh Yasin used the Centre to draw together the eventual founders of Hamas, including Isa al-Nashshar, Dr. Ibrahim al-Yazuri, Abdulfattah Doukhan, Dr. Abdul Aziz Rantisi, Mohamad Hassan Shama'a, and Salah Shehade (Rantisi and Shehade, as well as Yasin, were killed in targeted assassinations). According to Hamas leaders and Israeli officials, this Islamic Centre was registered with the Israeli military authorities that administered the Gaza Strip in 1978.[32] This registration also explains a common argument made by Israeli authors that the Israeli government, in effect, "sponsored" Hamas in an effort to undermine Yasser Arafat and the PLO.[33] The spiritual-reformist organization sputtered to a halt in 1983 when Yasin was arrested for gun smuggling.[34] After that, the organization apparently focused its activities on building schools and mosques, scholarship programs for university students, and other charitable activities.

Hamas leaders have also said that around this time, Centre members began to consider an effort to launch militant activities against Israel.[35] It was not until 1988, after the beginning of the first intifada ,that the organization formally presented itself as "Hamas." Its military branch was named al-Qassam, after a Palestinian activist from

---

[31] Quoted in "Hizbullah Heroes Face the Test of Peace," *The Guardian*, June 1, 2000.

[32] For more information, see Charbel (2003). See also Israeli (1993).

[33] Charbel (2003); Israeli (1993).

[34] Charbel (2003); Israeli (1993).

[35] Charbel (2003).

the 1936 Arab Revolt. The original leader of al-Qassam was Salah She-hade; he was killed by the Israeli military in July 2002 and replaced by Muhammed Dief.[36]

Hamas derives its legitimacy from claims that it was the primary instigator of the first intifada, which began in December 1987. More likely, it managed to capitalize on this wider movement, along with Arafat and the PLO. For example, Hamas issued its charter in January 1988 and would subsequently publish 30 communiqués outlining its positions and philosophy over the subsequent eight months. These communiqués provided Hamas with the opportunity to establish itself as an Islamic alternative to the secular PLO. In addition, Hamas derives legitimacy from its local activism and charitable activities, which began in 1973 and continue today. The combination of these activities established Hamas as a credible player in the Palestinian political and militant arena.[37]

In May 1989 the Israeli government arrested Sheikh Yasin. Hamas's Gaza spokesman, Dr. Abdul Aziz Rantisi, and Yasin's acting deputy, Ismail Abu Shanab, assumed leadership of the group without much difficulty. This seamless leadership handover would eventually become a key characteristic of Hamas. Indeed, in December 1992, former Israeli Prime Minister Yitzhak Rabin deported over 400 Palestinian activists to the Marj al-Zahur camp in southern Lebanon. Although Hamas members—including Dr. Rantisi and former West Bank leader Salah Darwaza—made up a substantial portion of the deportees, Hamas continued its militant activities.[38] Some analysts argue that the deportations actually caused the organization to become more militant. Two years later, Hamas carried out its first suicide bombing when it attacked a bus in Afula, killing eight and injuring

---

[36] IDF Spokespersons Unit, "Salah Shehadeh—Portrait of a Hamas Leader," November 10, 2002, http://www.mfa.gov.il/mfa/government/communiques/2002/findings+of+the+inquiry+into+the+death+of+salah+sh.htm (as of March 10, 2006).

[37] For more information on the evolution of Hamas, see Mishal and Sela (2000).

[38] Jarbawi and Heacock (1993), pp. 32–45. See also Bedein (1999).

approximately 44 persons.[39] This attack marked the beginning of a violent campaign waged by Hamas against the Israelis, which also was intended to undermine the secular Palestinian Authority.[40]

Hamas's campaign of violence is aimed at the Israeli government and population, not the United States or other allies. Despite its opposition to the Oslo Accords, the Wye Agreement, and the Road Map for Peace, Hamas has remained aloof from bin Laden's appeal to join a global jihad, even though Sheikh Yasin expressed anger over the U.S. government's support for the government of Ariel Sharon, as well as the U.S.-led war in Iraq.[41] Indeed, many Palestinian Islamist leaders have been critical of bin Laden's use of the Palestinian cause in his rhetoric.

**Ideological Foundation**

Hamas's ideology, like that of many Islamic movements in the Arab world, is firmly grounded in the teachings of Egypt's Muslim Brotherhood (for more information on the Muslim Brotherhood, see the section in Chapter Three on al-Gama'a and the Egyptian Islamic Jihad). Indeed, Sheikh Yasin was the leader of the Gaza Strip branch of the Muslim Brotherhood in the 1970s and early 1980s.[42] One key ideological difference between the Brotherhood and Hamas is that Hamas believes in the use of violence in addition to passive resistance and charitable evangelism. Hamas's ideology is also strongly nationalistic, in contrast to the Brotherhood's pan-Islamism. Despite these differences, Hamas is still considered a militant faction of the wider Muslim Brotherhood movement in the West Bank and Gaza. As such, a number of Hamas's objectives—promoting traditional Islamic values and reducing Western influence—remain consistent with those of

---

[39] For more information on Hamas's terrorist activities, see the RAND Terrorism Chronology and the RAND-MIPT Terrorism Incident Database, http://www.tkb.org/Home.jsp.

[40] For more information on the conflict between the PLO and Hamas, see Saikal (1994), pp. 28–30.

[41] In October 2003, Sheikh Yasin expressed the view that the United States is lying to the world about weapons of mass destruction in Iraq and misinterprets Hamas's struggle with Israel. "Hamas Leader Talks Strategies," BBC News, October 29, 2003.

[42] Hroub (2000), pp. 32–36.

al-Qaeda and the broader Islamist movement. This belief system can be seen in an interview with Hamas's chief spokesman, Mahmud Zahhar, in 1994:

> A pebble tossed in a pool leaves a series of concentric circles. I live in the Rimal quarter. This quarter is in Gaza. Gaza is in Palestine. Palestine is in the Arab world. The Arab world is in the Islamic world. The error arises when you try to substitute a little circle for a bigger one, for instance, making the small circle of narrow nationalism a substitute for the large circle of the great community of believers.[43]

Thus, in many ways the ideological foundation of Hamas would seem to indicate a strong parallel between its interests and that of global jihadists. Hamas's leadership clearly views itself as one of many Islamist movements throughout the greater Islamic community. At the same time, the group has been reluctant to join the al-Qaeda network. Why? Hamas could benefit from al-Qaeda's support, especially given the cyclical attacks and counterattacks that have occurred during the most recent intifada. These continued operations have stretched Hamas's resources, even as Western governments have clamped down on its network of support organizations in the United States and Europe.[44] Additionally, the Israeli military has killed over 20 Hamas leaders since October 2000. Therefore, at this seemingly low point in Hamas's development, a tactical alliance with global jihadists would seem to have some appeal.

The charter published by Hamas in 1988 perhaps clarifies the group's reluctance to join the al-Qaeda network. It makes a clear distinction between global Islamist movements and the Hamas movement in Palestine:

---

[43]  Quoted in "Interview with Mahmud Zahhar" (1995), p. 84.

[44]  After 9/11, the U.S. government shut down a number of Hamas charities and has pressured other governments, especially the UK, to do so as well. This pressure appears to have affected Hamas because the quality of its weapons and explosive devices used shows a decrease over the past three years. In addition, Hezbollah has been attempting to augment the Palestinian uprising by providing its own weapons.

The Islamic Resistance Movement is an outstanding type of Palestinian movement. It gives its loyalty to Allah, adopts Islam as a system of life, and works toward raising the banner of Allah over every inch of Palestine. Therefore, in the shadow of Islam, it is possible for all followers of different religions to live in peace and with security over their person, property, and rights. In the absence of Islam, discord takes form, oppression and destruction are rampant, and wars and battles take place.[45]

So while al-Qaeda and Hamas have similar ideological roots, Hamas's interpretation of its role in the Islamic community is narrower and focused fundamentally on the Palestinian question. This narrow focus is an important element in Hamas's ideology. Moreover, the group has been consistent in its beliefs. Nevertheless, a shift in its focus toward the United States is possible under some circumstances, given Hamas's strategic and operational objectives.

### Strategic and Operational Objectives

Hamas's fundamental objective is to establish an Islamic Palestinian state. That objective has two subsets:

- to create a separate Palestinian state
- to assert an Islamic form of government in that state.[46]

To achieve the first strategic objective, Hamas has focused its attacks on the Israeli government and citizens. A key tactic in this campaign is suicide bombings. Although Hamas was not the first Palestinian terrorist group to adopt the tactic of suicide bombings, it has perhaps been the most successful. Hamas initially conducted these attacks (the first, as mentioned above, took place in 1994) against bus passengers. Since the beginning of the Al-Aqsa intifada in 2000, Hamas has also targeted shopping malls, cafés, and pedestrian markets. Many terrorism scholars argue that Hamas uses this tactic because of

---

[45]  Hamas charter, translated and published in the *Journal of Palestine Studies,* Vol. 22, No. 4, Summer 1993, p. 14.

[46]  Hamas charter.

its shock and media value. While that argument seems logical, Hamas spokesmen continue to state that the purpose of these attacks is to retaliate for Israeli assassinations of its leaders. Hamas makes this argument not only through interviews with media representatives, but also with announcements over mosque loudspeakers in the West Bank and Gaza.

Hamas is careful to explain its motivations because the wider Palestinian community in the West Bank and Gaza has, at times, been highly critical of the use of suicide bombers. For example, after a series of suicide bombings in 1996, a public opinion poll taken in the West Bank and Gaza Strip indicated that a majority (59 percent) of Palestinians believed that the Palestinian Authority should take steps to stop the suicide attacks.[47]

Hamas's second strategic objective is the establishment of an Islamic Palestinian state. To achieve this objective, Hamas must oppose the Palestinian Authority and al-Fatah organization. The Hamas leadership, therefore, decided to abstain from Palestinian National Authority elections in 1995 and instead to focus on municipal elections in the Palestinian territories.[48] It continues to argue that it does not want a civil war in the territories and will pursue its Islamic agenda through democratic means after the creation of a Palestinian state. Yet there have been a number of clashes between Hamas and al-Fatah since 1988.[49] Similarly, Hamas has been criticized within and outside the wider Palestinian community for undermining the peace process and, with it, any chance of independence for the Palestinians. Mahmud Zahhar addressed this criticism in 1995:

> The problem is that we always use as our starting point international acceptance of power rather than the people's acceptance. What's the use of having a state that is accepted by the Arab and Western states if the people are against it? Isn't that the case of Algeria? Or Sudan? It seems that the world is looking for civil wars . . . What if the people support their state and the whole

---

[47] For more information, see Cragin and Chalk (2003).

[48] "Interview with Mahmud Zahhar." See also Mishal and Sela (2000), pp. 113–146.

[49] See, for example, Ahmad (1994); and Kattub (1992).

world is against it? Isn't the most important thing to be in harmony with one's people? What is the source of legitimacy—the general will of the people or acceptance by America and the Western powers? I leave you to choose which is preferable.[50]

Hamas, therefore, presents an interesting contradiction in strategic and operational objectives, especially when it comes to potential shifts. On the one hand, evidence indicates that Hamas's leadership is focused exclusively on Israel and ending the Israeli occupation of the West Bank and Gaza Strip. This leadership appears to be pragmatic enough to realize that widening the conflict may alienate its own support base, bring in a strong U.S. response, and harm its ability to compete politically with al-Fatah. That said, an argument could be made that, from Hamas's point of view, the United States has not prevented the Israeli government from pursuing a policy of targeted assassinations, bulldozing the houses of families linked to terrorist attacks, or building the new security fence. It is also arguable that the Israeli government could not afford to continue these policies without military and financial support from the U.S. government. So it is not unimaginable that Hamas could shift some attention to U.S. targets, however unlikely that may be.

### Environmental Factors

Several environmental factors influence Hamas's choice of tactics, targets, and strategic objectives. The primary influence, as discussed above, appears to be its relationship with local Palestinian communities and, to some extent, the Palestinian diaspora. But there are other important factors. For example, during the Gulf War, Arafat chose to side with Saddam Hussein. Hamas leaders, in contrast, openly criticized Saddam's occupation of Kuwait. As a result, Hamas received an influx of monetary support from charities and individuals in the Gulf States in the early 1990s.[51] Though not rising to the level of state

---

[50] "Interview with Mahmud Zahhar."

[51] For examples of such reports, see Ramati (1993), p. 2; and Emerson, (1992), p. 27.

sponsorship (as in the case of Lebanese Hezbollah), these funds helped Hamas sustain its charitable and military activities.

More important is the Hamas relationship with al-Fatah and the Palestinian Authority. At the beginning of the second intifada, Palestinian secular and religious terrorist groups formed a unified command to help coordinate activities against Israel.[52] This relationship, more than any other, exemplifies the pragmatic nature of Hamas. Though it is an ideologically based group, it is willing to cooperate with potential antagonists if it will help further the group's long-term strategic or short-term operational objectives. Notably, in the spring of 2004 the cooperation between Hamas, al-Fatah, and the al-Aqsa Martyrs' Brigades (a terrorist group linked to al-Fatah) became strained. In part, this was the result of Hamas's declaration that it was ready to govern in Gaza after a unilateral Israeli withdrawal. Similarly, the al-Aqsa Martyrs' Brigade has begun to challenge the old power structure within al-Fatah. Internecine violence broke out in July 2004, which included kidnappings and violent riots in Ramallah as well as in the Gaza Strip.

### Epilogue

The research for this study was conducted prior to the January 2006 Palestinian elections in which Hamas—or more correctly, Hamas's Change and Reform Party—won an outright majority (74 out of 132 seats) in the Palestinian Legislative Council. In those elections, Hamas's platform focused primarily on internal issues and corruption within Fatah and the Palestinian Authority. Indeed, since winning, Hamas leaders have continued to argue that they want to introduce domestic economic and political reforms before returning to the issue of the peace process. That said, international pressure may force Hamas to address the peace process before the group would prefer.

For the most part, the analysis provided in this chapter has held true even given those elections. Hamas's leaders have continued to balance an internal religious agenda with a pragmatic approach. For example, Hamas's leaders have made an effort to reach out to Fatah to

---

[52]  For past coordination, see leaflets republished in Mishal and Aharoni (2004).

form a more cooperative government. Hamas also appointed an internal party personality, Ismail Haniyeh, as prime minister, and Abed al-Azia Duaik as the head of the Palestinian Legislative Council.[53] (The political head of the organization, Khaled Mashaal, is based in Damascus.) Duaik, in particular, is a well-respected academic in the West Bank. Thus, his appointment indicates a signal on the part of Hamas that its religious reforms are likely to be secondary to economic reforms at least in the early phases of its leadership. Fatah's leaders, for the most part, have rejected Hamas's efforts toward cooperation. The al-Aqsa Martyrs' Brigades and the Palestinian Islamic Jihad have continued their terrorist attacks, although at a reduced tempo.

Similarly, al-Qaeda's deputy leader, Ayman al-Zawahiri, released a statement in which he warns Hamas that "power is not an end in itself, but simply a stage on the path of implementing Sharia law" and called on the organization to continue the fight against Israel. In a public interview, Hamas's political leader Mashaal said the movement had "its own vision" and did not need al-Qaeda's advice.[54] A statement by a radical Kuwaiti cleric, Sheikh Hamed al-Ali, distributed to jihadi forums suggests that Hamas should hold steadfast to Islamic law, not deviate to fall into the "mirage of peace" and reject previous agreements signed by the Palestinian Authority. Sheikh al-Ali refers to three traps in which he believes the West and Israel want Hamas to be ensnared, including substitution of Islamic law for treaties such as Oslo and Camp David, laying down arms and then being led to the "slaughter of humiliation," and becoming a "toy" in the hands of the White House, the Kremlin, the European Parliament, and the "Enslavement Nations" (United Nations).[55] In another posting, Abu Yehia al-Libi, an

---

[53]  Duaik was deported in 1992, along with 415 other individuals associated with various Palestinian terrorist groups. He returned to the West Bank and Gaza Strip approximately one year later but apparently did not actively participate in Hamas activities or decisionmaking.

[54]  "Hamas Rejects al-Qaeda's Support," BBC News, March 5, 2006, http://news.bbc.co.uk/2/hi/middle_east/4776578.stm (as of April 23, 2006).

[55]  SITE Institute, "A Statement from Sheikh Hamed al-Ali Addressing the Core of the Problem Between Ayman al-Zawahiri, Hamas, and the Chechen Mujahideen," March 8, 2006, http://siteinstitute.org/bin/articles.cgi?ID=publications154706&Category=publications&Subcategory=0 (as of April 23, 2006).

al-Qaeda operative who escaped with three others from the U.S. prison in Bagran, Afghanistan, in July 2005, writes of four "perversions and corrupt behaviors" that Hamas has manifested, including entering into an "infidel legislative council" and not making Islamic law paramount to all other concerns.[56]

The jihadist criticism of Hamas, as Stephen Ulph notes, lays bare the rift between the global jihadist movement, with its supra-national goals, and local groups and organizations that have more limited objectives and are open to tactical use of the political process. It has also exposed the fear that political progress, however limited, will compete with the jihadist program.[57] For the present, it appears that Hamas sees its own interests as separate from those of al-Qaeda and of the wider global jihadist movement.

---

[56] SITE Institute, "Hamas and the Impending Exposure by Abu Yehia al-Libi," April 17, 2006, http://www.siteinstitute.org.

[57] Ulph (2006).

# Other Islamist Groups Outside the al-Qaeda Network

## The Armed Islamic Group (GIA)

Terrorism and revolutionary violence have played a significant role in the modern history of Algeria. From 1954 to 1962, the Front de Libération Nationale (FLN) fought against the French colonial presence in this country and used terrorist attacks both in Algeria and in France as part of this war. Although the FLN was a predominantly nationalist organization, it used religious rhetoric in an effort to mobilize support. Once it came to power in Algeria, it began to restrict expressions of political Islam. Approximately 30 years later, an Islamist revolutionary organization, the Armed Islamic Group (GIA), would institute a campaign against the Algerian government now controlled by the FLN.

The GIA began in response to the Algerian government's decision to nullify the 1992 popular elections, which would have brought the Muslim party, the Islamic Salvation Front (FIS), into power. The FIS had gained momentum in the period between 1988 and 1992, partly in response to local factors and partly as a result of a wider Islamist movement across North Africa. The FIS established a social base in such urban centers as Algiers, Blida, Oran, Annaba, and Mostaghanem. In fact, it was the populations of these cities that rioted against the established order in October 1988 and contributed to the success of the FIS in the 1992 elections.[1]

---

[1] For more information see, Yaphe (2002), Chapter 2.

The GIA, in contrast to the FIS, was based in the countryside and has been one of the most extreme Islamist terrorist groups in history, often using tactics more brutal than those employed by some of the most savage terrorist organizations operating today. This extreme violence alienated the GIA from what could have been a wider popular base in both rural and urban areas and in recent years has caused a significant decline in its ability to conduct attacks both in Algeria and abroad.

**Ideological Foundation**

The ideological foundations of the GIA are similar to those of other Islamists emerging in the late 1980s. Its leaders were influenced by Egyptian Islamist theoreticians, such as Sayyid Qutb, and they saw the establishment of an Islamic government in Algeria as their primary goal.[2] Before the 1992 elections, Islamists might have thought that this revolution could be accomplished peacefully. Yet the military crackdown that prevented the FIS from coming into power ruled this possibility out.

GIA leaders believed that only an Islamic state could successfully take care of its citizens' spiritual and material wealth. Moreover, to achieve this revolution, political activities needed to be accompanied by violence. Indeed, many of the group's initial leaders and members had just returned from the Afghan war. These individuals had received a significant amount of religious indoctrination and training in the methods of guerrilla warfare. They had also witnessed the power of jihad to bring down even a "superpower," the Soviet Union.[3] Thus,

---

[2]  See Kepel (2002), pp. 159–173. Sayyid Qutb was one of the most significant figures in the development of modern radical Islamism. While in prison, before his execution by President Nasser's government, he wrote the influential book, *Ma'alim fi'l-tariq* ("Signposts for the Road"), a manifesto drawn from his vast, multivolume commentary on the Quran, *Fi zilal al-Qur'an* ("In the Shade of the Quran"). Qutb argued that the Muslim world was in a state of *jahiliyyah,* the ignorance that prevailed before Muhammad's revelation, and that the governments of Muslim countries were apostate and therefore illegitimate. He advocated the seizure of power by a revolutionary vanguard that would then impose Islamization from above.

[3]  Kepel (2002).

it was logical that their ideology would be rooted in beliefs similar to those of other returning jihadist fighters, such as members of al-Gama'a al-Islamiyya in Egypt or the Islamic Army of Aden Abyan in Yemen.

Until 1998, the GIA was the most powerful and active Islamic extremist group in Algeria. At that point, a splinter organization, the Salafist Group for Preaching and Combat (GSPC), eclipsed the GIA, as discussed in the first volume of this study as a result of popular revulsion at the GIA's use of extreme violence against civilians. The GSPC eventually joined the al-Qaeda network, whereas the GIA has remained largely independent and has relegated itself in recent years to conducting small-scale attacks inside Algeria.

### Strategic and Operational Objectives

Throughout the 1990s, the GIA waged what many have considered to be an insurgent campaign against the Algerian government, using rural, mountainous hideouts to conduct strikes against Algerian police and security forces. The group complemented its rural insurgency with an urban terrorist campaign that focused on assassinating key government, intellectual, and cultural figures in Algeria, in addition, bomb attacks in restaurants and against other civilian targets.[4] In what some would describe as an act of desperation, the GIA turned to conducting large-scale civilian massacres. In some cases, the GIA conducted massacres of whole villages using mostly knives and machetes, in an attempt to force loyalty and support from Algerian Muslims. The massacres appeared as random acts of violence in which women and children were brutally killed. In fact, the GIA was targeting specific villages, families, and communities that it believed were providing support to rival Islamist factions.[5] The GIA was trying to send a message that if Algerian civilians did not provide support they would suffer the same fate as the villagers who had been massacred.

---

[4]  Kepel (2002), p. 70.

[5]  Kalyvas (1999), p. 244.

The GIA also adopted what one scholar calls an "apocalyptic" out-look that embodied the *takfir* ideology,[6] essentially the condemnation as apostates worthy of death of those Muslims who do not agree with the radicals' interpretation of Islam.[7] Eventually this tactic, in conjunction with other factors, such as a reconciliation program for Islamic militants instituted by Algerian President Abdelaziz Bouteflika in July 1999 (aimed at trying to contain the insurgency by offering amnesty in exchange for militants laying down their weapons), resulted in the GIA's decline.[8]

The Algerian regime was not the GIA's only target. The GIA began establishing cells in Europe and Africa in order to attack its other primary adversary, France. The group held the French responsible for propping up the Algerian regime and resented the influence of French culture on Algerian society, which it viewed as harmful to Islam and the Arabic language and culture.[9] As a result, the GIA waged a terrorist campaign inside France—primarily through these external networks—and relied heavily on the large Algerian expatriate population in France to provide support.

Some of the more noteworthy attacks inside Algeria include the massacre at Sidi Youssef in September 1997 in which 63 civilians were killed in a relatively protected area (Sidi Youssef is a neighborhood of Beni-Messous, an outlying suburb of Algiers which is home to a large military base. The security forces did not arrive until several hours after the attack, despite being stationed nearby).[10] In January 1998, the GIA conducted four separate civilian massacres in which over 400

---

[6]   According to Reuven Paz, the *takfir* ideology is "the perception of the secular Muslim society as heretical, with the majority of the blame placed on the rulers of the Arabic and Islamic states." See Paz (2000).

[7]   Takeyh (2003), p. 70.

[8]   Takeyh (2003), p. 72.

[9]    Takeyh (2003), p. 63.

[10]   Takeyh (2003), p. 63.

people were killed in one night, raising the profile of these massacres with Western governments, which vowed to provide assistance to the Algerian government to stop the attacks.[11]

The GIA also threatened attacks against foreigners inside Algeria in 1993, warning them to leave or suffer the consequences. To date, the GIA is believed to be responsible for over 100 deaths of foreigners in Algeria, mostly Europeans.[12] One of the group's most shocking attacks was the killing of seven French monks in May 1996 after they were abducted from their monastery.[13] Outside Algeria, the GIA conducted a series of bombings in 1995 against the Paris metro, resulting in eight deaths and hundreds of wounded. The group also hijacked an Air France flight in Marseille in 1994 and bombed a Paris market in 1995, resulting in four deaths.[14] Notably, the GIA has not conducted any attacks outside Algeria since 1996.

**Environmental Factors**

The GIA sealed its own fate through the use of tactics inside Algeria that ultimately alienated any potential support base, both by conducting a campaign of civilian massacres and by attacking small business owners and the middle class—the economic backbone of the Muslim community in Algeria.[15] Unlike the GSPC, which splintered from the GIA in 1998 over its use of civilian massacres and its battlefield losses, the GIA never established a solid relationship with al-Qaeda outside the few members who were veterans of the Afghan war and who knew or had met bin Laden in that context. Although bin Laden took a special interest in supporting the Algerian extremists at the beginning of their campaign—probably because they contributed large numbers of

---

[11] "Hundreds Murdered in Widespread Algeria Attacks," International Policy Institute for Counter-Terrorism, January 6, 1998, http://www.ict.org.il.

[12] "Hundreds Murdered in Widespread Algeria Attacks.

[13] "Armed Islamic Group Attacks from 1998–Present," International Policy Institute for Counter-Terrorism, http://www.ict.org.il.

[14] "Armed Islamic Group," in U.S. Department of State (2003b); "Groupe Islamique Armee" (2003).

[15] Takeyh (2003), p. 70.

fighters to the Afghan war and were trying to establish an Islamic government in Algeria—he eventually turned his back on them because of their campaign of civilian massacres.[16]

The spiritual advisor for the GIA was Abu Qatada, an al-Qaeda leader now in British custody. Qatada issued a fatwa for the group in the mid-1990s authorizing attacks against women and children,[17] but he later denied he had done so after it became clear that many in the larger Islamic extremist world did not approve of such methods. The GSPC vowed not to attack civilians and was able to gain a following among Islamist supporters and disgruntled GIA members who had been alienated by the GIA's tactics.[18]

## Al-Gama'a al-Islamiyya

The Egyptian al-Gama'a al-Islamiyya, an offshoot of the Egyptian Muslim Brotherhood, began in the early 1970s, not as an organized terrorist group, but as a student movement in Egyptian universities and prisons.[19] Although Muslim Brotherhood members assassinated Egyptian Prime Minister Nuqrashi Pasha in 1948 and attempted to kill President Gamal Abdel Nasser in 1954, the strategy and tactics of the organization evolved as it reached an informal accommodation with the Egyptian power structure. Al-Gama'a leaders rejected the Muslim Brotherhood's gradualist approach to change and instead based their ideology on principles enunciated by Sayyid Qutb.[20]

---

[16]  Knights (2003).

[17]  Michael Isikoff, Daniel Klaidman, and Evan Thomas, "Al Qaeda's Summer Plans for Americans," *Newsweek,* June 2, 2003, http://www.stevequayle.com/News.alert/03_Unrest/ 030526.al-Qaeda.summer.html (as of March 10, 2006); Terence McKenna, "Interview with Abu Qatada," CBC News, June 2002, http://www.cbc.ca/national/news/ recruiters/qatada_interview.html (as of March 10, 2006).

[18]  "Groupe Salafiste pour la Predication et le Combat (GSPC)" (2003).

[19]  "Al-Gama'a al-Islamiyya (GAI)" (2003).

[20]  "Al-Gama'a al-Islamiyya (GAI)" (2003).

Al-Gama'a began recruiting its mid-level leaders from the ranks of unemployed university students angry about the lack of economic opportunity, while poorer individuals in the southern rural regions of Assiut and Minya populated the group's rank and file.[21] Although the group had an early leadership structure that allowed it to make quick decisions, al-Gama'a ranks were loosely organized, allowing for maximum operational secrecy and effectiveness. After Sadat's assassination, the Egyptian government launched a massive crackdown on Islamic extremists and their supporters and jailed a large number of those believed to subscribe to extremist views. As a result, terrorist violence in Egypt was greatly reduced during the 1980s as many of the Islamic extremists who managed to escape imprisonment fled to Afghanistan to participate in the jihad against the Soviet Union. In Afghanistan, many of al-Gama'a's future leaders gained expertise in guerrilla warfare and terrorist tactics. Those same individuals returned to Egypt in the late 1980s ready to apply what they had learned to their struggle against the government of Hosni Mubarak.

**Ideological Foundation**

The ideological foundations of al-Gama'a are very much intertwined with the general emergence of political Islam in modern Egypt. Most scholars date a resurgence of political Islam in the Arab world to the crisis of secular nationalism following the 1967 Six Day War.[22] Yet the ideological roots of this political philosophy can be traced back to the fourteenth-century philosopher Ibn Taymiyya, who postulated that Muslims did not owe allegiance to impious rulers. Ibn Taymiyya's work is significant because his philosophy influenced the avatars of such modern radical Islamists as Hasan al-Banna, the founder of

---

[21] "Al Gama'a al-Islamiyya," International Policy Institute for Counterterrorism, http://www.ict.org.il/inter_ter/orgdet.cfm?orgid=12 (as of March 10, 2006).

[22] See, for example, Kepel (2002). See also Abu-Rabi (1996).

the Muslim Brotherhood;[23] Sayyid Qutb; and Maulana Abu al-Al'a Mawdudi.[24]

The "blind sheikh" Omar Abd al-Rahman and his followers represent another cleavage in the Egyptian Muslim Brotherhood. He eventually became the spiritual leader of al-Gama'a, providing the group with religious guidance and issuing fatwas when necessary. Abd al-Rahman was the ultimate decisionmaker on issues of strategy, and he encouraged members to use terrorist tactics to overthrow the Egyptian regime, even though he spent most of his time behind prison walls. Abd al-Rahman was imprisoned by the Egyptian government in 1981 for conspiring to kill President Anwar Sadat, released in 1984, and then jailed again in 1989 for incitement to riot. In 1990, he went to the United States to spread his message to Muslims in New Jersey but was jailed in 1995 for his involvement in the 1993 World Trade Center bombing. He remains in prison today.[25]

## Strategic and Operational Objectives

Al-Gama'a reemerged in the early 1990s with a renewed sense of purpose after the return of its members from the Afghan jihad. Al-Gama'a leaders were energized by what they believed was a moral victory of Islamism in Afghanistan, and they were convinced that they could accomplish in Egypt what the mujahideen had achieved in Afghanistan by ousting the "illegitimate" governing power. As a result, al-Gama'a put its theories into practice in Egypt by attacking a wide variety of targets—Coptic Christians, banks, police, politicians, tourists, and

---

[23] Ibn Taymiyya's work was not revived until the Egyptian scholar Jamal al-din al-Afghani (1838–1897) began to express reservations about nationalism and modernity in the late nineteenth century and used Ibn Taymiyya's work to do so. Al-Afghani influenced later writings by Rashid Rida (1865–1935) along the same philosophical lines, which then influenced the following twentieth century political thinkers: Hasan al-Banna, Sayyid Qutb, and Muhammad al-Ghazali. Maulana Abu al-Al'a Mawdudi, a contemporary of Qutb from India, was also influenced independently by Ibn Taymiyya's work. Unlike his Arab contemporaries, he argued strongly that pan-Arabism was anti-Islamic. Mawdudi's work influenced Osama bin Laden and other pan-Islamic militants.

[24] Hallaq (1993); Black (2001), p. 155.

[25] Katzman (2005).

the media—with the goal of undermining Egyptian state power, secular institutions, and the economy and creating the perception that the Egyptian government was not able to protect its citizens.[26]

Two interrelated major splits developed over strategy within the organization. The first split occurred following the 1997 attack against Western tourists at Luxor; the second concerned whether the group should ally itself with bin Laden and al-Qaeda. The Luxor operation was allegedly organized by a group of renegade al-Gama'a members without the authorization of the group's leadership. The operation was designed to embarrass the Egyptian government by demonstrating that it was unable to protect foreigners. The al-Gama'a operatives who planned the attack were also hoping to get a boost in popular support from the success of the operation. Instead, there was widespread popular outrage over the incident, causing the group's historical leadership—who were imprisoned in Egypt—to call for a ceasefire to discuss the group's future direction and to repair existing disputes over strategy. Most of the group's active operational leaders were running the organization from outside Egypt.

The second split occurred shortly after al-Gama'a's call for a ceasefire when the group's operational leader, Rifa'i Taha Musa, signed bin Laden's 1998 declaration of war against "Jews and Crusaders."[27] Al-Gama'a was weakened both operationally and financially by the aftereffects of the Luxor attack and needed a boost to continue functioning as a viable terrorist organization. It is unclear whether Taha Musa actually agreed with bin Laden's views, wanted to seize power in al-Gama'a, or simply saw the financial and organizational benefits that al-Gama'a's rival terrorist group, the Egyptian Islamic Jihad (EIJ), reaped from making the decision to join al-Qaeda. Whatever the reason, Taha Musa courted bin Laden by making trips to Afghanistan and even appeared sitting next to him and EIJ leader al-Zawahiri in a videotape released

---

[26] "Al Gama'a al-Islamiyya," in U.S. Department of State (2003b).

[27] "Al Gama'a al-Islamiyya," in U.S. Department of State (2003b).

in September 2000 that threatened U.S. interests.[28] Nevertheless, Taha Musa was unable to recruit many of his cadres to support bin Laden and conduct attacks against the United States. Al-Gama'a witnessed how the EIJ had suffered significant setbacks because of its decision to join al-Qaeda. The group chose to go underground until it regained its strength. However, there are still al-Gama'a members who supported Taha Musa's desire to join al-Qaeda in attacking the United States, and those individuals could still participate in terrorist operations against U.S. targets.[29]

The historical leadership decided to call a unilateral ceasefire in 1999 once the group's spiritual leader, Abd al-Rahman, agreed, but this was done without the approval of the external leadership.[30] Despite Abd al-Rahman's cancellation of the ceasefire in June 2000, al-Gama'a has not conducted a terrorist attack either inside or outside Egypt since August 1998, and some suggest the historical leadership has struck a deal with the Egyptian government to lay down its arms in exchange for their release from prison.[31] In March 2002, the historical leaders issued a statement renouncing the use of violence. However, the external leaders have not appeared to abandon their commitment to jihad.[32]

Al-Gama'a has never attacked a U.S. target but has repeatedly threatened to attack Americans.[33] The group's most noteworthy attacks include the 1995 failed assassination attempt on President Mubarak in Addis Ababa, a 1995 car bombing in Rijeka, Croatia, that killed one

---

[28] Robert Windrem and Charlene Gubash, "Al-Zawahiri Statements Often Precede Attacks," NBC News, February 25, 2004. http://msnbc.msn.com/id/4358624 (as of March 10, 2006).

[29] "Al Gama'a al-Islamiyya," in U.S. Department of State (2003b).

[30] "Al Gama'a al-Islamiyya," in U.S. Department of State (2003b).

[31] "Al Gama'a al-Islamiyya," in U.S. Department of State (2003b).

[32] "Al Gama'a al-Islamiyya," in U.S. Department of State (2003b).

[33] "Al Gama'a al-Islamiyya," in U.S. Department of State (2003b).

and injured 29, a 1996 attack on tourists outside the Europa Hotel in Cairo that killed 18 foreign tourists, and the 1997 civilian massacre at Luxor in which 58 foreign tourists were killed.[34]

### Environmental Factors

In the early 1990s, al-Gama'a was able to wage a sustained terrorist campaign, conducting attacks in multiple sectors and striking at high-profile targets. Because al-Gama'a appeared to many observers in the early to mid-1990s to pose a real threat to the regime, President Mubarak decided to use a consistently heavy hand against the group. The state of emergency that Mubarak instituted when he took office in 1981 allowed him to deploy an array of repressive measures against al-Gama'a to curb the threat, including detaining without representation individuals suspected of terrorist activity.[35] The measures taken by the state security services also succeeded in widening the splits within the leadership and driving down the group's threat potential.

## Al-Wa'ad

Al-Wa'ad ("the Promise") is a shadowy Islamic extremist organization based in Egypt about which little is known. According to press reports of the trials of al-Wa'ad members in Egypt, the group formed in 1996. It is rather small and is made up largely of Egyptian citizens with dual nationality, including Russians (Chechens), Dutch, Germans, Canadians, and reportedly even Americans. The group was accused in a 2001 indictment of raising money for international jihadist causes, including Palestinian and Chechen groups, suggesting that al-Wa'ad subscribes to a pan-Islamic agenda.[36] Some of the militants arrested were businessmen or persons with a university education, a finding

---

[34] "Al-Gama'a al-Islamiyya (GAI)" (2003).

[35] "Egypt Imposes Another 3-Year State of Emergency," CBC News, February 25, 2003, http://www.cbc.ca/stories/2003/02/24/Egyptemergency030224 (as of March 10, 2006).

[36] "The Difficult Future of Holy Struggle," *The Economist,* January 31, 2002, http://economist.com/displayStory.cfm?story_id=966016 (as of March 10, 2006).

consistent with what we believe is the membership of other Egyptian extremist groups.[37] Much of the financing for the group's activities allegedly came from members who owned their own companies.[38] The Egyptian authorities, as well as various newspaper articles, have linked the group to al-Qaeda, but Western diplomats have reportedly questioned these links.[39] Al-Wa'ad has not plotted any attacks against U.S. targets thus far.[40] According to the trial testimony, the group was created from a fatwa issued by two prominent Egyptian clerics, Sheikh Fawzi al-Saeed of the al-Tawhid mosque and Nashaat Ibrahim of the Kabul mosque, both in Cairo, who are believed to be the key leaders of the group.

### Strategic and Operational Objectives

Al-Wa'ad appears to have taken up the mantle of both the EIJ and al-Gama'a. Starting in November 2001, an Egyptian military court tried at least 94 al-Wa'ad members in 2001 and 2002 for attempting to overthrow President Mubarak and threatening the state's security. The initiation of this trial followed a major crackdown on extremists by the Egyptian government after the September 11 attacks. The trial, which concluded in September 2002, resulted in reduced sentences of 2–15 years for more than 40 defendants believed to have played a key role in terrorist planning.[41] The rest of the individuals who were initially indicted were acquitted and released. Although the arrests may have eliminated or reduced the potential al-Wa'ad threat, some press reports indicate that at least two new terrorist groups have formed in Egypt as

---

[37] Khaled Dawoud, "Trying Times for Islamists," *Al-Ahram Weekly* Online, January 10–16 2002, http://weekly.ahram.org.eg/2002/568/eg6.htm (as of March 10, 2006).

[38] "Egypt: Trial of Al-W'ad Group Adjourned," Cairo MENA, FBIS AFP20020106000116, January 16, 2002.

[39] Karl Vick, "Political Repression Spawns Extremism in Arab World," *The Washington Post,* October 30, 2001, http://www.commondreams.org/headlines01/1030-03.htm (as of March 16, 2006).

[40] "Egypt: Verdicts Issued Against Defendants in Tanzim al-Wa'd case," MENA, FBIS GMP20020909000103, September 9, 2002.

[41] "Egypt: Verdicts Issued . . . ."

of this writing—the Jihad Group for the Victory of Muslims at Home and Abroad; and Jundullah, a faction of EIJ.[42]

Al-Wa'ad militants were reportedly organizing attacks against public buildings in Egypt, Muslim and Christian clergymen, artists, writers, and foreigners in Egypt, as well as plotting to assassinate Mubarak.[43] The individuals whom al-Wa'ad was targeting for assassination were all known for their secular views and opposition to Islamic extremism.[44] According to trial testimony, two of the militants put on trial in Egypt after September 11 were trained as pilots in Texas. No specific evidence was revealed, however, that they planned to use their expertise in a terrorist attack. At least one operative from Dagestan was considered to be an explosives expert who trained other members of the group. Militants from al-Wa'ad also reportedly traveled overseas and trained with other extremists to apply the skills they learned to their jihad in Egypt.[45]

## South Africa: People Against Gangsterism and Drugs (PAGAD)

PAGAD was formed in 1996 as a Muslim community group fighting drugs and violence in South Africa.[46] By early 1998, the group had also become violently antigovernment and anti-Western. It is closely associated, if not intertwined, with the South African Islamic group Qibla. PAGAD uses several front names, including Muslims Against Global

---

[42] Abduh Zaynah, "Egyptian Authorities Reportedly Apprehend New Fundamentalist Group," Al-Sharq al-Aswat, FBIS GMP20030828000164, August 28, 2003.

[43] Dawoud, "Trying Times . . . ."

[44] Dawoud, "Trying Times . . . ."

[45] Dawoud, "Trying Times . . . ."

[46] According to the 2001 South African census, there are approximately 665,000 Muslims in South Africa, or 1.5 percent of the population (2.5 percent of the population is of South Asian origin, the ethnic background of most of South Africa's Muslims), making Islam the third-largest religion in South Africa (after Protestant and Catholic). Thus, Muslims are a significant part of South African society—a central place they have occupied historically in South Africa's development (CIA, 2004).

Oppression and Muslims Against Illegitimate Leaders, when launching anti-Western protests and campaigns.[47] PAGAD operates mainly in the Cape Town area, South Africa's foremost tourist venue.[48] While PAGAD's and Qibla's overall strength was last estimated (in 2001) at several hundred members, PAGAD's G-Force (Gun Force), which operates in small cells, probably contains fewer than 50 members and is the PAGAD element believed to be responsible for carrying out acts of terrorism.[49] PAGAD has not been active since 2002.

**Ideological Foundation**

PAGAD and its ally Qibla, founded and led by Achmat Cassiem since 1979,[50] advocate a greater political voice for South African Muslims.[51] Though distinct, the two groups are often treated as one by the media. According to an extensive study by the Centre for the Study of Violence and Reconciliation in South Africa, PAGAD originated

> in a network of hitherto disparate and isolated anti-drug, anti-crime groups and neighborhood watches frustrated by their inability to tackle problems whose roots extended far beyond their individual localities.

While its ideology was "predominantly, but by no means exclusively Muslim" from the beginning,

> PAGAD's development . . . cannot be seen simply as the unfolding of a master plan conceived and executed by a small group of Islamic radicals. Rather it has to be viewed as the outcome of the

---

[47] U.S. Department of State (2003b); Potomac Institute for Policy Studies, TerrorismCentral, http://www.terrorismcentral.com (both as of March 16, 2006).

[48] Potomac Institute for Policy Studies.

[49] U.S. Department of State (2003b).

[50] Qibla was founded in 1979 and inspired by the Iranian Revolution. The group's aim was either to defend and promote Islam in South Africa or to establish an Islamic state in South Africa. Cassiem was vocal in the struggle against apartheid and was imprisoned at on Robben Island at age 17.

[51] "Appendix C: Background Information on Other Terrorist Groups," in U.S. Department of State (2003b).

> interplay between many internal and external forces—of action
> by PAGAD and its constituent elements and reaction by the State
> and its agencies in the specific political, social and economic con-
> text of the Western Cape.

PAGAD is perceived by the South African state and the United States
as "an urban terror group threatening not just the State's monopoly
on the use of coercive force but the very foundations of constitutional
democracy."[52]

Led by a national coordinator, Abdus Salaam Ebrahim, PAGAD
and Qibla view the secular South African government as a threat to
Islamic values.[53] According to one study, PAGAD's ideology stems
from "belief in essentialist notions of a historical truth encapsulated in
Islam . . . a number of stands converge at this level without any coher-
ent distinction between them, and one can simultaneously belong to
more than one stream"—indicating an organization that has common
interests but not necessarily homogenous beliefs. It desires to "protect
the new South Africa from the 'scourge' of democracy and liberal-
ism which is essentially a Western principle." Its leader maintains that
Islam is "the true meaning of the democratic principle of 'the people
shall govern.'"[54]

PAGAD states that it was originally founded to "eradicate gang-
sterism and drugs from our society, thereby restoring morality and
social order to the communities that have lost hope of combating
this lethal social evil."[55] Over time, however, its outlook has evolved
to become sharply antigovernment and anti–United States, with deep
Islamic influences. Authorities suspect that in addition to Qibla's ini-
tial Iranian inspiration, PAGAD has ties to Islamist extremists in the

---

52  Dixon and Johns (2001).

53  Potomac Institute for Policy Studies; "Appendix C: Background Information on Other
Terrorist Groups."

54  "Organisation and Structure of Pagad," PAGAD, South Africa: UniTech—University of
Zululand, online at http://www.duc-uz.co.za/PAGAD%5B2%5D.htm.

55  PAGAD: http://www.pagad.co.za/nethome.htm (no longer available).

Middle East.[56] This suspicion goes hand in hand with a growing belief that Saudi-financed imams were active in Cape Town's mosques, propagating and inspiring militant Islam. However, they do not appear to have made widespread inroads. As Morrison and Lyman stated in early 2004, there "is little evidence of other terrorist sympathies among South Africa's Muslim population."[57] Nevertheless, a number of South African academic experts have made accusations that PAGAD and Qibla are affiliated with al-Qaeda. This has been difficult to prove, although Cassiem did maintain in an October 2001 interview that he had recruited—via Muslims Against Illegitimate Leaders—"1000 young volunteers to fight in Afghanistan."[58] While it is doubtful that this statement is true, it does reinforce the possibility that Qibla and PAGAD may look beyond their immediate interests in the Western Cape and South Africa to be part of the global Islamist struggle.

### Strategic and Operational Objectives

When PAGAD was first formed in early 1996, it worked with the South African authorities to combat organized crime and narcotics in the Western Cape area. However, following a number of increasingly violent attacks perpetrated by PAGAD in late 1996, the South African government outlawed the group. There is evidence to suggest that PAGAD underwent a split in October 1996, similar to that between the "Provisional" Irish Republican Army (IRA), which wanted to abandon violence and return to peaceful means of struggle against the British, and the "Real" IRA, which wanted to continue the violence. In January 1997, three of PAGAD's founding members, Farouk Jaffer, Nadthmie Edries, and Mohammed Ali "Phantom" Parker, left the main organization and registered PAGAD as a nonprofit commu-

---

[56] Although increasingly anti-Western and anti-U.S., PAGAD had not been designated as a foreign terrorist organization by the U.S. government as of 2003 (U.S. Department of State, 2003a). However, PAGAD was listed on the Terrorist Exclusion List in 2001 (U.S. Department of State, 2002b).

[57] Lyman and Morrison (2004), p. 82.

[58] "Islam—A South African Perspective: An Interview with Achmat Cassiem," Carte Blanche MNET, October 1, 2001, produced by Sophia Phirippides, http://www.mnet.co.za/CarteBlanche/Display/Display.asp?Id=1808.

nity organization under South African law. The remaining members of PAGAD effectively became Qibla's strong-arm wing through the G-Force. Indeed, Parker complained that PAGAD had been "taken over by Qibla" in the months leading up to this split.[59] Currently, PAGAD's Web site appears to be that of a community-empowering organization, with no mention of Islam.

This split could explain why the two factions of PAGAD appear to have two very different targeting practices: that of assassinating drug dealers and crime lords, and that of bombing symbols of globalization. Indeed, the official PAGAD has condemned attacks on people unconnected with drugs and gangsterism but has also stated time and again that the South African government's failure to curb drug dealing and crime is the entire driving force behind PAGAD's actions.

In addition to the few hundred estimated criminal victims of PAGAD's targeted violence, PAGAD's bombing targets have included South African authorities, moderate Muslims, synagogues, gay nightclubs, tourist attractions, and Western-associated restaurants. PAGAD is believed to have carried out the August 25, 1998, bombing of the Cape Town Planet Hollywood restaurant. PAGAD members are also thought responsible for nine additional bombings in the Cape Town area in 2000.[60] These nine bombings resulted in some 30 injuries. Of the nine attacks, five were car bombings that targeted South African authorities, public places, and restaurants and nightclubs with Western associations. According to the U.S. government, these attacks included larger bombs triggered by more sophisticated remote detonation devices than had been previously witnessed in South Africa. Police arrested several suspects affiliated with PAGAD in November 2000 and confiscated several pipe bombs. There were no further bombings or inci-

---

[59] "Organisation and Structure of Pagad."

[60] "Appendix C: Background Information on Other Terrorist Groups"; Potomac Institute for Policy Studies.

dents after the arrests.[61] Notably, PAGAD did not take credit for these attacks and, instead, maintained that the bombings were actually the responsibility of the South African police.[62]

In early 2002, PAGAD was suspected of being behind a bomb attack at the Cape Town International Airport, which coincided with the trial of two of its members on a charge of illegal possession of explosives. This followed a similar attack, on January 12, at the courthouse where the trial was slated to begin. Although PAGAD denied any involvement in the incident, it was the second time the trial had been postponed on account of bomb attacks.[63]

### Environmental Factors

Since 2001, PAGAD's activities have been severely curtailed by law enforcement and prosecutorial actions against leading members of the organization. There were no urban terror incidents from September 2000 through 2001, compared to nine bombings in the Western Cape in 2000 that caused serious injuries, and a total of 189 bomb attacks since 1996. Although South Africa undertook a number of counterterrorist actions during 2001–2002 in support of the war on terrorism,[64] Morrison has warned that "the South African government has been too ill-informed, and ill equipped, to bring effective controls upon radical Islam within its borders."[65]

---

[61] "Africa Overview," U.S. Department of State (2001).

[62] This statement was made on PAGAD's Web site, http://www.pagad.co.za (no longer available). It should be noted that, in the past, the apartheid government frequently carried out "pseudo-operations" involving government-initiated attacks made to appear to be those of the liberation movements in a number of Southern African countries.

[63] Information about these and other terrorist attacks can be found in the RAND-MIPT Terrorism Incident Database, http://www.tkb.org/Home.jsp.

[64] South Africa enacted legislation establishing a financial intelligence unit, which targets money laundering. A draft antiterrorism law was approved by the cabinet and informally submitted to the Parliament. South Africa provided support to the United States by extraditing a member of the Symbionese Liberation Army. South Africa is also a party to five of the 12 international conventions and protocols relating to terrorism. "Africa Overview," in U.S. Department of State (2003b).

[65] Morrison (2001), p. 19.

This points to the danger that, as the militancy of PAGAD's and Qibla's followers has evolved—particularly after September 2001, if Cassiem is to be believed—there will be an increasing pool of potential recruits for militant Islamic activity both inside and outside South Africa. If the security and policing services are unable to confront this problem—and U.S. authorities are deeply concerned that this is the case already[66]—then the potential that South Africa could become a center of Islamist terrorism and terrorist support could increase (although most South African analysts are skeptical about this possibility, given South Africa's historic involvement of Muslims in society). Moreover, while South Africa generally has a history of militant, often violent, protest against authority, it is unlikely that the same levels of anti-apartheid violence would be seen in any antiestablishment protests conducted by South Africa's Muslim communities.

This is not to say that South Africa—as the most advanced country in Africa and with a very large Muslim population—could not become a support-base for externalized jihadist activities. The danger was highlighted by the April 2004 arrests of five alleged al-Qaeda suspects in South Africa. The South African police chief stated that those arrested were part of "an al-Qaeda-linked plot to disrupt the country's third democratic elections" and that the arrests led directly to other arrests in Jordan, Syria, and the United Kingdom.[67]

Whether any of these individuals were involved with Qibla (which is unlikely, given that they were all foreign nationals) or whether they were developing an independent jihadist cell in South Africa remains

---

[66] Interview with senior U.S. Department of Defense Africa official, Washington, D.C., July 2004.

[67] The police chief stated that those arrested in the UK were found in possession of "boxes and boxes of South African passports," raising serious concerns that someone in South Africa's Home Affairs Ministry might have supplied them. "SA Action Led to Arrest of al-Qaeda Suspects: Selebi," SAPA, May 27, 2004; "SA Police Foils Al-Qaeda Plot to Disrupt Elections," Panafrican News Agency (PANA) Daily Newswire, May 27, 2004; Michael Wines, "South Africa Says It Deported 5 Terror Suspects Before Vote," *The New York Times,* May 28, 2004, p. 12.

unclear. Nevertheless, leaders of the South African Muslim community maintain that the overwhelming majority of South African Muslims are

> people emotionally identifying with Al-Qaedah's rhetoric against the United States of America, but in another part of their hearts, condemning wholesale the kind of violence that Al-Qaedah has undertaken around the world.[68]

The same sources stated that foreign jihadists coming into South Africa would not be able to blend into the South African Muslim community because

> they would be identified immediately by people within the community . . . the news would get out. It's not very easy to hide in the South African Muslim community if you're a foreigner. You're going to be identified almost immediately.

## Eritrean Islamic Jihad/Eritrean Islamic Reform Movement

The Eritrean Islamic Jihad Movement (EIJM), Harakat al Jihad al Islami (also known as the Abu Sihel Movement), is a Sunni Islamist group that changed its name in 2003 to the Eritrean Islamic Reform Movement (EIRM) (also called the Islamic Salvation Movement).[69] The group has been active in the Horn of Africa in various guises since the mid-1970s. It seeks the violent overthrow of Eritrea's secular government and its replacement with an Islamic government.

---

[68] "SAFRICA: Analyst, Muslim 'Authority' Discuss Deportation of Al-Qaeda Suspects," BBC Monitoring International Reports (Radio 702, Johannesburg, in English, May 27, 2004).

[69] http://web.lexis-nexis.com/universe/document?_m=3b10ee425f375821178bacd87541ecf1&_docnum=6&wchp=dGLbVzz-zSkVb&_md5=dfe6f1d0d3d3896dd4ab74f1b0d86083.

The group is led by its Secretary-General, Sheikh Mohamed Amer, and his deputy, Amir Abul Bara Hassan Salman.[70] It has been named by U.S. officials as being "one of al-Qaeda's main allies in the Horn of Africa."[71] However, the true nature of EIRM's external relationships is far more complicated, and far less obvious, than this. The EIRM appears to be an amalgam of a number of different organizations, interests and factions, combining moderate and radical Islam. Its methods combine *da'wa* (propagating Islam) and jihad.[72]

Eritrea, the EIRM's main target, has complained that Sudan is backing the group to advance Khartoum's wider Islamic agenda across the Horn.[73] Eritrea, in turn, is believed to support the Sudanese opposition group National Democratic Alliance, which has the stated objective of overturning the current National Islamic Front government in Khartoum.[74] It is also alleged that, in the summer of 2001, Ethiopia sponsored a conference of Eritrean exile terrorist groups, which included the EIJM, in the Ethiopian city of Gonder. Thus it appears that regional governments use terrorist groups in the Horn for their own geopolitical ends.

Following the conference in Gonder, a new group was formed in March 2003 called the Eritrean National Alliance (ENA), or the Alliance of the Eritrean National Forces, a coalition of thirteen Eritrean opposition groups led by Heruy Tedla Biru and dedicated to the overthrow of Eritrean president Isaias Afewerki's government. The ENA is

---

[70] Interview with the Deputy Amir of the Eritrean Islamic Jihad Movement—Abul Bara' Hassan Salman: "The Governing Regime Is a Terrorist Regime Which Acts with Enmity Against the Eritrean People," *Nida'ul Islam,* Issue 22, February–March 1998, http://www.fas.org/irp/world/para/docs/eritrea.htm (as of April 23, 2006).

[71] Victoria Ward, "Warning to Travellers After British Geologist Killed in Eritrea," *PA News/The Scotsman,* April 18, 2003, http://www.dehai.org/archives/dehai_news_archive/apr-may03/0284.html (as of March 16, 2006).

[72] Iyob (2004).

[73] Support for this theory comes from a news conference held by EIRM's Secretary-General Amer in Khartoum in mid-1998. Interview with the Deputy Amir of the Eritrean Islamic Jihad Movement; United Nations Development Programme (1998).

[74] http://web.lexis-nexis.com/universe/document?_m=9d00794b6fab0f9b6ee0588c13a017&_docnum=1&wchp=dGLbVtz-zSkVb&_md5=8df17f6fc5cf681f0edc01e7a0c76be0.

believed to include the EIRM; Eritrean Islamic Salvation, also called the Arafa Movement; the Eritrean Democratic Resistance Movement (Gash-Setit); the Eritrean Liberation Front–Revolution Council; and other groups and factions.[75]

Some questions remain as to whether the EIRM is fully integrated into the ENA or continues to operate alongside it. The ENA, unlike the EIRM, does not espouse an Islamic ideology but rather a secular one comprising elements of Afro-Marxism, Maoism, and Ba'athism. Many EIRM supporters do not appear to subscribe to the group's militant Islam but rather support it because of resentment over the ruling Popular Front for Democracy and Justice (PFDJ) and PFDJ's curtailment of Islamic political activity. (The Eritrean government also curtails Christian evangelism out of concern that it might disturb the balance between Islam and Christianity in the country and threaten national unity.)[76] A January 2004 U.S. Institute of Peace report noted that "the EIJM's continuity as an organization is fed by the PFDJ regime's unwillingness to contemplate real versus virtual political participation of Eritrea's multicultural citizens."[77]

The ENA has stated that it would not attack the Eritrean military but rather "strategic targets such as television and radio centres," as it wanted to "win over" the military. Heruy also indicated that it would not attempt to assassinate President Afewerki because "the problems [assassinations] produced later are too big to handle." Ethiopia, Sudan, and Yemen, according to Heruy, had promised "material support" to

---

[75] See http://www.theodora.com/wfb2003/eritrea/eritrea_government.html; IRIN, "Horn of Africa: Armed Factions and the Ethiopia-Eritrea Conflict," May 14, 1999, http://www.fas.org/irp/world/para/docs/19990514.htm (both as of March 17, 2006).

[76] See Christian Solidarity Worldwide, Eritrea, at http://www.cswusa.com/Countries/Eritrea.htm (as of June 8. 2006).

[77] Iyob (2004).

the ENA. Heruy stated that "We wish to get rid of the dictatorship in our country and the natural thing to do is to ally ourselves with our immediate neighbours."[78]

**Ideological Foundation**

The EIRM has not been designated as a foreign terrorist organization by the U.S. Department of State.[79] Indeed, while the EIRM has been accused of being an al-Qaeda affiliate in Eritrea, there is little evidence of any links between the group and al-Qaeda. The leadership of the EIRM and ENA has indicated that it sees its struggle against Afewerki's government within the wider context of al-Qaeda's professed push for a new Islamic caliphate, but it is clear that the EIRM's operational view remains focused on the situation in Eritrea, with some concern over Sudan and Ethiopia as well. Indeed, an April 2003 communiqué from the then-EIJM blamed the Eritrean government for using the September 11 attacks to attempt to link the Eritrean jihadists to al-Qaeda and of fabricating evidence that the Eritrean "mujahideen" were targeting civilians. The EIJM communiqué stated,

> We do not target civilians and innocent people of Eritrea or the foreign[ers] visiting or residing in Eritrea. We, in our fighting are targeting the Afewerqi regime and its military machinery and that Jihad in Eritrea is not terrorism against innocents, but has been launched for a sublime end and a legitimate goal, that is lifting tyranny and grievance suffered by the Eritrean people in general, and by Muslims in particular, from that dictatorial ruling regime and resisting the (state terrorism) carried out by Afewerqi Chauvenic [sic] regime.[80]

---

78 "New Rebel Force in Eritrea: An Alliance of 13 Eritrean Opposition Groups Says It Is Setting Up a Military Wing to Topple President Isaias Afewerki," BBC News, May 2, 2005, http://news.bbc.co.uk/go/pr/fr/-/1/hi/world/africa/2995873.stm (as of March 17, 2005).

79 The EIRM/EIJM is not even mentioned in the State Department's *Patterns of Global Terrorism 2002*; see U.S. Department of State (2003a).

80 Eritrean Islamic Jihad Movement General Secretariat, April 17, 2003, http://www.meskerem.net/eritrean_islamic_jihad_movement.htm (as of June 2004).

**Strategic and Operational Objectives**

As noted, the EIRM maintains that its actions are directed only against the Eritrean government and not against civilians. It is clear that such statements need to be treated with some skepticism, especially because there is a lack of clarity regarding the EIRM-ENA relationship when it comes to attacks against the Eritrean military. The EIRM has claimed various "military successes" against the Eritrean armed forces. For example, in August 2003, the EIRM's "military secretariat" released a communiqué stating that its "mujahideen" had successfully carried out five attacks during July and August 2003, and claimed 44 Eritrean military personnel killed, with the loss of only three "mujahideen."[81]

Nevertheless, the Eritrean government has blamed the movement for civilian deaths, including the murder of British geologist Timothy Nutt in April 2003.[82] The government believes that such attacks are aimed at deterring foreign investment in Eritrea, but the EIJM has denied any involvement, stating that its policy was "only to attack government targets in Eritrea."[83] Another attack in August 2003, in which two local employees of the U.S.-based aid group Mercy Corps International were killed in the northern Red Sea region of the country, was similarly blamed by the government on the EIJM.[84] In November 2003, two UN aid trucks in Tesseney near the Sudanese border were destroyed by remote-control devices placed under each truck. There were no casualties.[85]

In March 2004, the Eritrean government blamed Sudan and Ethiopia for backing "terrorists"—notably the EIJM—who allegedly

---

[81]  Awate Team, "EIRM's 'Military Communiqué' & Our Commentary," August 18, 2003, http://www.awate.com/artman/publish/article_2025.shtml (as of March 17, 2006).

[82]  Ward, "Warning to Travellers."

[83]  "New Rebel Force in Eritrea."

[84]  "US Told Suspected al-Qaeda Affiliate Killed Aid Workers in Eritrea," AFP, October 6, 2003, 12:40PM PDT, http://quickstart.clari.net/qs_se/webnews/wed/cx/qus-eritrea-unrest.r2lw_do6.html (as of June 2004).

[85]  Jonah Fisher, "UN Assesses Security in Eritrea," BBC News, November 24, 2003, http://news.bbc.co.uk/go/pr/fr/-/1/hi/world/africa/3234378.stm (as of March 17, 2006).

bombed a hotel, also in Tesseney,[86] killing three people. It was not clear whether the dead at Tesseney were civilians or military. While both Ethiopia and Sudan denied the accusation and accused Eritrea of blaming them for its internal problems, Eritrean Foreign Minister, Ali Said Abdella, also claimed the group "had been trained and armed by al Qaeda head Osama bin Laden during the 1990s."[87]

**Environmental Factors**

The focus of the EIRM (and the ENA) remains firmly fixed on the Eritrean government, but there is a possibility that other regional factors could push it toward militancy outside Eritrea's borders. Although it is unlikely that the EIRM would suddenly refocus its violence against wider Western targets outside Eritrea, the EIRM could become involved with other like-minded Islamic organizations throughout the Horn of Africa to promote common interests and perhaps seek to establish an Islamic federation in the Horn. This is a possibility as long as the interests, actions, and legacies of most of these groups, their supporters, and targets, remain interwoven in an almost indistinguishable pattern of relationships.

A multitude of groups and factions, each with its external supporters, abounds across the Horn. For a description of these groups, see the box on the next page.

---

[86] Tesseney is believed to be central to the EIJM's operations because it is the Eritrean base for refugee repatriations from the Sudan and so has a significant UN presence.

[87] "Eritrea Says Sudan and Ethiopia Behind Hotel Blast," Reuters, March 10, 2004, http://eri24.com/news4651.htm (as of April 23, 2006).

---

**Other Groups Across the Horn of Africa**

---

**Djibouti:** The Afar Front pour la Restauration de l'Unité et la Démocratie (FRUD) and the separate FRUD–"Dini/combatant faction."

**Eritrea:** The little-known Red Sea Afar Democratic Organisation (RSADO) and Afar Liberation Front [Party].

**Ethiopia:** The ethnic Somali Ogadeni clan occupies much of southeastern Ethiopia, and its preeminent political party, the Ogadeni National Liberation Front (ONLF), has resisted attempts by the Addis Ababa government to have it join the Ethiopian Somali Democratic League, which is a multi-clan umbrella party affiliated with the ruling Ethiopia People's Revolutionary Democratic Front (EPRDF). The ONLF is also believed to be linked to the United Front for the Liberation of Western Somalia (UFLWS) in Somalia. Finally, there are the Oromo Liberation Front, the United Oromo People's Liberation Front, the Oromo Peoples' Liberation Organisation, and the Oromo Peoples' Democratic Organisation, the latter a member of the EPRDF coalition.

**Somalia:** The many factions and groups include the United Somali Congress–Patriotic Movement and the Rahanweyn Resistance Army, both allegedly supported by Ethiopia; the Somali National Front, a Marehan group split between pro- and anti-Ethiopia factions; Mohamed Hussein's ruling Somali National Alliance, supported by Eritrea; and the previously noted al-Itihaad al-Islamiyya (covered in the first volume, *Part 1, the Global Jihadist Movement*) and its affiliated UFLWS, which is believed to receive support from Ethiopia.

Finally, there is also the question of the Afar region which, following the de facto independence of Eritrea in 1991, found itself straddling three states: Ethiopia, Eritrea, and Djibouti. Afar rebels fighting in Ethiopia are known as the Ugogomo, or revolutionary party, and are believed to be supported by the ruling EPRDF, which includes the Afar Revolutionary Democratic Front (ARDUF) in Ethiopia. The ARDUF and Ugogomo are thought to be closely associated. (IRIN, "Horn of Africa.")

# The Iraqi Insurgency

The nonaffiliated part of the Iraqi insurgency, that is, the component that is outside the al-Qaeda and al-Zarqawi networks, is diverse and widespread. It is composed of groups of both nationalist and religious provenance.[1] The insurgency is almost exclusively Sunni. Both the Shi'ite and Kurdish communities have continued to rally around their new national leaders and, until the February 2006 bombing of the al-Askari mosque in Samarra—one of the holiest Shi'ite shrines[2]—refused to engage in sectarian revenge.

We do not place the Shi'ite militiamen associated with Muqtada al-Sadr in the insurgent category because even though al-Sadr's militiamen, organized in the so-called Mahdi's Army, share the Sunni hostility toward the United States and have engaged in violent activities, these activities generally do not rise to the level of Sunni terrorism. Moreover, al-Sadr must operate within the broader framework of Shi'ite politics in Iraq. In this context, al-Sadr's movement has to take account of the political and religious authority of the Iraqi Shi'ite hierarchy headed by Ayatollah Ali al-Sistani—which limits the al-Sadr movement's freedom of action and ability to mount a sustained insur-

---

[1]  This chapter reflects information provided by CJTF-7 personnel in Baghdad; Kathleen Ridolfo, "A Survey of Armed Groups in Iraq," RFE/RL Iraq Report, June 4, 2004; "Iraqi Insurgency Groups," http://www.globalsecurity.org/military/ops/iraq_insurgency.htm (as of March 17, 2006); and surveys of open press sources.

[2]  The shrine, built in 944, is the site of the tombs of the Tenth and Eleventh Imams, Ali al-Hadi and his son, Hassan al-Askari. Samarra is also the place where, according to Shi'a tradition, the Twelfth or "Hidden" Imam, Muhammad al-Mahdi, went into occultation.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 242 of 632

gency with popular support. Al-Sadr's movement participated in the January 2006 general elections as part of the United Iraqi Alliance, the Shi'ite coalition, and emerged as a power broker in the formation of a new Iraqi government.

The insurgency under discussion is certainly one of the most complex and challenging ever faced by the United States. It presents no single coherent enemy against which American forces can mass their superior strength. The insurgency's various components fight for their own reasons, having little in common other than a desire to remove the U.S. and coalition presence from the country. In general, they seek to create a crisis between the Iraqi government and the Iraqi people in the hopes that outside support for the government will wane, forcing the withdrawal of foreign forces.[3] The insurgency is far larger than the 5,000 guerrillas previously thought to be at its core. One indication is the sheer number of suspected insurgents—some 22,000—who have cycled through U.S.-run prisons. Most have been released. Indeed, some U.S. commanders in Iraq have expressed concern that the Abu Ghraib prison has become a "jihad university"—a breeding ground for extremist leaders and a school for terrorists.[4]

At least 28 different insurgent groups have formed in 2003 through 2005, some but not all based in the Sunni triangle north and west of Baghdad. Some of these groups are increasingly embracing tactics imported by foreign fighters, such as the car bombings of civilian targets.[5] It goes without saying that the universe of insurgent groups in Iraq is very dynamic and fluid. Groups appear, change, merge, divide, and disappear. They operate under different names and sometimes

---

[3]  "Defeating the Insurgency in Iraq," U.S. Institute for Peace Workshop, May 16, 2005.

[4]  Jim Krane, "U.S. Officials: Iraqi Insurgency Bigger," *Philadelphia Inquirer,* July 9, 2004; Thom Shanker, "U.S. Fears Abu Ghraib Is 'Jihad University,'" *International Herald Tribune,* February 15, 2006.

[5]  Edward Cody, "Sunni Resistance to U.S. Hardens," *The Washington Post,* July 7, 2004, p. 1.

under no name at all.[6] Therefore, our intention is not to provide a comprehensive portrayal of the Iraqi insurgency but to identify its key components, trajectory, and likely prospects.

## Ideological Foundation

As noted in the preceding discussion, the myriad groups engaging in armed activity in Iraq have little in common other than a desire to remove the U.S. and coalition presence from the country. The Sunni groups—the backbone of the insurgency—want the new Iraqi government to fail, but beyond that, they exhibit wide differences. By contrast, Shi'ite militants—including al-Sadr's movement—back the idea of a new government that is representative of the majority Shi'ite population, even if they compete over control of that government. (The al-Sadr movement and the Supreme Council for the Islamic Revolution in Iraq are fierce competitors for dominance in the Shi'ite-majority southern provinces.)

For the moment, nationalism is the glue that holds the Sunni-based insurgency together. Sheikh Abdul-Satar Abdul-Jabbar of the Council of Islamic Scholars, Iraq's preeminent Sunni organization, has said that the main, Sunni-based insurgency is likely to rage as long as Iraqis' sense of nationalism is bruised by the presence of U.S. military forces on their soil.[7]

In the wake of the turnover of authority from the Coalition Provisional Authority (CPA) to the Iraqi government, and especially after the first round of elections in January 2005, tensions appeared to be rising between the homegrown Iraqi resistance and the foreign Islamist fighters. There has been evidence of sniping between groups on Arabic television and Web sites and in interviews with Iraqi and American officials, as well as from members of the insurgency and people with close ties to it. All speak of rising friction between nationalist

---

[6]  Ahmed Hashim, "Iraqi Insurgency Is No Monolith," *The Daily Star* (Lebanon), July 28, 2003, http://www.lebanonwire.com/0307/03072815DS.asp (as of March 17, 2006).

[7]  Cody, "Sunni Resistance to U.S. Hardens."

fighters and foreign-led Islamists over goals and tactics, with some Iraqi insurgents indicating revulsion over the car bombs and suicide attacks in cities that have caused hundreds of civilian deaths.[8] The split took a dramatic turn in July 2004, when masked men calling themselves the Salvation Movement released a videotape containing threats to kill al-Zarqawi.[9] The next day, a statement posted on an Islamist Web site, claiming to be signed by al-Zarqawi, lashed out against the Council of Islamic Scholars. The statement accused the group of weakness for offering a ransom to prevent the beheading of Nicholas Berg, the American killed in May 2004.[10] More recently, in the run-up to the ratification of the new Iraqi constitution in the fall of 2005, jihadists have publicly executed Sunni clerics who advocated participation in the October 2005 referendum on the constitution. Since then, there have been reports of armed clashes and executions of foreign jihadists by Iraqi Sunnis. (As this book was going to to print, the news was received that al-Zarqawi and several of his associates had been killed in a U.S. air strike on their hideout on June 7, 2006.)

## Strategic and Operational Objectives

The strategic and operational objectives of these groups vary widely. The most senior official from Hussein's regime still at large is the former vice-chairman of Saddam's Revolutionary Command Council, Izzat Ibrahim al-Douri, who specialized in internal security. He may

---

[8]   Ian Fisher and Edward Wong, "Iraq's Rebellion Shows Signs of Internal Rifts," *The New York Times,* July 11, 2004, p. 1.

[9]   In the video, three men with rocket-propelled grenades and other weapons, flanked by an Iraqi flag, delivered the threats. The man speaking had a clear Iraqi accent. "We have started preparing . . . to capture [al-Zarqawi] and his allies or kill them and present them as a gift to our people. This is the last ultimatum to those who give him shelter. This is the last warning. If you don't stop, we will do to you what the coalition forces have failed to do." By issuing its threat on a tape released to the satellite channel al-Arabiya, the group has copied the tactics of al-Zarqawi himself, who has repeatedly used that network and the al-Jazeera channel to publicize its terrorist attacks (AP, July 7, 2004).

[10]   Ian Fisher and Edward Wong, "Iraq's Rebellion Shows Signs of Internal Rifts," *The New York Times,* July 11, 2004, p. 1.

be directing some of the attacks.[11] Former regime loyalists believe that they have no option but to continue fighting and are also convinced that the United States and its coalition partners will tire long before they do.[12] These groups are trying to apply the experiences of other guerrilla and terrorist organizations to their operations. Their objective, as noted earlier, is to return the old order, or vestiges of it, to power.

Nationalists do not necessarily support the return of the Ba'ath party (some actively oppose it), but they resent what they consider to be the U.S. occupation of Iraq and are angered by the coalition's failure to restore law and order, as well as security, and by U.S. operational methods that are seen as deliberately humiliating the Iraqis and their honor. These individuals or groups are relying heavily on kinship and tribal ties to provide them with shelter and succor as they plan and execute their operations.

Iraqi Islamists have emerged after decades of suppression by the Ba'thist regime. At the beginning of Operation Iraqi Freedom, many were amateurs. Others have proven to have considerable military experience. All of them have learned quickly, and they have the experiences of other Islamist organizations to help them. Their objective is the establishment of an Islamic state. As discussed in Part 1, foreign Islamist fighters have infiltrated into Iraq to fight the United States, its allies, and the Iraqi government and have provided the bulk of the suicide bombers who have caused the largest number of casualties in the conflict.

Insurgent elements are employing an increased range of weapons in their attacks. Iraqi militants employed Katyusha rockets for probably the first time in an October 28, 2003, attack in Kirkuk. Other relatively advanced weapons reportedly used by, or newly available to, the insurgents include 160-millimeter mortars; shoulder-fired surface-to-air missiles; an improvised, though not crude, multiple rocket launcher (used to attack the Rashid Hotel in Baghdad); and improvised explosive devices (IEDs) and antitank mines (both used to damage heav-

---

[11] Cody, "Sunni Resistance to U.S. Hardens."

[12] Sergio Ramazzotti, "Iraqi Rebel Vows to Kill 'Lying' Americans, Distances Resistance from al-Qa'ida," *La Repubblica,* January 24, 2004, pp. 33–38.

ily armored coalition vehicles). Of course, the insurgents continue to attack with their original means—including rocket-propelled grenades (RPGs) and smaller IEDs—while adding new weapons, allowing them to engage more difficult coalition targets from longer ranges.

## Environmental Factors

The early dissolution of the CPA in June 2004 clearly threw off the insurgents and their plans, forcing them to redirect their target selection from primarily U.S. and coalition to Iraqi targets and creating a split in their ranks.[13] The split between native Iraqi insurgents and foreign fighters played into former interim Prime Minister Iyad Allawi's strategy of seeking to divide the insurgency by appealing to Iraqi fighters to reject the presence of foreigners. Allawi and other officials of the former interim government met with former Ba'ath Party members and Sunni tribal leaders to convince them that their interests and those of foreign fighters were not the same.[14]

The high turnout in the January 30, 2005, elections and the prospect of a sovereign Iraqi government dominated by Shi'ite and Kurdish parties appears to have caused some sectors within the Sunni insurgency to doubt their strategy. The February 28, 2005, issue of *Time* magazine revealed direct contacts in Baghdad between senior insurgents, including former members of the Saddam regime, and U.S. officials. The goal of the insurgents participating in the talks, according to the article, was to establish a political identity that would enable them to represent disenfranchised Sunnis and to negotiate an end to the U.S. military offensive in the Sunni triangle.[15]

The expectation of U.S. officials and some sectors of the Iraqi government is that Sunnis will eventually channel their discontent into political action rather than continue to take up arms. A move in this

---

[13]  Edward Wong, "Undeterred, Insurgents Keep Up Deadly Attacks Across Iraq," *The New York Times,* July 2, 2004.

[14]  Fisher and Wong, "Iraq's Rebellion Shows Signs of Internal Rifts."

[15]  "Talking with the Enemy," *Time,* February 28, 2005.

direction could further widen the rift between local insurgents and foreign fighters. But the reality is that the Sunni Arabs are a minority in the country and will probably be a small or nonexistent presence in the highest echelons of the new Iraqi government, even though they had governed the area that is now Iraq since the days of the Ottoman Empire. Shi'ite politicians have been remarkably conciliatory after their success in the January 2005 elections, despite continued violence against Shi'ites. Nevertheless, Shi'ite parties could block constitutional amendments desired by the Sunnis, thus alienating Sunnis even further (the possibility of such amendments was left open at the time of the approval of the Iraqi constitution as an incentive for Sunnis to participate). Moreover, there is strong sentiment within Shi'ite political sectors to resume the policy of "de-Ba'athification" that had been deemphasized by the Allawi government. That, of course, would render an agreement to end the insurgency harder to achieve.

Security is a major environmental factor shaping Iraqi political dynamics. The interim Iraqi government displayed a single-minded focus on issues of security. At his first cabinet meeting, interim Prime Minister Allawi kept the discussion centered on ways to combat the tenacious insurgency. His first public appearance after his appointment was at a military recruiting center. His first out-of-town trip was to an Iraqi army base. And his first official order was a new national security decree allowing him to exercise broad powers of martial law in rebel strongholds.[16] The offensives to retake Fallujah and to pacify the area known as the "triangle of death" southwest of Baghdad were major initiatives to reduce insurgent sanctuaries. The successor government of Ibrahim al-Ja'afari has continued this emphasis, and it can be expected that the government elected after the adoption of a permanent Iraqi constitution will support a continued U.S. military presence until an adequate level of security is restored.

---

[16] Danica Kirka, "Iraq Vows 'Sharp Sword' vs. Attackers," *The Boston Globe,* July 13, 2004.

## Future Trajectory of the Insurgency

At this writing, the Iraqi insurgency is in a transitional stage. It is evolving in response to wider political events in Iraq, which center, of course, on the rise of the Shi'ites to a dominant position in the state. Sunni-Shi'ite dynamics, therefore, will likely become more significant. Even as the original political goals of the insurgency become less attainable, changes that might occur in the future could include the rise of more competent insurgent units and the emergence of more skilled leaders. The effect could be more sophisticated and more skillfully conducted attacks against government and civilian targets; increasing attacks on armored vehicles; systematic efforts to restrict air and road mobility; and the destruction of oil infrastructure.

For the short to medium term, the insurgency may persist as long as coalition forces remain visible in Iraq. Iraqi forces have provided the American military with intelligence for air strikes on rebel safe havens.[17] How often the Iraqi government asks for American airpower to achieve tactical goals may affect the pace and scope of the insurgency. U.S. and British commanders have been careful to emphasize their partnership with the new Iraqi security forces, but they acknowledge that Iraqi units still lack the training, equipment, and motivation to take on the insurgency.[18] That can be expected to change, of course, as Iraq resumes full sovereignty and builds up its armed forces.

In the end, terror alone cannot guarantee success for the insurgents. Despite the uncertainty about the future of Iraq, there can be no doubt that the January 2005 election, the approval of the Iraqi constitution, and the January 2006 election for a permanent Iraqi government drove a nail in the coffin of Sunni political supremacy in Iraq. The insurgency can continue to wreak havoc, but doing so will become an exercise in political futility. In these circumstances, three general scenarios are possible:

---

[17]  Edward Wong, "New Law in Iraq Gives Premier Martial Powers to Fight Uprising," *The New York Times,* July 7, 2004, p. 1.

[18]  Richard Lloyd Parry, "Coalition Could Act Alone over Rebels," *The London Times,* July 1, 2004.

In the most benign case, significant elements of the Sunni community realize that a return to the status quo ante is no longer viable. They accept a minority role within a democratic Iraq. The Sunnis might find a common interest with the Kurdish parties in balancing Shi'ite predominance. A rough balance of power could develop, allowing for what might be called "democracy with Iraqi characteristics."[19] Over the medium to long term, the insurgency, increasingly isolated from its Sunni base, would eventually subside.

In the second scenario, the representatives of the Sunni community are too alienated or terrorized to enter into a political arrangement with the Shi'ites and the Kurds. The insurgency could continue, perhaps at high levels of violence, but would be unable to transcend its narrow social base or to prevent the nascent government from gradually consolidating its control over the country.

In the third and least favorable scenario, if the new government is unable to contain the insurgents and terrorists or to win broad support among the diverse ethnic and religious communities in Iraq, it will be no match for local warlords and will have to contend with the growth of terrorist infrastructures. A failure of central authority could lead to a formal or de facto partition of the country.[20]

The wild card in Iraq's political evolution is external interference. Elements of the former Saddam regime are believed to be directing the insurgency from Syria. Tens of thousands of Iranian pilgrims, smugglers, drug runners (hashish and heroin), and illegal immigrants have entered southern Iraq, which contains Shi'ite pilgrimage sites in Najaf and Karbala. The influx also includes Iranian intelligence operatives and agents attempting to promote Iranian influence. Iranian activity is not just limited to the southern part of Iraq. Two Iranians were caught in Baghdad in the summer of 2004 attempting to detonate a

---

[19] See Rabasa, Benard, Chalk, et al. (2004), p. 53. Different Iraqi scenarios are discussed in more detail on pp. 53–54.

[20] Robin Wright, "In Iraq, Daunting Tasks Await," *The Washington Post,* July 7, 2004, p. 14.

car bomb.[21] In June 2004, eight British Marines were seized by the Iranian military while navigating the river border with Iran. And at least twice in July 2004 machine guns were fired at night from the Iranian side of the border toward Iraqi workers prospecting for oil on their own side.[22]

These Iranian actions may be part of a long-term strategy by Tehran to create an Iranian sphere of influence in southern Iraq. Matters are complicated by the existence of Shi'ite political parties in Iraq with varying degrees of loyalty to Iran. The key question is whether they will identify themselves as Shi'ites first, united with their Iranian brethren, or as Iraqis, threatened by Iranian encroachment. In addition, key periods of religiosity—the annual Karbala pilgrimage and the hajj—can help bring radical Islamists into and out of Iraq and the Arabian peninsula. The final answer may not be clear for years.

---

[21] Richard Lloyd Parry and Richard Beeston, "Iranian Bombers Held in Baghdad," *The Times* (London), July 6, 2004.

[22] Richard Lloyd Parry, "Iraq Struggles to Stem New Incursion," *The Times* (London), July 19, 2004.

# Non-Islamist Groups

## Categories of Non-Islamist Groups and Insurgencies

Non-Islamist terrorist and insurgent groups fall into two basic categories:

- *Marxist insurgencies, most of them Maoist, that follow a strategy of "people's war" as defined in the writings of Mao Zedong and the Vietnamese revolutionaries.* There are, of course, variations, and each of these insurgencies has its own specific characteristics, but they generally follow the same model.
- *Separatist groups.* Although some claim to be Marxist or Islamic, the separatists' primary goal is to establish independent ethnically defined entities. This category includes such groups as the Liberation Tigers of Tamil Eelam (LTTE), also known as the Tamil Tigers; Basque Fatherland and Liberty (ETA); and the Moro Islamic Liberation Front (MILF), among others.

## The Revolutionary Armed Forces of Colombia and National Liberation Army

### Ideological Background

The Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN) are Marxist armed groups that have operated in Colombia since the 1960s. The FARC originated as the mil-

itary arm of the Moscow-line Colombian Communist Party and has an orthodox Marxist-Leninist ideology, although its military approach is derived from Maoist and Vietnamese "people's war" doctrine. The ELN, on the other hand, was inspired by the Cuban Revolution and was infused with a strong dose of Marxist-oriented Catholic "liberation theology." Both advocate armed revolutionary struggle to overthrow the Colombian government and replace it with a socialist system. A third actor in the Colombian conflict, the United Self-Defense Forces of Colombia (AUC), the so-called paramilitaries, opposes the Marxist groups. AUC is in the process of demobilizing pursuant to an agreement with the government of President Álvaro Uribe.[1]

### Strategic and Operational Objectives

The FARC has not deviated from its original strategy of "protracted people's war" that it reaffirmed at its landmark Seventh Conference in 1982. The strategy, based on Maoist, Vietnamese, and Farabundo Marti National Liberation Front (FMLN) precepts, involves gradually extending the organization's presence and control in the countryside and eventually isolating the government forces in the major cities. This strategy of territorial control is linked to the FARC's involvement in the drug trade that generates much of the revenue that funds the organization's operations (the other main sources of funds are extortion, kidnappings, and cattle rustling).[2]

FARC methods and tactics include bombings, assassinations, kidnappings (which have political as well as financial utility), and hijackings. The FARC also carries out guerrilla and main force military action against Colombian political, military, and economic targets, including the electrical infrastructure. It has increasingly conducted support operations outside Colombia. It has logistical facilities on the

---

[1]  For a survey of the ideology of the FARC and ELN, see Rabasa and Chalk (2001). Colombia's Fundacion Seguridad & Democracia has published a valuable series of reports on the demobilization of several AUC units in 2005 and on numerous other aspects of the political-military situation in Colombia, found at the foundation's Web site, http://www.seguridadydemocracia.org (as of March 17, 2006).

[2]  Some have argued that the FARC has in fact simply become a criminal cartel, but this perception underestimates the group's political agenda. See Rabasa and Chalk (2001).

Panamanian side of the inhospitable Darien border region, as well as camps in Venezuela and Ecuador. Still, FARC targets have been almost exclusively domestic. However, in March 1999, a FARC unit executed three U.S. Indian rights activists on Venezuelan territory after it kidnapped them in Colombia. Foreign citizens, as well as Colombians, often are targets of FARC kidnapping for ransom.[3]

Both the FARC and the ELN have entered into periodic negotiations with successive Colombian governments. President Andrés Pastrana's government (1998–2002) attempted to come to terms with the FARC. The negotiation process involved giving the FARC control of a 42,000-square-kilometer territory in central Colombia known as the *despeje*, a demilitarized area. The negotiations broke down in February 2002, and the government abrogated the agreement that gave the FARC free rein in the despeje. The Uribe government, which came to office in July 2002, has pursued a more aggressive counterinsurgency strategy that has sought to reduce the FARC's influence in its operational areas. Ongoing operations have succeeded in dismantling a significant part of the FARC infrastructure in its base areas in the departments of Meta, Caquetá, and Guaviare, in southeastern Colombia.[4] The FARC has attempted to counter with diversionary attacks in areas of limited government presence. Colombian analysts debate whether the Uribe government's campaign has successfully eroded the FARC's hold over its base areas or whether the group has implemented a tactical move to lower its profile in order to build up its strength and regain the strategic initiative at a later date.[5]

In recent years, the ELN has declined in importance and become more amenable to a negotiated political settlement. Although the group retains a strong presence in the oil-producing department of Arauca,

---

[3]  See Chapter Seven.

[4]  Rabasa conversation with senior Colombian army officer, Washington, D.C., August 2005. See also the data on combat operations in Fundacion Seguridad y Democracia (Bogotá), "Coyuntura de Seguridad, Enero–Marzo 2005," http://www.seguridadydemocracia.org/ docs/pdf/boletin/boletin8completo.pdf (as of March 17, 2006).

[5]  The latter is the opinion of Colombian insurgency expert Alfredo Rangel Suarez, "Un campanazo de alerta: las lecciones de Putumayo," *El Tiempo* (Colombia), August 12, 2005.

in eastern Colombia, it has suffered from inroads by the FARC and the paramilitaries into its former strongholds on the Atlantic coast and Magdalena valley.[6]

**Environmental Factors**

The FARC sees itself as part of the anticapitalist and antiglobalist movement. For example, the group is a member of the Sao Paulo Forum discussed in Chapter Six, and it has stated that it will now target U.S. forces and economic interests in Colombia. The more active role of the United States in providing military assistance and training to Colombian government forces, including the training of specialized units for the protection of a critical oil pipeline in northeastern Colombia, could produce a shift in FARC strategy toward directly targeting U.S. personnel and assets.

Numerous incidents point to the presence of Middle Eastern actors in Colombia and FARC-controlled territory. An Egyptian terrorist belonging to al-Gama'a al-Islamiyya, who was wanted in connection with the 1997 massacre of Western tourists at Luxor, entered Colombia illegally in 1998 to hold talks with the FARC. He was arrested and turned over to the United States via Paraguay.[7] In October 1998, FARC and Iranian officials signed an agreement allowing the construction of an Iranian meatpacking plant and slaughterhouse in the "demilitarized zone" in southern Colombia that was then controlled by the FARC.[8] In 2004, there were reports of FARC personnel forming suicide squads to

---

[6]   See Espejo and Garzon (2005).

[7]   "La Frontera de 'Los Caballitos,'" http://historicos.elespectador.com/periodismo_inv/2001/noviembre/nota1.htm (as of March 17, 2006).

[8]   "U.S. Pressured Bogota to Stop Iranian-Funded Meat Plant," ABC News, January 6, 2000.

attack government as well as American facilities and personnel. These reports could be false or misguided, however, because the FARC has yet to conduct a definitive suicide operation.[9]

## Maoist Insurgencies

### Ideological Foundation

Maoist groups throughout the world—prominently in Peru, Nepal, India, Bhutan, and the Philippines—are committed to seizing power using the concept of "people's war" and instituting Maoist forms associated with The Great Proletarian Cultural Revolution in China.[10]

In India, a growing number of states—most prominently Bihar and Andrah Pradesh—have experienced a steadily escalating level of Maoist insurgent violence. So concerned has New Delhi become that in September 2005, it convened a strategy coordination session of the chief ministers from Maoist-affected states. Indian Maoism, previously the senior partner in the Coordination Committee of Maoist Parties and Organizations of South Asia, now finds itself overshadowed by its Nepalese counterpart. Indeed, using a combination of terror, guerrilla warfare, and main force action, the Communist Party of Nepal (Maoist), or CPN(M), has come to dominate much of the countryside in a struggle that now has cost more than 12,000 lives. Viewed by the Revolutionary Internationalist Movement (RIM) umbrella organization as the premier Maoist force active in the world today, the CPN(M) has increasingly made common cause with like-minded Indian groups. Joint pronouncements cite Indian and American imperialism as the leading enemies of mankind. In Bhutan, the activities

---

[9] "Militiaman Reportedly Training Guerrillas to Carry Out Suicide Attacks Captured," *El Espectador,* March 18, 2004; Frank Monteverde, "Interview with FARC spokesman Raul Reyes," New Colombia News Agency, November 29, 2003. In January 2003, FARC members appeared to conduct a suicide operation as they self-detonated a vehicle that pulled alongside a military convoy. Yet given the lack of any further suicide-like attacks, the death of the perpetrators might have been unintended.

[10] The definition is from Thomas A. Marks's review of this report, August 2005. For a authoritative study of Maoist insurgencies, see Marks (1996).

of Ngolops (armed Nepalese dissidents) pose a serious threat to the country's security. Ngolops, referred to by Bhutanese authorities as "antinationals," are people of Nepalese origin who claim that they are Bhutanese citizens forcibly evicted by the Royal government of Bhutan into refugee camps.[11] In the state of Assam, India, Ngolops formed the United Liberation Front of Asom and the National Democratic Front of Bodoland as their political arms. In the Philippines, the Maoist Communist Party of the Philippines (CPP) remains active, with its New People's Army thought to field some 13,000 combatants. Reports of the CPP collaborating with Islamic groups such as the MILF have yet to be confirmed.[12] Peru's Shining Path (Sendero Luminoso, or SL) once held the leading role in RIM now ascribed to the CPN(M). Characterized by the extreme brutality of its attacks, Shining Path steadily grew after its founding in the early 1960s. The group suffered a near-fatal blow with the capture of its leader Abigail Guzmán in 1992, but the kidnapping of 71 oil workers in June 2003 and the ambush of a military patrol in July 2003 demonstrate that remnants remain active.[13]

**Strategic and Operational Objectives**

Maoist groups emphasize violence in rural areas to mobilize a "counterstate" capable of challenging urban-based government power. Although each group has its peculiarities, all generally follow the strategy and tactics developed in the writings of Chinese and Vietnamese revolutionaries. Maoist strategy involves first gaining control of the countryside through a variety of tactics, of which terror against "class enemies" is an essential component, and eventually isolating and defeating the government forces in the urban centers. The operationalization of this approach takes a predictable form. As the armed political movement projects itself into local areas, resistance is neutralized by terror. Appeals for help from victims or their relatives are answered by the armed local representatives of the state, the police. The police are ambushed, forced

---

[11] "Bhutan Assessment, 2003," http://www.satp.org/satporgtp/countries/bhutan/index.html (as of March 17, 2006).

[12] Cronin (2004).

[13] McDermott (2004a).

to seek refuge in their stations, and then systematically eliminated. The result in affected areas is a population dominated by the insurgents. Seeking to reverse the tide, the government commits the main force units of its military. As these forces disburse to reclaim lost population, they are themselves attacked by insurgent main force units formed from "regularized" guerrilla formations. "Mobile warfare," in Maoist terminology, ensues, with force-on-force action designed to produce equilibrium. This is to be followed by "war of position," as government forces are routed and captured "positions" held. In the end, the counter-state, the alternative society formed under the Maoists, is to become the state.

### Environmental Factors

Maoist groups connect not only through organized meetings but also by reading accounts of one another's exploits and duplicating models for organizing, training, and equipping. Although "anti-imperialist," these groups by and large direct their attacks against domestic enemies and have not attacked the United States directly.

Although not a direct threat to the United States, Maoists use terrorism as an integral component of their strategy of people's war and are inherently hostile to the international order. They may thus find common interests with al-Qaeda and its associates. They have, as opportunity has presented itself, participated in narcotics trafficking. Nepal serves as a hub for hashish trafficking in Asia.[14] SL deals in drugs, and coca farmers are being organized into support bases for SL.[15] The Philippines' New People's Army derives much of its revenue from marijuana trafficked to urban areas and the production of hashish oil exported to Europe through crime syndicates in Manila.[16] Clearly, Maoist groups thrive in countries where there is corruption, lawlessness, transnational crime, and the discontent produced by broken political systems. Key factors that could move the Maoists to become a larger

---

[14]  McDermott (2004a).

[15]  McDermott (2004a).

[16]  Rabasa, discussion with Intelligence Service, Armed Forces of the Philippines, Manila, August 2005.

threat include U.S. support for governments under attack by Maoists, spillover effects from insurgency, and recruitment and indoctrination of native peoples against urban elites and governments.[17]

## Liberation Tigers of Tamil Eelam

### Background and Ideological Foundation

The Liberation Tigers of Tamil Eelam (LTTE) is a terrorist insurgency that has waged a bitter war for the creation of a separate Tamil Eelam state in Sri Lanka's northern and eastern provinces for the past four and one-half decades. The group emerged in the wake of renewed intercommunal antipathy and violence between the country's majority Sinhalese and minority Tamil populations during the 1970s.[18] The LTTE developed as an extremist outgrowth of the Tamil United Liberation Front, a social-political movement that was prepared to advance Tamil demands through the accepted channels of the Sri Lankan state. Rejecting this stance, a hard core of militants formed a variety of underground guerrilla organizations dedicated to armed struggle against the Colombo government during the mid-1970s. Initially, 42 militant groups were created, although five quickly achieved dominance. These were: the Tamil Eelam Liberation Organisation; the People's Liberation Organisation of Tamil Eelam; the Eelam People's Revolutionary Front; the Eelam Revolutionary Organisation of Students; and the Tamil New Tigers (TNT).[19] Of these, it was the TNT that was to assume the early mantle of the Tamil struggle.

Led by Chetti Thanabalasingham, the TNT embarked on a particularly intensive campaign of assassination and violence in 1974 that

---

[17]  Davis and Bedi (2004).

[18]  For further details on the roots and genesis of the ethnic conflict in Sri Lanka, see Gunaratna (1993a, 1993b, 1998); Little (1994); Rupesinghe, ed. (1998); Rotberg, ed. (1999); Bullion (1995); Hellmann-Rajanayagam (1994); Venkatachalam (1987); Manogaran (1987); Misra (1995); De Silva (1986, 1995); and Suryanarayan (1991).

[19]  Gunaratna (1993b), p. 27.

was variously designed to silence pro-government Tamils,[20] eliminate informants, and disrupt police investigations into terrorist incidents and related criminal activities perpetrated under the group's auspices. Velupillai Prabhakaran, the TNT's second in command, assumed leadership of the organization in 1976 when Thanabalasingham was arrested. He renamed the group the Liberation Tigers of Tamil Eelam and set about to reconfigure it in a manner consonant with his own ambitious intentions and ideological designs. Affirming the legitimacy of the Tamil struggle for independence on the basis of the Thimpu Principles[21] and specifying that it was only through the LTTE that these objectives could be achieved, Prabhakaran fashioned a uniquely elite, ruthlessly efficient, and highly professional fighting force[22] that emphasized selective recruitment (a policy that continues to this day) and an institutional ethos of unswerving dedication to the Eelam cause.

Over the course of the intervening 28 years, the LTTE has gained a reputation as one of the most sophisticated and deadly terrorist insurgencies in the world. At the time of writing, the Tigers had successfully driven the Sri Lankan government to the negotiating table and effec-

---

[20] Significantly, attention was drawn precisely to this LTTE policy in a 1998 analysis of the group by the U.S. State Department. Included within a synopsis of the Tigers' "political objectives" was "eliminate moderate Tamils and other Tamil militant groups that compete with the LTTE for influence within the Sri Lankan Tamil community." See U.S. Department of State (1998).

[21] The Thimpu Principles affirm the following five nonnegotiable demands: (1) recognition of Tamils as a nation; (2) recognition of the existence of an identified homeland for the Tamil people; (3) recognition of the right of the Tamil people to self-determination; (4) recognition of the right of the Tamil people to a separate citizenship; and (5) recognition of the fundamental right of all Tamils to look on the north and eastern provinces of Sri Lanka as their country. See Kumar Ponnambala, "The Only Possible Solution to the Tamil National Problem," TamilCanadian.com (as of March 21, 2006).

[22] "We fight while others merely talk" was how the LTTE both defined and distinguished themselves from other Tamil militant organizations. Cited in Wijesekera (1993), p. 310.

tively forced it to accept terms for a ceasefire that have since allowed the group to set up a mini Eelam state covering roughly 15 percent of the country's entire geographic territory.[23]

Current estimates of the LTTE's overall on-ground strength in Sri Lanka vary between a low of 12,000 to a high in excess of 20,000.[24] The true figure likely lies somewhere between these two approximations, although a recent split in Tiger ranks resulting from the defection of the group's special commander for the Eastern Batticaloa-Amparai District, Vinayagamoorthi Muralitharan (alias Colonel Karuna), has complicated the picture somewhat, reducing the number of cadres available to Prabhakaran by an estimated 5,500.[25] Although Karuna's departure represents a potentially serious blow to the LTTE, it probably will not significantly dent the group's overall human resource and operational capabilities, for three reasons. First, most Tamil forces are concentrated in the Prabhakaran-loyal districts of northern Sri Lanka. Second, virtually all the specialist units at the center of past militant

---

[23] The ceasefire was brokered by Norway on February 22, 2002, and has since led to several rounds of talks between the LTTE and Colombo over the last two years. At the time of writing, the Tigers had put forth their own blueprint for home rule, which calls for the establishment of a so-called Interim Self Governing Authority covering eight Tamil-majority districts in the northeast and a subsequent plebiscite (five years later) on self-determination. Prabhakaran has given explicit warning that if this proposal is not taken seriously, the LTTE will once again take up arms against the central government. Many in Colombo believe that the Tiger leader has no interest in peace and is merely using the current period of relative stability to rearm, recruit additional cadres, and consolidate control over the north. Chalk interviews with Sri Lankan intelligence and military officials, Colombo, May 2004.

[24] RAND fieldwork and interviews, Sri Lankan Armed Forces (SLAF) and Internal Intelligence Bureau (IIB), Colombo, May 2004. According to one source, the LTTE's strength breaks down as follows: military strength, 11,000–15,000 (depending on the numbers of Karuna supporters that have yet to be integrated back into the group); intelligence cadres, 2,500; Black Tigers, 350; total strength including political and logistical support cadres, 21,000.

[25] RAND fieldwork and interviews, SLAF and Western diplomatic official, Colombo, May 2004. See also B. Rahman, "Split in LTTE: The Clash of the Tamil Warlords," South Asia Policy Institute Topical Paper No. 942, March 2004; "Rebel Commander Willing to Meet LTTE Top Leadership," Associated Press, March 11, 2004; IISS, "Sri Lanka's Peace Process in Jeopardy"; Chris Kamalendran, "Inside the Karuna Fortress," The Sunday Times (Sri Lanka), March 14, 2004; Bandula Jayasekera, "Prabhakaran Smuggled in 11 Arms Shiploads During Truce—Karuna," The Island (Sri Lanka), April 9, 2004.

activities—including the Black Tigers, the Leopards Division, and the intelligence wing—remain fiercely loyal to the LTTE and, just as important, view Prabhakaran's continued leadership as absolutely essential to the success of the Eelam struggle. Third, the immediate threat from Karuna was silenced after his forces were decisively defeated in a sustained Tiger offensive at the Verugal River (just south of Trincomalee in eastern Sri Lanka) on April 9, 2004; of those who survived the onslaught, the bulk have since returned to their local villages and show no sign of taking up arms again.[26]

**Operations and Tactics**

As noted, the LTTE remains one of the most adept terrorist insurgencies in the world. The group has effectively fought the Sri Lankan armed forces (SLAF) to a standstill and currently exercises effective control over significant stretches of northeast Sri Lanka. The Tigers have also repeatedly demonstrated an ability to operate along the entire guerrilla conflict spectrum from selective assassinations and targeted terrorist strikes to mobile hit-and-run attacks as well as full-scale, multiple battalion-sized assaults.[27] Much of this success is due to a highly dynamic learning process that has taken advantage of the inherent weaknesses in Colombo's military and security establishment.

In many ways, the SLAF has yet to emerge as a professional force that truly understands the nature and type of war it has been fighting. The majority of commanders have never seen any action, with many promoted purely on the basis of seniority or as a result of political connections, personal loyalties, and friendships. Compounding the situation is the wholly inadequate training and support that is given to

---

[26] Interviews, SLAF, Colombo, May 2004. Although Karuna's defection is unlikely to prove a major challenge to Prabhakaran, the incident does demonstrate the potential costs to a group of centralizing under the authority of a single leader that demands and expects complete subordination. Karuna was an extremely experienced guerrilla fighter and highly revered figure among the Tamils of eastern Sri Lanka. His loss will undoubtedly complicate the LTTE's challenge of establishing and consolidating control over this part of Sri Lanka (which is, itself, an integral component of the Eelam state that the Tigers ultimately seek to create).

[27] RAND fieldwork and interview with SLAF, Colombo, May 2004.

regular soldiers. Some recruits have been dispatched to the front line after only four weeks of basic combat training, and troops regularly cite shortages in such basic equipment as modern assault rifles, ammunition, and field radio sets.[28]

On a strategic level, the SLAF tends to rely on outdated doctrines that place a premium on taking and holding static lines of defense through maximum force as opposed to more nuanced (and relevant) counterinsurgency operations that combine civil campaigns to win hearts and minds with directed disruptive missions behind enemy lines. Indeed the one positive initiative to create a permanent special forces body able to undertake unconventional missions of this type— the Long Range Patrol Group (LRPG)[29]—was reversed in 2003 after Prime Minister Ranil Wickremesinghe dismantled the group following unsubstantiated claims that the squad was involved in a plot against his ruling coalition.[30]

The weaknesses and associated failings of the SLAF have provided the LTTE with a useful benchmark of what *not* to do in terms of combat readiness and effectiveness. Indeed the makeup of the group's military structure is exactly contrary to that of the Sri Lankan army. Tiger commanders are promoted purely on merit and all retain extensive battlefield experience. Regular cadres undergo intensive training that is specifically geared to the Sri Lankan context (see below). And LTTE tactics emphasize small teams, deep penetration, and pseudo-style operations, generally taking on a more conventional footing (of which the LTTE is perfectly capable of mounting) only when theater conditions are most conducive to this style of fighting.[31]

---

[28]  RAND fieldwork and interviews, senior Western diplomat and SLAF, Colombo, May 2004.

[29]  The LRPG, a U.S.-trained unit, was established in 1996.

[30]  Iqbal Athas, "Safe House Raid: Heads Roll as Army Chief Cracks the Whip," *The Sunday Times* (Sri Lanka), January 25, 2004. Some observers have gone even further, claiming that the decision to dismantle the LRPG was deliberately orchestrated to keep the LTTE at the negotiating table and ensure that Prabhakaran continued to view the Norwegian-led peace process as beneficial. Comments made during the World Alliance for Peace in Sri Lanka (WAPS) conference on "Road Maps to Peace in Sri Lanka," Oslo, August 20, 2004.

[31]  RAND fieldwork, Colombo, May 2004.

Tactically, the LTTE has conspicuously exploited the outmoded doctrines of the SLAF to repeatedly confound Sri Lankan military offensives. Indeed, one of the main reasons the army has failed to secure much of the north and east is due to its overwhelming reliance on set-piece, trench warfare. The Tigers quickly recognized that the best way to defeat this type of warfighting stance was first to monitor the combat readiness and deployment size of known defense lines using long-range reconnaissance and sabotage teams and then, based on this intelligence, to hit them with overwhelming artillery fire and battalion-sized attack forces. Between 1995 and 2002, roughly 60 percent of all Sri Lankan field casualties resulted from this adaptive combination of low- and high-level assault modalities.[32] On an "unconventional" level, the LTTE has developed highly effective (and feared) suicide wings to carry out selective assassinations, urban bombings, and sea-borne attacks. Located in both the Black Tigers and Sea Tigers, these cadres have been responsible for well over 200 strikes since 1987, the vast bulk of which have been successful in achieving their primary aim. Table 5.1 details some of the most well known of these instances. Indeed until recently, the LTTE was unique among militant substate entities around the globe in specifically institutionalizing martyrdom as a signature mode of attack and establishing this form of violence as not only "normal" and positive but also the sine qua non of operational effectiveness.[33]

---

[32] RAND fieldwork and interviews, SLAF and senior Western diplomats, Colombo, May 2004. The LTTE is currently thought to be in the possession of a battery of new-age missiles with an accurate firing range of 40 miles.

[33] By comparison, at the height of the Lebanese Shi'ite campaign against American diplomatic and military targets in Beirut during the 1980s, suicide bombings accounted for fewer than 20 percent of all Hezbollah/Islamic Jihad terrorist operations. See Merari and Braunstein (1984), p. 10.

**Table 5.1**
**Prominent LTTE Suicide Attacks, 1987–2002**

| Date | Target | Purpose | Remarks |
|------|--------|---------|---------|
| 1987 | Tamil University taken over by SLAF | Destroy strategic military location | Attack modeled on the 1983 Hezbollah truck bombing in Beirut; 75 people died in the assault.[a] |
| 1991 | Rajiv Ghandi (Indian prime minister) | Political assassination | Ghandi was assassinated for his decision to curtail Indian support for the LTTE and lead a peacekeeping force to stabilize the situation in Jaffna. This is the only act of concerted terrorism that the LTTE has carried out beyond the Sri Lankan theater. Eleven others were killed in the attack.[b] |
| 1991 | Joint Operations Center (JOC), Ministry of Defense | Destroy strategic military location | The blast killed over 20, wounded 50, and destroyed vehicles as far away as 300 yards from the JOC premises.[c] |
| 1993 | Ranasinghe Premadasa (Sri Lankan president) | Political assassination | Premadasa was killed by a deep penetration mole who had been on the presidential staff for several years. He was targeted for his endorsement of the 1987 Indo–Sri Lankan Peace Accord. The attack killed 17 and wounded over 60.[d] |
| 1994 | Gamini Dissanayake (opposition leader running in the 1994 presidential elections) | Political assassination | Dissanayake was targeted for his key role in arranging the details of the 1987 Indo–Sri Lankan Peace Accord; an additional 50 people were killed in the attack (which bore strong resemblances to the Ghandi assassination).[e] |
| 1995 | Naval gunboats (SLNS *Suraya* and SLNS *Ranasuru*) | Destroy strategic naval asset | Both ships were completely destroyed in the twin assaults, which left 11 sailors dead (the two ships were berthed with skeleton crews at the time of the strikes). It has been speculated that al-Qaeda's attack on the USS *Cole* was modeled on this operation.[f] |

**Table 5.1—continued**

| Date | Target | Purpose | Remarks |
|------|--------|---------|---------|
| 1995 | Ceylon Petroleum Corporation oil facility | Destroy strategic economic target | Four oil storage tanks were destroyed, triggering one of the largest fires ever seen in Colombo. Twenty-one persons were killed in the operation.[g] |
| 1996 | Central Bank | Destroy strategic economic target | This is the most destructive act of terrorism to have ever taken place in Sri Lanka, killing 91 and injuring in excess of 1,400.[h] |
| 1997 | Colombo World Trade Center | Destroy strategic economic target | The WTC was hit just one week after it opened. The attack, which killed 15 and injured over 100, was thought to be in retaliation for the U.S. decision to designate the LTTE as a terrorist organization (the bombing is one of the few conducted by the Tigers that has made no attempt to limit foreign casualties).[i] |
| 1999 | Chandrika Kumaratunga (Sri Lankan president) | Political assassination | Kumaratunga was targeted for her hard-line stance against the LTTE and (then) refusal to negotiate with the group. Although the president survived the attack, which was carried out by a male Black Tiger dressed as a woman, she suffered damage to her face and lost her right eye. Fourteen other people were killed, including a top officer in charge of Kumaratunga's security.[j] |
| 2001 | Bandaranaike International Airport | Destroy strategic economic target and hub of critical transportation infrastructure | Twenty-six civil and military aircraft were destroyed in the attack; it is estimated that losses to Sri Lankan Airways exceeded $350 million.[k] |

[a] Amal Jayasinghe, "Tiger Bombers Primed for a Repeat," *The Australian*, February 8, 1996; Amy Waldman, "Suicide Bombing Masters: Sri Lankan Rebels," *The New York Times*, January 14, 2003.

[b] "Tigers Suspect in Gandhi Assassination," *The Daily News* (Sri Lanka), May 25, 1991; "Tiger Terror," *The Times* (London*f*), August 10, 1995.

[c] Daryll de Silva, "Car Bomb Wrecks JOC Headquarters," *The Daily News,* June 22, 1991.

[d] Amal Jayasinghe and Anosh Ahamath, "President Assassinated," *The Sunday Observer* (Sri Lanka), May 2, 1993; "Tiger Terror."

**Table 5.1—continued**

[e] "Gamini Killed in Bomb Blast," *The Daily News,* October 24, 1994; "Tiger Terror," *The Times* (London), August 10, 1995.

[f] Author interview, Western diplomatic official, Colombo, May 2004; Panduka Senanaysake and Nicholas Candappa, "LTTE Blasts Two Navy Gunboats," *The Daily News,* April 20, 1995; Panduka Senanayake, "LTTE Claims Responsibility over Blasts in Trinco," *The Observer* (Sri Lanka), April 19, 1995.

[g] Sarath Malalasekera, "Tiger Hitmen Go for Oil Facility," *The Daily News,* October 21, 1995.

[h] Vijitha Yapa, "Tamil Lorry Bomb Rips Apart Central Bank in Colombo," *The Independent* (UK), February 1, 1996; Amal Jayasinghe, "Tiger Bombers Primed for a Repeat," *The Australian,* February 8, 1996.

[i] Niresh Eliatamby, "Tigers Take Carnage to Heart of Colombo," *The Courier-Mail* (Australia), October 16, 1997; John Stackhouse, "Terrorists Rip Sri Lankan Peace," *The Globe and Mail* (Canada), October 16, 1997; John Burns, "Tamil Bombing Tied to U.S. Terror Listing," *The International Herald Tribune,* October 17, 1997.

[j] "Wounded Sri Lankan President Calls on Tamils to Join Fight Against Terrorism," CNN.com, December 20, 1999, http://www.time.com/time/asia/magazine/99/1227/srilanka.iv.wickramasinghe.html; Dilshika Jayamaha, "Bombing Wounds Sri Lankan President," *The Washington Post,* December 19, 1999.

[k] Rohan Gunaratna, "Intelligence Failures Exposed by Tamil Tiger Airport Attack," *Jane's Intelligence Review,* September 2001, p. 16; "The Tigers Pounce," *The Economist,* July 28, 2001; "Tamil Rebels Raid Sri Lankan Airport," *The Washington Post,* July 25, 2001.

Boosting its tactical and operational base is part of the LTTE's active and innovative R&D agenda. The group has demonstrated remarkable skill in this regard, particularly in the realms of suicide devices, standoff resources, and marine attack munitions. The Tigers have developed numerous technologies to avail martyr operations, ranging from bomb vests complete with primary, secondary, and even tertiary detonation switches—including one version that explodes when the wearer raises his or her arms in surrender—to specially equipped suicide boats, bicycles, and motorbikes. These delivery media are repeatedly tested and reconfigured in secure Tiger camps and are only actively deployed after they have demonstrated a high degree of effectiveness (generally upward of 90 percent).[34]

LTTE has been even more adroit with surface and underwater combat innovation. The group is known to have fabricated at least two types of submersible, timer-activated explosive: a cylindrical bomb

---

[34] RAND fieldwork and interviews, Western diplomatic official and Internal Intelligence Directorate (IID), Colombo, May 2004.

(roughly 60–90 centimeters in height) that can be suspended from a ship's propeller or rudder shaft and an improvised RDX slab that can be attached to a vessel's hull with a black glycerol mixture. The Sea Tigers have also manufactured a variety of attack, logistics, personnel, and multipurpose craft as well as stealth suicide boats especially equipped with angled metallic superstructures to reduce their radar cross-section.[35] However, perhaps the most creative R&D effort has been the attempt to construct two-man mini-submarines for releasing divers inside Sri Lankan harbors. Revelations that the LTTE were making concerted moves in this direction first broke in 2000 when a partially completed prototype was discovered at a Tamil-owned shipyard in Phuket. According to informed sources, the five-meter vessel, while rudimentary, was capable of remaining submersed for up to six hours (at speeds up to five knots) and could very well have served as a prototype for more advanced versions to attack operational naval surface ships.[36]

### Environmental Factors

Although the LTTE does not presently threaten the United States, it does provide a benchmark for the sophistication that a substate insurgency can achieve given the right combination of circumstances. Moreover, there is always the danger that the group could contract out its expertise to other groups that are of more immediate relevance to the ongoing global war on terror, including jihadists in South and Southeast Asia, or could itself come to view Washington as an obstacle to the attainment of Tamil objectives in Sri Lanka. According to one source in Colombo's Internal Intelligence Directorate (IID), the LTTE has already made contact with al-Qaeda through Pathmanathan Kumaran, the Tigers' weapons procurement chief, who allegedly traveled to Kabul between 2000 and 2001 to try to arrange the procure-

---

[35] Campbell and Gunaratna (2003).

[36] Interview, IIB, Colombo, May 2004. See also "Lanka Suspects Submarine in Thailand to be LTTE's," Associated Press, July 16, 2000; Davis (2000), p. 28. It is not currently known whether the LTTE has been able to successfully introduce submarines into its overall battle armory.

ment of surface-to-air missiles (munitions that the group had already demonstrated a proven capacity to employ, using them to bring down two Sri Lankan transport planes and a helicopter gunship during the 1990s). It is not known whether these munitions were ever supplied to the Tigers or, indeed, if this initial contact was followed with subsequent meetings. The same IID source also explicitly referred to the residual threat of attacks being directed against U.S. warships visiting the port of Trincomalee should Prabhakaran begin to view Washington's stance in the current peace process as unalterably opposed to the notion of an independent or at least fully autonomous Tamil homeland.[37] For these reasons, the United States needs to be aware of how the LTTE has evolved and how learning has affected its organizational capabilities and the corresponding threat levels that those capabilities represent.

## Basque Fatherland and Liberty (ETA)

### Ideological Foundation

Founded in 1959, ETA is a Marxist group that uses terrorism in hopes of forming an independent Basque state in parts of northern Spain and southwest France.[38] ETA stands for Euskadi ta Askatasuna, which means "Basque Fatherland and Liberty." In the past, ETA has received assistance from the Cuban and Libyan regimes, and some of its members have found political asylum in Mexico and Venezuela. It has had links with other militant left-wing movements in Europe and elsewhere, such as the Provisional Irish Republican Army (PIRA).[39] Although ETA's aim is to establish an independent Basque state based on Marxist principles, there have been ideological splits in the organization as to whether there should be class war or national war, as well

---

[37]  RAND fieldwork and interview, IID, Colombo, May 2004.

[38]  Some analysts today downplay the salience of the ideology in motivating the group. Thomas A. Marks's review of this manuscript, July 2005.

[39]  See, for instance, Mariano Rajoy, "Está absolutamente probado que ETA se entrenó en algunos países con terroristas islámicos," *El Mundo,* Madrid, October 21, 2001, p. 26.

as splits within the ETA over the level of violence the group should use to achieve its goals.[40]

**Strategic and Operational Objectives**

ETA's goal is the establishment of an independent Basque state through the use of violence. Like the PIRA, which is linked to a political movement (Sinn Fein), ETA has a political arm, Herri Batasuna, which is in fact a coalition of various nationalist factions. ETA's goal is complicated by the fact that only about half of the population of the Basque country is of Basque origin. In the 2001 regional elections, Batasuna received only about 10 percent of the vote. Batasuna was declared illegal in 2003 and is listed as a terrorist organization by the United States and the European Union.

ETA conducts assassinations of national and regional officials and attacks on government buildings in Spain. In 1973, ETA operatives killed Generalissimo Francisco Franco's apparent successor, Admiral Luis Carrero Blanco, by planting an underground bomb that exploded as he was being driven to mass at a Madrid church. In 1995, an ETA car bomb almost killed José María Aznar, then leader of the conservative Popular Party, who later became Spain's prime minister. The same year, investigators disrupted a plot to assassinate King Juan Carlos. And in 1999, Spanish investigators foiled a truck bombing of Madrid's Picasso Tower, a skyscraper designed by the architect of the World Trade Center.[41]

ETA finances its operations through kidnapping, extortion, robbery, arms trafficking, and "taxes," as well as with money leaking from its political counterpart Batasuna.[42] ETA operatives have reportedly trained in Algeria, Libya, Lebanon, and Nicaragua. Mexico, Cuba, and several South American states harbor ETA operatives.[43]

---

[40] Drake (1998), p. 56; Perez-Agote (1999).

[41] Steven Adolf, "Taliban van Baskenland Onder Druk Door Antiterreur," NRC Handelsblad, October 1, 2001, p. 5.

[42] Cronin (2004).

[43] Miro (2003).

**Environmental Factors**

A dispute within the ETA over the future course of the movement resulted in an extremely small faction willing to work with Osama bin Laden's terrorist network. Journalistic sources claim that up to 80 members of ETA were in Iraq prior to Operation Iraqi Freedom, and two of them were arrested on February 29, 2004, transporting explosives to Madrid.[44] Moreover, al-Qaeda has had a lengthy presence in Spain. In November 2001, Spanish authorities arrested eight men suspected of being al-Qaeda operatives involved in the September 11 attacks, and one of these men reportedly had past links with Batasuna.[45] Although there has been no evidence that ETA has considered targeting Americans, connections with the al-Zarqawi terror network and European al-Qaeda networks could induce members of this organization to join in attacks on U.S. interests in Europe.

## Some Conclusions Regarding Groups Outside the al-Qaeda Universe

We began this volume by discussing three categories of alternative groups and alternative threats in the ongoing struggle against terrorism: (1) Islamist groups that articulate a politico-religious agenda for their own country and are not directly linked to the al-Qaeda network; (2) Islamist terrorist groups whose agendas are primarily ethno-nationalist and that present a reasonable challenge to U.S. allies; and (3) highly capable, non-Islamist, terrorist groups. Table 5.2 separates the groups we examined into these three categories. Notably, of the Islamist groups outlined, only two—al Wa'ad and the Iraqi insurgents—developed after 1998, when Osama bin Laden issued his fatwa calling for a global jihad against "Jews and Crusaders."

---

[44] Magdi Allam, "Patto di sangue Eta-integralisti—In Iraq anche le brigate basche," *Corriere della Sera,* March 15, 2003; Richard Giragosian, "The al-Qaeda Franchise," *Asia Times,* March 17, 2004.

[45] Sumario (Proc. Ordinario) 0000035/2001 E, Juzgado Central de Instuccion No. 005, Madrid, Spain, September 17, 2003, pp. 366 and 577.

**Table 5.2**
**Categories of Groups Outside the Global Jihadist Movement**

| Group | Islamist with Politico-Religious Agenda | Islamist with Ethno-Nationalist Agenda | Highly Capable, Non-Islamist |
|---|---|---|---|
| Hezbollah | X | | |
| Hamas | X | X | |
| GIA | X | | |
| Al-Gama'a | X | | |
| Al-Wa'ad | X | | |
| PAGAD | X | | |
| EIJM | X | | |
| Iraqi insurgents | X | X | X |
| LTTE | | | X |
| FARC | | | X |
| ETA | | | X |
| Maoist insurgencies | | | X |

The other groups were already well established and active and had articulated their agenda prior to al-Qaeda's emergence in the international arena. The majority of the Islamist groups we have discussed interpret their jihad much more narrowly than groups affiliated or associated with al-Qaeda. Hezbollah's interests center on Lebanon and its immediate vicinity; Hamas is focused on the Palestinian problem; and the GIA seeks to overthrow the Algerian government. Even for the groups to which affiliation or association with al-Qaeda might be operationally attractive, external and internal factors have held such tendencies in check. Hezbollah appears to be influenced by its ties to Syria and Iran, as well as by its involvement in Lebanese politics. Al-Gama'a al-Islamiyya appears to be concerned about the views of its support communities in Egypt.

Nevertheless, these groups should not be dismissed as unthreatening just because they have not joined the global jihadist movement.

These organizations—which we refer to as *regional threats*—endanger U.S. regional security interests and U.S. friends and allies, and some, such as Hezbollah, could emerge as global threats.

**Potential Dangerous Shifts Ahead**

Some analysts have argued that after the September 11 attacks and the onset of the global war on terror, Islamist terrorist groups have begun to move toward al-Qaeda. The logic behind this argument is that the success of these attacks caused a shift in the worldview of many like-minded groups, turning them away from their local agendas to a more global, anti-America outlook. This view has some merit. It is clear from our previous discussion that many of the nonaffiliated Islamist groups have at least considered some involvement with al-Qaeda or expansion toward a more pan-Islamic agenda. Importantly, the interaction among these groups so far appears to have been motivated by both ideology and pragmatism.

In this context, even some of the non-Islamist groups could decide to cooperate with al-Qaeda or other Islamist groups for their own reasons. For example, many of the militant groups now maintain representatives in the criminal and black market world. This interconnectivity allows terrorists to acquire weapons as necessary, perhaps even to expand their capabilities. We discuss the nexus between transnational criminal organizations and militant groups in Chapter Seven. At this point, it is important to stress that some terrorist groups could shift their worldview, thus adopting an agenda similar to that of al-Qaeda. Alternatively, others could simply capitalize on a perceived trend toward anti-U.S. attacks, shifting the focus of their own attacks toward U.S. targets—either to increase their potential through alliances with more capable al-Qaeda affiliated groups or simply to gain greater recognition.

A recent RAND study analyzed factors that caused terrorist groups to adjust their intentions (e.g., their ideology or worldview) and capabilities. The study isolated three key factors that

cause terrorist groups to shift from their chosen paths: (1) counter-attacks by security forces; (2) external support from states or other militant organizations; and (3) gain or loss of popular support.[46]

Significantly, the global war on terrorism has affected a number of the terrorist organizations discussed in this study in all three areas. We mentioned earlier that a potentially dangerous shift can be seen in the emerging Hamas-Hezbollah nexus, as illustrated by the March 14, 2004, attack in the Israeli port of Ashdod.[47] Given the qualitative leap in Hamas's efforts, it might not be a surprise that Hezbollah financed and, indeed, allegedly planned this attack. Yet this degree of aid and coordination is greater than anything prior in the Hamas-Hezbollah relationship. From an Israeli viewpoint, some security officials have stated that this attack motivated the Israeli government to assassinate Sheikh Yasin.[48] Indeed, the Israeli security apparatus has methodically assassinated both existing and emerging Hamas leaders and many experts believe it may take years for Hamas to rebuild, if it ever can recover.[49]

But the Ashdod attack also holds other, and more global, implications for the war on terrorism. First, it demonstrates that Sunni and Shi'ite militants *will* work together, given a mutual enemy. In this case, the enemy is Israel, but this does not preclude cooperation between Sunni and Shi'ite militants against the United States. Second, up to this point, Hamas was facing significant counterterrorism pressure from the Israeli government. In addition, tightening security and the fence around Palestinian territories all served to make it more difficult for Hamas to carry out its operations in Israel. Thus it could have been more willing to take strategic guidance from Hezbollah—not just aid

---

[46] For more information, see Cragin and Daly (2004).

[47] Cragin and Daly (2004); Cragin interviews, Israeli counterterrorism experts, April 2004.

[48] Cragin interviews, Israeli counterterrorism experts, April 2004.

[49] The IDF also reportedly was responsible for an attack against a Hezbollah leader, Ghaleb Awali, in Beirut on July 19, 2004. It is likely that this attack was also linked to the Ashdod bombing, perhaps as a warning for Hezbollah not to get too involved in the Israeli-Palestinian conflict.

but actual suggestions for types of attacks and targets. Parallel counterterrorism efforts by the United States and its allies in the war on terrorism could provoke other nonaffiliated terrorists to accept guidance from al-Qaeda in the future, as Hamas apparently did from Hezbollah. Finally, in the case of Hezbollah, a potential explanation for the shift in its aid toward Hamas is that Hezbollah may be struggling to sustain attention and support since Israel pulled out of southern Lebanon. Greater involvement in the Palestinian resistance could help Hezbollah increase its momentum and support. It is thus possible that Muslim anger at the U.S. presence in Iraq could similarly provoke shifts in the agendas of Hezbollah or other groups vis-à-vis the United States, as these groups continue to vie for local recruits and support.

# Antiglobalization Movements

During the past ten years, political movements based on ideologies opposed to the spread of global capitalism, the destruction of the natural environment, and the growth of such transnational bodies as the European Union (EU) have taken root in Western Europe and North America, where the presence of international media has given these oppositionists a vast forum. At its core, this nascent ideological movement opposes corporate power and the assumed socioeconomic dislocations that may follow in the wake of the spread of globalized capitalism across the world.

It is in this context that several commentators have described the antiglobalization movement as a de facto "New, New Left," drawing comparisons to the international radical upheaval that swept France and other countries in 1968. Although antiglobalization radicals have been associated with marches and demonstrations, the real importance of the movement in terms of terrorism and national and international security considerations lies in its effect on organizations that have shown, in varying degrees, an explicit penchant for violence.

This chapter provides an overview and assessment of anarchist groups, the "New, New Left," and right-wing extremists in Europe and North America; antiglobalization populist movements and radical indigenous people's movements in Latin America; and ecoterrorists and other niche extremists on the even farther fringe of the movement. It should be noted that this analysis is not intended to be comprehensive. The fluid and overlapping nature of the groups, along with their often

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 276 of 632

secretive and frequently opaque nature, makes it difficult to arrive at authoritative judgments. These evaluations should be viewed as a first step in a more long-term process to assess potential terrorist threats.

## Anarchism, the "New, New Left," and the Extreme Right in Western Europe and North America

### Anarchists

During the 1880s and 1890s, prime ministers, presidents, and monarchs were frequent targets of anarchist bombs and guns. A series of spectacular terrorist attacks in Europe and North America, including those that took the lives of Czar Alexander II of Russia in 1881, French President Marie-François Sadi Carnot in 1894, and U.S. President William McKinley in 1901, led to widespread fears of a worldwide anarchist conspiracy and a transatlantic campaign to eradicate the movement.[1] From the time of the 1917 Russian Revolution until the collapse of European communism in 1989, Marxism-Leninism eclipsed anarchism as the premier left-wing anticapitalist ideology.[2] In the postsocialist world, activists opposed to global capitalism, militarism, nuclear power, and other perceived ills have rediscovered anarchism and embraced it as a framework for explaining and changing the political, economic, and social order.

Nowhere has anarchism enjoyed a greater resurgence than in Germany, Spain, and Italy, the ideology's traditional Western European homes. Chronically high levels of unemployment, disillusionment with mainstream politics, and a deep reservoir of opposition to globalization have made Western European audiences receptive to anarchism. Recently, violence has been associated with anarchist militants. Beginning shortly before Christmas in 2003, Romano Prodi, president of the European Commission; European Central Bank chairman Jean-

---

[1]    For more on this campaign, see Jensen (2001). For more on anarchism in Europe during this period, see Miller (2001), pp. 41–58.

[2]    Except possibly in Spain during the Spanish Civil War, when anarcho-syndicalists were the dominant force in the Catalunya region until suppressed by the communists in 1938.

Claude Trichet; and EUROPOL, the continent's police coordinating body, received packages containing small amounts of explosives. No one was hurt by these bombs. They were "little more than a symbolic gesture," according to the Public Prosecutor's Office in Bologna.[3] An organization known as the Informal Anarchist Federation (*Federazione Anarchica Informale*), numbering an estimated 350 members, took credit for the parcel bomb sent to Prodi.[4] A communiqué delivered to the offices of a Roman newspaper explained the purposes of the attack, namely, to strike out at the "control and repression structures . . . of the new European order," and, ultimately, "the destruction of the state."[5] At the tactical level, anarchist goals include the release of imprisoned comrades and, more broadly, the abolition of jails and prisons.[6]

The anarchist "galaxy," according to Italian officials, includes "insurrectional-anarchists." Numbering no more than 100, this subset of activists is highly elusive and dangerous, according to Italian authorities.[7] "They do not claim responsibility for their attacks [and] they act suddenly," according to one magistrate.[8] Since 1996, their targets have included railway building sites, the offices of the center-left Democrats of the Left party, and international corporations, such as McDonalds and Blockbusters.

---

[3]  Luigi Spezia, "Prodi: Spate of Searches," *La Republica* (Rome), December 29, 2003, FBIS. "Gunpowder may not have been used, just chlorate-based weedkiller, which 'does little more damage than Christmas sparklers, because this was no lethal device,' one detective said."

[4]  "Letter Bombs Addressed to EU Officials Panic Europe," National Public Radio, Weekend Edition Sunday, January 25, 2004.

[5]  Luigi Spezia, "Bologna, Explosives Claim: 'Prodi Was Our Target,'" *La Repubblica* (Rome), December 24, 2003, FBIS.

[6]  Emanuela Fontana, "A Subversive Thread from Rovereto Leads to Riva del Garda," *Il Giornale* (Milan), December 9, 2003, FBIS.

[7]  Fabrizio Roncone, "The Map: Although They Are Few and Disorganized, They Now Feel Like Protagonists," *Corriere della Sera* (Milan), November 12, 2003, FBIS.

[8]  Roncone, "The Map . . . ."

Italian anarchists have forged links with anarchists in other European countries, such as Spain, Greece, Germany, and France.[9] The Internet has been a boon to anarchist groups by allowing dispersed individuals to share information, plan operations, recruit new members, and, allegedly, to share bomb-making recipes.[10] Germany has proven to be a particularly fertile ground for anarchist recruitment. Within the so-called "autonomist scene," there are as many as 5,000 activists and supporters, according to Germany's internal intelligence agency, the Office for the Protection of the Constitution (*Bundesamt für Verfassungsschutz*, or BfV).[11] In the autonomists' view, acts of counterviolence are a necessary response to the "structural" violence embodied in the German state and society. Recent violent actions by the autonomists include arson, attacks on neo-Nazis, militant demonstrations against nuclear power, and the disruption of road and rail transport. During street protests, autonomists typically don combat gear, wear masks, and form into "black blocs" to smash windows, assault police, and carry out other violent acts. In the view of the German authorities, such actions cross the line from protest into terrorism. Indeed, according to the BfV, these groups "have posed a threat to internal security in Germany."[12]

In Italy, some observers have claimed that the upsurge in terrorist violence heralds a return to the "days of lead" (*giorni di piombo*) of the 1970s, in which Italian society was paralyzed by frequent ter-

---

[9]   Claudia Fusani, "Counteroffensive at Viminale: 'We Know All the Names,'" *La Repubblica* (Rome), December 30, 2003, FBIS.

[10]   Sophie Arie, "Berlusconi Says Basta! to Violence," *Guardian* (London), November 6, 2003,  http://www.guardian.co.uk/elsewhere/journalist/story/0,7792,1079040,00.html  (as of March 21, 2006).

[11]   BfV, Annual Report of the Office for the Protection of the Constitution 2002, Cologne: BfV, n.d., p. 108.

[12]   BfV, Annual Report, p. 97. The BfV also alleges that other groups on the extreme left are willing to use violence to achieve their goals. Most notable are activists with links to remnants of the Red Army Faction (*Rote Armee Fraktion*, or RAF), the Marxist-Leninist terrorist movement that dissolved in 1998. BfV, Annual Report, fn. 115, p. 239.

rorist bombings, assassinations, and violent street protests.[13] Similarly, the Council of the European Union has concluded that the possibility exists for the "resurrection" of extreme left-wing and anarchist terrorism across the continent.[14] Recent events would seem in some ways to bear out this judgment. In Italy, in addition to the violent anarchists, other terrorists have emerged, including those claiming to be successors to the Red Brigades, which splintered in 1984. Extremist groups such as the Revolutionary Proletarian Initiative Nuclei (*Nuclei di Iniziativa Proletaria Rivoluzionaria*), which claimed responsibility for a bomb attack in 2002 near the Interior Ministry in Rome, have no more than a dozen members,[15] although some observers claim such groups are attracting increasing support.[16]

That said, the claim that Italy is returning to the "days of lead" seems overstated. Anarchist groups are small, and while they have carried out acts of terrorism, they cannot be compared to the violence of the late 1970s. At first glance, the left-wing extremist threat in Germany might appear to be larger, since the number of violent activists is greater. However, most of the terrorist incidents described by the German authorities are really little more than glorified vandalism. Window breaking, minor arson, and rock throwing, rather than assassination, are the order of the day. Moreover, what is considered "anarchist" violence by European authorities may not always be the responsibility

---

[13] See, for example, "Return to the 'Days of Lead,'" *Weekend Australian* (Sydney), March 23, 2002, p. 15.

[14] Council of the European Union, "Situation in the Terrorist Activity in the European Union: Situations and Trends," document no. 5759/02, January 31, 2002, p. 9.

[15] U.S. Department of State (2003b), p. 142.

[16] See, for example, "Nuclei di Iniziativa Proletaria Rivoluzionaria (NIPR)," *Jane's World Insurgency and Terrorism* 16, October 2002.

of anarchist groups. In both Italy and Germany, there is a long tradition of labeling incidents of political violence as "anarchist" when in fact other groups on the right have been responsible.[17]

An assessment of the terrorist potential of the anarchist groups presents a mixed picture. Factors that could contribute to terrorism include highly efficient communications and transportation networks, elite alienation, impatience with conventional political organizing, and membership with a strong commitment to the cause and a willingness to take risks. Countervailing factors include the apparent willingness of the state to take actions against suspected terrorists, the lack of concrete grievances, and the existence of traditional and nonviolent outlets for expressing political grievances.

**The "New, New Left"**

During the past decade, once-staid meetings of international financial and political institutions—the International Monetary Fund, the World Bank, the Group of Eight (G-8)—have been transformed into arenas of street protest, civil disobedience, and occasionally violence. To some outsiders, the antiglobalization movement (or, as many activists prefer to call it, the global justice movement) appears to be an inchoate collection of a wide variety of causes ranging from international debt, to global capitalism, to freedom for Mumia Abu-Jamal, the former Black Panther on death row in Pennsylvania for the murder of a police officer. Sometimes described as the "New, New Left,"[18] the movement, while still highly diverse, has begun to fashion a coherent worldview.

---

[17] Statewatch, "EU Definition of Terrorism: Anarchists Targeted as Being 'Terrorists' Alongside Al Qaeda," Analysis No. 10, February 2002, p. 3, http://www.statewatch.org/news/2002/feb/terrdef.pdf (as of March 22, 2006); and Paul Berman, "The Passion of Joschka Fischer," *The New Republic,* September 3, 2001, p. 36.

There is an extensive history in Italy of anarchists or "left-wingers" appearing as suspects in the early stages of investigations, being arrested and later being shown to be innocent. In 2000 and 2001 two trials concerning explosions during the so-called 'years of lead' originally blamed on anarchists resulted in convictions for right-wingers acting with state collusion." (Statewatch, "EU Definition of Terrorism," p. 3.)

[18] Bob von Sternberg, "Call It Anarchism or New New Left, It Has a Big Voice," *Star Tribune* (Minneapolis), May 21, 2000, p. 25A.

At the movement's core, as mentioned earlier, is opposition to global capitalism. Globalization, according to the Act Now to Stop War and End Racism (ANSWER) Coalition, "is in fact a form of class war by the rich and powerful against the poor. It is a form of corporate violence against working people and their labor unions."[19] The global justice movement, in the words of a leading theorist, "is the only major channel through which we can engage the most critical issues," such as climate change, poverty, and environmental degradation—issues that are allegedly ignored in mainstream political discourse.[20]

Opposing "globalization," or international financial institutions, is no longer at the movement's cutting edge. Like the anarchists, global justice movement activists are turning their energy to opposing what they consider illegitimate concentrations of public and private power. According to one movement polemicist, a "genuine, global revolution is underway," sparked by the belief that

> Political freedom without economic freedom is meaningless. This shared understanding is one of the rallying points for this new international gathering force of dissidents, conjured into existence by a capitalism more powerful and unchecked than anything we have seen for a century. . . . Freedom—sovereignty—is about the right to decide your economic, as well as your political destiny.[21]

The potential for these movements to pose a violent threat to the political, economic, and social order beyond isolated excesses—that is, the potential to cross the line from protest to terrorism—is unclear. It is not at all certain, for example, that today's movements will follow the trajectory of the left-wing, largely student-based movements of the 1960s and 1970s, from which violent extremists emerged in West Germany, Italy, France, and the United States.[22]

---

[19]  ANSWER fact sheet, October 2, 2003, http://www.internationalANSWER.org.

[20]  George Monbiot, "Stronger Than Ever: Far from Fizzling Out, the Global Justice Movement Is Growing in Numbers and Maturity," *Guardian* (London), February 28, 2003, p. 19.

[21]  Paul Kingsnorth, "The Global Backlash," *New Statesman,* April 28, 2003.

[22]  Berman (1996), p. 96.

**The Extreme Right**

On the other end of the political spectrum, extreme right-wing activists also profess an opposition to global capitalism, international financial bodies, Third World debt, and other manifestations of globalization. The British National Party, for example, claims that the "bosses of the banks" have used "bribery or economic pressure to encourage the corrupt rulers of unfortunate Third World states to take out huge loans their people can never repay."[23] In the discourse of some right-wing extremists in Germany, globalization is an American-led conspiracy, conducted by, and for the benefit of, Jewish capitalists.[24] Other right-wing extremists oppose globalization on the grounds that it undermines national sovereignty. In the words of one writer, "Pro-White Nationalists are natural enemies of Globalization for racial, economic and sovereignty reasons."[25] The National Alliance, one of North America's largest neo-Nazi groups, has set up an "Anti-Globalism Action Network," and claims that "White Nationalists are . . . anticapitalist and anti-establishment and pro-environment . . . [they] are the true revolutionaries."[26]

Much of this railing against the evils of globalization is probably opportunistic—done in the hopes that it will attract recruits rather than as a result of new interpretations of events. However, the use of antiglobalization rhetoric may also reflect deeper trends within the extreme right, specifically, a growing ideological convergence with some parts of the far left. This is not an entirely new phenomenon, of course. During the previous century, political extremists ostensibly at odds with each

---

[23] British National Party, "Cults, Jets and Greed—The Frantic Rush to 'One World,'" http://www.bnp.org.uk/articles/rush_globalism.htm (as of March 22, 2006).

[24] BfV, *The Significance of Anti-Semitism in Current German Right-Wing Extremism,* p. 9, http://www.extremismus.com/vs/antisemitism-e.pdf (as of March 22, 2006).

[25] Walter Nowotny, "Pro-White Nationalism Versus Globalization," *Pro-White Forum,* July 17, 2002, http://www.churchoftrueisrael.com/nsforum/ns7-17.html (as of March 22, 2006).

[26] Quoted in Anti-Defamation League, "Deceptive Web Site Attempts to Lure Anti-Globalization Activists to Neo-Nazi Movement," http://www.adl.org/NR/exeres/D512AD57-27F3-44B0-AA18-14D136259DCF,0B1623CA-D5A4-465D-A369-DF6E8679CD9E, frameless.htm (as of March 22, 2006).

other in fact shared a common outlook. In Weimar Germany during the 1920s, some members of the extreme right described the Soviet Union in approving terms as an anticapitalist, antiliberal beacon for the world.[27] During the 1960s, the American Nazi Party, violently opposed to racial integration, found common cause with the Nation of Islam, whose leader, Elijah Muhammad, praised white opponents of "race mixing."[28] In recent years, opposition to Israel and Zionism has also emerged as a common theme for the extreme right and the New, New Left. The leader of France's leading Jewish organization has decried the emergence of a "brown-green-red" alliance that attacks Jews and Israel in racist, anticapitalist, and anticolonialist terms.[29]

### An Extreme Right–Islamist Alliance?

The possibility of a tactical alliance between white supremacists and Islamist extremists cannot be discounted. The National Alliance has staged pro-Palestinian demonstrations outside the Israeli embassy in Washington, and Louis Beam, a prominent anti-Semitic agitator, has publicly praised the "liberation movements" of Syria, Libya, Iran, and Palestine.[30] Echoing a favorite Islamist trope, the National Alliance denounces "American and allied forces which have repeatedly made war on Moslem states in response to the demands of the Jewish lobby."[31] The global war on terrorism, according to the National Alliance, is "just a new name for the same game of killing when the Jewish lobby says 'kill.'"[32]

---

[27] Furet (1999), p. 203.

[28] Clegg (1997), pp. 152–153.

[29] "Le CRIF dénonce une alliance antisémite 'brun vert rouge,'" Accueil TF1, January 27, 2003, http://www.col.fr/judeotheque/archive.web/CRIF%20Cukierman%20fustige%20l%E2%80%99alliance%20brun,%20vert,%20rouge.htm (as of June 2005); and Strauss (2003), pp. 61–65.

[30] Anti-Defamation League, "Louis Beam," http://www.adl.org/learn/Ext_US/beam.asp?xpicked=2&item=beam (as of March 22, 2006).

[31] National Alliance, "Make Your Neighborhood a Terror-Free Zone," http://www.natall.com/leaflets (as of March 22, 2006).

[32] "Real Homeland Security," *Free Speech,* Vol. VIII, No. X, October 2002, p. 8.

Al-Qaeda, according to some press accounts, has shown some interest in reaching out to non-Islamic militant groups, with anti-Semitism, anti-Americanism, and anti-Westernism serving as a common ground.[33] An alliance between the global justice movement and either neo-Nazis or Islamic radicals is harder to imagine. Certainly the movement's libertarian elements (and the movement's anarchist fringe) would be unlikely to support linkages with politically and theologically totalitarian groups. Although neo-Nazis, Islamists, and the New, New Left share an anti-Zionist stance (and a deep well of anti-Semitism), opposition to Israel remains a relatively minor component of the global justice movement's agenda, and so is unlikely to serve as the foundation for any real partnership.

## Neo-Marxist and Radical Populist Movements in Latin America

Antiglobalist movements are not part of the universe of terrorism, and some claim to be democratic—although they generally reject definitions of Western liberal democracy. Nevertheless, they threaten U.S. security interests because they threaten the stability of key countries and take countries where they seize power into destructive detours into irrational economic and political policies.

The antiglobalization movement in Latin America is unique in that many of the regional leftist movements and parties are linked in an international structure known as the São Paulo Forum. The São Paulo Forum was established under the auspices of Fidel Castro in 1990 in the Brazilian city of São Paulo. The forum brings together about 120 Latin American leftist political parties and organizations, including the two major Colombian guerrilla organizations—the FARC and the ELN—as well as the Cuban Communist Party, Venezuelan President Hugo Chávez's V Republic political movement, Nicaragua's Sandinistas, the FMLN of El Salvador, the National Revolutionary

---

[33] Paolo Pontoniere, "Al Qaeda Reaching Out to Non-Islamic Militant Groups," *Pacific News Service*, November 16, 2001.

Union of Guatemala, former Haitian President Jean-Bertrand Aristide's Lavallas Movement, Mexico's Zapatista National Liberation Army, and the United Left Movement of Peru.

The goal of the forum's organizers was to develop a post-Soviet strategy for the Latin American revolution. The fall of the Berlin Wall and the subsequent Soviet collapse were traumatic events for the extreme left in Latin America. Nevertheless, the more optimistic radicals argued that the end of communism in the Soviet Union and Eastern Europe did not signify the end of the socialist camp. According to a document of the VI Conference of the São Paulo Forum, "China, Vietnam, Laos, North Korea, and Cuba remain on their feet, and are working to develop their own political strategies to advance the socialist alternative."[34]

The forum's political program centers on a strong critique of "neoliberalism," which it describes as an economic model that allows the elites to accumulate even greater wealth at the expense of the poor. Globalization, according to the forum, is "pillage on a planetary scale." The forum believes that the contradictions between the wealthy few and the exploited many cannot in the long term be sustained and that the neoliberal economic model will collapse sooner rather than later.

At the strategic and tactical levels, the forum concluded that the antiglobalization forces needed to develop "new forms of struggle." It was necessary to move beyond the social sectors that had supported the left in the past, and capture "popular organizations that have emerged in response to the injustices of the modern capitalist model." Among the new forms of struggle that were recommended was taking advantage of the democratic opening in a number of Latin American countries, particularly in those where "democratic and popular fronts" were viable alternatives to unpopular neoliberal governments. Although the method of struggle was to be the democratic process, the forum's goal remains revolution. This was clearly stated in the Base Document of the IX Encounter of the forum, held in Managua, Nicaragua, in February

---

[34] Cited in Alejando Peña Esclusa, "A los diez años de su fundación: radiografía del Foro de São Paulo," forums.terra.com/foros/actualidad/ actualidad_C5/actualidad_venezolana_F100/foro_P532013 (as of November 2001).

2000: "Our goal is revolution. That is, a profound transformation of society, which should be accomplished by reaffirming and recreating democracy, an essential aspect of any alternative political project."[35]

In recent years, political forces backed by the São Paulo Forum have gained some notable successes. By the mid-1990s the strategy has brought to elected office throughout Latin America 291 deputies or legislative chamber members, 51 senators, 10 governors, and several hundred mayors affiliated with the São Paulo Forum.[36] The most spectacular success of the antiglobalization Latin American left was the election of Hugo Chávez as president of Venezuela in December 1998, but Chávez's election was not an isolated case. Other antiglobalist populists have been elected, or have come close to being elected, in a number of South American countries. Lucio Gutiérrez, a former military officer who led a coup against the government of President Jamil Mahuad in 2000, won the presidential election in Ecuador in November 2002 (although Gutiérrez has since sought to govern as a centrist). Evo Morales, the longtime leader of the Bolivian coca farmers, came in second out of eleven candidates in the June 2002 Bolivian presidential election, and his Movement Toward Socialism (MAS) gained the second-largest number of seats in the Bolivian parliament. Morales was elected president of Bolivia in December 2005.

The goal of the Cuban government and its allies in the São Paulo Forum of reversing the so-called neoliberal reforms in Latin America currently focuses on derailing the Free Trade Area of the Americas (FTAA), which would remove trade barriers among all Western hemisphere countries except Cuba. In January 2004, the Cuban government hosted the third "Hemispheric Meeting Against the FTAA," attended by 1,200 antiglobalization activists from 32 countries. In their final declaration and action plan, the anti-FTAA forces took credit for the ousting of Bolivian president Gonzalo Sánchez de Lozada

---

[35] "IX Encuentro del Foro de São Paulo: Capitalismo contemporaneo y debate sobre la alternativa," http://www.geocities.com/nuestrotiempo/25foro.htm.

[36] Institute for Cuban and Cuban-American Studies (ICCAS), University of Miami, Cuba Transition Project, "Cuban Foreign Policy in Latin America," No. 51, January 22, 2004, p. 2.

in 2003 and agreed to a coordinated strategy to defeat any and all trade liberalization agreements with the United States, including a modified North American Free Trade Agreement (NAFTA), as well as bilateral accords. The first battle is to be waged against the U.S.–Central America Free Trade Agreement (CAFTA), which is pending ratification by the legislatures of Costa Rica, El Salvador, Guatemala, Honduras, and Nicaragua.[37] Havana and its anti-FTAA allies are well poised to obstruct or reverse movement toward the FTAA, the most important U.S. policy objective in the hemisphere. Venezuela, Brazil, and Argentina walked out of the World Trade Organization talks in Cancun, Mexico, in 2003, and are delaying negotiations on the final draft of the FTAA treaty.

**Radical Indigenous Peoples' Movements in the Andean Region**

Radical indigenous peoples' movements throughout the Andean region have been a major transmission belt for Cuban and Venezuelan influence and general antiglobalization activity. These movements include leftist and populist groups, such as those led by Evo Morales and Felipe Quispe in Bolivia, the Pachakuti in Ecuador, and Uruguayan, Argentine, and Mapuche Indian groups in Chile (see below). The emergence of these movements is related to broader social and political trends in the Andean region, most notably the collapse of traditional governing arrangements that permitted small Spanish-origin elites to monopolize political power and exclude the indigenous majorities, and the reaction against the effects of neoliberal economic policies.

In Bolivia, economic reforms—privatizing state enterprises, reducing subsidies, and encouraging foreign investment—were implemented in the 1980s and 1990s but stalled toward the end of the 1990s as a result of a downturn in the price of Bolivia's mining output. A coca eradication program spearheaded by the United States led to the near-elimination of coca cultivation in the Bolivian lowlands but deprived

---

[37] ICCAS, "Cuban Foreign Policy in Latin America, Part II, Cuba Transition Project," No. 52, February 3, 2004.

tens of thousands of peasants in the lowlands of an income.[38] The result was the growth of the MAS, started by the coca farmers' leader Evo Morales, and the radical indigenous people's movement led by Felipe Quispe. Morales, who came in second in the June 2002 presidential election, despite (or because of) open opposition by the U.S. ambassador, has proposed a "participatory democracy" model for Bolivia based on elements of the Cuban model and Chávez's "Bolivarian Revolution." In April 2003, Morales and leaders of indigenous peoples in Ecuador and Honduras met with Chávez in Caracas and agreed to create an alliance extending beyond indigenous peoples to other "dispossessed" groups in Latin America.[39] Felipe Quispe, the founder and leader of the Pachakuti Indian Movement (MIP), was imprisoned from 1992 to 1997 for his role in the Tupac Katari Guerrilla Army, a Bolivian terrorist organization. In the 2002 election, MIP came in third in the capital city of La Paz. The MIP's long-term goal is to abolish Bolivia and other Andean states and restore the Tahuantinsuyo, the pre-Colombian indigenous state. In the short term, the movement seeks to replace its authority for the state's authority in the areas it controls—that is, to create a parallel state structure based on communitarian values.[40]

Antiglobalization forces in Bolivia scored a spectacular victory when they overthrew the U.S.-backed government of President Sánchez de Lozada in October 2003. The conflict began soon after Sánchez de Lozada announced his decision to export natural gas to the United States and Mexico. An estimated 74 people were killed in a month of protests against the government's free-market economic policies before President Sánchez de Lozada resigned and left the country.[41] Sánchez

---

[38] Marc Lifsher, "The Andean Arc of Instability," *The Wall Street Journal,* February 24, 2003.

[39] "Bolivia, indigenismo y vasos comunicantes," *Destaque Internacional—Informes de Coyuntura,* Año V, No. 113, Buenos Aires, October 23, 2003.

[40] "Felipe Quispe: de 'terrorista' a líder parlamentario," http://www.redvoltaire.net/article454.html; and "El Mallku Speaks: Indigenous Autonomy & Coca," January 15, 2002, http://www.narconews.com/felipe1eng.html (both as of March 22, 2006).

[41] Jose de Cordoba, "Indians Agitate for Political Goals," *The Wall Street Journal,* January 8, 2004.

de Lozada's successor, Vice President Carlos Mesa, resigned in June 2005, after weeks of escalating street demonstrations and violent confrontations, conceding that he was no longer able to govern. Mesa's resignation opened the way for Morales's election in 2005. A powerful anti-U.S. and antiglobalization indigenous movement has also emerged in Ecuador. In January 2000 thousands of indigenous protesters and young army officers overthrew the government of president Jamil Mahuad and announced the creation of a new government, including a "Parliament of the People" and a three-man governing junta. However, the coup was defused when the country's military chief took a seat in the junta but then dissolved it and turned over power to Vice President Gustavo Noboa. In the November 2002 election, former colonel Lucio Gutiérrez, a leader of the 2000 revolt, defeated the incumbent Noboa. Although he appeared very much in the Chávez mold—a former coupmaker who campaigned as a populist—Gutiérrez has moderated his stance since taking office and has sought to cooperate with the United States and international financial institutions.[42] The antiglobalization movement, however, remains capable of threatening or even bringing down his government.

In Peru there have been signs of the revival of the Shining Path. Although its leaders, including its chairman Abigail Guzmán, are in prison, the group never completely disappeared. There have been reports of kidnappings and killings in the Upper Huallaga Valley, the organization's traditional stronghold, since 2001.[43] With the increase in coca cultivation in the area as a consequence of U.S. eradication efforts in Colombia, Shining Path remnants may be able to access the resources that they need to fund a renewed insurgency.

---

[42] "Ecuador's Gutierrez Boosts His Image in U.S. Tour," *The Wall Street Journal,* February 21, 2003.

[43] See "Peru's Shining Path Starting to Show Signs of New Life," *The Miami Herald,* June 15, 2001.

# The Convergence of Terrorism, Insurgency, and Crime

During the Cold War, many of the insurgent and terrorist organizations that proliferated throughout what was then known as the Third World were largely dependent on great power support. Even when these groups developed within a specific local context, they were quickly assimilated into one global camp or the other. The Soviets and the Cubans backed a number of so-called liberation movements in Africa and Central America, as well as Middle East terrorist organizations; while the United States supported groups such as the National Union for Total Independence of Angola (UNITA) in Angola, the Afghan mujahidin, and the anti-Sandinista forces in Nicaragua.

The end of the Cold War brought an effective end to external support for these groups. The Soviet Union disappeared and the United States simply lost interest in the fate of many of its former clients. For many of these groups, making the adaptation to a new environment was a matter of survival. Their post–Cold War survival strategies hinged on their ability to generate new sources of revenue to support their operations. Some groups were unable to make the transition and disbanded or made peace with the governments that they were seeking to overthrow, as in the case of the Salvadoran and Guatemalan rebels.

Other groups, however, tapped into locally available sources of revenue and grew in strength. The most successful in making the transition were those that operated in countries that produced high-value commodities, legal or otherwise—for instance, diamonds in West Africa; minerals in Central Africa; cocaine and heroin in Colombia; and opium and heroin in Southwest Asia and the "Golden Triangle."

Still other groups were able to fund themselves successfully by means of smuggling and arms trafficking, kidnapping and extortion, piracy, compact disc counterfeiting, and a variety of other criminal activity.

These activities provided easy targets of opportunity for terrorist or rebel movements. The groups had the firepower to deal themselves into the trade. They could trade the commodities themselves, as in the case of the Liberia-backed Revolutionary United Front of Sierra Leone and "conflict diamonds"; or protect and "tax" them, which is the FARC's preferred approach to the cocaine industry;[1] or set themselves up as middlemen in human and arms trafficking.

The activities of these groups tend to weaken and corrupt political and social institutions, particularly when they involve trafficking in a lucrative and social destructive commodity such as cocaine. To the extent that these groups are successful, they also displace state and government institutions, usually weak to begin with, in the areas where they establish a foothold. Unchecked, the groups will expand their resource base, increase their recruiting pool, and generate greater capacity at the expense of the state. Therefore, there is a high correlation between the development of these groups and failed or failing states.

To illustrate the operation and evolution of these linkages, we will analyze several case studies. These include the Tamil Tigers in Sri Lanka; the Abu Sayyaf Group in the Philippines; the FARC and ELN in Colombia; the activities of al-Qaeda, Hezbollah, and the Revolutionary United Front (RUF) in West Africa; and Hezbollah and other Middle Eastern extremist groups in North America and the tri-border region of Paraguay, Brazil, and Argentina.

---

[1]  The FARC is involved in the drug trade at all stages of production and transportation; however, most commentators concur that the bulk of the FARC's income from drugs is derived from taxing production as opposed to profits earned through trafficking.

## The Tamil Tigers' Widespread International Criminal Network

One factor that has considerably benefited the LTTE insurgency over the past three decades is the group's sophisticated international support network. While much of this infrastructure is a result of legitimate fundraising activity among the Tamil diaspora and political lobbying designed to discredit the Sinhalese Colombo government, a significant component has been criminal in nature, involving human smuggling, drug trafficking, and gunrunning.

### Human Smuggling

The trade in human beings is thought to constitute an important part of LTTE financial procurement, providing a consistent and long-term source of operational income (as well as a convenient way to establish arms procurement agents around the world—see below). According to intelligence officials in Canada, Australia, and the UK, the group is playing a pivotal role in smuggling illegal migrants and refugees out of Sri Lanka and India to the West, charging anywhere between $18,000 and $32,000 per transaction.[2] The overall scope of this trade is difficult to determine. However, in June 2000, the Sri Lankan Criminal Investigation Department (CID) uncovered one major LTTE smuggling ring involving an estimated 600–700 people who had been trafficked to the EU on forged Schengen state visas.[3] Even after taking overhead costs into account, the net profits from such an operation would have been substantial, running into the millions of dollars.

The Tigers allegedly make considerable use of Thailand for human trafficking—both as an identification forgery hub and as a staging point for onward journeys. The group is thought to have established a small

---

[2]   Chalk interviews with defense and intelligence officials, London, Ottawa, Bangkok, and Canberra, November–December 2000.

[3]   With a Schengen visa, a person may travel freely, with no internal border controls and few stops and checks, in the 15 European countries that are party to the Schengen agreement. See "CID Bust Another Multi Billion Rupee Human Smuggling LTTE Operation," *Daily News* (Sri Lanka), May 17, 2000; and "Human Smuggling Racket Busted," *Daily Mirror* (Sri Lanka), June 26, 2000.

but highly effective cadre of intermediaries in Bangkok and Chiang Mai. They are used to facilitate the actual movement of migrants across national borders. Such a modus operandi is also seen as a viable way of distancing senior LTTE members from possible prosecution in the event that a smuggling ring is broken up or otherwise penetrated by law enforcement authorities.[4]

Canada constitutes the main destination of choice for the bulk of the LTTE's human cargo because of its large Tamil diaspora (which facilitates rapid local integration into the adopted society) and Canada's liberal immigration laws.[5] Once in the country, the migrants quickly go underground and generally take on low-paying menial jobs that have been prearranged by the LTTE. This effectively ensures that the new arrivals remain semipermanently indentured to the group. In the current context, this essentially means acting as local Tiger henchmen or debt collectors.[6]

### Drug Trafficking

Apart from human smuggling, there have been additional claims about the group's involvement in drug-running operations from South Asia's Golden Crescent. According to the Toronto-based Mackenzie Institute, some of the most profitable LTTE activities have been in the form of heroin trafficking, particularly since the 1980s when Afghan and Pakistani producers started to use smuggling routes through southern

---

[4]  Personal correspondence between Chalk and Sri Lankan High Commission officials, Bangkok, December 2000. See also Davis (2003c), p. 32.

[5]  Police and intelligence officials believe that the LTTE-Canadian smuggling route operates according to a basic procedure. Clients first travel to Bangkok, often on stolen passports that have been doctored for the purpose, where they await the provision of forged identity documents such as passports, driver licenses, and residency cards. Onward journeys to Canada are then arranged. Personal correspondence between Chalk and Sri Lankan intelligence officials, Bangkok, December 2000. See also Joshi (2000); and "Underground to Canada," *The National Post* (Canada), March 25, 2000.

[6]  Personal correspondence between Chalk and Canadian and Sri Lankan intelligence officials, Ottawa and Bangkok, November–December 2000.

India and Sri Lanka more frequently.[7] Officials in Colombo agree; one senior official asserted that collections from the Tamil diaspora pale compared to the group's narco-based revenue.[8]

Definitive proof linking the LTTE to an official policy of drug trafficking has yet to materialize. In Canada, for instance, both the Royal Canadian Mounted Police (RCMP) and the Canadian Security Intelligence Service (CSIS) have failed to implicate the group conclusively in heroin smuggling operations in Montreal, Toronto, and Vancouver, despite conducting intensive and protracted investigations into the trade over the past two years.[9]

Sri Lankan government sources insist that this merely reflects the tightly organized and compartmentalized nature of LTTE trafficking networks in general, which, as with human smuggling, has effectively insulated the group and its senior membership from prosecution.[10] Western organized crime specialists tend to adopt a similar line, further pointing out that, at least on a circumstantial level, definite indicators do exist suggesting a connection between the LTTE and the heroin trade:

---

[7]  "Funding Terror: The Liberation Tigers of Tamil Eelam and Their Criminal Activities in Canada and Western Europe," Mackenzie Briefing Notes, The Mackenzie Institute, Toronto, 1995. See also "Narco-Terrorism Alliance in India, Sri Lanka," *The Hindu* (India), May 17, 1998.

[8]  Personal correspondence between Chalk and Sri Lankan intelligence and law enforcement officials, Colombo, March 1999. It should be noted information derived from Sri Lankan officials concerning this matter must necessarily be viewed with a degree of caution and circumspection.

[9]  Personal correspondence between Chalk and officials with the Canadian Security Intelligence Service (CSIS), Ottawa, November 2000.

[10]  Personal correspondence between Chalk and Sri Lankan High Commission officials in Ottawa, Bangkok, and Canberra, November–December 2000.

- There have been numerous arrests of Tamils on drug-related charges over the last fifteen years, many of whom have had at least some links with militant organizations.[11]
- The LTTE supreme leader, Velupillai Prabhakaran, is known to have met the legal costs of many of these Tamils and has occasionally authorized "sustenance payments" to their family members while they served their prison terms.[12]
- Several organized gangs operating in the greater Toronto metropolitan area and engaged in the importation and distribution of number 3 heroin ("brown sugar") retain important symbolic links with the LTTE, including the VVT gang;[13] the Jane Finch, Kipling, Sooran, Seelapul, and Mississauga gangs; and the Gilder Tigers.[14]

### Gunrunning

Finally, the LTTE is known to run a highly proficient gunrunning operation. The group's weapons and munitions network, which spans the globe, is headed by Tharmalingham Shanmugham, alias Kumaran Pathmanathan and colloquially known simply as "KP." Second to Prabhakaran and with a half-million-dollar bounty on his head, he is currently the second-most-wanted man in Sri Lanka. Most members of his weapon procurement team—the "KP Department"—have no criminal record and have not been involved in active guerrilla or terrorist operations. The reliance on noncombatants is a deliberate tactic that is designed to minimize the possibility that those involved with

---

[11] See, for instance, Athas (1999); Anthony Davis, "Tiger International," *Asiaweek.com*, http://www.pathfinder.com/asiaweek/96/0726/cs1.html (as of March 22, 2006); "To Catch a Tiger," *The Island* (Sri Lanka), May 25, 1998; "Funding Terror: The Liberation Tigers of Tamil Eelam and Their Criminal Activities in Canada and the Western World," pp. 5–6.

[12] Correspondence between Chalk and South Asian terrorism specialist, June 1997.

[13] A west Toronto Tamil gang named for Valvettithurai, a northern Sri Lankan town.

[14] RCMP Directorate for Criminal Intelligence, "The Use of Organized Criminal Activity for Profit by Extremists Operating in Canada," internal document supplied to Chalk, January 20, 2000.

gunrunning operations will be known to either Sri Lankan or overseas intelligence and law enforcement agencies.[15]

Facilitating the movement of arms is a highly active merchant shipping network known as the Sea Pigeons. Apart from the PIRA and the PLO, the LTTE is the only insurgent-terrorist group that is known to have at its disposal a viable maritime capability for logistical purposes. Today, the fleet numbers at least 11 deep-sea freighters, the majority of which reportedly sail under Honduran, Panamanian, or Liberian flags of convenience.[16] The LTTE has effectively exploited the notoriously lax registration requirements of shipping bureaus in these countries, allowing the group to confound international tracking and monitoring attempts by repeatedly changing the names, manifest details, and duty statements of the vessels used, which has also been an integral part of the so-called "phantom ship" phenomenon (see below).[17]

LTTE munitions procurement draws on a variety of sources. Much of the group's overseas arms purchases come from the booming post–Cold War arms bazaars that have emerged in Southeast and Southwest Asia—especially Cambodia, Burma, Pakistan, and, until the U.S.-led Operation Enduring Freedom, Afghanistan. The Tigers have also moved to establish major weapons trading centers in Bulgaria, the Czech Republic, North Korea, Ukraine, Croatia, and South Africa.[18]

Thailand has emerged as the main logistical interface between these various international source countries, both with regard to weapons bound for the Sri Lankan theater and for subcontracted deals involving other insurgent and criminal actors. The LTTE Thai net-

---

[15]  Byman, Chalk, Hoffman, et al. (2001),  p. 119.

[16]  LTTE vessels sail under a number of additional flags. Three ships, the *Sun Bird*, the *Amazon,* and the *Golden Bird,* for instance, are respectively known to have been registered in Cyprus, New Zealand, and Malta.

[17]  Chalk interview, Canberra, September 1998. See also Mike Winchester, "Ship of Fools: Tamil Tigers' Heist of the Century," *Soldier of Fortune,* Vol. 23, No. 8, August 1998, p. 39; "Tiger Arms Ship in High Sea Drama," *The Sunday Times* (Sri Lanka), May 9, 1998; and "Armed to the Teeth," *India Today,* January 11, 1996.

[18]  Byman, Chalk, Hoffman, et al. (2001), p. 119.

work involves the recruitment of locally based Tamils who are used to open and staff front companies based in Trang and Phuket on the Andaman Sea coast as well as in Bangkok, notably around Naret Road and the General Post Office.[19]

### Rationale for Convergence with Organized Crime

The LTTE's involvement in organized crime essentially relates to changing geopolitical decisions and calculations undertaken by the Indian government in the 1980s. During the early stages of the Tamil insurgency in Sri Lanka, the LTTE had benefited greatly from the backing and support of New Delhi, which was acutely aware of the risk of ignoring the sympathetic ethnic proclivities of its own Tamil population in Tamil Nadu. Moreover, the Indian government was actively prepared to support the Tamil separatist war as a way of indirectly pressuring Colombo to remain within its sphere of influence. Between 1983 and 1987, India's Research and Analysis Wing, the agency charged with advancing India's clandestine foreign policy goals, provided sanctuary and arms to the LTTE as well as insurgent training in paramilitary camps located in the south of the country.

Although the Indian government was instrumental in supporting the Tamil insurgency during the early 1980s, by 1987 New Delhi was beginning to fear that the creation of an independent Tamil state in Sri Lanka could spark secessionist demands in its own Tamil Nadu. Moreover, the presence of armed Tamil militants in the country had begun to cause a growing problem in the south, compounding already serious strains brought about by the number of Tamil refugees fleeing from Sri Lanka's Jaffna peninsula.[20] As a result, the Indian government terminated its support for the LTTE and actively began looking for a

---

[19]  See Davis (2003c), p. 30.

[20]  Gunaratna (1998), p. 117. By 1987, the total number of Tamil refugees in Sri Lanka had risen to an estimated 13,000.

federalist solution to Sri Lanka's growing ethnic crisis, something that Colombo was equally keen to achieve given the increasingly violent and costly nature of the insurgency.[21]

New Delhi's subsequent efforts to disrupt the Tigers' munitions supply chain represented a significant blow to the group, requiring the development of a more secure and independent line of weapons funding and acquisition. Accordingly, the LTTE moved to develop its own logistical network—one that would be self-sustaining, specific to the needs of the group, and, most importantly, insulated from the changing strategic imperatives of a sole state backer. To a certain extent, the LTTE could rely on remittances and contributions from sympathetic members of its extensive diaspora in such countries as the United Kingdom, Australia, Canada, Switzerland, and Norway.[22] However, this represented only a finite, effectively capped source of assistance that was contingent on the mobilization of communities that may have little opportunity or willingness to support an insurgency being fought on the other side of the world. The move to organized criminality reflected the need for larger, more consistent injections of support, as well as the requirement for battle-related materiel that could only be supplied through the shadowy world of underground arms trading.

The LTTE has strenuously sought to play down any suggestion that it is involved in organized crime for any reason other than self-preservation. A considerable component of the group's overseas publicity and propaganda effort entails portraying the Tigers as a bona fide organization engaged in a fully justified and legitimate war of national liberation. More to the point, the LTTE political leadership seeks to

---

[21]  In July 1987, Colombo and New Delhi signed the Indo–Sri Lankan Peace Accord, which provided for a complete cessation of hostilities and the surrender of all weapons by the Tamil militants; the amalgamation (subject to a referendum) of the Northern and Eastern Provinces into one, Tamil-dominated administrative unit with its own elected provincial council; co-equal status for Tamil and English as official languages; the prevention of the use of Indian territory by Tamil militants for military or propaganda purposes; and the repatriation of Tamil refugees. New Delhi also agreed to send a peacekeeping force (IPKF) to Sri Lanka, sparking a bloody secondary guerrilla war with the LTTE that eventually led to a humiliating Indian withdrawal in March 1990. For further details of this period see Singh (2001).

[22]  Overall, the LTTE has a relatively sizable diaspora in 54 countries from Bangladesh to Botswana.

impress on the international community that, should the organization succeed in winning control of a separate state, it would exercise its duties in a responsible manner consistent with democratic norms of civilized behavior.[23] Obviously any overt attachment to organized criminality—particularly drug trafficking, which the United States has portrayed as one of the most threatening transnational dangers currently confronting the global community—would run counter to this objective.

A related consideration has to do with the Tamil diaspora. As noted above, contributions from expatriates do not constitute a self-sustaining source of income for the LTTE. They nevertheless remain an important source of supplementary income. Donations from the UK, Australia, and Canada, for instance, are collectively estimated to net up to $1.5 million a month for the group's cause, most of which is derived from a standard baseline "tax" that is imposed as a minimum moral obligation on families living in the respective host state.[24] To a large extent, the LTTE's ability to procure this funding has been indicative of its general invisibility to law enforcement by shunning unnecessarily explicit criminal behavior.[25]

These public relations considerations have acted as a self-regulating brake on the LTTE's overall convergence with organized crime. The group has conspicuously sought to cover its tracks at every juncture (as noted above, very few cadres have ever been charged on drug-related offenses) and has generally engaged only in those endeavors that are directly related to its war effort and that offer a reasonably secure line of funding and support. Consequently, the LTTE has not morphed into the type of criminal-terrorist entity seen in other parts of the world. Crime remains an adjunct to its wider political goals rather than its central purpose.

---

[23] See, for instance, Chalk (2000).

[24] See, for instance, Davis, "Tiger International," p. 35; "Tamil Expatriates Finance LTTE Terror," *Daily News* (Sri Lanka), June 8, 1998; "A Tamil Tiger Primer on International Arms Bazaar," *The International Herald Tribune,* March 10, 1998; and "The LTTE Rides High in Norway," *Lanka Outlook,* Summer 1998, pp. 24–25.

[25] Chalk interview, Ottawa, October 17, 2002.

## The Abu Sayyaf Group: An Islamic Terrorist-Criminal Group

Mindanao has been the locus of a prolonged and bitter Moro Islamic separatist conflict since the mid-1970s. Historically, the Moro National Liberation Front (MNLF) represented the main vehicle for this struggle. However, the group made peace with Manila in 1996,[26] and since then two entities have been at the forefront of militant activities in the southern Philippines: the Moro Islamic Liberation Front (MILF) and the Abu Sayyaf Group (ASG). Of the two, it is the latter that has established the most concerted ties to organized criminal activity.

Abu Sayyaf is a self-styled Islamic insurgent movement that first emerged in 1989 with the assistance of Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law and personal representative in the Philippines.[27] Its original founder was Abdurajak Janjalani, an ultra-fundamentalist veteran of the anti-Soviet campaign in Afghanistan who fought under the command of the mujahidin commander Abdul Rasul Sayyaf and was influenced by bin Laden. Under Janjalani's tutelage, the ASG developed a highly radical ideological agenda that aimed for the creation of an independent and exclusive Islamic state in Mindanao. In pursuit of this objective, the group has advocated the deliberate targeting of all non-Muslims in the southern Philippines and

---

[26] The MNLF signed a peace agreement with Manila in 1996, known as the Davao Consensus, which created a limited Autonomous Region of Muslim Mindanao and provided for peace and development efforts in the south. For an overview of the accord see Chalk (1997).

[27] At its inception, the ASG was known as al-Harakat al-Islamiyya (Islamic Movement); in 1992, the group renamed itself the Mujahidin Commando Freedom Fighters before settling on Abu Sayyaf in 1993.

has repeatedly defined its intentions as intimately tied to an integrated effort aimed at asserting the global dominance of Islam through militant armed struggle.[28]

Although the ASG was originally founded as a committed and closely coordinated jihadist movement, it has progressively degenerated into a network of loosely based territorial commands concerned more with money than political or religious goals. The main factor accounting for this structural and ideological fragmentation was the death of Janjalani, who was killed during a Philippine police ambush in December 1998.[29] Not only did his elimination trigger an acute leadership crisis within the group (which has never been resolved), more importantly it removed the chief driving force behind the ASG's former Islamic zeal.[30] The combined effect of these two factors was the gradual infusion of outside criminal tendencies and imperatives, the principal thrust of which has been piracy and kidnapping.

### Piracy

The ASG has carried out numerous pirate attacks off Mindanao and nearby islands, particularly between Tawi-Tawi, Sulu, Basilan, and the Zamboanga Peninsula. The group essentially has free run of these waters, because of both the absence of joint Philippine-Malaysian maritime patrols (essentially reflecting interstate tensions arising from ongoing territorial disputes and issues of maritime sovereignty) and the difficulty of instituting a comprehensive monitoring regime of the Philippines' extensive archipelagic coastline.

---

[28] Turner (1995), p. 15; Concepcion Clamor, "Terrorism in the Philippines," paper presented before the Council for Security Cooperation in the Asia Pacific's Working Group on Transnational Crime, Manila, May 1998, p. 5; "Validation of the Existence of the ASG," internal document prepared for the Philippine National Intelligence Coordinating Agency, February 14, 1997; "Separatist Rebellion in the Southern Philippines," *IISS Strategic Comments,* Vol. 6, No. 4, May 2000, p. 2.

[29] See, for instance, Jose Torres, "The Abu Sayyaf Ten Years After," ABS-CBN News, n.d., http://www.abs-cbnnews.com/images/news/microsites/abusayyaf/abu10.htm (as of March 22, 2006).

[30] Comments made during the INR Workshop on Radical Islam in Southeast Asia, Washington, D.C., October 31, 2003.

ASG cadres, usually operating in teams of between two and ten, mainly target fishing trawlers, merchant vessels, and small-scale cargo containers, launching assaults from fast motorized outriggers, or *bancas,* that are able to outrun any vessels that the ill-equipped Philippine navy can put to sea.[31] Typically, a ship will be threatened with an RPG or peppered with heavy machine gun fire and a payoff demanded. If this is not forthcoming, the vessel will be boarded, its cargo ransacked, the captain's safe stolen (often this will contain a large amount of cash to pay port fees and loading charges), and the crew killed.[32]

In addition to commercial carriers, the ASG has also periodically attacked passenger ferries that operate crossings in the Sulu and Celebes Seas. The monetary scale of these assaults is of a lower magnitude than that offered by cargo containers and fishing trawlers, and most ships are able to carry only a small number of paying customers, most of whom will not be particularly wealthy. But the ships themselves tend to offer a highly attractive target of opportunity given their lack of maneuverability, the frequency and regularity of inter-island sailings, and the near total absence of onboard security.[33]

Between 1996 and the end of September 2003, 811 actual and attempted acts of piracy were recorded in Southeast Asia, 11 percent of which took place in Philippine waters.[34] Although many of these incidents involved ships berthed at Manila port, a considerable proportion occurred in the vicinity of southern islands and inlets under the direct control of, or close to, Abu Sayyaf strongholds. It is this consistent

---

[31] Davis (2003b), p. 14.

[32] See, for instance, Virtual Information Center, "Primer: Piracy in Asia," October 31, 2003, pp. 19–20, http://www.vic-info.org/RegionsTop.nsf/45cb6498825bd61d0a256c6800737df2/90b323f6d67ef5de0a256b9500807103?OpenDocument (as of March 22, 2006).

[33] Peter Chalk, "Threats to the Maritime Environment: Piracy and Terrorism," presentation given before the RAND Stakeholder Consultation Meeting, Ispar, Italy, October 28–30, 2002.

[34] See International Maritime Bureau (2003), p. 5. Generally speaking, only Indonesia has surpassed the Philippines in terms of the regional incidence of piracy.

correlation of attacks and geography that accounts for the ASG's current designation as one of the leading terrorist-piracy organizations in Southeast Asia.[35]

There are no reliable statistics as to how much money the ASG has actually made by engaging in maritime crime. However, most commentators believe it to be substantial, providing a largely self-generating source of income that is reflected in the group's ongoing pursuit of seaborne profiteering.[36]

Despite this active track record, there has as yet been no indication of direct ASG involvement in the most lucrative aspect of the piracy phenomenon, the outright hijacking of a targeted vessel for the purposes of repeat illegal trading. Known as phantom ships, these carriers are falsely documented under flags of convenience, generally from Honduras, Panama, and Liberia (all of which are notorious for their extremely lax registration requirements), and used to transport and then reroute the cargoes of unsuspecting commodity agents or brokers. However, there have been allegations that Abu Sayyaf members have worked in conjunction with phantom ship criminal syndicates, helping to hide hijacked vessels in secluded harbors under ASG control and to facilitate the discharge of diverted payloads to corrupt local officials and members of the armed forces.[37] Given the enormous profits that can be garnered from phantom ship frauds—the International Maritime Bureau estimates groups engaged in the practice can earn upward of US $50 million a year[38]—the possibility that this type of indirect involvement has indeed occurred cannot be discounted.

---

[35]  See, for instance, Coast Guard Intelligence Assessment (2000), p. I-7.

[36]  This perspective on the ASG was expressed to Chalk in various meetings and interviews in the Philippines, London (International Maritime Bureau), and Singapore between 2000 and 2003.

[37]  Virtual Information Center, "Primer: Piracy in Asia," pp. 20–21.

[38]  Personal correspondence between Chalk and Eric Ellen, IMB, London, January 1997. See also "Dead Men Tell No Tales," *The Economist*, December 18, 1999.

## Kidnapping

Although the ASG has long engaged in kidnapping and extortion, under Janjalani's leadership such tactics were used exclusively as a means for raising funds for operational and logistical purposes. Since 1998, however, abductions have increasingly been aimed at generating money for its own sake. The practice has been encouraged by the general willingness of the victims' families to pay ransoms, as well as their reticence to involve the authorities or seek judicial redress, even in the event that the hostage takers are subsequently apprehended.[39] In one publicized case, two Hong Kong hostages were released for a "board and lodging fee" of 2 million Philippine pesos (P) (roughly $36,000) 106 days after their original capture.[40] At the time this was typical of most ransom demands, which according to the Philippine National Police generally ran between a minimum of P500,000 (roughly $9,000) and a maximum of P2 million.[41]

The scale of these incidents reached new heights in March 2000 when the ASG carried out a mass kidnapping of more than 50 elementary school children and teachers, including Catholic priest Rhoel Gallardo (who was later killed), from the village of Tumahubong on the island of Basilan.[42] The operation constituted the largest single abduction carried out by the group and has since been seen by several commentators as marking the turning point of Abu Sayyaf into a full-fledged kidnap-for-ransom business.[43]

---

[39]  Chalk (2002), p. 202; Independent Insight Inc., "Kidnap-for-Ransom in the Philippines," Manila, November 12, 2001, p. 3.

[40]  "Guerrillas Make a Killing Out of Abductions," *South China Morning Post,* December 28, 1998; "HK Hostages Released After 106-Day Ordeal," *South China Morning Post,* December 24, 1998.

[41]  Chalk interview, Manila, June 1998. See also "Zambo Blast Cover Up for Weak ASG," *Manila Times,* January 5, 1999.

[42]  See, for instance, "Abu Sayyaf Primer," Virtual Information Center, November 5, 2002, p. 12, http://www.vic-info.org/regionlist2002.htm; "Gunmen Take Foreigners Hostage in Malaysia," *The Washington Post,* March 25, 2000; "Philippine Military Begins Assault on Muslim Rebels," CNN Interactive Worldwide News, April 22, 2000.

[43]  See, for instance, Lopez (2000); and Gunaratna (2001).

It was the following month, however, that the ASG gained international notoriety for engaging in criminally motivated abductions. On April 23, a faction led by Ghalib Andang (otherwise known as Commander Robot) carried out a lightening raid on a diving resort in Sipadan, Malaysia (Easter Island), capturing 21 hostages, including ten Malaysians, three Germans, two French nationals, two South Africans, two Finns, one Lebanese, and a Filipino. Initial ransom demands were cast in terms of provision of supplies and political stipulations (reversion to barter trading, curbs on foreign fishing, foreign mediation in the Mindanao dispute, release of prominent Islamist terrorists imprisoned in the United States) but quickly evolved into demands for money—$1 million for each of the Western tourists. Five months later, a Libyan-brokered deal was reached for the release of six of the captives, which the head of the Philippine armed forces, General Angelo Reyes, later confirmed netted the group over $16 million.[44]

The Sipadan operation proved to be a major boon as well as a prominent tactical watershed. The injection of money allowed the ASG to recruit impoverished local villagers who were reportedly offered "salaries" of P40,000 to P100,000 each; buy the loyalty of competing factions (intelligence sources claim that several million pesos were distributed for this purpose); and acquire the necessary weapons and logistical resources to sustain the group's activities over the short to medium term.[45] More to the point, it proved that "crime paid" both monetarily and in terms of institutional bargaining power, and ensured that kidnapping would remain the ASG's favored means of financial procurement.

---

[44] See, for instance, U.S. Department of State (2003b), pp. 101–102; Oxfam Small Arms Report, draft text supplied to author, 2001, p. 3; "Fears of the Hostage Takers," *The Economist,* August 26, 2000; "Libya Denies Ransom Offer for Hostages," *The Sacramento Bee,* August 13, 2000; and "Philippine Forces Continue All-Out Attack on Rebels," *The Washington Post,* September 17, 2000. According to Reyes, US $1 million was paid for the nine Western hostages and US $350,000 for each of the rest.

[45] Torres, "The Abu Sayyaf Ten Years After"; "A Clash of Civilisations," ASEAN Focus Group—Asian Analysis, Australian National University, May 2000, http://www.aseanfocus.com (as of March 23, 2006).

Reflecting this, in the 13 months following the Sipadan operation, no less than 102 people were abducted in various incidents across the southern Philippines. The tally included French and German journalists, Malaysian resort workers, U.S. tourists, and Christian missionaries (one of whom was subsequently beheaded)—reportedly generating additional ransom payments of between $15 million and $20 million.[46]

Overall, the ASG is thought to account for roughly 20 percent of all kidnappings that take place in the Philippines. However, if one adds abductions perpetrated by ex-members of the police and security forces, many of whom are alleged to retain close criminal ties to Abu Sayyaf (and MILF), the total would rise to near 60 percent.[47] It was in this context that the Minority Parliamentary House leader, Feliciano Belmonte, famously referred to Ghalib Andang as the "Bill Gates of the [Philippine] kidnapping industry."[48] (Andang was captured in November 2003 after a gun battle in southern Jolo Island as he was planning another abduction.)

**Gunrunning**

The third major form of criminal activity to which the ASG has been connected is gunrunning. The southern Philippines has been awash with weapons since the mid-1980s, emerging as one of the main sources

---

[46] "Abu Sayyaf Group," pp. 12–19; Independent Insight Inc., "Kidnap-for-Ransom in the Philippines," p. 2; "Rebels Kidnap America; Philippines to Reconsider Ransoms," *The Washington Post,* August 31, 2000; "A Hostage Crisis Confronts Estrada," *The Economist,* May 6, 2000; and "Military Finds 2 Beheaded by Philippine Rebels," *The Washington Post,* May 7, 2000. At the time of writing, the ASG held no hostages; those who were seized between 2001 and 2002 either had been killed (generally by beheading) or had escaped from their captors during military pursuit operations.

[47] Independent Insight Inc., "Kidnap-for-Ransom in the Philippines," p. 4. Thirty-five percent of abductions in the Philippines are carried out by drug groups (15 percent) and international syndicates (20 percent); 4 percent are perpetrated by ad hoc criminal groups (that are organized due to a specific opportunity) or street gangs; only 1 percent carry demands of a purely political nature.

[48] Lopez (2000).

for light arms in Southeast Asia.[49] Several factors account for the prolif-eration of munitions in the region, including (1) shortfalls in the disar-mament, demobilization, and reintegration programs that followed the conclusion of the MNLF insurgency in 1996; (2) illicit transfers from corrupt members of the army and militiamen of the Civilian Armed Forces Geographic Units;[50] (3) diversion of arms from the U.S. Excess Defense Articles program in the Philippines;[51] and (4) local produc-tion both from the MILF and from skilled gunsmiths in Mindanao and northern Luzon. Prices on the black market reportedly range from US $660 for an M-16 assault rifle to US $37 for .38- and .45-caliber handguns.[52]

The ASG has effectively tapped the burgeoning stock of weap-onry in Mindanao, both to augment its own supplies and to build up inventory that can be sold to other interested parties. The group has developed a particularly useful "business" in the latter regard, acting as an intermediary for the regional trafficking of Philippine-source weap-onry. An established maritime tradition, combined with the lack of active coastal surveillance around Mindanao, as noted in the discus-sion of piracy, has ensured that Abu Sayyaf smugglers can move arms caches quickly with relatively little risk of interdiction. Members of the organization are also known to have built strong links with well-

---

[49] Philippine security officials conservatively estimate that between 75,000 and 100,000 weapons are loose throughout the southern Philippines, most of which are long arms as opposed to handguns.

[50] Between 1972 and 1986, a total of 8,000 army weapons, mainly Garand M-1 rifles, M-14s, and M-16s, went unaccounted for.

[51] Between 1992 and 1998—as part of its EDA program—the United States gave the Philippines 3,638 M-14s, an unspecified number of M-16s, 16,488 Colt M1911 pistols, and 116 A-1 automatic rifles. Many of these "offloaded" weapons subsequently found their way on to the black market as a result of leakage from the police and security forces. Oxfam Small Arms Report, pp. 5–6.

[52] Davis (2003a), pp. 32–37.

connected criminal and terrorist elements based in Malaysia, providing the group with the necessary points of contact through which to arrange and conclude regionwide, as opposed to purely local, deals.[53]

Most of the arms that are purchased for resale are trafficked over water, passing from bases in Zamboanga and Jolo, across the Sulu Sea to prearranged buyers and subcontractors in the Malaysian provinces of Sabah, Sarawak, and Kelantan. From here consignments are moved to key regional hubs in Cambodia (Sihanoukville), Thailand (Phuket, Ranong, Rayong), Bangladesh (Cox's Bazaar, Chittagong), and Singapore.[54] These same routes work in reverse, providing an effective two-way corridor that can be used for both the import and export of munitions.

The general level of ASG munitions trading activity has risen dramatically over the last four years as a result of the prolific ransom payments the group has received from its various kidnapping pursuits. According to local commentators, the unprecedented injection of cash triggered a major arms-buying spree across Mindanao, driving up prices for everything from mortars and "baby" M-16 assault weapons fitted with grenade launchers (M-203) to recoilless rifles, M-60, and even .50-caliber heavy machine guns.[55]

Flush with cash, the ASG has been able to pay top dollar for these armaments.[56] The cost is passed onto paying customers in the form of 50 percent markups, allowing the group to build up a modern and broad-ranging weapons inventory.[57] Demand for this base stock has been consistently strong, both because Philippine-source munitions

---

[53] Comments made during the Bureau of Intelligence and Research (INR) Workshop on "Radical Islam in Southeast Asia," Washington, D.C., October 31, 2003.

[54] Davis (2003a), pp. 30–32.

[55] Torres, "The Abu Sayyaf Ten Years After"; Lopez (2000); Oxfam Small Arms Report, p. 7.

[56] For example in 2001, the ASG was reportedly prepared to pay P48,00 for one M-16 rifle (the standard weapon of the security forces), nearly double the official listed price by the government (P25,000). The group was also offering P280,000 for an Ultimax light machine gun, which normally retails for around P93,000. Oxfam Small Arms Report, p. 7.

[57] Davis (2003a), p. 35.

are cheap in comparison to those coming from extraregional sources such as North Korea, China, and Pakistan (price inflation notwithstanding) and far more sophisticated than traditional supplies from Cambodia (most of which derive from surplus stocks left over after the Third Indochina War).

### Rationale for Convergence with Organized Crime

As noted above, ASG involvement with organized crime primarily reflects the group's general organizational and ideological fragmentation since the death of Janjalani in 1998. Over the past five years, the group has steadily degenerated into a loosely based network of territorial "lost commands" concerned more with money than fundamentalist Islamist imperatives. Although the rhetoric of jihadism still infuses the group, it has been used largely to legitimate and cover up what is essentially a criminally based agenda.[58]

Exacerbating the ASG's general evolution into criminality have been two additional factors. First, the very success of the group's illicit endeavors, particularly kidnapping, not only demonstrated the financial worth of crime but also provided the necessary capital to offset unavoidable overhead operating costs (such as those associated with building up a viable weapons inventory).

Second, and no less important, ASG Islamist ranks have been steadily diluted by the importation of recruits who view the group less as a vehicle to achieve specific Islamic objectives than as a means of enrichment. Local bandits, laid-off agricultural and construction workers, and farmers suffering from poor crops simply gravitate into

---

[58] It should be noted that Khaddafy Janjalini—a leading ASG member and brother of the group's original founder—has been pushing to reintegrate the organization and return it to the pursuit of an explicit Islamist agenda. It is too soon, however, to tell if this attempt to regenerate the ASG as a "bona fide" jihadist force will be successful.

and out of the group as their own individual exigencies change.[59] Philippine intelligence sources estimate that the ASG's membership grew rapidly after the kidnappings in 2000 and 2002 as members of the local Moro community flocked to the group, lured by the promise of action and the huge ransom payments that had been coerced out of foreign government hands.[60] As one senior Philippine military commander remarked, the root causes of ASG can increasingly be summed up in two words: "thrills and joblessness."[61]

The group has used its wealth to purchase weapons, communication sets, and transportation vehicles. This has allowed it to repeatedly absorb, recover, and at times respond to government attacks that have been orchestrated under the auspices of Balikitan-02-I and Balikitan-03-II. Initiated in 2002 and renewed in 2003, these combined military exercises have involved Army, Marine, and Scout Ranger special force units and were designed to train the Philippine military to root out Abu Sayyaf cells in the southern Philippines. Philippine offensives (code named "Endgame") have been successful in Basilan and Zamboanga.[62] Nevertheless, the ASG's involvement in such terrorist attacks as the 2005 Valentine Day bombings in Manila reflect an organization that is not only very much alive, but is also capable of operating beyond the traditional Mindanao theater.[63]

---

[59] Comments made during the INR Workshop on "Radical Islam in Southeast Asia," Washington, D.C., October 31, 2003. Poverty is chronic in Mindanao, which remains the least developed of the Philippine provinces. According to the World Bank, a staggering 92 percent of the population lives below the official poverty line; in Jolo, the ASG's main center of strength, unemployment runs between 50 and 70 percent of the male population. See Davis (2003b), p. 18.

[60] Torres, "The Abu Sayyaf Ten Years After."

[61] Cited in Davis (2003b), p. 18.

[62] Davis (2003b), p. 17. At the time of writing, at least 300 ASG armed militants were thought to remain on Jolo, with between 100 and 160 scattered across Basilan and Zamboanga.

[63] Chalk interview, Philippine police, military, and intelligence officials, Manila, March 2005. See also Carlos Conde, "The Philippines: Bombs in Three Cities Kill 6," *The New York Times,* February 15, 2005; "Over 60 Hurt in Makati Explosion; GMA Inspects Site," ABS-CBN, February 16, 2005.

On a more general level, the reorientation from religious-separatist to material ambitions has effectively eliminated the option of a political accommodation. Indeed, if anything, one can expect to see the ASG deliberately fostering a climate of general instability in Mindanao to ensure the survival of what has proven to be an especially conducive environment for wider arms trafficking, kidnapping, and piracy. Over the longer term, there is also the risk that a criminalized ASG will emerge as a resource for foreign-based terror networks, notably al-Qaeda and its Southeast Asian affiliate, Jemaah Islamiyah (JI).[64] Such concerns should not be viewed as idle speculation. With the MILF keen to play down its own alleged support of transnational Islamic extremism in the context of ongoing peace negotiations with the Philippine government,[65] the ASG may well prove by default to be the favored conduit through which external radicals seek to extend the range and scope of their operations in Southeast Asia. Indeed, as recently as 2003, Philippine intelligence was claiming that JI and al-Qaeda terrorists had been working in conjunction with Abu Sayyaf members in the procurement, preparation, and distribution of explosive devices, including, cellular-detonated car bombs.[66]

## Colombia: The Synergy of Drugs and Insurgency

Over the past decade, Colombia has confronted a metastasizing left-wing insurgency that has been sustained and further complicated by funds derived from an entrenched criminal economy. Three main players have been integral to this chronic situation: the FARC, the ELN,

---

[64]  In 2003, Abu Sayyaf's chief explosives expert, Abdul Mukim Edris, escaped from prison with Fathur Rohman al-Ghozi, JI's principal operative in the southern Philippines and one of the network's most senior bomb-makers in Southeast Asia (al-Ghozi was killed by Philippine police three months later).

[65]  At the time of writing, the MILF had announced its intention to pursue comprehensive peace talks with the Manila government aimed at consolidating a final settlement to the conflict by 2004.

[66]  See, for instance, Davis (2003b), p. 18.

and illegal paramilitary self-defense forces, loosely organized under the umbrella of the United Self-Defense Forces of Colombia (AUC).

The FARC was established in 1964 as the military wing of the Moscow-line Colombian Communist Party under the leadership of Manuel Marulanda Vélez (alias Tirofijo or "Sureshot"). The group's long-term aim is the seizure of national power through a people's war, although its current public short-term agenda calls for land redistribution, disbanding of the military and the security forces, a crackdown on the AUC, and empowering the historically disenfranchised lower working and peasant classes.[67] The FARC has an estimated fighting force of 15,000 to 18,000 combatants who are organized into seven regional "bloques" (or blocs) and some 71 fronts (67 rural and four urban) that are deployed in a coordinated pattern across the country. The group also has some 10,000 milicia members who help with logistics and intelligence gathering.[68] A lengthy process of peace negotiations between the Colombian government and the FARC—which involved the surrender to the FARC of an extensive demilitarized zone in south-central Colombia—collapsed at the beginning of 2002 after the FARC carried out a series of high-profile kidnappings and assassinations.

The Havana-line ELN was founded in 1964 by intellectuals from the University of Santander and is presently led by Nicolas Rodriguez (alias Gabino). Like the FARC, the group stresses economic and social reform and the general restructuring of the state security apparatus. However, it has also long contested oil drilling and production in northern Colombia and tends to emphasize an overall ideological agenda that mixes Cuban revolutionary theorizing with "liberation theology." The ELN is much smaller than the FARC, numbering 3,500–5,000 fighters

---

[67] For further details see FARC's Web site, http://www.farccep.org.

[68] Chalk interview, Bogotá, September 2001. See also Rabasa and Chalk (2001), pp. 23–29; International Crisis Group (2002), pp. 9–10.

and some 3,000 milicias, with most of its strength concentrated in the northeastern departments of Santander, Norte de Santander, the coastal department of Bolívar, and Antioquia.[69]

The bulk of Colombia's contemporary *autodefensas* (self-defense) groups, commonly known as paramilitary groups, emerged in reaction to the activities of the ELN and the FARC and found strong support in areas where the state was unable to effectively fulfill its local protection responsibilities.[70] Although the autodefensas were initially considered by many Colombians as a necessary evil in the containment of left-wing inspired insurgency and terror, they increasingly have been viewed as a significant domestic security threat. Despite allegations of collusion with the self-defense groups, the Colombian military maintains that it does not discriminate and treats actions against autodefensas that result in numerous casualties just as it does actions against any other illegal armed group. At the time of writing, the AUC leadership had declared a ceasefire and agreed to disarm in accordance with the so-called Justice and Peace Law that was passed by the Colombian congress in June 2005. The legislation provides for the demobilization and social reintegration of up to 20,000 fighters, but it also restricts the crimes for which paramilitaries can be prosecuted, most of which carry extremely light sentences that can be served on farms as opposed to prisons.[71]

---

[69] Chalk interview, Bogotá, September 2001. Rabasa and Chalk (2001), pp. 30–31; ICG (2002), p. 10. FARC and the ELN announced a tactical alliance in August 2003, the purpose of which was to coordinate strikes against the government of President Uribe. The union never materialized, however, and the groups have effectively remained as distinct entities.

[70] Whereas FARC and the ELN reject the right of the state to govern, the *autodefensas* question the ability of the state to govern.

[71] Not surprisingly, the law has been the subject of considerable controversy, with critics both in Colombia and the United States charging that it effectively shields senior paramilitary leaders from prosecution/extradition for serious crimes, including, notably, those associated with drug trafficking. See Juan Forero, "New Colombia Law Grants Concessions to Paramilitaries," *The New York Times*, June 23, 2005; and Juan Forero, "U.S. Threat Is a Blow to Colombia's Easy Terms for Death Squads," *The New York Times*, July 7, 2005.

The FARC, the ELN, and the AUC all appear on the U.S. State Department's list of designated foreign terrorist organizations.[72] All three have become intimately involved with criminal activities: the FARC and the AUC primarily support themselves through the drug trade; the FARC additionally engages in ancillary kidnappings for ransom (KFR) and extortion rackets, which are also a principal mainstay and specialty of the ELN.

### The Drug Trade

Both the FARC and the AUC have established strong ties to the Colombian drug producers and traffickers, the world's largest suppliers of cocaine and the Western hemisphere's largest producers of opiates and such opiate-based derivatives as heroin.[73]

Although the FARC has been engaged in narco-related activities at least since 1982,[74] its involvement in the country's drug business has substantially increased over the past decade due to the increasingly dispersed nature of the illicit drug industry following the collapse of the Cali and Medellín cartels in the early 1990s. The group has developed particularly intensive coca and opiate growing and refining operations in the southeastern departments of Putumayo and Caquetá. Depending on the source, the FARC derives between US $300 million

---

[72] The FARC and the ELN were designated in 1997; the AUC in 2001. The placement of the latter on the list arguably reflects U.S. domestic politics and pressure by leading congressional members to justify the extension of military aid to Colombia despite its poor human rights record.

[73] In 2002, for instance, Colombia's coca yield was sufficient to produce an estimated 680 metric tons of pure cocaine, which represents some 80 percent of global illicit production. While Afghanistan continued to dominate the overall heroin trade, Colombia had effectively cornered the U.S. market, supplying the bulk of all refined opiates sold along America's eastern seaboard. For further details see Bureau for International Narcotics and Law Enforcement Affairs, International Narcotics Control Strategy Report, 2002, Washington, D.C.: United States Department of State, pp. II-3–II-5, IV-19–IV-26. See also "Coca Cultivation in Colombia, 2002," Office of National Drug Control Policy Press Statement, February 27, 2003, http://www.whitehousedrugpolicy.gov/NEWS/press03/022703.html.

[74] The policy of taxing the drug industry and mobilizing and recruiting people involved in the lower end of the drug business was laid out formally in the Conclusions of the FARC Seventh Conference in 1982. Before then, the FARC condemned drug trafficking as counterrevolutionary. See Rabasa and Chalk (2001), pp. 25–26.

and US $1 billion a year in income from criminal activities.[75] About half of that income is from the drug trade, the other half from extortion and kidnappings.[76]

The FARC controls and taxes the drug trade in its areas of influence by enforcing its role as the sole buyer and seller of coca or cocaine at various stages of production and transportation. The group has a precise schedule of fees, called *gramaje,* for protection and services to drug producers and smugglers. Table 7.1 shows the FARC fees in 1999.

According to Colombian officials, about half of the FARC's various fronts are linked to the narcotics trade. Some 11 fronts have a special command element called the "financial collective" that has the responsibility to manage the income from drug production and, to a lesser

**Table 7.1**
**FARC Profits from Drug-Related Activity**

| Activity | Fee |
| --- | --- |
| Production of basic paste | $15.7/kilo |
| Chlorhydrate of cocaine | $52.6/kilo |
| Protection of laboratories | $5,263 each |
| Protection of coca fields | $52.6/hectare |
| Protection of poppy fields | $4,210/hectare |
| Security of landing strips | $2,631 each |
| Cocaine shipments | $10.5/kilo |
| River transportation | 20% of shipment value |
| International drug flights | $5,263 each |
| Domestic drug flights | $2,631 each |

SOURCE: Colombian Armed Forces briefing, March 2000.

---

[75] "Best estimates" of the income FARC derives from the drug trade generally fall in the range of US $200 million–$400 million. See Council on Foreign Relations and the Markle Foundation, Terrorism Q&A: FARC, ELN, AUC (2004), http://cfrterrorism.org/groups/farc_print.html (as of March 23, 2006).

[76] According to Colombian military figures, in 1998 the various illegal organizations (guerrillas and paramilitaries) derived 620 billion pesos ($551 million) from the drug traffic, 350 billion pesos ($311 million) from extortion, and 265.5 billion pesos ($236 million) from kidnappings (Rabasa and Chalk, 2001, p. 32). The Uribe government is currently engaged in an attempt to more accurately gauge the extent of the group's overall funding activities.

extent, trafficking (which remains a secondary as opposed to primary activity). The income is split between the "bloc" to which the front is attached and the FARC Secretariat. Like other large corporations, the FARC Secretariat employs accountants who rotate among the FARC fronts to verify the accounts.[77] However, Colombian military offensives in 2004 and 2005 may have disrupted the FARC Secretariat's ability to supervise and control the activities of the fronts.[78]

The FARC unit whose modus operandi was closest to that of a classic drug cartel is the 16th Front, based in the department of Vichada, under Tomás Medina Caracas, better known as "Negro Acacio." This individual does business with drug traffickers in the departments of Vichada, Guainía, Casanare, and Meta, in the eastern plains, and has exported cocaine to the United States through business associates in Brazil. According to Colombian authorities, the 16th Front derives an annual income of 144 billion pesos (US $128 million) from drug trafficking. The Colombian army has mounted several operations against the 16th Front. In February 2001, it captured the group's major Brazilian drug trafficking intermediary but has not succeeded in capturing Negro Acacio or shutting down the group's drug trafficking activities.[79]

In contrast to the FARC, the other major Colombian leftist rebel group, the ELN, has shown more reluctance to become involved in the illegal drug trade, probably because of its roots in Christian-Marxist "liberation theology." However, after the death of its long-time leader, *el cura* Pérez, a former Catholic priest, those who argue for a more

---

[77] Chalk interview, Colombian government, police and counternarcotics officials, Bogotá, September 2001. See also McDermott (2004b), pp. 29–31.

[78] Rabasa's discussion with senior Colombian military commander, Washington, D.C., August 2005.

[79] "Así funciona el 'cartel' montado por las FARC," *El País* (Cali), June 4, 2003, http://elpais-cali.terra.com.co/historico/jun042003/NALZ/A504N1.html (as of March 23, 2006); "Pruebas de EU Contra 'Acacio'" *El Espectador* (Bogotá), March 10, 2002. According to Colombian military sources, as of August 2005 Negro Acacio was at large and continued to be involved in large-scale drug trafficking. Rabasa interview with senior Colombian military commander, Washington, D.C., August 2005.

"pragmatic" approach to drugs gained ground within the organization. Nevertheless, the ELN's drug trafficking does not approach the levels of the FARC or AUC.[80]

The AUC—which is more a collection of *autodefensas* than a coherent organization—also finances itself by taxing the drug trade. Individual components of the AUC are believed to engage more directly in trafficking operations than does the FARC (which, as noted above, derives most of its narco-funds through taxation on production), working in close coordination with Mexican syndicates to move cocaine and opiates into the United States (see below). The extent of the income that the *autodefensas* derive from the narcotics trade is not known. However, in a televised interview in March 2000, Carlos Castaño, the AUC's national chief at the time, openly admitted that drug trafficking and taxation of peasants producing coca in Antioquia and Córdoba provided up to 70 percent of the financing for his forces.[81] (Castaño has since disappeared and is believed to have been murdered by rivals within the AUC.) A 2003 Colombian peace commission report claimed the AUC derived possibly as much as 80 percent of its revenue from the drug trade and that self-defense forces in general monopolize up to 40 percent of the country's entire narcotics industry.[82]

In conjunction with Mexican cartels, the AUC moves heroin and cocaine into the United States by several means. Considerable use is made of human couriers who smuggle shipments directly into the United States on commercial airlines at approximately one kilogram per trip (although individual batches of up to 20 kilograms have occasionally been intercepted). In most instances, drugs will be either secreted in clothing or hidden in specially designed luggage fitted with false bottoms.[83]

---

[80] Alfredo Rangel Suarez, "Un campanazo de alerta: las lecciones de Putumayo," *El Tiempo* (Colombia), August 12, 2005, pp. 61–63.

[81] "Colombian Death Squad Leader Reveals His Face," CNN Interactive World Wide News, February 3, 2000. See also Bruce M. Bagley, "The Evolution of Drug Trafficking in Colombia in the 1990s," unpublished paper provided to authors, February 2000, pp. 9–10.

[82] McDermott (2003b), p. 7.

[83] Bureau for International Narcotics and Law Enforcement Affairs (2003), p. IV-24.

Narcotics are also trafficked to intermediary distribution points in Mexico from South America, Haiti, the Dominican Republic, Puerto Rico, and Jamaica. Consignments will be loaded at sea, typically using "go-fast" transport boats that operate from secluded coastal areas located on Colombia's Caribbean coast and increasingly on the less-well-patrolled Pacific seaboard. They are then transported to American distributors either overland or via specially chartered flights or private yachts.[84]

Narcotics have been smuggled into major Pacific and Atlantic ports, such as Los Angeles, San Francisco, Boston and Baltimore, as camouflaged containerized bulk. However, there appears to be increasingly less reliance on this method of trafficking, which the U.S. Drug Enforcement Agency (DEA) believes reflects heightened maritime cargo inspections instituted under the framework of the Bush administration's Container Security Initiative.[85]

Recent peace overtures by the AUC formalized with the Peace and Justice Law in June 2005 have somewhat complicated the picture of the group's involvement in the Colombian drugs trade. The legislation requires the paramilitaries to renounce involvement in cocaine and heroin trafficking, but some critics charge it contains loopholes that will allow leading AUC "narco-kingpins" both to escape extradition and to retain their drug-related profits. According to Richard Lugar, the chairman of the Senate Foreign Relations Committee, the law will "leave intact the [paramilitaries'] mafia-like structures" by granting commanders the protection of "double jeopardy" while failing to require that they fully disclose knowledge of the AUC's operations

---

[84] Bureau for International Narcotics and Law Enforcement Affairs (2004), p. IV-24; Rabasa and Chalk (2001), pp. 13–14; "Drugs Flood in from Mexico," *The Washington Post,* November 29, 1999.

[85] Bureau for International Narcotics and Law Enforcement Affairs (2004), p. IV-24. For details on the Container Security Initiative, see U.S. Department of State press release, "Fact Sheet: Securing U.S. Ports," http://www.dhs.gov/dhspublic/interapp/press_release/press_release_0865.xml (as of March 23, 2006).

and finances.[86] Advocates of the law, however, defend the concessions as necessary in order to induce the *autodefensas* to lay down their arms and reintegrate themselves into society.[87]

**Kidnappings for Ransom and Extortion**

Virtually all KFR and extortion committed in Colombia are perpetrated by the FARC and the ELN.[88] According to Amnesty International, 2,200 kidnappings took place in the country during 2003, or roughly one every four hours.[89] Although figures for 2004 showed a sharp decline of roughly 58 percent, 1,250 cases were still recorded, 32 percent of which took the form of KFR incidents carried out by the FARC and ELN (compared to 9 percent attributed to paramilitaries).[90] Colombian government sources believe the two groups earn roughly

---

[86] See Juan Forero, "New Colombia Law Grants Concessions to Paramilitaries," *The New York Times,* June 23, 2005. Commanders will be given the opportunity to confess to drug-related charges in Colombia, which will prevent them from facing similar indictments in the United States. In addition, the law defines "paramilitarism" as a political crime, which under the country's constitution would safeguard AUC leaders from standing trial in foreign countries on related trafficking offences. Critics also maintain there is nothing in the legislation to ensure that commanders will, in fact, provide a full and honest confession of their criminal activities.

[87] See Alfredo Rangel's sophisticated argument on the requirements and limitations of a peace process with the autodefensas in the context of a continued conflict with the FARC. "Una ley instrumento de paz," *El Tiempo,* May 16, 2005.

[88] AUC's kidnappings are thought to constitute no more than 8–20 percent of all abductions that take place in the country, most of which are connected to the drug trade. In most cases, targets are families and relatives of traffickers who either have been arrested or are suspected of diverting or stealing drug shipments. In the first instance, hostages are held to ensure that detainees are not tempted to turn state's evidence and inform on former associates; in the second, to coerce compensation for the loss of the consignment in question. ICG (2002), p. 18; McDermott (2003a), p. 27.

[89] Fundación Seguridad & Democracia, "Balance de seguridad en Colombia, Año 2003."

[90] Amnesty International, Colombia Report for 2005, http://web.amnesty.org/report2005/col-summary-eng (as of March 23, 2006). See also "Kidnappings 'Halved' in Colombia," BBC News, July 22, 2004, http://news.bbc.co.uk/go/pr/fr/-/2/hi/americas/3916235.stm (as of March 23, 2006). According to the U.S. State Department, there were 185 kidnappings in Colombia during the first four months of 2005. See U.S. Department of State, Consular Information Sheet: Colombia, August 2005, http://travel.state.gov/travel/cis_pa_tw/cis/cis_1090.html (as of March 23, 2006).

US $230 million a year from these abductions, which has helped turn the nation into the KFR (and more generalized kidnapping) capital of the world.[91]

Traditionally, the bulk of FARC KFRs occurred in the agricultural crop and livestock production areas in the eastern part of the country. Most victims are cattle ranchers, farmers, and merchants. Beginning in the 1980s, however, the group started to expand the range and scope of its operations, increasingly focusing on wealthy and middle class residents of major cities such as Bogotá.[92] Although high-income members of the urban elite are still favored targets, improved security has limited the opportunities for carrying out such abductions. As a result, the FARC has once again begun to shift the tactical direction of its KFRs. They now routinely take the form of mass random seizures in rural or semi-rural areas—a practice that the police euphemistically refer to as *pesca milagrosa* (literally, miraculous fishing).[93]

ELN KFR activities have generally been more opportunistic in nature than those of the FARC and have largely not emphasized urban-based kidnappings. Most of the group's victims are abducted after being stopped at staged roadblocks, with the hijacking of school buses emerging as an especially favored tactic (largely because parents have been willing to pay quickly for the safe return of their children).[94] Although ransom demands are smaller than those demanded by the FARC, they still constitute an important source of income—roughly 60 percent of the ELN's total operating revenue.[95]

---

[91] For a comprehensive analysis of the country's kidnapping industry see Pax Christi (2001).

[92] Rabasa and Chalk (2001), p. 34.

[93] Chalk interview, Cali, September 2001. See also Mauricio Rubio, "Kidnapping and Armed Conflict in Colombia," paper presented before the International Peace Research Institute Workshop on Techniques of Violence in Civil War, Oslo, August 2004, p. 4.

[94] In 2002, 384 minors were kidnapped by the ELN; the release for most of them took days or weeks to negotiate rather than months.

[95] McDermott (2003a), pp. 26–27. Similar comments were made to RAND analyst Peter Chalk during interviews in Cali, September 2001.

The ELN and the FARC also engage in extensive extortion activity, which nets the two organizations an estimated US $300 million a year. The ELN, in particular, has moved to consolidate this form of criminality into its overall tactical agenda, viewing it as integral to its policy of influencing the oil industry in Colombia's northeast. Executives and high-ranking employees of petroleum companies have been consistently singled out for intimidation. At one point, the destruction of oil pipelines had become almost routine in the northern departments of the country, unless appropriate "revolutionary taxes" were paid.[96] This is no longer the case because U.S. training has dramatically improved the efficiency of pipeline protection.

More generally, the two groups have moved to coerce regular payments from wealthy individuals. The FARC's "Law 002" of 2001 provided that all persons or families with combined assets in excess of US $1.0 million were required to contribute a percentage of their net worth to support the group. Those who did not pay would be "detained," the FARC warned.[97]

Another form of extortion common to the FARC and the ELN has involved the intimidation of mayors, councilors, and other municipal leaders. The purpose has been to gain influence over local government structures in order to tap the financial resources made available as part of decentralization reforms carried out in the 1980s and 1990s. Both groups have been relatively successful in these endeavors, especially in rural towns, where they are now able to siphon payrolls, tax receipts, infrastructure development funds, and various other sources of income.[98]

**Rationale for Convergence with Organized Crime**

The principal factor accounting for the involvement of the FARC, the ELN, and the AUC in organized crime in the contemporary Colombian

---

[96] Rabasa and Chalk (2001), p. 31; Sweig, "What Kind of War for Colombia?" p. 123; International Crisis Group, "Colombia's Elusive Quest for Peace," p. 10.

[97] See "Ley 002, sobre la tributación," http://six.swix.ch/farcep/Leyes/ley002.html (as of March 24, 2006).

[98] Rabasa and Chalk (2001), p. 34.

context is their requirement for funds to pay their troops and to purchase weapons, ammunition, and other battle-related materiel. The need for these resources has risen exponentially over the last five years as a result of three main trends: (1) growing guerrilla-AUC conflict for control over the country's disputed drug-growing and resource-rich regions; (2) increased U.S. counternarcotics and counterinsurgency assistance to the Colombian military and police;[99] and (3) the heightened willingness of the state's security forces to crack down on militia self-defense activity. In effect, an escalating internal arms race has arisen, the dimensions of which can only be met by a sustained and highly costly procurement process. Crime presents the quickest and easiest way to meet these requirements.[100]

The FARC is a good example of these dynamics at work. In August 2000, the Colombian newsweekly, *Semana,* published the minutes of the group's Secretariat annual meeting, which included the following statement: "The acquisition of arms currently has permitted us a qualitative jump in our process of becoming the Ejercito del Pueblo [People's Army or FARC-EP]."[101] The assertion was important because it illustrates the strong psychological connection the FARC leadership has made between money, weapons, and power.[102]

This self-defined nexus was perhaps best underscored three months later when the group instructed its fronts to increase their various revenue-generating activities to approximately US $600 mil-

---

[99] The United States has provided well over US $3 billion in direct security assistance to Colombia since 2000 (aid currently totals more than $600 million a year), which makes the country the third largest recipient of U.S. foreign aid after Israel and Egypt. See McDermott (2005), p. 26; USIP (2004), p. 2; and Juan Forero, "New Colombia Law Grants Concessions to Paramilitaries," *The New York Times*, June 23, 2005. Initially this money could only be used to support counternarcotics operations. However, with terrorism now occupying a preeminent place in American foreign and security policy, the scope of U.S. aid has been extended to allow assistance for directed operations against the FARC, the ELN, and paramilitaries (all of which are designated as foreign terrorist organizations).

[100] For a comprehensive analysis of small arms trafficking in Colombia see Cragin and Hoffman (2003).

[101] "Los Planes de las FARC," *Semana,* August 7, 2000.

[102] Cragin and Hoffman (2003), p. 5.

lion.[103] The rationale behind the order was to ensure consistency in the receipt of arms shipments so that an effective response could be mounted against escalating AUC attacks as well as expected assaults by Colombian military forces reequipped by the United States. Because the FARC competes with the *autodefensas* and the security forces for military supremacy, it has logically sought to counter actual and latent challenges stemming from each group by procuring more weapons.[104]

Drug money has allowed both the FARC and the AUC to purchase a wide assortment of military-grade weaponry including, in the former case, alleged caches of surface-to-air missiles. The two organizations have also been able to augment the volume of their respective munitions stocks through bulk purchasing. Indeed, the FARC is believed to have been asking its international brokers and subcontractors to quote arms prices in singles and *thousands* from as early as 2000.[105] Just as noteworthy have been several interceptions of extremely large weapons consignments, including one shipment bound for the AUC that was seized in June 2000 and that reportedly contained 4,000 AK-47 rifles.[106]

Even the ELN, by far the smallest and weakest of the three main illegal organizations in Colombia, has been able to sustain a reasonably concerted war footing through the acquisition of weapons and explosives purchased with criminal proceeds. The group has repeatedly demonstrated its ability to blow up key infrastructure targets in the north of the country, attacking the strategically important Caño Limón

---

[103] "El Otro Plan Colombia," *Cambio,* March 20, 2000.

[104] See, for instance, Cragin and Hoffman (2003), pp. 40–41.

[105] "Gunrunner Sarkis Links Peruvian Army, SIN to Arms Trafficking," *La Republica* (Lima, Peru), September 21, 2000.

[106] "Traición en el Mercado Negro de Armas," *El Tiempo,* June 28, 2000.

Covenas oil pipeline in Arauca no less than 170 times in 2001.[107] In October 2003, it took responsibility for the downing of a U.S. State Department plane that was spraying cocaine crops with defoliants.[108]

Beyond considerations pertaining to weapons acquisitions, the FARC, the ELN, and the AUC no doubt have been attracted to the enormous profit potential that is available in Colombia. An entrenched criminal economy, weak state structures, and endemic civil conflict have provided an ideal environment for nonstate actors to engage in lucrative illicit activities that can be justified (and hidden) on the basis of left- or right-wing authoritarian populist rhetoric. The three groups have all benefited from the imposition of protection levies to pay for security against one another's attacks, and the FARC and the AUC have purportedly concluded agreements to ensure that their fighting does not unduly affect their drug business. According to one former paramilitary leader, Rodrigo Molano, "The self-defense forces do not necessarily fight the guerrillas. In many cases they only have a dissuasive presence, respecting [established] territorial divides with the FARC."[109]

The latter aspect has encouraged many commentators to argue that the FARC, the ELN, and the AUC are approaching or may have already reached the critical point where political motivational drivers are balanced with, or even superseded by, the economic imperative to pursue designs of a purely commercial nature. Tamara Makarenko has observed this dynamic with respect to the FARC. Contending that cash flow has now become an objective in its own right, she portrays

---

[107] Caño Limón Covenas carries roughly 105,000 barrels of oil every day to ports on the Caribbean coast. Attacks on the pipeline cost the Colombian government an estimated US $430 million a year in lost oil revenues. See Sweig (2002), p. 135; "Once Again Colombia Mourns," *The Economist,* February 15, 2003.

[108] "Colombian Rebels Claim Responsibility for Downing U.S. Plane," Associated Press, October 3, 2003.

[109] Cited in McDermott (2003b), p. 8.

the group as one that has evolved (or devolved) into a quasi-insurgent entity that, while not fully abandoning its political agenda, is simultaneously interested in maximizing criminal profits.[110]

The growing involvement of the FARC, the ELN, and the AUC in organized crime carries significant implications for peace and stability in Colombia. The ability to acquire and maintain a sophisticated arms base has significantly heightened the potential violence threshold of the three groups. In the case of the FARC, it has also availed a general expansion of the group's operations beyond the rural theater to more urban-based settings, reflected in the wave of terrorist bombings that have taken place in major metropolitan centers since 2002.[111]

Finally, in common with the Abu Sayyaf Group in the southern Philippines, the nexus between crime, terrorism, and insurgency severely limits the opportunities for meaningful negotiation between state and nonstate actors. As noted above, the FARC, the ELN, and the AUC have all derived protection taxes from local populations in areas under their respective control. Moreover, the general chaos within Colombia that has been a by-product of the country's civil conflict has transformed the country's internal geopolitical landscape into a patchwork of dissident-controlled zones that have been used to support highly profitable drug growing and refining, kidnapping, and extortion activities. In short, each of the three groups has a strong financial incentive to continue the violence, which obviously has significant implications for the success of any eventual peace negotiation.

---

[110] Makarenko (2003), p. 11.

[111] Colombian intelligence sources believe FARC may have inserted as many as 10,000–15,000 agents in and around major cities such as Cali, Medellín, and Bogotá. They also allege the group has contracted with the Provisional Irish Republican Army (PIRA) to provide specific training in urban-based sabotage and terrorism. See Sweig (2002), p. 127; "Once Again, Colombia Mourns"; "Colombia's Peace Bid at Risk," *The Washington Post,* August 25, 2001.

## Al-Qaeda and Hezbollah in Africa: The Conflict Diamonds Nexus

Even before the loss of their bases in Afghanistan, al-Qaeda leaders showed interest in the potential of sub-Saharan Africa for financial transactions as well as a source of strategic minerals. Al-Qaeda reportedly used sympathetic crime networks to convert funds into diamonds and gold, as well as in attempts to obtain nuclear, chemical, and biological material.[112] Al-Qaeda's interest in Africa also derives from the potential of the region's vast ungoverned territories for training and basing and the opportunities presented by conditions in the region to exploit religious friction and to support the expansion of Islamic radicalism.

The economic links between Islamic terrorism and organized crime in sub-Saharan Africa center on so-called conflict diamonds (also called "blood diamonds" or "terror diamonds").[113] The conflict diamond phenomenon was first noticed during the Angolan civil war, when National Union for the Total Independence of Angola (UNITA) leader Jonas Savimbi realized that the country's extensive diamond fields could finance his struggle against the ruling Marxist Popular Movement for the Liberation of Angola. UNITA capitalized on the smuggling routes that the movement had developed during the independence struggle in the 1970s. By 1993 Savimbi had in place one of the world's largest diamond trafficking networks, earning an estimated $4.1 billion between 1992 and 2000.[114] Subsequent international actions to restrict UNITA's diamond trade seem to have been

---

[112] Wannenburg (2003), pp. 77–90.

[113] The term *blood* or *conflict diamonds* refers generally to rough diamonds obtained by using or threatening to use coercion or military force, particularly in Africa. According to the European Commission, blood diamonds represent 2–4 percent of global diamond production: "Al-Qaeda linked to blood diamonds in Africa," Sapa-AFP, April 29, 2003.

[114] InvestigativeJournalists SouthAfrica.com. Discussion Forum, Blood Diamonds, February 2003, http://www.southafrica.com/forums/showthread.php?t=3478 (as of March 27, 2006); Cooper (2002).

relatively successful in limiting the supply of funds to the organization (from $700 million in 1996 to $100 million in 2002) and may even have contributed to its demise.[115]

This pattern—in which diamonds were used as war currency—has been replicated in other African conflicts, particularly in Sierra Leone, Liberia, and the Democratic Republic of the Congo.[116] The Revolutionary United Front of Sierra Leone, a murderous rebel force that has engaged in mass killing, looting, rape, and violence of the worst kind, supports itself largely through the extraction and sale of diamonds in the areas that it controls. In the eastern Congo, diamonds have been integral to the Congolese Rally for Democracy and the Movement for the Liberation of Congo insurgencies, and to the insurgencies' nexus with their external allies in Rwanda and Uganda.[117]

Although Central Africa does offer considerable strategic mineral assets for plundering, the area of greatest concern is the Parrot's Beak, a small wedge of land on Liberia's border with Guinea where rebel factions vie for blood diamonds.[118] Across the border in Sierra Leone, the government believes that illicit prospecting is rife, involving about three times the number of the 435 registered license holders. This is especially the case in the diamond-rich area of Kono, where the highest number of legal mining licenses has been distributed.[119]

The relationship between al-Qaeda and the terror diamond trade is a matter of some controversy. The *9/11 Commission Report* (July 2004) questioned whether al-Qaeda has been trafficking in "conflict" diamonds. The report noted, "We have seen no persuasive evidence that al Qaeda funded itself by trading in African conflict diamonds."[120]

---

[115] Cooper (2002).

[116] InvestigativeJournalists SouthAfrica.com.

[117] U.S. House of Representatives (2000a), p. 8.

[118] Greg Campbell, "Blood Diamonds," Amnesty Now, http://www.amnestyusa.org/amnestynow/diamonds.html (as of March 24, 2006).

[119] Rod MacJohnson, "'Blood Diamonds' Initiative a Mixed Success in War-Scarred Sierra Leone," Agence France-Presse, May 18, 2003, http://www.reliefweb.int/w/rwb.nsf/0/58053e67d50efe91c1256d2b0054b284?OpenDocument.

[120] National Commission on Terrorist Attacks Upon the United States (2004).

Nevertheless, there is a wealth of open-source information linking al-Qaeda to the illegal diamond trade in West Africa: the Sierra Leone Special Court (the war-crimes court investigating the conflict in Sierra Leone); the Belgian government's own investigation (this is important and relevant because Antwerp, Belgium, is the world's largest diamond market); the extensive investigative journalism of *The Washington Post*; and the most-in-depth report on this subject, that by Global Witness, a nongovernmental organization that has reported extensively on al-Qaeda's known or alleged "terror diamonds" connections.

The apparent discrepancy between the findings of the 9/11 Commission and those of the other sources noted above is due to the fact that each appears to have been asking different questions. The 9/11 Commission—and the FBI and CIA investigations on which the commission relied[121]—appeared to look at the question of whether al-Qaeda traded in diamonds to fund itself (as UNITA or other groups had in the past). In contrast, the other investigations looked at the question of whether al-Qaeda used diamonds and other precious minerals to hide and transfer funds. This would appear to be the reason why the 9/11 Commission (and other U.S. agencies) came up with a

---

[121] *The 9/11 Commission Report* cited a number of U.S. government reports only and did not appear to use—at least, by citation—any of the highly detailed open-source reports, such as those by Global Witness, cited in this report. The U.S. government reports cited by the commission (p. 499, footnote 129) included the FBI report, "Allegations of Al Qaeda Trafficking in Conflict Diamonds," July 18, 2003; CIA analytic report, "Terrorism: Assessing al-Qa'ida and Hizballah Ties to Conflict Diamonds," CTC 2002-40121CH, January 13, 2003; CIA analytic report, "Couriers, Hawaladars Key to Moving Al-Qa'ida Money," CTC 2003-40063CH, May 16, 2003; DOS cable, Brussels 05994, "WP Reporter Claims More Witnesses to 2001 Al-Qaida/Conflict Diamonds Link," December 12, 2002; DOS cable, Brussels 001054, terrorism and conflict diamonds, March 1, 2002; FBI situation reports and supporting documents from the Sierra Leone trip, February 2004.

negative response to their question, whereas the other investigations answered theirs in the affirmative. This distinction is extremely important because it ultimately shows two sides of a similar concern.[122]

Al-Qaeda is believed to have used diamonds (1) to develop anonymous, movable wealth prior to September 2001—perhaps expecting that known existing al-Qaeda assets would be frozen following the attacks—and (2) to launder funds from other sources, such as drug sales. Global Witness states that al-Qaeda uses diamonds for four principal reasons: to raise funds for its cells; to hide money targeted by financial sanctions; to launder the profits of criminal activity; and to convert cash into a commodity that holds its value and is easily transportable.[123] Most worryingly (see below), the Global Witness report also clearly outlines how al-Qaeda used both corrupt officials (such as Liberia's former president Charles Taylor) and the existing Hezbollah West African diamond-smuggling network to support its activities.

In 1999, Mohamed Hijazi, a longtime diamond miner and dealer in Sierra Leone, was appointed as RUF's agent "to negotiate with any person or company within or outside Sierra Leone for the prospecting, mining, buying & selling of diamonds."[124] Transcripts from court cases against al-Qaeda members contain evidence that the network has people with expertise in the diamond business in these areas, including those who previously were involved in the gemstone and diamond trade in Tanzania, which al-Qaeda has allegedly used to finance

---

[122] A recent trip (May 2005) to Sierra Leone by RAND researcher Kevin O'Brien to investigate this and other concerns regarding an al-Qaeda presence in West Africa further solidified this distinction and conclusion. In interviews with members of the U.S., UK, and other Western missions, the complexity of this question was notable: Although very few respondents believed that al-Qaeda had used Sierra Leone diamonds to fund its activities, most acknowledged that al-Qaeda operatives may have used such diamonds to provide readily transportable value, and that known al-Qaeda and Hezbollah operatives had been in Sierra Leone and Liberia during the period in question.

[123] Global Witness (2003), p. 28.

[124] "Lawmakers Back Bill Curbing 'Blood Diamonds,'" Reuters, June 24, 2001, http://webnetarts.com/socialjustice/diamonds.html (as of March 24, 2006).

operations.[125] The U.S. government made similar charges, linking the sale of tanzanite, a gemstone found only in Tanzania, to al-Qaeda financing.[126]

Al-Qaeda's use of precious gems is reported to have begun in 1993 when bin Laden was establishing his base in Sudan. To finance the organization, he allegedly bought and sold gems.[127] According to Lyman and Morrison, al-Qaeda subsequently took advantage of the Congolese civil war to extend its activities to the Congo. Al-Qaeda's illegal trade in gems has since spread to other countries in Africa, allegedly colluding with the governments of Burkina Faso and Liberia to buy diamonds mined by the RUF in Sierra Leone.[128] Both President Blaise Campaore of Burkina Faso and Libyan dictator Muammar Qadhafi are also mentioned in connection with both the Sierra Leonean and Liberian ends of these operations.[129] Although the RUF has denied having any links with al-Qaeda or selling diamonds to it, it has reportedly acknowledged that such sales could have taken place without its knowledge.[130]

In September 1998, following international efforts to freeze al-Qaeda and Taliban accounts after the August 1998 bombings of the U.S. embassies in Tanzania and Kenya, senior al-Qaeda financial officer Abdullah Ahmed Abdullah arrived in Monrovia, Liberia, to meet with Ibrahim Bah (an Afghan veteran from Senegal who went on to deal diamonds for Liberian president Taylor with the rebels in Sierra Leone) and talk with senior Liberian and RUF officials. At this time, Abdullah attempted a $100,000 arms-for-diamonds deal. Although the deal fell

---

[125] Douglas Farah, "Al Qaeda Cash Tied to Diamond Trade Sale of Gems from Sierra Leone Rebels Raised Millions, Sources Say," *The Washington Post,* November 2, 2001.

[126] "Africa Overview," U.S. Department of State (2002a).

[127] Lucy Jones, "Al-Qaeda 'Traded Blood Diamonds,'" BBC News Online, February 20, 2003, http://news.bbc.co.uk/1/hi/world/africa/2775763.stm.

[128] Lyman and Morrison (2004), pp. 83–84.

[129] Douglas Farah, "Report Says Africans Harbored Al Qaeda: Terror Assets Hidden In Gem-Buying Spree," *The Washington Post,* December 29, 2002, p. A01; Morrison (2001), pp. 15, 18, and 19.

[130] Dagne (2002), p. 21; Farah, "Al Qaeda Cash Tied to Diamond Trade Sale."

through, Abdullah maintained contact with the network he found there.[131] Fragments of correspondence alleged to be between Ayman al-Zawahiri and "Abu Mohammed al-Masri" (an alias used by Abdullah), found by *The Wall Street Journal* in a computer in Afghanistan, indicate that the subsequent diamond deals were controlled by al-Qaeda at the highest levels. Zawahiri is reported to have said that these deals will "transfer our activities to the stage of multinationals and [bring] joint profit."[132]

A joint investigation by European intelligence agencies,[133] reported in *The Washington Post* in December 2002, alleged that three men—Aziz Nassour, a Lebanese diamond merchant,[134] his cousin Samih Ossailly, and the aforementioned Bah—were the primary conduits linking al-Qaeda to the Liberian leadership and a company in Belgium that polished and sold conflict diamonds. In 2000, more than $14 million worth of diamonds were sold. Buyers' identities are known only to Bah and to a few others.[135] According to FBI sources quoted in the story, two al-Qaeda operatives implicated in the 1998 attacks, a Tanzanian called Ahmed Khalfan Ghailani and a Kenyan, Fazul Abdullah Mohammed, both on the FBI's wanted list, traveled between Liberia, Burkina Faso, and Sierra Leone and Afghanistan and Pakistan exchanging cash for diamonds. (Ghailani was arrested in Pakistan in

---

[131] Amelia Hill, "Terror in the East: Bin Laden's Dollars 20m African 'Blood Diamond' Deals," *Observer News,* October 20, 2002, p. 6.

[132] Farah, "Report Says Africans Harbored Al Qaeda."

[133] Much of the evidence comes from Western intelligence reports and from the trials of al-Qaeda suspects after the September 11 attacks and the 1998 bombings of U.S. embassies in East Africa. See Jones, "Al-Qaeda 'traded blood diamonds.'"

[134] Belgian intelligence also reported that Nassour and his family were implicated in the trade of diamonds with UNITA and are suspected of having links with the Amal Shi'ite militia and Lebanese leader Nahib Berri. The subnational groups that extend al-Qaeda's web of influence include Abu Sayyaf in the Phillipines, which controls territory and can levy taxes on citizens, and is known for counterfeiting (linked to the laundering of fake $100 bills in Hong Kong); the Albanian mafia (used as logistical support to the Balkan cells of al-Qaeda), which is linked to the Kosovo Liberation Army and is involved in heroin and cocaine trading; and Indian mafia figures. See Wannenburg (2003).

[135] Wannenburg (2003).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 333 of 632

July 2004.) Bah is alleged to have begun using ASA Diam, a company associated with Ossailly and Nassour, in July 2000 to "front" diamonds secured in West Africa; ASA Diam's diamond trading subsequently took a sharp upward turn to over $14 million worth of diamond sales in 2000. In February 2001, Nassour and Bah met to discuss increasing these diamond purchases. Ghailani and Mohammed supervised the transaction. Judging from reports of diamond sales in both West Africa and Belgium in 2000, the pace of this activity had accelerated to such a point that, by August 2000, these operatives "appear to have cornered most of the Sierra Leonean and Liberian diamond markets." Local diamond merchants were hard-pressed to buy diamonds, and new buyers were paying a premium of between 15 and 30 percent.[136]

In January 2001, Nassour and Ossailly were trying to buy weapons—allegedly including SA-8 surface-to-air missiles and sophisticated rockets for BM-21 multiple rocket launchers—from the Nicaraguan army via an Israeli arms dealer based in Panama named Simon Yelnik. Other reports allege that al-Qaeda attempted to buy similar items via Bulgaria using precious gems. An intercepted email from the Israeli arms dealer to a Russian arms merchant, listing assault rifles, ammunition, ground-to-air missiles, and 200 rockets for multiple rocket launchers, said the consignment was for "our friends in Africa." The weapons were to be delivered to Liberia with an Ivorian end-user certificate. Nassour and Ossailly later acknowledged to Belgian officials that the transaction was discussed but never completed.[137]

In April 2001, however, when ASA Diam's purchasing in West Africa was at its height, it stopped reporting diamond sales in Antwerp.[138] Nassour and Ossailly were believed to have used couriers to exchange $300,000 for diamonds every week between December 2000 and September 2001.[139] In 2000, Ossailly and a Boston-based used car dealer, Ali Darwish, set up a safe house in Monrovia to funnel

---

[136] Farah, "Report Says Africans Harbored Al Qaeda"; Campbell, "Blood Diamonds."

[137] Farah, "Report Says Africans Harbored Al Qaeda"; "West African Leaders 'in al-Qaida Plot,'" *Guardian Unlimited*, December 30, 2002.

[138] Farah, "Report Says Africans Harbored Al Qaeda."

[139] Hill, "Terror in the East."

the wealth from the diamond fields to rebel organizations throughout the world;[140] Ghailani and Mohammed moved into the house in March 2001.[141] During the summer of 2001, Ghailani and Mohammed stayed in the compound of the president of Burkina Faso in the capital, Ouagadougou, before moving to Camp Gbatala, a military camp in Liberia near Taylor's private farm; for this, the Liberian president was allegedly paid US $1 million.[142]

By September 2001, al-Qaeda had laundered an estimated $20 million in diamonds, most of which were under United Nations sanctions aimed at preventing their use in fueling civil wars. Payment to al-Qaeda for the diamonds was made in cash or weapons.[143] According to David Crane, the chief prosecutor for the Special Court on Sierra

---

[140] According to sources, small packets of diamonds, often wrapped in rags or plastic sheets, are taken by senior RUF commanders across the porous Liberian border to Monrovia. There, at a safe house protected by the Liberian government, the diamonds are exchanged for briefcases of cash brought by diamond dealers who fly several times a month from Belgium to Monrovia, where they are escorted by special state security through customs and immigration control. See Farah, "Al Qaeda Cash Tied to Diamond Trade Sale."

[141] According to the Belgian officials, couriers took weekly flights from Antwerp on the now-defunct Sabena airline to Abidjan. There, they hired light planes from Weswua Airlines to fly to Monrovia, Liberia, and then went on to meet rebel RUF commanders in Sierra Leone. Nassour, now living in Beirut, is being investigated concerning claims he conducted deals with al-Qaeda with his cousin Ossailly, who was arrested on weapons-related charges in June 2002 by Belgian officials. Nassour, Ossailly, and Bah all deny involvement with al-Qaeda. See Wannenburg (2003). Nassour told Global Witness that he met Liberian president Taylor in July 2001 to discuss setting up a mobile phone business and an airline company. Nassour claims he waited for four days for a meeting with Taylor before he gave up and left. An eyewitness maintains Nassour's visit was linked to problems that were threatening to destroy the arrangement. The source claims that Nassour arrived the day after a colleague fled with $500,000 of al-Qaeda money. The witness maintains Aziz Nassour, the Lebanese diamond merchant, met Taylor at Harpur port, where arms are delivered and timber illegally exported, and handed over US $200,000, apparently to ensure continuation of the smuggling trade. The alleged deal ended with the September 11 attacks two months later, although Global Witness is convinced al-Qaeda has continued its trade. Hill, "Terror in the East."

[142] The U.S. Defense Intelligence Agency allegedly monitored Ghailani and Mohammed in preparation for a Special Forces team in neighboring Guinea to snatch the two, but the mission was not carried out, because the team could not confirm the targets' identities, according to Douglas Farah ("Report Says Africans Harbored Al Qaeda").

[143] Jones, "Al-Qaeda 'Traded Blood Diamonds.'"

Leone established in January 2003 to try people accused of war crimes during that country's long civil war in the 1990s, al-Qaeda continued to operate in West Africa, principally to buy diamonds:

> They're all interconnected. They all work together. They know each other. It's a common plan, a scheme, to move diamonds as a commodity, to do whatever they need to trade it for cash, arms, or to launder money. . . . Diamonds fuel my conflict, and diamonds fuel the war on terrorism. Charles Taylor is harboring terrorists from the Middle East, including al Qaeda and Hezbollah, and has been for years . . . he is a player in the world of terror and what he does affects lives in the United States and Europe.[144]

In August 2004, a confidential Sierra Leone Special Court investigation was leaked to the South African press. The leaked report stated that "a series of witnesses place six top al-Qaeda fugitives in Africa buying up diamonds before the September 11 attacks." These figures "dealt directly with Liberia's former President Charles Taylor and other leaders and warlords in what was then a rogue West African nation from 1999 onwards," according to the accounts of witnesses interviewed by the Special Court. Its findings concluded that flight records and some "undisclosed evidence in Europe" appeared to support the accounts of pre–September 11 al-Qaeda diamond business in Liberia. The report further states that "al-Qaeda has been in West Africa since September 1998 and maintained a continuous presence in the area through 2002."[145]

U.S. government officials cited by the report stated that al-Qaeda proceeds from the diamond dealings were estimated to be $15 million. The al-Qaeda figures said to be involved in the network included

---

[144] Mike Blanchfield, "Al-Qaeda Funded by 'Blood Diamonds': Illicit Stones Traded to Pay for Terror Operations, UN Says," *The Ottawa Citizen,* Sunday Final Edition, February 9, 2003; Rod MacJohnson, "'Blood Diamonds' Initiative a Mixed Success in War-Scarred Sierra Leone," Agence France-Presse, May 18, 2003, http://www.reliefweb.int/w/rwb.nsf/0/58053e67d50efe91c1256d2b0054b284?OpenDocument  (as of March 24, 2006).

[145] Much of the evidence comes from Western intelligence reports and from the trials of al-Qaeda suspects after the September 11, 2001, attacks and the 1998 bombings of U.S. embassies in East Africa. See Jones, "Al-Qaeda 'Traded Blood Diamonds.'"

Ghailani; Mohammed; Mohammed Atef (killed in Afghanistan in 2001); the Pakistani Aafia Siddiqui, al-Qaeda's only prominent female figure;[146] Kenyan Sheikh Ahmed Salim Swedan, wanted for the 1998 attacks in East Africa; and Abdullah Ahmed Abdullah. Abdullah was alleged by the report to have continued operating in Guinea into 2002, long after other reports had al-Qaeda operatives leaving West Africa. The report also cites Charles Taylor's extensive involvement with al-Qaeda in making arrangements for gems, weapons, and cash. Abdullah was later reported to have ordered Ghailani and Mohammed to do al-Qaeda's diamond buying "because they were of African descent and would not arouse any suspicion."[147]

### Hezbollah and Africa

Lebanese Hezbollah was, in many ways, the precursor to al-Qaeda's activities in this area. Regardless of its Lebanese focus, Hezbollah is known to maintain a global network to support fundraising and operational and logistical requirements for its operations abroad. It is suspected that much of this is done in close cooperation with Iranian intelligence services. Similar to, and perhaps imported from, its operations in North and South America, Hezbollah raises and launders large amounts of money in Africa. It recruits and trains new operatives for both target selection and surveillance and operations, all with the aim of supporting its principal goals in the Middle East.

Hezbollah has also established numerous front companies in Africa, once again reflecting its practice elsewhere in the world. According to one source, many Hezbollah activists previously based in the tri-border region of South America relocated to Africa because of the "increased attention" on its activities there following the 1992 and 1994 bombings in Argentina. Other activists ended up in Europe,

---

[146] The presence of Siddiqui in Monrovia at this time, alongside Sheikh Ahmed Salim Swedan, an al-Qaeda leader on the FBI's Most Wanted Terrorist list, indicates just how important al-Qaeda's leadership considered the West African diamond operation. Glenn R. Simpson, "U.N. Ties al Qaeda Figure to Diamonds," *The Wall Street Journal,* June 28, 2004.

[147] Edward Harris, "Al-Qaeda in Africa," *The Mail and Guardian,* August 8, 2004, http://www.mg.co.za/Content/l3.asp?ao=120020 (as of March 24, 2006).

Asia, and less conspicuous parts of South America.[148] Some analysts hold the view—reportedly supported by Israeli intelligence—that, with the assistance of Tehran, Hezbollah has specifically been funneling religious students into Uganda and other African countries to recruit and train potential new operatives.[149] An example is Shafi Ibrahim, arrested by Ugandan authorities in late 2002 for being the leader of a cell of Ugandan Shi'ites believed to be working for both Hezbollah and Tehran.[150]

European, Israeli, and American intelligence sources have long known that Hezbollah has raised significant amounts of money in West Africa through the largely Shi'ite Muslim Lebanese communities in Sierra Leone, Ivory Coast, Burkina Faso, and Togo. There are an estimated 120,000 Lebanese in West Africa, mostly involved in import-export businesses.[151]

This fundraising is accomplished through a number of different means: First, Hezbollah has raised significant amounts of funds over the past 20 years through diamond sales from Sierra Leone, with Ibrahim Bah (noted above) suspected of brokering diamond deals through buyers connected to Hezbollah, assisted by sympathetic Lebanese businessmen across the region. As with al-Qaeda, the illegal diamond industry has provided Hezbollah with a means to raise and

---

[148] Matthew Levitt, "Hizbullah's African Activities Remain Undisrupted," *RUSI/Jane's Homeland Security and Resilience Monitor,* March 1, 2004, http://www.washingtoninstitute.org/media/levitt/levitt020404.htm.

[149] Levitt, "Hizbullah's African Activities Remain Undisrupted."

[150] He and his comrades in the theology school were taught to use small arms, produce explosive devices, collect preoperational intelligence, plan escape routes, and withstand interrogation techniques. The students were given fictitious covers, money, and means of communication, then "instructed to collect intelligence on Americans and Westerners present in Uganda and other countries." See Matthew Levitt, "Hizbullah: A Case Study of Global Reach," Conference on Post-Modern Terrorism: Trends, Scenarios, and Future Threats, International Policy Institute for Counter-Terrorism, Israel, September 8, 2003, http://www.washingtoninstitute.org/media/levitt/levitt090803.htm.

[151] "Hizbullah (Part I)," Intelligence and Terrorism Information Center, Center for Special Studies, June 2003, http://www.intelligence.org.il/eng/bu/hizbullah/Hizballah.htm; Levitt, "Hizbullah's African Activities Remain Undisrupted."

launder money.[152] Indeed, it has also been claimed that Hezbollah and other radical Islamic groups transferred millions of dollars made from Congolese diamond sales to their organizations.[153]

Second, Hezbollah raises large amounts of funds from the expatriate Lebanese community in West Africa, both through voluntary donations and by what one analyst refers to as "Mafia-style shake-downs." Across West Africa, Hezbollah is believed to raise the most funds in the Ivory Coast, followed closely by Senegal—these two have the highest concentrations of Hezbollah activity in Africa.[154] The importance of these networks to Hezbollah would appear to be so high that when, on December 25, 2003, Union Transport Africaines flight 141 to Beirut crashed on take-off in Benin with three key Africa-based Hezbollah activists on board, carrying (according to Arab press reports) $2 million in contributions raised from wealthy Lebanese in Africa, Hezbollah "immediately sent an envoy to Benin to console the sons of the Lebanese community"—indicating the value these networks hold for Hezbollah.[155] However, when such donations do not suffice, Hezbollah gangs attack the commercial properties of local Lebanese nationals who resist demands for solicitations.[156]

---

[152] Farah, "Al Qaeda Cash Tied to Diamond Trade Sale."

[153] "Africa Overview," U.S. Department of State (2002a).

[154] "Hezbollah: Profile of the Lebanese Shiite Terrorist Organization of Global Reach Sponsored by Iran and Supported by Syria (Part A)," Intelligence and Terrorism Information Center, Center for Special Studies, June 2003, http://www.intelligence.org.il/eng/bu/hizbullah/hezbollah.htm.

[155] Arab media reported that $2 million "represented the regular contributions the party receives from wealthy Lebanese nationals in Guinea, Sierra Leone, Liberia, Benin, and other African states," Hamid Ghiryafi, "Hizbullah Officials Carrying Donations Reportedly Killed in Lebanese Plane Crash," *al-Siyasah* (Kuwait), December 29, 2003; Miriam Karouny, "Benin Plane Crash Deaths Rise to 111," Reuters, December 26, 2003.

[156] Lansana Gberie, "War and Peace in Sierra Leone: Diamonds, Corruption and the Lebanese Connection," The Diamonds and Human Security Project—Partnership Africa Canada, International Peace Information Service, Network for Justice and Development, Occasional Paper #6, November 13, 2002, http://www.reliefweb.int/w/rwb.nsf/0/898ad5b9 f3f339a585256c7200799005?OpenDocument (as of March 26, 2006).

## Hezbollah and Crime in North America

As the preceding discussion shows, Hezbollah's convergence with organized crime spans continents. The most important locus of Hezbollah's criminal activity is the Bekaa Valley, which has provided a continuous source of narcotics that Hezbollah has commercialized, despite international efforts to shut down opium cultivation there. With funding from Iran dwindling, Hezbollah is seeking to increase its drug trafficking niche by tapping new markets abroad.[157] This trend is now seen in North America.

### Hezbollah in Canada

Hezbollah has used Canadian territory for ten years to recruit, launder money, raise funds, forge documents, and purchase military-related equipment for use in attacks on Israel. It has also built up a network of agents across the country. Mohammed Hussein al-Husseini, a Hezbollah member, told Canadian security officials that "Hezbollah has members in Montreal, Ottawa, Toronto—all of Canada."[158] One of these Canada-based agents, Fauzi Ayub, was arrested by Israeli authorities after being sent to the West Bank to engineer attacks against Israelis. Two others, wanted for terrorist acts committed elsewhere, were hiding out in Canada. One has since been charged in connection with the 1996 bombing in Saudi Arabia that killed 19 Americans.

Canadian police and intelligence reports show the group has been using Canada in recent years to buy materiel, forge travel documents, raise money, and steal luxury vehicles. In 1999 and 2000, Hezbollah sent detailed shopping lists to agents who were allegedly part of a network in Vancouver, Toronto, and Montreal to fill the orders and ship the equipment back to Lebanon in courier packages. Hundreds of thousands of dollars were moved through various Canadian banks, such as the Bank of Nova Scotia, to finance purchases for what the participants

---

[157] U.S. House of Representatives (2000b).

[158] Stephen Brown, "Canada—Terrorist Haven," *FrontPagemagazine.com,* December 9, 2002, http://www.frontpagemag.com/Articles/ReadArticle.asp?ID=5007 (as of March 27, 2006); Byman (2003).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 340 of 632

referred to as the "resistance" and the "brave people." Canadian Hezbollah agents also discussed a scam they called a "miracle strike," which involved taking out life insurance policies on people and then having them killed in Lebanon.[159]

Two of the alleged Hezbollah Canadian agents, Lebanese immigrants identified as Mohammad Dbouk and his brother-in-law Amhaz, shopped at a "military supply warehouse and looked at some military supplies and instruments in Vancouver." Mr. Dbouk inquired at one company about buying "any equipment used to blow up rocks." The agents were cautious to protect the secrecy of their work, although apparently unaware that every phone call was being recorded by Canadian intelligence. "Amhaz expressed his concern about depositing large sums of money in the bank account and suggested that Dbouk give him smaller sums of money to avoid suspicion [by the banks]," the Canadian Security Intelligence Service wrote, "Dbouk advised Amhaz that he would give instructions that the money be transferred to Ali Bassal in Montreal, after which time Dbouk would fly/travel to Montreal to get the cash and return to B.C." Dbouk fled Canada and returned to Lebanon, but Amhaz still resides in Burnaby, British Columbia. He has denied any involvement with Hezbollah.[160]

The extent of Hezbollah operations in Canada first came to light in the 1990s, when Mohammed Hussein al-Husseini was arrested for deportation. He told the CSIS about a cross-Canada network and confessed that agents had spied on Canadians and reported on Canadian life and infrastructure. In two cases, alleged Hezbollah agents were found hiding out in Edmonton and Ottawa. One of them has been charged with taking part in the 1996 bombing attack in Saudi Arabia. "Hezbollah has members in Montreal, Ottawa, Toronto—all of Canada," al-Husseini told CSIS before he was deported in 1994. Hezbollah wants to collect information on Canada, on life in Canada and its infrastructure, "in case there's a problem with Canada." He

---

[159] Stewart Bell, "Hezbollah Uses Canada as Base: CSIS Agency Wiretaps Show Suspected Operatives Using Laundered Money to Buy Materiel," http://www.clhrf.com/documents/hezbollah.canada.htm (as of March 27, 2006).

[160] Bell, "Hezbollah Uses Canada as Base."

was reportedly referring to videotapes of Canadian landmarks sent to Hezbollah headquarters in Lebanon. The RCMP has also linked auto theft rings in Ontario and Quebec to Hezbollah, saying that a portion of the criminal proceeds were funneled to the group, and that luxury sport utility vehicles stolen in Canada were being driven by high-ranking Hezbollah leaders in Lebanon. The CSIS reports on Hezbollah's Canadian activities were made available recently to U.S. attorneys prosecuting accused operatives involved in a North Carolina cigarette smuggling ring.[161]

Another indication of how highly Hezbollah's leaders value their Canadian operation is that money raised from a Hezbollah cigarette-smuggling ring in North Carolina was sent to Canada. Mohammad Dbouk, the Hezbollah operative mentioned above, was sent from Lebanon to run the Vancouver cell. According to a U.S. Senate committee, Dbouk was so highly regarded by Hezbollah that his application to become a "martyr" was rejected five times. None of the members of Vancouver's Hezbollah cell has been charged in Canada. American attempts to extradite one cell member ended in frustration, prompting a couple of Senate hearing participants to remark that it's hard to extradite from Lebanon—and from Canada, too.[162]

### The Hezbollah Criminal Nexus in the United States and Mexico

A new criminal nexus between Hezbollah and Mexican drug rings has emerged in Washington state (specifically the Olympic Peninsula), in central California, and in the American Midwest. Based on statements from informants and wiretaps, officials at the DEA said the Mexican cartels appear to have financial ties to Middle Eastern groups.[163] Bill Ruzzamenti, director of California's High Intensity Drug Trafficking Area (HIDTA) program, states, "We have a number of methamphetamine cases where we've made a direct connection between the

---

[161] Bell, "Hezbollah Uses Canada as Base"; Brown, "Canada—Terrorist Haven"; DEA/RCMP Joint Report, "Chemical Diversion and Synthetic Drug Manufacture," September 2001, http://www.rcmp-grc.gc.ca/crimint/chemical_e.htm (as of March 27, 2006).

[162] Brown, "Canada—Terrorist Haven."

[163] "Drug Money for Hezbollah?" Associated Press, September 1, 2002.

Hezbollah and Mexican cartels." [164] The DEA suspects that associates of the Lebanon-based Hezbollah have been smuggling large amounts of pseudoephedrine tablets in cars and trucks across the Canadian border for sale to the drug cartels in California. DEA and Cana-dian authorities arrested 65 people, including a number of Jordanian cit-izens, suspected of smuggling pseudoephedrine, a key ingredient of methamphetamine, bound for California.[165] The state narcotics bureau has come to suspect that the cartels are using profits from the resale of the pseudoephedrine to bankroll the sharp increase in marijuana cultivation on public land. Currently, there are three ongoing investi-gations concerning the involvement of Hezbollah-related activity with Mexican drug cartel activity in central California alone.[166]

The DEA says the trail starts in Canada and ends with Mexican drug cartels based in California. Cartel members travel to the Midwest to meet brokers, who smuggle cold tablets across the border. The cold tablets are then used in labs in Washington state. U.S. authorities determined that about one-third of foreign terrorist organizations are trafficking in narcotics on a large scale, providing insight into how two of the nation's most serious threats are connected.[167] In Southern California, the DEA San Diego Field Division and the California Border Alliance Group reported that Middle Eastern criminals (Iraqis, Jordanians, Yemenis, and Israelis) were distributing pseudoephedrine tablets in numerous U.S. urban centers.[168]

---

[164] Julie Cart, "Park's Pot Problem Explodes: Officials Say Mexican Cartels Linked to Mideast Terrorists Run the Operation," *Los Angeles Times,* May 14, 2003.

[165] Cart, "Park's Pot Problem Explodes."

[166] Karasik's interview with HIDTA official, December 2003.

[167] Josh Meyers, "Drug Trade Funding Terrorist Group Actions, U.S. Says," *Los Angeles Times,* July 31, 2002.

[168] U.S. Department of Justice (2000), p. 12.

## The Middle Eastern Terrorist-Criminal Nexus in the Tri-Border Area of South America

The tri-border area, where Paraguay, Argentina, and Brazil meet, has long been a location of terrorist activity (see Figure 7.1). There are about 630,000 inhabitants in the region, some 25,000 of whom are of Syrian, Lebanese, and Palestinian descent. The Paraguayan city of Ciudad del Este and the Brazilian city of Foz do Iguaçu are separated only by the short *Puente de la Amistad* (Friendship Bridge). This is the area where the first immigrants from Syria, Lebanon, Jordan, Egypt, Iraq, and the Palestinian territories settled about 50 years ago.[169] In the 1980s, there was an additional influx of Lebanese migrants seeking to escape the Lebanese civil war.

The area is considered the most important center for financing Islamic terrorism outside the Middle East.[170] The permeable border between the three countries hosts one of the most active black markets in the world. The commercial district of Ciudad del Este, on the Paraguayan side of the Paraná River, is a mosaic of businesses owned mostly by merchants of Arab origin. The city is viewed by Argentine and Brazilian authorities as a regional hub where organized criminal enterprises, insurgent groups, and terrorist organizations enjoy safe haven and opportunities for strategic alliances. On the Brazilian side, in Foz do Iguaçu, two mosques are suspected of harboring radical activity.[171]

---

[169] "Middle East Terror Groups Find Sanctuary, Revenue in South America," The Jewish Institute for National Security Affairs (JINSA), January 15, 2004. Accessible online at http://www.jinsa.org/articles/articles.html/function/view/categoryid/1701/documentid/2331/history/3,2360,655,1701,2331 (as of March 27, 2006).

[170] Jose Meirelles Passos, "Tri-Border: U.S. Steps Up Investigation of the Muslim Community," *O Globo* (Rio de Janeiro), October 15, 2001.

[171] "Search Extends to Latin America," STRATFOR, September 19, 2001; Daly (2003); "Sources: Middle Eastern Terrorists Have South American Links," CNN, November 9, 2001; "Terrorist Sanctuary in South America? Tales from the 'Triple Border,'" *Pravda On-Line,* November 20, 2001.

**Figure 7.1**
**Tri-Border Region, with Access to the River Plate**



SOURCE: Col. William W. Mendel, "Paraguay's Ciudad del Este and the New Centers of Gravity," *Military Review*, March–April 2002.
RAND *MG430-1*

Middle Eastern terrorist organizations—primarily Lebanese Hezbollah, but also Hamas, and the Egyptian Islamic Jihad—have been detected in the tri-border area for at least a decade. These groups engage in black market operations, arms purchases, and planning for terrorist attacks on U.S., Israeli, and Jewish targets.[172] Argentina, home to the largest Jewish community in Latin America, about 300,000 strong, has taken the brunt of Islamic terrorism in the region. Hezbollah is suspected of carrying out the bombing of the Israeli embassy in Buenos

---

[172] In October 1998, a suspected Hezbollah member was arrested in front of the U.S. Embassy in Asunción, Paraguay, while surveying the facility in advance of a possible terrorist attack. "Search Extends to Latin America."

Aires in 1992, in which 29 persons died and 242 were injured, and the bombing of the Jewish Community Center in Buenos Aires on July 18, 1994, that killed 85 people and injured more than 200. The modus operandi of the terrorists was similar in both attacks. In both cases, car bombs were used while the buildings were undergoing repairs, and police officers on security details inexplicably disappeared before the bombings.[173]

According to a *New York Times* report of a secret deposition by a high-level defector from the Iranian intelligence service, who gave his name as Adbolghassem Mesbahi, the Iranian government organized the bombing and paid former Argentine President Carlos Menem US $10 million to say that there was no evidence of Iranian involvement. Menem's former chief of staff denied the allegations and suggested they were politically motivated.[174] The bombing remains unsolved in the Argentine judicial system. After a flurry of initial arrests, only one person was found to have a direct link to the bombing—a dealer in stolen motor vehicles accused of selling the white Renault used for the car bomb and refitting it for the bombing. There were allegations that local police and corrupt officials were involved in the bombing of the Jewish Community Center, as well as in the bombing of the Israeli embassy. Several senior policemen and a retired military officer were arrested as accessories in 1996 and 1997 but later released.[175]

According to a published report, Argentine State Intelligence Secretariat detected al-Qaeda operatives in the region following the

---

[173] "Search Extends to Latin America"; Daly (2003); "Sources: Middle Eastern Terrorists Have South American Links."

[174] "Iran Blew Up Jewish Center in Argentina, Defector Says," *The New York Times,* July 22, 2002. Mr. Mesbahi said that the money was paid from a $200 million Swiss account controlled by Iran's then president, Ali Akbar Hashemi Rafsanjani, and a son of the late Ayatollah Khomeini. According to the *New York Times* article, Argentine and German officials describe the defector as a senior operative who provided valuable information about Iranian terrorist operations in Europe and Asia through the mid-1990s. He defected to Germany in 1996, reportedly because he was upset at his agency's involvement in the killing of dissident intellectuals in Iran and abroad.

[175] Yael Shahar, "Investigation Plagued by Allegations of Cover-Ups," Institute for Counter-Terrorism, July 22, 2002.

bombings of the U.S. Embassies in Kenya and Tanzania. Al-Qaeda operatives reportedly did indoctrination and fundraising, provided cover for fugitives, and gave basic explosives training. According to intelligence officials, Khaled Sheikh Mohammad, al-Qaeda's reputed operations chief, visited Foz do Iguaçu in December 1995. Police data reportedly show that Mohammad entered Brazil via São Paulo from Pakistan on December 4 and left Rio de Janeiro for the Netherlands on December 25. (There was no warrant for Mohammad's arrest at the time of his visit to Brazil.) After the September 11 terrorist attacks, al-Qaeda and Hezbollah operatives apparently left Ciudad del Este and Foz do Iguaçu and moved to more-remote locations or back to the Middle East.[176]

In February 2003, Paraguayan security raided a store owned by Ali Khalil Mehri, a 32-year-old businessman of Lebanese descent. They recovered Hezbollah propaganda and documentation of money transfers to Canada, Chile, the United States, and Lebanon totaling more than $700,000. Also found were fundraising forms for the Middle East organization al-Shahid, which is dedicated to the "protection of families of martyrs and prisoners." Paraguayan prosecutors charged Mehri with selling millions of dollars of pirated software and channeling the proceeds to Hezbollah. Mehri, released on bail after his arrest, crossed into Brazil and then flew from São Paulo to Paris. Authorities now believe he is in Syria.[177]

There are also reports of an al-Qaeda presence in Uruguay and along the Uruguayan-Brazilian border. A leading Brazilian newspaper, *O Estado de São Paulo,* reported that Uruguay's intelligence services had shared information with the Brazilian government linking the mayor of Chui, a Brazilian town separated only by a street from the Uruguayan town of Chuy, to bin Laden (the mayor, Mohamad Kassem Jomaa, denied the allegations).[178]

---

[176] Daly (2003); "Police: Mohammed Visited Brazil in 1995," CNN São Paulo, March 9, 2003.

[177] "Middle East Terror Groups Find Sanctuary"; "Revenue in South America."

[178] "Search Extends to Latin America."

In April 2002, the Brazilian police arrested an Egyptian militant named Mohamed Ibrahim Soliman in Foz do Iguaçu at the behest of the Egyptian government. Soliman was accused of carrying out attacks in Egypt with Said Hasan al-Mohammed (or Said Hasan Mukhlis), a suspected member of the Egyptian terrorist organization al-Gama'a al-Islamiyya who was arrested in Chuy in 1999 trying to enter Uruguay from Brazil carrying a false Malaysian passport.[179] Two months before September 11, Argentine intelligence officials reported that they had arrested an Arab on smuggling charges and that the suspect had discussed upcoming terrorist attacks in the United States.[180]

In October 2002, the Argentine intelligence service issued a terrorist warning, noting that intelligence pointed to increased terrorist activity. According to intelligence sources in the Middle East, the effort was aimed at U.S. and Israeli targets and was being coordinated by Hezbollah terrorist mastermind Imad Mugniyeh.[181]

### Smuggling, Black Market Activities, and Money Laundering Operations

Smuggling and black market activities are the principal source of income from Islamic extremists in the tri-border region. In 1987 the leader of a business association of commercial and industrial interests estimated that contraband accounted for two-thirds of Paraguay's foreign trade.[182] Paraguayan police estimate that about 70 percent of the 600,000 cars in Paraguay were purchased on the black market, with at least a portion of the profits likely going to terrorist groups. Recently, President González Macchi was exposed in the press as owning a stolen

---

[179] "Egyptian Militant Arrested in Southern Brazil," Reuters, April 16, 2002. Al-Mohammed was charged with having participated in the massacre of 58 foreign tourists and at least four Egyptians at the Egyptian temple of Luxor, in November 1997, the worst atrocity of the al-Gama'a al-Islamiyya campaign of terror in Egypt in the 1990s.

[180] Daly (2003).

[181] Mugniyeh masterminded the bombing of the U.S. Marine barracks and the French paratroopers headquarters in Beirut in 1983. He carried out several assassinations and attempted assassinations. He is believed to be living in Iran. See Gunaratna (2002), pp. 142, 147.

[182] "Paraguay:Crime," http://reference.allrefer.com/country-guide-study/paraguay/paraguay 121.html (as of March 27, 2006).

BMW and his wife a stolen Mercedes. Both cars had the same title document, which belonged to a Toyota.[183]

The smuggling and associated commercial activity also provide cover for money laundering operations. Argentine officials point to evidence of terrorist financial activity in the form of thousands of U.S. dollars stamped by Lebanese currency dealers from Lebanese currency exchange banks, tens of thousands of counterfeit dollars, and receipts from wire transfers made between the tri-border area and the Middle East.[184]

In 2002, the Hezbollah financial chief in Ciudad del Este, Sobhi Mahmoud Fayad, was convicted on charges of tax evasion. The Paraguayan authorities requested the extradition from Brazil of Hezbollah's reputed chief of operations in Latin America, Assad Ahmad Barakat, on similar charges. Barakat was the co-owner of one of Ciudad del Este's largest shopping malls, which intelligence sources believe he used as a front for fundraising and recruitment. He is suspected of being a major player in the bombing of the Israeli embassy and the Jewish Community Center in Buenos Aires. Barakat was caught and extradited to Paraguay in November 2003.[185] Two of his associates, Mazen Ali Saleh and Saleh Mahoud Fayoud, were arrested and charged with falsifying immigration documents and dealing in pirated compact discs.[186]

### Drug Trafficking and Arms Smuggling

During the early 1980s, Paraguay emerged as a transit point in the international drug trade. Colombian and other international drug traffickers operate in Paraguay in association with corrupt military officers

---

[183] Mendel (2002), p. 52.

[184] "South America's 'Tri-Border' Back on Terrorism Radar," CNN, November 7, 2002.

[185] "Alleged Hizbullah Financier Extradited by Brazil to Paraguay," Naharnet, November 20, 2003, http://www.naharnet.com/domino/tn/Newsdesk.nsf/0/41BE05F953ABCE5542256 DE300318F15?OpenDocument&PRINT (as of March 27, 2006).

[186] "Sources: Middle Eastern Terrorists Have South American Link." Criminal charges were filed against the former Paraguayan Consul General in Miami, Carlos Weiss, for having issued 150 irregular visas, 18 to Arab citizens living in Ciudad del Este.

and politicians of the ruling Colorado Party. The U.S. Department of State estimates that Paraguay moves ten metric tons of cocaine annually to markets in Europe and the United States. Paraguay also produces some of the highest-grade marijuana in the continent and exports most of it to Brazil, which ranks as the largest market in Latin America for cocaine, heroine, marijuana, and boutique drugs such as Ecstasy.[187]

According to the Council on Foreign Relations, Hezbollah smuggles cocaine from South America to Europe and the Middle East.[188] On May 10, 2003, Paraguayan authorities arrested Hassan Abdallah Dayoub as he was preparing to ship an electric piano stuffed with more than five pounds of cocaine to Syria. Dayoub is a relative of Assad Barakat, the chief Hezbollah operative in South America. Dayoub was subsequently sentenced to five and a half years in prison for drug smuggling.[189]

A guns-for-cocaine connection between Paraguayan gunrunners and the FARC was uncovered and one FARC operative was arrested.[190] Jeffrey Goldberg, author of "In the Party of God," which appeared in *The New Yorker* in October 2002, spent three weeks in the tri-border area researching Hezbollah and its international funding and activities. He recounted crossing the borders of Argentina, Brazil, and Paraguay with extreme ease, and being offered an AK-47 rifle for $375. The price even included a hotel delivery. When he asked about acquiring explosives, he was told that was also possible.[191]

**Rationale for Convergence with Organized Crime**

Several factors account for the involvement of a Middle East terrorist organization in criminal activity in the tri-border area. First, there are demographic and geostrategic factors: the presence of a substantial Levantine community with links to their home countries, living in a

---

[187] "DEA boosts its role in Paraguay," *The Washington Times,* August 21, 2001.

[188] TerrorismAnswers.org (as of March 27, 2006).

[189] "Middle East Terror Groups Find Sanctuary."

[190] Cited in Mendel (2002), p. 54.

[191] Mendel (2002), p. 54.

remote and yet strategic area—on the Pan American Highway strad-
dling the Argentine-Brazilian border. The area has fluvial communica-
tions by way of the Paraná River to the River Plate, Buenos Aires, and
Montevideo, as well as the Atlantic Ocean. Second, an existing crimi-
nal infrastructure exists (smuggling has been the economic mainstay
of this region since the establishment of independent states in the area).
Third, Paraguay's weak political institutions and investigative and law
enforcement capabilities, as well as pervasive official corruption, have
created the conditions for the unchecked growth of terrorist and crimi-
nal networks.[192] Fourth, and perhaps most important, Hezbollah and
other Middle East militant and terrorist organizations have established
a global presence. The last factor is likely to increase in importance
as the international pressure and denial of sanctuaries in traditional
host countries forces organizations like al-Qaeda to look for alternative
bases of operations.

---

[192] Transparency International lists Paraguay as 144 in its 2005 Corruption Perception
Index, with a score of 2.1 on a scale of 1 (most corrupt) to 10 (least corrupt), http://www.
transparency.org/cpi/2005/cpi2005.sources.en.html#cpi (as of March 27, 2006).

# Conclusions and Recommendations

From a policy perspective, the first-order question is whether the trajectory of insurgent and terrorist groups outside the global jihadist movement will bring them closer to that movement. To answer this question, we examine what factors could affect this outcome and what the U.S. policy response should be. The second-order question is the level of threat these groups represent for U.S. regional interests, including the security of U.S. friends and allies, and what the U.S. policy response should be. Finally, we discuss how to harmonize U.S. policies to address these two questions.

With regard to convergence with al-Qaeda, the groups of greatest concern are, of course, the Islamist groups that share aspects of al-Qaeda's worldview. Of the groups examined, only two—Egypt's al-Wa'ad and the Iraqi insurgents—developed after bin Laden's 1998 fatwa against "Jews and Crusaders." The other groups were well established, active, and had articulated their own agendas prior to al-Qaeda's emergence in the international arena. Therefore, they can be assumed to be less receptive to al-Qaeda's ideology of global jihad than the groups that emerged since that time.

Among these groups, the majority interpret their jihad much more narrowly than groups affiliated or associated with al-Qaeda. Hezbollah's interests center on Lebanon and its immediate vicinity; Hamas is focused on the Palestinian issue; and the GIA on overthrowing the Algerian government. For the groups to which association with al-Qaeda might be operationally attractive, external and internal factors have held such tendencies in check. Hezbollah appears to be

161

influenced by its ties to Syria and Iran as well as by its involvement in Lebanese politics. Al-Gama'a al-Islamiyya appears to be concerned about carving out some political space to operate in Egypt.

Even some of the non-Islamist groups could decide to cooperate with al-Qaeda or other Islamist groups for their own reasons. For example, many of these militant groups now maintain representatives in the criminal and black market world. This interconnectivity allows terrorists to acquire weapons as necessary, perhaps even to expand their capabilities. At this point, it is important to stress that some terrorist groups could shift their worldview, thus adopting an agenda similar to al-Qaeda's. Alternatively, others could simply capitalize on a perceived anti-U.S. trend, shifting the focus of their attacks toward U.S. targets to increase their potential by making alliances with more capable al-Qaeda–affiliated groups or simply to gain greater recognition.

A recent RAND study analyzed factors that caused terrorist groups to adjust their intentions (e.g., their ideology or worldview) and capabilities. The study isolated three key factors that cause terrorist groups to shift from their chosen paths: (1) counterattacks by security forces; (2) external support from states or other militant organizations; and (3) gain or loss of popular support.[1] To those, we could add a fourth: general shifts in the international security environment—such as that brought about by the U.S.-led global war on terrorism. Some extremist organizations, such as the MILF in the Philippines, have tried to distance themselves from al-Qaeda to reduce their exposure to the global war on terrorism.[2] Similarly, according to a well-informed Sri Lankan source, the global war on terrorism has reduced international tolerance of LTTE terrorism. There has been a crackdown on LTTE activities in the United Kingdom and Canada, and Thailand has become

---

[1]   Cragin and Daly (2004).

[2]   The issue of the MILF-JI relationship is contested. The MILF denies it and, as of August 2005, was cooperating with the Philippines military against the Abu Sayyaf Group (as it is obliged to do under the terms of the ceasefire between the MILF and the Manila government). Other authorities, however, such as Rohan Gunaratna and Zachary Abuza, believe that there is a continuing relationship between the MILF and JI. Rabasa's correspondence with Gunaratna and Abuza, September 2005.

more active in intercepting arms shipments to the group. These developments apparently influenced the LTTE's decision to enter into peace negotiations with the Sri Lankan government.[3]

A potentially dangerous shift can be seen in the emerging Hamas-Hezbollah nexus, as shown by the March 14, 2004, attack in the Israeli port of Ashdod. As discussed earlier, the significance of this attack was not the number of casualties but the demonstration of Hamas's ability to hit more strategic targets.[4]

This degree of aid and coordination is greater than anything prior in the Hamas-Hezbollah relationship. It demonstrates that Sunni and Shi'ite militants will work together, given a mutual enemy. Second, the pattern of behavior demonstrated by Hamas could be duplicated by other, nonaffiliated terrorists. That is, just as Hamas accepted linkage with Hezbollah, so other groups could accept guidance from al-Qaeda. Finally, a potential explanation for Hezbollah's behavior in this case is the need to sustain attention and support since Israel pulled out of southern Lebanon. Greater involvement in the Palestinian resistance could achieve this goal. It is possible, then, that Muslim anger at the U.S. presence in Iraq could provoke similar shifts in Hezbollah or other groups' agenda vis-à-vis the United States as these groups continue to vie for local recruits and support.

The bottom line is that most of the extremist groups discussed in this report—terrorists and insurgents alike—have a limited or localized political agenda, and this means that they are likely to accept political rules and social norms acceptable to a majority as opposed to al-Qaeda and its utopian vision of a restored global caliphate.

Several of the groups covered in the study have not welcomed the attention that al-Qaeda has brought to their various causes. This is particularly true of nonaffiliated organizations but also, arguably, of associated entities such as JI and elements of the MILF (both of which now seem to be debating the overall value of being linked to bin

---

[3]  Discussion with retired international institution official, Washington, D.C., October 2004.

[4]  Discussion with retired international institution official, Washington, D.C., October 2004, and Cragin interviews, Israeli counterterrorism experts, April 2004.

Laden's network in terms of availing their own respective objectives in Southeast Asia and Mindanao). In certain ways, this has acted as a useful brake on their militant actions and encouraged a greater disposition toward negotiation and compromise (to some extent illustrated by talks and ceasefires in former chronic terrorist theaters such as Sri Lanka and Colombia). The United States should seek to capitalize on these tensions and the movement that they have created, both as an adjunct to its general war on ideas against extremist ideologies, as well as in the context of more specific regional security efforts and assistance programs.

Nevertheless, beyond the question of convergence, it is important that we not dismiss groups as unthreatening just because they have not joined the global jihadist movement. Some represent deadly threats to the states that they seek to subvert; others, like Hezbollah, could suddenly emerge as global threats.

## Implications for the U.S. Military and the U.S. Air Force

In the first volume, we discussed the use of air power as an option to attack terrorists in difficult or inhospitable terrain, as well as the use of air transport in counterterrorist or counterinsurgency operations in countries with widely dispersed populations and poor land transportation infrastructure. These considerations apply as well to many of the cases discussed in this volume. However, there is a difference: With the exception of the Iraqi insurgency, the United States is not—and as a general principle should not be—involved in direct military operations against these groups.

Therefore, the emphasis should be on strengthening the capabilities of friendly governments to confront insurgent and terrorist groups. U.S. Air Force Special Operations Forces (active duty, Reserve, and National Guard units)—at approximately 11,000 personnel, second

only to Army SOF at 29,000—can be particular pertinent to the counterinsurgency and counterterrorism training role required by the new environment.[5]

The judgment in Part 1 of this study that these local wars have to be fought and won by local governments and security forces, with the United States in a supporting role, is even more valid in the case of those conflicts driven by local grievances and those in which the rebel movements enjoy significant support. By the same token, since some of these groups have limited political agendas, under the right circumstances they could become part of a negotiating process leading to a political solution of the conflict—a major difference from groups that are part of the global jihadist movement, which have to be destroyed or forced to leave the field.

To develop effective strategies against insurgent and terrorist groups, it is important to look at them in a broad context, even if they operate locally, because the migration of tactics, techniques, and procedures (TTPs) is creating a regionalization of violence—terrorists and insurgents and political opportunists. Many of these groups are learning what works best and adopting those best practices. These tactical models contribute to the proliferation of effective styles of unconventional warfare throughout different zones of conflict. Innovations include the use of IEDs by Hezbollah and their evolution into sophisticated weapons designed to interrupt supply lines. Hamas has been known to use ambulances as a cover for suicide bombers or logistical support. MANPADs and now suicide bombers with suicide vests first used by Palestinian groups against targets in Israel and the Palestinian territories are now used as mass casualty weapons by Chechens against Russian military aircraft.

The first implication for the U.S. military and the Air Force is a clear understanding that the TTPs used by all groups, whether they are

---

[5]  U.S. Air Force Special Operations Forces are made up of the following: (1) the active-duty 16th Special Operations Wing; (2) two Air Force Reserve units: the 919th Special Operations Wing and the 920th Rescue Wing; and (3) three Air National Guard units: the 106th Rescue Wing (New York Air National Guard), the 129th Rescue Wing (California Air National Guard), and the 193rd Special Operations Wing (Pennsylvania Air National Guard).

part of the global jihad or not, are beginning to mimic each other. This means that from a tactical standpoint U.S. military doctrine needs to anticipate the dissemination of those tactics across theaters in the war on terror.

The second implication is that, although the United States has a supporting role in opposing those groups in the "al-Qaeda universe," the potential role for the United States in countering extremist groups beyond al-Qaeda is even more indirect. The challenge for the U.S. military is to be prepared either to provide increased levels of support to key allies should they require it or to engage these extremist groups should they shift their attention toward the United States— while simultaneously avoiding direct involvement in these conflicts. This strategic challenge has particular relevance to the U.S. Air Force. Understanding the circumstances that might stimulate change in these extremist groups, for example, may require the allocation of intelligence, surveillance, and reconnaissance resources. It may also necessitate broad global readiness, incorporating regions such as Southeast Asia and Latin America, in addition to the Middle East, in the war on terrorism.

For the U.S. military and the U.S. Air Force in particular, tools for targeting terrorist groups can also be used in cooperation and coordination with host-state operations against terrorist, insurgent, and criminal groups. It is important to note that the criminal transport of narcotics, arms, illegal migrants, explosives, etc., occurs in hubs and spokes concurrent or co-located with terrorist groups—especially the FARC (at the crossroads of Colombia, Panama, Ecuador, Brazil, and Venezuela) and Maoists (in Nepal, for example, at the crossroads between Russia, China, and India; and in the Philippines and Peru). This argues for the "dual use" of U.S. security assistance for both counterterrorism and counternarcotics purposes. Older aircraft with high-tech intelligence-collection capabilities can be used against both terrorist havens and criminal nodes. In addition, air support for host country coast guard operations in and around waterways is a critical component of coastal and riverine surveillance and interdiction of smuggling routes used by terrorists and criminal networks.

# Bibliography

Abu-Rabi, Ibrahim M., *Intellectual Origins of Islamic Resurgence in the Modern Arab World*, New York: State University of New York Press, 1996.

Abuza, Zachary, "The Moro Islamic Liberation Front (MILF) and Security in Southeast Asia," U.S. Institute of Peace, June 9, 2005, http://www.usip.org/fellows/reports/2005/0609_abuza.html.

———, "Balik-Terrorism: The Return of the Abu Sayyaf," Strategic Studies Institute (SSI), U.S. Army War College, September 2005, http://www.strategicstudiesinstitute.army.mil/pdffiles/PUB625.pdf.

Ahmed, Hisham, *From Religious Salvation to Political Transformation: The Rise of Hamas in Palestinian Society*, Jerusalem: PASSIA, April 1994.

Al-Gama'a al-Islamiyya (GAI)," *Jane's World Insurgency and Terrorism*, May 16, 2003.

"Al-Qaeda and the Zimbabwe Nexus," *Focus 34,* Helen Suzman Foundation, June 2004.

Athas, Iqbal, "Sri Lankan Narcotics Network Busted," *Jane's Intelligence Review,* January 1999.

Bedein, David, "Rabin's Hamas Compromise," *MidStream*, Vol. 39, 1999.

Berman, Paul, *A Tale of Two Utopias: The Political Journey of the Generation of 1968*, New York: W.W. Norton & Company, Inc., 1996.

Bickerton, Ian J., and Carla L. Klausner, *A Concise History of the Arab-Israeli Conflict*, New Jersey: Prentice Hall, 1995.

Black, A., *The History of Islamic Political Thought*, New York: Routledge, 2001.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 358 of 632

Black, Ian, and Benny Morris, *Israel's Secret Wars*, New York: Grove Weidenfeld, 1991.

Bullion, Alan, *India, Sri Lanka and the Tamil Crisis, 1976–1994: An International Perspective,* London: Pinter, 1995.

Bureau for International Narcotics and Law Enforcement Affairs*, International Narcotics Control Strategy Report, 2002,* Washington, D.C.: United States Department of State, 2003.

———, *International Narcotics Control Strategy Report, 2003,* Washington, D.C.: United States Department of State, 2004.

Byman, Daniel, "Should Hezbollah Be Next?" *Foreign Affairs,* Vol. 82, No. 6, November/December 2003.

Byman, Daniel, Peter Chalk, Bruce Hoffman, William Rosenau, and David Brannan, *Trends in Outside Support for Insurgent Movements,* Santa Monica, Calif.: RAND Corporation, MR-1405-OTI, 2001.

Campbell, Tanner, and Rohan Gunaratna, "Maritime Terrorism, Piracy and Crime," in Rohan Gunaratna, ed., *Terrorism in the Asia-Pacific: Threat and Response,* Singapore: Eastern Universities Press, 2003, pp. 78–79.

Chalk, Peter, "The Davao Consensus: A Panacea for the Muslim Insurgency in Mindanao?" *Terrorism and Political Violence,* Vol. 9, No. 2, 1997.

———, "The Liberation Tigers of Tamil Eelam's (LTTE) International Organization and Operations: A Preliminary Analysis," Canadian Security Intelligence Service Commentary No. 77, March 17, 2000.

———, "Militant Islamic Extremism in the Southern Philippines," in Colin Rubenstein and Jason Isaacson eds., *Islam in Asia: Changing Political Realities,* New Brunswick, N. J.: Transaction Press, 2002.

Charbel, Ghassan, "The Khaled Mishaal Interview (2 of 7)," *Dar al-Hayat*, December 5, 2003.

CIA—*See* U.S. Central Intelligence Agency.

Clegg, Claude Andrew III, *An Original Man: The Life and Times of Elijah Muhammad*, New York: St. Martin's Press, 1997.

Coast Guard Intelligence Assessment, *Worldwide Maritime Threat Assessment 2000,* Washington, D.C.: U.S. Coast Guard, C-G-002-00, May 2000.

Cole, Juan, "The United States and Shi'ite Religious Factions in Post-Ba'thist Iraq," *Middle East Journal*, Vol. 57, No. 4, Autumn 2003.

Cooper, Neil, "The Business of War," *Ploughshares Monitor,* Vol. 23, No. 3, Autumn 2002, http://www.ploughshares.ca/libraries/monitor/mons02h.html (as of March 24, 2006).

Cragin, Kim, and Peter Chalk, *Terrorism and Development*: *Using Social and Economic Development Policies to Inhibit a Resurgence of Terrorism,* Santa Monica, Calif.: RAND Corporation, MR-1630-RC, 2003.

Cragin, Kim, and Sara Daly, *The Dynamic Terrorist Threat: An Assessment of Group Motivations and Capabilities in a Changing World,* Santa Monica, Calif.: RAND Corporation, MR-1782-AF, 2004.

Cragin, Kim, and Bruce Hoffman, *Arms Trafficking and Colombia,* Santa Monica, Calif.: RAND Corporation, MR-1468-DIA, 2003.

Cronin, Audrey Kurth, *Foreign Terrorist Organizations*, Washington, D.C.: Congressional Research Service Report for Congress, February 6, 2004.

Dagne, Ted, *Africa and the War on Terrorism,* Washington, D.C.: Congressional Research Service Report for Congress, January 17, 2002.

Daly, John C. K., "The Latin Connection," *Terrorism Monitor,* Volume 1, Issue 3, October 10, 2003, http://www.jamestown.org/publications_details.php?search=1&volume_id=391&issue_id=2877&article_id=23407 (as of March 27, 2006).

Davis, Anthony, "Tracking Tigers in Phuket," *Asiaweek*, June 16, 2000.

———, "Philippines Security Threatened by Small Arms Proliferation*," Jane's Intelligence Review,* August 2003a.

———, "Resilient Abu Sayyaf Resists Military Pressure," *Jane's Intelligence Review,* September 2003b.

———, "Thailand Cracks Down on Illicit Arms Trade," *Jane's Intelligence Review,* December 2003c.

Davis, Anthony, and Rahul Bedi, "Pressure from India Leads to Bhutan Insurgent Crackdown," *Jane's Intelligence Review*, February 2004, pp. 32–35.

Dawoud, Khaled, "Trying Times for Islamists," *Al-Ahram Weekly Online*, January 10–16, 2002.

De Silva, K. M., *Religion, Nationalism and the State in Modern Sri Lanka*, Tampa, Fla.: University of South Florida Press, 1986.

———, *The Traditional Homelands of the Tamils: Separatist Ideology in Sri Lanka: An Historical Appraisal*, Kandy, Sri Lanka: International Centre for Ethnic Studies, 1995.

———, *Sri Lanka: Ethnic Conflict, Management and Resolution,* Kandy, Sri Lanka: International Centre for Ethnic Studies, 1996.

Dixon, Bill, and Lisa-Marie Johns, "Gangs, Pagad & the State: Vigilantism and Revenge Violence in the Western Cape," *Violence and Transition* (Centre for the Study of Violence and Reconciliation, South Africa), Vol. 2, May 2001, http://www.csvr.org.za/papers/papvtp2.htm (as of March 16, 2006).

Drake, C.J.M., "The Role of Ideology in Terrorists' Target Selection," *Terrorism and Political Violence*, Vol. 10, No. 2, Summer 1998.

Emerson, Steven, "Meltdown," *The New Republic*, November 23, 1992.

———, *American Jihad: The Terrorists Living Among Us*, New York: Free Press, 2002.

Espejo, German, and Juan Carlos Garzon, "La Encrucijada del ELN," *Informe Especial*, Bogotá, Colombia: Fundacion Seguridad y Democracia, July 2005.

Furet, François, *The Passing of an Illusion: The Idea of Communism in the Twentieth Century*, trans. Deborah Furet, Chicago and London: The University of Chicago Press, 1999.

Global Witness, *For a Few Dollars More: How al Qaeda Moved into the Diamond Trade*, London: Global Witness Ltd., April 2003, http://www.globalwitness.org/reports/show.php/en.00041.html (as of March 24, 2006).

"Groupe Islamique Armee," *Jane's Intelligence Review*, July 30, 2003.

"Groupe Salafiste pour la Predication et le Combat (GSPC)," *Jane's Intelligence Review*, May 16, 2003.

Gunaratna, Rohan, *Indian Intervention in Sri Lanka: The Role of India's Intelligence Agencies*, Colombo, Sri Lanka: South Asian Network on Conflict Research, 1993a.

———, *War and Peace in Sri Lanka*, Colombo, Sri Lanka: Institute of Fundamental Studies, 1993b.

———, *Sri Lanka's Ethnic Crisis and National Security,* Colombo, Sri Lanka: South Asian Network on Conflict Research, 1998.

———, "The Evolution and Tactics of the Abu Sayyaf Group," *Jane's Intelligence Review,* July 2001.

———, *Inside Al Qaeda,* New York: Columbia University Press, 2002.

Gutierrez, Eric, and Saturnino Borras, Jr., *The Moro Conflict: Landlessness and Misdirected State Policies,* Washington, D.C.: East-West Center, Policy Studies, No. 8, 2004.

Hallaq, Wael B., trans., *Ibn Taymiyya Against the Greek Logicians*, Oxford: Clarendon, 1993.

Hellmann-Rajanayagam, Dagmar, *The Tamil Tigers: Armed Struggle for Identity*, Stuttgart, Germany: F. Steiner, 1994.

"Hizballah and Israelis Wage Electronic War in South Lebanon," *Jane's Intelligence Review,* February 1, 1995.

"Hizballah Lends Its Services to the Palestinian Intifada," *Jane's Intelligence Review,* November 1, 2001.

Hroub, Khaled, *Hamas*, Washington, D.C.: Institute for Palestine Studies, 2000.

"Hundreds Murdered in Widespread Algeria Attacks," International Policy Institute for Counterterrorism, January 6, 1998.

International Crisis Group (ICG), "Colombia's Elusive Quest for Peace," Latin America Report No. 1, March 26, 2002, http://www.crisisgroup.org/home/index.cfm?id=1538&l=1 (as of March 23, 2006).

International Institute for Strategic Studies (IISS), "Sri Lanka's Peace Process in Jeopardy," Strategic Comments 10/3 (April 2004).

International Maritime Bureau, *Piracy and Armed Robbery Against Ships, Report for the Period 1 January–30 September 2003*, London: International Chamber of Commerce, 1993.

"Interview with Mahmud Zahhar," *Journal of Palestine Studies*, Vol. 24, No. 3, Spring 1995.

Israel Defense Forces, IDF Spokespersons Unit, "Salah Shedhadeh—Portrait of a Hamas Leader," published online, November 10, 2002.

Israeli, Raphael, *Muslim Fundamentalism in Israel*, Exeter, UK: BPCC Wheatons Ltd, 1993.

Iyob, Ruth, "Shifting Terrain: Dissidence Versus Terrorism in Eritrea," *Terrorism in the Horn of Africa,* U.S. Institute of Peace Special Report No. 113, January 2004, www.usip.org/pubs/specialreports/sr113.html#eritrea (as of March 16, 2006).

Jabar, Faleh A., "The Worldly Roots of Religiosity in Post-Saddam Iraq," *Middle East Report*, No. 227, Summer 2003.

Jaber, Hala, *Hezbollah: Born with a Vengeance,* New York: Columbia University Press, 1997.

Jarbawi, Ali, and Roger Heacock, "The Deportations and the Palestinian-Israeli Negotiations," *Journal of Palestine Studies*, Vol. 22, No. 3, Spring 1993.

Jensen, Richard Bach, "The United States, International Policing, and the War Against Anarchist Terrorism, 1900–1914," *Terrorism and Political Violence*, Vol. 13, No. 1, Spring 2001, pp. 15–46.

Johnson, R. W., "Al-Qaeda and the Zimbabwe Nexus," *Focus 34*, Vol. 1, No. 4, June 2004.

Joshi, Charu, "The Body Trade," *The Far Eastern Economic Review,* October 26, 2000.

Joshi, Manoj, "On the Razor's Edge: The Liberation Tigers of Tamil Eelam," *Studies in Conflict and Terrorism*, Vol. 19, 1996.

Kalyvas, Stathis N., "Wanton and Senseless? The Logic of Massacres in Algeria," *Rationality and Society*, Vol. 11, No. 3, 1999.

Kattub, Doud, "Current Developments and the Peace Process," *Journal of Palestine Studies*, Vol. 22, No. 1, 1992.

Katzman, Kenneth, *Al Qaeda: Profile and Threat Assessment,* Washington, D.C.: Congressional Research Service, February 10, 2005, http://www.usembassy.it/pdf/other/RS22049.pdf.

Kepel, Gilles, *Jihad: The Trail of Political Islam*, London: I. B. Tauris, 2002. (Originally published as *Jihad: Expansion et Déclin de I'Islamisme* in 2000).

Knights, Michael, "Algerian Operations Compress Islamist Insurgency," *Jane's Intelligence Review*, November 18, 2003.

Little, David, *Sri Lanka: The Invention of Enmity*, Washington, D.C.: United States Institute of Peace Series on Religion, Nationalism and Intolerance, 1994.

Logan, Sam, "Guns, Cocaine: One Market out of Control," International Relations and Security Network (ISN) Security Watch, Swiss Federal Institute of Technology (ETH Zurich), February 28, 2006, http://www.isn.ethz.ch/news/sw/details.cfm?ID=14921 (as of April 24, 2006).

Lopez, Antonio, "For the Love of Money," *Asiaweek,* Vol. 26, No. 5, 2000.

Lyman, Princeton N., and J. Stephen Morrison, "The Terrorist Threat In Africa, *Foreign Affairs*, January/February 2004, pp. 83–84.

Makarenko, Tamara, "A Model of Terrorist-Criminal Relations," *Jane's Intelligence Review,* August 2003.

Manogaran, Chelvadurai, *Ethnic Conflict and Reconciliation in Sri Lanka*, Honolulu: University of Hawaii Press, 1987.

Marks, Thomas A., *Maoist Insurgency Since Vietnam*, London: Frank Cass, 1996.

———, *Insurgency in Nepal,* Carlisle, Pa.: Strategic Studies Institute, December 2003.

McDermott, Jeremy, "Kidnapping Increases in Latin America," *Jane's Intelligence Review,* June 2003a.

———, "Colombia Pursues Paramilitary Peace Deal," *Jane's Intelligence Review,* October 2003b.

———, "The Shining Path Glimmers Again," *Jane's Intelligence Review*, January 2004a, pp. 22–26.

———, "FARC and the Paramilitaries Take Over Colombia's Drugs Trade," *Jane's Intelligence Review,* July 2004b, pp. 29–31.

———, "Colombian Insurgency Escalates as Guerrillas Go Back on Offensive," *Jane's Intelligence Review,* July 2005, p. 26.

Mendel, William W., "Paraguay's Ciudad del Este and the New Centers of Gravity," *Military Review,* March–April 2002.

Merari, Ariel, and Yosefa Braunstein, "Shi'ite Terrorism: Operational Capabilities and the Suicide Factor," *Terrorism, Violence and Insurgency Journal*, Vol. 5, No. 2, Fall 1984.

Miller, Martin A., "The Intellectual Origins of Modern Terrorism in Europe," in Martha Crenshaw (ed.), *Terrorism in Context*, University Park, Pa.: Pennsylvania State University Press, 2001, pp. 41–58.

Miro, Ramon J., *Organized Crime and Terrorist Activity in Mexico, 1999–2002,* Washington, D.C.: Library of Congress Federal Research Division, February 2003.

Mishal, Shaul, and Reuben Aharoni, *Speaking Stones: Communiqués from the Intifada Underground*, New York: Syracuse University Press, June 2004.

Mishal, Shaul, and Avraham Sela, *The Palestinian Hamas*, New York: Columbia University Press, 2000.

Misra, S. S., *Ethnic Conflict and the Security Crisis in Sri Lanka*, Delhi: Kalinga Publications, 1995.

Morrison, J. Stephen, "Prepared Statement of J. Stephen Morrison," United States House of Representatives, Hearing Before the Subcommittee on Africa of the Committee on International Relations on Africa and the War on Global Terrorism, One Hundred Seventh Congress, November 15, 2001.

Nakash, Yitzhak, *The Shi'is of Iraq*, Princeton, N.J.: Princeton University Press, 2003.

National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States,* Washington, D.C.: U.S. Government Printing Office, 2004.

Pax Christi, *The Kidnap Industry in Colombia,* The Hague: Pax Christi–Nederlands, November 2001.

Paz, Reuven, "The Heritage of the Sunni Militant Groups*: An Islamic Internacionale?*" International Policy Institute for Counter-Terrorism, January 4, 2000, http://www.ict.org.il/spotlight/comment.cfm?id=379 (as of March 10, 2006).

Perez-Agote, Alfonso, "The Future of Basque Identity," in William A. Douglass et al., eds., *Basque Politics and Nationalism on the Eve of the Millennium*, Reno and Las Vegas: University of Nevada Press, 1999.

Pugh, Michael, "Piracy and Armed Robbery at Sea," *Low Intensity Conflict and Law Enforcement,* Vol. 2, No. 1, 1993.

Rabasa, Angel, Cheryl Benard, Peter Chalk, C. Christine Fair, Theodore W. Karasik, Rollie Lal, Ian O. Lesser, and David E. Thaler, *The Muslim World After 9/11,* Santa Monica, Calif.: RAND Corporation, MG-246-AF, 2004.

Rabasa, Angel, and Peter Chalk, *Colombian Labyrinth: The Synergy of Drugs and Insurgency and Its Implications for Regional Stability*, Santa Monica, Calif.: RAND Corporation, MR-1339-AF, 2001.

Ramati, Yohanan, "Islamic Fundamentalism Gaining," *Midstream*, Vol. 39, No. 2, 1993.

Rangel Suárez, Alfredo, *Colombia: Guerra en el fin de siglo*, Bogotá: Tercer Mundo, 1998.

Redmond, Robert, "Phantom Ships in the Far East," INTERSEC, Vol. 6, No. 5, May 1996.

Reeve, Simon, *The New Jackals: Ramzi Yousef, Osama Bin Laden and the Future of Terrorism*, Boston: Northeastern University Press, 1999.

Ridolfo, Kathleen, "A Survey of Armed Groups in Iraq," *RFE/RL Iraq Report*, June 4, 2004.

Rood, Steven, *Forging Sustainable Peace in Mindanao: The Role of Civil Society,* Washington, D.C.: East-West Center, Policy Studies, No. 17, 2005.

Rotberg, Robert, ed., *Creating Peace in Sri Lanka: Civil War and Reconciliation*, Washington, D.C.: Brookings Institution, 1999.

Rupesinghe, Kumar, ed., *Negotiating Peace in Sri Lanka: Efforts, Failures and Lessons*, London: International Alert, 1998.

Saad-Ghorayeb, Amal, *Hizbu'llah: Politics and Religion*, London: Pluto Press, 2002.

Saikal, Amin, "Reflections on Autonomy: the PNA and Hamas Must Find a Way to Work Together," *Middle East Insight*, Vol. 11, No. 1, November–December 1994, pp. 28–30.

Santos, Soliman M., "Peace Negotiations Between the Philippine Government and the Moro Islamic Liberation Front: Causes and Prescriptions," Washington, D.C.: East-West Center Washington Working Papers, January 2005.

Schwartz, Stephen, "Jihadists in Iraq: An Unwelcome Saudi Export," *SOURCE*, Vol. 9, No. 20, February 2, 2004.

Singh, Depinder, *The IPKF in Sri Lanka,* New Delhi: Trishul Publications, 2001.

Sisty, Leo, and Maud Beelman, "Arrested Italian Cell Sheds Light on Bin Laden's European Network," *An Investigative Report of the Centre for Public Integrity*, October 3, 2001.

Sobelman, Daniel, "Hizbullah Lends Its Services to the Palestinian Intifada," *Jane's Intelligence Review*, November 1, 2001.

Soueid, Mahmoud, "Islamic Unity and Political Change: Interview with Sheikh Mohammad Husayn Fadlallah," *Journal of Palestine Studies*, Vol. 25, No. 1, Autumn 1995.

Spencer, David, "FARC's Innovative Artillery," *Jane's Intelligence Review*, Vol. 11, No. 12.

Strauss, Mark, "Anti-Globalism's Jewish Problem," *Foreign Policy,* November/December 2003.

Suryanarayan, V., ed., *Sri Lankan Crisis and India's Response*, Delhi: Patriot Publishers, 1991.

Sweig, Julia E., "What Kind of War for Colombia?" *Foreign Affairs,* Vol. 81, No. 5, September/October, 2002.

Takeyh, Ray, "Islam in Algeria: A Struggle Between Hope and Agony," *Middle East Policy*, Vol. 10, No. 2, Summer 2003.

Thomas, Raju, "Secessionist Movements in South Asia," *Survival,* Vol. 36, No. 2, 1994.

Turner, Mark, "Terrorism and Secession in the Southern Philippines: The Rise of the Abu Sayyaf," *Contemporary Southeast Asia,* Vol. 17, No. 1, June 1995.

Ulph, Stephen, "Al-Zawahiri Takes Hamas to Task," *Terrorism Focus,* The Jamestown Foundation, Vol. 3, No. 9, March 7, 2006.

United Nations Development Programme, "Emergencies Unit for Ethiopia," *Horn of Africa Monthly Review,* September–October 1998, http://www.sas.upenn.edu/African_Studies/eue_web/hoa0998.htm (as of March 16, 2006).

United States Institute of Peace (USIP), *Civil Society Under Siege,* Washington, D.C.: USIP Special Report 114, February 2004, http://www.usip.org/pubs/specialreports/sr114.html (as of March 24, 2006).

U.S. Central Intelligence Agency (CIA), *World Factbook 2004,* "South Africa," http://www.cia.gov/cia/publications/factbook/geos/sf.html (as of March 16, 2006).

U.S. Department of Justice, *Drug Threat Assessment, California, Southern District,* Johnstown, Pa.: National Drug Intelligence Center, December 2000.

U.S. Department of State, *Terrorist Group Profiles*, Washington, D.C.: U.S. Government Printing Office, November 1998.

———, Office of the Coordinator for Counterterrorism, *Patterns of Global Terrorism*, *2000,* Washington D.C.: April 2001,_http://www.mipt.org/Patterns-of-Global-Terrorism.asp (as of March 16, 2006).

———, Office of the Coordinator for Counterterrorism, *Patterns of Global Terrorism*, *2001,* Washington, D.C.: April 2002a, http://www.mipt.org/Patterns-of-Global-Terrorism.asp (as of March 16, 2006).

———, Office of the Coordinator for Counterterrorism, Fact Sheet, "Terrorist Exclusion List," November 15, 2002b, http://www.state.gov/s/ct/rls/fs/2002/15222.htm (as of March 16, 2006).

———, Office of the Coordinator for Counterterrorism, Fact Sheet: "Foreign Terrorist Organizations," January 30, 2003a, http://www.state.gov/s/ct/rls/fs/2003/17065.htm (as of March 16, 2006).

———, Office for the Coordinator for Counterterrorism, *Patterns of Global Terrorism*, *2002,* Washington, D.C.: April 2003b, http://www.mipt.org/Patterns-of-Global-Terrorism.asp (as of March 16, 2006).

U.S. House of Representatives, "Africa's Diamonds: Precious, Perilous Too?" Hearing before the Subcommittee on Africa, Committee on International Relations; May 9, 2000a.

———, Committee on the Judiciary Subcommittee on Crime, Testimony of Frank J. Cilluffo, Deputy Director, Global Organized Crime Program, Director, Counterterrorism Task Force, Center for Strategic and International Studies, "The Threat Posed from the Convergence of Organized Crime, Drug Trafficking, and Terrorism," Washington, D.C., December 13, 2000b.

Usher, Graham, "Hizballah, Syria, and the Lebanese Elections," *Journal of Palestine Studies*, Vol. 26, No. 2, Winter 1997.

Venkatachalam, M. S., *Genocide in Sri Lanka*, Delhi: Gian Publishing House, 1987.

Wannenburg, Gail, "Links Between Organised Crime and al-Qa'ida," *South African Journal for International Affairs,* Spring/Winter 2003, pp. 77–90.

Wege, Carl Anthony, "Hizbollah Organization," *Studies in Conflict and Terrorism*, Vol. 17, 1994, pp. 151–164.

Wijesekera, Daya, "The Liberation Tigers of Tamil Eelam (LTTE): The Asian Mafia," *Low Intensity Conflict and Law Enforcement,* Vol. 2, No. 2, Autumn 1993.

Yaphe, Judith, ed., *The Middle East in 2015*, Washington, D.C.: National Defense University, 2002.



SEARCH THE ARCHIVE

[              ] SEARCH

Home » News



NEWS

## Current Site

☐ Department of Justice
   L U.S. Attorneys
      L Southern District of New York

## Archives

☐ Department of Justice
   L U.S. Attorneys
      L Southern District of New York

# MALIAN MAN SENTENCED IN MANHATTAN FEDERAL COURT TO 57 MONTHS IN PRISON FOR CONSPIRING TO PROVIDE MATERIAL SUPPORT TO TERRORISTS

**FOR IMMEDIATE RELEASE**          Monday March 12, 2012

Preet Bharara, the United States Attorney for the Southern District of New York, announced that Malian citizen OUMAR ISSA was sentenced today in Manhattan federal court to 57 months in prison for conspiring to provide material support to a foreign terrorist organization. In December 2009, ISSA and two other men – Harouna Touré and Idriss Abdelrahman – were charged with agreeing to transport cocaine through West and North Africa with the intent to support the drug trafficking activities of Al Qaeda, Al Qaeda in the Islamic Magreb ("AQIM"), and the Fuerzas Armadas Revolucionarias de Colombia ("FARC"). Each of these organizations has been designated by the U.S. Department of State as a Foreign Terrorist Organization. ISSA was arrested in Ghana on December 16, 2009, and subsequently transported to the Southern District of New York, where he pled guilty on November 15, 2011, to providing material support to the FARC. ISSA was sentenced today by U.S. District Judge Barbara S. Jones.

Manhattan U.S. Attorney Preet Bharara said: "Oumar Issa knowingly agreed to provide material support to the FARC – a violent and destructive terrorist organization. We cannot repeat too often that we will do whatever it takes to capture, prosecute, and punish terrorists and those who support them, wherever they are and however long it takes."

According to the Complaint and Indictment filed in Manhattan federal court:

The principal goal of Al Qaeda, a terrorist organization founded in 1989, is to attack the United States. Al Qaeda functions on its own and through various terrorist organizations that act as affiliated groups. The group known as AQIM – formerly the Salafist Group for Preaching and Combat ("GSPC") – was founded in the late 1990s with the assistance of Usama Bin Laden.

The FARC is a highly structured international terrorist group dedicated to the violent overthrow of the democratically elected Government of Colombia. Organized as a military group, the FARC actively engages in narcotics trafficking as a financing mechanism, and has evolved into the world's largest supplier of cocaine. For at least the past five years, the FARC has been responsible for violent acts committed against U.S. persons and commercial and property interests in foreign jurisdictions – including in Colombia – in order to dissuade the United States from continuing its efforts to disrupt the FARC's cocaine manufacturing and trafficking activities.

From September 2009 through December 2009, ISSA, Touré, and Abdelrahman, who are all from Mali, agreed to provide the FARC with services, including logistical assistance and

secure transportation for a shipment of cocaine across Africa, false identification documents, and other material support and resources, knowing that the FARC was engaged in terrorist activity.  The defendants also agreed to provide material support and resources, including property, and currency and monetary instruments to Al Qaeda and AQIM, knowing that these groups were engaged in terrorist activities.

<div align="center">*          *          *</div>

 In addition to the prison term, Judge Jones also ordered ISSA, 36, to forfeit $50,000, and pay a $100 special assessment fee.

 The charges against Touré and Abdelrahman are merely accusations, and they are presumed innocent unless and until proven guilty.

 The charges against ISSA, Touré, and Abdelrahman were the result of the coordinated efforts of the U.S. Attorney's Office for the Southern District of New York and the DEA's Special Operations Division and Ghana Office.  Mr. Bharara praised the outstanding investigative work of the DEA and thanked the Department of Justice's Office of International Affairs, its National Security Division, and the Department of State for their assistance.  Mr. Bharara also thanked the Government of Ghana for its cooperation.

 The case is being handled by the Office's Terrorism and International Narcotics Unit. Assistant U.S. Attorneys Jeffrey A. Brown, Christian R. Everdell, and Edward Kim are in charge of the prosecution.

12-074

Return to Top

JUSTICE.GOV/USAO



REUTERS    World    Business    Markets    Breakingviews    Video    More 

WORLD
NEWS

JANUARY 13, 2010 / 9:50 AM / UPDATED 12
YEARS AGO

# Al Qaeda linked to rogue aviation network

By Tim Gaynor,
Tiemoko Diallo

21 MIN READ



TIMBUKTU, Mali (Reuters) - In early
2008, an official at the U.S.
Department of Homeland Security
sent a report to his superiors detailing
what he called "the most significant
development in the criminal
exploitation of aircraft since 9/11."

A policeman patrols a market in central Timbuktu December 28, 2009. The fabled city is in the Sahel region of northern Mali. The area has become a stronghold for a franchise of Al Qaeda, and a hub for trafficking cocaine from South America by air, which is then smuggled onto Europe. REUTERS/Tim Gaynor

The document warned that a growing fleet of rogue jet aircraft was regularly crisscrossing the Atlantic Ocean. On one end of the air route, it said, are cocaine-producing areas in the Andes controlled by the leftist Revolutionary Armed Forces of Colombia. On the other are some of West Africa's most unstable countries.

The report, a copy of which was obtained by Reuters, was ignored, and the problem has since escalated into what security officials in several countries describe as a global security threat.

The clandestine fleet has grown to include twin-engine turboprops,

TRENDING STORIES

executive jets and retired Boeing 727s that are flying multi-ton loads of cocaine and possibly weapons to an area in Africa where factions of al Qaeda are believed to be facilitating the smuggling of drugs to Europe, the officials say.

Al Qaeda in the Islamic Maghreb (AQIM) has been held responsible for car and suicide bombings in Algeria and Mauritania.

Gunmen and bandits with links to AQIM have also stepped up kidnappings of Europeans for ransom, who are then passed on to AQIM factions seeking ransom payments.

The aircraft hopscotch across South American countries, picking up tons of cocaine and jet fuel, officials say. They then soar across the Atlantic to West Africa and the Sahel, where the drugs are funneled across the Sahara Desert and into Europe.

An examination of documents and

HK stocks rise as banks, property shares gain; Alibaba weighs on tech sector

Fact Check-Alberta court case not linked to lifting of COVID-19 restrictions

Facebook pressed by U.S. lawmakers on disabling NYU research accounts

Sudan recalls ambassador to Ethiopia after mediation offer rejected

Israeli survey finds 3rd Pfizer vaccine dose has similar side effects to 2nd

interviews with officials in the United States and three West African nations suggest that at least 10 aircraft have been discovered using this air route since 2006. Officials warn that many of these aircraft were detected purely by chance. They caution that the real number involved in the networks is likely considerably higher.

Alexandre Schmidt, regional representative for West and Central Africa for the UN Office on Drugs and Crime, cautioned in Dakar this week that the aviation network has expanded in the past 12 months and now likely includes several Boeing 727 aircraft.

"When you have this high capacity for transporting drugs into West Africa, this means that you have the capacity to transport as well other goods, so it is definitely a threat to security anywhere in the world," said Schmidt.

The "other goods" officials are most worried about are weapons that

militant organizations can smuggle on the jet aircraft. A Boeing 727 can handle up to 10 tons of cargo.

The U.S. official who wrote the report for the Department of Homeland Security said the al Qaeda connection was unclear at the time.

The official is a counter-narcotics aviation expert who asked to remain anonymous as he is not authorized to speak on the record. He said he was dismayed by the lack of attention to the matter since he wrote the report.

"You've got an established terrorist connection on this side of the Atlantic. Now on the Africa side you have the al Qaeda connection and it's extremely disturbing and a little bit mystifying that it's not one of the top priorities of the government," he said.

Since the September 11 attacks, the security system for passenger air traffic has been ratcheted up in the United States and throughout much of the rest

REUTERS NEWS NOW

Subscribe to our daily curated newsletter to receive the latest exclusive Reuters coverage delivered to your inbox.

Submit

of the world, with the latest measures imposed just weeks ago after a failed bomb attempt on a Detroit-bound plane on December 25.

"The bad guys have responded with their own aviation network that is out there everyday flying loads and moving contraband," said the official, "and the government seems to be oblivious to it."

The upshot, he said, is that militant organizations -- including groups like the FARC and al Qaeda -- have the "power to move people and material and contraband anywhere around the world with a couple of fuel stops."

The lucrative drug trade is already having a deleterious impact on West African nations. Local authorities told Reuters they are increasingly outgunned and unable to stop the smugglers.

And significantly, many experts say, the drug trafficking is bringing in huge

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 377 of 632

revenues to groups that say they are part of al Qaeda. It's swelling not just their coffers but also their ranks, they say, as drug money is becoming an effective recruiting tool in some of the world's most desperately poor regions.

U.S. President Barack Obama has chided his intelligence officials for not pooling information "to connect those dots" to prevent threats from being realized. But these dots, scattered across two continents like flaring traces on a radar screen, remain largely unconnected and the fleets themselves are still flying.

## THE AFRICAN CONNECTION

The deadly cocaine trade always follows the money, and its cash-flush traffickers seek out the routes that are the mostly lightly policed.

Beset by corruption and poverty, weak countries across West Africa have become staging platforms for

transporting between 30 tons and 100 tons of cocaine each year that ends up in Europe, according to U.N. estimates.

Drug trafficking, though on a much smaller scale, has existed here and elsewhere on the continent since at least the late 1990s, according to local authorities and U.S. enforcement officials.

Earlier this decade, sea interdictions were stepped up. So smugglers developed an air fleet that is able to transport tons of cocaine from the Andes to African nations that include Mauritania, Mali, Sierra Leone and Guinea Bissau.What these countries have in common are numerous disused landing strips and makeshift runways -- most without radar or police presence. Guinea Bissau has no aviation radar at all. As fleets grew, so, too, did the drug trade.

The DEA says all aircraft seized in West Africa had departed Venezuela.

That nation's location on the
Caribbean and Atlantic seaboard of
South America makes it an ideal
takeoff place for drug flights bound for
Africa, they say.

A number of aircraft have been
retrofitted with additional fuel tanks to
allow in-flight refueling -- a technique
innovated by Mexico's drug smugglers.
(Cartel pilots there have been known
to stretch an aircraft's flight range by
putting a water mattress filled with
aviation fuel in the cabin, then stacking
cargoes of marijuana bundles on top to
act as an improvised fuel pump.)

Ploys used by the cartel aviators to
mask the flights include fraudulent
pilot certificates, false registration
documents and altered tail numbers to
steer clear of law enforcement lookout
lists, investigators say. Some aircraft
have also been found without air-
worthiness certificates or log books.
When smugglers are forced to abandon
them, they torch them to destroy

forensic and other evidence like serial
numbers.

The evidence suggests that some
Africa-bound cocaine jets also file a
regional flight plan to avoid arousing
suspicion from investigators. They
then subsequently change them at the
last minute, confident that their switch
will go undetected.

One Gulfstream II jet, waiting with its
engines running to take on 2.3 tons of
cocaine at Margarita Island in
Venezuela, requested a last-minute
flight plan change to war-ravaged
Sierra Leone in West Africa. It was
nabbed moments later by Venezuelan
troops, the report seen by Reuters
showed.

Once airborne, the planes soar to
altitudes used by commercial jets.
They have little fear of interdiction as
there is no long-range radar coverage
over the Atlantic. Current detection
efforts by U.S. authorities, using fixed
radar and P3 aircraft, are limited to

traditional Caribbean and north
Atlantic air and marine transit
corridors.

The aircraft land at airports, disused
runways or improvised air strips in
Africa. One bearing a false Red Cross
emblem touched down without
authorization onto an unlit strip at
Lungi International Airport in Sierra
Leone in 2008, according to a U.N.
report.

Late last year a Boeing 727 landed on
an improvised runway using the hard-
packed sand of a Tuareg camel caravan
route in Mali, where local officials said
smugglers offloaded between 2 and 10
tons of cocaine before dousing the jet
with fuel and burning it after it failed
to take off again.

For years, traffickers in Mexico have
bribed officials to allow them to land
and offload cocaine flights at
commercial airports. That's now
happening in Africa as well. In July
2008, troops in coup-prone Guinea

Bissau secured Bissau international airport to allow an unscheduled cocaine flight to land, according to Edmundo Mendes, a director with the Judicial Police.

"When we got there, the soldiers were protecting the aircraft," said Mendes, who tried to nab the Gulfstream II jet packed with an estimated $50 million in cocaine but was blocked by the military.

"The soldiers verbally threatened us," he said. The cocaine was never recovered. Just last week, Reuters photographed two aircraft at Osvaldo Vieira International Airport in Guinea Bissau -- one had been dispatched by traffickers from Senegal to try to repair the other, a Gulfstream II jet, after it developed mechanical problems. Police seized the second aircraft.

Slideshow ( 10 images )

## FLYING BLIND

One of the clearest indications of how much this aviation network has advanced was the discovery, on November 2, of the burned out fuselage of an aging Boeing 727. Local authorities found it resting on its side in rolling sands in Mali. In several ways, the use of such an aircraft marks a significant advance for smugglers.

Boeing jetliners, like the one discovered in Mali, can fly a cargo of several tons into remote areas. They also require a three-man crew -- a pilot, co pilot and flight engineer, primarily to manage the complex fuel system dating from an era before automation.

Hundreds of miles to the west, in the sultry, former Portuguese colony of Guinea Bissau, national Interpol director Calvario Ahukharie said several abandoned airfields, including strips used at one time by the Portuguese military, had recently been

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 384 of 632

restored by "drug mafias" for illicit flights.

"In the past, the planes coming from Latin America usually landed at Bissau airport," Ahukharie said as a generator churned the feeble air-conditioning in his office during one of the city's frequent blackouts.

"But now they land at airports in southern and eastern Bissau where the judicial police have no presence."

Ahukharie said drug flights are landing at Cacine, in eastern Bissau, and Bubaque in the Bijagos Archipelago, a chain of more than 80 islands off the Atlantic coast. Interpol said it hears about the flights from locals, although they have been unable to seize aircraft, citing a lack of resources.

The drug trade, by both air and sea, has already had a devastating impact on Guinea Bissau. A dispute over trafficking has been linked to the assassination of the military chief of

staff, General Batista Tagme Na Wai in 2009. Hours later, the country's president, Joao Bernardo Vieira, was hacked to death by machete in his home.

Asked how serious the issue of air trafficking remained for Guinea Bissau, Ahukharie was unambiguous: "The problem is grave."

The situation is potentially worse in the Sahel-Sahara, where cocaine is arriving by the ton. There it is fed into well-established overland trafficking routes across the Sahara where government influence is limited and where factions of al Qaeda in the Islamic Maghreb have become increasingly active.

The group, previously known as the Salafist Group for Preaching and Combat, is raising millions of dollars from the kidnap of Europeans.

Analysts say militants strike deals of convenience with Tuareg rebels and

smugglers of arms, cigarettes and drugs. According to a growing pattern of evidence, the group may now be deriving hefty revenues from facilitating the smuggling of FARC-made cocaine to the shores of Europe.

## UNHOLY ALLIANCE

In December, Antonio Maria Costa, the executive director of the UN Office on Drugs and Crime, told a special session of the UN Security Council that drugs were being traded by "terrorists and anti-government forces" to fund their operations from the Andes, to Asia and the African Sahel.

"In the past, trade across the Sahara was by caravans," he said. "Today it is larger in size, faster at delivery and more high-tech, as evidenced by the debris of a Boeing 727 found on November 2nd in the Gao region of Mali -- an area affected by insurgency and terrorism."

Just days later, U.S. Drug Enforcement Administration officials arrested three West African men following a sting operation in Ghana. The men, all from Mali, were extradited to New York on December 16 on drug trafficking and terrorism charges.

Oumar Issa, Harouna Toure, and Idriss Abelrahman are accused of plotting to transport cocaine across Africa with the intent to support al Qaeda, its local affiliate AQIM and the FARC. The charges provided evidence of what the DEA's top official in Colombia described to a Reuters reporter as "an unholy alliance between South American narco-terrorists and Islamic extremists."

Some experts are skeptical, however, that the men are any more than criminals. They questioned whether the drug dealers oversold their al Qaeda connections to get their hands on the cocaine.

In its criminal complaint, the DEA said

Toure had led an armed group
affiliated to al Qaeda that could move
the cocaine from Ghana through North
Africa to Spain for a fee of $2,000 per
kilo for transportation and protection.

Toure discussed two different overland
routes with an undercover informant.
One was through Algeria and Morocco;
the other via Algeria to Libya. He told
the informer that the group had
worked with al Qaeda to transport
between one and two tons of hashish
to Tunisia, as well as smuggle
Pakistani, Indian and Bangladeshi
migrants into Spain.

In any event, AQIM has been gaining
in notoriety. Security analysts warn
that cash stemming from the trans-
Saharan coke trade could transform
the organization -- a small, agile group
whose southern-Sahel wing is
estimated to number between 100 and
200 men -- into a more potent threat in
the region that stretches from
Mauritania to Niger. It is an area with

huge foreign investments in oil, mining and a possible trans-Sahara gas pipeline.

"These groups are going to have a lot more money than they've had before, and I think you are going to see them with much more sophisticated weapons," said Douglas Farah, a senior fellow at the International Assessment Strategy Center, a Washington based security think-tank.

## NARCOTIC INDUSTRIAL DEPOT

The Timbuktu region covers more than a third of northern Mali, where the parched, scrubby Sahel shades into the endless, rolling dunes of the Sahara Desert. It is an area several times the size of Switzerland, much of it beyond state control.

Moulaye Haidara, the customs official, said the sharp influx of cocaine by air has transformed the area into an "industrial depot" for cocaine.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 390 of 632

Sitting in a cool, dark, mud-brick office building in the city where nomadic Tuareg mingle with Arabs and African Songhay, Fulani and Mande peoples, Haidara expresses alarm at the challenge local law enforcement faces.

Using profits from the trade, the smugglers have already bought "automatic weapons, and they are very determined," Haidara said. He added that they "call themselves Al Qaeda," though he believes the group had nothing to do with religion, but used it as "an ideological base."

Local authorities say four-wheel-drive Toyota SUVs outfitted with GPS navigation equipment and satellite telephones are standard issue for smugglers. Residents say traffickers deflate the tires to gain better traction on the loose Saharan sands, and can travel at speeds of up to 70 miles-per-hour in convoys along routes to North Africa.

Timbuktu governor, Colonel Mamadou

Mangara, said he believes traffickers have air-conditioned tents that enable them to operate in areas of the Sahara where summer temperatures are so fierce that they "scorch your shoes." He added that the army lacked such equipment. A growing number of people in the impoverished region, where transport by donkey cart and camel are still common, are being drawn to the trade. They can earn 4 to 5 million CFA Francs (roughly $9-11,000) on just one coke run.

"Smuggling can be attractive to people here who can make only $100 or $200 a month," said Mohamed Ag Hamalek, a Tuareg tourist guide in Timbuktu, whose family until recently earned their keep hauling rock salt by camel train, using the stars to navigate the Sahara.

Haidara described northern Mali as a no-go area for the customs service. "There is now a red line across northern Mali, nobody can go there,"

he said, sketching a map of the country on a scrap of paper with a ballpoint pen. "If you go there with feeble means … you don't come back."

## TWO-WAY TRADE

Speaking in Dakar this week, Schmidt, the U.N. official, said that growing clandestine air traffic required urgent action on the part of the international community.

"This should be the highest concern for governments … For West African countries, for West European countries, for Russia and the U.S., this should be very high on the agenda," he said.

Stopping the trade, as the traffickers are undoubtedly aware, is a huge challenge -- diplomatically, structurally and economically.

Venezuela, the takeoff or refueling point for aircraft making the trip, has a

confrontational relationship with
Colombia, where President Alvaro
Uribe has focused on crushing the
FARC's 45-year-old insurgency. The
nation's leftist leader, Hugo Chavez,
won't allow in the DEA to work in the
country.

In a measure of his hostility to
Washington, he scrambled two F16
fighter jets last week to intercept an
American P3 aircraft -- a plane used to
seek out and track drug traffickers --
which he said had twice violated
Venezuelan airspace. He says the
United States and Colombia are using
anti-drug operations as a cover for a
planned invasion of his oil-rich
country. Washington and Bogota
dismiss the allegation.

In terms of curbing trafficking, the
DEA has by far the largest overseas
presence of any U.S. federal law
enforcement, with 83 offices in 62
countries. But it is spread thin in Africa
where it has just four offices -- in

Nigeria, Ghana, Egypt and South Africa -- though there are plans to open a fifth office in Kenya.

Law enforcement agencies from Europe as well as Interpol are also at work to curb the trade. But locally, officials are quick to point out that Africa is losing the war on drugs.

The most glaring problem, as Mali's example shows, is a lack of resources. The only arrests made in connection with the Boeing came days after it was found in the desert -- and those incarcerated turned out to be desert nomads cannibalizing the plane's aluminum skin, probably to make cooking pots. They were soon released.

Police in Guinea Bissau, meanwhile, told Reuters they have few guns, no money for gas for vehicles given by donor governments and no high security prison to hold criminals.

Corruption is also a problem. The army has freed several traffickers

charged or detained by authorities
seeking to tackle the problem, police
and rights groups said.

Serious questions remain about why
Malian authorities took so long to
report the Boeing's discovery to the
international law enforcement
community.

What is particularly worrying to U.S.
interests is that the networks of
aircraft are not just flying one way --
hauling coke to Africa from Latin
America -- but are also flying back to
the Americas.

The internal Department of Homeland
Security memorandum reviewed by
Reuters cited one instance in which an
aircraft from Africa landed in Mexico
with passengers and unexamined
cargo.

The Gulfstream II jet arrived in
Cancun, by way of Margarita Island,
Venezuela, en route from Africa. The
aircraft, which was on an aviation

watch list, carried just two passengers. One was a U.S. national with no luggage, the other a citizen of the Republic of Congo with a diplomatic passport and a briefcase, which was not searched.

"The obvious huge concern is that you have a transportation system that is capable of transporting tons of cocaine from west to east," said the aviation specialist who wrote the Homeland Security report.

"But it's reckless to assume that nothing is coming back, and when there's terrorist organizations on either side of this pipeline, it should be a high priority to find out what is coming back on those airplanes."

Additional reporting by Tiemoko Diallo in Mali, Alberto Dabo in Guinea Bissau and Hugh Bronstein in Colombia, editing by Jim Impoco and Claudia Parsons

*Our Standards: The Thomson Reuters Trust Principles.*

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 397 of 632

Apps    Newsletters    Advertise with Us

Advertising Guidelines    Cookies    Terms of Use    Privacy



Do Not Sell My Personal Information





Your subscription makes our work possible.

*We want to bridge divides to reach everyone.*

Subscribe

# Air Al Qaeda: Are Latin America's drug cartels giving Al Qaeda a lift?

There is growing concerns that Al Qaeda in Africa and Latin American drug cartels are working together. Latin American cocaine flights go to Africa, en route to Europe. Are Al Qaeda members on the empty planes back to Latin America?

This website uses cookies to improve functionality and performance. By continuing to browse the site you are agreeing to our use of cookies.          Close



Tim Gaynor/Reuters/File

A policeman patrols a market in central Timbuktu, on December 28, 2009. The area around Mali's capital has become a stronghold for a franchise of Al Qaeda, and a hub for trafficking cocaine from South America by air, which is then smuggled onto Europe.

January 15, 2010

**By Scott Baldauf**, Staff writer

JOHANNESBURG, SOUTH AFRICA

It's known as the Coca Cola plane. In early November, drug traffickers landed a Boeing 727 in the Malian desert in Gao state and offloaded as much as 10 tons of cocaine. Then, rather than fly it back across the Atlantic to Latin America, they simply burnt it, treating it like a used Coke can.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 400 of 632

The terrain of northern Mali is stark desert, and a haven for Islamist insurgents with close ties to Al Qaeda. Initially, investigators thought the plane had crashed in the desert on take off.

But now, based on the fact that the plane was largely intact, many experts suspect that the drug cartels – perhaps in coordination with their Al Qaeda partners – burnt the plane deliberately.

"That shows you the strength of the drug cartels, and how much money they have," says Rinaldo Depagne, a West Africa expert at the International Crisis Group in Dakar, Senegal. "It's like a plastic [Coca Cola] bottle to them. When you are done with it, you just throw it away."

According to UN reports, nearly 60 percent of the cocaine sold in Europe transits through weak West African states such as Mali, Niger, Mauritania, and Guinea Bissau – a flow of cash and contraband that undermines the credibility of each country's ability to govern itself.

As many of these same countries are now becoming a haven for a shadowy group calling itself Al Qaeda in the Islamic Maghreb (AQIM), there are growing concerns that Islamist radicals and Latin American drug cartels may be working together, both to enrich themselves and to weaken the law enforcement capability of those West African states.

"At this point Al Qaeda in the Maghreb seems to be nothing more than just facilitators, but more and more we see evidence of them working together," says an official for the US military at the Africom command center in Stuttgart,

speaking on background. But it is safe to assume, the official adds, that Al Qaeda "is profiting from the drug trafficking trade going through its areas" of the Sahara.

A 2008 Department of Homeland Security report, obtained by Reuters, warned of a growing fleet of rogue aircraft – at least 10 aircraft including executive jets, twin-engine turboprops, and aging Boeing 727s, crisscrossing the Atlantic. The DEA also told Reuters that all aircraft seized in West Africa had departed Venezuela.

When it comes to traffickers use of planes between West Africa and Latin America, US military experts say there is a clear potential threat to American security. "We know what those planes are carrying across the Atlantic to Africa. But what goes back [on those planes] to [Latin] American shores?" says one US military official. "You know what the condition of the [US] southern borders are. You see the beginning of a process of thought."

## Al Qaeda funded by drug protection money?

If Al Qaeda is getting into the drug trade, it would not be the first terrorist organization to do so. Through much of the 1990s and 2000s, the Colombian leftist rebel group, the Revolutionary Armed Forces of Colombia (FARC), has largely funded its 40-year insurgency through kidnapping and cocaine production. The Taliban were also thought to have turned to the opium trade in order to finance its own buildup of arms in the southern part of Afghanistan.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 402 of 632

The motives of Al Qaeda would seem to be very different from those of the drug traffickers. Al Qaeda is an insurgent group fighting for a political goal, perhaps to defend its land or to impose its ideology. Drug traffickers are merely in it for money.

But in the West African Sahara, there's growing evidence that the two have found common cause in using the vast unpatrolled desert areas for transporting drugs up north to Europe, and as bases for military operations and training.

"Terrorists are looking at an ideology, they are fighting for their land," says another US military official at Africom. "Traffickers don't have an allegiance to an area, they change their routes, they change their methods, far faster than the law enforcement in a country can keep up with."

Latin American cartels have been smuggling drugs to Europe via Africa since the 1990s. But For West African nations, keeping up with the traffickers and now the insurgents may seem an impossible task. In 2006, a UN report found that the annual value of smuggled cocaine through West Africa is more than twice the gross domestic product of Guinea Bissau.

# US military trainers help out

Yet, confronting the traffickers and the insurgents is precisely what the US military hopes these nations will do in the very near future. In the past two years, American military trainers have increased their visits to West Africa, and conducted joint training exercises under Operation Enduring Freedom – Trans-Sahel Initiative.

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 403 of 632

On land, US Army trainers – many of them Special Forces commandos – train African soldiers in counterinsurgency methods, and the US government has begun to provide the army of Mali, Niger, and Mauritania with basic arms and equipment, something these nations can ill-afford to buy on their own. In addition, US Drug Enforcement Administration (DEA) agents have ramped up their efforts in West Africa, trying to help nations with weak law enforcement capabilities to rein in drug traffickers.

Last month, three suspects from Mali were extradited from Ghana to the United States to face charges of offering Al Qaeda protection to move cocaine from West Africa, through the Sahara, and up to Spain. The three suspects, Oumar Issa, Harouna Toure, and Idriss Abelrahman, told DEA informants that they were members of Al Qaeda's North African branch, and they could protect drug shipments at a fee of $4,200 per kilo.

Given the scale of what drug traffickers are willing to pay – and what Al Qaeda apparently earns for its part of the business – the challenge of stopping the drug trade through West Africa will be immense, say analysts.

It is one thing for the US military to train a man to fight an insurgent. It is quite another thing to put that man out in the field, earning little pay, where drug traffickers or radical Islamists can offer them bribes or other incentives to look the other way when it suits them.

"These traffickers are shipping huge amounts of cocaine so they have lots of money," says Depagne. "This is a huge threat for weak states of West Africa.

When you compare the money of a drug cartel to the budget of Mauritania, or to the salary of a policeman in Niger – who receives less than $200 a month – it's easy to see what will happen."

As for Al Qaeda, "if they manage to get that kind of money, it will put them on another level," says Depagne. "I don't know if you can find any evidence proving a link between Al Qaeda and the drug traffickers, unless you are CIA. But it doesn't take a rocket scientist to see why they would want to work together. To do terrorism, you need money, and what are you going to do in the deserts of Mali to make money. You take money where it is. You work with the drug traffickers."

## Related stories

- Al Qaeda rises in West Africa

- **TERRORISM & SECURITY** Al Qaeda-linked militant group in Mali executes British hostage

- Mali moves music festival as tourism threatened by Al Qaeda threat

ISSN 2573-3850 (online)

Follow us:



© The Christian Science Monitor. All Rights Reserved. Terms. Privacy Policy.

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 406 of 632





HOME    NEWS    COUNTRIES    INVESTIGATIONS    CRIMINAL ACTORS    INDEPTH

Home > News > Brief > Arrests Point to FARC Ties to Al Qaeda in North Africa



BRIEF

# Arrests Point to FARC Ties to Al Qaeda in North Africa

COLOMBIA / 8 APR 2013 BY JAMES BARGENT          EN    

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 407 of 632

078

Colombia's largest insurgency, the FARC, has allegedly been exchanging drugs for weapons with the North Africa faction of Al Qaeda, highlighting the international reach of the guerrilla's criminal networks.

In March, the US Drug Enforcement Administration (DEA) arrested two Colombians, one an alleged member of the Revolutionary Armed Forces of Colombia (FARC), along with three alleged members of a Salafist group linked to Al Qaeda in the Islamic Maghreb (AQIM) in Algeria on drug trafficking charges, according to the Spanish news organization Cadena Ser.

The Colombians were allegedly delivering a shipment of cocaine to swap for cash, and arms acquired in Libya following the fall of dictator Colonel Muammar Gaddafi. Spanish intelligence and DEA sources told Cadena Ser that several months before, FARC collaborators had made contact with members of AQIM, who had arranged the deal through members of a local Salafist group operating under their orders.

## InSight Crime Analysis

The AQIM is a faction of Al Qaeda with roots in Algeria but which recently rose to prominence for its role in the conflict in northern Mali. Unlike more zealous factions of Al Qaeda, the group has frequently demonstrated it is willing to fund itself through criminal activities such as drug trafficking and kidnapping for ransom.

It is quite possible that, as the investigation suggests, the group has established ties with the FARC. They share a mutual hatred of the United States. However, given the two groups' disparate ideologies, this is much more likely to be a purely criminal business relationship than any sort of political alliance.

COLOMBIA     FARC

share

**Tags**

COLOMBIA

FARC

Was this c
helpful?

We want to su
America's larg
crime databas
to do so, we n

DONATE

## Was this content helpful?

We want to sustain Latin America's largest organized crime database, but in order to do so, we need resources.

DONATE

---

## What are your thoughts? **Click here** to send InSight Crime your comments.

We encourage readers to copy and distribute our work for non-commercial purposes, with attribution to InSight Crime in the byline and links to the original at both the top and bottom of the article. Check the Creative Commons website for more details of how to share our work, and please send us an email if you use an article.

# Latest News



### Vigilante Death Squad Sends Bloody Message in Brazil-Paraguay Border Region

**NEWS** / 9 AUG 2021

### Are El Koki and His Gang Members No Longer Safe in Venezuela?

**NEWS** / 6 AUG 2021

# Related Content



### DEA Agents Posed as FARC to Net International Arms Trafficker

**ARMS TRAFFICKING** / 26 JUL 2017

A man from the Ivory Coast has pleaded guilty in a US court to offering support to undercover DEA agents...



### Venezuela-Colombia Border Could See Rise in Drug Trafficking

**COLOMBIA** / 30 MAR 2016

A recent report on drug trafficking in Venezuelan border state Zulia draws attention to a key cocaine corridor that may...



### Colombia's BACRIM Weakened but Ura Continue to Grow

**COLOMBIA** / 24 JAN 2014

The overall number of member narco-paramilitary groups kno has fallen by over 20 percent s

# About InSight Crime

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 409 of 632
380



THE ORGANIZATION

## Unraveling the Web of Elites Connected to Organized Crime

27 JUL 2021

InSight Crime published Elites and Organized Crime in Nicaragua, a d
into the relationships between criminal actors and elites in that Centr
American nation.

## Stay Informed with Weekly InSight

Get fresh updates on organized crime from across the region delivered to your inbox.

*We go into the field to interview, report and investigate. We then verify, write and edit, providing the tools to generate real impact.*

*Our work is costly and high risk. Please support our mission investigating organized crime.*

-->  DONATE

| ABOUT US | SITEMAP | INFORMATION PROCESS |
|---|---|---|
| OUR MISSION | HOME | PRIVACY POLICY |
| WHAT MAKES US DIFFERENT | NEWS | REFUND POLICY |
| DIRECTORS AND TEAM | COUNTRIES | CONTACT US |
| | INVESTIGATIONS | |
| | CRIMINAL ACTORS | Creative Commons Attribu |
| | INDEPTH | Noncommercial 3.0 Unpor |

  



Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 410 of 632

**Click to find out more about a new promotion**

Don't miss this content from our sponsor

PROGRAMS AND PODCAST    ISSUERS

Madrid ☀ 34o / 20o

AUGUST 09, 2021 UPDATED AT 17:14 CEST

ÚLTIMA HORA



x

**COURTS**
The airline Plus Ultra will finally be able to receive the 34 million euros granted by the Government

v

**SPAIN**

# FARC and groups linked to Al Qaeda exchange cocaine for weapons

The FARC has acquired weapons from the Libyan regime this summer after Gaddafi's death through groups linked to Al Qaeda in the Islamic Maghreb

○ ○ ○

**ANA TERRADILLOS** | 04/08/2013 - 06:09 h. CEST

The DEA (the U.S. Drug Enforcement Agency) arrested on March 21 in Algeria two Colombians who last summer carried out a drug trafficking operation in the south of the country with members of Al Qaeda in the Islamic Maghreb

The DEA and the Spanish information services have police record that one of the detainees is a member of the FARC that has always been financed by drug trafficking. **The exchange: cocaine for Libyan weapons acquired after the fall of Libyan President Muammar Gaddafi**. The purchase of weapons was made a few days before Colombia announced the beginning of talks with the Colombian guerrillas.

**MORE INFORMATION**

- **The acts for the memory of the victims of 9/11 tour Madrid**

It is the first time that a network of collaboration between Salafist groups operating under the umbrella of Al Qaeda in the Islamic Maghreb and collaborators

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 411 of 632

- Ruz releases two Chechens arrested for alleged belonging to Al Qaeda
- Salafist groups and 'lone wolves' threaten Spain
- Judge Pedraz sends one of the alleged jihadists to prison for belonging to Al Qaeda
- The Colombian Police confirm that ransom has been requested by the two Spanish tourists
- Five years after Operation Check, Colombia seeks the end of the FARC
- At least two people injured after an attack on the French embassy in Libya

**of the Colombian guerrillas is detected by police.** According to DEA sources, the U.S. anti-drug agency, the contacts were established months before the exchange by FARC collaborators who traveled to Algeria to contact and establish the agreement. The contact was made through members of Al Qaeda in the Islamic Maghreb and the exchange through Salafists who control that area and who move under the guidelines of AQIM.

**The exchange has been cocaine for Libyan weapons acquired by Salafist groups such as Ansar Al Dine after the fall of Libyan President Muammar Gaddafi.** Colombians also received a significant amount of money from the fundamentalist Salafists. The exchange took place at the end of summer in southern Algeria but the arrests took place on March 21 also in southern Algeria. Two Colombians and three Salafists who operate under the orders of Al Qaeda in the Islamic Maghreb were arrested. **The DEA and the Spanish information services are aware that one of the detained Colombians is a member of the FARC.**

The plane that was used to bring the cocaine shipment belongs to clans of drug traffickers that collaborate with the FARC and was burned in the city of Kidal in Mali on the border with Algeria as soon as the drugs were unloaded. The two citizens of Colombia are in the United States under the authority of the DEA and the three Salafists in the hands of the Algerian army that is carrying out the on-site investigation together with the United States.

**The DEA and the Spanish information services believe that the destination of cocaine brought from Colombia is Europe through Turkey.** Shipments to France have been detected but it is not ruled out that there are more European receiving countries. This modus operandi of drug trafficking is increasingly common among Salafist groups installed in North Africa. They are financed by kidnappings and drug trafficking with the help of the Tuaregs who often function as subcontractors of Al Qaeda in the Islamic Maghreb (AQIM).

On August 29, Colombian President Juan Manuel Santos announced that his

## THE MOST POPULAR



**Homicide or murder?**



**King Felipe VI receives the sash of Captain General of the three armies in Zarzuela**



**Official sources confirm that there is no person on the island**

**Rajoy downplays climate change by alluding to his scientific cousin**

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 412 of 632

government was prepared to begin talks with the FARC and on November 19 of last year the Revolutionary Armed Forces of Colombia declared a unilateral ceasefire between November 20 and January 20. The talks began in Olso (Norway) in the same scenario as those of ETA and have continued in Havana (Cuba) during all these months. **There have been stopwaters but just yesterday the President of Colombia, Manuel Santos, assured that the peace process between his government and the FARC guerrillas "is going well."** The truth is that at this time neither side has decreed any truce.

AQIM continues to have its main base of operations in Mali. The **uncontrolled desert of Mali is the main bastion of the Salafists** who have maintained their bases and training camps for decades. There is concern that AQIM has rearmed itself with Libyan weapons and explosives that it has begun to use in countries such as Nigeria and in attacks against Christians. The route they have made to move the weapons is Libya-Niger-Mali and the entire transfer has been done by road. Missiles and the military explosive have arrived in Mali through the Tuareg and AQIM mercenaries who in exchange for money introduce the arsenals into trucks that circulate as security convoys. Several trucks have been intercepted in Niger on their way to Mali with missiles and military explosive. Recent police reports to which the SER has had access indicate that the Al Qaeda subsidiary in North Africa has among its arsenal **"long-range missiles and a very destructive and powerful military explosive known as semtex."** It is a general purpose plastic explosive used for terrorist purposes because it is extremely difficult to detect and easy to obtain.

**The latest police reports prepared by with agents of the foreign information services deployed in the Sahel underline that "Al Qaeda in the Islamic Maghreb has increased its capabilities by obtaining weapons and explosives from the Libyan conflict."** From the counterterrorism point of view, the police officers stress **"the control of Libyan weapons that are leaving the country is being a security challenge."** It is considered that the police document "will be long before the Libyan security structures become fully operational again."

recommended by

MacKeeper

https://locksmithofhearts.com/

Senior Living | Search Ads

Playsstar

SmartAsset

Huffington Post

Huffington Post

Huffington Post

https://mx.investing.com/

The Motley Fool



**Direct**  Cadena SER

**ay** Pedro Blanco

Newsletter

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 415 of 632





FATF REPORT

# TERRORIST FINANCING IN WEST AFRICA

**October 2013**





FINANCIAL ACTION TASK FORCE

The Financial Action Task Force (FATF) is an independent inter-governmental body that develops and promotes policies to protect the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction. The FATF Recommendations are recognised as the global anti-money laundering (AML) and counter-terrorist financing (CFT) standard.

For more information about the FATF, please visit the website:

**www.fatf-gafi.org**



**GIABA**
Inter Governmental Action Group
Against Money Laundering in West Africa

The Inter-Governmental Action Group against Money Laundering in West Africa (GIABA) was established by the Economic Community of West African States (ECOWAS) Authority of Heads of State and Government in the year 2000. GIABA is a specialized institution of ECOWAS that is responsible for strengthening the capacity of member states towards the prevention and control of money laundering and terrorist financing in the region.

For more information about GIABA, please visit the website:

**www.giaba.org**

© 2013 FATF/OECD. © 2013 GIABA. All rights reserved.
No reproduction or translation of this publication may be made without prior written permission.
Applications for such permission, for all or part of this publication, should be made to
the FATF Secretariat, 2 rue André Pascal 75775 Paris Cedex 16, France
(fax: +33 1 44 30 61 37 or e-mail: contact@fatf-gafi.org).
or
the GIABA Secretariat, Complexe Sicap Point E Av Chiekh A. Diop, X Canal IV 1er Etage Immeuble A,
BP 32400, Ponty Dakar, Senegal (e-mail: secretariat@giaba.org).

Photocredits coverphoto: ©Thinkstock

# TABLE OF CONTENTS

ACRONYMS ........................................................................................................................ 2

EXECUTIVE SUMMARY ..................................................................................................... 3

CHAPTER 1: INTRODUCTION ........................................................................................... 5

   1.1 Background ................................................................................................................ 5
   1.2 Rationale for the Study ............................................................................................. 6
   1.3 Methodology ............................................................................................................. 7

CHAPTER 2: LITERATURE REVIEW ................................................................................. 9

   2.1 Definitions ................................................................................................................ 9
   2.2 Looking for a Model ................................................................................................. 9
   2.3 Amount: Money/Value ............................................................................................. 10
   2.4 Sources ..................................................................................................................... 12
   2.5 Conditions ................................................................................................................ 15
   2.6 Conclusions .............................................................................................................. 15

CHAPTER 3: TYPOLOGIES AND CASE STUDIES ........................................................... 17

   Typology 1: Terrorist Financing through Trade and other Lucrative Activities ............... 18
   Typology 2: Terrorist Financing through Non-Governmental Organisations/Charities
                  and Levies ................................................................................................ 20
   Typology 3: Terrorist Financing through Smuggling of Arms, Assets and Currency
                  (Cash Couriers) ........................................................................................ 23
   Typology 4: Terrorist Financing through Drug Trafficking ............................................. 26
   Other Cases ..................................................................................................................... 29
   Conclusion ....................................................................................................................... 31

CHAPTER 4: INDICATORS AND RED FLAGS .................................................................. 34

   Indicators: ........................................................................................................................ 34
   Red flags: ......................................................................................................................... 35

CHAPTER 5: CONCLUSION AND RECOMMENDATIONS .............................................. 36

   Conclusion ....................................................................................................................... 36
   Recommendations: ........................................................................................................... 37

BIBLIOGRAPHY ................................................................................................................. 40

APPENDIX ........................................................................................................................... 44

© 2013

## ACRONYMS

| | |
|---|---|
| AML | Anti-money laundering |
| AQIM | Al Qaeda in the Islamic Maghreb |
| CFT | Combatting the financing of terrorism |
| DIA | Defence Intelligence Agency |
| ECOWAS | Economic Community of West African States |
| FATF | Financial Action Task Force |
| GIABA | Inter-Governmental Action Group against Money Laundering in West Africa |
| MNLA | National Movement for the Liberation of Azawad |
| MUJAO | Movement for Oneness and Jihad in West Africa |
| NGO | Non-Governmental Organisations |
| NPO | Non-Profit Organisations |
| PEP | Politically Exposed Person |
| SALW | Small Arms and Light Weapons |
| STR | Suspicious Transaction Report |
| FIU | Financial Intelligence Unit |

© 2013

# EXECUTIVE SUMMARY

In West Africa, there is significant concern about the rise of terrorism. This is manifested by the number of terrorist attacks in some West African countries that have resulted in large human casualties and the destruction of property. The source of funding for terrorist activities has equally been of concern in the sub-region. The phenomenon is underpinned by several factors, including the presence of large, informal, cash-based economies, political instability, ethnic and communal violence, pervasive corruption, widespread poverty, gross unemployment, and underemployment. Significantly, terrorist groups and their financiers drive funds from both licit and illicit activities, and move them through formal and informal channels to support their activities. All of these factors have adverse effects on peace, security, and development in the sub-region.

The devastating effects of terrorism and terrorist financing have provoked strong interest among the authorities and national governments of the Economic Community of West African States (ECOWAS) on countering the threat, based on a clear understanding of the *modus operandi* of terrorist groups and their financiers. Accordingly, this typologies study aims to discover the methods used by terrorists, terrorist groups, and their supporters to collect, transfer, and utilise funds for their activities. It aims to provide a deeper understanding of the methods used by financiers to assist terrorists in carrying out acts of terrorism. The study also aims to provide information on terrorist financing methods to assist competent authorities and reporting entities in their responsibilities to combat terrorist financing. In this regard, the study provides case studies, from which key indicators and red flags have been generated to help policymakers and regulatory and enforcement authorities as well as reporting entities to understand better the nature and dynamics of terrorist financing in the sub-region.

As a prelude to this typology study, and recognizing the challenges of getting information on the subject matter in the sub-region, the Inter-Governmental Action Group against Money Laundering in West Africa (GIABA) commissioned five experts, one each in Burkina Faso, Mali, Niger, Nigeria and Senegal, to carry out a background study on terrorism and terrorist financing in their countries. These countries were selected based on the prevailing incidences of terrorism or its effects on them compared to other GIABA member States.

A workshop on terrorist financing in West Africa typologies was organised to review the reports of the experts and analyse the case studies gathered during the joint FATF/GIABA Expert Meeting on Money Laundering and Terrorist Financing Typologies organised in Dakar, Senegal from 26 to 28 November 2012. The workshop discussed, among others, the methods, and techniques employed by terrorists in collecting, transferring, and utilizing funds with reference to specific cases.

Analysis of the cases and questionnaires revealed a number of trends that may seriously threaten the security and stability of West Africa. Among these trends are:

- the upsurge in acts of terrorism and terrorist financing in the sub-region,

- emerging linkages between West African extremist groups and international terrorist organisations and provision of support by the latter to the former,

© 2013

- the use of both legitimate and illegitimate means by terrorists and terrorist groups to raise funds for personal upkeep, recruitment, purchase of tools and equipment, the dissemination of propaganda, and

- the exploitation of formal and informal channels to move funds.

The use of Non-Governmental Organisations (NGOs) and charities as conduits for terrorist financing is also becoming more apparent.[1]

A number of vulnerabilities were identified from the analysis of the experts' reports.

- Reporting institutions often lack the capacity to identify suspicious transactions related to terrorist financing.

- Terrorists, terrorist groups, and their supporters take advantage of the large informal, cash-based economy to fund their activities.

- Security and surveillance at various national borders are weak, compounded by numerous unofficial border cross points, thereby resulting in the infiltration of terrorists and illicit Small Arms and Light Weapons (SALW).

- Domestic inter-agency co-operation and collaboration, as well as information sharing among ECOWAS member States remain weak and thus providing an enabling environment for the illicit flow of cash and SALWs across borders without being detected.

Counter terrorism authorities' understanding of applicable laws is limited, which poses challenges for combating terrorist financing and terrorism.

As part of efforts to address terrorism and terrorist financing in West Africa, a number of recommendations were made to member States of ECOWAS, regional and international authorities, and development partners for implementation.

---

[1]   FATF (2013a).

© 2013

# CHAPTER 1: INTRODUCTION

## 1.1    BACKGROUND

Following a protracted period of conflict, social unrest, and political instability, West Africa[2] has made considerable advances in democracy, economic growth, and development in the past decade. Notwithstanding these advances, there is concern about the rise of terrorism and its adverse effects on peace, security, and development in the sub-region.  The frequency and lethal nature of attacks in some West African countries in recent years are an indication of the increasing sophistication of terrorist groups in the sub-region.  Although not broken down by country, the United States' 2011 Country Report on Terrorism indicated, "Africa experienced 978 attacks in 2011, an 11.5% increase over 2010.   This is attributable in large part to the more frequent attacks of the Nigeria-based terrorist group Boko Haram, which conducted 136 attacks in 2011 — up from 31 in 2010"[3].  In 2012, Boko Haram conducted 364 terrorist attacks, which killed 1 132 people.[4]

Compounding the situation is the rising radicalisation and the southward migration of terrorists and extremists, particularly members of Al Qaeda in the Islamic Maghreb (AQIM), through the Sahel towards Mali, Mauritania, and Niger.  Indeed, there are indications that AQIM has operational bases in some West African countries and has forged tactical alliances with terrorist groups such as Boko Haram in Nigeria, the Movement for Oneness and Jihad in West Africa (MUJAO), the National Movement for the Liberation of Azawad (MNLA), and Ansar Eddine in Mali and Niger.[5]  These alliances have taken the form of AQIM's provision of training and logistical support to Boko Haram and other terrorist operatives.  In addition, there is suspicion that Boko Haram has developed ties with the Somali militant group Al Shabaab.

More importantly, alliances and co-operation among Al Qaeda, AQIM, and West African terrorist groups, and the alleged provision of support by certain West African politicians and public officials to terrorist and likeminded groups in West Africa, underpin the seriousness of the problem and the associated negative effect it is having on the people and on the development of the sub-region.  Boko Haram has suspected relationships with AQIM and Al Shabaab, and the sophistication of its attacks in particular has raised concerns about the group's capacity to attack non-Nigerian targets in Nigeria and throughout Africa.[6]

There are terrorist organisations based in the region and they carry out their operations in the region, and there are terrorist organisations not based in West Africa but who derive a significant amount of financing through their activities in the region.  This is particularly evident in narcotics

---

[2]    West Africa refers to Benin, Burkina Faso, Cape Verde, Côte d'Ivoire, the Gambia, Ghana, Guinea, Guinea-Bissau, Liberia, Mali, Niger, Nigeria, Senegal, and Sierra Leone.

[3]    United States Department of State (2012).

[4]    United States Department of State (2013).

[5]    Tanchum, Michael (2012).

[6]    United States Congress (2011), pp. 1.

trafficking, which is often funnelled to Europe via pre-existing routes in West Africa and, at times, originating in South America.

West Africa is vulnerable to terrorism and terrorist financing for a number of reasons. The sub-region suffers from political instability, ethnic and communal violence, pervasive corruption, widespread poverty, and high rates of unemployment and underemployment, especially among young people. Terrorists and terrorist groups may exploit these negative conditions, especially with regard to young people. As an indication of the severity of the challenges to human development in the region, the United Nations Development Program (UNDP) in its 2011, Human Development report ranked 13 of the 15 ECOWAS countries as experiencing 'low human development'.[7] In 2010, GIABA reported, "West Africa's economy is predominantly characterised by informal activity. [...] The informal economy is large. [...] A measure of between 60% and 70% of GDP is probably representative of the region".[8] Poor governance and weak public institutions underpin most of the human development challenges in the region.

Most of the borders in West Africa are porous and there are many ungoverned spaces around the vast boundary lines. All the countries lack the capacity to effectively monitor the borders and boundary lines which is a vulnerability that can be exploited by terrorist groups to establish training bases for their members, and to transport and distribute weapons, across the sub-region.

The devastating effects of terrorism, including loss of life, destruction of property, insecurity, underdevelopment, and reputational damage, have attracted the attention of the authorities and national governments of ECOWAS on the need to act decisively to counter the threat. They seek not only to understand the nature and *modus operandi* of the terrorist groups involved, but more importantly, to devise means of countering their operations in the sub-region. To address this challenge, ECOWAS member States have enacted anti-terrorism and combating terrorist financing (CFT) laws, established institutional frameworks, strengthened investigative and prosecutorial capacities, and enhanced domestic inter-agency and international co-operation. In 2012, a regional Counter-Terrorism Action Plan was developed, with the support of many stakeholders, to strengthen regional efforts against terrorism. In addition, the Summit of Heads of State and Government of ECOWAS, held in Abidjan, Cote d'Ivoire from 27-28 February 2013, adopted the ECOWAS Counter-Terrorism Strategy and its Implementation Plan, as well as the Political Declaration on a Common Position against Terrorism. The Strategy and Implementation Plan in particular provide a framework for the fight against terrorism in West Africa.

## 1.2 RATIONALE FOR THE STUDY

Judging from the increasing manifestations and sophistication of terrorist activity in West Africa, more work has to be done to counter the problem. Terrorist groups have devised operational methods that have made it difficult for enforcement authorities to prevent attacks which have highlighted gaps in knowledge as it relates to understanding terrorist financing in West Africa. Specifically, among the key undermining factors in AML/CFT efforts in West Africa is the lack of

---

[7]    United Nations Development Program (2011).

[8]    Inter-Governmental Action Group Against Money Laundering West Africa [GIABA] (2010).

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 423 of 632

reliable knowledge on the methods and techniques terrorists and their supporters use to raise, move, and utilise funds for their activities.

To provide relevant and current information to help inform this typology project, GIABA commissioned five experts, one each in Burkina Faso, Mali, Niger, Nigeria, and Senegal to carry out a background study on terrorism and terrorist financing in their countries. These countries were selected based on the prevailing incidences of terrorism compared with other GIABA Member States. The studies were aimed at:

- Revealing the methods used by terrorists and terrorist groups to collect, transfer, and utilise funds for their activities;

- Deepening the understanding of methods and techniques used by terrorist financiers to assist terrorists in carrying out acts of terrorism;

- Highlighting the different typologies of terrorist financing prevalent in West Africa;

- Enhancing the knowledge and understanding of investigative and prosecutorial authorities of how illegal and legal funds are used for terrorist financing;

- Identifying relevant indicators and red flags to assist financial institutions and other reporting entities in decision making with regard to monitoring and reporting suspicious transactions on terrorist financing; and

- Assisting policy makers as well as legislative and judicial authorities to identify and close possible gaps in legislation on terrorism and terrorist financing.

Terrorists and terrorist organisations depend on funds for their personal, operational, and organisational needs. Detecting and cutting off their source of funding are critical steps in denying them the ability to operate. Apprehending, investigating, and prosecuting the financiers of terrorist groups and terrorist acts will serve as a deterrent to others. The freezing, confiscation, and seizure of terrorist assets will equally have a deterring effect. More importantly, understanding and addressing the issue of terrorist financing is critical because of the destructive effects of terrorism on peace, security, and development.

## 1.3    METHODOLOGY

As mentioned above, Burkina Faso, Mali, Niger, Nigeria, and Senegal were selected for the conduct of special studies in support of the typology project owing to the prevailing terrorism challenges in these member countries or its impact on them. Nigeria is of particular importance not only because of its size and position as the regional powerhouse, but also because of the far-reaching implications of terrorism-related insecurity for regional peace and security. The other four countries are of equal importance because of their location in or close to the terrorism-ridden Sahel region and the potential impact on regional security. The GIABA Secretariat engaged one expert in each of the five countries to conduct preliminary studies over a period of two months (September to October 2012). The experts reviewed relevant literature and administered two questionnaires (country level and

general population questionnaires) designed for government officials, law enforcement and judiciary personnel, civil society representatives, journalists, academics, experts, and reporting institutions in their respective countries. To a large extent, the results of the surveys and questionnaires confirmed the general understanding of terrorism in the aforementioned countries. The results also confirmed the cases presented by the experts. For instance, terrorist and terrorist groups rely on both legitimate and illegitimate sources of funding.[9]

Structured interviews were also carried out with experts and public officials dealing with issues of terrorism to reinforce some of the issues in the questionnaires. The responses were analysed and case studies were produced.

A joint FATF/GIABA Experts' Meeting on Money Laundering and Terrorist Financing Typologies was organised in Dakar, Senegal from 26 to 28 November, 2012. Various workshops, including one on terrorist financing in West Africa, were held to review progress on the typologies projects underway at that time. The workshop on terrorist financing discussed the methods and techniques employed by terrorists in raising, moving, and utilizing funds with reference to specific examples.

Each of the five national experts presented cases to illustrate the methods, techniques, and complexities of terrorist financing in West Africa. Considering the relatively high incidence of terrorist activity in Nigeria and the implications for its security and stability and that of West Africa, there were two additional presentations made by Nigerian authorities, one from the Defence Intelligence Agency (DIA) and the other by the Department of State Services (DSS). The US also provided a number of cases, including one that illustrates terrorist financing through transnational drug trafficking in West Africa and the Sahel region.

This report is divided into five (5) chapters:

- Chapter 1 provides background information on issues of terrorism and terrorism financing in the sub-region and describes the study's methodology.

- Chapter 2 reviews literature on terrorist financing with a focus on what can be found in West Africa.

- Chapter 3 highlights terrorist financing typologies based on the cases gathered during the study.

- Chapter 4 provides indicators and red flags for terrorist financing in West Africa.

- Chapter 5 provides a summary of study's findings and conclusions.

---

[9]    The individual country reports produced by the 5 experts were shared with all Project Team members and are available at the GIABA and FATF Secretariat.

© 2013

# CHAPTER 2: LITERATURE REVIEW

## 2.1   DEFINITIONS

Terrorist financing has been defined in various international counter-terrorism and counter-terrorism financing (CFT) instruments.  According to the UN Convention for the Suppression of the Financing Terrorism, the definition of terrorism—article 2 states:

> Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out: (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organisation to do or to abstain from doing any act" [10]

The World Bank and the International Monetary Fund (IMF) also define terrorist financing as "the financial support, in any form, of terrorism or of those who encourage, plan or engage in it"[11]. Furthermore, the Financial Action Task Force (FATF) notes that it involves the financing of terrorist acts, and of terrorists and terrorist organisations.[12]

## 2.2        LOOKING FOR A MODEL

In conjunction with the above definitions, it is useful to consider frameworks that provide further understanding of how terrorist financing manifests itself.  It is then possible to apply these frameworks to the particular case of West Africa.  While there is no broadly accepted model of terrorist financing along the lines of the placement, layering, and integration model of money laundering, a number of studies propose approaches for the systematic analyses of terrorist financing.  In the West African context, it is particularly important to note the limitations of considering terrorist financing in terms of "funds" or financial transactions alone, given the limited access to formal financial services in much of the region.

---

[10]     See United Nations (1999), Article 2.

[11]     World Bank and International Monetary Fund (2003).

[12]     FATF (2013b).

© 2013                                                                                                    9

One study that contemplates a broader definition of terrorist financing is the Terrorist Resourcing Model published by the Integrated Threat Assessment Centre (2007).[13]  The main premises of the model are:

1) the purposes and processes of terrorist financing and related activities are fundamentally different from those of money laundering; and

2) "money is only one of a number of essentially interchangeable instruments that can be exchanged for one another" in order for terrorist groups to obtain the end-use goods and other resources they need.

Thus, the notion of terrorist "resourcing" can provide a more appropriate framework for assessing the economic activities of terrorist actors.[14]  The Integrated Threat Assessment Centre also argues that terrorist financing/resourcing is a non-linear process.  The model thus consists of stages – acquisition, aggregation, transmission to organisation, transmission to cell, and conversion – that cover the process from end-to-end while accommodating a range of variations.  The model provides a framework for analysis of all methods and means – from both licit and illicit origins – used by terrorist organisations to support their operations and infrastructure, given their different needs, capabilities, and mechanisms.  While money or its equivalents are most often part of the process, these methods need not involve financial instruments or transactions at all, and could include the theft or smuggling of end-use goods, aggregations of donations, or direct provision of equipment to cells, to name a few.

An additional useful framework to take into account is the typology developed by Vittori.[15]  Her analysis categorises terrorist organisations – and draws inferences on their relative capability and autonomy – based on the methods and techniques in which they obtain and manage their resources.  Vittori places terrorist groups within one of seven categories – lone wolf, state sponsored, franchise, bundled support, state sponsoring, shell state, and transnational corporation.  These categories provide insight into a group's reasons for employing particular resourcing methods (in addition to regional socio-economic considerations), and why given methods come to be associated with particular types of groups.

## 2.3    AMOUNT: MONEY/VALUE

One strand of the literature is focused on whether substantial amounts of money are required in carrying out acts of terrorism.  It spells out three categories of terrorist financing.  In particular:

■ the funding of terrorist operations: providing money for the cost of carrying out actual attacks such as the cost of explosives, arms, and vehicles;

■ logistical funding: providing money for individuals and groups for personal upkeep, travel, and accommodation; and

---

13    Integrated Threat Assessment Centre (2007).

14    Integrated Threat Assessment Centre (2007:6).

15    Vittori (2011).

© 2013

■ using terrorist funds to provide social services, particularly to deprived communities, and to build support for terrorist groups.

With regard to the third category, Iannaccone and Berman (2006) shed some light on how terrorist groups or religious extremists become critical suppliers of social services, political action, and coercive force in situations where governments and economies function poorly.

Large terrorist movements rely on both legitimate and illegitimate sources of funding and require vast sums of money for operational, organisational, and administrative purposes, despite the fact that conducting a specific terrorist operation is relatively inexpensive.  By focusing merely on the cost of individual terrorist attacks, the large amounts required to maintain a terrorist organisation is grossly underestimated.[16]  Ashley (2012) notes, "the actual execution of a terrorist attack is only a tip of the iceberg… as it is simply the overt physical product of an extensive covert terrorist organisational infrastructure."[17]  Specific sources of funding for terrorist groups, include "…an array of states, groups, fronts, individuals, businesses, banks, criminal enterprises and nominally humanitarian organisations"[18]; all of which can be seen in West Africa.  Hence, specifically targeting the financial aspects of terrorist groups may not necessarily be an effective way of preventing terrorism.[19]

Underpinning the diversification of terrorist financing is the evolution of the nature of terrorist groups and the threat they pose over the past decade.  Tighter border security, immigration control, and greater scrutiny of financial transactions have forced groups like Al Qaeda to decentralise their operational approach and to rely on affiliate groups around the world to conduct operations.[20]  Although some of the groups and cells have close ties to Al Qaeda's senior leadership, they largely depend on sources other than Al Qaeda core for their funding.[21]  These groups and cells focus on not only operations in the areas in which they are based, but also on developing and maintaining financial and logistical support networks.  Accordingly, there are changes in the means by which funds are raised, stored, and, moved, with groups often sharing information on techniques and methods.[22]

Levitt and Jacobson (2008) also attribute the evolution in financing sources to rapid globalisation and sustained technological advances, which have enabled terrorist groups to raise, store, transfer, and distribute funds for their operations with ease.  In particular, the advent of new technology has spurred changes in how money is transferred, with mobile and online money transfers becoming more commonplace.

---

[16]   Arguilla *et al* (2001); 911 Commission (2004); Williams, Phil (2005) and Miguel del Cid Gomez, Juan (2010).

[17]   Thus, significant amounts of financial resources are required to plan attacks, recruit and train operatives, disseminate propaganda information, provide transportation, preserve communication channels, support offshoot groups, and provide for the upkeep of operatives and their families.

[18]   Levitt, Matthew (2002).

[19]   Gunaratna, Rohan (2002).

[20]   Levitt, Matthew and Jacobson, Michael (2008).

[21]   Rollins, John (2011).

[22]   Cragin, Kim *et al* (2007).

© 2013                                                                                   11

## 2.4        SOURCES

There is consensus that state financing of terrorist groups has declined dramatically in the post-Cold War period, though it has not disappeared completely.[23]  The decline in state sponsorship is partly attributed to international efforts to combat terrorist financing, including bilateral and multilateral economic sanctions against particular states suspected or known to be sponsors of terrorism.[24] Nonetheless, active and passive state sponsorship remain an important source of terrorist financing. For instance, according to Levitt and Jacobson (2008), while "active state sponsorship is increasingly rare, states [continue] to provide terrorist groups with a tangible service by simply allowing terrorists to have access to their territory, facilitating their travel, or by turning a blind eye to their activities within their borders".  Passas has noted that this can extend to minimal enforcement of oversight measures for financial transactions and charities.[25]  States can directly fund terrorist groups, supply them with weapons, or provide them with military training.[26]

The on-going international campaign against terrorist financing has demonstrated that terrorists and terrorist organisations exploit the non-profit organisation (NPO) sector to raise and move funds, provide logistical support, encourage terrorist recruitment, or otherwise support terrorist organisations and operations.  NPOs possess characteristics that make them particularly attractive to terrorists or vulnerable to misuse for terrorist financing. They enjoy the public trust, have access to considerable sources of funds, and their activities are often cash-intensive.[27] NPOs may also have exposure to a large number of beneficiaries, some of whom may be vulnerable to radicalisation. Furthermore, they may have a global presence that provides a framework for transnational operations, including in insecure and conflict-affected areas, where terrorist groups may be present or seek to operate.[28]

A number of case studies have highlighted the exploitation of NPOs as a means to support terrorism. Terrorists have abused NPOs by:

- diverting finances;

- diverting materials;

- using them as an intermediary to local partners that divert financing/materials;

- using them to facilitate travel and/or board travellers;

- using them as a front or cover for illicit activities, such as the transfer of arms;

---

[23]    Giraldo, Jeanne and Trinkunas, Harold (2007); Hardoin, Patrick and Wiechhardt, Reiner (2003); Clunan, Anne L. (2006); Bantekas, Ilias (2003); Levitt, Matthew and Jacobson, Michael (2008).

[24]    Bantekas, Ilias (2003); Clunan, Anne L. (2006).

[25]    Passas, Nikos (2012).

[26]    Byman, Daniel (2005); Wilkinson, Paul (2011); Quillen, Chris (2002).

[27]    FATF Interpretive Note to Recommendation 8 (Non-Profit Organisations).

[28]    Center on Global Counter-terrorism Cooperation et. al. To Protect and Prevent: Outcomes of a Global Dialogue to Counter Terrorist Abuse of the Non-Profit Sector, June 2013.

                                                                                          © 2013

- openly using them to provide social services as a means to solicit public support;

- using them as a platform to distribute messaging as a means to gain political/ideological support;

- using them to radicalise and/or enlist individuals; taxing them for access to certain impoverished areas;

- kidnapping and ransoming employees;

- impersonating employees to obtain access to particular areas/people; and

- using an NPO's name to raise funds, without the NPO's knowledge.[29]

There is an emerging nexus between terrorist financing and trade in that there is an increased likelihood of terrorist financiers using fraudulent trade-based practices to collect, transfer, and utilise funds and assets as well as the increasing reliance on trade-based money laundering by terrorist financiers.[30]  Similarly, FATF (2006) notes the potential exploitation of the international trade system by terrorist financiers and criminal organisations by way of generating vast sums of money through false invoicing of imports and exports.  Giraldo and Trinkunas (2007) note that by under-pricing a particular commodity, an individual seller or a company can transfer vast sums to a buyer who in turn sells it at high prices and uses the profit for terrorist financing.  According to Levitt and Jacobson (2008), the transfer and distribution of money, often across borders, by purchasing and transferring commodities under the guise of legitimate business or humanitarian support, and the eventual sale of them for cash, is an effective technique for terrorist financing.

International trade diversion, in particular, as noted by de Kieffer (2008), is a sophisticated technique used to launder vast amounts of money not least because "unlike other techniques,...[it] relies upon hiding in the plain sight...[with] large transactions...disguised as legitimate, using well-known and respected firms to accomplish the transfer".[31]  Trade diversion, de Kieffer argues, is "[not] only...difficult to detect, [but] also versatile in that it can allow funds to remain in numerous countries (including the United States) without prompting serious inquiry by the authorities.[32] Accordingly, it "has important implications for terrorist financing in that it potentially enables terrorist groups to raise and hide funds while evading government scrutiny".

The literature review also highlighted a link between terrorist groups and organised crime.  It is clear that there are many types of tactical and strategic relationships between criminals and terrorists in West Africa and elsewhere.  However, there is still significant debate among experts as to whether criminal and terrorist actors in the region are converging into a unified threat, or whether, as Wittig argues, that the "interaction between drugs, organised crime and terrorism is simply a function of the political-economic dynamics of the particular region.[33]  Mullins reasons that

---

[29]    Asia/Pacific Group on Money Laundering [APG] (2011).

[30]    US Department of State (2003).

[31]    Like other organised criminal groups, terrorist groups also use this technique to fund their operations.

[32]    DeKieffer, Donald (2008).

[33]    See, for example, Rollins, John (2011); Sanderson, Thomas M. (2004); Makarenko, T. (2004); Shelley, Louise and Picarelli, John (2005).

© 2013                                                                                                                13

such alliances are for mutual benefit, where agreements are made purely for financial gain and/or to fund operations, without compromising ideology.[34] The direct involvement of terror groups in organised crime enables them to work together, in a basic customer-supplier relationship established to facilitate specific types of transactions or resource exchanges in order to achieve certain objectives.

There is evidence to suggest that terrorist groups and cells in West Africa and beyond rely on proceeds from drug trafficking and hostage taking for ransom.[35] This is particularly true in areas with limited government control, porous borders, and extensive trading networks. The extraction of funds from human trafficking, arms trafficking, stolen goods, credit fraud and other criminal activities have also become commonplace for several terrorist organisations.[36] Other Middle Eastern and Latin American terrorist and extremist groups are known to be heavily involved in the drug trade in the tri-border region of Latin America- where Argentina, Brazil, and Paraguay meet.[37] There is evidence that some South American drug cartels are shipping drugs to West Africa in order to access European markets. Such connections can be seen in Cases 4.1 and 4.2 presented in this report.

Indeed, terrorist groups and organised criminal groups employ similar methods in funding their activities.[38] The extraction of funds from the drug trade, arms trafficking, money laundering, and credit fraud have become commonplace for several terrorist organisations.[39] As Chester Oehme illustrated the intersection of criminal organisations, insurgents, and terrorists appears the strongest and most pronounced in kidnapping, money laundering, and fuel and oil scams.[40]

Lacher (2012) attributes the growing presence of AQIM, MUJAO, and other groups in the region to the development of a highly lucrative kidnapping industry. Foster-Bowser and Sander (2012) support this view in their comprehensive assessment of security threats to the Sahel region. The author notes ransom payments are likely the most important source of funding for terrorist groups in the Sahel-Sahara region. Since 2003, AQIM alone has kidnapped dozens of foreigners and is believed to have received ransoms in the majority of the cases. According to Lacher, an estimated USD 40-65 million has been paid in ransoms to terrorist groups in the region and their appendages since 2008. LeSage has noted that the ransom for a single Western captive can be as high as USD 6.5 million,[41] and there is evidence to suggest that the intensity of AQIM attacks increases in the wake of

---

[34]   Mullins, Sam (2009).

[35]   Billingslea, W. (2004); Roth, Michael P. and Murat, Sever (2007); Sanderson, Thomas M. (2004); Abuza, Zachary (2003); and Rollins, John (2011).

[36]   Abuza, Zachary (2003); Billingslea, W. (2004); and Makarenko, T. (2004).

[37]   Berry *et al.* (2002); Levitt, Matthew and Jacobson, Michael (2008:10).

[38]   Schmidt, A.P. (1996); Shelley, Louise and Picarelli, John (2005); Makarenko, T. (2001); Roth, Michael P. and Murat, Sever (2007).

[39]   Abuza, Zachary (2003); Billingslea, W. (2004); and Makarenko, T. (2004).

[40]   Oehme III, Chester G. (2008).

[41]   Lesage, Andrew (2011).

© 2013

suspected large ransom payments.[42]   AQIM and affiliated groups do appear to be increasingly involved in criminal activities such as kidnapping and smuggling.

Byman has also noted that states can facilitate terrorist financing unwillingly as well, in cases where state control is too weak to constrain the resourcing efforts of terrorist groups[43].  The lack of stable institutions and governance in fragile states allow terrorists access to safe havens where they can exploit gaps in the global counter-terror finance regime, scant border controls and entrenched criminal activity to obtain the resources they require.  As terrorist organisations move increasingly to the use of criminal activity to generate proceeds they will benefit even more than in the past from access to jurisdictions with an ineffective, corrupt, and/or minimally functioning government.

Corruption creates the conditions under which terrorist financing flourishes.  GIABA (2010)[44] notes:

> "a source of illicit funds derived from corrupt practices that stands somewhat apart from other forms of corruption – and is possibly the most significant area of alarm as regards corruption in West Africa – is the involvement of politicians and high-level officials in organised crime.  In many of the jurisdictions, evidence suggests a degree of active and passive complicity in organised criminal activities such as the smuggling of drugs and other illicit goods among those occupying high public office.  This is unsurprising given the level of immunity enjoyed among those in the higher echelons of government, in combination with the potential rewards that may be gained, both financially and partially, as a result, in terms of influence."

## 2.5    CONDITIONS

Political and economic realities within states play a role in the close co-operation between criminal elements and terrorist organisations.  There is agreement within the literature that criminal and terrorist organisations thrive in:

- weak, post-conflict states with ineffective laws and institutions;
- states with porous and poorly guarded borders;
- states experiencing widespread and systemic corruption; and
- states offering lucrative criminal opportunities.[45]

## 2.6    CONCLUSIONS

In conclusion, much of what was found in the literature review mirrors the situation in West Africa.  In particular, West African terrorist groups rely on diverse and private sources of funding and exploit globalisation and technological advances in collecting, transferring, and utilizing funds for

---

[42]    Pham, Peter J. (2011) p. 250.

[43]    Byman, Daniel (2005).

[44]    Inter-Government Action Group Against Money Laundering [GIABA] (2010).

[45]    Oehme III, Chester G. (2008).

their activities. More importantly, West African terrorist groups seek to fund their activities through proceeds from organised criminal activities, including kidnapping and drug trafficking. The nexus between terrorist financing and trade is also readily apparent in West Africa.

16

© 2013

# CHAPTER 3: TYPOLOGIES AND CASE STUDIES

The following typologies were developed based on case studies presented by the aforementioned countries for the project. The typologies, which illustrate some of the methods and techniques employed by West African terrorists and terrorist groups to finance or support terrorist activities, also include additional cases submitted by the US.

There are four categories of typologies:

    i)  terrorist financing through trade and other lucrative activities;

    ii) terrorist financing through NGOs, charity organisations, and levies;

    iii) terrorist financing through smuggling of arms, assets and currencies by cash couriers; and

    iv) terrorist financing through drug trafficking.

Additionally, there are two cases that illustrate terrorist financing through Politically Exposed Persons (PEPs) and one case that illustrates terrorist financing through alternative transfer system, particularly *hawala*.

Nineteen of the cases in this report were presented by Financial Intelligence Units (FIUs) and security services of the sampled countries. Through investigations, security services detected early plans to commit terrorist acts, interrogated individual suspects, and obtained their statements, which confirmed that they were members of terrorist groups, and found out the type of financing used by the latter.

A number of the typologies cases deal with the methods and techniques of terrorist financing used by Boko Haram, the main terrorist group based in northern Nigeria. The methods and techniques range from raising funds through the sale of goods (Case 1.1), extracting profits and deploying logistics (telephone sets and SIM cards) provided by a telecommunications company (Case 1.2), relying on voluntary or compulsory contributions from members of the group (Case 2.1), to begging or alms collection through the poor and needy (Case 2.3), extorting funds from civilians (Case 2.4), engaging in cross-border smuggling of arms (Case 3.1), and using female cash couriers and arms smugglers (Case 3.2).

Significantly, Boko Haram conducts terrorist financing activities outside of Nigeria as evidenced by the arrests of some members of the terrorist organisation by security forces in Burkina Faso (Case 3.3) and along the Nigeria-Niger border (Cases 3.4 and 3.5). In these last two cases, it is reasonable to conclude that funds seized by security officers may have been the result of ransom payments for the release of hostages. Case 3.5 in particular involved a Nigerien national travelling from northern Mali, where kidnapping for ransom payments by terrorists and terrorist groups is common.

Terrorist financing is also conducted through other forms of organised criminal activities. Cases 4.2 and 4.3 illustrate terrorist financing through illicit drug trafficking from Latin America through West Africa to Europe and the Middle East involving by AQIM, the Fuerzas Armadas

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 434 of 632

Revolucionarias de Colombia (also known as the Revolutionary Armed Forces of Colombia or FARC), and other criminal organisations.

## TYPOLOGY 1: TERRORIST FINANCING THROUGH TRADE AND OTHER LUCRATIVE ACTIVITIES

Case 1.1:  **Sale of goods and other lucrative activities**

In September 2012, Mr T, a confirmed member of Boko Haram, was apprehended by security operatives when conducting surveillance on possible targets of attack in Abuja.  Upon interrogation, Mr T revealed that one of the ways through which Boko Haram funds its activities is by purchasing and sending items to its members in other locations.  These items are sold at inflated prices and the proceeds are used to finance the activities of the terrorist organisation, including renting apartments and procuring Improvised Explosive Devices (IED) materials for their operations.

*Source: Nigeria*

Case 1.2:  **Business profits/logistical support (telecommunications)**

In July 2011, security operatives apprehended Mr H, a member of Boko Haram and owner of a Nigerian telecommunications company, in northern Nigeria.  Upon interrogation, he confessed to using part of the profit from his business to support the activities of Boko Haram.  He also confessed to supplying pre-registered Subscriber Identity Module (SIM) cards and mobile phones to the group.

*Source: Nigeria*

Case 1.3:  **Real estate attempts to create fictitious companies in Senegal**

Mr M is a Canadian citizen of Somali origin residing in Dakar.  He established a real estate company, Company A in conjunction with Mr D, a Senegalese.  An account was opened for Company A at a bank in Senegal.  Shortly afterward, this account received a wire transfer of approximately USD 106 000 from Mr S, a Somali based in the United States.  A financial institution based in Dubai executed the transfer.

Based on the suspicious circumstances of the transaction, including the country of origin of funds, lack of adequate information documenting the identity of the new customer, and the destination of the funds, Senegalese Bank APLHA filed a Suspicious Transaction Report (STRs) to the Senegalese FIU.

During the subsequent FIU investigation, it was revealed that Company A had no legal status in Senegal and was established specifically for laundering illicit funds through the sale of imported goods.  Mr M, Mr D, and Mr S were in contact with extremist groups involved in terrorist activities in East Africa, North America, Europe, and Mauritania.

Mr M, Mr D, and Mr S established a related company, Company B, together with other Senegalese nationals, to import used goods, some of which were sold locally and the remainder exported to a third country for re-sale.  The proceeds of these sales were sent to a number of terrorist groups

18                                                                                                    © 2013

through different channels.

*Source: Senegal*

---

Case 1.4:  **Importation of used vehicles**

In 2012, the US District Court for the Southern District of New York issued civil money laundering complaint and "in rem" forfeiture action involving a number of Lebanese financial institutions and exchange houses.

An investigation by the US Drug Enforcement Administration (DEA) and other federal law enforcement agencies discovered a scheme to launder money through the United States financial system and the US used car market.  As part of the scheme, funds were transferred from Lebanon to the United States in order to purchase and ship used cars to West Africa for re-sale.  The cash proceeds generated from the sales are subsequently transferred, along with the proceeds of narcotics trafficking and other crimes, to Lebanon.  The cash is often moved through bulk cash smuggling.

Hezbollah members and supporters are involved at various points in the money laundering scheme. Hezbollah members and supporters facilitate the smuggling of cash, including proceeds from the sale of used cars exported from the United States and narcotics proceeds, from West Africa to Lebanon; they finance and facilitate the purchase of some of the used cars in the United States.

*Source: United States*

---

These case studies demonstrate that terrorists and terrorist groups are exploiting legitimate trade transactions in their bid to collect and transfer funds to support their activities and to support the larger terrorist organisation.  The cases reveal the complex and transnational nature of terrorist financing through trade, as terrorists and their financiers conduct various trade transactions in different countries so as to disguise the identity and origin of the funds they receive.  Importantly, it brings to the fore the need to strengthen international co-operation and collaboration against terrorist financing, and to strengthen the monitoring of international trade transactions

Case 1.2, highlights the reliance of terrorist groups on not only criminal proceeds, but also on proceeds from legal sources in funding their operations.  It also explains the constant changing of SIM cards and mobile phones by the sect members to evade detection and arrest by security operatives.  Furthermore, the case brings to light the ease with which legitimate businesses can be established in West Africa for the ultimate purpose of financing terrorism. Case 1.3, is indicative of the operational vulnerabilities associated with the weaknesses in registration of companies and highlights how terrorists can use fictitious companies to raise and move funds to terrorists and terrorist organisations across national borders.

There is an indication that the implementation of AML/CFT measures may have caused a tactical shift by terrorist financiers by way of their exploitation of non-traditional avenues for terrorist financing.  Within this context, there is a need to review and tighten business and company registration processes in ECOWAS member States.  The implementation of the UNSC Resolution 1373 through the establishment of country national lists has become a matter of urgency to help

security and defence forces, particularly financial institutions, in discharging their obligation of screening alleged terrorists and terrorist financiers. These cases demonstrate that the filing of STRs and the subsequent analysis conducted by FIUs are critical in prompting terrorist financing investigations by the appropriate authority.

## TYPOLOGY 2: TERRORIST FINANCING THROUGH NON-GOVERNMENTAL ORGANISATIONS/CHARITIES AND LEVIES

Case 2.1: **Financing through the financial system**

ZT, an international NGO/Charity organisation headquartered in the Middle East, sought to open an account in Bank A in Nigeria. While carrying out due diligence on ZT, Bank A discovered that the organisation and one of its directors had been indicted in a case involving terrorist financing in two countries. A Suspicious Transaction Report (STR) was immediately filed with the Nigeria Financial Intelligence Unit (NFIU). Analysis of ZT's bank statements and transactions established that ZT's transactions were inconsistent with the profiles of its accounts. There had been frequent cash deposits and withdrawals, including those from domestic ATMs, by individuals with no apparent connection to the charity and mostly in areas with a high incidence of terrorist activity within Nigeria.

The analysis further revealed that there had been transfers of funds from ZT's accounts into the accounts of individuals with whom ZT had no apparent relationship. Cash deposits were structured and made through multiple branches of the same bank. Funds transfers were from a foreign jurisdiction by a national of a country known to be state sponsor of terrorism; and there had been a series of transfers into the accounts by the charities headquarters in the Middle East.

Subsequent investigations established that ZT had operated in Nigeria for an extended period and had maintained multiple bank accounts in three different Nigerian banks. ZT was also affiliated with another NGO known to have supported terrorist groups, including Al Qaeda. Finally, it was established that ZT's charity operations supported Hamas, a Palestinian extremist organisation, and Gama'a al-Islamiyya, an Algerian terrorist group

The frequency of withdrawals from ZT accounts, especially in the states known for Boko Haram activities, raised concerns about the ultimate use of these funds. The promoters of ZT claimed to be paying the salaries of itinerant Islamic clerics in Nigeria.

*Source: Nigeria*

Case 2.2: **Contributions (collections) from members of a terrorist group**

In November 2012, security operatives in Nigeria arrested Mr B in one of the states known for terrorist activities in North-eastern Nigeria. Upon interrogation, Mr B confessed to being a treasurer for Boko Haram. He also confessed to being in possession of voluntary and mandatory donations made by members of the terrorist organisation in his area. Mr B further disclosed that, in addition to making voluntary donations of as little as NGN 50 or about USD 0.03, all members of Boko Haram were also expected to donate to the terrorist organisation. The compulsory donation was calculated based on the ability of each member. Funds raised from the donations were used to

© 2013

support the activities of Boko Haram.

*Source: Nigeria*

---

Case 2.3: **Begging (alms collection) by vulnerable persons**

In October 2011, security operatives in Nigeria arrested Mr K in North-western Nigeria. Upon interrogation, Mr K confessed that Boko Haram uses "Al Majiris" (child beggars), the physically challenged, and the elderly to appeal for donations in order to raise funds in support of the group's activities. According to Mr K, these beggars were positioned at strategic locations in major towns and were used as spies for the terrorist organisation.

*Source: Nigeria*

---

Case 2.4: **Extortion of civilians by means of intimidation**

In January 2012, security officers in Nigeria arrested Mr Y, a member of Boko Haram, in north-eastern Nigeria. Upon interrogation, Mr Y confessed that Boko Haram used subtle negotiations and intimidation to obtain protection fees. Even though one of the states refused to give in to this intimidation, some influential government officials of that state made "personal" donations to Boko Haram. Analysis of the bank statements of Mr Y showed monthly payments deposited into his account, representing the "protection fees". The funds generated were used to support the operations of Boko Haram.

*Source: Nigeria*

---

Case 2.5: **Execution of works for an NGO by a construction company**

AZC is a construction company based in a regional capital of northern Mali. The manager DOD has a company account with a local bank, B1.

Between 11th January 2011 and 2nd April 2012, the account received several money transfers totalling CFA Francs (XOF) 514 697 772. One of the transfers, amounting to XOF 92 735 646, was from a financial company. This company ordered the transfer on 14th June to pay for services rendered under a public contract. The last of these transfers was on 2nd April 2012.It shows an international NGO paid a sum of XOF 142 497 125 for services rendered by the company.

In May 2012, DOD ordered his bank BI to transfer the sum of XOF 143 939 735, representing the balance in his account, to the account of company Y, which was opened on 24th April 2012 in bank B2, located in a neighbouring country.

According to information received from the neighbouring country's Financial Intelligence Unit (FIU), company Y received four bank transfers on 3rd May, 2012 totalling XOF 298 750 000 from the same international NGO, just days after the first transaction with bank B2 on 23rd April 2012.

To justify the transfer order, DOD explained that his company wanted to temporarily transfer its activities out of the country and switch over to foodstuff business.

Company Y is a Malian company established in 2011. It is based in the same city as company AZC.

---

Mr HOM is the manager. This latter gave his bank B2 a deed of personal guarantee and solidarity established with bank B1 in Mali, but the document had every sign of a false document because it contained a name different from the one on Mr HOM's record when he was opening his bank account.

This ambiguity in the transfer order led the bank to file a suspicious transaction report to Mali's FIU, which in turn sent a report to the prosecutor to open a criminal investigation.

Signs of alleged terrorist financing:

- Company Y and its manager HOM are based in Mali but receive money in an account opened in a neighbouring country.

- The justification for a humanitarian NGO to pay such a huge sum of money for services rendered in company AZC's area of activity is implausible.

- The false document (a notarized deed of personal guarantee and solidarity) HOM sent to his bank B2 abroad seems to have been the pretext for DOD to order the transfer from his account in bank B1 in Mali.

- AZC and Y seem to be controlled by the same person (DOD). Some well-informed sources suspect DOD is supporting a rebel movement in Mali.

- Huge transfers are received in the AZC and SOAH accounts in both countries, received from the same international NGO which is no longer operating in the humanitarian sector.

**Comments:** This case illustrates the fraudulent use of Non-profit Organisations (NPOs) to finance the rebel movements in northern Mali through complex processes for international money transfers. The case brings to the fore the importance for Member States to implement measures relating to the monitoring and control of donations made to NGOs, and to sensitize Notaries on their AML/CFT obligations.

*Source: Mali*

As the above cases demonstrate, the exploitation of alms-giving in West Africa appears to be a common practice by terrorist organisations, especially Boko Haram. Boko Haram appears to be taking advantage of unsuspecting people, as well as those who are sympathetic to the organisation, to raise funds in support of their activities. Such cases reveal the need for relevant authorities to monitor the activities of street beggars, particularly in areas known for terrorist activities, in order to curtail this type of fundraising and ensure that terrorists do not exploit a vulnerable population.

Case 2.2 highlights how a terrorist organisation finances its activities through self-help/membership contributions and forced donations. As this method of terrorist financing is difficult to detect, the case reveals the need for relevant authorities to enhance their intelligence gathering capabilities and consider undercover operations as a way of obtaining information about terrorists and terrorist groups.

A number of case studies examined revealed the vulnerability of NGOs and charities and emphasized how terrorist organisations in West Africa are infiltrating this sector for their own gain.

Case 2.1 demonstrated the vulnerability of NGOs and charities to terrorist financing, particularly their potential role as conduits for moving funds in support of terrorist activities in various locations, and in hiding the financial trail of financiers. It brings to the fore the need to regulate and monitor the activities and transactions of NGOs and charities for terrorist financing in the sub-region.

Case 2.4 illustrates how funds could be raised through intimidation of government officials and wealthy individuals. The Boko Haram sect exploits the security challenges in the north to coerce some governors to co-operate in exchange for peace in their states. The case also reveals the need to enhance the personal security of government officials who may be intimidated and exploited by terrorist groups for protection fees.

Case 2.5 illustrates the fraudulent use of Non-profit Organisations (NPOs) to finance the rebel movements in northern Mali through complex processes for international money transfers. Upon examining this case further, signs of alleged terrorist financing emerged:

- The company and its manager were based in Mali but receive money in a bank account opened in a neighbouring country;

- The justification for a humanitarian NGO to pay such a large sum of money for services rendered in company AZC's area of activity was implausible.

- The false document (a notarised deed of personal guarantee and solidarity) Mr HOM sent to his Bank 2 abroad seemed to have been the pretext for DOD to order the transfer from his account in Bank 1 in Mali.

- AZC and company Y appear to have been controlled by the same person (DOD) who was suspected of supporting a rebel movement in Mali.

- Large transfers were received in the AZC accounts in both countries, received from the same international NGO, which is no longer operating in the humanitarian sector.

The cases bring to the fore the importance for Member States to implement measures relating to the monitoring and control of donations made to NGOs, and to better educate notaries on their AML/CFT obligations.

## TYPOLOGY 3: TERRORIST FINANCING THROUGH SMUGGLING OF ARMS, ASSETS AND CURRENCY (CASH COURIERS)

Case 3.1: **Arms smuggling at the Nigerian border**

Security operatives in Nigeria arrested Mr D, a member of the Boko Haram. Upon interrogation, Mr D confessed that proceeds from arms sales were often donated to Boko Haram. He also confessed that arms were sent to the terrorist organisation for their operations free of charge. Mr D disclosed that Boko Haram members involved in arms smuggling are allied with terrorists and terrorists groups outside Nigeria who either supply or facilitate the process for acquisition of the illicit small arms and light weapons.

*Source: Nigeria*

Case 3.2:  **Women cash couriers and arms smugglers in Nigeria**

In June 2012, Mr Q, a courier for Boko Haram, was arrested in north-western Nigeria.  Upon interrogation, Mr Q disclosed that the terrorist organisation frequently uses women to deliver arms, ammunitions, and cash to their members.  Mr Q stated that women are preferred because security personnel at roadblocks generally do not search them as the majority of security personnel are Muslim men and Islamic tenets forbid them from having any physical contact with women who are not their wives.

Boko Haram exploits this reality, according to Mr Q.  He further confessed that where male couriers are used, they pretend to be commercial drivers moving goods and commuters to their destinations.

On arrival at points of destination, calls are put through to recipients (members of Boko Haram) to meet the couriers at designated points for collection.

*Source: Nigeria*

Case 3.3:  **Cash couriers and arms smugglers (between Burkina Faso and Nigeria)**

Two individuals from Niger were apprehended at the Burkina-Niger border while on their way to Nigeria.  The two were in possession of weapons, ammunition (about 80 000 cartridges), and CFA Franc 8 000 000.  These persons were charged with trafficking in weapons and ammunition, and under interrogation, they disclosed that they had ties to Boko Haram.  The case is currently before the courts and additional charges related to terrorist financing may be added.

This case involved a private arms dealer in Burkina Faso who allegedly provided these weapons and ammunition without the approval of the authorities.

*Source: Burkina Faso*

Case 3.4:  **Cash couriers (between Niger and Nigeria)**

In June 2012, a Nigerian national was apprehended in Yassane, Niger and interrogated by border police.  He was carrying a large amount of cash in different denominations and two USB flash drives each with 4G capacity

The individual came to a police checkpoint without identification papers or luggage.  The police were suspicious and proceeded to search him and his property.  After sorting through the information stored on the flash drives, the security officers found two letters from the Emir of AQIM addressed to the leader of Boko Haram, Aboubacar Shekau.  The individual was also carrying large sum of money in his underpants.  In trying to trace the origin of the EUR 35 000, the police found that the bank notes had an alphanumeric identification code.

The individual was transferred to Nigeria, under the provisions of the Cooperation Agreement between Police Chiefs of ECOWAS Member States, and this made it possible to dismantle an extensive network of Boko Haram in their country.

*Source: Niger*

© 2013

Case 3.5: **Cash couriers in possession of explosive devices (between Niger and Nigeria from the North of Mali**

In July 2012, security personnel at the border police post in Yassane, Niger, apprehended a Nigerien national travelling from northern Mali. The individual, who was without identification papers, arrived at the border post with four pressure cookers. His demeanour raised suspicion and the individual was searched. Security personnel found large sums of different cash currencies in addition to the pressure cookers. The individual subsequently admitted that he had stolen the money from a market.

A State Prosecutor, recalling he had once heard about terrorists using pressure cookers to make explosives, asked that the individual be placed in custody. The individual was brought before judge and legal proceedings are under way.

*Source: Niger*

Case 3.6: **Hostage taking by AQIM Jihadists in the North of Mali**

In 2011, European citizens were kidnapped by a terrorist organisation in Mali. One month later, two suspected accomplices, Mr H and Ms M, were arrested in Gao and in Bamako respectively. Upon interrogation, law enforcement officials established that Mr H and Ms M were part of a small group, which organised the kidnapping of Europeans. Both individuals received CFA 60 000 and CFA 700 000 respectively from their group partners to travel within northern Mali to locate European targets. Mr H had also received money to purchase kidnapping supplies and other items in Bamako as well as being promised a vehicle. Most of the members of the kidnapping team were either identified to be, or believed to be affiliated with the terrorist organisation.

**Comment:** The two accused are being held in custody while legal proceedings are on-going.

*Source: Mali*

Case 3.1 highlights the challenge of small arms/light weapons trafficking across porous borders and collaboration among violent groups across the sub-region and beyond. Intermediaries who arrange the purchase and delivery of the weapons facilitate this. Similarly, there is need for ECOWAS Member States to strengthen their responses against illicit trade in small arms and light weapons in West Africa, including strengthening cross-border co-operation and collaboration.

Case 3.2 illustrates the insidious means used by terrorist groups to move funds and other materials/equipment intended for use in attacks. It highlights the need for security officials to be creative by thinking ahead of the terrorists. It also shows the influence of culture and religion and how they can inadvertently come into conflict with security measures.

Case 3.3, though yet to be concluded, highlights the need for ECOWAS governments to increase cross-border co-operation against arms and cash smuggling, strengthen security at their national borders, and address corruption within public institutions.

Case 3.4 highlights the problem of identifying persons often travelling without luggage or identity cards and with huge sums of foreign currency. This case also illustrates the importance of training staff to detect the tracking of bank notes derived from the payment of ransoms being transported by

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 442 of 632

travellers.  It demonstrates the implementation of the ECOWAS Convention on police co-operation within the framework of the West African Police Chiefs Committee (WAPCCO).

Case 3.5 highlights the need for and importance of training on investigation techniques and experience of prosecution authorities in dismantling terrorists and their sources of funding.

Case 3.6 highlights the utilisation of various material and financial resources to carry out hostage taking and details how the kidnappers are funded and assisted by accomplices including security officers.  The case also highlights that kidnapping for ransom is not just an act of terrorism but also a significant source of financing.  This case illustrates the weakness of member States to grapple with the phenomenon of corruption and frequent payments system for goods and services using foreign currencies (Euro and dollar), which then facilitate the criminals' activities.

## TYPOLOGY 4: TERRORIST FINANCING THROUGH DRUG TRAFFICKING

### Case 4.1:  **Drug Trafficking by AQIM and FARC**

In March 2012, Mr O, a Malian citizen, was sentenced to 57 months in prison by a US federal court in Manhattan for conspiring to provide material support to a foreign terrorist organisation.  Three months earlier, Mr O and two other men were charged with agreeing to transport cocaine through West and North Africa with the intent to support the drug trafficking activities of Al Qaeda, AQIM, and the Fuerzas Armadas Revolucionarias de Colombia (FARC).[1]   Mr O was arrested in Ghana in December 2009, and subsequently transported to the Southern District of New York, where he pled guilty on November 15, 2011, to providing material support to the FARC.

From September 2009 through December 2009, Issa and two other defendants who are all from Mali, agreed to provide the FARC with services, including logistical assistance and secure transportation for a shipment of cocaine across Africa, false identification documents, and other material support and resources, knowing that the FARC was engaged in terrorist activity.  The defendants also agreed to provide material support and resources, including property, currency, and monetary instruments to Al Qaeda and AQIM, knowing that these groups were engaged in terrorist activities.

1.  Organised as a military group, the FARC actively engages in narcotics trafficking as a financing mechanism, and has evolved into the world's largest supplier of cocaine.  For at least the past five years, the FARC has been responsible for violent acts committed against U.S. persons and commercial and property interests in foreign jurisdictions – including in Colombia – in order to dissuade the United States from continuing its efforts to disrupt the FARC's cocaine manufacturing and trafficking activities.

*Source: United States*

### Case 4.2:  **Triangular drug trafficking involving Latin America, Africa and Europe**

In 2011, Ayman Joumaa was charged with drug-trafficking and money laundering in the Eastern District of Virginia.  Joumaa's drug-trafficking organisation transports, distributes, and sells multi-ton bulk shipments of South American cocaine through West Africa.  Joumaa and his organisation operate in Lebanon, West Africa, Panama, and Colombia, and launder proceeds from their illicit activities, as much as USD 200 million per month, through various channels, including bulk cash smuggling operations and Lebanese exchange houses.  Joumaa's organisation uses, among other

things, Hezbollah couriers to transport and launder narcotics proceeds. Joumaa's organisation pays fees to Hezbollah to facilitate the transportation and laundering of narcotics proceeds.

In addition, the US Treasury Department identified Lebanese Canadian Bank (LCB) as an entity of primary money laundering concern under Section 311 of the USA PATRIOT Act, noting that Ayman Joumaa used accounts of various exchange houses at LCB to launder hundreds of millions of dollars in proceeds of narcotics trafficking. These exchange houses and other companies related to Joumaa originated over USD 66 million in wire transfers from Lebanese banks since January 2006, with approximately one-half of the wire transfers and approximately 94% of the funds originating from LCB, indicating that LCB is the favoured bank for these Joumaa-related entities, particularly for illicit banking activity.

*Source: United States*

---

Case 4.3:  **Drug Trafficking Triangle Involving Latin America, Africa and Europe**

In February 2011, Maroun Saade and a number of other defendants were charged with conspiring to provide various forms of support to Drug Enforcement Administration (DEA) confidential sources whom they believed to be representatives of the Taliban in Afghanistan. Some of these defendants agreed to receive, store, and move ton-quantities of Taliban-owned heroin through West Africa. For example, Saade, a narcotics trafficker operating in West Africa, agreed to receive and store Taliban-own heroin in Benin and transport that heroin to Ghana with the understanding that portions of those shipments would be sold in the U.S. for the financial benefit of the Taliban. Other defendants involved in this conspiracy where known cocaine traffickers and arms traffickers. The defendants engaged in this conduct knowing and intending to provide something of monetary value to a person and organisation that engages in terrorism and terrorist activity.

*Source: United States*

---

Case 4.4:  **Hezbollah fundraising in four West African countries**

In June 2013, four Lebanese individuals were designated by the U.S. Treasury Department under Executive Order 13224, which effectively blocked the designated individuals from the U.S. financial system by freezing their assets and prohibiting U.S. entities from doing business with them. The four men were aiding Hezbollah in its efforts to extend its influence throughout West Africa. The designation was part of a multi-year effort to expose and undermine linkages between South American drug traffickers and Middle Eastern militant groups.

The designated individuals organised fundraising efforts for Hezbollah, recruited members, and in some cases styled themselves as ambassadors of Hezbollah's Foreign Relations Department. Ali Ibrahim al-Watfa, Hezbollah's permanent liaison to Sierra Leone, co-ordinated the transfer of funds from Sierra Leone to Hezbollah in Lebanon through the Hezbollah Foreign Relations Department. Abbas Loutfe Fawaz, Hezbollah's leader in Senegal, used supermarkets that he owned and operated in Dakar, Senegal, to raise funds for Hezbollah and attract supporters. He also led secret meetings to devise ways to increase Hezbollah's fundraising efforts. Ali Ahmad Chehade, the Hezbollah Foreign Relations Department official for Cote d'Ivoire, co-ordinated travel for Hezbollah members from Senegal to Cote d'Ivoire and acted as a recruiter assisting Specially Designated Global Terrorist Abd

Al Munim Qubaysi.  Hicham Nmer Khanafer, an active and influential Hezbollah member in The Gambia, held weekly Hezbollah fundraising and recruiting drives at a local mosque.

*Source: United States*

Case 4.5:  **West African trade-based money laundering facilitated by Lebanese exchange houses**

In April 2013, two Lebanese exchange houses, Kassem Rmeiti & Co. For Exchange (Rmeiti) and Halawi Exchange Co. (Halawi), became the first non-bank financial institutions to be named as foreign financial institutions of "primary money laundering concern" under Section 311 of the USA PATRIOT Act.  Rmeiti and Halawi were facilitating a money laundering network previously operated by Ayman Joumaa, Lebanese Canadian Bank, and two other exchange houses prior to actions taken against those entities in 2011 (see Case 4.2).

Rmeiti provided at least USD 25 million in payments between 2008 and March 2011 to U.S.-based car dealers and exporters associated with the Joumaa narcotics and money laundering network, and between March 2011 and October 2012, Rmeiti facilitated the movement of at least USD 1.7 million for Beninoise and Lebanese money launderers and drug traffickers.

Halawi facilitates transactions for a network of individuals and companies, which launder money through the purchase and sale of used cars in the United States for export to West Africa.  As of late 2012, Benin-based money launderers were using Halawi to wire transfer money to U.S. car suppliers in support of their trade-based money laundering scheme.  Additionally, Halawi has laundered profits from drug trafficking and cocaine-related money laundering networks for a leading Hezbollah official and narcotics trafficker, and Halawi has also been routinely used by other Hezbollah associates as a means to transfer illicit funds.

*Source: United States*

These cases support the findings of the FATF 2008 Terrorist Financing Report, which discusses terrorist groups raising funds from criminal activity.  The report noted:

> "During the last decade, drug trafficking organisations have increasingly used countries along or near the West African coast as trans-shipment hubs for importing massive quantities of narcotics, particularly cocaine from South America, to be later distributed in Europe or elsewhere within Africa.  Through a combination of privately owned aircraft and maritime vessels, these organisations, predominantly based in Venezuela and Colombia, have transported hundreds of tons of cocaine, worth billions of dollars, to West African nations such as Benin, Sierra Leone, and Togo.  Drug trafficking was found to be an attractive source of funds for terrorist organisations, enabling them to raise large sums of money."

It should be noted that drug trafficking was found to be an attractive source of funds for terrorist groups, enabling them to raise large sums of money.  Given this reality there is a need for West African governments to strengthen measures against drug trafficking in the sub-region.

© 2013

## OTHER CASES

---

### Case 1: **Financial Contributions of Political Leaders (Boko Haram)**

Mr X, a former Boko Haram spokesperson, was arrested by a Nigerian security agency. Upon interrogation, Mr X mentioned names of local politicians whom he claimed were funding the terrorist group, including Mr M, a legislator. Both Mr X and Mr M hail from north-eastern Nigeria, the operational base of Boko Haram. Mr X disclosed that Mr M was responsible for scripting threatening text messages for the group members to send to various politicians and public officials.

Based on information provided by Mr X, Mr M was investigated and subsequently arrested by the Nigerian security agency. Examination by the agency of Mr M's telephone records, revealed constant communication between him and Mr X. Consequently, Mr M was charged with concealing information on attacks being planned by Boko Haram, providing telephone numbers of public officers to Boko Haram, and failing to disclose the identity of Mr X to the appropriate authorities.

*Source: Nigeria*

---

### Case 2: **Using Political Leaders to Channel Funds**



Mr Q, a son of a local PEP in Senegal, opened an account at a local bank on behalf of Company X, of which he is the Chief Executive Officer (CEO). A large amount of money was wired into the account from an account of Company K located in a North African country. Upon receipt of the money, Mr Q immediately issued a transfer order to his bank to transfer the money into the account of Company P, located in a neighbouring country. Mr R, the CEO of Company P, claimed that the payment was for services provided to Company K. Mr R is also a son of a PEP in the neighbouring country.

Based on the amount involved, the profile of the client, the origin and final destination of the funds,

---

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 446 of 632

the transaction which appears to be between persons who have no apparent relationship, and the unconvincing explanations provided by Mr R, the bank filed an STR to the FIU. Mr R is suspected of being linked to a powerful terrorist movement in the Sahel-Saharan region.

Investigations by the FIU revealed the following:

- Mr R, the CEO of Company P, recently graduated from the university and was acting at the behest of his father.

- This was the first transaction into the account of Company P.

- There was no apparent linkage between the client who issued the transfer order from Company K in North Africa and the recipient Company X in Senegal and its CEO, Mr Q.

- The North African country is well-known for terrorist activities and is used as a corridor for the payment of ransoms to kidnappers in the Sahel-Saharan area.

- Mr Q served as an intermediary for Mr R, who in turn was responsible for dispatching the funds to the true beneficiaries.

*Source: Senegal*

---

### Case 3:  **Alternative Remittances (Hawala between Jihadists et Katibats)**



Three nationals of a North African country, travelled to Senegal in the hope of obtaining Kenyan visas from the UK embassy in Dakar. The embassy represents the interests of Kenya in Senegal.

The individuals paid for the trip to Senegal out of personal funds. Upon obtaining their visas, they

© 2013

travelled to Kenya where their contact person in that country then transported them to the Somalia border. They were subsequently arrested and repatriated to Senegal. The three individuals then attempted to travel to Somalia via the Democratic Republic of the Congo (DRC) but were arrested again by law enforcement officials.

The investigation revealed that all three were recruited to go to the foreign "Jihadist" camps in Somalia and all had received funds equivalent to CFA Franc 5 000 000 through *hawala* from one of their fellow citizens who was established as a trader in Senegal. The ordering party was a member of a Salafist movement, based in these individual's country of origin, and acting on behalf of the recruiting agent in Somalia. The three individuals were in permanent contact with the leaders of these terrorist groups in their country of origin, in Kenya and especially in Somalia.

**Comments:** This case illustrates the use of hawala for terrorist financing purposes.

*Source: Senegal*

Cases 1 and 2 reveals how PEPs often use the financial system and front companies to fund and support terrorist activities within the West African sub-region. These cases highlight an emerging nexus between politics and terrorism/terrorist financing, notwithstanding the decline in state/government sponsorship of terrorism over the years. It shows willingness of corrupt politicians to use terrorism as a tool to further and protect their interests. Importantly, Boko Haram's ability to sustain and conduct sophisticated terrorist attacks may be partly attributed to the alleged support provided to it by some PEPs.

## CONCLUSION

All of the typologies presented above highlight a number of methods involved in terrorist financing in West Africa. First, the lack of security in the Sahel region, particularly northern Nigeria, Niger, and Mali, is permitting unfettered smuggling of cash, arms and ammunitions, as well as other resources required by terrorist organisations. There appears to be an increased reliance on the legitimate businesses and trade transactions for the purpose of terrorist financing.

From the twenty-one cases presented by experts at the workshop, four (Cases 1.3, 2.1, 3.2, and 3.3) were most illustrative of the complexities of terrorist financing in West Africa. More specifically, in order to raise, move and distribute funds and carry out terrorist activity, terrorists and terrorist groups are exploiting existing political, socio-economic, and security challenges, such as:

- poverty, deprivation, violence and political instability,
- corruption and bad governance,
- weak border surveillance and porous national borders,
- weak inter-agency co-operation amongst domestic competent authorities and inadequate international co-operation.

Analysis of the various cases lends support to the view that substantial amounts of money are required to carry out terrorist activities. While carrying out individual operations requires small amounts, maintaining terrorist organisations, including providing for the upkeep of members and their families and the purchase of weapons and other materials, require considerable amounts.

The handling of the aforementioned cases, particularly from Burkina Faso, Niger and Nigeria, reveals several major issues in West Africa with regard to the fight against terrorism and terrorist financing. First, the possession of large amounts of cash and weapons reveals the prevalence of cash and weapons smuggling in the sub-region. It also reveals the weakness of border security, as terrorists and terrorist groups move and operate across borders without detection or hindrance.

These various cases reveal the lack of co-operation and collaboration, including information sharing, among competent authorities in the region.

## RAISING FUNDS

Terrorist financing is underpinned by the need for terrorist organisations to provide for the personal upkeep of their members and their families, purchase weapons and logistics, preserve communication channels, and adopt self-protection measures. Accordingly, terrorists and terrorist groups in the sub-region employ both legitimate and criminal means to raise funds. Based on the cases presented, funds are commonly raised through donations/alms giving/compulsory levies, misuse of trade proceeds, and organised criminal activities including widespread kidnapping for ransoms, extortion, robberies, smuggling of cash, and other valuables.

There is an exploitation of the *zakat*, one of the five pillars of Islam, which obliges all Muslims to give 2.5% of their annual earnings to charity. Children, the physically challenged, the elderly, and the poor are used to beg for alms. Donations received are used to support terrorist activities. It is extremely difficult to detect begging related to support for terrorism especially as begging is an accepted social practice in West African societies, not least because of widespread poverty, unemployment, and underemployment. Piousness and generosity of many West Africans also underpin the culture of begging.

In addition, when examining the cases provided for this study, 9% of funds for terrorism are raised through corrupt PEPs and misuse of trade accounts. Given the small sample size, this may not be statistically relevant; however, it does point to the need to strengthen CFT measures, including use of risk-based approach to address trade-based TF.

Furthermore, the provision of equipment, SIM cards, and materials to terrorists, by legitimate businesspeople, as illustrated by one of the cases, enables terrorists and terrorist organisations to effectively evade detection and arrest by security operatives. Reliance on this technique is reflective of and underpinned by a major vulnerability in West Africa, namely, the prevalence of vast informal economies and the weak regulation and supervision of business operations.

Also, among the major methods and techniques from the cases are extortions, robberies, illegal oil bunkering, misuse of NGOs/Charities, and human trafficking. Collectively, these criminal activities account for 27%. Thus, there is growing evidence, although drawn from a small sample, of a nexus between terrorist financing and criminal activity – whether organised or small-scale.

## FUNDS MOVEMENT

The case studies demonstrated that terrorists use various formal and informal ways, techniques, or mediums to move their funds, including:

© 2013

- **Smuggling -** Weak security at national borders, ports and checks points in the selected countries facilitate smuggling of cash and small arms and light weapons across borders. Terrorists and terrorist groups are particularly aware of and exploit porous national borders, weak border surveillance, lack of domestic inter-agency co-ordination and collaboration, and cross-border co-operation. Furthermore, the lack of effective currency declaration systems at borders, prevalence of informal and unregulated economies, and the predominance of cash transactions in West Africa facilitates easy smuggling of cash and weapons. Terrorist organisations are also exploiting Islamic tenets that forbid men from having any physical contact with women they are not married to, by using women as cash and weapon couriers in Islam-dominated areas.

- **Bank/Wire transfers –** Financial institutions, especially the banks, were used to transfer funds in support of terrorist activities in other locations. This was observed in the cases involving PEPs and charity/NGO. In some instances, terrorists use proxy accounts to transfer funds to their members. Most often, these funds are withdrawn using the Automated Teller Machine (ATM).

- **Misuse of the NPO Sector -** Compromised NGOs/Charities use the cover of humanitarian work to avoid detection by serving as a conduit for moving funds to terrorists and/or terrorist organisations. This technique often involves the movement and distribution of funds by way of purchasing and transferring tangible items under the guise of legitimate business, and the eventual sale of them for cash. Monies accrued from such transactions are often used to provide logistical support to terrorists.

## INSTRUMENT/ MECHANISM

The main instrument used in almost all the terrorist financing case studies presented is cash This reflects the cash–based nature of the sub-region's economy. The key mechanism is the physical movement of cash (locally and across national borders). Another common mechanism is NGOs/charities and legal entities/enterprises. The increasing use of the DNFPBs may be attributable to improved implementation of the AML/CFT regime in the financial sector. This brings to the fore the issues of regulation and monitoring for AML/CFT. The third mechanism is through trade-based channels, and a fourth is the financial institution sector.

It is important to mention that some of the cases presented are still at various stages of investigation or prosecution and very few of the cases originated as STRs from reporting institutions. This shows a gap in reporting as well as difficulties in the identification of terrorist financing related STRs and the prosecution of terrorism and terrorism financing related cases. Difficulties in identification may be due to the inadequacy of capacity, lack of guidance, and weak inter-agency co-operation, especially in terms of information exchange amongst competent authorities and between reporting entities and AML/CFT regulators.

# CHAPTER 4: INDICATORS AND RED FLAGS

A number of indicators and red flags were identified based on analysis of cases presented by experts. In this case, indicators and red flags differ in terms of the degree of likelihood of occurrence of TF. While the indicators represent events that may or may not be indicative of TF, the red flags represent events that provide greater certainty that TF may have been carried out.

## INDICATORS:

- Purchase, transfer, and eventual sale of tangible items for cash particularly in areas with a high incidence of terrorist and criminal activities;

- Voluntary or mandatory donations by individuals, businesses, or state officials to religious/radical groups in crime and terrorism-ridden areas, especially after the occurrence of what may be considered a trigger event (religious/tribal clashes for example, local or remotely with possibility of influencing local events);

- Frequent cases of participation of terrorist/radical groups in organised criminal activities;

- Frequent carrying of large sums of cash to and from countries embroiled in conflict, instability, and large-scale criminal activities;

- Arrest of cash couriers or seizure of money and weapons by law enforcement officials in terrorism-prone areas;

- Structured cash deposits into an account by different individuals at multiple branches of a particular bank;

- Transfer of large sums of money to and from accounts of individuals or newly established companies with no apparent business relationships;

- Frequent cash deposits into or withdrawals from charity accounts by different individuals with no apparent relationships;

- Unexplained transfer of funds from foreign jurisdictions with high incidence of terrorist activities into the accounts of individuals and companies;

- Presentation of little, incomplete, or unverifiable information about the identity of account holder or destination of transfer;

- Transactions on individual and company accounts that is not consistent with account profiles;

- Preference for cash transactions;

- Travellers without luggage or identification papers; and

- Currency transactions in the informal sector.

© 2013

## RED FLAGS:

- Constant changing of mobile phones and SIM cards by individuals and groups known to have radical or anti-government views, especially after a terrorist group has been attacked by law enforcement;

- Establishment of companies by nationals of terrorism-prone countries and frequent international money/value transfers to and from the accounts of the companies;

- Extortion of money from the public by known members of a violent/terrorist group;

- Frequent visits to key and vulnerable targets by terrorist sympathisers or suspected terrorists;

- Collection of alms and donations by unknown persons or groups, particularly in areas that have high incidences of terrorist-related activity; and

- Frequent exchange of cash through informal channels by suspected sympathisers of terrorist groups.

# CHAPTER 5: CONCLUSION AND RECOMMENDATIONS

## CONCLUSION

Despite the limitations of this study in terms of the case study-based methodology, the prevalence of terrorism and its financing in the West African sub-region is indisputable, with negative consequences on the security, stability, and development of the sub-region. The insecurity and instability within West Africa is providing an enabling environment for extremism and terrorism to thrive. Both legal and illegal channels, traditional (banks for example) and non-traditional (for example, trade, arms dealing), are being utilised to raise money or move them to the hands of terrorist groups and individuals. This is why there is an urgent need for all stakeholders to collaborate and co-operate in combating terrorism and terrorist financing in West Africa.

In summary, the following are the findings of the study:

- Terrorists and terrorist organisations use both legitimate and illegitimate means to raise funds. The funds raised are used to provide for the personal upkeep of members and their families, purchase of tools and equipment, recruit new members, and disseminate propaganda to attract sympathy/support to assist in carrying out terrorist acts;

- Formal and informal channels of cash movement are exploited by terrorists to move their funds around;

- There is weak capacity for identifying STRs relating to terrorism financing by reporting institutions;

- Security and surveillance at various national borders are weak, resulting in the infiltration of terrorists, small arms, and light weapons. In addition, there are numerous unofficial border-crossing points that cannot be adequately patrolled by State officials;

- NGOs and charities are vulnerable to exploitation by terrorist organisations. This study found that terrorist organisations are not only targeting NGOs and charities, but also the most vulnerable members of society (the elderly, beggar children, the infirm) in an effort to raised funds and hide their true intent;

- Law enforcement and regulatory agencies, security and intelligence services and the judiciary lack the requisite capacity to effectively address the challenge of terrorism and terrorism financing;

- The inability and unwillingness of national competent authorities to effectively co-operate and collaborate, especially in information sharing, is partly responsible for the deteriorating security and increasing terrorist financing in the sub-region;

© 2013

- Sub-regional co-operation and international co-operation between member states and other countries, especially in terms of information sharing is weak, resulting in the infiltration of terrorists and the free flow of terrorist funds and small arms/light weapons across national borders;

- The proliferation of extremist groups and their linkages to known international terrorist organisations as well as the growing tendency of religious extremism within the region is a potent threat to the security and development of the region; and

- The predominance of the informal sector coupled with the cash-based nature of the region's economies facilitates currency exchange by terrorists and other criminal groups.

## RECOMMENDATIONS:

The following recommendations are proffered based on the findings of the study:

### WEST AFRICAN COUNTRIES

- Put in place an effective mechanism to implement the relevant UN and FATF provisions for countering terrorist financing; especially the generation, movement and utilisation of funds within each country.

- Effectively monitor the activities of street beggars, fund raisers at religious sites particularly in areas known for terrorist activities, in order to curtail this type of fundraising and ensure that terrorists do not exploit the general population.

- Enhance intelligence gathering capabilities and consider the use of undercover operation and co-operating insiders as a way of obtaining credible information about terrorists and terrorist groups.

- Put in place effective regulatory and monitoring mechanisms to ensure effective supervision of the activities and transactions of NGOs and charities without retarding their important functions, including the adoption and implementation of standard guidelines and procedures for the monitoring and supervision of the operations of NGOs and charities, covering those operating internationally, in order to ensure that they are not being used as conduits for terrorists financing.

- Review and put in place effective business and company registration management processes.

- Implement measures relating to the monitoring and control of donations made to NGOs, and to better educate notaries on their AML/CFT obligations.

- Enhance training on investigation techniques and experience of prosecution authorities in dismantling terrorists and their sources of funding.

© 2013

- Implement the ECOWAS Convention on police cooperation within the framework of the West African Police Chiefs Committee (WAPCCO) as well as the Regional Counter Terrorism Action Plan.

- Strengthen the responses of ECOWAS Member States against illicit trade in small arms and light weapons in West Africa, including strengthening cross-border co-operation and collaboration.

- Deepen the implementation of AML/CFT measures, especially customer identification and reporting of suspicious transactions to effectively combat terrorist financing.

- Collect quantitative and qualitative information on terrorist financing and terrorist activity in order to gauge the scope of the issues and to identify trends. This should also include the sharing of information within the region in order to identify regional trends or shifts in activity.

- Enhance national inter-agency collaboration and international co-operation in information sharing.

- Improve border surveillance and security at national borders and develop synergy with neighbouring countries.

- Examine the social support structure of terrorism in its cultural and social context, especially by security agencies in order to develop specific responses to specific terrorist financing situations.

- Establish formal operational co-operation mechanisms to exchange information between customs authorities and security agencies to monitor cross border trade.

- Devise policies and programs aimed at integrating both the formal and informal sectors aimed at regulating and monitoring the activities of money launderers and terrorist financiers. This should also include deliberate policies aimed at reducing preference for cash transactions and eventually creating cashless payment systems from which potential terrorism-related transactions and money laundering could be detected, investigated, or prevented.

- Strengthen human and institutional capacities in order to improve on investigation, prosecution and adjudication for cases of terrorist financing.

- Take practical steps to address the issues of corruption within security agencies that could hinder the detection and effective investigation and prosecution of terrorist financing cases, including, as necessary, the adoption of internal oversight and institutional framework to enhance integrity in law enforcement.

- Establish early warning systems within security and intelligence services to serve as vigilance tool in identifying and countering potential and real

38                                                                              © 2013

threats of terrorist financing, especially in countries with large religiously sensitive population.

- Review and amend, where necessary, legislations and regulations relating to terrorism and terrorist financing in order to ensure effective deterrence, and to provide the maximum co-operation possible to other jurisdictions in order to effectively combat the threats;

- Involve the civil society, religious groups and the private sector more effectively in terrorist financing prevention efforts; and

## REGIONAL / INTERNATIONAL AUTHORITIES AND DEVELOPMENT PARTNERS SHOULD:

- ECOWAS should integrate terrorism and terrorist financing in its regional conflict and disaster early warning system to monitor and assess terrorists funding and sympathisers (Community anti-terrorism Vigilance System), in collaboration with national, academic and civil society bodies.

- Develop regional training platforms by institutions such as GIABA to facilitate experience sharing among relevant authorities actors and to strengthen operational capacities;

- Increase technical assistance to national specialised agencies, including FIUs. In particular, support the development of specific courses on terrorist financing, financial analysis, organised crime, financial investigations to enhance the investigative, prosecutorial, and intelligence-gathering capacities of specialised personnel.

- Support sub-regional initiatives for capacity building and increase regional and international co-operation, including arrangements for sharing of information on continuous basis.

© 2013

## BIBLIOGRAPHY

911 Commission (2004), *Final Report of the National Commission on Terrorist Attack Upon the United States*, Worton & Company, Inc., New York, NY and London, UK.

Abuza, Zachary (2003), "Funding Terrorism in Southeast Asia: The Financial Network of Al Qaeda and Jemaah Islamiya", *Contemporary Southeast Asia: A Journal of International & Strategic Affairs*, Vol. 25, No. 2, 169-1999.

Arquilla, John; Ronfeldt, David and Zannini, Michele (2001), "Networks, Netwar, and Information-Age Terrorism", in Howard, RD, Sawyer RL (ed), *Terrorism and Counterterrorism: Understanding the New Security Environment.*

Ashley, Sean P. (2012), "The Future of Terrorist Financing: Fighting Terrorist Financing in the Digital Age", *Penn State University Journal of International Affairs*, Vol. 1, No. 2.

Asia/Pacific Group on Money Laundering [APG] (2011), *Typologies Report: NPO Sector Vulnerabilities*, APG, Sydney, Australia, July 2011.

Basile, Mark (2004), "Going to the Source: Why Al Qaeda's Financial Network is Likely to Withstand the Current War on Terrorist Financing", *Studies in Conflict and Terrorism*, Vol. 27.

Bantekas, Ilias (2003), "The International Law of Terrorist Financing", *The American Journal of International Law*, Vol. 97, No. 2.

Berry, LaVerle *et al* (2002), *A Global Overview of Narcotics-Funded Terrorist and other Extremist Groups*, The Library of Congress, Washington DC, United States.

Billingslea, W. (2004), "Illicit Cigarette Trafficking and the Funding of Terrorism", *Police Chief*, Vol. 71, No. 2, 49-56.

Byman, Daniel (2005), *Deadly Connections*, Cambridge University Press, Cambridge, United Kingdom.

Clunan, Anne L. (2006), "The Fight against Terrorist Financing", *Political Science Quarterly*, Vol. 121, No. 4, 569-596.

CNN (2011), 'Al Qaeda-linked Group Finds Fertile Territory in Nigeria as Killings Escalate', 18 November 2011.

Comras, Victor (2005), "Al Qaeda Finances and Funding to Affiliate Groups." *Strategic Insights*, Vol. IV, No. 1, US Naval Postgraduate School, Monterey CA, United States.

Cragin, Kim *et al* (2007), *Sharing the Dragon's Teeth: Terrorist Groups and the Exchange of New Technologies*, RAND Corporation, Santa Monica CA, Unites States.

Dekieffer, Donald (2008), "Trade Diversion as a Fund Raising and Money Laundering Technique of Terrorist Financing", in Biersteker, J. and Eckert, Sue (2008), *Countering the Financing of Terrorism*, Routledge, London and New York.

FATF (2008), *Terrorist Financing*, FATF, Paris, France.

© 2013

FATF (2006), *Trade-Based Money Laundering*, FATF, Paris, France.

FATF (2013a), *Best Practices - Combating the Abuse of Non-Profit Organisations (Recommendation 8)*, FATF, Paris, France.

FATF (2013b), *Methodology for Assessing Technical Compliance with the FATF Recommendations and the Effectiveness of AML/CFT Systems*, FATF, Paris, France.

Forster-Bowser, Erin and Sander, Angelia (2012), *Security Threats in the Sahel and Beyond: AQIM, Boko Haram and al Shabaab*, Civilian-Military Fusion Center, Norfolk VA, United States.

Giraldo, Jeanne, and Trinkunas, Harold (2007), *Terrorism Financing and State Responses – A Comparative Perspective*. Stanford University Press, Stanford CA, United States.

Greenberg, Maurice; Wechshler, Willaim F.; and Wolosky, Lee (2002), *Terrorist Financing: Report of an Independent Task Force Sponsored by the Council on Foreign Relations*, Council on Foreign Relations, New York NY, United States.

Gunarata, Rohan (2002), *Inside Al Qaeda: Global Network of Terror*, pp. 88-99, Columbia University Press, New York NY, United States.

Hardoin, Patrick and Weichhardt, Reiner (2003) "Financing of Terrorism: A View from NATO", in *Swiss EAPC/PfP Workshop on Combating Financing of Terrorism*, Geneva, Switzerland.

Integrated Threat Assessment Centre [Government of Canada] (2007), *Terrorist Financing and Resourcing*, ITAC, Ottawa, Canada.

Inter-Governmental Action Group Against Money Laundering West Africa [GIABA] (2010), *Threat Assessment of Money Laundering and Terrorist Financing in West Africa*, May 2010, Dakar, Senegal,

Lacher, Wolfram (2012), *Organised Crime and Conflict in the Sahel-Sahara Region*, Carnegie Endowment for International Peace, Washington DC, United States.

Lesage, Andrew (2011), *The Evolving Threat of al Qaeda in the Islamic Maghreb*, Institute for National Strategic Studies, National Defense University, 2011.

Levitt, Matthew (2002), "The Political Economy of Middle East Terrorism", *Middle Review of International Affairs*, Vol. 6, No. 4, 49-65.

Levitt, Matthew, and Jacobson, Michael (2008), *The Money Trail: Finding, Following, and Freezing Terrorist Finances*, Washington Institute for Near East Policy, Washington DC, United States.

Makarenko, T. (2004), "The Crime-Terror Continuum: Tracing the Interplay Between Transnational Organised Crime and Terrorism", *Global Crime*, Vol. 6, No. 1, 129-145. McCulloch, Jude and Pickering, Sharon (2005), "Suppressing the Financing of Terrorism: Proliferating State Crime, Eroding Censure and Extending Neo-colonialism", *The British Journal of Criminology*, Vol. 45, No. 4, 470-486.

Miguel del Cid Gomez, Juan (2010), "A Financial Profile of the Terrorism of Al-Qaeda and its Affiliates", *Perspectives on Terrorism*, Vol. 4, No. 4.

Mullins, Sam (2009), "Parallels between Crime and Terrorism: A Social Psychological Perspective", *Studies in Conflict and Terrorism, 32:9, 811-83*0, DOI: 10.1080/10576100903109776.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 458 of 632

Napoleoni, Loretta (2005), *Terror Incorporated: Tracing the Dollars Behind the Terror Networks*, Seven Stories Press, New York NY, United States.

Oehme III, Chester G. (2008), "Terrorist, Insurgents and Criminals – Growing Nexus?", *Studies in Conflict & Terrorism*, Vol. 31 , Issue 1, pp 80-93.

Passas, Nikos (2012), "Terrorist Finance, Informal Markets, Trade and Regulation" In Lum, C. and Kennedy, L.W. (Eds), *Evidence-Based Counter terrorism Policy*, Springer, New York NY, United States.

Pham, Peter J. (2011), *Foreign Influences and Shifting Horizons: The Ongoing Evolution of al Qaeda in the Islamic Maghreb*, Foreign Policy Research Institute, Spring 2011.

Prober, Joshua (2005). "Accounting for Terror: Debunking the Paradigm of Inexpensive Terrorism." *Policy Watch*, No. 1041, Washington Institute for Near East Policy, Washington DC, United States.

Quillen, Chris (2002), "A Historical Analysis of Mass Casualty Bombers", *Studies in Conflict & Terrorism*, Vol. 25. No. 2, 279-292.

Rollins, John (2011), *Al Qaeda and Affiliates: Historical Perspectives, Global Presence, and Implications for US Policy*, Congressional Research Service, 25 January 2011.

Roth, John; Greenburg, Douglas; and Willie, Serena (2004), *Monograph on Terrorist Financing: Staff Report to the Commission*, National Commission on Terrorist Attacks Upon the United States, Washington DC, United States.

Roth, Michael P., and Murat, Sever (2007), "The Kurdish Workers Party (PKK) as Criminal Syndicate: Funding Terrorism through Organised Crime, A Case Study" *Studies in Conflict and Terrorism 30:10*, 901-920, DOI: 10.1080/10576100701558620.

Sanderson, Thomas M. (2004). "Transnational Terror and Organised Crime: Blurring the Lines." *SIAS Review*, Vol. 24, No. 1, 49-61.

Schmidt, A.P. (1996). "The Links Between Transnational Organised Crime and Terrorist Crimes." *Transnational Organised Crime*, Vol. 2, No. 4, 40-82.

Serge Daniel « AQMI (ALQAIDA au Maghreb Islamique), l'industrie de l'Enlèvement », Edition Fayard -2012.

Shelley, Louise, and Picarelli, John (2005). "Methods and Motives: Exploring Links Between Transnational Organised Crime and International Terrorism", *Trends in Organised Crime*, Vol. 9, No. 2, 52-67.

Tanchum, Michael (2012), "Al-Qa'ida's West African Advance: Nigeria's Boko Haram, Mali's Touareg, and the Spread of Salafi Jihadism", *Israel Journal of Foreign Affairs*, Vol VI: 2.

United States Congress (2011), *Boko Haram: Emerging Threat to the US Homeland*, US Government Printing Office,  Washington DC, United States.

US Department of State (2003),  *International Narcotics Control Strategy Report*, US Department of State, Washington DC, United States.

US Department of State (2005),  *International Narcotics Control Strategy Report*, US Department of State,Washington DC, United States.

© 2013

US Department of State (2012), *Country Report on Terrorism- 2011*, July 31, 2012, US Department of State,Washington DC, United States.

US Department of State (2013), *Country Report on Terrorism- 2012,* May 30, 2013, US Department of State,Washington DC, United States.

United Nations (1999), *International Convention for the Suppression of the Financing of Terrorism*, available at www.un.org/law/cod/finterr.htm (accessed October 2013).

United Nations Development Program (2011), *Sustainability and Equity: A Better Future for All*, United Nations, New York NY, United States.

Vittori, Jodi (2011), *Terrorist Financing and Resourcin,* Palgrave Macmillan, New York NY, United States.

Wittig, Timothy (2011), *Understanding Terrorist Finance*, Palgrave Macmillan, New York NY, United States.

Wilkinson, Paul (2011), *Terrorism versus democracy: the liberal state response*, Milton Park, Abingdon, 2013, New York NY, United States.

Williams, Phil, and Felbab-Brown, Vanda (2012), *Drug Trafficking, Violence, and Instability,* Strategic Studies Institute and University of Pittsburgh for International Security Studies, United States.

Williams, Phil (2005), "Warning Indicators, Terrorist Finances, and Terrorist Adaptation", *Strategic Insights*, Volume IV, Issue 1.

World Bank and International Monetary Fund (2003), *Reference Guide to Anti-Money Laundering and Combating the Financing of Terrorism*, World Bank and IMF, Washington DC, United States.

Rapport sur la Criminalité organisée et les Trafics illicites, 2008, ONUCD/MJ.

## APPENDIX

### CASE 1.1 SALE OF GOODS AND OTHER LUCRATIVE ACTIVITIES



### CASE 1.2: BUSINESS PROFITS/LOGISTICAL SUPPORT (TELECOMMUNICATIONS)



© 2013

**CASE 2.1: FINANCING THROUGH THE FINANCIAL SYSTEM**



**CASE 2.3: BEGGING (ALMS COLLECTION) BY VULNERABLE PERSONS**



Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 462 of 632

## CASE 2.4: EXTORTION OF CIVILIANS BY MEANS OF INTIMIDATION



## CASE 3.1: ARMS SMUGGLING AT THE NIGERIAN BORDER



© 2013

 ONE-MINUTE WORLD NEWS

Page last updated at 11:57 GMT, Wednesday, 22 October 2008 12:57 UK

✉ E-mail this to a friend          🖶 Printable version

# Colombia hails end of drugs ring

**Africa**

*Americas*

**Asia-Pacific**

**Europe**

**Middle East**

**South Asia**

**UK**

**Business**

**Health**

**Science & Environment**

**Technology**

**Entertainment**

**Also in the news**

---

Video and Audio

**Programmes**

Have Your Say

In Pictures

Country Profiles

Special Reports

Related BBC sites

  Sport

  Weather

  On This Day

  Editors' Blog

  BBC World Service

Languages

**Colombian officials say a global drug-trafficking ring that stretched from South America to Asia has been smashed after two years of police work.**

Since July 2006, 111 people suspected of working for Colombian cartels and paramilitaries have been in the country and overseas, officials say.


Eradication of coca crops forms part of the fight against drugs

Among those detained in Colombia were three men suspected of channelling funds to Lebanese Hezbollah guerrillas.

The South American country is the world's biggest producer of cocaine.

A statement from the attorney general's office said the international police operation, codenamed Titan, had been under way for more than two years.

Its aim was to break up a drug-trafficking and money-laundering ring that operated globally, from Colombia to the US, Canada, Europe and the Middle East.

"The criminal organisation used routes through Venezuela, Panama, Guatemala, the Middle East and Europe, bringing in cash from the sale of these substances via different means of money-laundering," the statement said.

Ninety people were detained overseas, while raids in the cities of Bogota, Cali, Medellin and Pereira led to 21 further arrests.

Among those arrested in were three men who the authorities say used front companies to send money back to their home countries in the Middle East.

The funds were for the "alleged financing of terrorist groups like Hezbollah", the attorney-general's office said.

Colombia remains the world's top cocaine producer despite US aid to tackle the illegal drugs crop.

Since 2000, Washington has spent some $5bn (£3bn) training Colombian forces and providing equipment and intelligence to combat drug-traffickers and eliminate coca crops.

✉ E-mail this to a friend          🖶 Printable version

---

Bookmark with:                                  What are these?

  Delicious      Digg      reddit      Facebook      StumbleUpon

## SEE ALSO

Country profile: Colombia
19 Jul 08 | Country profiles

Quick guide: Colombian conflict
03 Nov 06 | Americas

RELATED INTERNET LINKS

Colombia attorney-general's office (in Spanish)

US DEA

The BBC is not responsible for the content of external internet sites

FROM OTHER NEWS SITES

Al Jazeera Colombia links arrests to Hezbollah - 25 hrs ago

Lebanon Daily Star Colombian 'drug smugglers' accused of financing Hizbullah - 30 hrs ago

Sydney Morning Herald Cocaine ring 'gave profits to Hezbollah' - 40 hrs ago

Los Angeles Times Colombian cocaine ring linked to Hezbollah - 50 hrs ago

Washington Post* Colombia says smashes drug ring with Hezbollah ties - 54 hrs ago

About these results

* Requires registration

TOP AMERICAS STORIES

US lifts lid on WikiLeaks probe

Iran scientist heads home

Argentina legalises gay marriage

📶 | News feeds

MOST POPULAR STORIES NOW

| SHARED | READ | WATCHED/LISTENED |



  BBC News

  BBC News

  BBC News

  BBC News

  BBC News

  BBC News

  BBC News

  BBC News

  BBC News

  BBC News

Most popular now, in detail

FEATURES, VIEWS, ANALYSIS



**Ghost town**
Has China's housing
bubble burst?



**The guerilla plant**
How the world's
oldest clove tree
defied an empire



**Walking away**
Why Royal Ballet
principal Sergei
Polunin quit

MOST POPULAR NOW │ Traffic to this site is currently 32% below normal

SKIP TO TOP

PRODUCTS & SERVICES        E-mail news        Mobiles        Widgets & Alerts        News feeds        Podcasts

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 465 of 632



# Los Angeles Times

LOG IN

 

ADVERTISEMENT

SCROLL DOWN FOR CONTENT

[x] CLOSE



# Drug probe finds Hezbollah link

BY CHRIS KRAUL AND SEBASTIAN ROTELLA

OCT. 22, 2008 12 AM PT



TIMES STAFF WRITERS

BOGOTA, COLOMBIA — U.S. and Colombian investigators have dismantled an international cocaine smuggling and money laundering ring that allegedly used part of its profits to finance Hezbollah, the Lebanon-based Shiite militia, officials said Tuesday.

Culminating a two-year investigation, authorities arrested at least 36 suspects in recent

# Los Angeles Times

$1 for 6 months
Limited-Time Offer

SUBSCRIBE NOW



between South American cocaine traffickers and Middle Eastern militants, Colombian investigators allege.

Authorities accuse Harb of being a "world-class money launderer" whose ring washed hundreds of millions of dollars a year, from Panama to Hong Kong, while paying a percentage to Hezbollah, which is designated as a terrorist group by the United States and Israel. Harb was charged with drug-related crimes in a sealed indictment filed in Miami in July, but terrorism-related charges have not been filed.

The suspects allegedly worked with a Colombian cartel and a paramilitary group to smuggle cocaine to the United States, Europe and the Middle East. Harb traveled extensively to Lebanon, Syria and Egypt and was in phone contact with Hezbollah figures, according to Colombian officials.

ADVERTISING



"The profits from the sales of drugs went to finance Hezbollah," said Gladys Sanchez, lead investigator for the special prosecutor's office in Bogota, in an interview. "This is an example of how narco-trafficking is a theme of interest to all criminal organizations, the

Los Angeles Times

**$1 for 6 months**
Limited-Time Offer

SUBSCRIBE NOW

✖

The FARC is the Spanish acronym for the Revolutionary Armed Forces of Colombia guerrilla group.

The U.S. Drug Enforcement Administration led the far-flung investigation, playing a central role in nailing down the Hezbollah connection, Sanchez said. U.S. officials in Bogota and Washington declined to discuss details of their evidence.

Iran, Hezbollah's longtime sponsor, and donations from the Lebanese diaspora are two sources for a multimillion-dollar budget that pays for the militia's armed and political wings and for social projects such as hospitals in Beirut. But investigations around the world have shown that Hezbollah also funds itself through drug dealing, arms trafficking, contraband smuggling and other rackets in the Americas, Africa and elsewhere.

Western anti-terrorism agents have expressed concern about an increasing Hezbollah presence in South America. The militia is accused of two major anti-Jewish bombings in Argentina in the 1990s. In June, the U.S. Treasury Department designated two Venezuelans of Lebanese descent, one a diplomat, as Hezbollah financiers and supporters.

Venezuelan President Hugo Chavez's alliance with Iran raises fears that his country could become a base for Hezbollah activity, said U.S. and Israeli anti-terrorist officials who spoke anonymously because of the issue's sensitivity. Venezuela has strongly denied any links to terrorist activity.

Venezuela also serves as the corridor for a third of Colombian cocaine bound for the U.S. and Europe, including some loads moved by Harb's group, Colombian investigators said.

**Los Angeles Times** | **$1 for 6 months** Limited-Time Offer          SUBSCRIBE NOW          ✖

investigators said. Harb's group paid Hezbollah 12% of its profits, much of it in cash, the investigators said, without giving a dollar figure.

ADVERTISEMENT

The inquiry grew into Operation Titan, a two-year case worked by Colombian and U.S. agents that has led to more than 130 arrests and the seizure of $23 million, Sanchez said. Investigators deployed 370 wiretaps and monitored 700,000 conversations.

"This case was brought about by putting undercover agents into the money laundering cycle," said a U.S. government official who was not authorized to comment publicly. "This has given us a window into the worldwide financial enterprise that by dotted lines links traffickers from South America and the United States to West Africa, Europe and Hong Kong."

The drugs were allegedly sent via Panama, Venezuela and Guatemala to the U.S., the Middle East and Europe.

Chinese police this year captured Oscar Cano Alazate, a Colombian accused of setting up dozens of front companies in Hong Kong to launder money for the group. Hong Kong and the Panama free-trade zone served as centers for a scheme whereby drug cash from

Los Angeles Times | $1 for 6 months
Limited-Time Offer          SUBSCRIBE NOW

ADVERTISEMENT

The group also used human couriers, fake businesses, international transfers and real estate transactions to launder the money in other locations, including Africa and Canada, Colombian officials said.

On Oct. 13, Colombian police arrested Harb, who lived on a resident's visa in Bogota with his family, after learning that he had an Air France ticket to Syria for the next day and becoming concerned that he might flee. They also arrested the other accused boss, Ali Mohamad Rahim, and Harb's brother, Zacaria, both Lebanese immigrants who had been living in Bogota. Chekry Harb is in his late 50s and Rahim in his early 40s, officials said.

Colombian officials said the three are among 15 of the suspects who will be extradited to the United States.

Harb's key suppliers in Bogota included leaders of the so-called Office of Envigado, according to Colombian authorities. The paramilitary drug trafficking organization headed by Diego Fernando Murillo, known as Don Berna, and other former foot soldiers of the late Medellin cartel boss Pablo Escobar has an international reach.

Los Angeles Times          $1 for 6 months          SUBSCRIBE NOW
                           Limited-Time Offer

ADVERTISEMENT

--

[chris.kraul@latimes.com](mailto:chris.kraul@latimes.com)

rotella@latimes.com

Chris Kraul, reporting from Bogota, Colombia

ADVERTISEMENT

Sebastian Rotella, reporting from Madrid

**Los Angeles Times** | **$1 for 6 months** Limited-Time Offer    SUBSCRIBE NOW  ✕



Chris Kraul covered South America for the Los Angeles Times from his base in Bogota, Colombia. He joined the paper in 1987 and was business editor of the San Diego edition until it closed in 1992. He then began covering the border and Mexican economies until his assignment to The Times' Mexico City bureau in 2001. He reopened the paper's Bogota bureau in 2006. He has also covered the wars in Afghanistan and Iraq. He is a graduate of the University of South Florida and also has been a reporter at the San Jose Mercury News, San Diego Union-Tribune and the San Diego Business Journal.

Los Angeles Times

$1 for 6 months
Limited-Time Offer

SUBSCRIBE NOW

CALIFORNIA

Chilling details emerge about execution-style killing of TikTok star at movie theater

---

TELEVISION

How 'The White Lotus' turned a $9,000-a-night resort into the 'hotel from hell'

---

CALIFORNIA

As Dixie fire tears through communities, some refuse evacuation orders with guns in hand

---

TRAVEL

The 21 best things to do on Catalina

---

LIFESTYLE

She turned an unpermitted backyard studio into the ultimate WFH hideaway

---

Los Angeles Times | **$1 for 6 months** Limited-Time Offer    SUBSCRIBE NOW    ✖

Subscribe for unlimited access

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the
L. A. Times?

Los Angeles Times  |  **$1 for 6 months**
Limited-Time Offer      SUBSCRIBE NOW    ✖

U.S. DEPARTMENT OF THE TREASURY

## Press Center

## Treasury Designates Medellin Drug Lord Tied to Oficina de Envigado Organized Crime Group

7/9/2009

*To view or print the PDF content on this page, download the free Adobe® Acrobat® Reader®.*

TG-201

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today designated Medellin-based drug trafficker Francisco Antonio Florez Upegui (a.k.a. " *Don Pacho*") as a Specially Designated Narcotics Trafficker pursuant to Executive Order 12978. Today's action also targets 18 individuals and six entities located in Colombia and Guatemala that are part of his drug trafficking network. Florez Upegui and his associates have close ties to the *Oficina de Envigado*, a violent Medellin-based organized crime group that engages in large-scale drug trafficking and money laundering activities in Colombia. Specifically designed to target Columbia's drug cartels, E.O. 12978 freezes any assets the designees may have that are subject to U.S. jurisdiction and prohibits all financial and commercial transactions by any U.S. person with the designated companies and individuals.

"Francisco Antonio Florez Upegui and his extensive network of drug trafficking associates, front companies, and business managers rely on their financial networks for survival," said OFAC Director Adam J. Szubin. "We will continue to go after these drug trafficking networks and expose their support systems, forcing them out of the international financial system."

Today's designation targets key members of the Francisco Antonio Florez Upegui drug trafficking organization, including Chekri Mahmoud Harb, a significant money launderer; Carlos Enrique Gonzalez Hoyos, a key heroin distributor; brothers Robinson Duvan and Oscar Alonso Acosta Serna, significant money launderers; and Guatemalan national Jose Rodrigo Dougherty Monroy, a major cocaine distributor. Florez Upegui's financial associates in Colombia are also targeted in today's action, including two of his brothers, Carlos Jairo and Elkin de Jesus Florez Upegui, as well as Ruth Cecilia Velasquez Rodriguez and Jairo de Jesus Velez Trujillo. Four Lebanese nationals, Imad Abdul Rahim Alvarado, Ali Mohamad Abdul Rahim, Abdul Naser Dib El Malt and Ali Ahmad Kaddoura, were also designated today. In October 2008, Colombian authorities apprehended Florez Upegui and many of his senior associates. However, Ali Ahmad Kaddoura evaded capture in Colombia and is currently a fugitive from U.S. law enforcement.

Six entities controlled by Florez Upegui and his associates have also been designated today, including *Florez Hermanos Ltda.*, a hotel services company; *Inversiones Florez Y Florez Y Cia S.C.A.*, an agricultural and livestock business; *Canales Venecia Ltda.*, a butcher shop; *Almacen Futuro No.1*, a clothing store; and *Variedades Harb Sport*, a sports-clothing company – all located in Medellin, Colombia. *Comercial Jinan S.A.*, a sports store in Guatemala controlled by associate Chekri Mahmoud Harb, was also designated.

Florez Upegui and 14 of the individuals designated by OFAC today face drug trafficking and money laundering charges in the U.S. District Court for the Southern District of Florida under a July 2008 U.S. federal indictment. In October 2008, Florez Upegui and several others were arrested by Colombian authorities as part of Operation Titan, a major Drug Enforcement Administration (DEA) investigation. Florez Upegui began his drug trafficking activities 30 years ago as a member of the Medellin Cartel. In recent years, the Francisco Antonio Florez Upegui organization trafficked narcotics not only to the United States, Mexico, Guatemala and Panama, but also to nations in Africa, Europe, and the Middle East.

Today's designation is part of the ongoing interagency effort by the Departments of the Treasury, Justice, State and Homeland Security to implement Executive Order 12978. OFAC worked in close coordination on this investigation with DEA offices in Miami and Bogotá.

**REPORTS**

- Francisco Antonio Florez Upegui organization

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 476 of 632

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 477 of 632

**WED, OCT 7, 2020**

# The Maduro-Hezbollah Nexus: How Iran-backed Networks Prop up the Venezuelan Regime

**Issue Brief by Joseph M. Humire**

**Americas**      **Conflict**      **Corruption**      **Latin America**

**National Security**      **Terrorism**      **Venezuela**

**Weapons Trafficking**

Venezuela's Nicolás Maduro next to Iranian President Hassan Rouhani during the 18th Summit of Heads of State and Government of the Non-Aligned Movement in Baku, Azerbaijan. Iran-backed Hezbollah operates clandestine networks of clans in Venezuela with financiers, fixers, and facilitators connected to the Maduro regime. Picture taken on October 25, 2019.

## Key Points

- Too often, Hezbollah in Venezuela is characterized as only a

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 478 of 632

potential terrorist threat. In reality, the Lebanese terrorist group has helped to turn Venezuela into a hub for the convergence of transnational organized crime and international terrorism.

- Hezbollah's crime-terror network in Venezuela has facilitated Iran's cooperation with the Maduro regime.

- The United States, allies, and international institutions must ramp up regional counterterrorism collaboration, crack down on illicit financial networks, and build stronger ties with Lebanese and other Arab communities in Latin

America.

---

## Introduction

In the face of another fated sham election in Venezuela, countries throughout the Americas and Europe are focusing on the many illicit tactics Nicolás Maduro uses to hold on to power. Top among them: the far-reaching illicit networks that prop up the Maduro regime. This includes armed groups that control vast swaths of territory, establishing a parallel state structure that conjoins the Maduro regime to international terrorism and transnational organized crime. In this environment, US policy shifted from "incrementalism" to "maximum pressure" in 2019, in an effort to constrain Nicolás Maduro's grip on power in Venezuela.

This approach led to a March 2020 US Department of Justice (DOJ) announcement of multiple narcoterrorism indictments against the Maduro regime, including charges against Nicolás Maduro himself.[1] Two months later, the DOJ indicted a former member of Venezuela's National Assembly, the Syrian-Venezuelan dual national Adel El Zebayar, for allegedly working with Maduro and several top regime leaders in Venezuela on a narcoterrorism conspiracy that involved dissidents of the Revolutionary Armed Forces of Colombia (FARC), drug cartels in Mexico, the Islamic Republic of Iran, Syria, and the Lebanese terrorist group Hezbollah.[2]

These actions by the DOJ highlight a debate in the United States and Europe about the presence and role of Hezbollah in Venezuela and Latin America overall. Too often this debate is characterized by simplistic views that see Hezbollah in Venezuela as only a potential terrorist threat. Equally, other views diminish the role and relationship between Hezbollah and the Maduro regime altogether. Neither position captures the nuance of how Hezbollah operates in Venezuela and neighboring countries, nor does it establish a baseline for understanding how Hezbollah fits into the larger strategic picture of the illicit networks propping up the Maduro regime, and its relationship with Iran.

Adding to this deficit of knowledge is that, for many Latin American policymakers, Hezbollah is viewed as a distant problem far from local concerns. Likewise, for US and European policymakers, Latin America is not a top priority for counterterrorism efforts focused mostly on the Middle

East and North Africa. This state of affairs has allowed legal and policy vacuums to arise regionwide, which the Maduro regime and Hezbollah have exploited to turn Venezuela into a central hub for the convergence of transnational organized crime and international terrorism.[3]

**DOWNLOAD PDF**

"...the Maduro regime and Hezbollah have exploited [legal and policy vacuums] to turn Venezuela into a central hub for the convergence of transnational organized crime and international terrorism."



### Hezbollah and Crime-Terror Convergence

Hezbollah is responsible for carrying out terrorist attacks in Israel, Lebanon, Kuwait, Argentina, Panama, United Kingdom, Saudi Arabia, and Bulgaria.[4] In Latin America, it is infamously known for the bombings of the Israeli embassy in 1992 and the Asociación Mutual Israelita Argentina (AMIA) Jewish community center in 1994, both in Buenos Aires, collectively killing one hundred and fourteen people and injuring hundreds more. The AMIA attack shocked many counterterrorism analysts at the time because it was the first terrorist attack by Hezbollah outside of Lebanon or the Middle East. The long arm of Iran and Hezbollah's terror networks is also suspected of downing the Alas Chiricanas Flight 00901 in Panama the day after the 1994 bombing in Buenos Aires, killing all twenty-one passengers aboard.

The Hezbollah terror network that moved from Lebanon to Colombia to the Tri-Border Area, between Paraguay, Brazil, and Argentina—to carry out the 1994 AMIA attack—is still active today. The work of the late Argentine special prosecutor Alberto Nisman ensured that Latin America remembers this fact.[5] Since the AMIA attack, Hezbollah's External Security

Organization (ESO) or "Unit 910," responsible for its extraterritorial operations, has successfully co-opted many Lebanese families throughout Central and South America, as well as the Caribbean.

Members of the Argentine Jewish community hold up pictures of the victims of the 1994 AMIA Hezbollah attack during the commemoration of the 14th anniversary of the attack in Buenos Aires. The AMIA attack was the first terrorist attack by Hezbollah outside of Lebanon or the Middle East. Since then, Hezbollah terror networks in Latin America have morphed into transnational criminal organizations, with important operations in Venezuela. Picture

taken on July 18, 2008.

Throughout the years, Hezbollah's ESO has morphed from merely a terrorist network in Latin America to engage in the region's most lucrative illicit enterprise: narcotics. Of the more than two thousand individuals and entities around the world designated by the US government as foreign narcotics kingpins, almost two hundred are affiliated with or connected to Hezbollah. [6] Its growing involvement in massive money-laundering schemes and multi-ton shipments of cocaine led the Drug Enforcement Administration (DEA) to name a subunit of Hezbollah's ESO that is sometimes referred to as the "Business Affairs Component," or BAC. [7]

Hezbollah's involvement in drug trafficking is not new. Its criminal activities were established by the same founder as the ESO, Imad Mugniyeh, the deceased Hezbollah leader who is also implicated in the AMIA terrorist attack in Argentina. Hezbollah's transnational crime portfolio is currently led by the secretary general's cousin and Hezbollah's envoy to Iran, Abdallah Safieddine, who shares this portfolio with Adham Hussein Tabaja. [8] A prominent Hezbollah member who owns its media propaganda arm, Tabaja has set up many investment mechanisms and cash- and credit-intensive businesses to launder Hezbollah's illicit proceeds. The most notable is Al-Inmaa Engineering and Contracting, based in Lebanon and Iraq, whose financial manager, Jihad Muhammad Qansu, has a Venezuelan passport. [9] Together, Tabaja and Safieddine are tied to a vast transnational criminal network that includes an array of businesses in Latin America—namely in textiles, beef, charcoal, electronics, tourism, real estate, and construction—used to launder Hezbollah's illicit funds. In October 2018, the Justice Department elevated Hezbollah's status in the United States by listing it as one of the top five transnational criminal organizations (TCO). [10] Naming Hezbollah alongside three major Mexican cartels and the Central American gang MS-13 was a wake-up call for Latin America to realize that, in today's age, Hezbollah is equal to the cartels in organized crime and terror.

The National Defense University (NDU) has been ahead of the curve in assessing the convergence of organized crime and terrorism. In the foreword to NDU's seminal 2013 publication on the topic, the former NATO Supreme Allied Commander and Atlantic Council board member Admiral James Staviridis described the convergence.[11]

> [Transnational] organizations are a large part of the hybrid threat that forms the nexus of illicit drug trafficking—including routes, profits, and corruptive influences—and terrorism, both homegrown as well as imported Islamic terrorism…They have achieved a degree of globalized outreach and collaboration via networks, as well as horizontal diversification.

This description is apt for Hezbollah, which inherently has a multidimensional model for its organizational structure with foreign relations and social-service sectors, a political party, and media groups— but blends these legitimate activities with its clandestine illicit networks, both in Lebanon and worldwide. Most of the Lebanese diaspora worldwide is not involved in these criminal or terrorist activities; however, given that approximately 14 percent of Lebanon's gross domestic product (GDP) comes from remittances, Hezbollah's ESO is actively infiltrating these communities to build financial support networks abroad.[12] In Latin America, these support networks are nested primarily in Lebanese and Arab communities, of which the largest in the region reside in Brazil, Argentina, Colombia, and Venezuela.

**Hezbollah's Support Network in Venezuela and Ties to the Maduro Regime**

For more than one hundred and fifty years, waves of mass migration arrived from Lebanon, Syria, and Armenia to Venezuela. The first wave arrived in the late nineteenth century, during the Ottoman era.[13] In the early twentieth century, another wave of mass migration arrived in Venezuela from Lebanon, mostly Maronite Christians, who settled largely in Margarita Island, Puerto Cabello, Punto Fijo, and La Guaira.[14] By 1975, at the onset of the Lebanese civil war, Venezuela became well known as a prominent destination for those seeking to escape the harsh conditions of the war.

Venezuela's vibrant economy and relatively high standard of living at the time offered a beacon for many Lebanese. While many in the Lebanese-Venezuelan community have made significant contributions to society, this historic refugee route to Venezuela was exploited by Hezbollah to build support networks. Often without the larger Lebanese community aware of this clandestine activity, an "army" of logistical professionals—entrepreneurs, lawyers, accountants, and others—emerged within the diaspora as a support network in Venezuela who help to raise, conceal, move, and launder illicit funds for Hezbollah, some of which is used to advance its terror operations worldwide (as shown in the "Saleh Clan" subsection below).

In Venezuela, Hezbollah's support network operates through compartmentalized, familial clan structures that embed into the Maduro regime-controlled illicit economy and the regime's political apparatus and bureaucracy. Many of the clans are assimilated within the Venezuelan state and society through the robust Lebanese and Syrian communities that extend to neighboring Colombia.

*The Saleh Clan*

Hezbollah's crime-terror network in Colombia and Venezuela was revealed in 2011 after a two-year investigation that resulted in one hundred and thirty arrests and the seizure of $23 million of illicit funds moved through West Africa into Lebanon through the Lebanese Canadian Bank.[15] In one of the most significant cases on trade-based money laundering, Operation Titan took down a transregional cocaine-trafficking and mass money-laundering ring run by Hezbollah through local facilitators in Colombia, led by Ayman Saied Joumaa. A Colombian-Lebanese drug kingpin, Ayman Joumaa, was indicted in the United States

by a federal grand jury for trafficking cocaine with Los Zetas in Mexico and, according to the Treasury Department, runs an extensive maritime shipping network tied to Hezbollah.[16]

Operation Titan started in 2008 when US and Colombian investigators were targeting a Medellín-based cartel called *La Oficina de Envigado*, or "*La Oficina.*"[17] Over the two-year investigation, authorities unraveled the many connections *La Oficina* had with the large Lebanese community along the Caribbean coast in Colombia.[18] These connections were strengthened by Hezbollah facilitators who established a complex maze of cross-border trade and bulk-cash couriers between Colombia and Venezuela.

A prominent Shia businessman and Hezbollah operative, Ali Mohamad Saleh, led the cross-border crime-terror network in Colombia and Venezuela uncovered during Operation Titan. Ali Mohamad and his brother, Kassem Mohamad Saleh, were designated as terror financiers in 2012 by Treasury's Office of Foreign Assets Control (OFAC), while Ali Mohamad Saleh was also designated as a narcotics kingpin a year earlier. For many years, the Saleh clan controlled the illicit markets for drugs, weapons, contraband, bulk-cash smuggling, and money laundering in Maicao, Colombia (see below for more on Maicao) close to the northern border with Venezuela. Local drug cartels in western Venezuela controlled by members of the Maduro regime, prominently in Zulia State, benefit from this illicit cross-border trade once managed by the Saleh clan.[19] According to shopkeepers in Maicao, the Saleh brothers fled overnight to Venezuela after being sanctioned in 2012, and are now reportedly in Maracaibo working with another prominent Lebanese clan embedded into the Maduro regime bureaucracy.[20]

Created by: The Center for a Secure Free Society. Designed by: The Atlantic Council.

*The Nassereddine Clan*

Ghazi Nassereddine was sanctioned by OFAC in 2008 for his ties to Hezbollah and listed as a person of interest by the Federal Bureau of Investigation (FBI) in 2015. [21] Ghazi's older brother, Abdallah Nassereddine, is a prominent businessman on Margarita Island who owns several real-estate properties and commercial centers on the once-

popular vacation destination in Venezuela.[22] Originally from Lebanon, the Nasserredine clan rose to political prominence in Venezuela once Hugo Chávez became president. Ghazi entered the Foreign Ministry in Venezuela, attaining official diplomatic status, and Abdallah became an important, although low-profile, figure in the United Socialist Party of Venezuela (PSUV), serving as a regional coordinator for Nueva Esparta State.[23]

While stationed at the Bolivarian Republic's embassy in Damascus, Syria, Ghazi Nassereddine helped arrange meetings between senior Venezuelan officials and high-ranking Hezbollah operatives. According to DEA informants, in or about 2009, Ghazi fixed a meeting in Syria between Hezbollah and Venezuela's then-Interior Minister Tareck El Aissami, and the Venezuelan military counterintelligence chief, Hugo Carvajal Barrios.[24] The meeting allegedly prompted a cocaine-for-weapons scheme between the FARC and Hezbollah that materialized in 2014 when a Lebanese cargo plane full of small arms (AK-103s, rocket-propelled grenade launchers, etc.) arrived at the presidential hangar (rampa 4) of the Maiquetia International Airport in Caracas.[25] The weapons were reportedly a partial payment for the cocaine the FARC provided to the Maduro regime, and was transferred to a military base in Guárico, Venezuela.

Still a close associate of Nicolás Maduro, the former diplomat Ghazi Nassereddine currently runs the Venezuelan think tank Global AZ and has taken several trips to France, Germany, and Italy since leaving Syria in 2011.[26] Other members of the Nassereddine clan are suspected of running political indoctrination, paramilitary training, and weapons and drug smuggling in Venezuela. One Nassereddine clan member is also believed to be in charge of security for Venezuela's current Minister of Petroleum and former Vice President Tareck El Aissami.[27]

In the counterterrorism lexicon, the Nassereddine clan would be characterized as "fixers"—or, in the case of Ghazi, a "super fixer"—because the members aren't part of Hezbollah's hierarchical chain of command, but are integral to organizing support networks in Venezuela that connect Hezbollah to the Maduro regime. These fixers provide distance and a measure of deniability for Hezbollah leaders to hide their connection to the Maduro regime, and establish pathways to the regime's bureaucracy and political apparatus in Venezuela.

*The Rada Clan*

The city of Maicao is a historic commercial hub in La Guajira department in Colombia, with a large concentration of Lebanese immigrants dating back to the nineteenth century. In 2017, Colombian immigration authorities deported one of its residents, a Hezbollah financier and Venezuelan-Lebanese dual national, Abdala Rada Ramel, who was suspected of running a drug-trafficking and contraband-smuggling ring from Maicao to Cartagena. [28]

He is a prominent member of the Rada clan, known to have close ties to a high-level Hezbollah leader. According to *Semana*, a well-known Colombian magazine, in his initial interrogation, Abdala Rada Ramel revealed that his illicit activities in Colombia were in coordination with his "supervisor" Salman Raouf Salman, a shadowy Hezbollah ESO leader who has been implicated in numerous terrorist operations worldwide. [29]

Cutting his teeth in Argentina as Hezbollah's on-the-ground coordinator for both bombings in Buenos Aires in 1992 and 1994, Salman Raouf Salman—whose alias is Samuel Salman El Reda El Reda—continues to direct Hezbollah's ESO crime-terror network in Latin America, including in Venezuela. [30] With an international arrest warrant issued by Argentina in 2009, an OFAC terrorist designation in 2019, and a $7 million reward for information leading to his capture, Salman Raouf Salman, along with his brother Jose Salman El Reda El Reda, is credited with building Hezbollah's support networks in Latin America. [31]

Salman Raouf Salman's ties to the Rada clan date back to the 1994 AMIA attack. Argentine authorities suspect a Venezuelan-Lebanese dual national named Amer Mohamed Akil Rada of being involved in the Hezbollah attack of the AMIA building. [32] Amer Mohamed, who is also suspected of being involved in the 1992 terrorist bombing of the Israeli embassy in Buenos Aires, is alleged to have worked closely with Salman Raouf Salman throughout the 1990s to case various targets for Hezbollah's ESO in Argentina, Brazil, Colombia, and Venezuela.

Decades later, a fifty-three-year-old Amer Mohamed Akil Rada, has set up small import-export businesses in Panama, sending textiles to Colombia and charcoal to Lebanon, with as much as 80 percent of the proceeds used to support Hezbollah. [33] In counternarcotics circles, charcoal is often called "black cocaine" because it is frequently used to disguise the

transfer of cocaine.[34] Akil Rada's relatives continue to operate in Venezuela and are involved in the cryptocurrency industry, which is controlled by the Maduro regime.[35] Joselit de la Trinidad Ramirez Camacho, the Maduro regime's crypto chief responsible for the state-backed petro, was recently indicted by DOJ and has a $5-million bounty for helping regime officials evade OFAC sanctions.[36] The indictment states that Ramirez Camacho has "deep political, social, and economic ties to multiple alleged narcotics kingpins, including Tareck El Aissami."[37] The Rada clan connections to the Maduro regime are nested in this relationship with Tareck El Aissami.

The Rada, Saleh, and Nassereddine clans are part of a much larger global illicit network of fixers, financiers, and facilitators for Hezbollah, operating out of Venezuela with protection from the Maduro regime. Members of two of the three clans have been designated by the US Treasury Department as global terrorists for their ties to Hezbollah.[38] Unlike the Nassereddine clan, members of the Rada clan and Saleh clan are not formally a part of the Maduro regime; however, they each manage aspects of the illicit economies of drugs, weapons, contraband, smuggling, and money laundering between Venezuela, Lebanon, and Syria. Each provides a specific service and comparative advantage for connecting Hezbollah to the Maduro regime, acting as "convergence points" to the regime-controlled illicit economy and specific sectors of its licit economy, establishing a degree of plausible deniability for both the Maduro regime and Hezbollah's leadership, which both deny any direct cooperation.[39]

The US-Colombia joint Operation Titan, which, by 2014, led to ten separate but interrelated kingpin designations by OFAC and three federal indictments by DOJ, described some of these convergence points that established air and sea bridges between Venezuela, Iran, and Hezbollah.[40] As the US "maximum pressure" campaign ensues, this bridge becomes increasingly important to maintain a transregional threat network that enables Iran and Hezbollah to prop up the Nicolás Maduro regime in Venezuela and the Bashar al-Assad regime in Syria.

**From Syria to Venezuela**

Iran and Hezbollah's support to the Maduro regime in Venezuela follows the strategy of its support to Bashar al-Assad in Syria to protect the logistical foothold of Iran's land bridge through the Levant**.** In Venezuela, the logistical air bridge between Caracas, Damascus, and Tehran is what Maduro protects and has served profitable for Hezbollah and Iran.

In southwestern Syria, more than three hundred thousand Venezuelans reside in a city called As-Suwayda. [41] Many of them dual nationals, comprising almost two thirds of the primarily Druze governorate in Syria

also called As-Suwayda. Known in Syria as "little Venezuela," As-Suwayda is currently occupied by Russian military forces, Iran's Islamic Revolutionary Guard Corps (IRGC), and Hezbollah militants that are affiliated with 60 percent of all armed groups in the province defending Bashar al-Assad. [42]

Hezbollah's defense of the Assad regime in Syria is controversial in Lebanon. Since Hezbollah's inception, Secretary General Hassan Nasrallah insists on denying the group's growing global footprint in the world of transnational organized crime in order to maintain legitimacy in Lebanon—even to the point of admitting Hezbollah's financial support from Iran in order to distract from its other illicit sources of revenue. [43] Along these same lines, Nasrallah repeatedly emphasized that Hezbollah has no interests outside of Lebanon. But, in 2013, he publicly confirmed Hezbollah's support of the Assad regime, in a speech in which he called Syria the "backbone" of the axis of resistance. [44] This public support broke with decades of denial, and laid bare Hezbollah's global interests outside of Lebanon.

Across the Atlantic, similar support is mounting by Iran and Hezbollah for the Maduro regime in Venezuela. [45] Venezuela's strategic location in South America and at the crossroads of the Caribbean provides Iran and Hezbollah with an ability to diminish their geographic disadvantage against the United States. To hide this relationship, Chávez, and then the Maduro regime, provided dual identities to some Middle Easterners, building a clandestine network that provides intelligence, training, funds, weapons, supplies, and know-how to both the Maduro and Assad regimes. [46]

Iran's Foreign Minister Mohammad Javad Zarif and Jorge Arreaza shake hands and pose for a photo during the Ministerial Meeting of the Non-Aligned Movement Coordinating Bureau in Caracas, Venezuela. The dual-use nature of Iran's cooperation with the Maduro regime, layered with the illicit finance connections of its facilitators and Hezbollah's established crime-terror network in Venezuela requires a robust response from the international community. Picture taken July 20, 2019.

The aforementioned Lebanese-Venezuelan-Colombian clans are part of this transregional threat network that provides support to Hezbollah's illicit activities and, equally, establishes a logistical base in Venezuela that allows the Maduro regime and associated criminal groups, including FARC dissidents and ELN guerrillas, to expand their operations.[47] The Maduro regime's reliance on illicit networks is enhanced by Hezbollah's transregional nature, while the Lebanese terror group benefits from state support in Venezuela to move its illicit funds and personnel in and out of the region. Combined, Hezbollah has helped the Maduro regime become the central hub for the convergence of transnational organized crime and international terrorism in the Western Hemisphere, multiplying the logistical and financial benefits for both.

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 496 of 632

Created by: The Center for a Secure Free Society. Designed by:
The Atlantic Council.

**Pariah States: Iran and Venezuela**

Recent nationwide shortages of gasoline have added to the complexity of
the crisis in Venezuela. Despite having the largest reserves of petroleum
in the world, the state-owned oil enterprise, Petroleós de Venezuela
(PDVSA), cannot refine its heavy crude due to mismanagement and
corruption, leading to mass shortages and pent-up demand. In April 2020,

the Maduro regime turned to Iran to partner in helping fix the oil refineries on the Paraguana peninsula, and to provide much-needed fuel to Venezuela. The newly minted oil minister, Tareck El Aissami, and the regime's special envoy to Iran, Lebanese-Colombian businessman Alex Saab, seemingly worked out a gold-for-gas deal with Tehran. [48]

Shortly after, in a period of a month and a half, the Iranian airline, Mahan Air, flew seventeen flights and the National Iranian Oil Company (NIOC) sailed five tankers from Iran to Venezuela to provide parts from China, Iranian technicians, and approximately 1.5 million barrels of gasoline to the fuel-starved Maduro regime. [49] Months later, the refineries on the Paraguana peninsula still do not operate, and Venezuela is once again facing fuel shortages. But, according to Bloomberg, the Islamic Republic received almost half a billion dollars' worth (nine tons) of gold bars as payment. [50]

The Iranian entities involved in this reported gold-for-gas scheme—namely Mahan Air, NIOC, and the Islamic Republic of Iran Shipping Lines (IRISL)— are all sanctioned by OFAC for connections to Iran's feared clerical army, the Islamic Revolutionary Guard Corps (IRGC). The nature of the IRGC and these state-owned or controlled entities raises a concern for potential dual-use operations, which have less of a commercial or humanitarian intent and are more militaristic in their ambitions. [51] A civil-forfeiture complaint filed in a district court in Washington, DC, suggests that the IRGC is behind the fuel shipments to Venezuela, citing the corporate records of four additional Liberian-flagged tankers from Iran that were stopped from arriving in Venezuela. [52] The contents of these tankers were seized by the United States in what has been described as the "largest U.S. seizure of Iranian fuel" to date. [53]

Much like in Syria, the IRGC's ability to operate in Venezuela is due to the heightened capability of Hezbollah's support network. Hezbollah's influence within, and infiltration of, Lebanese expat communities gives Iran a gateway to grow its footprint in Venezuela. Prominent businessmen, such as Alex Saab, are needed to facilitate this relationship with Iran because of their language, culture, and in-depth understanding of the Middle East. The June 2020 arrest in Cape Verde, off the coast of West Africa, and possible extradition of Saab to the United States for eight counts of money laundering has forced the Maduro regime to turn to other facilitators to manage the Iran portfolio.

One likely candidate is Lebanese-Venezuelan businessman Majed Khalil Mazjoub, who, along with his brother, Khaled, has amassed an empire in Venezuela in the shadows of the Chávez and Maduro regimes. [54] The Khalil Mazjoub brothers also reportedly received many preferential business deals from the Evo Morales regime in Bolivia, according to a 2017 legislative investigation by a Bolivian senator. [55] Immigration records from Bolivia show that Khaled Khalil Mazjoub traveled to La Paz at least seven times in the last five years, including a trip to Bolivia with his brother in 2015. [56] A close relative of the Khalil Mazjoub brothers in Lebanon, former Lebanese Finance Minister Ali Hassan Khalil, was recently sanctioned by OFAC for his "material support to Hezbollah" and other corruption charges. [57] A master of Middle Eastern networking with intimate knowledge of Venezuelan kleptocracy, Majed Khalil Mazjoub has the trust, access, and placement in Venezuela to help Iran and the Maduro regime continue their strategic cooperation should Alex Saab be sent to a US prison.

The dual-use nature of Iran's cooperation with the Maduro regime, layered with the illicit finance connections of its facilitators and Hezbollah's established crime-terror network in Venezuela, creates a tier-one national security concern for the United States—one that is multifaceted and requires a robust response.



Part of this cooperation is a new Iranian supermarket called "Megasis," launched in Caracas in July. According to the *Wall Street Journal*, the

supermarket is an offshoot of an Iranian retail chain, Etka, that is a subsidiary of the Ministry of Defense and Armed Forces Logistics (MODAFL) in Iran. [58] For the last fourteen years, the MODAFL has partnered with Venezuela's defense-logistics agency, the Venezuelan Company of Military Industries (CAVIM), setting up opaque military projects and shielding financial transfers through PDVSA's commercial exchange with China. [59]

The dual-use nature of Iran's cooperation with the Maduro regime, layered with the illicit finance connections of its facilitators and Hezbollah's established crime-terror network in Venezuela, creates a tier-one national security concern for the United States—one that is multifaceted and requires a robust response.

**Policy Recommendations**

The United States' "maximum pressure" policy, in effect since January 2019, has focused on eroding the political and economic support of the Maduro regime. Still, the regime has proven resilient because it relies on external state and non-state actors. Unlike Colombia's FARC or ELN, Hezbollah is one of the less visible non-state actors helping the Maduro regime, but an important one nonetheless.

Understanding the nature of how Hezbollah operates in Venezuela, through the lens of threat-convergence theory, is critical for US, European, and Latin American efforts focused on finding a solution to the crisis in Venezuela. In order to neutralize the threat, the United States must engage in a counter-threat network approach that equally attacks convergence points throughout the world from which Iran, Hezbollah, and the Maduro regime benefit. However, the international community should combine these targeted actions with a global narrative that delegitimizes Hezbollah's presence in the region, with the goal of diminishing the terrorist group's influence in the larger Lebanese communities in Latin America.

Any strategy that aims to diminish Hezbollah's influence in Latin America must work with the Lebanese diaspora that is as much a victim as it is the target of Hezbollah's illicit activities. The following actions follow this strategy.

1. The United States has been helping to boost regional counterterrorism cooperation in recent years through hemispheric ministerial forums

that have led to the first four Hezbollah terror designations in Latin America.[60] Under current conditions of COVID-19, the momentum for these forums has stalled, but the importance of the designations remains. The designation of Hezbollah as a terrorist organization is critical to ensuring that each country criminalizes the act of membership or support of Hezbollah, so that local authorities can prevent potential terrorist actions before they take place. **Thus, continuing with these Hemispheric Counterterrorism Ministerial Conferences will help to ensure that the regional counterterrorism coalition strengthens.**

The hemispheric ministerial forums were essential in building a broader coalition of countries in Latin America that supports these terror designations. Through a total of three forums from December 2018 to January 2020, this effort has grown a coalition of eighteen participating and four observing nations, as well as the participation of the United Nations (UN), the Organization of American States (OAS), the International Criminal Police Organization (INTERPOL), and the Police Community of the Americas (AMERIPOL). Each forum built on the success of the last to establish a regional consensus on the concern of the Hezbollah network's activities in Latin America, officially declared through a joint communique.[61] This document helped reinforce existing terror designations of Hezbollah in Latin America and catalyze new countries to consider doing the same.

2.  A primary conduit of the convergence of organized crime and international terrorism is illicit finance. Financial-intelligence units (FIUs) are the nerve center of a government's ability to collect, analyze, and report on suspicious

activity related to money laundering, corruption, terror finance, and other financial crimes. FIUs have played an outsized role in helping to shut down the illicit financial networks of Hezbollah and its sympathizers worldwide. In the absence of adequate antiterrorism legislation in Latin America, the FIUs have established many mechanisms to cooperate on regional counter-terror-finance efforts. **This FIU cooperation in the Americas should be expanded to Gulf states in the Middle East—namely the United Arab Emirates (UAE), Bahrain, Kuwait, and Oman—that oversee well-known money-laundering jurisdictions widely and constantly used by Iran and Hezbollah.** United Nations Security Council Resolution 2462 provides an impetus for this cooperation.

3. **The US State Department (and Commerce Department), in coordination with the Department of Homeland Security International Trade Office, should establish a robust public-diplomacy campaign with Lebanese and other Arab communities throughout Latin America, to build partnerships aimed at weeding out Hezbollah's malign influence.** Such partnerships would need to be multifaceted, with commercial cooperation, cultural exchange, customs enforcement, and media partnerships aimed at anti-corruption initiatives that help legitimate businessmen stay away

from the perverse incentives that Hezbollah or any other illicit actors could offer. Many in the broader Lebanese communities in Latin America are eager to participate in efforts that help build credibility to reduce the reputational risk of their commercial activity.

4. **The Organization of American States could adopt a convergence task force that works on identifying convergence points where Hezbollah and other crime-terror networks operate in Latin America and the Caribbean.** This could be part of the OAS Inter-American Network on Counterterrorism, a project created in 2019 and aimed at strengthening cooperation to prevent and address terrorist threats in the Western Hemisphere. The goal of the convergence task force should be to share real-time information on the logistical networks (persons and entities) that help both the Maduro regime and Hezbollah.

The Iran and Hezbollah nexus in Venezuela, first under Chávez and now with Maduro, has been underestimated by the international community for far too long. The findings in this report demonstrate that these connections exist and are mutually beneficial, allowing Hezbollah a safe space to conduct its global crime-terror operations and providing the Maduro regime with increased illicit support from the Middle East. Curtailing the Maduro-Iran-Hezbollah cooperation is a critical step in stemming illicit networks that are helping to sustain the Maduro regime and prolonging the Western Hemisphere's worst humanitarian crisis.

**DOWNLOAD PDF**





HOME    NEWS    COUNTRIES    INVESTIGATIONS    CRIMINAL ACTORS    INDEPTH

Home > News > Brief > Brazil's PCC is Recruiting FARC Dissidents: Colombia Defense Minister



**BRIEF**

# Brazil's PCC is Recruiting FAR Dissidents: Colombia Defense Minister

**EX-FARC MAFIA** / 1 FEB 2017 BY LEONARDO GOI          EN    

Brazil's largest criminal organization is reportedly recruiting dissident FARC guerrillas in order to broaden its drug trafficking operations in the region, but the group will face several challenges if it is attempting to expand its presence in Colombia.

Colombian Defense Minister Luis Carlos Villegas told the Wall Street Journal that the First Capital Command (Primeiro Comando da Capital – PCC) is offering jobs to dissidents of the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia – FARC). The PCC, a powerful prison gang established in Brazil in the early 1990s, is allegedly courting FARC dissidents in an effort to obtain heavy weapons and military training needed to fight against Brazil's armed forces, while also hoping to expand into Colombian territory, security experts told the Journal.

On Tuesday, January 31, Villegas met in Amazonian city of Manaus with Brazilian Defense Minister Raúl Jungmann. The agenda touched upon the peace treaty signed between the FARC and the Colombian government, and the growing threat that organized crime groups pose to the security of the two countries. The ministers have agreed to work together to eradicate transnational criminal organizations operating along their shared 1,600 kilometer border.

## InSight Crime Analysis

While the PCC's efforts to recruit FARC soldiers are a sign that the group is trying to intensify its operations in Colombian territory, the gang's alleged plan will likely face a number of obstacles.

**SEE ALSO:** PCC News and Profile

### Tags

EX-FARC MAFIA

FARC

FARC PEACE

PCC

Was this c helpful?

We want to su America's larg crime databas to do so, we n

DONATE

First, Colombia's southeast border is highly competitive criminal territory. The PCC will likely confront other organized crime groups that are looking for ways to fill the power vacuum created by the FARC's demobilization. In fact, the Urabeños criminal organization have already reportedly begun offering FARC soldiers a salary of 1,800,000 Colombian pesos (approximately $600) to join their ranks, in an effort to take control of the guerrilla's drug trafficking and illegal mining businesses.

What's more, the PCC is not the only Brazilian group with connections to the FARC that may be looking to take advantage of the guerrilla demobilization.

"The FARC's principal commercial alliance in northern Brazil currently sits with Família do Norte (FDN), not PCC," Lloyd Belton, a political and country risk analyst at S-RM, told InSight Crime.

EX-FARC MAFIA    FARC    FARC PEACE    PCC

share    *facebook* *twitter* *linkedin*

## Was this content helpful?

We want to sustain Latin America's largest organized crime database, but in order to do so, we need resources.

DONATE

---

**What are your thoughts? Click here to send InSight Crime your comments.**

We encourage readers to copy and distribute our work for non-commercial purposes, with attribution to InSight Crime in the byline and links to the original at both the top and bottom of the article. Check the Creative Commons website for more details of how to share our work, and please send us an email if you use an article.

# Latest News



### Vigilante Death Squad Sends Bloody Message in Brazil-Paraguay Border Region

**NEWS** / 9 AUG 2021

### Are El Koki and His Gang Members No Longer Safe in Venezuela?

**NEWS** / 6 AUG 2021

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 507 of 632

# Related Content



### How Colombia Peace Crisis Could Shake Up Criminal Landscape

**COLOMBIA** / 6 OCT 2016

Colombia's surprise rejection of a peace agreement between the government and the hemisphere's longest-running insurgency could push rebel factions to...



### Relatives of Jailed PCC Members Launder Millions For Brazil Gang

**BRAZIL** / 11 JUL 2019

Brazilian prison gang the PCC has laundered an estimated $15 million of drug money through accounts opened by relatives of...



### 82% of Colombia F FARC Say MinDef. F

**COLOMBIA** / 29 MAY 2015

Authorities in Colombia claim FARC's presence has been red percent of national territory, a

# About InSight Crime

A



NICARAGUA   COLOMBIA   HONDURAS

THE ORGANIZATION

### Unraveling the Web of Elites Connected to Organized Crime

27 JUL 2021

InSight Crime published Elites and Organized Crime in Nicaragua, a d into the relationships between criminal actors and elites in that Cent American nation.

○ ○ ○ ○ ○

## Stay Informed with Weekly InSight

Get fresh updates on organized crime from across the region delivered to your inbox.

We go into the field to interview, report and investigate. We then verify, write and edit, providing the tools to generate real impact.

*Our work is costly and high risk. Please support our mission investigating organized crime.*

--> 

ABOUT US

OUR MISSION

WHAT MAKES US DIFFERENT

DIRECTORS AND TEAM

SITEMAP

HOME

NEWS

COUNTRIES

INVESTIGATIONS

CRIMINAL ACTORS

INDEPTH

INFORMATION PROCESS

PRIVACY POLICY

REFUND POLICY

CONTACT US



Creative Commons Attribu Noncommercial 3.0 Unpor







Privacy - Terms

DONATE

# Assad Ahmad Barakat



Assad Ahmad Barakat is a U.S.-designated key Hezbollah financier who has operated in the Tri-Border Area (TBA) of South America—the region that straddles the borders of Paraguay, Brazil, and Argentina.

next extremist

return to full database

previous extremist

Choose a section:

Jump to…

# Overview

Assad Ahmad Barakat is a U.S.-designated key Hezbollah financier who has operated in the Tri-Border Area (TBA) of South America—the region that straddles the borders of Paraguay, Brazil, and Argentina. • Barakat, who has close ties with Hezbollah's leadership, was the group's chief of military operations and fundraising in the TBA in the 1990s. • He operated Hezbollah's financial network in the region, and owned several businesses of his own that conducted money laundering activities to generate funds for the group. • Barakat was indicted by Paraguay in 2001, and served a six-and-a-half-year prison sentence in the country after he was arrested in Brazil in 2002. • He was released from Paraguayan custody in 2009. • He is wanted by Paraguayan authorities for identity theft and by Argentine authorities for money laundering on behalf of Hezbollah in an Argentine casino. In September 2018, Brazilian police arrested Barakat near the Paraguayan and Argentine borders. • He was extradited to Paraguay in July 2020. •

DONATE

conducted money laundering schemes to generate funds for Hezbollah. • Barakat also operated additional businesses based in Lebanon, Chile, and the United States, at times with the assistance of his brothers Hatem and Hamzi. • He also collected funds for Hezbollah by pressuring Lebanese shopkeepers in the TBA to pay a quota to the group under threat of putting their family members on a "Hezbollah blacklist." • Barakat regularly sent large sums of money to the group in Lebanon and Iran and even personally carried funds to Lebanon, traveling with a Paraguayan passport as of 2000. •

In addition to his direct fundraising roles, Barakat reportedly served as the deputy financial director of a mosque in Brazil, as the deputy for another Hezbollah financial official, Ali Muhammad Kazan, and eventually as the primary liaison in the TBA for Hezbollah's Secretary General Hassan Nasrallah. • He was also reportedly one of two individuals in charge of distributing counterfeit U.S. currency in the TBA. • As of 2001, Barakat reportedly traveled to Lebanon and Iran annually to meet with Hezbollah's leadership. •

## Background

| | |
|---|---|
| Date of Birth | Education |
| **March 25, 1967** | **Not determined.** |
| Place of birth | Citizenship |
| **Lebanon** | **Lebanese** |
| Place of residence | Arrested |
| **Paraguay (in custody)** | **06/2002: tax evasion; 09/2018: identity theft** |
| Extremist Use of Social Media | |
| **Not determined.** | Custody |
| | **Paraguayan** |

Barakat was also involved in planning Hezbollah's military operations. He was an organizer and key financier of Hezbollah's 1994 bombing of the AMIA Jewish community center in Buenos Aires that killed 85 people and injured over 300. • Barakat relayed information to Hezbollah's leadership about Arabs in the TBA who traveled to the United States or Israel. He regularly hosted and attended meetings with other senior Hezbollah leaders in the TBA, such as one meeting in Brazil in the fall of 2000 at which they discussed potential assassination plots. Authorities later discovered videos on Barakat's personal computer of violent Hezbollah military operations in Lebanon. •

In 2001, Paraguay indicted Barakat on charges of association, abetment of crime, and tax evasion, and an international warrant was issued for his arrest. In response, Barakat fled the TBA that October. • However, he was arrested by Brazilian authorities in Foz do Iguaçu, Brazil,

DONATE

Barakat was designated as a Specially Designated Global Terrorist by the U.S. Department of the Treasury on June 10, 2004. Two of his businesses, Casa Apollo and Barakat Import Export Ltda., were also designated at the time for their involvement in generating support for Hezbollah. •

Barakat was released from Paraguayan custody in 2009, though Paraguay reportedly lost track of his whereabouts since. • According to the Brazilian Federal Police, Barakat continued to operate on behalf of Hezbollah in Argentina, Brazil, and Chile. Argentine police accused him of money laundering at a casino in the Argentine city of Puerto Iguazu. In August 2018, Brazil's supreme court authorized Barakat's arrest after Paraguay issued an arrest warrant. On September 21, 2018, Brazilian police announced they had arrested Barakat in Foz do Iguaco, Brazil, near the border with Paraguay and Argentina. •

Extremist entity

**Hezbollah**

Read Threat Report

**Type(s) of Organization:**

Militia, political party, social-service provider, terrorist, transnational, violent

**Ideologies and Affiliations:**

Iranian-sponsored, Islamist, jihadist, Khomeinist, Shiite

**Position(s):**

Hezbollah financier

# Also Known As

- Assaad Ahmad Barakat •
- Assad Ahmed Muhammad Barakat •
- Assad Hassan Barakat •
- Assad Barakat •
- Hajj As'ad Ahmad Barakat
- Jach Assad Ahmad Barakat •

# History

Mid-1980s

## Immigrates to Paraguay to escape the Lebanese Civil War.

Source: "Terrorist and Organized Crime Groups in the Tri-Border Area (TBA) of South America," Library of Congress, July 2003, 2, 20, https://www.loc.gov/rr/frd/pdf-files/TerrOrgCrime_T-BA.pdf.

DONATE

**1990S**

Serves as the chief of Hezbollah's fundraising and military operations in the TBA.

**Hezbollah operatives bomb the AMIA Jewish community center in**

**Arrested by Brazilian authorities in Foz do Iguaçu, Brazil, and**

**Immigrates to Paraguay to escape the Lebanese Civil War.**

**Attends a other seni leaders in**

**Extradited to Paraguay, where he is imprisoned**

**Serves as the chief of Hezbollah's fundraising and military operations in**

**Indicted in F charges of a abetment of**

**Designated as a S Designated Globa Terrorist by the U.**

1980 1990 **2000**

# Designations

## United States

The U.S. Department of the Treasury designated "Assad Ahmad Barakat" as a Specially Designated Global Terrorist pursuant to Executive Order (E.O.) 13224 on June 10, 2004. *

Return to Full Database

Take action:

**HELP COUNTER EXTREMISM**

**STAY UPDATED ON THE LATEST**

Email Address

Full Name

Submit

DONATE

## Fact:

On August 9, 2020, gunmen on motorbikes ambushed and killed six French aid workers and two Nigerien guides at the Kouré Giraffe Reserve in Niger. Though there was no immediate claim of responsibility, jihadists linked to either ISIS or al-Qaeda were suspected.



View Archive

## CEP on Twitter

August 9, 2021 - 9:11am                    August 9, 2021 - 9:06am

RT @nytimes: The Taliban's swift advance     RT @VOA_Extremism:
in recent days, gaining control over          in Mali Village Raids, D
several provincial Afghan capitals, signals    https://t.co/JD6OKDl
the start of a br…



Email Address

Subscribe

DONATE

New York

London

CEP Germany

  



Contact | Privacy and Terms of Use | Copyright Policy

DONATE



Stay up to
date on our
latest news.

Get the latest news on
extremism and counter-
extremism delivered to your
inbox.

○ Eye on Extremism
(Daily)

○ General Interest
(Weekly)

● Both

Subscribe

OVERVIEW

AND FOREIGN
FIGHTERS

AND TERRORIST
INCIDENTS

DOMES
COUNT
EXTREM

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 516 of 632

# Overview

<p>Although Brazil has experienced no major terrorist attacks in recent years, numerous extremist groups have established an active presence within its borders. Multiple neo-Nazi groups operate in southern Brazil, including Carecas do Subúrbio, Carecas do ABC, and White Power. Brazil has also seen a rise in Islamic extremism, with reports of <a href="http://www.counterextremism.com/threat/hezbollah">Hezbollah</a&gt;, <a href="http://www.counterextremism.com/threat/al-qaeda">al-Qaeda</a&gt;, and <a href="http://www.counterextremism.com/threat/hamas">Hamas</a&gt; recruiting, planning attacks, and fundraising from within the country. (Sources: <em><a href="http://www.haaretz.com/brazil-thwarts-neo-nazi-bomb-plot-1.276586">Haar…;, <em><a href="http://thebrazilbusiness.com/article/terrorism-in-brazil">Brazil Business</a></em>, <a href="https://www.loc.gov/rr/frd/pdf-files/TerrOrgCrime_TBA.pdf">Library of Congress</a>)</p>

<p>Terrorist groups have established extensive smuggling networks in the <a href="https://www.counterextremism.com/press/terrorists-and-criminals-reap-mo… Area (TBA) </a> that straddles the borders of Brazil, Paraguay, and Argentina. Hezbollah operatives in the TBA have reportedly generated significant revenue from criminal enterprises in the region, which has been used to finance the activities of their counterparts in Lebanon. Brazilian criminal organizations are believed to assist Hezbollah with smuggling weapons into the country and with the attainment of explosives. (Sources: <a href="http://www.nbcnews.com/id/17874369/ns/world_news-americas/t/hezbollah-b… News</a>, <a href="https://www.treasury.gov/press-center/press-releases/Pages/tg997.aspx">…. Department of the Treasury</a>, <em><a href="http://www.jpost.com/International/Hezbollah-smuggling-weapons-to-Brazi… Post</a> </em>, <em><a href="https://oglobo.globo.com/brasil/policia-federal-aponta-elo-entre-faccao… Globo</a></em>)</p>

<p>The Brazilian government has successfully thwarted suspected terrorist attacks and disrupted terrorist finance rings as well as document forgery networks. In September 2015, Brazil&rsquo;s federal police arrested members of a money laundering group suspected of providing financial support to ISIS. In December 2015, Rio&rsquo;s civil police uncovered a document fraud network that had provided 70 authentic Brazilian birth certificates to Syrian nationals, 20 of whom managed

to secure Brazilian passports. (Source: <a
href="http://www.state.gov/documents/organization/258249.pdf">U.S. Department of State</a>)
</p>

<p>Brazil has ramped up its efforts to counter terrorism during major sporting events. In
preparation for the 2016 Summer Olympics in Rio de Janeiro, Brazilian security forces carried out
simulation exercises in bomb defusal and containing riots. Brazil also cooperated with intelligence
agencies from five other countries in order to arrest 12 suspected pro-ISIS operatives who were
planning to carry out attacks at the event. On May 4, 2017, a Brazilian judge sentenced eight of
those arrested to serve between five and 15 years in prison. Brazilian authorities were alerted to
the group by the FBI, which said the men were trying to buy weapons and had shared bomb-
making videos online. (Sources: <a
href="http://www.state.gov/documents/organization/258249.pdf">U.S. Department of State</a>,
<a href="https://www.cnn.com/2015/12/02/sport/brazil-2016-olympics-security-pari…;, <a
href="http://www.reuters.com/article/us-olympics-rio-security-operations-idUS…;, <a
href="http://www.cnn.com/2016/07/21/americas/brazil-olympics-terror-arrests/"…;, <em><a
href="http://www.telegraph.co.uk/news/2016/07/21/brazil-police-order-arrest-o…;, <a
href="https://www.state.gov/j/ct/rls/crt/2017/282846.htm#BRAZIL">U.S. Department of
State</a>, <a href="http://www.bbc.com/news/world-latin-america-39813733">BBC News</a>)
</p>



In late July 2016, Brazilian
authorities arrest 12 Brazilian
nationals suspected of planning
attacks at the Olympic Games in
the name of ISIS.

# Radicalization and Foreign Fighters

The Tri-Border Area (TBA) of South America—an area that straddles the borders of Brazil, Paraguay, and Argentina—is considered by law enforcement to be a concentrated area of criminal and terrorist activity. In 1998, then-director of the FBI Louis Freeh referred to the TBA as a "free zone for significant criminal activity, including people who are organized to commit acts of terrorism." In a July 2003 report updated in 2010, the Library of Congress said that Islamist groups have plotted attacks—as well as fundraised through drug trafficking and money laundering schemes—within the TBA. Egyptian Islamic Jihad and the Moroccan Islamic Combatant Group also operate in Brazil, according to the Brazilian Federal Police, though there is little publicly available information on their activities. (Sources: NBC News, Small Wars Journal, Library of Congress, *Brazil Business*)

## Hezbollah

Hezbollah—a Lebanese-based, Iranian-backed, terrorist group designated by the United States as a Foreign Terrorist Organization—has reportedly operated out of South America's TBA since the mid-1980s. The group is believed to recruit from a sizable local population of Lebanese immigrants, many of whom arrived in South America after the 1948 Arab-Israeli War and the 1985 Lebanese Civil War. U.S. military strategist Edward Luttwak alleged that Hezbollah operates training and recruitment camps in the TBA, and has planned terrorist attacks from the region. (Sources: Washington Institute for Near East Policy, NBC News)

Hezbollah has been implicated in two major bombings in Argentina, which shares a nearly 800-mile long border with Brazil. The terror group claimed responsibility for bombing the Israeli embassy in Buenos Aires in 1992, killing 29 people. The Argentine government later accused Hezbollah of carrying out the 1994 AMIA Jewish community center bombings in the same city that killed 89. In 2013, the late Argentine State Prosecutor Alberto Nisman found that Iranian and Hezbollah agents had planned the AMIA bombing from Brazil and other South American countries. Nisman discovered 12 Hezbollah-linked individuals who reside or resided in Brazil, seven of whom were directly or indirectly involved in the AMIA bombing. (Sources: CNN, BBC News, U.S.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 519 of 632

Department of State, BBC News, Journal of International Security Affairs, U.S. Department of State, Reuters, Business Insider, Library of Congress)

A 2007 investigation by Telemundo and NBC News found that Hezbollah operatives were running an extensive smuggling network in the TBA and were sending profits to the organization's leaders in Lebanon. According to the U.S. Department of the Treasury, Hezbollah's chief representative in South America, Bilal Mohsen Wehbe, purportedly helped to raise more than $500,000 for Hezbollah from Lebanese businessmen in the TBA following Lebanon's war with Israel in 2006. Luttwak has referred to the TBA as Hezbollah's second most-important financing base after Lebanon. (Sources: NBC News, U.S. Department of the Treasury)

Assad Ahmad Barakat is a U.S.-designated key Hezbollah financier who has operated in the Tri-Border Area (TBA) of South America—the region that straddles the borders of Paraguay, Brazil, and Argentina. Barakat, who has close ties with Hezbollah's leadership, was the group's chief of military operations and fundraising in the TBA in the 1990s. He operated Hezbollah's financial network in the region, and owned several businesses of his own that conducted money laundering activities to generate funds for the group. In August 2018, Brazil's supreme court authorized Barakat's arrest after Paraguay issued an arrest warrant. On September 21, 2018, Brazilian police announced they had arrested Barakat in Foz do Iguaco, Brazil, near the border with Paraguay and Argentina. Barakat was extradited to Paraguay in July 2020. (Sources: U.S. Department of the Treasury, Library of Congress, Reuters, BBC News, ABC)

Highly organized criminal organizations in Brazil have reportedly helped Hezbollah smuggle weapons into the country and have supplied Hezbollah with explosives. The Primeiro Comando da Capital (PCC)—a Brazilian prison gang—is believed to treat imprisoned Hezbollah members well in exchange for international contacts. (Sources: Jerusalem Post, Council on Foreign Relations, An-Nahar, O Globo)

## Al-Qaeda

In 2011, Veja, a Brazilian news magazine, reported that there were at least 20 individuals affiliated with the global jihadi Salafist network al-Qaeda who were living in Brazil. One of al-Qaeda's chief propagandists, a Lebanese man named Khaled Hussein Ali, has reportedly lived in Brazil since 1998. Although Brazilian police arrested Ali in March 2009, he was released less than a month later. Nuclear physicist Adlene Hicheur—who was involved in a 2009 al-Qaeda terror plot in France —also lived in Brazil after he was released from prison in 2013. Hicheur worked at the Federal

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 520 of 632

University of Rio de Janeiro until July 2016, when he was deported back to France. (Sources: Reuters, *Veja*, Reuters)

In July 2016, al-Qaeda-linked extremists on social media reportedly called for lone wolf attacks at the Olympic Games in Rio de Janeiro, which began on August 5. The extremists advised individuals to obtain Brazilian visas, and to purchase weapons in the country's slums. They also called on followers to kidnap members of the Israeli delegation in order to free unspecified Muslim prisoners. (Source: *Jerusalem Post*)

## Hamas

Hamas, a U.S.-designated Palestinian terrorist group whose strength is concentrated in the Gaza Strip and West Bank, operates in Brazil, according to Brazilian Federal Police. The militants are believed to plan attacks, recruit followers, and fundraise in the South American country. According to the Library of Congress, Hamas actively uses the TBA as a "support base" for its operations. (Sources: *Brazil Business*, *Haaretz*, Library of Congress)

In 2008, Brazil's ambassador to the United States, Antonio Patriota, declared that Brazil had not designated Hamas as a terrorist organization because it maintains an active political wing. Brazil has reportedly maintained semi-diplomatic ties with the Palestinian terror group. In February 2015, a Brazilian delegation met with Hamas-affiliated politicians in Ramallah, the West Bank, according to Al-Monitor. A month later, Hamas congratulated former Brazilian President Dilma Rousseff on her reelection. In 2015, the Brazilian magazine *Veja* cited an unnamed Brazilian security official who called an impending Palestinian embassy in Brazil "a sovereign Hamas area now" because diplomats and their vehicles would be exempt from security checks. The embassy opened the following year. (Sources: Brazilian Palestinian National Interest Committee, Al-Monitor, Jewish Telegraphic Agency)

## ISIS

In September 2015, Brazil's federal police arrested members of a money laundering group with suspected ties to ISIS. The group had allegedly moved more than $10 million since 2010. Two months later, in November 2015, ISIS foreign fighter and executioner Maxime Hauchard reportedly tweeted: "Brazil, you are our next target." Brazilian Counterterrorism Director Luiz Alberto Sallaberry described the tweet as a credible threat. In April 2016, Brazil's national intelligence agency reported that the threat of Islamist terror attacks at the Olympic Games had increased. ISIS

began translating its core propaganda into Portuguese in the weeks leading up to the Olympic Games, according to the *New York Times*. A few months later, in June 2016, Brazilian media sources reported that an individual known as Ismail Abdul Jabbar al-Brazili, or "The Brazilian," was disseminating ISIS propaganda and attempting to recruit Brazilians online. (Sources: U.S. Department of State, Reuters, *New York Times*, PJ Media, U.S. Department of State)

Between July 21-25, 2016, Brazilian authorities arrested 12 ISIS-inspired Brazilian nationals who had reportedly met online. The suspects were allegedly planning to carry out attacks at the August 2016 Olympic Games and had attempted to purchase a gun on the Internet. Justice Minister Alexandre de Moraes referred to the group—which called itself "Defenders of the Sharia"—as "absolutely amateur." Eight of those arrested were sentenced to jail terms ranging from five to 15 years on May 4, 2017. In May 2018, Brazilian authorities arrested 11 people accused of organizing over social media to create an ISIS cell in Brazil and recruit foreign fighters. (Sources: BBC News, BBC News, CNN, *New York Times*, U.S. Department of State, *Guardian*)

## Far-Right Extremism

After Germany was defeated in World War II, many Nazis reportedly relocated to southern Brazil, among other South American countries. Today, Brazil is host to a number of Neo-Nazi groups, including Carecas do Subúrbio, Carecas do ABC, and White Power. Although these groups are largely concentrated in the south of country, it appears they are expanding into the country's central-west. Neo-Nazis in Brazil are reported to primarily target Jews, Afro-Brazilians, and gay people, as well as *nordestinos*, or people from northern Brazil. (Sources: Reuters, *Brazil Business*)

In May 2009, Brazilian Federal Police thwarted an attack by neo-Nazis on two synagogues in Porto Alegre, in southern Brazil. The suspects reportedly belonged to a small 50-member neo-Nazi group called Neuland. (Source: *Haaretz*)

In Brazil, YouTube has reportedly become more popular than all but one television channel. As such, it has become a primary medium for far-right radicalization. Members of the Brazilian rightwing and far right, including Brazilian President Jair Bolsonaro, credit YouTube for their rising influence. Bolsonaro won Brazil's presidency in October 2018. He gained widespread recognition as a far-right YouTube star posting conspiracy theories and rightwing hoaxes. Since becoming president, he has declared that Brazil must not become "a country of the gay world, of gay tourism. We have families." He has also said he would rather have a dead son than a gay son. A longtime member of Brazil's congress, Bolsonaro had frequently made such remarks, as well as

calling for a military coup in 1999 and comparing indigenous reservations in Brazil to chickenpox. In March 2020, YouTube, Facebook, and Twitter all deleted posts by Bolsonaro that they said spread misinformation about COVID-19. An October 2019 *Guardian* analysis found that 42 percent of viral messages spread on WhatsApp by the rightwing during Brazil's election cycle were fake news. Brazilian YouTuber Carlos Jordy has posted videos accusing teachers of indoctrinating students into communism. Jordy credited YouTube for his own success as well as for making Bolsonaro president. (Sources: *New York Times*, Bloomberg News, BBC News, *New York Times*)

## Anti-Semitism

The rise of a far-right government in Brazil has led to an increase in anti-Semitic incidents in the country. On January 16, 2020, then-Secretary of Culture Roberto Alvim released a video to announce the creation of a new arts funding program, but the video drew criticism for similarities to a 1933 speech by Nazi Propaganda Minister Joseph Goebbels. The video's soundtrack also featured Richard Wagner's Lohengrin, a favorite of Hitler's. Bolsonaro fired Alvim the following day after widespread criticism. In February 2020 in São Paulo's Jaguariúna city, a group of men encircled a 57-year-old Jewish man, tore up his yarmulke with a knife, and physically beat him while shouting anti-Semitic slurs. In June 2020, Brazilian Pastor Tupirani da Hora Lores implored his Rio de Janeiro congregation to pray for a second Holocaust. Brazilian Jewish leaders attribute a rise in anti-Semitism to a general lack of knowledge about Jews. (Sources: Forward, Forward, Jewish Telegraphic Agency, *Jerusalem Post*)

Some in Brazil have latched onto Bolsonaro's support of Israel and created conspiracy theories of Jewish power over the government. They allege Jews put Bolsonaro and his far-right government into power and are driving his agenda. For example, a November 2019 issue of *Istoe* magazine included an article titled "Goebbels of the Planalto," referring to Brazil's presidential palace. The article suggested Brazil's Jewish Secretary of Communications Fabio Wajngarten was part of a Jewish conspiracy to promote recent advertising budget cuts to media outlets opposing the government. In May 2020, anti-Semitic comments were posted on the Facebook page of Brazilian Senator Davi Alcolumbre, who had recently become the first Jewish Brazil's National Congress. (Sources: Forward, *Haaretz*, Jewish Telegraphic Agency, *Jerusalem Post*)

Brazil has also witnessed anti-Semitism related to the COVID-19 pandemic. Conspiracy theories on Facebook and other social media platforms alleged that Jews have not been infected or are actively spreading the virus. The station temporarily suspended Morais following outcry from the

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 523 of 632

Jewish community. Brazilian blogger Allan dos Santos wrote on Twitter likened the choice of using controversial drug chloroquine to Jews choosing between a shower and a gas chamber. On April 8, 2020, news host Marcos de Morais on Brazilian TV station SBT declared that people infected with COVID-19 should be taken to "concentration camps of health care, with more sophisticated equipments, with the best professionals." (Source: Forward)

## Foreign Fighters

As of July 2015, three Brazilians have gone to fight with Islamist groups in Syria and Iraq, according to the Soufan Group. (Source: Soufan Group)

# Major Extremist and Terrorist Incidents

In the months leading up to the 2016 Summer Olympics in Rio de Janeiro, Brazil enacted new legislation and stepped up law enforcement activity. In March 2016, the government passed a counterterrorism bill that criminalizes terrorism, advocacy for terrorism, and terrorist financing. With the help of French, British, Israeli, and U.S. intelligence services, in July 2016 Brazilian authorities arrested 12 Brazilian citizens who were allegedly planning to carry out attacks during the Olympic Games. In September 2016, Brazil began to indict the terror suspects, who allegedly belonged to a local pro-ISIS terrorist cell called "Defenders of Sharia." According to Brazil's Justice Minister Alexandre Moraes, the suspects communicated via encrypted messaging platforms WhatsApp and Telegram. Moraes characterized the cell as "an amateur cell without any preparation." (Sources: Library of Congress, Reuters, CNN, *Telegraph*, U.S. Department of State, Reuters, *New York Times*)

1967 — 1968

A Brazilian right-wing group, led by a conspiracy theorist named Aladino Felix, carries out terrorist acts to justify repression by the country's

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 524 of 632

## military dictatorship.

According to interrogation reports, group members claim that the attacks were reportedly encouraged by a general close to then-president Arthur da Costa e Silva. Felix led a group of 14 police officers who detonated bombs, stole arms and explosives, and robbed a bank between December 1967 and August 1968.

**MID-1980S**

Hezbollah is believed to begin operating in the TBA.

Source: *Guardian*

Hezbollah is believed to begin operating in the TBA.

Suicide bombers attack the Israeli embassy in Buenos Aires, Argentina.

A car bomb kills 85 people and wounds hundreds more at the Asociación

Kha Leb Bra

Bra the Naz

---

# Domestic Counter-Extremism

## Counterterrorism

The Anti-Terrorism Division (DAT) of Brazil's federal police department, the Departamento de Policia Federal (DPF), is the country's lead counterterrorism agency. Under the Ministry of Justice and Citizenship, the DAT is responsible for conducting investigations into extremist groups and protentional terror attacks. The DPF's Tactical Operations Command (TOC), Brazil's state-level military and civil police, its Ministries of Justice and Defense, and its national intelligence agency, Agência Brasileira de Inteligência (ABIN), are also involved in the country's counterterrorism efforts. A 2015 U.S. Department of State assessment indicated that Brazil's law enforcement and security agencies lacked coordination due to inter-service rivalries and that the country would "benefit from consolidated and automatic information sharing." (Sources: U.S. Department of State, U.S.

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 525 of 632

Department of State, U.S. Department of State, Office of the President of Brazil)

As part of the 2015 U.S. Department of State's Antiterrorism Assistance (ATA) program, the United States provided training to Brazilian law enforcement and security agencies "with the goal of enhancing investigative capabilities, building border security capabilities, and supporting Brazil's efforts to prevent terrorist attacks in the 2016 Summer Olympics." In a July 2016 report entitled "Security in the Rio 2016 Olympic and Paralympic Games," Brazil's Office of the President wrote that the government was prepared to protect millions of visitors—athletes and attendants—from public safety threats using the "procedures and protocols required." (Source: Office of the President of Brazil)

## Legislation

Engaging in an act of terror became a prosecutable offense in Brazil with the passage of the 1980 National Security Law. However, that law was difficult to enforce because the parameters of what constituted an act of terror had not been clearly defined. In March 2016, Brazil enacted Law No. 13.260, which defined terrorist acts as a set of violent activities carried out "for reasons of xenophobia; discrimination; or prejudice in regard to race, color, ethnicity, or religion" if intending to cause "social or generalized terror" by "exposing persons, property, public peace, or public safety to danger." Under Law No. 13.260, individuals who perpetrate or abet (including via the provision of financial assistance) acts of terror receive a prison sentence of between 12 and 30 years. The first convictions under Law No. 13.260 took place on May 4, 2017, when eight  Brazilian citizens were found guilty of having disseminated ISIS propaganda on social media. (Sources: U.S. Department of State, Library of Congress, U.S. Department of State)

Brazil has also addressed terror-financing through its anti-money laundering legislation. The country added financing terrorism to a list of money laundering offenses in 1998. In 2001 and 2003, Brazil introduced new legislation which made it easier for the Council for Financial Activities Control (COAF) to access the financial records of persons under investigation. That legislation also increased the COAF's abilities to share financial intelligence with interested foreign parties. In October 2015, former Brazilian President Dilma Rousseff signed Law No. 13.170, allowing Brazil to freeze assets of individuals and entities in accordance with U.N. Security Council Resolutions. The Ministry of Justice reported in 2017 that "to date Brazil has not reported any convictions for terrorism or blockage of assets" for individuals on U.N. sanctions lists. (Sources: Washington Institute, U.S. Department of State, Brazil Government News)

Despite these laws, the Financial Action Task Force (FATF) in 2018 expressed "serious concerns" about Brazil's anti-money laundering/combating the financing of terrorism (AML/CFT) efforts. From 2016 to 2019, the FATF issued multiple reports calling on Brazil to remedy multiple deficiencies the agency identified. The FATF has pointed to the Tri-Border Area as a high-risk area for money laundering. The FATF has called on Brazil to enhance the scope of its criminal offenses regarding money laundering, boost its surveillance mechanisms and due diligence, and bolster its international cooperation in AMLF/CTF. (Sources: FCPA Blog, FATF, FATF, FATF)

# International Counter-Extremism

Brazil is part of the BRICS alliance, which also includes Russia, India, China, and South America. Brazil assumed the rotating presidency of the alliance in 2019 and identified counter terrorism as a priority during the country's presidency. (Sources: BRICS, Economic Times)

Brazil is a member of the Organization of American States' (OAS) and its Inter-American Committee Against Terrorism (CICTE), which was established in 1999 and holds an annual forum "for discussion and decision-making on counter terrorism issues." In addition, Brazil is part of an association with Russia, India, China, and South Africa (known as BRIC) and has collaborated with those countries in a joint working group on counterterrorism. Brazil continues to work with Argentina and Paraguay to combat terror-related activity in the TBA and in February 2017 participated in a U.S.-sponsored "Practitioner's Workshop on Countering Transnational Terrorist Groups in the Tri-Border Area." (Sources: U.S. Department of State, OAS, OAS)

Brazil has also worked on issues related to terrorism and terrorist financing with countries involved in the Southern Common Market South American trade bloc and the Financial Action Task Force of Latin America (GAFILAT). However, despite these efforts, Brazil has had a "longstanding gap" in its ability to confront terrorist financing, according to the U.S. Department of State. (Sources: U.S. Department of State U.S. Department of State)

## Tri-Border Area

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 527 of 632

Brazil has also specifically worked to coordinate its counterterrorism efforts with Argentina and Paraguay in the TBA. In 1996, the three nations established a joint Trilateral Tri-Border Area Command to better control commerce and the transit of international individuals. Brazil contributed members from several of its intelligence and security agencies. However, the Command has suffered from institutional corruption, inadequate funding and resources, and poor training, hindering its efforts to combat illicit activity in the TBA. (Sources: U.S. Department of State, Library of Congress)

In July 2019, Brazil, Paraguay, Argentina, and the United States formed an alliance to combat terrorism and "illicit activity" in the region, focusing on activity in the TBA. Representatives of the so-called "three plus one" alliance intend to meet twice a year. The countries agreed to the alliance during the Western Hemisphere Counterterrorism Ministerial Plenary in Buenos Aires, Argentina, that month. During the conference, U.S. Secretary of State Mike Pompeo singled out Hezbollah and Iran as the leading terrorist threats to the region. (Sources: U.S. Department of State, *Rio Times*)

# Public Opinion

Brazil has ramped up its efforts to counter terrorism during major sporting events, including the 2014 World Cup and the 2016 Summer Olympics in Rio de Janeiro. Though not specifically focused on terrorism-related concerns, a 2016 poll by Brazil's Datafolha Institute found that 63 percent of Brazilians believed the Olympics would result in "more harm than benefit." With Brazil suffering one of its worst recessions in decades, "it becomes a big question about whether [the massive security costs] are really worth the outcome," said David Murakami Wood, a Canadian researcher who has studied Brazilian security agencies. (Source: *Los Angeles Times*, Global News)

According to Marcia Cavallari of Brazil's IBOPE polling institute, a majority of Brazilians supported the preventive national security measures taken before the 2016 Summer Olympics. Cavallari's statements in July 2016 appeared to echo approval ratings for Brazil's national security efforts during the 2014 FIFA World Cup. Following the 2014 games, polling from Brazil's Datafolha Institute showed that 60 percent of respondents rated public safety in Brazil as better than they had expected. (Sources: Datafolha, *Wall Street Journal*)

## Related Content



**Report: Hamas**

Hamas is an offshoot of the Muslim Brotherhood and emerged in the Gaza Strip in the late 1980s during the first Palestinian intifada (uprising) against Israel. The group...



**Report: Hezbollah**

Iran helped create the terrorist group Hezbollah in Lebanon in the early 1980s in order to expand its influence in the region. Under the pretense of fighting foreign...

Return to Top

## Daily Dose

Extremists: Their Words. Their Actions.

**Fact:**

On August 9, 2020, gunmen on motorbikes ambushed and killed six French aid workers and two Nigerien guides at the Kouré Giraffe Reserve in Niger. Though there was no immediate claim of responsibility, jihadists linked to either ISIS or al-Qaeda were suspected.

## CEP on Twitter

August 9, 2021 - 9:11am

RT @nytimes: The Taliban in recent days, gaining c... provincial Afghan capitals of a br…



Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 529 of 632

 

View
Archive





The Counter Extremism Project (CEP) is a
not-for-profit, non-partisan, international
policy organization formed to combat the
growing threat from extremist ideologies.

**SOCIAL**

**OFFICES**

New
York

London

CEP
Germany

**JOIN US**

Subscribe

DONATE

Contact          Privacy and Terms of Use          Copyright Policy

© 2021 Counter Extremism Project

Cookie Settings

530

GLOBAL

# Al-Qaeda Has Rebuilt Itself—With Iran's Help

Interviews with al-Qaeda members and bin Laden's family reveal a pact that allowed the group to prepare for its next phase.

By Adrian Levy and Cathy Scott-Clark



Tora Bora Caves in Afghanistan on December 2001. (Author Archive)

The last Islamic State redoubts have been falling in quick succession in recent weeks, with the U.S.-backed coalition taking the caliphate's self-declared capital of Raqqa last month, and then Syrian forces reclaiming the strategic oil city of Deir al-Zour. But while the group's experiment in a statehood built on rape, slavery, and execution nears its end, an older terror front has been quietly reconstituting itself. Against all odds, and despite the most costly counter-terrorism campaign ever waged by the West, al-Qaeda has flourished —its comeback assisted by a remarkable pact with Iran.

President Trump recently pointed to this relationship to justify de-certifying the Iran nuclear deal. Facing overwhelming European opposition to that move, CIA director Mike Pompeo suggested the al-Qaeda-Iran pact had been an "open secret" during the Obama administration, which had failed to act. Then last week, the CIA declassified a new trove of documents from the 2011 raid that killed Osama bin Laden in his compound in Abbottabad, Pakistan. This document dump, which will take years to sort through and analyze, appeared to confirm the relationship—detailing among other things how Hamza, Osama bin Laden's son, sheltered in Iran and even got married there; and how, according to one 19-page document, negotiations between al-Qaeda and the Revolutionary Guards in Tehran touched on funding and arming the Sunni terror outfit so it could strike at American targets.

In the days since, several commentators, including in these pages, have dismissed these purported connections as exaggerated, pushed by the White House and its allies to justify the administration's hostile posture toward Iran. But important new evidence, including interviews with senior al-Qaeda members and Osama bin Laden's family, gathered by the authors over the past

five years, tells a surprising history of the post-9/11 epoch, and it's one that severely undercuts the conventional view.

Our research reveals that al-Qaeda and covert agents acting for the Iranian deep state first attempted to broker an unlikely agreement more than two decades back, after Saddam Hussein flat-out rejected al-Qaeda's request for military assistance. The pact then flourished under the George W. Bush administration, when a back-channel from the White House to Tehran, running from 2001 to 2003, discussed it frequently. Former State Department and White House officials in on these talks maintain that the vice president's office suggested the White House do nothing, worrying that the administration would undermine the campaign to oust Saddam Hussein in Iraq—which was being underwritten by claims *he* sponsored al-Qaeda and concealed weapons of mass destruction. Finally, according to these same sources, the vice president's office also told U.S. envoys working on Iran and Afghanistan that once regime change had succeeded in Iraq, Tehran was next.

RECOMMENDED REA

The Olympics Have
Their Appeal
YASMEEN SERHAN

The Diplomats With
Country
TIMOTHY MCLAUGHLIN

China Discovers the
of Its Power
MICHAEL SCHUMAN

A starting point for al-Qaeda's struggle to mend itself after the U.S. invasion of Afghanistan came on November 12, 2001, when Osama bin Laden decided to head to his cave complex in Tora Bora. According to family members, bin Laden told his wives at the farewell that he wanted a different life for the children. "Please discourage them from joining this jihad," he told his third wife Seham, a Saudi schoolteacher, in a conversation some of his children overheard and described to us. As bin Laden took off for the caves, and most of his family was smuggled into Pakistan, one of al-Qaeda's most important

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 533 of 632

officials headed for Iran. On December 19, 2001, Mahfouz Ibn El Waleed, a whip-thin Islamic scholar from Mauritania, boarded a bus in Quetta, in the Pakistani province of Baluchistan, heading for Taftan, the official border crossing into Iran. He told the story to us over many lengthy meetings, explaining how he travelled on counterfeit documents as "Dr. Abdullah," a "medic, treating refugees from the Afghan war," carrying a suitcase filled with U.S. dollars, in a bus with a wanted poster for bin Laden pasted to the windscreen.

At Osama bin Laden's side for a decade prior to 2001, Mahfouz had become a pivotal figure on al-Qaeda's leadership council and the head of its sharia (legal) committee. When he began his journey to Taftan, he was on the UN Security Council's sanctions list, and was wanted by the FBI for questioning about his involvement in managing the logistics for the 1998 attacks on U.S. embassies in East Africa. The CIA had raided his home in Sudan in 1998, investigating the Mauritanian's role in counterfeiting and money laundering, as well as his attempt to consolidate bin Laden's assets in Khartoum to send to Afghanistan. He had fled only moments before the raid, and he'd been on the run ever since. Mahfouz hoped, as his bus headed for the Iranian border, to persuade Iranian agents to offer a more permanent sanctuary to al-Qaeda's leaders and bin Laden's family.

Geography, politics, and history lay behind a seemingly bizarre decision by an outlawed Sunni outfit to attempt to partner with a recalcitrant Shia power. Iran shared a common border with Baluchistan in Pakistan, close to where many fighters and bin Laden family members were hiding. Mahfouz had also been to the Persian Gulf before, sent there by bin Laden in 1995 to win military support for al-Qaeda. Mahfouz had first visited Iraq, where Saddam Hussein had rejected his request; however, in Iran, the Quds Force—a covert unit within the Revolutionary Guards responsible for clandestine foreign

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 534 of 632

policy—was open to it, by Mahfouz's account. On the table was an offer of advanced military training, with al-Qaeda fighters invited in 1995 to attend a camp run by Hezbollah and sponsored by the Iranian Quds force in Lebanon's Beqaa Valley. Trainers there were researching how to manufacture "shaped charges"—powerful IEDs that could pierce armor plating, and would later cause havoc among U.S. forces in Iraq.

There is no evidence that this 1995 pact came to anything. But a door was opened, and on December 20, 2001 when Mahfouz reached the Taftan border crossing and made a dash into Iran, he was greeted on the Iranian side by agents from the Ansar ul-Mahdi Corps, an elite cell within the Quds Force; he eventually won an audience in Tehran with its commander, General Qassem Soleimani. However, Iran was not yet fully committed to cooperating. According to senior U.S officials then working on South Asia and Afghanistan for the State Department and the White House, Iran's Foreign Ministry, fearful that the U.S. would turn its military attentions to Iran after it finished the invasion of Iraq for which it was then building international support, reached out to the Americans.

z Ibn El Waleed, aka Abu
l Mauritania, at home in
ott, in 2015
 Scott-Clark).

At international conferences in Germany, Geneva, and Tokyo between December 2001 and April 2003, convened to tackle reconstruction in post-Taliban Afghanistan, Iranian officials proposed to their U.S. counterparts certain incentives in exchange for normalizing relations. Early on, the Quds force was gambling that other al-Qaeda leaders would follow Mahfouz and seek shelter in Iran, and on that basis Iranian officials proposed potentially

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 535 of 632

offering them to the Americans as their end of the deal. U.S. officials involved in these talks recalled that the Bush administration flat-out declined, the president lumping Iran in with the so-called "axis of evil" powers in his State of the Union address in January 2002.

According to Mahfouz and many others in al-Qaeda, in addition to members of Osama's family and former U.S. government officials, the Quds Force now green-lit the sanctuary plan. The Mauritanian contacted the remnants of al-Qaeda's council in Baluchistan, Pakistan. The first to be sent over were al-Qaeda wives and daughters, along with hundreds of low-level volunteers who were escorted to Tehran. The women were put up at the four-star Howeyzeh Hotel on Taleqani Street. Husbands and unmarried fighters stayed across the road at the Amir Hotel. From there, the Quds Force gave them false travel documents that disguised them as Iraqi Shia refugees and flew them out to other countries, where they either settled or went on to join other conflicts.

The next wave came early in the summer of 2002, when high-ranking al-Qaeda leaders arrived in Iran intending to stay and galvanize the outfit. They were marshaled by Abu Musab al-Zarqawi, the Jordanian thug who would form al-Qaeda in Iraq, the forerunner to ISIS. The first to come was Saif al-Adel. A former colonel in the Egyptian Special Forces, he traveled under the pseudonym Ibrahim. He was accompanied by fellow Egyptian and al-Qaeda council member Abu Mohammed al-Masri—whose papers identified him as Daoud Shirizi—a former professional soccer player who was also wanted by the FBI for involvement in the 1998 embassy attacks. Joining them was Abu Musab al-Suri, one of the most important strategic voices in the movement. Immediately, a re-formed al-Qaeda military council planned its first attack from within Iran, according to Mahfouz, striking three residential compounds in Saudi Arabia, killing more than 35 people (including nine Americans) in 2003.

The Mauritanian, certain the pact was holding, now called for bin Laden's family. One of the wives and many of the children, Hamza included, arrived in Iran in mid-2002, initially settling in a fortified farmhouse, east of Zabol, an Iranian border town mainly inhabited by Arab nationals, where Arabic was the lingua franca. Hamza, unable to get used to his new life, wrote to bin Laden. "Oh father! Where is the escape and when will we have a home? Oh father! I see spheres of danger everywhere I look," he wrote, according to a copy of the letter we saw. By mid-2003, the Quds Force had gathered Hamza, his half brothers and sisters, their mothers, and the al-Qaeda military and religious councils in Iran and escorted them to a heavily guarded training center in one of the former Shah's palaces in northern Tehran. Only Zarqawi and the fighters from Zarqar, his hometown, did not come. The Quds Force had offered them funding and weapons, transporting them, via Kurdistan, to Baghdad, where they began targeting U.S. troops.

But even at that point, the future was not at all certain for al-Qaeda's clerical and military leaders in Iran, nor for bin Laden's family. The Quds Force continued offering to hand over all of them to the U.S at discreet meetings in Switzerland that took place up until April 2003. The White House continued to decline.

By 2006, the outfit had rebounded, and bin Laden's family decided to try to reach him, wherever he was hiding in Pakistan, against the wishes of the Iranians. Hamza suggested he go first but was vetoed as too fragile, and emotional. At 19, he "would never survive on his own," his mother told him, according to Mahfouz and half siblings of Hamza we interviewed. Hamza's wife, Asma, had just given birth to a daughter. Instead, Hamza's half-brother Saad, who was autistic, made a disastrous attempt, becoming marooned in Waziristan, Pakistan, where he was killed in a drone strike in 2009. Next to try was Iman, the daughter of Osama bin Laden and Najwa, his first wife.

Case 3:20-mc-00206-FDW-DSC    Document 10-1    Filed 08/10/21    Page 537 of 632

Iman, we learned, was tired of listening to the men debate. While she was on an escorted visit to a Tehran supermarket, she slipped her Quds Force guard, grabbed Iranian clothes and a plastic children's doll and, disguising herself as a nursing mother, ran. Having decided that finding her father was too dangerous, she eventually fled to Syria, where her mother was living.

Finally, in 2010, the Quds Force, which had come under pressure from al-Qaeda to allow all of bin Laden's family to leave Tehran, permitted Hamza and his mother to quit the base in Tehran. It had not been a straightforward negotiation—al-Qaeda in Pakistan resorted to kidnapping an Iranian diplomat there to force Tehran to make up its mind in the outfit's favor. Hamza and his mother had requested that the Quds Force guide them to Qatar, where Hamza intended to study. Instead the Quds Force insisted they cross into Pakistan. Hamza's mother eventually arrived at Abbottabad in February 2011, while Hamza hid in the Pakistani tribal areas, from where he wrote to his father again. He and his "pious wife" Maryam now had two children, the second "a son who I gave your name," he wrote, according to a copy of the letter we saw. Finally, in April 2011, after many weeks of deliberations, Hamza was cleared by al-Qaeda's military chief in Waziristan to begin a journey to Abbottabad, just days before the SEAL team raided. He wrote to his mother first, worrying: "Dear Mother, explain what I can take. … You know how important books are to me. Can I take them or not?" A few days later came her curt reply: "It is preferable to travel light."

Hamza would remain with his father for a little over 12 hours. Bin Laden, spooked, forced him to leave, only for the SEAL team to arrive shortly afterward. A contingent of al-Qaeda's clerical and military leaders remained in Iran until April 2012, when Mahfouz also slipped away from his Quds Force guard, and eventually flew home to Mauritania. Most of the outfit's military council, a core group of five led by the Egyptian Saif al Adel, remained in Iran

until 2015. Then the Quds Force transported some to Syria to join the fight against the Islamic State. Leading this cell was Abu al-Khayr al-Masri and Abu Mohammed al-Masri—the latter Hamza's father-in-law, described by the U.S. intelligence community as the "most experienced and capable operational planner not in U.S. or allied custody." With them came Jordanian fighters with connections to Zarqar, including one of Zarqawi's most important deputies—the plan being for this group to contact ISIS fighters and leaders, encouraging a split.

Finally, in August 2015, with al-Qaeda needing a propaganda victory amid the ascent of ISIS, Osama bin Laden's successor Ayman al-Zawahiri found a job for Hamza, who made the first of what are now seven audio statements. A 26-year-old who had still never fired a gun was used as a billboard, al-Qaeda clerics and members of his family say. Zawahiri, though, remained in charge, hiding in Pakistan, while military operations were led by Saif al Adel, who the Quds Force moved into a safe house in District 9, Tehran. Saif was now alone. In 2016, his pregnant wife, Asma, had been allowed to leave for Doha, where she stayed with bin Laden family members deported from Pakistan. Shortly after landing, she lost her baby and filed for divorce, unable to countenance the prospect of another epoch of jihad—which was precisely what al-Qaeda was planning.

Only 400 strong when the Twin Towers fell, damaged by the U.S. invasion of Afghanistan and then later overshadowed by ISIS, al-Qaeda now, with its leadership split between Iran, Pakistan, and Syria, has quietly rebuilt itself to the point of being able to call on tens of thousands of foot soldiers. Melding with anti-Assad forces, reducing its volubility, and toning down the barbarity associated with it during the Zarqawi years, a reformed al-Qaeda found in Hezbollah and the Quds Force a model for how it might now evolve.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 539 of 632

# Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran

Israeli agents shot Abu Muhammad al-Masri on the streets of Tehran at the behest of the U.S., officials said, but no one — Iran, Al Qaeda, the U.S. or Israel — has publicly acknowledged the killing.

Published Nov. 13, 2020Updated Nov. 27, 2020



The American Embassy in Nairobi, Kenya, was bombed in 1998, one of two attacks that day attributed to the Qaeda leader Abu Muhammad al-Masri.Agence France-Presse — Getty Images

[Read in Persian](#)

WASHINGTON — [Al Qaeda's second-highest leader](#), accused of being one

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 540 of 632

of the masterminds of the deadly 1998 attacks on American embassies in Africa, was killed in Iran three months ago, intelligence officials have confirmed.

Abdullah Ahmed Abdullah, who went by the nom de guerre Abu Muhammad al-Masri, was gunned down on the streets of Tehran by two assassins on a motorcycle on Aug. 7, the anniversary of the embassy attacks. He was killed along with his daughter, Miriam, the widow of Osama bin Laden's son Hamza bin Laden.

The attack was carried out by Israeli operatives at the behest of the United States, according to four of the officials. It is unclear what role if any was played by the United States, which had been tracking the movements of Mr. al-Masri and other Qaeda operatives in Iran for years.

The killing occurred in such a netherworld of geopolitical intrigue and counterterrorism spycraft that Mr. al-Masri's death had been rumored but never confirmed until now. For reasons that are still obscure, Al Qaeda has not announced the death of one of its top leaders, Iranian officials covered it up, and no country has publicly claimed responsibility for it.

Mr. al-Masri, who was about 58, was one of Al Qaeda's founding leaders and was thought to be first in line to lead the organization after its current leader, Ayman al-Zawahri.

Long featured on the F.B.I.'s Most Wanted Terrorist list, he had been indicted in the United States for crimes related to the bombings of the U.S. embassies in Kenya and Tanzania, which killed 224 people and wounded hundreds. The F.B.I. offered a $10 million reward for information leading to his capture, and as of Friday, his picture was still on the Most Wanted list.

The F.B.I. wanted poster for Abdullah Ahmed Abdullah, who went by the nom de guerre Abu Muhammad al-

Masri.Federal Bureau of Investigation

That he had been living in Iran was surprising, given that Iran and Al Qaeda are bitter enemies. Iran, a Shiite Muslim theocracy, and Al Qaeda, a Sunni Muslim jihadist group, have fought each other on the battlefields of Iraq and other places.

American intelligence officials say that Mr. al-Masri had been in Iran's "custody" since 2003, but that he had been living freely in the Pasdaran district of Tehran, an upscale suburb, since at least 2015.

Around 9:00 on a warm summer night, he was driving his white Renault L90 sedan with his daughter near his home when two gunmen on a motorcycle drew up beside him. Five shots were fired from a pistol fitted with a silencer. Four bullets entered the car through the driver's side and a fifth hit a nearby car.

As news of the shooting broke, Iran's official news media identified the victims as Habib Daoud, a Lebanese history professor, and his 27-year-old daughter Maryam. The Lebanese news channel MTV and social media accounts affiliated with Iran's Islamic Revolutionary Guards Corps reported that Mr. Daoud was a member of Hezbollah, the Iranian-backed militant organization in Lebanon.

It seemed plausible.

The killing came amid a summer of frequent explosions in Iran, mounting tensions with the United States, days after an enormous explosion in the port of Beirut and a week before the United Nations Security Council was to consider extending an arms embargo against Iran. There was speculation that the killing may have been a Western provocation intended to elicit a violent Iranian reaction in advance of the Security Council vote.

And the targeted killing by two gunmen on a motorcycle fit the modus operandi of previous Israeli assassinations of Iranian nuclear scientists. That Israel would kill an official of Hezbollah, which is committed to fighting Israel, also seemed to make sense, except for the fact that Israel had been consciously avoiding killing Hezbollah operatives so as not to provoke a war.

In fact, there was no Habib Daoud.

Several Lebanese with close ties to Iran said they had not heard of him or his killing. A search of Lebanese news media found no reports of a Lebanese history professor killed in Iran last summer. And an education researcher with access to lists of all history professors in the country said there was no record of a Habib Daoud.

One of the intelligence officials said that Habib Daoud was an alias Iranian officials gave Mr. al-Masri and the history teaching job was a cover story. In October, the former leader of Egypt's Islamic Jihad, Nabil Naeem, who called Mr. al-Masri a longtime friend, told the Saudi news channel Al Arabiya the same thing.

Iran may have had good reason for wanting to hide the fact that it was harboring an avowed enemy, but it was less clear why Iranian officials would have taken in the Qaeda leader to begin with.

Some terrorism experts suggested that keeping Qaeda officials in Tehran might provide some insurance that the group would not conduct operations inside Iran. American counterterrorism officials believe Iran may have allowed them to stay to run operations against the United States, a common adversary.

It would not be the first time that Iran had joined forces with Sunni militants, having supported Hamas, Palestinian Islamic Jihad and the Taliban.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 543 of 632

"Iran uses sectarianism as a cudgel when it suits the regime, but is also willing to overlook the Sunni-Shia divide when it suits Iranian interests," said Colin P. Clarke, a counterterrorism analyst at the Soufan Center.

Iran has consistently denied housing the Qaeda officials. In 2018, the Foreign Ministry spokesman Bahram Ghasemi said that because of Iran's long, porous border with Afghanistan, some Qaeda members had entered Iran, but they had been detained and returned to their home countries.

However, Western intelligence officials said the Qaeda leaders had been kept under house arrest by the Iranian government, which then made at least two deals with Al Qaeda to free some of them in 2011 and 2015.

Although Al Qaeda has been overshadowed in recent years by the rise of the Islamic State, it remains resilient and has active affiliates around the globe, a U.N. counterterrorism report issued in July concluded.

Iranian officials did not respond to requests for comment for this article. But on Saturday, after this article was published, the Foreign Ministry spokesman Saeed Khatibzadeh denied the presence of any Qaeda members in Iran. He warned American media "not to fall for the trap of Hollywood scenarios fed to them by American and Zionist officials," according to a statement on the ministry's website.

Spokesmen for the Israeli prime minister's office and the Trump administration's National Security Council declined to comment.

Mr. al-Masri was a longtime member of Al Qaeda's highly secretive management council, along with Saif al-Adl, who was also held in Iran at one point. The pair, along with Hamza bin Laden, who was being groomed to take over the organization, were part of a group of senior Qaeda leaders who sought refuge in Iran after the 9/11 attacks on the United States forced them

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 544 of 632

to flee Afghanistan.

According to a highly classified document produced by the U.S. National Counterterrorism Center in 2008, Mr. al-Masri was the "most experienced and capable operational planner not in U.S. or allied custody." The document described him as the "former chief of training" who "worked closely" with Mr. al-Adl.

In Iran, Mr. al-Masri mentored Hamza bin Laden, according to terrorism experts. Hamza bin Laden later married Mr. al-Masri's daughter, Miriam.

Hamza bin LadenCentral Intelligence Agency

"The marriage of Hamza bin Ladin was not the only dynastic connection Abu Muhammad forged in captivity," the former F.B.I. agent and Qaeda expert Ali Soufan wrote in a 2019 article for West Point's Combating Terrorism Center.

Another of Mr. al-Masri's daughters married Abu al-Khayr al-Masri, no relation, a member of the management council. He was allowed to leave Iran in 2015 and was killed by a U.S. drone strike in Syria in 2017. At the time, he was the second-ranking Qaeda official after Mr. Zawahri.

Hamza and other members of the Bin Laden family were freed by Iran in 2011 in exchange for an Iranian diplomat abducted in Pakistan. Last year, the White House said that Hamza bin Laden had been killed in a counterterrorism operation in the Afghanistan-Pakistan region.

Abu Muhammad al-Masri was born in Al Gharbiya district of northern Egypt in 1963. In his youth, according to affidavits filed in lawsuits in the United States, he was a professional soccer player in Egypt's top league. After the Soviet invasion of Afghanistan in 1979, he joined the jihadist movement that was coalescing to assist the Afghan forces.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 545 of 632

After the Soviets withdrew 10 years later, Egypt refused to allow Mr. al-Masri to return. He remained in Afghanistan where he eventually joined Bin Laden in the group that was later to become the founding nucleus of Al Qaeda. He was listed by the group as the seventh of its 170 founders.

In the early 1990s, he traveled with Bin Laden to Khartoum, Sudan, where he began forming military cells. He also went to Somalia to help the militia loyal to the Somali warlord Mohamed Farrah Aidid. There he trained Somali guerrillas in the use of shoulder-borne rocket launchers against helicopters, training they used in the 1993 battle of Mogadishu to shoot down a pair of American helicopters in what is now known as the Black Hawk Down attack.

One of the American Black Hawk helicopters shot down in Mogadishu, Somalia, in 1993 by fighters trained by Mr. al-Masri.Scott Peterson/Getty Images

"When Al Qaeda began to carry out terrorist activities in the late 1990s, al-Masri was one of the three of Bin Laden's closest associates, serving as head of the organization's operations section," said Yoram Schweitzer, head of the Terrorism Project of the Institute for National Security Studies in Tel Aviv. "He brought with him know-how and determination and since then was involved in a large part of the organization's operations, with an emphasis on Africa."

Shortly after the Mogadishu battle, Bin Laden put Mr. al-Masri in charge of planning operations against American targets in Africa. Plotting a dramatic, ambitious operation that, like the 9/11 attacks, would command international attention, they decided to attack two relatively well-defended targets in separate countries simultaneously.

Shortly after 10:30 a.m. on Aug. 7, 1998, two trucks packed with explosives pulled up in front of the American embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. The blasts incinerated people nearby, blew walls off

buildings and shattered glass for blocks around.

In 2000, Mr. al-Masri became one of the nine members of Al Qaeda's governing council and headed the organization's military training.

He also continued to oversee Africa operations, according to a former Israeli Intelligence official, and ordered the attack in Mombasa, Kenya, in 2002 that killed 13 Kenyans and three Israeli tourists.

Mr. al-Masri was said to have ordered an attack in Mombasa, Kenya, in 2002 that killed 13 Kenyans and three Israeli tourists.Pedro Ugarte/Agence France-Presse — Getty Images

By 2003, Mr. al-Masri was among several Qaeda leaders who fled to Iran which, although hostile to the group, seemed out of American reach.

"They believed the United States would find it very difficult to act against them there," Mr. Schweitzer said. "Also because they believed that the chances of the Iranian regime doing an exchange deal with the Americans that would include their heads were very slim."

Mr. al-Masri was one of the few high-ranking members of the organization to survive the American hunt for the perpetrators of 9/11 and other attacks. When he and other Qaeda leaders fled to Iran, they were initially kept under house arrest.

In 2015, Iran announced a deal with Al Qaeda in which it released five of the organization's leaders, including Mr. al-Masri, in exchange for an Iranian diplomat who had been abducted in Yemen.

Mr. Abdullah's footprints faded away, but according to one of the intelligence officials, he continued to live in Tehran, under the protection of the Revolutionary Guards and later the Ministry of Intelligence and Security. He was allowed to travel abroad and did, mainly to Afghanistan, Pakistan and

Syria.

Some American analysts said Mr. al-Masri's death would sever connections between one of the last original Qaeda leaders and the current generation of Islamist militants, who have grown up after Bin Laden's 2011 death.

"If true, this further cuts links between old-school Al Qaeda and the modern jihad," said Nicholas J. Rasmussen, a former director of the National Counterterrorism Center. "It just further contributes to the fragmentation and decentralization of the Al Qaeda movement."

**Adam Goldman and Eric Schmitt reported from Washington, Farnaz Fassihi from New York and Ronen Bergman from Tel Aviv. Hwaida Saad contributed reporting from Beirut and Julian E. Barnes from Washington.**

Join a subscriber-only event. Connect with our journalists. **See the lineup.**

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

## Treasury Designates Lorenzana Family Members and Businesses Allied with the Sinaloa Cartel

11/14/2012

### *Action Targets Powerful Guatemalan Drug Trafficker*

**WASHINGTON –** The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) today designated two key operatives connected to Waldemar Lorenzana Lima, one of Guatemala's most powerful drug traffickers, as Specially Designated Narcotics Traffickers (SDNTs) pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act). For years, Waldemar Lorenzana Lima has used his businesses and agricultural holdings in La Reforma, Zacapa, Guatemala as a front for the northbound movement of drugs through Guatemala. Today, OFAC designated Ovaldino Lorenzana Cordon and Marta Julia Lorenzana Cordon for their role in the drug trafficking activities of their father, Lorenzana Lima as well as the Lorenzana family's extensive business network.

In April 2010, OFAC designated Lorenzana Lima and three of his sons for their role in facilitating the narcotics-trafficking activities of the Sinaloa Cartel in Guatemala. Today's action prohibits U.S. persons from conducting financial or commercial transactions with the eight designated entities and two designated individuals, and freezes any assets they may have under U.S. jurisdiction.

"Treasury will continue to target major drug cartels wherever they are operating, including family organizations that work together to traffic narcotics. Today's designation of Marta Julia and Ovaldino Lorenzana Cordon, members of one of Guatemala's most significant crime families, along with the Lorenzanas' business network, allows us to continue our efforts to dismantle transnational drug trafficking organizations operating in Guatemala," said OFAC Director Adam J. Szubin.

The Lorenzana drug trafficking organization plays a key role in facilitating cocaine trafficking between Colombia and Mexico. Through their connections with Colombian suppliers, they utilize their home country of Guatemala as a staging point for cocaine shipments. Once the cocaine arrives in Guatemala, the Lorenzana family works with the Sinaloa Cartel to traffic cocaine into Mexico and, eventually, the United States. Guatemalan authorities arrested Lorenzana Lima and one of his sons, Eliu Elixander Lorenzana Cordon, in April 2011 and November 2011, respectively. They remain in custody pending extradition to the U.S.

The designations announced today are the latest in a series of efforts by OFAC to thwart transnational drug cartels, such as the Sinaloa Cartel, which are responsible for distributing significant amounts of cocaine, marijuana, and methamphetamine to the United States. President Obama identified the Sinaloa Cartel as a significant foreign narcotics trafficker under the Kingpin Act in April 2009.

Today's action, supported by the Drug Enforcement Administration, is part of OFAC's ongoing efforts under the Kingpin Act to apply financial measures against significant foreign narcotics traffickers worldwide. Internationally, OFAC has designated more than 1,100 businesses and individuals linked to 97 drug kingpins since June 2000. Penalties for violations of the Kingpin Act range from civil penalties of up to $1.075 million per violation to more severe criminal penalties. Criminal penalties for corporate officers may include up to 30 years in prison and fines of up to $5 million. Criminal fines for corporations may reach $10 million. Other individuals face up to 10 years in prison and fines for criminal violation of the Kingpin Act pursuant to Title 18 of the United States Code.

*View a chart of the Lorenzana organization.*    .

### ###



Video
Live
Shows

Menu

LOG IN

Good Morning America Good Morning America
World News Tonight World News Tonight
Nightline Nightline
20/20 20/20
This Week This Week
The View The View
What Would You Do? What Would You Do?
Coronavirus
Olympics

U.S.
Politics
International
Entertainment
Business
Technology
Lifestyle
Health
Virtual Reality
Weather
Tips
Sports
FiveThirtyEight
Privacy PolicyPrivacy Policy
Your CA Privacy RightsYour CA Privacy Rights
Children's Online Privacy PolicyChildren's Online Privacy Policy
Interest-Based AdsInterest-Based Ads
Terms of UseTerms of Use
Do Not Sell My InfoDo Not Sell My Info
Contact UsContact Us

ABC News Network | © 2021 ABC News Internet Ventures. All rights reserved.

Search Headlines, News and Video...

recent years there has been more recent concern about the group establishing a footprint in Central America.

"The defendant's coordination of money laundering activities occurred in the United States, Lebanon, Benin, Panama, Colombia, the Democratic Republic of Congo and elsewhere," the indictment alleged.

"According to information from sources, his alleged drug and money laundering activities facilitated numerous global drug trafficking organizations, including the criminal activities of the Los Zetas Mexican drug cartel," DEA Administrator Michele Leonhart said in a statement.



Video
Live
Shows

Menu

🔔　LOG IN

Good Morning America Good Morning America
World News Tonight World News Tonight
Nightline Nightline
20/20 20/20
This Week This Week
The View The View
What Would You Do? What Would You Do?
Coronavirus
Olympics
⋮⋮⋮

U.S.
Politics
International
Entertainment
Business
Technology
Lifestyle
Health
Virtual Reality
Weather
Tips
Sports
FiveThirtyEight
Privacy PolicyPrivacy Policy
Your CA Privacy RightsYour CA Privacy Rights
Children's Online Privacy PolicyChildren's Online Privacy Policy
Interest-Based AdsInterest-Based Ads
Terms of UseTerms of Use
Do Not Sell My InfoDo Not Sell My Info
Contact UsContact Us
ABC News Network | © 2021 ABC News Internet Ventures. All rights reserved.

Search Headlines, News and Video...

# EXHIBIT A



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

Case ID: FNK-7862

David D. Aufhauser                                    OCT 2 8 2016
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Re: May 5, 2016 Kingpin Act Designations of Abdul Waked, Hamudi Waked, Lucia Touzard, and Related Companies

Dear Mr. Aufhauser:

This letter is a follow up to your letters of May 24, 2016 and June 15, 2016 in which you requested a copy of the administrative record regarding your clients' designations as specially designated narcotics traffickers (SDNTs) pursuant to Section 805 of the Foreign Narcotics Kingpin Designation Act (Kingpin Act), 21 U.S.C. § 1904(b).

On July 5, 2016 and July 18, 2016, OFAC released to you a copy of your clients' administrative records upon which their designations were based. At that time, OFAC stated that should additional unclassified, non-privileged, or otherwise releasable information become available regarding the basis for your clients' designations, such information would be provided to you.

On August 26, 2016, OFAC then released to you a non-privileged and unclassified summary of otherwise privileged information and stated that should additional releasable information become available regarding the basis for your clients' designations, such information would be provided to you. Enclosed please find a non-privileged and unclassified summary of additional information including two Attachments. Attachment 1 is provided for your reference to better understand the term Consolidated Priority Organization Target used in the summary. Attachment 2 is being provided for your reference with respect to when certain individuals and entities were identified and designated pursuant to the Kingpin Act.

Please refer to FNK-7862 cited above in all future correspondence. For the most expedient communications, please direct all questions and correspondence regarding your requests to **OFAC.Reconsideration@treasury.gov**. You may also write, call, or fax OFAC at the following:

U.S. Department of the Treasury
Office of Foreign Assets Control
ATTN: Office of Global Targeting
1500 Pennsylvania Avenue, N.W. (Freedman's Bank Building)
Washington, DC 20220

1

1:16-cv-01730 0292

Telephone: (202) 622-2420
Fax: (202) 622-5390

Thank you for your cooperation.

Sincerely,

Mark Samara
Assistant Director
Crime/Narcotics and Western Hemisphere Division
Office of Foreign Assets Control

Enclosures

2

Case ID: FNK-7862

## Non-Privileged and Unclassified Summary of Otherwise Privileged Information

According to law enforcement assessments:

Abdul Mohamed WAKED FARES[1] (WAKED FARES) and Nidal WAKED HATUM (WAKED HATUM) are co-heads of the WAKED Money Laundering Organization (MLO) based in Colón, Panama and have been identified as Consolidated Priority Organization Targets (CPOTs)[2] based on their sophisticated network of companies used to facilitate drug money laundering.

In addition to being a corporate lawyer at GRUPO WISA S.A. (GRUPO WISA), Lucia TOUZARD ROMO (TOUZARD ROMO) provides a variety of services, including shell and other company incorporation, corporate development, and customs facilitation, to WAKED FARES, Mohamed Abdo WAKED DARWICH (WAKED DARWICH), and GRUPO WISA, as well as the WAKED MLO. Additionally, TOUZARD ROMO is WAKED FARES' and WAKED DARWICH's representative and acts for or on their behalf via her various documented corporate officer and director positions at WAKED FARES and WAKED DARWICH companies.

WAKED DARWICH, WAKED FARES' son, is controlled or directed by, and/or acts for or on behalf of, WAKED FARES as shown by his position as a deputy to WAKED FARES in WAKED FARES-owned or -controlled companies.

According to multiple sources:

The WAKED MLO uses family members and trusted individuals to control and operate dozens of entities across various sectors of the Panamanian economy in furtherance of their drug money laundering operations. As of September 2015, the WAKED MLO is the largest known money laundering organization operating in Panama.

WAKED FARES began laundering drug money in the early-to-mid 1980s for the Medellin Cartel. WAKED FARES mentored his nephew, WAKED HATUM. WAKED FARES and WAKED HATUM have provided and continue to provide money laundering services to multiple specially designated narcotics trafficking networks. In the 1990s and early 2000s, WAKED

---

[1] Names in all capitalized letters denotes individuals, a company, or an organization that has been previously identified or designated by the President of the United States or by the Office of Foreign Assets Control (OFAC) as a specially designated narcotics traffickers pursuant to the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908.

[2] CPOTs represent "the 'command and control' elements of the most prolific international drug trafficking and money laundering organizations" as identified by the Organized Crime Drug Enforcement Task Force, a group comprised of "94 U.S. Attorney's Offices, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Drug Enforcement Administration, the Federal Bureau of Investigation, the Internal Revenue Service, the U.S. Coast Guard, the U.S. Immigration and Customs Enforcement, the U.S. Marshals Service, the Criminal and Tax Divisions of the U.S. Department of Justice and numerous State and local agencies." See U.S. Department of Justice, "Organized Crime Drug Enforcement Task Forces," June 9, 2015, https://www.justice.gov/criminal/organized-crime-drug-enforcement-task-forces, Attachment 1, p.1.

1

1:16-cv-01730 0294

FARES was a trusted money launderer for the UNITED SELF-DEFENSE FORCES OF COLOMBIA (a.k.a. AUTODEFENSAS UNIDAS DE COLOMBIA or AUC)[3] and other right-wing paramilitary groups in Colombia.  Beginning in the mid-2000s, WAKED FARES and WAKED HATUM laundered money for the SINALOA CARTEL,[4] JOUMAA,[5] CHEAITELLY,[6] and various Colombian criminal organizations (known as *bandas criminales*). WAKED FARES and WAKED HATUM also laundered for other specially designated narcotics traffickers including LOS URABENOS;[7] LA OFICINA DE ENVIGADO;[8] REVOLUTIONARY ARMED FORCES OF COLOMBIA (FARC);[9] and Ali Houssein HARB.[10]

WAKED HATUM and WAKED FARES are willing and able to launder narcotics and illicit proceeds on behalf of any organization as long as the commission is paid.  WAKED FARES and WAKED HATUM both receive drug proceeds through their respective companies and are able to launder drug proceeds in increments of $1 million or higher.

Their money laundering scheme involves sending millions of U.S. dollars in drug proceeds to Colombia and Panama, primarily by smuggling bulk cash on commercial aircraft.  The WAKED MLO uses a variety of methods to structure and obscure transactions, including but not limited to:

- A Colombian drug trafficker has $5 million in Spain to be collected.
- WAKED MLO would pay the Colombian drug trafficker the $5 million less a commission.
- WAKED would have the money in Spain deposited into other foreign bank accounts. Thereafter, the money would be sent to numerous companies located in various Free Trade Zones.
- After the money reached the companies in the various Free Trade Zones, the money would be electronically transferred to China, where it would be utilized to buy merchandize or pay accounts for individuals in the Colon Free Trade Zone, located in Colon, Panama.

---

[3] On June 2, 2003, the President of the United States identified the United Self-Defense Forces of Colombia pursuant to the Kingpin Act.  *See* Office of Foreign Assets Control (OFAC) Designations Pursuant to the Foreign Narcotics Kingpin Designation Act, November 24, 2015, Attachment 2, p. 1.
[4] On April 15, 2009, the President of the United States identified the SINALOA CARTEL pursuant to the Kingpin Act.  *See* Attachment 2, p. 2.
[5] On January 26, 2011, OFAC designated the JOUMAA drug trafficking and money laundering organization as well as other individuals, including Ayman Saied JOUMAA, pursuant to the Kingpin Act.  *See* Attachment 2, p. 12.
[6] On December 29, 2011, OFAC designated Jorge Fadlallah CHEAITELLY pursuant to the Kingpin Act.  *See* Attachment 2, p. 14.
[7] On May 31, 2013, the President of the United States identified LOS URABENOS pursuant to the Kingpin Act. *See* Attachment 2, p.2.
[8] On June 26, 2014, OFAC designated LA OFICINA DE ENVIGADO pursuant to the Kingpin Act.  *See* Attachment 2, p. 22.
[9] On June 2, 2003, the President of the United States identified the Revolutionary Armed Forces of Colombia pursuant to the Kingpin Act.  *See* Attachment 2, p.1.
[10] On June 27, 2012, OFAC designated Ali Houssein HARB pursuant to the Kingpin Act.  *See* Attachment 2, p. 16.

2

WAKED FARES and WAKED HATUM specialize in trade-based money laundering schemes, including the over-valuation of commercial invoices, the falsification of commercial invoices, and corruption involving customs fraud, tax fraud, and bribes.

Drug proceeds were laundered using various businesses in Panama City, Panama and the Free Trade Zone located in Colon, Panama.  Specifically, GRUPO WISA and VIDA PANAMA received bulk drug proceeds from drug traffickers, including the SINALOA CARTEL, as part of the drug money laundering scheme.  GRUPO WISA and VIDA PANAMA would deposit the drug proceeds into banks in Panama, sell products to businesses in Colombia, and then use false invoices to deposit cash as payment for merchandise in banks in Panama.

WAKED FARES owns LA RIVIERA duty free stores in the Tocumen Airport in Panama City, Panama that are being used to launder millions of dollars in drug proceeds.  Drug trafficking organizations are transporting bulk cash in suitcases aboard commercial airlines into Tocumen Airport, delivering the bulk cash to LA RIVIERA duty free stores and bribing airport officials.

In 2014, one of WAKED FARES' major clients was Ali HARB.  WAKED FARES supplied HARB with home appliances that have been paid for in Panama.

In addition, the WAKED MLO has laundered drug profits through real estate investments and bank loans obtained by the family's businesses.  The WAKED MLO, WAKED HATUM, and WAKED FARES have purchased hundreds of properties across Panama and have funded the development of various commercial real estate projects using the commissions they have earned from drug money laundering.

WAKED HATUM and WAKED FARES self-finance and use drug money to fund the purchase of supplies and other equipment needed during the development and construction phases of these commercial real estate projects, settle accounts with development and construction companies building the Millennium Plaza and the Soho Complex, and pay bribes to local authorities.

WAKED HATUM and WAKED FARES also exercise control over and use BALBOA BANK AND TRUST to launder narcotics proceeds; specifically they deposit drug bulk cash proceeds moved to Panama, control bank accounts for hundreds of companies, real and fictitious, and launder large sums of drug trafficking proceeds on behalf of their clients.  WAKED HATUM and WAKED FARES charge a commission for the deposit of bulk United States dollars or Euros at BALBOA BANK AND TRUST branches in Panama.

WAKED FARES and WAKED HATUM also use shell companies and property holdings as collateral in exchange for loans.  WAKED FARES and WAKED HATUM use the loans in furtherance of their money laundering activity.  Funds are taken to pay for products that do not exist or to overpay for products.  WAKED FARES and WAKED HATUM utilize fraudulent invoices to explain the payments for the products.  Narcotics traffickers then pay WAKED FARES and WAKED HATUM in either bulk cash or via wire transfer.  The loans are subsequently repaid, allowing the process to begin anew.

3

PUBLICIDAD

# La Prensa



**Panamá, 09 de agosto del 2021**

Portada    Panorama    Hoy por Hoy    Opinión    Deportes    Economía    Vivir+    Reseña    Reseña Empresarial    Sociales

**TEMAS DE HOY:**  Knockout   Blue Apple   Ministerio Público   Ricardo Martinelli L...   Luis Enrique Martine...   Estados Unidos   Policía Nacional   Coronavirus   Minsa (Ministerio De...)

**AMBIENTE Y DESARROLLO.**

# Construirán torre de 48 pisos en vieja sede del Disa

*La media cuadra de ocho mil metros cuadrados está rodeada de 38 árboles de las más diversas especies.*

Edith Castillo Duarte | ecastillo@prensa.com
15 jul 2006 - 01:00 AM



ÁREAS VERDES. Los desarrollistas dicen que los árboles son parte del diseño del proyecto hotelero.

Recibe los titulare

Dirección de co

ÚL

09:05 Empieza la
hospitales privad
dosis por seman

08:10 Joseph Blat
el martes ante la
Michel Platini [ Le

07:55 Messi, una
pero que genera

06:00 Raúl Queve
lideran un banco
reactivación econ

LAS

01:00 ¿Quién ma
aquí', Annette Cá

01:00 El impacto
de los hermanos
Linares [ Leer má

01:00 Los retene
control sobre el c
común? [ Leer má

20:43 Gobierno: I
digital deben esta
dosis anticovid ar

https://www.prensa.com/impresa/economia/Construiran-torre-pisos-vieja-Disa_0_1790071082.html                    1/4



La única herencia que sobrevive al fenecido Banco Disa se resiste a desaparecer. Treinta y ocho árboles, de las más diversas especies, que rodean una media cuadra de ocho mil metros en la transitada calle 51 Campo Alegre, en plena área bancaria, no podrán ser derribados para darle paso a la construcción de un millonario proyecto hotelero.

La Dirección de Ornato y Aseo del Municipio de Panamá está pendiente de los avances de la obra, ya que los vecinos del sector han manifestado su preocupación por la suerte que correrán los frondosos árboles sembrados hace por lo menos 50 años.

ADVERTISING



El empresario Moisés Levy, quien en asocio con Abdul Waked e inversionistas extranjeros proyecta edificar una torre de 48 pisos que albergaría un hotel de 300 habitaciones, casino, centro comercial y oficinas, aseguró que no hay de qué preocuparse porque se tratará de salvar todos los árboles. "Fue precisamente por esa belleza natural que compramos ese terreno", aseguró.

Los inversionistas todavía no han solicitado los permisos correspondientes ante el municipio capitalino porque cambiaron el plano original que solo contemplaba una torre de oficinas y apartamentos.

La arquitecta y ambientalista Raiza Banfield considera que dada la riqueza natural de esta área los diseñadores y desarrollistas deben echar mano de toda su creatividad a fin de que puedan levantar su proyecto sin afectar el ambiente, lo que le agregará un mayor valor a la inversión.

## MAS NOTICIAS

| Cciap plantea más ahorro en el Estado y mejorar la recaudación de impuestos | › |
|---|---|
| Huawei reporta resultados negativos en el segundo trimestre | › |
| Copa apunta al 70% de su capacidad para septiembre | › |
| Banco Mundial elige a Panamá para sede regional | › |
| Precio de metales impulsa al alza superávit de Perú | › |



**MTXMT**
METROPORMETRO.COM
Proyectos residenciales nuevos

DE

01:05 Cciap plant
Estado y mejorar
impuestos  [ Leer

01:03 Huawei rep
en el segundo tri

01:03 Copa apun
para septiembre

01:03 Banco Mun
sede regional [ Le

01:00 Precio de n

EDICI

AÑO

MES

DÍA

A






Villas de Pedregal, Rana de Oro
**$75,000**

Detrás de La Doña 24 de Diciembre -10,465 mts2
**$200,000**

Princesa del mar Panoramica vista directa al mar la avenida balboa
**$575,000**

Más de 9 Hermosas Hectáreas en Potrerillos Dolega
**$225,000**

Impresionante Vista Casa "Villa Serenidad" Cerca del Centro, Boquete
**$599,900**

Dos Terrenos dentro del Club de Golf de Coronado
**$458,992**

Puertas de Villalba, Panamá Este
**$59,878**

VENETIAN TOWER, PUNTA PACIFICA
**$1,120,000**

Ofertas exclusivas de metropormetro.com

---

## COMENTARIOS



TAMBIÉN TE PUEDE INTERESAR...







**Asistente Financiero**

asistentefinanciero.com

Solicita 100% en línea tu Tarjeta de Crédito con pre-aprobación inmediata o encuentra el seguro para tu auto con las mejores aseguradoras de Panamá.

**Ellas**

ellas.pa

Tu espacio para encontrar información e inspiración

**Martes Financiero**

martesfinanciero.com

Contenido financiero que hace noticia en Panamá y el mundo.

**Revista K**

@revistak

Periodismo social y cultural con perspectiva moderna.

**Club La Prensa**

club.prensa.com

Vive diariamente diversas experiencias con el Club del que todos hablan.

**Me...**

met...

Por en

**Advertencia:** Todo el contenido de www.prensa.com pertenece a Corporación La Prensa, S.A. Razón por la cual, el material publicado no se puede reproducir, copiar o transmitir sin previa autorización por escrito de Corporación La Prensa, S.A. Le agradecemos su cooperación y sugerencias a suscripciones@prensa.com y Servicio al Cliente. En caso de necesitar mayor información, llámenos al 323-6400.

Política de Privacidad







**Subscribe and enjoy exclusive content**

**Are you a subscriber of La Prensa?**

Log in

**If you are not a subscriber**

Get unlimited access to all the content of La Prensa, Ellas, Martes Financiero and Mi Diario Digital.

Subscribe from $ 5 monthly

**Need help?**

Contact us at 323-6400 / subscriptions@prensa.com (mailto:suscripciones@prensa.com)

Panama, August 9, 2021

# La Prensa

Cover page   Panorama   Day by day   Opinion   sports   Economy   Live +   Review   Business Review   Social

TODAY'S TOPICS:   Knockout   Blue Apple   Public Ministry   Ricardo Martinelli L ...   Luis Enrique Martine ...   United States   National Police   Coronavirus   Minsa (Ministry Of ...

ENVIRONMENT AND DEVELOPMENT.

# They will build a 48-story tower in the old headquarters of Disa

*The eight thousand square meter half block is surrounded by 38 trees of the most diverse species.*

Edith Castillo Duarte | ecastillo@prensa.com

Jul 15, 2006 - 01:00 AM



GREEN AREAS. The developers say the trees are part of the design of the hotel project.

Recibe los titulares

Dirección de co

LA

09:05 Starts the ... private hospitals; thousand doses p

08:10 Joseph Bla Swiss justice on T Michel Platini [ Re

07:55 Messi, a ve but who generate

06:00 Raúl Queve lead a bank focus reactivation of th

REGÍSTRATE GRATIS POR EMAIL A LA PRENSA

# Subscribe and enjoy exclusive content

Empieza tu mañana con las noticias que necesitas leer directo en tu correo electrónico. Regístrate gratis aquí.

### Are you a subscriber of La Prensa?

Dirección de correo *

Log in                                                              Suscribirse

### If you are not a subscriber

Get unlimited access to all the content of La Prensa, Ellas, Martes Financiero and Mi Diario Digital.

Subscribe from $ 5 monthly



**Need help?**

Contact us at 323-6400 / subscriptions@prensa.com (mailto:suscripciones@prensa.com)

## MORE NEWS

Cciap plantea un nuevo pacto fiscal para fortalecer al Estado y mejorar                                     ›

Huawei reports negative results in the second quarter                                                       ›

Copa targets 70% of its capacity by September                                                               ›

World Bank chooses Panama for regional headquarters                                                         ›

Metals price boosts Peru surplus                                                                            ›

## COMMENTS

LAS

01:00 ¿Quién ma
aquí', Annette Cá

01:00 El impacto
de los hermanos
Linares [ Leer má

01:00 Los retenes
control sobre el c
común? [ Leer ma

20:43 Gobierno: l
digital deben esta

DE

01:05 Cciap plant
Estado y mejorar
impuestos  [ Leer

01:03 Huawei rep
en el segundo tri

01:03 Copa apun
para septiembre

01:03 Banco Mur
sede regional [ Le

01:00 Precio de n

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 564 of 632

# Subscribe and enjoy exclusive content

**Are you a subscriber of La Prensa?**

Log in



**If you are not a subscriber**

Get unlimited access to all the content of La Prensa, Ellas, Martes Financiero and Mi Diario Digital.

Subscribe from $ 5 monthly

**Need help?**

Contact us at 323-6400 / subscriptions@prensa.com (mailto:suscripciones@prensa.com)

EDICI

AÑO

MES

DÍA

TAMBIÉN TE PUEDE INTERESAR...

## Subscribe and enjoy exclusive content



**Are you a subscriber of La Prensa?**





Log in

### Asistente Financiero

asistentefinanciero.com

Solicita 100% en línea tu Tarjeta
de Crédito y llévate la aprobación
inmediata. Y encuentra el
seguro para tu auto con las
mejores aseguradoras de
Panamá.

### Ellas

ellas.pa

Tu espacio para encontrar

**If you are not a subscriber**

Get unlimited access to all the content of La
Prensa, Ellas, Martes Financiero and Mi Diario
Digital.

Subscribe from $ 5 monthly

### Financiero

financiero que hace
amá y el mundo.

### Revista K

@revistak

Periodismo social y cultural con
perspectiva moderna.

### Club La Prensa

club.prensa.com

Vive diariamente diversas
experiencias con el Club del
que todos hablan.

### Me

met

Por
en

**Need help?**

Contact us at 323-6400 / subscriptions@prensa.com (mailto:suscripciones@prensa.com)

**Advertencia:** Todo el contenido de www.prensa.com pertenece a Corporación La Prensa, S.A. Razón por la cual, el material publicado no se puede
reproducir, copiar o transmitir sin autorización previa de La Prensa. En caso de estar interesado comuníquese con nuestro departamento Legal e agradecemos su cooperación y sugerencias a
suscripciones@prensa.com y Servicio al Cliente. En caso de necesitar mayor información, llámenos al 323-6400.

Política de Privacidad

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 566 of 632



 pressreader

Search Results

Crítica

# Corte falla contra Waked, pero sus abogados apelan

14 Apr 2017



La corte del distrito de Columbia, Estados Unidos, rechazó un recurso interpuesto por los abogados de Abdul Waked, en el que se alegaba que la OFAC había violado el debido proceso al incluir al Grupo Wisa en la Lista Clinton. El empresario apeló la decisión.

La defensa de Waked, a cargo de la firma Williams & Connolly, cuestionaba que la OFAC había sustentado la designación por lavado de dinero en base a un expediente administrativo "expurgado", lo cual dificultaba aclarar las acusaciones. El tribunal aceptó ese argumento, pero determinó que en resúmenes que les suministraron a los demandantes en agosto y octubre, les detallaban claramente las acusaciones.

El fallo del tribunal resalta en los resúmenes se califica a los demandantes como la organización más grande de lavado de dinero conocida en Panamá. Se indica que iniciaron en la década de los 80 con el cartel de Medellín.

Se alega el envío de millones de dólares producto del narcotráfico, mediante el contrabando de efectivo a granel en aviones comerciales para el cartel de Sinaloa. El efectivo llegaba en maletas a Tocumen, donde eran sobornados funcionarios del aeropuerto.

Las maletas llegaban a duty free en Tocumen y eran depositadas luego en bancos. Otros mecanismos eran la venta de productos a empresas en Colombia y el uso de facturas falsas. El resumen agrega que también se lavó dinero a través de inversiones inmobiliarias y en cuentas en el Balboa Bank and Trust.

La defensa de Abdul Waked apeló la decisión del juez Collen Kollar-Kotelly por haber negado sus peticiones para un procedimiento abreviado y el requerimiento de información que sustente su inclusión en la Lista Clinton.



Write a comment...

Listen | Page View | Share | Save | More

👍 Upvote   👎 Downvote

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 567 of 632



Conéctate

**Empresas**

# Waked, un imperio del perfume que huele a supuesto lavado de dinero



*Este es el organigrama del supuesto lavado de dineros que investiga el Departamento del Tesoro.*

8:57 - 6/05/2016

Abdul y Nidal Waked, principales ejecutivos del Grupo panameño Wisa en Panamá han sido incluidos en la "Lista Clinton" de actividades ligadas al lavado de dinero y el narcotráfico, de acuerdo con el Departamento del Tesoro de Estados Unidos.

Según el reporte del Departamento del Tesoro de Estados Unidos, se investigaron una red que incluye seis ejecutivos y 68 compañías ligadas la investigación denominada "Waked Money Laundering Organization"(Waked MLO) y a los empresarios panameños Abdul Waked y Nidal Waked, ha publicado la Agencia de Noticias ANPanamá.

Entre las empresas que aparecen mencionadas en la investigación son Vida Panamá (Zona Libre) S.A., una empresa de importación / exportación en Zona Libre de Colón de Panamá; Grupo Wisa S.A., un holding de empresas que participan en bienes raíces, construcción, comercio, hostelería, y los medios de comunicación, incluyendo la cadena La Riviera de las tiendas libres de impuestos que operan en toda América Latina; Soho Panamá S.A. y entidades relacionadas, incluyendo un centro comercial de lujo y el desarrollo de bienes raíces en el centro de la Ciudad de Panamá; Balboa Bank & Trust, un banco de Panamá; y la estrategica Investors Group Inc., una compañía que es propietaria y controla Balboa Bank & Trust, así como otras dos compañías de servicios financieros. Balboa Bank & Trust fue utilizado para el blanqueo de narcóticos y otras ganancias ilícitas para múltiples organizaciones criminales internacionales.

La Riviera es en Colombia una reconocida cadena de venta de perfumes y artículos de uso personal. Al conocerse la decisión del Departamento del Tesoro, Abdul Waked, presidente del Grupo Wisa, señalaba que estas acusaciones eran infundadas y que se ponían a disposición de los organismos de control para aclarar cualquier duda.

Recientemente, La Riviera se vio involucrada en la disputa por la exclusividad de la comercialización de la marca española MNG Mango, pulso que le ganó a su competidora.



Menu

connect

*Companies*

# Waked, a perfume empire that smells of alleged money laundering



*This is the organization chart of the alleged money laundering being investigated by the Treasury Department.*

8:57 - 6/05/2016

Abdul and Nidal Waked, main executives of the Panamanian Wisa Group in Panama have been included in the "Clinton List" of activities linked to money laundering and drug trafficking, according to the United States Department of the Treasury.

Según el reporte del Departamento del Tesoro de Estados Unidos, se investigaron una red que incluye seis ejecutivos y 68 compañías ligadas la investigación denominada "Waked Money Laundering Organization"(Waked MLO) y a los empresarios panameños Abdul Waked y Nidal Waked, ha publicado la Agencia de Noticias ANPanamá.

Entre las empresas que aparecen mencionadas en la investigación son Vida Panamá (Zona Libre) S.A., una empresa de importación / exportación en Zona Libre de Colón de Panamá; Grupo Wisa S.A., un holding de empresas que participan en bienes raíces, construcción, comercio, hostelería, y los medios de comunicación, incluyendo la cadena La Riviera de las tiendas libres de impuestos que operan en toda América Latina; Soho Panamá S.A. y entidades relacionadas, incluyendo un centro comercial de lujo y el desarrollo de bienes raíces en el centro de la Ciudad de Panamá; Balboa Bank & Trust, un banco de Panamá; y la estratégica Investors Group Inc., una compañía que es propietaria y controla Balboa Bank & Trust, así como otras dos compañías de servicios financieros. Balboa Bank & Trust fue utilizado para el blanqueo de narcóticos y otras ganancias ilícitas para múltiples organizaciones criminales internacionales.

La Riviera es en Colombia una reconocida cadena de venta de perfumes y artículos de uso personal. Al conocerse la decisión del Departamento del Tesoro, Abdul Waked, presidente del Grupo Wisa, señalaba que estas acusaciones eran infundadas y que se ponían a disposición de los organismos de control para aclarar cualquier duda.

Recientemente, La Riviera se vio involucrada en la disputa por la exclusividad de la comercialización de la marca española MNG Mango, pulso que le ganó a su competidora.

[House Hearing, 115 Congress]
[From the U.S. Government Publishing Office]

ATTACKING HEZBOLLAH'S FINANCIAL NETWORK: POLICY OPTIONS

=======================================================================

HEARING

BEFORE THE

COMMITTEE ON FOREIGN AFFAIRS
HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

_____

JUNE 8, 2017

_____

Serial No. 115-51

_____

Printed for the use of the Committee on Foreign Affairs

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Available via the World Wide Web: http://www.foreignaffairs.house.gov/
or
http://www.gpo.gov/fdsys/

_____

U.S. GOVERNMENT PUBLISHING OFFICE

25-730 PDF                    WASHINGTON : 2017

_____
For sale by the Superintendent of Documents, U.S. Government Publishing Office,
Internet:bookstore.gpo.gov. Phone:toll free (866)512-1800;DC area (202)512-1800
  Fax:(202) 512-2104 Mail:Stop IDCC,Washington,DC 20402-001

COMMITTEE ON FOREIGN AFFAIRS

EDWARD R. ROYCE, California, Chairman

CHRISTOPHER H. SMITH, New Jersey
ILEANA ROS-LEHTINEN, Florida
DANA ROHRABACHER, California
STEVE CHABOT, Ohio
JOE WILSON, South Carolina
MICHAEL T. McCAUL, Texas
TED POE, Texas
DARRELL E. ISSA, California
TOM MARINO, Pennsylvania
JEFF DUNCAN, South Carolina
MO BROOKS, Alabama
PAUL COOK, California
SCOTT PERRY, Pennsylvania
RON DeSANTIS, Florida
MARK MEADOWS, North Carolina
TED S. YOHO, Florida
ADAM KINZINGER, Illinois
LEE M. ZELDIN, New York
DANIEL M. DONOVAN, Jr., New York
F. JAMES SENSENBRENNER, Jr.,
    Wisconsin
ANN WAGNER, Missouri
BRIAN J. MAST, Florida
FRANCIS ROONEY, Florida
BRIAN K. FITZPATRICK, Pennsylvania
THOMAS A. GARRETT, Jr., Virginia

ELIOT L. ENGEL, New York
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
ALBIO SIRES, New Jersey
GERALD E. CONNOLLY, Virginia
THEODORE E. DEUTCH, Florida
KAREN BASS, California
WILLIAM R. KEATING, Massachusetts
DAVID N. CICILLINE, Rhode Island
AMI BERA, California
LOIS FRANKEL, Florida
TULSI GABBARD, Hawaii
JOAQUIN CASTRO, Texas
ROBIN L. KELLY, Illinois
BRENDAN F. BOYLE, Pennsylvania
DINA TITUS, Nevada
NORMA J. TORRES, California
BRADLEY SCOTT SCHNEIDER, Illinois
THOMAS R. SUOZZI, New York
ADRIANO ESPAILLAT, New York
TED LIEU, California

Amy Porter, Chief of Staff        Thomas Sheehy, Staff Director

Jason Steinbaum, Democratic Staff Director

C O N T E N T S

----------

Page

WITNESSES

Matthew Levitt, Ph.D., director and Fromer-Wexler fellow, Stein
  Program on Counterterrorism and Intelligence, The Washington
  Institute for Near East Policy................................... 4
David Asher, Ph.D., member, Board of Directors, Center on
  Sanctions and Illicit Finance, Foundation for Defense of
  Democracies..................................................... 18
Mr. Derek Maltz, executive director, Governmental Relations, Pen-
  Link, Ltd...................................................... 31
Mara Karlin, Ph.D., associate professor of practice and associate
  director of strategic studies, School for Advanced
  International Studies, Johns Hopkins University................ 42

LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

Matthew Levitt, Ph.D.: Prepared statement........................ 7
David Asher, Ph.D.: Prepared statement........................... 20
Mr. Derek Maltz: Prepared statement.............................. 34
Mara Karlin, Ph.D.: Prepared statement........................... 44

APPENDIX

Hearing notice................................................... 76
Hearing minutes.................................................. 77
The Honorable Thomas A. Garrett, Jr., a Representative in
  Congress from the Commonwealth of Virginia: Material submitted
  for the record................................................. 79

The Honorable Theodore E. Deutch, a Representative in Congress
  from the State of Florida: Material submitted for the record...     84
The Honorable Gerald E. Connolly, a Representative in Congress
  from the Commonwealth of Virginia: Prepared statement..........     86
Written responses from David Asher, Ph.D., to questions submitted
  for the record by the Honorable Christopher H. Smith, a
  Representative in Congress from the State of New Jersey........     88
Written responses from Matthew Levitt, Ph.D., and David Asher,
  Ph.D., to questions submitted for the record by the Honorable
  Michael T. McCaul, a Representative in Congress from the State
  of Texas......................................................     89

ATTACKING HEZBOLLAH'S FINANCIAL NETWORK: POLICY OPTIONS

----------

THURSDAY, JUNE 8, 2017

House of Representatives,

Committee on Foreign Affairs,

Washington, DC.

The committee met, pursuant to notice, at 10:08 a.m., in room 2172, Rayburn House Office Building, Hon. Edward Royce (chairman of the committee) presiding.

Chairman Royce. This hearing will come to order. This hearing is on attacking Hezbollah's financial network, and different policy options that we have. So we consider these additional steps needed to confront one of the top terror threats in the world, and that threat is Hezbollah. It is a terrorist group that is based in Lebanon, where it is a significant political force as well. If you look at the history, it dates back to 1982 when members of Tehran's Revolutionary Guard Corps' Quds Force first deployed in Lebanon's Beqaa Valley. And they created, armed, and funded a small force which became Hezbollah.

Today, as the leading Iranian proxy, Hezbollah continues to be Iran's front line against Israel. Since its 2006 war with Israel, Hezbollah has dramatically grown its supply of rockets and missiles, allowing it to strike throughout Israel, with much greater precision and force.

I was in Haifa in 2006, and at that point in time, there were 10,000 of these rockets fired out of an inventory of about 20,000. I saw the consequence of it. There were 600 victims from Haifa in the trauma hospital who were being treated as a result of the attacks on civilian neighborhoods.

It is 11 years since that period of time, and now, instead of 10,000 rockets and missiles remaining in the inventory, there are 110,000, and these are of increasing sophistication. One observer even wrote that Hezbollah is now, in his words, ``more militarily powerful than most North Atlantic treaty organization members.'' One of reasons for this, by the way, is that many of these newer missiles Iran is working on developing--and I am talking about the government, Iran's Islamic Revolutionary Guard Corps--is working on the ability to make these GPS-guided missiles.

Hezbollah is putting its military power to very effective use. In Syria, its fighters are key to the efforts by Iran's Islamic Revolutionary Guard Corps and Moscow's efforts to prop up the Assad regime, along with Russian troops and Iran's Revolutionary Guards.

For 30 years, Hezbollah has remained Iran's proxy, and Iran

remains Hezbollah's primary source of financial support. In
April 2015, its leader, Hassan Nasrallah, boasted that even
under sanctions, Iran still funded Hezbollah's terror war. And
he anticipated that a rich--in his words, ``a rich and powerful
Iran, which will be open to the world,'' would be able to do
even more. The Iran nuclear agreement has made it possible for
Iran to provide Hezbollah with a windfall. As one witness will
testify today, Hezbollah's activities since the nuclear
agreement have ``expanded in scope.''

But Tehran is not Hezbollah's only source of income,
because since its inception, Hezbollah has developed a broad
criminal network involved in a range of illegal activities--
from drug trafficking, to cigarette smuggling, to money
laundering, to counterfeiting. These global terrorists double
as global criminals.

Indeed, in February 2016, the U.S. Drug Enforcement
Administration--in an operation led by one of the witnesses who
is here with us today--implicated Hezbollah in a multimillion
dollar drug traffic and money laundering network that spanned
four continents and put cocaine ultimately on the streets of
the United States.

The committee is focused on the best way to attack
Hezbollah's financial network and its tentacles across the
globe. And in 2015, we led the way to enact the Hezbollah
International Financing Prevention Act to target those that
facilitate financial transactions for Hezbollah. This has
helped put Hezbollah in the ``worst financial shape in
decades,'' according to the top Treasury official, despite
Iran's continued support. Part two of this legislation is
coming, but, unfortunately, that is of little comfort to
Israelis staring down at an arsenal of rockets that sit just
across the border from Lebanon or the Syrians being slaughtered
at the hands of Hezbollah operatives that are participating in
ethnic cleansing in Syria.

We look forward to hearing from our witnesses today on ways
in which the United States can further tighten the grip.

I now yield to our ranking member today, Mr. Deutch, for
any opening comments he may have.

Mr. Deutch. Thank you, Mr. Chairman. I would like to thank
you and Mr. Engel for holding today's hearing on what is
arguably one of the greatest threats to U.S. security interests
and the interests of so many of our allies. And thanks to the
witnesses for being here today as well.

Hezbollah is a terrorist organization that has attempted to
carry out, or has successfully carried out, attacks on multiple
continents, from the bombing on in the U.S. Marine barracks in
1983, to the bombing of a Jewish center in Argentina in 1994,
to the bus bombings in Bulgaria in 2012. Hezbollah's reign of
terror has no geographical boundaries.

Perhaps most concerning in recent years has been
Hezbollah's entry into Syria. Working on behalf of the
murderous Assad regime, there are estimated to be 7,000
Hezbollah fighters inside Syria. Receiving significant military
support from Iran, Hezbollah, along with various Iranian-backed
militias, has assisted the Assad regime in devastating attacks
on the Syrian people.

In turn, ISIS-affiliated retaliatory attacks have been
launched inside Lebanon, killing innocent Lebanese civilians.
Hezbollah's involvement in Syria has fed the emergence of the
Russia-Iran-Assad alliance. Open source reporting now details
the transfer of advanced weaponry from Russia to Hezbollah. It
is reported that Hezbollah is in possession of Russian designed
surface-to-air shoulder-mounted missiles. This is in addition
to the precision-guided missiles it is apparently now receiving
from Iran that will add to its arsenal of over 120,000 rockets
capable of reaching every corner of Israel. And Hezbollah is

now sending fighters to Iraq and to Yemen.

Let me be clear: There can be no future in Syria where Iran and/or Hezbollah has a permanent, military presence. And it remains to be seen how this administration thinks that it can cooperate with Russia and Syria when Russia has so far been unwilling to separate itself from Iranian efforts to strengthen Assad.

Last month, Hezbollah's leader, Hassan Nasrallah, stated that the conflict had entered what he described as a new and critical phase in which Damascus, Moscow, Tehran, and Hezbollah were, and I quote, ``in more harmony politically and militarily than at any time.''

Hezbollah has long received hundreds of millions of dollars a year from Iran. However, Hezbollah has expended its own financing operations to include what has become known as the business affairs component, a transnational criminal network that engages in everything from narcotrafficking to money laundering, to the sale of counterfeit cigarettes and goods. These operations have gained significant foothold in Latin America, in Europe, and in Africa. Increased cooperation between U.S. law enforcement and law enforcement entities around the world has resulted in significant exposure and breakup of many of Hezbollah's illicit financing networks. Project Cassandra, a DEA-led effort, which we will hear more about from our witnesses, exposed a massive narcotrafficking ring.

International cooperation is crucial to our efforts to disrupt Hezbollah. And this is precisely why our allies in Europe must join the United States, the GCC, Canada and others in designating the whole of Hezbollah as a terrorist organization. The idea that there is separation between Hezbollah's military and political wings is, quite frankly, laughable, which is why I recently introduced a resolution urging that you designate Hezbollah, in its entirety, as a terrorist organization.

I am proud to be joined by a bipartisan group of members in this effort, including members of this committee, our chairman emeritus Ros-Lehtinen, and Mr. Lieu, Mr. Zeldin, and Mr. Schneider.

Congress has played a significant role in preventing funds from flowing to Hezbollah. In 2015, I was proud to join Chairman Royce in introducing and passing the Hezbollah International Financing Prevention Act. And I just want to note that when we first introduced those new sanctions, we were told, as we so often are warned against the perils of using economic sanctions, that the Lebanese banking sector would collapse. But through the work of this committee and outreach to those Lebanese banks, that has not been the case. In fact, Lebanon's central bank has shut down the accounts of Hezbollah members and affiliates. But there is more that we can do. Secondary sanctions, for one, proved extremely effective in our policy toward Iran.

Today provides us with an opportunity to hear from our witnesses new policy prescriptions for cracking down on Hezbollah, both on the military and terrorism fronts, and ways to stop its funding streams.

Mr. Chairman, before turning back over, I would ask unanimous consent to enter into the record a statement by the Anti-Defamation League supporting new legislative efforts to crack down on Hezbollah's funding.

Chairman Royce. Without objection.

Mr. Deutch. I appreciate that. I look forward to this committee working together, as we regularly do, in a bipartisan manner under your leadership, Mr. Chairman, to move forward with these new efforts. I thank you and I yield back.

Mr. Connolly. Mr. Chairman, if I could just add, I have

joined in the resolution so there are other members as well.

Mr. Deutch. I thank my friend from Virginia.

Chairman Royce. Thank you, Mr. Connolly.

This morning, we are pleased to be joined be a very distinguished panel. We have Dr. Matt Levitt, a director at the Washington Institute for Near East Policy. And he previously served as a senior official at the Treasury Department. He has written extensively on Hezbollah.

We also have Dr. David Asher. He is a member of the board at the Foundation for Defense of Democracies, and he has played a senior role in numerous economic and financial pressure campaigns. He was an early pioneer in tackling North Korea's proliferation network.

We also have Mr. Derek Maltz with us, the executive director of government relations at Pen-Link. Previously, Mr. Maltz led the Drug Enforcement Administration's special operations division in actively targeting narcotics trafficking tied to Hezbollah.

We have Dr. Mara Karlin, associate professor with the Johns Hopkins School of Advanced International Studies. She previously served as an aide to the Under Secretary for Policy at the Department of Defense with a focus on the Levant.

So without objection, the witnesses' full prepared statements will be made a part of the record, and members will have 5 calendar days to submit any statements or questions or extraneous material for the record. We will start with Dr. Levitt, and we will ask you to summarize your remarks.

STATEMENT OF MATTHEW LEVITT, PH.D., DIRECTOR AND FROMER-WEXLER FELLOW, STEIN PROGRAM ON COUNTERTERRORISM AND INTELLIGENCE, THE WASHINGTON INSTITUTE FOR NEAR EAST POLICY

Mr. Levitt. Thank you, Chairman, Mr. Deutch, members of the committee. It is a pleasure to be here to testify before you today, and assess our efforts and those pursued to date to counter Hezbollah's ability to exploit the international financial system to its benefit. The regional international threats posed by Hezbollah have only increased over time, underscoring the importance of denying the group the financing and resources critical to its ability to function.

Hezbollah has, in fact, experienced a series of financial setbacks, in part because of the actions we have taken, leading U.S. officials to describe the group as being ``in the worst financial shape in decades.'' In recent months, Hezbollah has resorted to launching an online fundraising, crowd-sourcing campaign entitled Equip a Mujahid Campaign, which calls for donations large and small, payable all at once, or in installments, to equip Hezbollah fighters. It has also promoted a fundraising campaign on billboards and posters in Lebanon, promoting a program in which supporters can avoid recruitment into Hezbollah's militia forces for a payment of about $1,000. These are desperate measures for a group suffering through tough financial times. And yet it has enough money to do a great many disturbing things around the world.

I should stress here that of the various actions we are suggesting, that I am suggesting and others, the idea is not to undermine the Lebanese economy, but to protect it from exposure to the criminal and money-laundering enterprises in which Hezbollah is deeply involved. It should, therefore, not surprise that after Congress passed the Hezbollah International Finance Prevention Act, Lebanon Central Bank issued a circular ordering Lebanese banks to close accounts belonging to individuals and institutions associated with Hezbollah. According to the Central Bank, hundreds of Hezbollah-linked accounts have since been closed.

Now Hezbollah continues to operate in Europe, despite the

partial ban in July 2013, and it is aggressively engaged in criminal enterprises and Africa and in South America. And despite being designated as a terrorist group by the Gulf Cooperation Council, Hezbollah reportedly began storing some of its funds outside Lebanon in response to the effects of the HIFPA legislation, including in places like Iraq and Dubai.

Now, Hezbollah continues to get significant support from Iran, but I think today I want to focus on its global criminal enterprise. Now I am going to leave the business affairs components and other things to my colleagues. What I want to highlight here are some of other successes. For example, the extent of Hezbollah's drug connection was underscored in the wake of the U.S. Treasury's narcotics kingpin designation of the Panama based Waked Money Laundering Organization in May 2016. This action wasn't taken under a terrorism authority, and the press release said nothing about Hezbollah, but when this particular money laundering organization was targeted, it tied up the illicit finances linked to various elements within the Iran threat network, including Hezbollah, and forced them to find other money laundering channels in the region. Much of that activity reportedly shifted to the Tri-Border Area, and to Paraguay in particular. Hezbollah criminal enterprises run deep in Africa, as evidenced most recently by the arrest in Morocco, Hezbollah financier Kassim Tajideen, who has since been extradited to the United States and indicted in Washington, DC.

There a bunch of steps I think we can do to further actions we have already taken. The first is to designate additional Hezbollah entities as appropriate. HIFPA prescribes doing business with designated Hezbollah entities. So the more a Hezbollah entity is designated, the more impactful the legislation will be. This should include, but not be limited to, entities operating in Lebanon. For example, consider the list of Lebanese businesses designated with Lebanon-based IRGC Quds Force operative, Hasan Ebrahimi, in February.

Targeting Hezbollah criminal enterprises in South America, Africa, and Europe will be very important as well. Again, think about the Waked money laundering organization and that success. And finally, in this regard, consider follow-on actions to existing designations where appropriate. For example, the IRGC official in Lebanon, Ebrahimi, was providing Hezbollah funds through Hezbollah's al Waad construction firm, which we had already designated in 2009 or this Equip a Mujahid Campaign in Lebanon is being run by the Islamic Resistance Support Organization, IRSO, which Treasury already designated back in 2006.

Second, we should target Hezbollah criminal support networks of a variety of different types. I get into those in my testimony.

Third, we should consider applying secondary sanctions under HIFPA to financial institutions banking Hezbollah, its associates outside the Middle East. And here, for example, I think we should look at places like Balboa Bank & Trust, which was designated by Treasury in the context of the action taken against the Waked money laundering organization.

We should revisit the question of designating Hezbollah a transnational criminal organization, which it absolutely is without question. We should resume sanctioning Iran for state sponsorship of terrorism.

Again, we saw the Ebrahimi action in February, but the Quds Force, Mahan Air--a whole host of other low-hanging fruit, Iranian entities involved in Tehran's support for terrorism-- should be designated. And this, in no way, would jeopardize or conflict with the JCPOA Iran deal.

And finally, we absolutely must continue to enhance interagency coordination and cooperation against the Iran threat network. That began to fall apart a little bit in the

context of the Iran deal where some agencies wanted to push harder and some did not. Today there is, I think, greater consensus on the need to push hard on the maligned activities that Iran is engaged in beyond procurement, such as support for terrorism. And I think that there is a lot more we can do here. There are positive signs, on this I will conclude, for example, of using the global counterterrorism forum, the law enforcement and coordination group, both to address best practices for countering Hezbollah terrorist, criminal, and other terrorist activities that have been a great success. The State Department, similarly, has used the counterterrorism partnership fund to launch an international initiative in very close partnership with the Department of Justice to raise awareness about Iran and Hezbollah's broad range of terrorist and criminal activities around the world, and to help train our allies around the world to figure out how best to prosecute and deal with those activities. These types of efforts should be doubled down on. There is a lot more we can do. I thank you for the opportunity to testify before you today.

[The prepared statement of Mr. Levitt follows:]


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


----------


Chairman Royce. Thank you. Mr. Asher.

STATEMENT OF DAVID ASHER, PH.D., MEMBER, BOARD OF DIRECTORS, CENTER ON SANCTIONS AND ILLICIT FINANCE, FOUNDATION FOR DEFENSE OF DEMOCRACIES

Mr. Asher. Chairman Royce, Ranking Member Deutch, and other members of the Foreign Affairs Committee, thanks for the opportunity to discuss with you the challenges we face countering Hezbollah's rapidly expanding global web of terror, crime, and insurgency, including its direct ties to the United States.

I will be brief about the challenges we face in combating Lebanese Hezbollah's illicit web of activities and finances, and begin with a little recounting of how I got involved. Beginning in 2008, in the summer, I had the honor of advising the man on my left and several others in the room at the Drug Enforcement Administration and the Department of Treasury, Special Operations Command, Department of State, and Customs Border Protection on developing and spearheading a unified strategy across law enforcement and special operations to pursue Hezbollah's web of activities, with the goal of fundamentally disrupting Hezbollah's growing involvement in cocaine trafficking and money laundering, including through the United States financial system and through our own borders.

I am proud to say that a seamless collaborative web of combining a small group of U.S. agencies was established and leveraged to combat these activities using every agency's unique authority. So it is a whole-of-government approach that makes you proud about being part of this government. It is a combination of law enforcement, financial, criminal, civil, and regulatory authorities that led to a wide range of actions that you have heard about, providing a framework to deter, disrupt, and publicly illuminate the global illicit Hezbollah network. I think it was probably the most successful operational effort taken against Hezbollah to date by the U.S. Government after many years of inaction.

Yet, in the last years of the previous administration, for reasons that most definitely had to do with the Iran deal and

concerns of interfering with it, which I thought were totally
unfounded as a former nuclear negotiator with Iran and North
Korea, we lost much of the altitude that we had gained in our
global effort. And many aspects--including key personnel who
were reassigned, budgets that were slashed, and many key
elements of the investigations that were underway--were
undermined. And it was a bit of a tragedy and a travesty. And I
think it was, again, very unfounded. But today, we have to deal
with the legacy of that and how to rebuild this capability,
knowing that you can have a nuclear deal with Iran and you can
contain and disrupt its illicit activities and terrorist
activities, and we really have to do both.

But the result today is that criminal states and criminal
terrorist organizations continue to benefit from a type of
implicit immunity from prosecution. And Mr. Royce, you and I
have gone over this with North Korea over the years. We still
haven't seen the types of charges that were assembled against
that government, even in the wake of the Sony attacks, and more
recently, hacking of the Federal Reserve Bank in New York.
Moreover, neither al-Qaeda nor Hezbollah has ever been
organizationally prosecuted by the Department of Justice for
repeatedly attacking the United States, killing thousands, or
hundreds, of our citizens, and for being tied to a wide range
of transnational organized crimes and violations of our laws.
And by the way, the same is true with the Islamic State, of
which I had the honor to be the Deputy Special Coordinator on
the economic warfare side at the State Department a couple
years ago.

We have not applied Mafia-style RICO prosecutions that
would aim to incarcerate the members of these organizations for
life, take away their sanctuaries, strip them of their
finances, and undermine their credibility. I, frankly, have no
good answer why, except that I have heard from people,
including Director Comey, that there is a sense of fear that if
we do this, it is going to lead to reprisals.

I personally spearheaded the targeting of a Lebanese
Canadian bank, a $5\1/2\ billion bank that was at the heart of
Hezbollah and Iran's finances in Lebanon. We did not receive
retaliation as a nation for bankrupting their largest financial
institution. I think the fears are overwrought, and I find the
phobias surrounding prosecution of terrorists baseless,
bizarre, and moreover, largely against the spirit in the letter
of the laws we are sworn to uphold.

Today, I would like to highlight that the Department of
Justice needs to rebuild, properly fund, and expand
capabilities and investigations against what I call the Iran
action network, not just the threat network: Hezbollah's
terrorist and military wing and their friends and partners in
criminal states like Venezuela and North Korea.

And indeed, we can discuss this if you would like. The
level of cooperation between the Government of Venezuela, the
Government of Iran, the Government of Syria, and Lebanese
Hezbollah that we observed in undercover operations with which
we personally were involved, including people in this room, was
absolutely astonishing. The evidentiary basis to take down this
entire global network exists. The facts are clear, and they are
already revealed in many unsealed indictments.

Thank you for your time and I look forward to any questions
you have.

[The prepared statement of Mr. Asher follows:]

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

----------

Chairman Royce. Mr. Maltz.

STATEMENT OF MR. DEREK MALTZ, EXECUTIVE DIRECTOR, GOVERNMENTAL RELATIONS, PEN-LINK, LTD.

Mr. Maltz. I would like to thank you for this opportunity to discuss this important topic. I retired from DEA, but I remain in daily contact with my colleagues and I pay close attention to the emerging threats to our country. I lost my brother Michael, U.S. Air Force para rescue early in the war and I am very passionate about national security and public safety issues. During the period I was the director of SOD, I had the privilege of working with numerous law enforcement agencies around the world, the intelligence community, and the Department of Defense. We had 30 agencies to include the U.K., Australia, Canada, NYPD, and we represented a center that was synchronizing efforts around the globe. I have witnessed the amazing results that have been achieved when agencies share operational intelligence and coordinate their efforts. Unfortunately I have also witnessed the lost opportunities that have been created when information wasn't shared.

In response to September 11th, very smart people in the government decided to form a counter-narco terrorism center inside the SOD operation. And they had vision because they knew the nexus between drugs and terrorism and crime was very, very closely tied, so the coordination became really important.

Over the years the nexus between crime and terror has grown. It is all about the money, they need money to operate. That is the bottom line. We heard from the experts that they are losing money, they are in bad financial shape, so drug trafficking is very important. We must shut down these funding streams, and we must use all the powerful tools of national power to attack this global threat. We can't investigate terrorism in a cocoon. The American public expects the government to cooperate and share information on these major threat investigations. And we must work very hard to break down the barriers that currently exist between those that investigate criminal groups, and those that are responsible for preventing terrorism. We need to develop a mutually supportive framework so the law enforcement actions can enhance intelligence community actions and vice versa, so intelligence community actions can enhance law enforcement actions.

I was the head of SOD when we started this initiative back in 2006, 2007 looking at global trade-based money laundering very, very alarming to me. I was fortunate to meet Admiral James Stavridis, the commander of SOUTHCOM, and he showed me a very disturbing visual that remains in my iPhone today, a fireball when narco terrorists and Islamic terrorists are joined; that is what I saw in my observations working on Project Cassandra, Operation Titan for almost 10 years. It was alarming that this decorated admiral had the vision back in those days to see what was evolving in South America with the drug traffickers.

Unfortunately, based on what I observed, this is what I see everyday in my mind, that fireball. Hezbollah, one of the worst terrorist organizations--killing all these Americans around the world--was laundering proceeds of cocaine through the Lebanese Canadian Bank. They were operating like a major drug cartel. Now, in the press, we are hearing about the Captagon all over Syria. And I have some other information on that we can't discuss today.

Despite the limited support that our CNTOC task force received, we were very effective in what we were able to do. Project Cassandra was a long-term initiative target against a very significant organized crime network. We combined the

resources and the expertise of some really, really smart people in the government from Treasury, CBP, and other agencies—including Dr. Asher and the lead agent in the back, Jack Kelly, who was the catalyst on this operation.

We were able to use the tools of national power to make a difference for our country's safety. And we went after this bank very hard, and we did a 311 action, we did civil actions with the Southern District of New York, and we actually seized $150 million from a bank account in Lebanon, because of really, really innovative and powerful laws of the United States. And you know what? They felt the pain because they tried to hide the money from us in LCB and they moved it to another bank, but we found it because we have some good investigators in this country. Thanks to the CNTOC task force, we actually ultimately forfeited $102 million, and it is in the U.S. asset forfeiture fund, so we are very proud of that.

Investigators documented $300 million moving into the U.S. from Lebanon for the purchase and the shipment of these cars to west Africa. There were 30 businesses named in this particular action. Unfortunately, and sadly, there are many more businesses operating that were not affected because of the lack of information sharing.

Although criminal law enforcement, the intelligence community, and others working on terrorism have come a long way in sharing information, there is a lot more to be done. At this point in this country's history, we don't need any more inspector general reports talking about lack of information sharing. We need some accountability on the people that aren't sharing. As state sponsorship of terrorism is fueled by drug trafficking, and criminal activities are on the rise, we have to pay more attention. The special operations division, within the Department of Justice, established itself as a multiagency coordination center that can immediately deconflict investigative information, coordinating operation and mitigating threats through its resources and its global capabilities.

I would highly recommend that this committee and other Members of Congress consider enhancing the special operations capabilities and designate it as the transnational organized crime center for America. It is critical, in my view, that we continue to use all the powerful laws and we continue to enhance the laws. There must be open and collaborative efforts between the criminal investigations and the intelligence community because we are in this together. We all are going to face the same consequences if we don't work together. We must illuminate the networks with the really smart people we have in America. We must use every tool and have an all-tools-available approach.

As the Senate report adequately and accurately depicted, the Lebanese Canadian Bank investigation served as a model for interagency success. I am excited and hopeful that the Department of Justice and Homeland Security under the Trump administration will examine operations like Project Cassandra and pick out the best lessons learned and let us move forward.

Thank you for the opportunity to appear before you today. And I would like to discuss this important topic in any details. Thank you.

[The prepared statement of Mr. Maltz follows:]


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]



----------

Chairman Royce. Thank you, Mr. Maltz. Thank you for your service.

Dr. Karlin.

STATEMENT OF MARA KARLIN, PH.D., ASSOCIATE PROFESSOR OF PRACTICE AND ASSOCIATE DIRECTOR OF STRATEGIC STUDIES, SCHOOL FOR ADVANCED INTERNATIONAL STUDIES, JOHNS HOPKINS UNIVERSITY

Ms. Karlin. Chairman Royce, Mr. Deutch and members of the committee, thank you for this opportunity to appear before you today. Having examined Hezbollah as a national security policymaker and a researcher for nearly two decades, I can confidently say this is a critical time to assess it. To effectively examine Hezbollah's financing, one must consider the political military context, particularly the impact and implications of the Syria conflict. Hezbollah has both benefited from and suffered because of its involvement there. Starting with the latter, support around the region has been shaky, as Sunnis around the Middle East watch Hezbollah aid in Syria's destruction. In Lebanon, the Shia see body bags of its youth. With estimates of 5,000 to 10,000 Hezbollah members fighting in Syria, it is hemorrhaging members like never before. Indeed, it has bled more in Syria than in fighting Israel, over a much shorter period of time. Hezbollah is waging a counterinsurgency to prop up Assad. The American military has learned, over the last decade and a half, that this type of conflict is extremely difficult and costly in blood and in treasure. Notable power shifts are at play because of the Syria conflict. The Assad regime owes its continued existence to Hezbollah. Meanwhile, Hezbollah has become a regional player-- it has a substantial presence in at least four different countries--but is increasingly exerting Iran's mandate.

Today, Qassem Soleimani is the decider of Hezbollah's future, not Hassan Nasrallah. The conflict in Syria shifted the dynamics between them such that Hezbollah seems willing to do whatever Iran wants, whenever it asks, and regardless of the cost. Iran is willing to fight until the last Hezbollah member in Syria, and it appears Hezbollah is, too; that is a problem for Hezbollah. Lebanon Shia are isolated, increasingly disillusioned by Hezbollah, but see few protectors. Many of those now joining Hezbollah focus on money. Indeed, one out of every four Lebanese Shia receives a salary from Hezbollah. Given this, the Lebanese Shia desperately need alternative, political representation and new opportunities, particularly in the economic sector.

Now to be sure, Hezbollah has benefited from its involvement in the Syrian conflict. Ten years ago, I was most worried about Hezbollah's weapons, now I am more worried about the experience Hezbollah has gained. Before it was a capable military force, good at a limited number of missions. Its portfolio has expanded dramatically. It has become a hardened force, adept at facilitating Iranian power projection around the Middle East. It has learned to command and control a complicated conflict in collaboration with numerous actors. It has acquired substantial experience in diverse environments, using increasingly sophisticated weapons. And as the operating space in Syria becomes crowded, and the U.S. military deepens its direct involvement there, we could see inadvertent or deliberate interactions with Hezbollah.

Now turning to Lebanon. While the situation appears quiet, one should not be fooled. For a country of a few million brimming with sizable populations of long-term Palestinian refugees, and more recent Syrian ones, and 18 or so different confessional groups, it is a miracle Lebanon exists. That is important to remember--the state has institutions, but they are fragile. They do little in the way of actual governing, and are

often beholden to nonstate forces or external actors.

    As you all know well, Lebanon's military is a top recipient of U.S. security assistance. It is in U.S. interests for the military to fight nefarious actors whenever it is willing. Without U.S. support, its ability to do so is minimal. It has deployed throughout much of Lebanon and taken important, albeit insufficient, steps to counter violent actors. The Lebanese military is flawed, but it is nationally supported and well-respected in a country with few institutions that can be described as such. It has an impeccable record of maintaining control over its weapons over the last decade. And, of course, Hezbollah does not need the Lebanese military's weapons. It has Tehran and Damascus for that. Hezbollah poses the most potent threats to Lebanon's internal security. It turned its weapons on the Lebanese people in 2008 and will do so again if necessary.

    There is a memorial to the civil war at the front of Lebanon's ministry of defense composed of weapons collected from various groups melted together. You will not, however, find Hezbollah stockpile in that hunk of resting metal.

    As you seek to legislate further action against Hezbollah, I urge you to ask the following questions: To the White House, is the strategy focused on ISIL or does it include the Assad regime? To the intelligence community, how are Iran, Syria, and Russia adjusting their support for and/or collaboration with Hezbollah and Syria? What points of friction exist between them and Hezbollah? Can they be exploited? And what about between the Lebanese Shia and Hezbollah? To the State and Defense Departments, how are they regularly assessing their program to strengthen the Lebanese military? And to the Defense Department, how is the U.S. military accounting for the increased potential of U.S.-Hezbollah confrontation in and around Syria? Thank you very much.

    [The prepared statement of Ms. Karlin follows:]


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


                          ----------


    Chairman Royce. Thank you. If I could just ask a question here on, I guess a striking lesson in life, which is the zeal for the deal which becomes eventually a deal at any cost, how people get caught up on that. In April, it was reported that the Justice and the State Departments in the Obama administration denied or delayed requests from prosecutors and agents to lure some key Iranian fugitives to friendly countries so that they could be arrested for procuring material for Iran's nuclear program. This is something that Dr. David Albright spoke to before this committee, a former U.N. weapons inspector. He testified that out of a misplaced fear of negatively affecting the deal, the Obama administration also interfered in U.S. law enforcement efforts.

    So it is with interest to note Dr. Asher's testimony this morning, because in that testimony, he says: ``In narrow pursuit of the Iran nuclear agreement, the administration actively mitigated investigations and prosecutions needed to effectively dismantle Hezbollah in the Iran action network. Senior leadership presiding, directing, and overseeing various sections within the Department of Justice, the Department of Homeland Security, the Department of State, and portions of the U.S. intelligence community, systematically disbanded any action that threatened to derail the administration's policy agenda focused on Iran.''

So I was going to ask Dr. Asher what details you could give us on that and maybe ask Mr. Maltz your opinion as well. Dr. Asher?

Mr. Asher. Well, I had the unfortunate experience of being at the State Department coming back to work on the counter ISIL economic warfare plan as the coordinating under General Allen, so I saw a lot of this happening. This was after I departed the Hezbollah effort, largely because it was being defunded inside the DOD. And so I saw a lot of this directly, you know, we had money flowing, pallets and pallets of money flowing to Iran. There was a lot of stuff. Let's recall, in fairness, the Bush administration stripped the Department of Justice of its authorities to indict the Government of North Korea, to pursue the North Korean nuclear program, which we had a very sophisticated plan to destroy.

Chairman Royce. Another case of the zeal for the deal.

Mr. Asher. Another case of the zeal for the deal. I predicted to my colleagues that by the end of the Obama administration, we would see the same dynamics. This is a bipartisan syndrome, okay? It is not, you know, blame the Obama administration, blame the Bush administration. There is something about people wanting to have a deal at almost any cost. And in the case of the Iran deal, there are a lot of things around here talking about the nuclear negotiations, but there is no provision, as we discussed before, in outsourcing, even though they built a North Korea nuclear reactor in Syria right under the noses, right under the Six Party talk. There are a lot of holes in this cheese. Law enforcement didn't have to be one of them. It doesn't have to be one of them. People respect, including in Iran and Lebanon, when laws are enforced. The arrest recently of Kassim Tajideen, one of the most important super facilitators for Iran and Hezbollah, has sent a shock wave through the leadership of Hezbollah and the Iranian regime. The fact that we have him in prison here and that maybe he might cooperate, I am sure that has gotten their attention.

We had the ability, I can't comment on those two operations which I am aware of, that were essentially aborted, but we had many more that we were inhibited from acting on, for political reasons. We had operations that were denied overseas; we had funding that was cut. People were making a decision that the counterterrorism mission and the Iran nuclear deal was a central and all-important element, whereas containing Iran's malevolent forces was less important. I think you can do both, and we have to do both. I don't think it is an either/or.

If the Iranians don't like it, too bad, they blew up our Embassy twice, they killed hundreds of Marines. They went after us in Iraq when I was working with the Special Operations Task Force in support of them there, and killed nearly 800 Americans with explosively formed projectiles designed by Hezbollah. I have a beef against these people, obviously. And we have the tools, thanks to the great work of the DEA and other law enforcement agencies, to take them apart financially, economically, politically, and strategically, using law enforcement which the world will respect.

Chairman Royce. And maybe also I will ask Mr. Maltz what steps do we need to take? What steps does Congress need to take to rebuild our enforcement capabilities there?

Mr. Maltz. Well, like I said, sir, the Special Operations division has a history of success. As a matter of fact, you were very, very supportive in the Viktor Bout case. The last time I was before you was when you supported the DEA on the extradition of Viktor Bout, so I will never forget that. Thank you.

Chairman Royce. By the way it sends a powerful message to a lot of other miscreants on this globe, the fact that he is behind bars, and thank you very much for your success on that.

Mr. Maltz. So on that note, SOD had had this counter narco-terrorism operation center for the purpose of coordinating these type of investigations. We created that to provide a unity of effort. That is the purpose, because we are in this together. You cannot separate out the terrorist aspects and the criminal aspects, because at the end of the day, it is what is in the best interest of the U.S. Government. So I compliment some folks in the government in the Department of Justice and Admiral McRaven specifically, because we organized a U.S. Government interagency effort on this threat. And every agency that came to the table agreed that Hezbollah was a priority against the United States. So the idea was to put all the resources on the table. We went down to Florida for this big government meeting where the Attorney General, the Department of Homeland Security Director, and all these other officials were there.

So the idea would be, let's put the stuff on the table and work together. As soon as we left the meeting and as soon as Admiral McRaven retired, it fell apart, in my view. And I was the one in charge of the operation at SOD, so I could say that very clearly. And so for me, how the heck can you have an action against this organization running the Southern District of New York, the best in the country, and interagency did not come together and provide the necessary information to make it a more powerful action. So we had the right concept, but we didn't complete the deal. You know how upset I was when I saw The Wall Street Journal article at the end of last year? Very much--very accurate article. The car parks are booming in west Africa because the business is booming. We had a chance to knock them dead, and we held back because of interagency cooperation. So we have to end it.

Chairman Royce. We are going to return to that issue. I have to go to Mr. Deutch, and thank you.

Mr. Deutch. Thank you, Mr. Chairman. And thank you to the witnesses for a really excellent presentation.

Dr. Karlin, you said that Qassem Soleimani is now the decider of Hezbollah's future, and you talked about using Hezbollah for Iranian power projection. My question is how that is done, and whether it is Iraq, or Yemen, Bahrain, UAE, Saudis, are you suggesting that Hezbollah, or can you speak to whether Hezbollah is more than a model for the terrorist groups looking to act in those countries, and is, in fact, playing an operational role. If so, how broadly?

Ms. Karlin. Thank you for that question, Mr. Deutch. Hezbollah is the best design model Iran could have really hoped for in a number of ways. And I think when you look at attempts to build a similar force, say, Iranian support to the Houthis, it is just not going to be equivalent for domestic Yemeni reasons, among others. But, I think, for those of us who spent so long looking at Hezbollah, it was always a question of, if Iran asked Hezbollah to get involved in circumstances that would be really problematic domestically, what would Hezbollah do?

This was particularly thought of if there was some sort of entanglement between Israel and Iran, what would Hezbollah do if this ended up being a problem? And what we have seen is because Hezbollah can only play its singular role in Lebanon with Iran's weapons, what is happening now is existential for it.

And so this debate that used to occur doesn't occur anymore. Indeed, any thoughts Nasrallah might have are immaterial. If someone like Qassem Soleimani needs Hezbollah to go bleed in Syria, he doesn't really have a choice anymore, which is why you see not just the bleeding in Syria, which is obviously really problematic from a domestic and regional support perspective, but Hezbollah getting involved in training

Houthis in Yemen, also not core to its interests really at all.

It doesn't have a whole lot of options here. And we have seen this ability so that when we put on, say, U.S. Defense Department hats, one worries about Iran's conventional military, but it is the ability to build these violent nonstate actors like Hezbollah, and then deploy them in the various circumstances against their own interests in really problematic and lethal ways.

Mr. Deutch. I appreciate that. Dr. Levitt, in 2012, a bipartisan group of members began sending letters to our EU partners, urging them to designate Hezbollah. In 2013, they declared Hezbollah's military wing a terrorist organization. And as I mentioned earlier in my comments, the U.S. and others don't make this distinction between political and military wings. What impact would a full designation from the EU have on Hezbollah's ability to operate on the continent? And what more could the U.S. be doing now to encourage the EU to declare Hezbollah, in its entirety, a terrorist organization?

Mr. Levitt. Thank you for the question. When this was going on, my book on Hezbollah had just been finished and spent 8 months with Georgetown University press, God bless them, till it came out. That gave me an opportunity to make seven, eight, nine different trips to Europe, Brussels and most capitals at the time trying to push them on this issue.

Some of their concerns were some of the concerns you heard earlier about reprisals, about who are we to ban an entity that is duly elected in Lebanon? For many of the governments, however, at the end of day, their decision to ban even part of Hezbollah, the military and terrorist wing, had nothing to do with what terrorism Hezbollah had carried out around the world, let alone in Europe, but had everything to do with Syria. And so, that provided us a real opportunity.

What the legislation in Europe does already is it gives us an opportunity to go to the Europeans and get them to cooperate with us on Hezbollah investigations related to the terrorism and military activities, but Hezbollah is a large movement, and it doesn't operate a Hezbollah terrorism incorporated. And so it is often very difficult to explain to the Europeans, or prove to the Europeans, in open source, in a way that they can go public with, that an entity we want to target with them is, in fact, related to the military and terrorist wing, and not just politics or social welfare. Banning all of Hezbollah would end that debate and discussion, and it would stop giving Hezbollah a pass in which it could just, through basic front organizations and money laundering, pretend that something is a legitimate actor, part of their ``legitimate side of the house,'' when, in fact, it is supporting, or also supporting the terrorist and military activities.

If I may follow up also on the earlier question related to this. I don't think we can just target Hezbollah anymore. We need to bring this into a larger picture in targeting the Iran threat or the Iran action network more broadly. In particular, the Shia militias that are now so active in Iraq and in Syria. I think the likelihood that we could see some direct conflict between U.S. forces and these, including Hezbollah in Tanf from southern Syria is very, very real. And what we need to realize is that many of these Shia militants are not going to go back to being pharmacists and farmers when the immediate conflict is over in Iraq or in Syria.

And that means that we are seeing, right now, right before our eyes, the creation of an Iranian foreign legion of people who can go and do things for them in an asymmetric kind of way that Mara was talking about. It reminds me of Hezbollah and Iran's proxies just a few years after the Iranian revolution, where Iran wanted attacks carried out against U.S. and other interests, say, for example, in Kuwait. And they sent Hezbollah

operatives and they sent Iraqi Shia operatives. Some of the same people operating today, people like Hadeel Ammari, people like Abu Mahdi al-Muhandis, the very same people, these relationships go back 30 years. And we need to be targeting of course Hezbollah but not only Hezbollah. The Europeans as well.

Chairman Royce. We will go to Ileana Ros-Lehtinen.

Ms. Ros-Lehtinen. Thank you so much, Mr. Chairman and the ranking member.

Hezbollah is one of the most dangerous and formidable terror organizations in the world responsible for some of history's most notorious terror attacks. As Dr. Karlin noted, Hezbollah is more than just a partner in the Iranian regime, it is an extension of Iran's IRGC Quds Force and it is fulfilling Tehran's every wish, including propping up the murderous Assad regime in Syria, a mission which has only increased Hezbollah's sophistication, its stockpile, and its capabilities. We cannot ignore Hezbollah's influence and control over the Lebanese state, and by extension, the Lebanese Armed Forces, or LAF.

In your written testimony, Dr. Karlin, you state that the LAF is ``easily manipulated'' and ``only as capable as its political leadership permits.'' So if the LAF is easily manipulated, and Hezbollah has such a large influence over Lebanese institutions, how can we, in the U.S., reconcile U.S. support for the LAF? And I would like to hear the other witnesses respond to that, also.

And even with some of the safeguards that are in place, are we not running the risk of U.S. assistance to the LAF indirectly helping Hezbollah?

Ms. Karlin. Thank you for that question. If I might start with a little bit of history, the very first time I went to Lebanon was during the Syrian occupation----

Ms. Ros-Lehtinen. Well, thank you, Dr. Karlin. I do appreciate history, but I only have 3 minutes. How can we reconcile? How can both things be true? It is, LAF is ``easily manipulated, it is only as capable as the political leadership permits'' and yet we support the LAF. It is confusing, yes?

Ms. Karlin. Ideally, we want the Lebanese Government to be able to secure its territory, right, to have a monopoly on violence. And the more that there are violent nonstate actors that exist and proliferate around Lebanon, whether it is groups like Hezbollah, or it is groups within the refugee camps, like we have seen with Fatah Islam historically, the more that we want the Lebanese military to be capable of trying to shrink that operating space.

Ms. Ros-Lehtinen. Thank you. And how about the other witnesses, if you care to comment?

Mr. Levitt. The other witnesses are all pointing to me. I would just say that you are absolutely right, it is complicated. The LAF has done some very good things in taking the fight to the Islamic State, for example, but the LAF is compromised, even as it is the most basic glue that holds the Lebanese state together. So I think what we need to do is try and have as much influence with the LAF as possible, and understand that our expectations need to be limited, and that explains why, sometimes, we are very careful with what weapon systems we provide.

Ms. Ros-Lehtinen. Thank you. Let me just get to one last question. The U.S. Government has issued an interagency report stating that there are links, as we have discussed, between cigarette smuggling and terrorist organizations, such as Hezbollah. Do you have any recommendations on what we can do in Congress or the administration should do to clamp down on this source of funding for Hezbollah and other terrorist groups?

Mr. Asher. I mean, there is no doubt that we saw, in many cases, the cigarettes being moved away, same route, same facilitation networks as the cocaine. So one of the best ways

to do this is a public-private partnership. I had a great opportunity when I was running the North Korea illicit activities initiative and actually partnered with the Secret Service and the Philip Morris Corporation. It actually worked. We let the people affected by the cigarettes underwrite some of the law enforcement activities and we got support from members.

Ms. Ros-Lehtinen. So you would recommend----

Mr. Asher. I think we can do a lot together with the private sector to go after this, but we need to have a joint task force. This is the most important element, because these are polymorphic crimes. It is not just cocaine smuggling or Captagon. They are basically doing anything they can make a buck on, and cigarette smuggling is definitely one of them.

Ms. Ros-Lehtinen. Thank you.

Any other comments?

Mr. Maltz. I would say that, in my experience, one of the last cases that I was involved with at the SOD was another very disturbing trend, groups from Yemen operating all over the United States, involved with cigarette, unpacked cigarettes, K2 and spice, EBT fraud counterfeit goods and sending millions and millions of dollars right back to Yemen. So we have these global trade-based schemes going on from America back to these countries. So we have to step up the efforts.

Ms. Ros-Lehtinen. Thank you so much. Mr. Schneider?

Chairman Royce. I think Mr. Brad Schneider is next.

Mr. Schneider. Thank you. And I, again, want to thank the committee for calling this hearing, the witnesses for your testimony, but also for your long and dedicated work on this issue. We talked, in this hearing, quite a bit about the link between Iran and Hezbollah, Hezbollah's international activity, and the impact of Syria. Dr. Karlin, I think you said it very well, what I would look for, and I am anxious to understand better, is the administration's strategy for the Levant and how we take that on. I only have 5 minutes, so I am going to say I want to see it and we can talk about it later.

I would like to bring an issue that we haven't talked about here, and that is Russia's involvement with Hezbollah. To what extent--maybe I will turn it to you, Dr. Karlin--to what extent have you seen Russian cooperation with Hezbollah and Syria?

Ms. Karlin. Thank you. At a tactical and operational level we have seen Russian air cover for Hezbollah ground movement, we have seen the likelihood of joint operating centers, that is worrisome. What worries me a lot more is that Russia's military, if you follow its modernization over the years, has gotten pretty good. And I worry about Hezbollah learning about things, like how to use cyber warfare, how to use electronic warfare. It is worth noting, however, that strategically, this is a relationship of convenience. This conflict is existential for Hezbollah and Syria, it is not for the Russians.

Mr. Schneider. But I know it was reported last year in the Daily Beast, I believe, that Russia was providing Hezbollah long-range tactical missiles and other material. Have you seen that, and is there any evidence that the relationship is going to outlast the Syrian conflict?

Ms. Karlin. I have not seen evidence of that beyond those reports which I have also read. Russia has its own problems with groups like Hezbollah, which is why I still see this as a relationship of convenience rather than an actual partnership or alliance. And indeed, it is conceivable that the Russians will want to come to a serious negotiation on Syria way before Hezbollah will, because it is just not in their interest for a Syrian conflict to turn out any other way than Assad remaining in power.

Mr. Schneider. Great, thank you. I am going to turn to Dr. Levitt in a little different direction. You talked a fair amount about the Hezbollah International Financing Prevention

Act. Thank you for your help with that. A broader question--what metric should we be using to determine whether or not it is working, and what steps we should take further to push forward?

Mr. Levitt. First of all, let me thank you for your leadership on the Hezbollah International Financial Prevention Act. You were involved in this in the very, very beginning before many others were. I think there are so many tools here, that we were using some of them as you heard, and then we all but stopped. And in order to have a real effect, you have to have some continuity. There were prosecutions that were put on ice. There were designations that didn't happen. The fact that Kassim Tajideen was--we worked with the Moroccans, he was arrested in Morocco, he was extradited to the United States. He is now here in Washington, DC, in custody, been indicted. That I think is a very, very, positive sign, but there is a lot more that has to happen, across the interagency. The type of interagency cooperation that we have had in the past and we now need to have looking forward that you heard from myself and from my colleagues.

I also think we lost a real opportunity under the original HIFPA, the decision on whether or not to designate Hezbollah as a transnational organized criminal enterprise was given not to law enforcement, but to the DNI. And that decision was largely politicized and didn't move forward. It really boggled the mind. I wrote about it at the time. There may be reasons to decide not to move forward with it that I would disagree with, but there is no question that Hezbollah operates as a transnational organized criminal enterprise, and to designate them as such would really not only tar and feather them, but give us even more opportunities to target them.

Again, I think that Mara Karlin is right, that Qassem Soleimani is calling the shots more than anybody else. And the reason for that is because Hezbollah is so incredibly beholden to Iran for funds and weapons, and its position, which means that we need to be targeting not only Hezbollah operatives, but also the Iranian operatives and entities that are overseeing this relationship, which means getting comfortable with the idea of holding Iran's feet to the fire for its support for terrorism in particular, leaving the human rights and ballistic missiles aside, which we should be doing as well in the context of the Iran deal. This does not undermine or cross the Iran deal.

Mr. Schneider. Thank you. I am almost out of time. So let me just reiterate: I agree with you. I think we have to hold Iran to account for its activities, not just support of terrorism throughout the world, but also its activities within the region and its human rights activities at home. And I agree with what you said earlier; I don't think that threatens the JCPOA.

So, again, thank you to the witnesses,

And, with that, I yield back.

Chairman Royce. We go to Mr. Dan Rohrabacher of California.

Mr. Rohrabacher. Thank you very much, Mr. Chairman, and thank you for your leadership on, again, another really important issue for the safety of our country.

Let me ask some fundamental questions. Is Hezbollah, the people who make up Hezbollah, are they all Palestinians?

Mr. Asher. No.

Mr. Rohrabacher. Tell me what Hezbollah is made up of then.

Mr. Levitt. Hezbollah is a Lebanese group. It is not a Palestinian group----

Mr. Rohrabacher. Okay. But----

Mr. Levitt [continuing]. Comprised primarily of Lebanese Shiites.

Mr. Rohrabacher. I guess the reason I was asking that is

that we know that large numbers of Palestinians went to Lebanon, and I assumed that that was the group that eventually became Hezbollah. That is not correct?

Mr. Levitt. No. When it was founded, it got support from Fatah and other Palestinian groups to be sure and Imad Mughniyah and others. It does also see other sub-units. There is a Sunni sub-unit that includes some Palestinians called the Resistance Brigades, but that is not Hezbollah.

Mr. Rohrabacher. So they are Lebanese?

Mr. Levitt. Yes.

Mr. Asher. Mr. Rohrabacher, I can assure you that Imad Mughniyah himself studied at the financial feet of Yasser Arafat, and it is an interesting--and operationally and financially, we have a very substantial relationship between Palestinian Islamic jihad financiers and Hezbollah's Islamic jihad organization, i.e., the terrorist wing.

So it is a very interesting question, and they are based around a place called Burj al-Barajneh, which is near the airport. That was the historical base of the Palestinian Islamist jihad. It is interesting that there is so much of the Hezbollah terrorist and military wing activity right there, as well.

Ms. Karlin. Sir, if I might add, I have been to Burj al-Barajneh, and it is worth noting that actually traditionally the relationship between Hezbollah and the Palestinians in Lebanon is quite fraught because the Palestinians in Lebanon are Sunni. Hezbollah is Shia. And when the Palestinian refugees came to Lebanon, they threw off a very delicate confessional balance. So it is a very complicated thing, sir.

Mr. Rohrabacher. Yes, it is very complicated, and that is the reason why I asked that question. I have always been under the assumption that, yes, they were from Lebanon, but they were basically Palestinian refugees that are now Lebanese. So thank you for clarifying that.

What is the budget for Hezbollah? Do we have an overall budget? Anybody?

Mr. Levitt. No.

Mr. Rohrabacher. No?

Mr. Levitt. Hundreds of millions at a minimum, but I have seen no open-source and--I mean, no open-source numbers----

Mr. Rohrabacher [continuing]. Do they put those hundreds of millions in a bank somewhere?

Mr. Levitt. Pardon?

Mr. Rohrabacher. Do they put those hundreds of millions in a bank? Do they have bank accounts, because I thought this is what this was all about today.

Mr. Levitt. So, when we got inside the Lebanese Canadian Bank, which we did one way or another, we observed billions of dollars that were under the control both of the Lebanese Hezbollah, which we knew which accounts they were and how much money was in them through unclassified means, as well as Iranian money, and it was billions of dollars, too.

Mr. Rohrabacher. What banks were those again?

Mr. Asher. The Lebanese Canadian Bank, but there were many others that were part of a network. Everything we saw was larger than anyone expected.

And the other thing was that the connection to money laundering and drug trafficking proceeds were much greater than we ever expected.

Mr. Rohrabacher. Okay. So, if we know they have billions of dollars or hundreds of millions of dollars in these banks, can't we do something about that? Aren't we just--if nothing else, I mean, we could use our ability to hack into systems and destroy their bank accounts.

Mr. Maltz. Sir, like I said before, we did identify $150 million sitting in a bank, Banque Libano-Francaise, and we

did--because of the great work in the U.S. with the Southern District of New York--seize $150 million. They transferred the money to the U.S. Marshals' account from Lebanon, and we forfeited $102 million.

Mr. Rohrabacher. Congratulations on that.

Mr. Maltz. But there is a lot more.

Mr. Rohrabacher. Why aren't we doing more of it then? They are still there.

Mr. Maltz. Well, if we get the interagency task force together and we enforce some accountability on the folks involved, then we can do a lot more.

Mr. Rohrabacher. Okay.

I have just a couple more seconds here. Let me just note that we have recently seen an attack on Iran and the Iranian Government. The mullahs believe the Sunni forces have attacked them. This may signal a ratcheting up of certain commitments by the United States of America. And as far as I am concerned--I just want to make this point and see what you think--isn't it a good thing for us to have the United States finally backing up Sunnis who will attack Hezbollah and the Shiite threat to us? Isn't that a good thing? And if so, maybe it is a Trump strategy of actually supporting one group against another, considering that you have two terrorist organizations?

Mr. Levitt. Those attacks were claimed by the Islamic State. It is never in our interest to support a terrorist group like the Islamic State. We should condemn the attacks in Iran, as----

Mr. Rohrabacher. Even----

Mr. Levitt [continuing]. We should condemn any act of terrorism, even as we hold Iran accountable for its sponsorship of terrorism.

Mr. Rohrabacher. So that is like Joe Stalin was a horrible guy; we must never associate with horrible guys like that, even to get Hitler. And so maybe it is a good idea to have radical Muslim terrorists fighting each other. I will leave it at that. Thank you.

Mr. Asher. I mean, having coordinated the economic warfare plan against the Islamic State, I would not condone an attack by the Islamic State, much like Matt. I would be determined to destroy them financially----

Mr. Rohrabacher [continuing]. Hezbollah----

Chairman Royce. I think we need to go to Joaquin Castro here from Texas for his time.

Mr. Castro. Thank you, Chairman.

And thank you, the witnesses, for being here today and for your testimony.

Dr. Karlin, I wanted to follow up on a point that you were making or ask a question based on a point that you made. We know that Russia has assisted and helped Hezbollah. And, of course, we have been dealing in our Nation with the prowess of Russia's cyber capabilities and their abilities for cyber malfeasance.

Can you talk about your concern, if you have a concern, that they are sharing this information or this ability, capabilities, with groups like Hezbollah, and do we have an assessment of what Hezbollah's cyber capabilities are right now and terrorists groups like them?

Ms. Karlin. Thank you for that question. I have not seen an unclassified assessment of Hezbollah's cyber capabilities.

What I might say on the Russian military front, and my most recent job as the Deputy Assistant Secretary for Strategy and Force Development meant I spend a lot of time thinking about Russian military modernization and the trajectory that it is on, and it is pretty worrisome because not only do we see Russian investments in kind of weapons like its nuclear stockpile, but we also see some worrisome doctrine.

So the Russians have what is known as the Gerasimov
Doctrine: Escalate to deescalate. The idea is that if I punch
you, you should punch me a whole lot harder so that I give up.
That is a pretty dangerous doctrine to play around with, and I
worry about Hezbollah not necessarily getting the weapons from
Russia, but I worry about them watching how Russia uses its
doctrine, employs its doctrine, and then maybe starting to use
it itself, say, vis--vis Israel.

Mr. Castro. But certainly they could be trained in some of
these essential capabilities?

Ms. Karlin. Oh, absolutely conceivable.

Mr. Castro. Sure. And then it is interesting: Obviously, we
consider Hezbollah a terrorist organization, but they also have
some measure of political control in municipal governments in
Lebanon, Parliament seats, which makes them almost a hybrid of
a state actor and a nonstate actor, you know, versus ISIS,
right, which doesn't seek to elect people, at least as far as
we can tell, in the same way in politics.

So let me ask you guys, what do you see them as? Do you see
them as a state actor or as a nonstate actor? I open that up to
the panel.

Mr. Levitt. Thanks for the question. You are right: They
are both. But we need to see them as a nonstate actor in terms
of the explicitly illicit conduct that they are conducting
around the world as a transnational criminal organization, as a
terrorist organization, and as a militia independent of
Lebanon.

They are able to do that function even as they run for
municipal government and they run for Parliament and they hold
ministerial positions, because we allow it. If you allow an
organization that, independent of the country, does all these
other things, then, also, by the way, has people run for
office, then it can pretend to have more legitimacy than it
does.

But I think Mara Karlin was right: The greatest threat to
Lebanon, on so many levels--financial, stability--is Hezbollah.
And I think it is in part our fault, the international
community's fault, as Mr. Deutch suggested, for failing to see
Hezbollah holistically as a group that, whatever else it is
involved in, it is very much involved in a whole host of
explicitly illicit activities, as Mara pointed out, that have
nothing to do with the interests of Lebanon, even its interests
as a party in Lebanon.

So, ultimately, it is a nonstate actor that engages in some
state activities because it benefits them to do so.

Ms. Karlin. Mr. Castro, I couldn't agree more with Matt's
comments. I might just add that the weaker the Lebanese state
is, the better it is for Hezbollah.

Mr. Asher. Just if I could add, we identified publicly in
DEA the business affairs component of the Islamist jihad
terrorist wing of Hezbollah, the military wing of Hezbollah, as
at the center of the narcotrafficking, money laundering
conspiracy that involved the Lebanese Canadian Bank, a massive
number of cells in Europe distributing cocaine, cocaine coming
into the United States. So there is no doubt--and I am not
trying to say we shouldn't go after the entire organization,
designate the entire organization--but the case that could be
made most directly from a law enforcement perspective just
following the facts would tie the terrorist wing under Imad
Mughniyah, who died, and his successor and his business manager
Adham Tabaja, who he designated, to the cocaine money
laundering.

So there is a strategy that could be pursued where we go
after the business affairs component of Islamist jihad, charge
Islamist jihad for having blown up our Embassies and killed our
people, and we leave the rest of Hezbollah sort of off to the

side. That is an option that some prosecutors have advocated, but I am not sure that that is necessarily really comporting with the facts fully.

Mr. Levitt. I will just add to that. This is where people get most uncomfortable, right? If you really dig down to the information, you will find time and again that the ``political'' or ``social welfare leadership'' is involved in all of this illicit activity. The business affairs component was directly tied to Abdallah Safieddine. Safieddine is a political senior Hezbollah official.

And so, for those who are uncomfortable recognizing that Hezbollah actually is one holistic entity, for those who are uncomfortable with the consequences of having to follow the evidence to where it leads, that may explain why some people are hesitant to do so. It is inexcusable. We should be following the evidence where it takes us, whether it is in a murder case or a bank robbery case or a terrorism case.

Mr. Castro. Thank you.

I yield back, Mr. Chairman.

Chairman Royce. Mr. Perry.

Mr. Perry. Thanks, Mr. Chairman.

Thanks to the panel.

Generally speaking, maybe it is Dr. Levitt and Dr. Asher, why shouldn't the U.S. Treasury Department sanction the Central Bank of Lebanon?

Mr. Levitt. The simple answer is because they are actually very good partners. The Central Bank of Lebanon put out a circular making sure that the Lebanese financial system would enforce things like HIFPA and did a very good job of doing so.

As Mara said before, completely destabilizing Lebanon, destabilizing the financial system there is not in our interest, and of the partners we have, they are one of the best.

Mr. Perry. Are they facilitating payments that benefit Hezbollah?

Mr. Levitt. I can't answer that question in any specificity. Because Hezbollah has such a large footprint in the Lebanese economy, it is likely that that happens at some point. Would you, by targeting the Lebanese Central Bank, at the end of the day have a net benefit? No.

Mr. Perry. Okay. Why shouldn't the Department sanction Iranian banks for which sanctions were lifted under the JCPOA? Anybody?

Mr. Levitt. My colleagues keep looking at me. That is fine.

I think that we need to be careful that banks that were delisted, when we look at them for relisting or we look at other banks, we are very, very careful and specific to make sure that we are doing these under the authorities that still exist, and they do exist. There will be people who will tell you that you can't redesignate an Iranian entity that was taken off the list, but if it was taken off a proliferation list and it is still today involved, for example, in sponsorship of terrorism, it absolutely can and should be----

Mr. Perry. And should be, right?

Mr. Levitt [continuing]. Considered for designation.

Mr. Perry. Okay.

Mr. Asher. We are legally mandated, essentially, to do this. That is something, from your oversight perspective, Mr. Perry, that you can remind people. We have a legal responsibility to enforce this act, and we can't willfully ignore the facts. I, unfortunately, have seen a lot of willful ignorance in my career as----

Mr. Perry. You can't use the JCPOA to be derelict in your duty, right?

Mr. Asher. That is right.

Mr. Perry. And that is what is happening in this case----

Mr. Asher. And it is happening.

Mr. Perry. Considering they are intensifying international criminal activities, is there any reason the administration shouldn't consider designating Hezbollah as a transnational criminal organization?

Mr. Levitt. They absolutely should. As I said in my testimony and get into more detail in the written testimony, we should revisit this immediately.

Mr. Perry. Is there any disagreement among the panel?

Some of the most lucrative activities happen in the TBA, the Tri-Border Area. Can any of you talk about the current measures and what additional measures should be included regarding their criminal syndicate activities in Latin America, et cetera? Anybody?

Mr. Maltz. All I can say, sir, is that, when I was the head of the SOD, we saw a lot of cocaine leaving the TBA, going all over to the world, working closely with folks in Venezuela, connected to the highest levels of the government in Venezuela, but as far as currently, I can't give you an accurate assessment of what they are seeing in the TBA now.

Mr. Perry. And what is your recommendation for continued or further action in that regard?

Mr. Maltz. Again, like I have said all along, the best recommendation I can give to this committee: It has to start with information sharing. Let's stop pushing it under the rug. Get the experts together in a room, designate these as priorities. Every agency should be mandated to put the information on the table and then focus on the targets, and that is not happening.

Mr. Asher. If I could just say, I think the most powerful current way for the Department of Justice to impose a huge legal penalty against Lebanese Hezbollah, including its terrorist wing, would be to actively prosecute the government of Nicolas Maduro and his associates, including Tareck El Aissami, his executive vice president, for their involvement and complicity and active conduct in cooperating with Hezbollah in narcotrafficking money laundering on an international scale.

Mr. Perry. Okay.

Mr. Levitt. If I can add one last thing here.

Mr. Perry. Sure.

Mr. Levitt. Again, under HIFPA, we can apply secondary sanctions--and as I described in my testimony at length, so I won't describe it now--we can and should be looking for secondary sanctions, financial institutions with which we can hit secondary sanctions, in particular in South America and, after the Waked Money Laundering Organization was shut down, we saw a lot of that movement interest the Tri-Border Area, Paraguay in particular. There are no shortage of targets.

Mr. Perry. Okay.

Dr. Asher, Dr. Levitt, and Mr. Maltz, and I guess Dr. Karlin, as well, I did some time in Iraq. I just want, if you can in the few moments that are remaining, to assess the role of Iraqi financial institutions and businesses in enabling Hezbollah in Iran.

Mr. Levitt. We do know that, in the wake of the original HIFPA legislation, some Hezbollah money was moved out of Lebanon for fear that it wasn't quite as safe there as it once might have been, and some of it was moved, we understand, to places like Dubai and to Iraq.

The first order of business is to try and pressure the Iraqi Government to work as closely with us as possible in ways that they already have, for example, on countering the Islamic State financing, exchange houses, et cetera. Then, short of that, if there are illicit banks that are still providing these types of services knowingly, then we should consider the secondary sanctions option. But that doesn't need to be our

first choice. But we definitely need to be working further on the financial system as it relates to these threats.

Mr. Asher. Very quickly, based on open-source commercial records, you can see a very significant movement of Hezbollah financial operatives tied to the business affairs component of Islamist jihad into Iraq in the last few years. They have established a whole string of businesses in the south in partnership with Iraqi militant groups. It is obviously part of some sort of strategy that they are executing for their Iranian friends.

Mr. Perry. Just for clarification, in the south, do you mean in places like Basra and Nasiriyah?

Mr. Asher. Yes, but also into the southern belts of Baghdad as well, so you see it in some of the mixed areas. They have an economic action plan that they are executing to infiltrate the Iraqi economy, with the Lebanese playing a much more significant role.

Chairman Royce. We go now to Dan Donovan from New York.

Mr. Donovan. Thank you, Mr. Chairman.

Dr. Levitt, during your testimony, you talked about how we should again sanction Iran. Last year, the United States Government paid Iran $1.7 billion to their government. The official purpose of that was a payment for $400 million for a contract for military weapons from decades ago. The remaining $1.3 billion was the interest that was collected on that $400 million while it remained in the United States. If we are going to sanction countries, if we are going to sanction entities, what kind of message do we send them when they are receiving a benefit for us freezing their assets in the United States, that $1.3 billion that they gained in interest?

Mr. Levitt. So that action was, I believe, an unfortunate but a technical action in terms of the interest. Interest was there. Whether that had to be done or not is another discussion for another time. My feeling is we are where we are. That happened. There is no undoing that. And what we need to do, I believe in keeping with the Iran deal, whether you like the Iran deal or not, whether I like the Iran deal or not, is to hold Iran's feet to the fire on its continuing illicit conduct because that was how the deal was sold to us.

We were told by the previous administration's officials time and again that we would continue to hold their feet to the fire on these issues. We need to. It does not violate the deal to do so. The problem is, because we didn't do anything, Iran has been emboldened. Because we didn't do anything and Iran went around the world, including the Governor of the Central Bank who came here and spoke in Washington, DC, at the Council on Foreign Relations and elsewhere and said the era of sanctions is over, people started buying that narrative. That narrative is false. And so the first thing we need to do is push back on that narrative with our European and Asian allies, make them understand--I hope, because we are where we are--that we will hold up to the letter of the Iran deal, which means enforcing terrorism, ballistic missile, and human rights sanctions.

Mr. Asher. So I have on my cell phone some pictures that were sent to me by a financial source who is not a U.S. Government source. I do some work for financial institutions on anti-money laundering sanctions compliance, and that source sent me pictures of $1 billion in two pallets of shrink-wrapped U.S. Federal Reserve $100 bill notes that were moved through a European country into West Africa and into a South American country by Iranian agents, it appears, to set up some sort of port-to-port scheme, perhaps involving narcotics trafficking. Whether the money is the money that was given by my State Department colleagues, unfortunately, in my mind, or not--you don't see $1 billion in palletized cash with Federal Reserve

Bank of New York symbols on them, the wrappers, every day--the fact is that money is being moved around for operational and devious reasons. I don't think it contributed whatsoever to creating a more peaceful relationship with the Iranian people.

Mr. Donovan. You know, I always ask witnesses when they testify before us that we are lawmakers, and, you know, we create laws, and we have to ask experts like you, what laws would you like to see Congress create that would achieve the goals that we all have here?

Would each of you be able to just tell me for a moment what you would think about a law that would prohibit a terrorist organization or a state terrorist organization from receiving a benefit from having their assets in a United States bank?

Mr. Asher. I say I think we need to demand, sir, if you could and your members, colleagues, that the RICO, Racketeer Influenced and Corrupt Organizations Act, which terrorism is a predicate for RICO, be used assiduously against the major terrorist organizations to go after their members, their money, and their facilities, knowing that we can use long-arm statutes like we did against this Banque Libano-Francaise to go after their money and correspondent bank accounts here, even if we can't get to it in Lebanon or Iran or somewhere in the Middle East.

So RICO is an absolutely central feature. It doesn't need to be legislated, but you could encourage its use. It has never been used in a large way, other than against the FARC, and that was quite successful.

Mr. Donovan. And as Dr. Levitt had said earlier, if we designate Hezbollah as a criminal enterprise, RICO then would be available to us.

Mr. Levitt. RICO is available anyway. That would provide other benefits, but we could do RICO yesterday.

Mr. Donovan. Thank you.

Mr. Chairman, I yield back the remainder of my time.

Chairman Royce. Mr. Garrett?

Mr. Garrett. Thank you, Mr. Chairman.

With the risk of--let me see how gentle I can be. I think we have missed the target here. As we discuss in this very meaningful and worthwhile hearing attacking Hezbollah's financial network tangentially, certainly we have discussed Iran, but I have a rather convoluted line chart here that I have done that shows Iran giving what is estimated to be, depending upon your source: Open source, $60 million to $200 million a year to Hezbollah; the IRGC controlling the entire black economy in Iran and big, large portions of the above-ground economy in Iran; and, just in the black economy side, controlling revenue between $25 billion and $50 billion a year and them supporting Iran. We have drug ops in Lebanon supporting Hezbollah, but the drug ops in Lebanon really took off after the Syrian civil war escalated, creating a vacuum. And when the LAF stopped patrolling the fields in the areas in the Beqaa Valley, we saw a skyrocketing production of drugs. So that was caused largely by Iran, who now has coopted the LAF to the point now where I recently read an article that said, ``The distinction between Hezbollah and the Lebanese state is meaningless.''

In fact, the Lebanese President is a Hezbollah ally, and the Lebanese were the only nation not to sign the resolution condemning the attacks on the Saudi consulate and Embassy in Iran, and so what we see here is we are talking about Hezbollah, but that is a branch on a tree. The tree should be called Iran. The roots of the tree should be called the IRGC. And if you want to solve the long-term problem, we need to take on the IRGC.

One of these gentlemen--and I apologize because I was copiously taking notes, so I don't know which of you it was--

said we need to hold up to the agreement of the JCPOA, which I not jokingly referred to as the JCPOS--you can figure that one out--which means enforcing ballistic missile sanctions and, I quote: ``Hold up to the agreements of the JCPOA, which means enforcing ballistic missile sanctions.''

I wish--and I don't know how to do this because I am new here--that I could have read into the record an article from, of all places, NPR, which points out that the JCPOA is so tragically flawed that the lawyers that wrote it should be disbarred. Let me read to you from the U.N. Security Council Resolution 1929, which requires ``Iran shall not undertake any activity related to ballistic missiles.''

Fast forward the JCPOA--if anybody knows this nod along with me--which reads: ``Iran is called upon not to undertake any activity regarding ballistic missiles.''

I am not that good a lawyer, but I know the difference between ``shall not'' and ``called upon not to.'' And so we either intentionally sent really bad lawyers to negotiate a deal that puts Iran on a glidepath, not only to destroy sanctity and peace and stability in the region; we either intentionally did that or we hired the worst possible negotiators, who don't know the difference between ``may'' and ``shall,'' which you learn as a first-year law student.

No enmity intended toward anyone in the room and particularly not the lady and gentlemen on the committee--I had to look, Dr. Karlin, to make sure--but would you not agree that the root of the problem with Hezbollah is Iran and that the root of the problem in Iran is the IRGC and that the root of the IRGC is Quds, if I want to walk this dog farther down the trail?

I mean, if we really want to attack the source of this, do we not look to the IRGC in returning peace and stability and functionality to Iran, whose people want it but whose people can't have it when the Quds Forces are willing to shoot student protestors in the head, right, with impunity, and the United States does nothing.

I apologize. I pride myself not on doing soliloquies and diatribes in these things, but I am frustrated because I think we are mistargeting. Would any one of you gentlemen or lady, is the root of the Hezbollah problem not Iran?

Mr. Asher. Absolutely.

Mr. Garrett. And is the root of the Iran problem----

Mr. Asher. The IRGC, of course. And I worked to build a plan at CENTCOM where we went after the Iranians on various levels for various things that they did, including the IRGC, of which, unfortunately, much was abandoned as we got closer to the JCPOA. Whether you advocate a regime change or not, we don't accept the regime and its activities, and there is no way to divorce the IRGC from the Iranian economy and from the Lebanese state, in effect.

Mr. Garrett. I am a big fan of peace and stability, and I advocate loud and vociferously on behalf of regime change. I don't think it needs to be done at the point of a gun, but I do think that we created circumstances in the JCPOA, and we have not pursued our allies, particularly in Europe, who do business with the IRGC, and we can do this with open sources documented to make them pick who they want to do business with.

Yes, sir?

Mr. Levitt. Let me just put some meat on this bone, for example. The Financial Action Task Force gave Iran a year, a year that ends this month, to improve its behaviors on money laundering terror finance. Among the many things it is supposed to do are some very technical things and some very broad things. One of the things Iran has said it will not do is delete the cutout that it has for anything it describes as a resistance organization, i.e., Hezbollah. And it doesn't appear

they are going to change that. That is this month, and we need
to make sure that the administration makes its position very,
very clear this is unacceptable for us because you will
probably not get Iran off the FATF blacklist for special
measures right now, but you will probably get them a little bit
of an extension to see if they can do more.

Mr. Garrett. Mr. Chairman, I am over time.

I wanted to say, in conclusion, we can have a regime change
if we will strictly enforce sanctions. We have never been
willing to do that. Hopefully this administration will change
that. Thank you.

Chairman Royce. Thank you, Mr. Garrett.

We go now to, I think, Mr. Ted Yoho--oh, Mr. Gerry Connolly
is here.

Mr. Connolly. Thank you, Mr. Chairman.

Sorry, Ted.

Mr. Yoho. I yield.

Mr. Connolly. I thank my friend from Florida.

Welcome, to the panel.

Dr. Karlin, are you familiar with the JCPOA?

Ms. Karlin. Yes, sir, I am.

Mr. Connolly. Was it an all-comprehensive agreement that
covered all of Iranian behavior and our concerns?

Ms. Karlin. I did not work on the JCPOA as an Obama
administration official. My understanding is that it is
primarily focused on the nuclear piece.

Mr. Connolly. Correct. Can you think of a treaty governing
an adversary that was all comprehensive in history?

Ms. Karlin. Not off the top of my head.

Mr. Connolly. Right. So, when President Kennedy, for
example, negotiated the first Nuclear Test Ban Treaty to ban
atmospheric testing of nuclear weapons with then Nikita
Khrushchev and it was widely lauded as a peaceful measure, it
didn't address other Soviet behaviors. Is that not correct?

Ms. Karlin. Indeed. Usually, one----

Mr. Connolly. Right. And when one looks at the JCPOA in
terms of metrics, based on the fact that it was designed to
curb and, in fact, reverse aspects of the nuclear development
program in Iran, have those metrics been met, or is it widely
agreed that Iran has, in fact, cheated and violated the terms
of the agreement?

Ms. Karlin. I think it is a complicated picture, and I am
probably not the best person to address it.

Mr. Connolly. I don't think it is complicated. By and
large, all of the specific metrics with respect to the Iranian
nuclear development program have, in fact, been met, which may
be why we are trying to----

Mr. Asher. Could I just make one interjection?

Mr. Connolly. Excuse me, sir. No, please. And that may be
why we want to divert attention sometimes in this hearing to
other aspects of the Iranian behavior that indeed are to be
decried and, to the best of our ability, sanctioned.

I take enormous exception to my colleague from Virginia
asserting that maybe this administration will be serious about
sanctions when the previous one did not. It was precisely
because sanctions were working in the Group of 5, holding it
together, that brought Iran to the table for the first time.

Ms. Karlin. I couldn't agree more, sir.

Mr. Connolly. And we don't get to rewrite history. You
don't have to like it, but you don't get to rewrite it, and I
think the record needed to be corrected.

So, maybe, Dr. Levitt or Dr. Karlin, but I am intrigued by
Hezbollah's expanding role in the Syrian civil war,
particularly, where they have been exposed. What is your sense,
Dr. Levitt, of the cost? I mean, they have lost thousands of
fighters. They have lost leadership. Has it weakened Hezbollah,

or have they been able to use the exposure in Syria to their advantage in terms of strengthening the organization and its capabilities?

Mr. Levitt. And the honest answer to that question is yes.

Mr. Connolly. Yes, it has weakened them?

Mr. Levitt. Yes, it has weakened them, and yes, it has strengthened them both. I thought Mara addressed this well in her remarks. Hezbollah had lost more people killed and more people wounded in this so far fairly brief conflict than in all the wars with Israel. It is costing Hezbollah a tremendous amount of money. The fighting in Syria is still getting the funds, but not everything in Lebanon that Hezbollah traditionally does--some of the other social welfare, political things are not. Again, showing the ties between military terrorism activities and political, social welfare activities, it is having an impact in terms of their supporters as well as some people's families are getting more money than other people, depending on how long you fought. The fact that they are now having to put up banners on the streets in Lebanon saying, ``Well, if you don't really want to fight, you can make about a $1,000 donation and get out of it,'' it is like people are trying to get out of the forced conscription in Russia or Turkey back in the day.

Mr. Connolly. Right.

Mr. Asher. And so they are facing those types of problems. They have, however, had the benefit of the Islamic State rising to be such a threat that there has been a circling of the wagons in Lebanon--and elsewhere too, but we will focus on Lebanon--where the people say: I don't like Hezbollah, but Hezbollah is effectively defending me against the Islamic State, and so I don't have the luxury of still being angry at them for dragging my country, Lebanon, into the civil war.

Mr. Connolly. Do you believe that the costs are hurting them back in Lebanon, either in terms of credibility, ability to recruit, or, for that matter, participate in whatever governance they participate in?

Mr. Levitt. It is hurting them in terms of their ability to run their programs and their ability to recruit. There is dissension within the ranks among their supporters, but they are getting by just fine. And we need, therefore, right now to take the financial measures that will further undermine them.

All of your comments on the JCPOA I understand. Under the JCPOA, we were told these other things were going to continue. It is a fact that some of these were halted a little bit because some people felt they didn't want to shake the deal. I don't mean to make a statement about the deal there.

Now, we are where we are. Now is the opportunity to get back on the saddle here because we do have an opportunity to further exacerbate those financial tensions for Hezbollah.

Mr. Connolly. Yes. And this is a test of a new administration, whether its close ties to Russia can be put to our advantage in terms of curbing the behavior of Hezbollah and the Iranian Revolutionary Guard in areas we care about: Syria and Iraq. And maybe it is time to now put that question to the new administration.

Thank you. My time is up.

Chairman Royce. Thank you.

We go now to Mr. Ted Yoho.

Mr. Yoho. Thank you, Mr. Chairman.

And I appreciate the panel being here.

I read an article about Hezbollah about a month ago and how it said that it has become a force of over 100,000 very well armed, very well trained, one of the top fighting forces in the world. And I am going to ask the panel--who wants to weigh in on this--was that possible before the JCPOA and the release of the money that Iran got, or did that benefit Hezbollah to

become that strong of a force? Dr. Karlin?

Ms. Karlin. Thank you for that question. That number is a little larger than I have heard, but the concept, I think, is absolutely spot on, that Hezbollah has grown. It has grown more capable quantitatively and qualitatively.

But we have seen it on this trajectory for a while now. Back in 2010 or so, my former boss Secretary Gates noted that Hezbollah had more missiles and rockets than most governments in the world. I would say the money has been useful, but it is the Syria conflict that has been determinative.

Mr. Yoho. Right. And that is where it was; it was in Syria, was the report I read. And they are not affiliated with a nation as far as a national government. They are kind of a proxy group, correct?

Ms. Karlin. Hezbollah does serve in the Lebanese Government.

Mr. Yoho. Okay. And then, Mr. Levitt, I want to get clarification. Did you say that Iran should be redesignated as a state sponsor of terror?

Mr. Levitt. Iran is designated a state sponsor of terror. There is no redesignation then.

Mr. Yoho. That is what I thought, and I misheard you then.

Mr. Levitt. It was a response to a question about whether the context of redesignating Iranian entities that may have been taken off lists under the JCPOA and my argument that it would be in no way a violation of the JCPOA if they were relisted under still existing sanctions authorities like counterterrorism, which need to be very, very clear and show that evidence, that this is not simply just putting an entity back on the list for proliferation purposes.

Mr. Yoho. Okay.

And then, Dr. Asher, you had a comment you wanted to talk to Mr. Connolly about, and I will give you about 30 seconds if you want to add to it.

Mr. Asher. So I respect Mr. Connolly's points about the JCPOA as a former negotiator in the Six Party Talks of North Korea and also working on North--Iran nuclear at one stage, but I am very concerned about outsourcing.

The thing we learned with North Korea in 2002 with the Al Kibar agreement was that countries can outsource. In 2002, there was an agreement between North Korea and Syria to build Al Kibar, the nuclear reactor for the nuclear weapons program with Syria. That broke ground in October 2003, according to unclassified information you can get on the internet. That is exactly when the NIE--the CIA--or the National Intelligence Council said the Iranians put their weapons program on hold. The idea that they could have outsourced it has always bothered me personally as an official at the time.

And then, in 2012, the Iranians and the North Koreans signed a science technology agreement that is almost exactly the same as what they signed with Syria between North Korea and Syria in 2002, and at the signing ceremony was Fereydoun Abbasi-Davani, the head of the Iranian nuclear weapons program. He just didn't show up very often to meetings. The question is, what is going on? And is it possible that Iran has outsourced? There is no provision in JCPOA over outsourcing, and it does worry me.

Mr. Yoho. All right.

And, Dr. Karlin, I want to come back to you. Is there continued production of heavy water in Iran, and does that come from nuclear activity?

Ms. Karlin. I am not aware of that, sir.

Mr. Yoho. All right. I believe the answer is yes. Is the volume beyond what the JCPOA allows for, which, again, we have read the reports--they are producing more than they should be-- and then is that production and value in violation of JCPOA? If

they are doing that, would you say that was in violation?

Ms. Karlin. If that were happening, that is beyond my expertise, sir.

Mr. Yoho. Can anybody else answer that?

All right. Mr. Maltz, I am going to go to you because the work you have done I find very interesting, and I don't know if it was you or Dr. Asher talking about the combination of the terrorist groups with the narcotrafficking. And do you see that increasing in the future?

Mr. Maltz. Absolutely. I mean, everyone in government says that terrorists are increasingly turning to crime and criminal networks for funding because the U.S. Government and our allied forces have done such a great job at shutting down their funding streams. They need funds to operate, and one of the biggest things that I saw that is really disturbing is the corruption factor. You can't pay off a general in West Africa with a Visa and a Mastercard. You need a suitcase of cash.

Mr. Yoho. Right.

Mr. Maltz. So the cash that is being generated from drug trafficking, the U.N. estimated, what, about $400 billion? So it is just common sense that they are going to get involved in drug trafficking and other illicit activity to be able to carry out their agenda. So, yes, I am very concerned, and it is evolving as far, as I am concerned.

Mr. Yoho. Do any of you believe that Hezbollah has been involved in the most recent Iranian kidnapping of the U.S. citizens or U.S. legal permanent residents? And if I don't have the time, Mr. Chairman, if they could submit that.

Chairman Royce. Is that a nod yes or a nod no? Pardon?

Mr. Levitt. I have seen no evidence to that effect.

Mr. Yoho. Okay. Thank you.

Chairman Royce. All right. Thank you.

We go to Ann Wagner of Missouri. Ambassador.

Mrs. Wagner. Thank you, Mr. Chairman, for hosting this hearing.

Hezbollah is obviously a constant violent threat to our allies and to us. The joint statement released by the U.S. and Saudi Arabia last month expressed the importance of supporting the Lebanese state in order to disarm Hezbollah. But I, along with many of my colleagues, are concerned that financial support to Lebanon may mean empowering Hezbollah.

Dr. Asher and Mr. Maltz, kind of as a follow-on to Congressman Yoho's questioning, it is well known that Syrian women and children are at risk of being trafficked in Lebanon. We also know that Hezbollah generates revenue from drug trafficking and, allegedly, human trafficking in the Americas.

Can you please discuss Hezbollah's involvement in human trafficking in Lebanon, Syria, and globally?

Mr. Asher. I mean, I have one specific case I can't discuss, but I am aware of one of the top-tier targets; we call them super facilitators. We actually had a thing called the Iran-Hezbollah super facilitators initiative targeting key functional financiers for the Hezbollah-Iran network globally.

And I am aware of one very significant case of Syrian children being trafficked all the way into West Africa by an individual, and it was a very painful case for us because the U.S. Government was well aware of it, and we did nothing. And it still haunts me that these poor children--and they were like young girls and boys--were sent to a heinous country in West Africa probably to their death because the guy in charge seemed to like torturing children. So, you know, that is one case, and he was definitely a Hezbollah senior functional official also tied to the Iranians.

Mrs. Wagner. Disturbing, but thank you, Dr. Asher.

Dr. Karlin, your testimony on Iran-Hezbollah relations was fascinating. Can Lebanon or other actors help fill a void with

the Lebanese Shia who are dependent on Hezbollah, as your testimony laid out, in terms of political representation and economic opportunities? And could you also maybe flesh out for me the factors preventing these opportunities?

Ms. Karlin. Thank you very much for that question. I am delighted that that was useful.

There are ways to fill this void, particularly if you look at strengthening Lebanon economically.

So what we have seen, because of the Syria conflict, is people who are joining Hezbollah because they don't have job opportunities and Hezbollah pays, obviously. So, to the extent you can look at microloans or other types of assistance so that, when you go into these areas where Hezbollah is strong, you actually see other entities there.

What I find most interesting on political representation, ma'am, is that you do hear some alternative voices to Hezbollah, but in particular, over the last few years, there were fewer and fewer people in Lebanon defending Hezbollah, and that quiet is meaningful and notable.

Mrs. Wagner. Interesting. Well, Dr. Karlin, I will just stay with you for a moment. On Tuesday, we witnessed U.S.-led air strikes near al-Tanf and on the Iranian-backed militias in Syria. How interconnected are Hezbollah and these militias, and do you believe that economic sanctions on these militias could help stem Hezbollah's financing?

Ms. Karlin. Thank you for that question. I, too, am really concerned about what is happening right now around al-Tanf. We see U.S. military getting more involved here, and it is very conceivable something could happen with these militias or with Hezbollah.

I think the Hezbollah-militia relationship is extremely tight. They are very much looking to one another. I defer to my colleagues regarding the financial piece, but my instinct is, if you can help weaken one, that is largely beneficial.

Mrs. Wagner. Anyone else?

Mr. Levitt. I will just add on two points, both of which are in my written testimony. One is, absolutely, we need to be targeting not just Hezbollah but the other Shia militias with which it is partnering very, very closely and, to get to some of the earlier questions, both of them together with Iranian soldiers and operatives on the ground in Syria. Al-Tanf is something we need to look at very, very closely. In the wake of that strike that you mentioned, Hezbollah issued a kind of veiled warning to the U.S. not to cross its--Hezbollah's--red lines in the area.

Mrs. Wagner. Uh-huh.

Mr. Levitt. And the other thing regarding Dr. Asher's comment on the super facilitators, I mentioned briefly in my oral remarks the need to target these key networks, and my written testimony gets into detail that we should be targeting, among those, the super facilitators, some of whom, I think including the one that Dr. Asher was referring to, are really-- they are Hezbollah people. Others are not. Others, they are not Hezbollah operatives. They are criminals. They are super facilitators who will help Hezbollah today and some other criminal enterprise tomorrow, but they play these mission critical roles, whether it is money laundering or accessing banks. And we should be targeting them as well, even if they are not card-carrying Hezbollah members, because they are providing mission critical, particularly logistic and financial, support to Hezbollah.

Mrs. Wagner. I thank you all.

And I thank you, Mr. Chairman. I believe I am out of time, and I will yield back.

Chairman Royce. We are out of time, but thank you very much, Ambassador Wagner.

We appreciate the time, the service, and the expertise of
our witnesses here this morning. And as we have heard, there is
much work to be done to rebuild our law enforcement
capabilities to tackle Hezbollah, and we look forward to
working with our witnesses as we press the administration to do
just that.
        Thank you very much. We stand adjourned.
        [Whereupon, at 11:54 a.m., the committee was adjourned.]




                        A P P E N D I X

                        ----------


            Material Submitted for the Record

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]



 Material submitted for the record by the Honorable Thomas A. Garrett,
  Jr., a Representative in Congress from the Commonwealth of Virginia

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]




 Material submitted for the record by the Honorable Theodore E. Deutch,
         a Representative in Congress from the State of Florida

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

## Treasury Sanctions the Waked Money Laundering Organization

5/5/2016

***Action Exposes Extensive Drug Money Laundering Network Based in Panama***

**WASHINGTON** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated the Waked Money Laundering Organization (Waked MLO) and its lleaders, Nidal Ahmed Waked Hatum (Waked Hatum) and Abdul Mohamed Waked Fares (Waked Fares), as Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act). OFAC also targeted six Waked MLO associates and 68 companies tied to the drug money laundering network, including Grupo Wisa, S.A., Vida Panama (Zona Libre) S.A., and Balboa Bank & Trust. Panamanian-Colombian-Spanish national Waked Hatum and Panamanian-Lebanese-Colombian national Waked Fares co-lead the Waked MLO, which uses trade-based money laundering schemes, such as false commercial invoicing; bulk cash smuggling; and other money laundering methods, to launder drug proceeds on behalf of multiple international drug traffickers and their organizations. As a result of today's action, all assets of these individuals and entities that are under the jurisdiction of the United States or in the control of U.S. persons are frozen, and U.S. persons are generally prohibited from engaging in transactions with them.

"This action exposes the Waked Money Laundering Organization and disrupts its ability to launder drug trafficking proceeds using trade-based methods, duty-free retail, real estate development, and financial services throughout the region," said John E. Smith, Acting OFAC Director. "We look forward to working jointly with the Panamanian authorities to protect the Panamanian and U.S. financial systems from abuse by narcotics traffickers and other illicit actors."

In addition to the Waked MLO and its two leaders, the OFAC action designated six Panama-based MLO associates for providing material support and/or acting on behalf of the MLO: Gazy Waked Hatum, Ali Waked Hatum, and Jalal Waked Hatum, brothers of Waked Hatum who manage Waked Hatum's import/export, retail, and real estate businesses; Mohamed Abdo Waked Darwich, Waked Fares' son, who manages Waked Fares' duty-free retail and real estate development operations; and two attorneys, Norman Douglas Castro Montoto and Lucia Touzard Romo, who provide a variety of services, including incorporating shell companies, to the Waked MLO and serve various roles in several Waked-related companies.

Today's designations also target the principal Panama-based companies used by the Waked MLO to launder drug and other illicit proceeds: Vida Panama (Zona Libre) S.A., an import/export company in Panama's Colon Free Trade Zone; Grupo Wisa S.A., a holding company for businesses involved in real estate, construction, retail, hospitality, and media, including the La Riviera chain of duty-free stores operating throughout Latin America; Soho Panama S.A. and related entities, including a luxury mall and real estate development in downtown Panama City; Balboa Bank & Trust, a Panamanian bank; and the Strategic Investors Group Inc., a holding company that owns and controls Balboa Bank & Trust as well as two other financial services companies. Balboa Bank & Trust was used to launder narcotics and other illicit proceeds for multiple international criminal organizations.

This action was conducted in coordination with the Drug Enforcement Administration, Customs and Border Protection, and the Miami Division of the Federal Bureau of Investigation. The Panamanian authorities have been informed of this designation and Panamanian and U.S. authorities will coordinate going forward.

Concurrent with this action, OFAC is issuing three general licenses that authorize certain transactions and activities for limited periods of time with five entities owned or controlled by the Waked network: Soho Panama, S.A. (a.k.a. Soho Mall Panama), a luxury mall in downtown Panama City; Plaza Milenio, S.A. (Millennium Plaza) and Administracion Millenium Plaza, S.A., related to a hotel complex in Colon, Panama; and two Panamanian newspapers, La Estrella and El Siglo, which are owned by Grupo Wisa, S.A. The first two general licenses aim to assist with winding down transactions for a limited period of time by authorizing specific activities that would otherwise be prohibited. The third general license is intended to allow both Panamanian newspapers to continue printing and operating by authorizing specific activities that would otherwise be prohibited.

Since June 2000, more than 1,900 individuals and entities have been named pursuant to the Kingpin Act for their role in international narcotics trafficking. Penalties for violations of the Kingpin Act range from civil penalties of up to $1.075 million per violation to more severe criminal penalties. Criminal penalties for corporate officers may include up to 30 years in prison and fines up to $5 million. Criminal fines for corporations may reach $10 million. Other individuals could face up to 10 years in prison and fines pursuant to Title 18 of the United States Code for criminal violations of the Kingpin Act.

To see a chart relating to today's action, click *here*      .

To see the general licenses issued concurrent with today's action, click *here*      , *here*      , and *here*      . Frequently Asked Questions related to these general licenses are available *here*.

To see the identifying information relating to today's actions, click *here*.

For a complete listing of designations pursuant to the Kingpin Act, click *here*      .

<p align="center">###</p>

# (../index.html)

Home (../index.html)  /  Groups

## TERRORIST GROUPS

## HAQQANI NETWORK



(hamas.html)

(hezb_e_islami.html)

(../groups.html)



## BACKGROUND

The Haqqani Network is a Sunni Islamist militant organization founded by Jalaluddin Haqqani, who emerged as a top Afghan warlord and insurgent commander during the anti-Soviet war; he was a member of the Hezb-e Islami faction led by renowned mujahedin commander Younis Khalis. Jalaluddin later allied with the Afghan Taliban as that group's Minister of Tribal and Border Affairs when the Taliban held power in Afghanistan during the mid-to-late 1990s. He was a known associate of Usama Bin Ladin and was recognized as one of Bin Ladin's closest mentors during the al-Qa'ida founder's formative years in the 1980s Afghan war. Sirajuddin Haqqani, Jalaluddin's son, currently leads the day-to-day activities of the group, along with several of his closest relatives. Sirajuddin in August 2015 was named as a deputy to newly appointed Taliban leader Mullah Akhtar Mohammed Mansur—cementing the alliance between the Haqqanis and the Taliban.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 605 of 632

The Haqqani Network is primarily based in North Waziristan, Pakistan, and conducts cross-border operations into eastern Afghanistan and Kabul. The group is primarily composed of members of the Zadran tribe. The Haqqanis are considered the most lethal and sophisticated insurgent group targeting US, Coalition, and Afghan forces in Afghanistan; they typically conduct coordinated small-arms assaults coupled with rocket attacks, IEDs, suicide attacks, and attacks using bomb-laden vehicles.



SIRAJUDDIN
HAQQANI

The Haqqani Network is responsible for some of the highest-profile attacks of the Afghan war, including the June 2011 assault on the Kabul Intercontinental Hotel, conducted jointly with the Afghan Taliban, and two major suicide bombings—in 2008 and 2009—against the Indian Embassy in Kabul. In September 2011, the Haqqanis participated in a day-long assault against major targets in Kabul, including the US Embassy, International Security Assistance Force (ISAF) headquarters, the Afghan Presidential Palace, and the Afghan National Directorate of Security headquarters. More recently, in October 2013, Afghan security forces intercepted a truck bomb deployed by the Haqqanis against Forward Operating Base Goode in Paktiya Province. The device, which did not detonate, contained some 61,500 pounds of explosives and was the largest truck bomb ever built. The group is also involved in a number of criminal activities in Afghanistan and Pakistan, including extortion, kidnapping for ransom, and smuggling.

The US Government in 2012 designated the Haqqani Network as a Foreign Terrorist Organization because of its involvement in the Afghan insurgency, attacks on US military and civilian personnel and Western interests in Afghanistan, and because of its ties to the Taliban and al-Qa'ida. In addition to designating the group, key members have also been individually designated. Haqqani leaders Saidullah Jan, Yahya Haqqani, and Muhammad Omar Zadran, as well as suicide operations chief Qari Abdul Ra'uf (also known as Qari Zakir), and Ibrahim Haqqani, remain either designated for financial sanctions or are on US most-wanted lists.





(https://get.adobe.com/reader)

Note: Documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

# SOUTHERN DISTRICT *of* NEW YORK

U.S. Attorneys » Southern District of New York » News » Press Releases

**Department of Justice**

U.S. Attorney's Office

Southern District of New York

FOR IMMEDIATE RELEASE                          Wednesday, February 6, 2019

## Manhattan U.S. Attorney Announces Extradition Of OFAC-Sanctioned Afghan Man For Narco-Terrorism Offenses

### Haji Abdul Satar Abdul Manaf is Charged with Attempting to Send Hundreds of Kilograms of Heroin for Distribution in New York City with Financial Benefit to the Haqqani Network and the Taliban

Geoffrey S. Berman, the United States Attorney for the Southern District of New York, and Christopher Tersigni, Special Agent in Charge of the United States Drug Enforcement Administration ("DEA") Special Operations Division, announced today the extradition of HAJI ABDUL SATAR ABDUL MANAF, a/k/a "Haji Abdul Sattar Barakzai," for attempting to import heroin into the United States, engaging in narco-terrorism for the benefit of the Taliban, and attempting to engage in narco-terrorism for the benefit of the Haqqani Network. MANAF was taken into custody by Estonian authorities in Tallinn, Estonia, on October 9, 2018, and extradited to the United States today. MANAF will be presented in Manhattan federal court later today. The case is assigned to United States District Judge Paul A. Crotty.

U.S. Attorney Geoffrey Berman stated: "As alleged, Manaf, already sanctioned by the Treasury Department for assisting the Taliban, attempted to import large quantities of heroin into the U.S., funneled heroin trafficking proceeds to the Taliban, and attempted to provide financial assistance to the Haqqani terrorist network. Thanks to the DEA and international law enforcement partners, Manaf is in the U.S. and facing justice in this District."

Special Agent in Charge Christopher Tersigni stated: "This action highlights the DEA's ability to hold accountable not only those who reside within our borders, but also those operating in other countries. Drug traffickers that bring harm to the citizens of this country must answer for their unlawful activities that have fueled the opioid epidemic."

According to the allegations contained in the Complaint and Indictment[1] which were unsealed today:

In June 2012, the United States Treasury Department sanctioned MANAF pursuant to the United States' terrorism sanctions authority, Executive Order No. 13224, for storing or moving money for the Taliban through his money remitting business, the Haji Khairullah Haji Sattar Money Exchange.

Beginning in January 2018, MANAF attempted to import large quantities of heroin into the United States; used the proceeds of heroin trafficking to benefit the Taliban; and attempted to provide financial support to

the Haqqani Network.  Specifically, MANAF participated in in-person meetings, recorded telephone calls, and electronic communications with five men whom MANAF understood to be affiliated with an international drug trafficking organization.  During those meetings, MANAF helped arrange to import large quantities of heroin into the United States with the assistance of – and recognizing that some of the proceeds of that narcotics trafficking would be provided to – the Taliban and the Haqqani Network.  Four of these men were, in fact, DEA confidential sources.  The fifth was an undercover DEA agent (the "UC").

The Haqqani Network and the Taliban have been and are engaged in highly public acts of terrorism against U.S. interests, including U.S. and coalition forces in Afghanistan.  In August 2018, MANAF sold the UC a 10-kilogram shipment of heroin (the "10 Kilo Shipment") in Afghanistan, after the UC told MANAF that the heroin would ultimately be imported into the United States for sale in New York.  MANAF repeatedly told the UC that MANAF had paid the Taliban in connection with the production of the 10 Kilo Shipment, and reported that armed members of the Taliban would guard and transport future heroin shipments for MANAF and the UC.  In August 2018, MANAF facilitated the transfer of thousands of dollars of what he believed to be narcotics proceeds to individuals MANAF had been advised were members of the Haqqani Network.  MANAF subsequently agreed to supply the UC with thousand-kilogram loads of heroin for importation into the United States.

*          *          *

The Indictment charges MANAF, 53, a citizen of Afghanistan, in three counts: (1) attempting to import heroin into the United States, (2) narco-terrorism, and (3) attempted narco-terrorism.  If convicted, MANAF faces a maximum sentence of life imprisonment and a mandatory minimum sentence of 10 years in prison on Count One, and a maximum sentence of life imprisonment and a mandatory minimum sentence of 20 years in prison on each of Counts Two and Three.  The statutory minimum and maximum sentences are prescribed by Congress and are provided here for informational purposes only, as any sentencing of the defendant will be determined by a judge.

Mr. Berman praised the outstanding investigative efforts of the DEA's Special Operations Division's Bilateral Investigations Unit; the DEA European Regional Director; the DEA Copenhagen, Canberra, Dubai, Islamabad, Kabul, New Delhi, and Sydney Country Offices; the Government of Estonia; and the Australian Criminal Intelligence Commission.  The defendant's arrest and subsequent extradition are also the result of the close cooperative efforts of the U.S. Attorney's Office for the Southern District of New York and the Department of Justice's Office of International Affairs.

The case is being prosecuted by the Office's Terrorism and International Narcotics Unit.  Assistant U.S. Attorneys Rebekah Donaleski and Kimberly J. Ravener are in charge of the prosecution.

The allegations contained in the Complaint and the Indictment are merely accusations, and the defendant is presumed innocent unless and until proven guilty.

[1] As the introductory phrase signifies, the entirety of the texts of the Complaint and Indictment and the descriptions of the Complaint and Indictment set forth below constitute only allegations and every fact described should be treated as an allegation.

---

**Attachment(s):**
Download U.S. v. Manaf complaint_18_mag_7833.pdf
Download U.S. v. Manaf indictment_18_cr._762_redacted.pdf

**Topic(s):**
Drug Trafficking

Counterterrorism

**Component(s):**
USAO - New York, Southern

**Press Release Number:**
19-024

Updated February 6, 2019

**East Asia Pacific**

# Afghan Officials: Haqqani Network Controls Taliban Command

By Ayaz Gul

May 09, 2016 10:00 AM



ISLAMABAD - Officials in Afghanistan say the State Department designated terrorist group, the al-Qaida linked Haqqani network, has effectively taken over battlefield command of the Taliban insurgency.

Haqqani militants allegedly operate from sanctuaries in neighboring Pakistan and are known for staging high-profile suicide assaults on Afghan and international forces.

"The Taliban are currently being commanded by [the] Haqqani [network]. We believe Haqqani and al-Qaida are two different names for the same terrorist organization," Interior Ministry spokesman, Sediq Seddiqi, told reporters in Kabul. He said Afghan security forces military strategists are aware of the terrorist threat and dealing with all of them as a common enemy of Afghanistan.

U.S. and Afghan leaders have long alleged the Haqqani network has ties to Pakistani military-intelligence. The group has fought along side the Taliban in the 15-year Afghan conflict, but mostly operated independently, until last year when its fugitive chief Sirajuddin Haqqani was named deputy to Taliban leader Mullah Akhtar Mansoor.



FILE - Sirajuddin Haqqani, far left, and Jalaluddin Haqqani, far right, then Taliban Army Supreme Commander, meet with reporters in Miram Shah, Waziristan on Aug. 22, 1998.

Officials at NATO's Resolute Support mission in Afghanistan last week also warned of the Haqqani network, describing it as "the most lethal" and "most competent" terrorist organization in the area.

"Siraj Haqqani, has been named the number two for the Taliban. And we think that he is increasing really, his day-to-day role in terms of conducting Taliban military operations," says U.S. Army Brigadier General Charles Cleveland, deputy chief of staff for communications for NATO's Resolute Support mission in Afghanistan.



FILE - NATO soldiers walk at the site of a suicide bomb attack in Kabul, Afghanistan, June 30, 2015.

"And we think that he is trying to exert more influence really, on the leadership with some of these shadow governors in some of these other places [in Afghanistan]," Cleveland noted. But he underscored concerns about the Haqqanis branching out from their traditional area and then focus on high profile attacks like the one that killed nearly 70 people in Kabul last month.

## Tensions with Pakistan

The Haqqani network's growing role is likely to fuel Afghanistan's tensions with Pakistan. Kabul has consistently pressed Islamabad to crackdown on the group, claiming it has evidence showing Haqqanis were behind the April 19 deadly bombing in the Afghan capital.



Afghan security forces inspect the site of suicide car bomb attack on a government security building in Kabul, Afghanistan, April 19, 2016.

Pakistani officials dismiss allegations the network is still operating from their territory. A senior foreign policy aide to Prime Minister Nawaz Sharif last week urged Afghans to share the evidence, saying Islamabad's probe into the violence has established it had nothing to do with it.

Despite emerging new security challenges, Afghan officials claim their forces have inflicted heavy casualties on the insurgents since the Taliban launched its so-called spring offensive last month.

Kabul's ambassador to Islamabad, Hazrat Omer Zakhilwal, tells VOA the battlefield successes have boosted moral of Afghan forces, which have received far less casualties than the previous fighting season.



https://www.voanews.com/east-asia-pacific/afghan-officials-haqqani-network-controls-taliban-command                    3/7

FILE - Afghanistan's ambassador to Pakistan, Omar Zakhilwal. (W. Asad/VOA)

"There were a lot of expectations within the Taliban and the supporters of the Taliban that their spring offensive would result in significant advancements for the Taliban and that there would be collapse of a few provinces by now," Zakhilwal said. "The complete opposite happened. The Taliban received and are still receiving tremendous casualties. They did not make any advancement. They are struggling right now with respective their spring offensive and objectives."

Afghan officials say U.S air support has been sought in certain cases, but foreign troops are not involved in ground combat.

Cleveland says about 75 percent of the Afghan Special Operation Forces missions are conducted independently, with no coalition assistance whatsoever.

"Out of that remaining 25 percent, a percentage of that, we're not going into the field with them, we're just essentially helping them with the planning and intelligence and advising and those types of things," he said.

**Afghan forces**

Independent Western security experts like Ted Callahan, who is based in northern Afghanistan, also agree with Kabul's assessment of the fighting.

Callahan says support from international forces has played a key role in operations Afghan National Defense and Security Forces have conducted, particularly in northern provinces, including Kunduz, which the Taliban had briefly overrun in 2015.

"I would say the mood of the local population is much more optimistic than we have seen for several months previously. But at the same time the question is how sustainable is this current model, because if you look it is really dependent on having international forces and their assets present," said Callahan.

Afghan forces have intensified counter-insurgency operations after the April 19 Kabul attack that officials blamed on the Haqqani network.

A Taliban spokesman, Zabihullah Mujahid, has dismissed as propaganda claims the insurgent group has suffered massive casualties and failed to achieve its objectives.

"Our spring offensive is not a week long or a moth-long activity. It is a full one year operation and our mujahideen will prevail as they did last year," Mujahid asserted.

Analysts believe the intensifying Afghan conflict means further deterioration of the country's relations with Pakistan.

A four-nation process, involving the United States, China, Afghanistan and Pakistan, to promote talks with the Taliban as well as Kabul's normal ties to Islamabad are now "practically hostage" to Afghan expectations of a direct Pakistani action against the Haqqani network, says an Afghan presidential aid, speaking to VOA on condition of anonymity.

## RELATED STORIES

**East Asia Pacific**

## Afghanistan, Pakistan Trade Accusations

Pakistan has "greater control" over the Taliban than the Afghan government "initially thought," but contrary to its public assurances, Islamabad has never intended to bring the insurgency to peace talks with Kabul, allege senior Afghan officials."In fact Pakistan's old policy vis-a-vis Afghanistan that was claimed to be abandoned in fact has not been," a close aide to Afghan President Ashraf Ghani told VOA. He requested anonymity.

By **Ayaz Gul**
Sat, 05/07/2016 - 07:47 AM



**East Asia Pacific**

## Afghanistan, Pakistan Trade Accusations

Each side blames the other of hindering the already fragile peace process in Afghanistan

 By **Sharon Behn**
Sat, 03/30/2013 - 01:43 PM

**East Asia Pacific**

## Pakistan: No Military Action Against Afghan Taliban on Its Soil

Pakistan is rejecting Afghan demands for military action against Taliban commanders within Pakistan and emphasizes the need to continue talks for a settlement to the conflict in Afghanistan.In Islamabad Tuesday, Pakistani foreign policy adviser Sartaj Aziz dismissed demands by Afghan President Ashraf Ghani that Pakistan evict Taliban insurgents through military action or arrest and hand them over to Kabul for trial and punishment for killing innocent Afghans. Ghani recently...

 By **Ayaz Gul**
Tue, 05/03/2016 - 11:09 AM

**East Asia Pacific**

## Afghanistan Outraged About Taliban's Pakistan Visit

Afghanistan has criticized Pakistan for allowing a Taliban delegation to visit the neighboring country, saying "a terrorist organization" should not have been been allowed to undertake such activities.The objection came a day after the Islamist insurgency confirmed a three-member Taliban delegation traveled to Islamabad from its Qatar-based political office for talks with Pakistani officials on "border-related issues" and "problems" facing...

 By **Ayaz Gul**
Thu, 04/28/2016 - 12:26 PM

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 615 of 632



**By**

# Ayaz Gul



NEWS WEBSITE OF THE YEAR

# The Telegraph

Log in 

News    Business    Sport    Opinion    Politics    World    Money    Life    Style    Travel    Culture

See all News



# Taliban's Haqqani network have considered joint al-Qaeda force claims US Treasury

The US Treasury department says al-Qaeda 'is gaining strength in Afghanistan while continuing to operate with the Taliban'

*By* Ben Farmer *and* Sami Yousafzai

26 January 2021 • 4:48pm

   

*To continue reading this article...*

## Start your one-month <u>free</u> trial

Turn to our trusted journalism when you need it most, with unlimited access to The Telegraph's award-winning website and app.

<div style="text-align:center">

Start your free trial

</div>

Then $1 per month for three months and $3 per week thereafter. Cancel anytime

*Already a subscriber?*

Log in

Related Topics

Extremism, Taliban, Asia, Afghanistan, Terrorism, Al-Qaeda

   

## More stories

 **'Jeremy is just like you': what real farmers think of Clarkson's Farm**

 **Why strength training is the secret to midlife weight loss**

 **Dom Sibley, Zak Crawley and Dan Lawrence need to be dropped - but there is a way back for two**

 **Crispin Odey says Bank of England will 'never' raise rates**

 **Police vetting process branded 'a mess' after Muslim officer's 'racist' tweets spark investigation**

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 618 of 632

# Letters: What happens when an electric car breaks down at the side of the road



# More from News



### Cystic fibrosis cure on horizon after scientists correct genetic mutation

*By* Sarah Knapton

9 Aug 2021, 3:00pm



### UK holidaymakers in France facing vaccine passport chaos

*By* Dominic Penna

9 Aug 2021, 2:58pm



◇ **Live**  |  Coronavirus latest news: Civil servants who refuse to return to office won't have pay cut, No 10 confirms

*By* Sarah Newey

9 Aug 2021, 2:57pm



### Belarus leader says Britain can 'choke' on fresh sanctions a year on from election protests

*By* Nataliya Vasilyeva

9 Aug 2021, 2:55pm

### Watch: Italian farmer arrested after hidden camera films him starting wildfire near Naples



*By* Telegraph Video

▶ 9 Aug 2021, 2:39pm



'Code red for humanity': Paris 1.5C climate goal set to be breached within two decades

*By* Olivia Rudgard

9 Aug 2021, 2:24pm

## More from The Telegraph



Travel news latest: Cap cost of 'rip-off' PCR tests, Government told



'Code red for humanity': Paris 1.5C climate goal set to be breached within two decades



Tokyo Olympics 2020 comes to an end with fittingly strange, poignant closing ceremony

Can I force my neighbours to get rid of their chicken coop?



### Learning to code is no longer fit for purpose



### Roast tomatoes and chickpeas with coconut and coriander recipe

---

## The Telegraph                                         Back to top ⌃

Follow us on:        f          ⊙          ⌄          ⌄          in          ▶

| Contact us | About us |
| --- | --- |
| Rewards | Reader Prints |
| Branded Content | Syndication and Commissioning |
| Guidelines | Privacy |
| Terms and Conditions | Advertising Terms |
| Fantasy Sport | UK Voucher Codes |
| Betting Offers | Modern Slavery |
| Manage Cookies | |

© Telegraph Media Group Limited 2021



**OFFICE OF
INSPECTOR GENERAL**

January 4, 2021

OIG-CA-21-012

MEMORANDUM FOR  DEPARTMENT OF DEFENSE
LEAD INSPECTOR GENERAL

FROM:              Gregory Sullivan /s/
                   Audit Director

SUBJECT:           Operation Inherent Resolve - Summary of Work Performed by
                   the Department of the Treasury Related to Terrorist
                   Financing, ISIS, and Anti-Money Laundering for First Quarter
                   Fiscal Year 2021

This summary provides an update on the Department of the Treasury's
(Treasury) programs to combat terrorist financing and activities to disrupt the
Islamic State of Iraq and Syria's (ISIS) financing. Per your request, we
provided this information in a question and answer format to help streamline
the information. This information is provided by Treasury management and is
not audited by Treasury Office of Inspector General.

**Q1. In a publicly releasable format, provide information on individuals and
organizations sanctioned for providing support to ISIS as follows:**

    **a. A reasonable estimate of the cumulative number of individuals and
    organizations sanctioned (by Treasury, not cumulative with State)
    for providing support to ISIS since 2014 through the reporting
    period October 1, 2020 – December 31, 2020.**

    Treasury uses the full range of its authorities to aggressively target
    ISIS leaders and operatives around the world. These efforts
    resulted in the United States designating 92 ISIS-associated
    individuals and organizations since 2014.

    **b. Details on individuals and organizations sanctioned for providing
    support to ISIS during the reporting period October 1, 2020 –
    December 31, 2020.**

    No individuals or organizations were sanctioned during this quarter.

1

c. **The number, if any, of previously sanctioned individuals and/or organizations removed from the sanctions list during the reporting period: October 1, 2020 – December 31, 2020.**

No sanctioned individuals or organizations were removed from the sanctions list this reporting period.

d. **Details on individuals and/or organizations sanctioned for connections to anti-U.S. Popular Mobilization Forces, and for providing support to anti-U.S. Popular Mobilization Forces.**

On October 22, 2020, Treasury designated Iraj Masjedi, a general in Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and Iran's Ambassador to Iraq, for acting for or on behalf of the IRGC-QF. In his decades of service with the group, Masjedi oversaw a program of training and support to Iraqi militia groups, and he directed or supported groups that are responsible for attacks that have killed and wounded U.S. and coalition forces in Iraq. Masjedi publicly admitted the IRGC-QF's role in special operations and the training of militia groups in Iraq, Syria, and beyond.

**Q2. In an unclassified, publicly releasable format, describe what was done this quarter with Coalition partners in Iraq and Syria to disrupt ISIS financial networks.**

Treasury told us it continues to work with interagency and Coalition partners, including the Government of Iraq, to prioritize identifying ISIS's financial reserves and financial leaders, disrupting its financial facilitation networks in Iraq, and designating ISIS facilitators, front companies, and fundraisers in Iraq, Syria, Turkey and elsewhere. Treasury also takes a leadership role in the Global Coalition to Defeat ISIS, serving as a co-lead of the Counter ISIS Finance Group along with its counterparts from Italy and Saudi Arabia. On November 10, 2020, Treasury contributed to the virtual meeting on countering ISIS in West Africa with members of the Global Coalition to Defeat ISIS, co-hosted by the State Department and Nigeria, highlighting the importance of countering terrorist financing as part of a larger effort against ISIS in the region.

2

**Q3. In an unclassified, publicly releasable format, describe ISIS funding in Iraq and Syria, to include what has changed since last quarter, the estimated amount of funds at its disposal, how funds are generated and distributed, and any shortfalls in the amount or distribution of funds this quarter.**

> Treasury told us ISIS's financial situation remains largely unchanged compared to the previous quarter. ISIS continued to raise funds through extortion of oil smuggling networks in eastern Syria, kidnapping for ransom targeting civilian businesses and populations, looting, and possibly the operation of front companies. ISIS also continued to use networks of couriers to smuggle cash between Iraq and Syria. The group relied on money services businesses, including hawalas,[1] to transfer funds between Iraq and Syria as well as internationally, often relying on logistical hubs in Turkey. ISIS probably has as much as $100 million available in cash reserves dispersed across the region, but Treasury does not know the amount of money ISIS distributed during this quarter.

**Q4. In an unclassified, publicly releasable format, describe ISIS-core's[2] ability to move funds into and out of Syria and Iraq.**

> Treasury told us ISIS's financial situation remains largely unchanged compared to the previous quarter. ISIS continued to use money services businesses, including hawalas, to move funds in and out of Iraq and Syria, often relying on logistical hubs in Turkey and in other financial centers. In addition, ISIS supporters increasingly relied on cryptocurrencies. They also rely on traditional methods of transferring funds into Iraq and Syria. ISIS members in Iraq transferred funds to ISIS members in northeastern Syria, including in Internally Displaced Persons camps, such as al-Hawl.[3] The group often gathered and sent funds to intermediaries in Turkey who smuggle the cash into Syria or send the funds to hawalas operating in the camp.

---

[1]  Hawala is an alternative or parallel remittance system. It exists and operates outside of, or parallel to traditional banking or financial channels. The components of hawala that distinguish it from other remittance systems are trust and the extensive use of connections such as family relationships or regional affiliations.

[2]  ISIS-core refers to the main portion of ISIS in Iraq and Syria, along with the key leaders of the global organization. The term is mainly used to differentiate the main ISIS leadership from the regional ISIS affiliates, such as ISIS-K in the Khorasan region and ISIS-P in the Philippines.

[3]  Al-Hawl is an Internally Displaced Persons camp in northern Syria housing upwards of 70,000 refugees and holds one of the largest concentration of current and former ISIS members who continue to receive donations from ISIS supporters internationally. The Tawasul hawala in al-Hawl served ISIS members and transferred payments for ISIS from outside Syria.

**Q5. In an unclassified, publicly releasable format, describe ISIS/ISIS-Khorasan (ISIS-K)[4] funding in Afghanistan, the estimated amount of funds at their disposal, and how funds are generated and distributed.**

> Treasury told us ISIS-K primarily raises funds through local donations, taxation, extortion, and some financial support from ISIS-core. In 2019, Afghan Taliban and Afghan government forces retook ISIS-K's stronghold in southern Nangarhar, which decreases the amount of money the group could earn exploiting natural resources in this territory. As of early 2020, ISIS core was possibly providing some funds to ISIS-K. According to Treasury's information, ISIS-K retains at least some financial reserves and relies on hawalas, particularly in Kabul and Jalalabad, to transfer funds.

**Q6. In an unclassified, publicly releasable format, describe al-Qaeda funding in Afghanistan, the estimated amount of funds at their disposal, and how funds are generated and distributed.**

> Treasury told us, as of 2020, al-Qaeda is gaining strength in Afghanistan while continuing to operate with the Taliban under the Taliban's protection. Al-Qaeda broadly still depends on donations from likeminded supporters, and from individuals who believe that their money is supporting humanitarian or charitable causes.

> Treasury told us Al-Qaeda capitalizes on its relationship with the Taliban through its network of mentors and advisers who are embedded with the Taliban, providing advice, guidance, and financial support. Senior Haqqani Network[5] figures have discussed forming a new joint unit of armed fighters in cooperation with and funded by al-Qaeda.

**Q7. In an unclassified, publicly releasable format, describe ISIS-core's ability to move funds into and out of Afghanistan.**

> Treasury told us ISIS-core has used hawala networks to transfer funds from overseas. According to Treasury's information, ISIS-K cultivated relationships with particular hawaladars who store tens of thousands of dollars for the group.

---

[4] ISIS-K is ISIS's province in the Khorasan region, which historically encompasses parts of modern day Iran, central Asia, Afghanistan, and Pakistan. ISIS announced its expansion into the Khorasan region in 2015.

[5] The Haqqani Network is a Sunni Islamist militant organization primarily based in North Waziristan, Pakistan and conducts cross-border operations into eastern Afghanistan and Kabul.

4

**Q8. In an unclassified, publicly releasable format describe al-Qaeda's ability to move funds into and out of Afghanistan.**

Treasury told us elements of al-Qaeda, including affiliate al-Qaeda in the Indian Subcontinent (AQIS), and terrorist groups targeting Pakistan, such as Tehrik-e Taliban Pakistan (TTP),[6] continue to use the Afghanistan-Pakistan border region as a safe haven. AQIS likely receives funding from al-Qaeda senior leadership.

**Q9. In an unclassified, publicly releasable format describe any known financial relationships between the Taliban and ISIS and its affiliates or between the Taliban and al-Qaeda and its affiliates.**

Treasury told us the Taliban do not have any known financial relationships with ISIS and its affiliates. Al-Qaeda maintains close contacts with the Taliban, providing advice, guidance, and financial support.

**Q10. In an unclassified, publicly releasable format describe what changes, if any, have been observed in financial relationships between the Taliban and terrorist organizations since February 29, 2020.**

Treasury told us as of May 2020, the Taliban and al-Qaeda maintained a strong relationship and continued to meet regularly.

---

[6] TTP is an alliance of militant networks formed in 2007 to unify opposition against the Pakistan military. TTP historically maintained close ties to senior al-Qaeda leaders, including al-Qaeda's former head of operations for Pakistan.

5

# The Washington Post

# U.S. signs peace deal with Taliban agreeing to full withdrawal of American troops from Afghanistan

By Sarah Dadouch, Susannah George and Dan Lamothe

February 29, 2020

 1.9k

DOHA, Qatar — The United States and the Taliban signed a peace deal Saturday that calls for the full withdrawal of American troops from Afghanistan within 14 months — a turning point in an 18-year war that has cost tens of thousands of lives.

The complete withdrawal of U.S. and coalition troops is contingent on a guarantee from the Taliban that Afghan soil will not be used by terrorists with aims to attack the United States or its allies, according to a copy of the agreement released by the State Department as the signing was underway.

But the Taliban does not have full control over all areas outside government hands. Other factions, including breakaway Taliban groups and others claiming allegiance to the Islamic State, have footholds around the country and potentially could grow stronger without U.S.-led forces to keep them in check.

Other major challenges lie ahead: Afghanistan's deepening political crisis, a controversial prisoner swap and complex intra-Afghan talks that could drag on for months or longer.

Even the relative calm in Afghanistan over the past week — a precondition for the peace deal signing — was thrown into question.

The spokesman for the Taliban's Qatar office, Suhail Shaheen, told The Washington Post that the Taliban hoped for a "permanent solution" to violence levels. But the pledge for a week-long period of reduced violence has "ended," he said.

Case 3:20-mc-00206-FDW-DSC   Document 10-1   Filed 08/10/21   Page 627 of 632

U.S. envoy Zalmay Khalilzad and Taliban deputy leader Mullah Abdul Ghani Baradar inked the deal on an ornate desk in an opulent hall at a hotel in Doha, Qatar, on Saturday. Secretary of State Mike Pompeo attended the ceremony and witnessed the signing while seated across from the two men.

Pompeo called the moment "historic" and said the Taliban needed to live up to commitments to break with al-Qaeda and reduce violence.

The deal signing came after a seven-day "reduction in violence" in which U.S., Afghan and Taliban forces pledged not to carry out offensive operations. The agreement does not specify whether that commitment would continue. Instead, it notes that a cease-fire would need to be agreed upon in intra-Afghan talks that are expected to start in 10 days.

The withdrawal will begin with a drawdown to 8,600 troops within 135 days, according to the document. During that time, U.S. allies and coalition members will also proportionally draw down their forces.

Trump called the deal "a powerful path forward to end the war in Afghanistan and bring our troops home" in a statement released Friday.

In Kabul, U.S. Defense Secretary Mark T. Esper said there is real hope for peace in Afghanistan, but he warned the Taliban to meet its obligations under the deal.

"The United States will not hesitate to nullify the agreement," Esper said at a ceremony with NATO Secretary General Jens Stoltenberg and Afghan President Ashraf Ghani that was held at the same time as the signing in Doha.

Stoltenberg called Saturday a "victory for peace" and noted increases in women's rights, life expectancy and respect for human rights.

"The challenge now is to secure these gains," he said.

Ghani also pointed to advances made in Afghan society, including freedom of speech and the advancement of women's rights.

"Today can be the moment of overcoming the past," he said.

But criticism of the pact came from Trump's former White House team.

Former national security adviser John Bolton said the deal brings an "unacceptable risk to America's civilian population."

"Legitimizing Taliban sends the wrong signal to ISIS and al-Qaeda terrorists, and to America's enemies generally," Bolton wrote in a tweet.

Under the deal, the Afghan government must assemble a negotiating team that will work with the Taliban to agree on the makeup of the country's new government. The peace deal stipulates that those talks must begin by March 10.

Ghani faces the challenge of building an inclusive negotiating team to represent the Afghans who are not aligned with the Taliban. The announcement of disputed election results earlier this month has left the government in Kabul deeply divided and has the potential to undermine Ghani's mandate to form that team.

Another potential obstacle is a planned prisoner exchange. The text of the peace deal released by the State Department said the prisoner swap — the release of thousands of Taliban prisoners in Afghan custody for about 1,000 members of the Afghan security forces in Taliban captivity — must occur by March 10 when inter-Afghan talks are set to start.

The peace deal also stated that the United States will work to remove members of the Taliban from sanctions lists and "seek economic cooperation and reconstruction with the new post settlement Afghan Islamic government."

Following the signing ceremony in Doha, Shaheen, the Taliban spokesman, told The Post that the Taliban is committed to the deal, but that doesn't mean violence levels will remain low in Afghanistan.

"That was for making the environment conducive to sign the deal," Shaheen said. The Taliban hopes to achieve a "permanent solution" to violence levels in Afghanistan, "but right now [there is] no such understanding of a cease-fire or reduction in violence.

Shaheen also suggested there may be some gray area in the Taliban's commitment not to allow terrorist groups to use Afghan soil to plan and launch attacks against the United States and its allies.

A peace deal with the Taliban has been a critical foreign policy goal for Trump, who campaigned on ending the war. But he has faced fierce criticism from the Afghan government as well as from fellow Republicans at home.

Afghan officials have repeatedly criticized the United States for excluding them from talks with the Taliban. Any significant withdrawal of U.S. forces from the country is expected to place increased pressure on Afghan government forces, whose casualty rates continue to rise.

On Thursday, a group of Republican lawmakers released a letter warning that the Taliban has "a history of extracting concessions in exchange for false assurances."

"A full-scale U.S. withdrawal" would "allow terrorist groups in Afghanistan to grow stronger and establish safe havens from which to plot attacks against us," the letter continued.

Trump's Friday statement said "ultimately it will be up to the people of Afghanistan to work out their future. We, therefore, urge the Afghan people to seize this opportunity for peace and a new future for their country."

U.S. and Taliban negotiators were close to signing a peace deal in September, but the effort was scuttled by Trump after an attack by the Taliban killed a U.S. soldier.

Since then, Khalilzad has sought confidence-building measures to bring both sides back to the table. In November, the Taliban released two Western hostages in exchange for the release of senior militants linked to the Taliban by the Afghan government. And over the last week, both sides reduced violence nationwide.

It is unclear if the reduction in violence will hold in the coming weeks as Afghan government officials and the Taliban begin talks. The Afghan government initially demanded a cease-fire before agreeing to talks with the Taliban.

As peace talks between the U.S. and the Taliban gained momentum last year, violence in Afghanistan intensified. The United Nations' annual report on civilian casualties released this month said 3,403 civilians were killed and 6,989 were injured in 2019.

The United Nations Assistance Mission in Afghanistan has documented more than 100,000 civilian casualties since the organization began its tally in 2009.

*George and Lamothe reported from Kabul. Sharif Hassan in Kabul and Haq Nawaz Khan in Doha, Qatar, contributed to this report.*

---

## Discover more of the stories that matter to you.

### Select your interests