IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

JOHN DOES 1 THROUGH 7,

    *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

    *Judgment Debtors.*

Case No.: 3:20-mc-00206-FDW-DK

## <u>MOTION FOR RELEASE OF FUNDS HELD BY GARNISHEE<br>BANK OF AMERICA, N.A.</u>

Judgment Creditors, John Does 1 through 7, pursuant to Section 201(a) of the Terrorism

Risk Insurance Act of 2002, 28 U.S.C. § 1610 note ("TRIA") and Fed. R. Civ. P. 69, hereby

move for an order compelling Bank of America, N.A. ("Bank of America"), to turn over certain

funds that are now in its possession. The funds to be executed upon are secured by a Writ of

Execution issued on March 27, 2023, DE 17, to enforce the Default Final Judgment registered by

this Court on January 20, 2021. DE 2.

### INTRODUCTION

1.      On November 5, 2020, Judgment Creditors obtained a Judgment in the United

States District Court for the Northern District of Texas against the Taliban, Al-Qaeda, and the

Haqqani Network for an amount totaling One Hundred Thirty-Eight Million Four Hundred

Eighteen Thousand Seven Hundred Forty-One Dollars and zero cents ($138,418,741) in

compensatory damages, jointly and severally for an act of terrorism committed by the Judgment

Debtors.

2.     The Judgment was obtained pursuant to a civil action brought under the Anti-Terrorism Act, 18 U.S.C. § 2333 (hereinafter "ATA") and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b) (hereinafter "RICO").

3.     On January 20, 2021, Judgment Creditors registered the Judgment in this Court. DE 2.

4.     On November 2, 2021, Doe Creditors collected $362,430.13 from the blocked assets of an agency or instrumentality of Al-Qaeda.

5.     As of the time of this filing, Judgment Creditors hold outstanding judgments for compensatory damages in the amount of $138,056,310.87, plus post-judgment interest. *See* Declaration of John Thornton ("Thornton Decl.") at par. 4, attached hereto as Exhibit A.

6.     Judgment Creditors do not believe that the Judgment Debtors have in their possession visible property on which levy can be made sufficiently to satisfy said Judgment. Judgment Creditors move for an Order to be issued against Bank of America, which has indicated in response to subpoenas issued on September 13, 2022 and February 24, 2023, that it has in its possession or control blocked funds belonging to VTB Bank Europe SE. *Id.* at par. 7. As will be shown herein, VTB Bank Europe SE is an agency or instrumentality of the Taliban pursuant to TRIA.

7.     As is explained more fully below, TRIA provides the federal statutory procedure for the enforcement of judgments against terrorist organizations such as the Taliban, Al-Qaeda, and the Haqqani Network, and for executing on any blocked assets of such terrorist organizations, their members, **or any entity or person who is their agency or instrumentality**:

SEC. 201. SATISFACTION OF JUDGMENTS FROM BLOCKED ASSETS OF
TERRORISTS, TERRORIST ORGANIZATIONS, AND STATE SPONSORS
OF TERRORISM.

(a) IN GENERAL- Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201.

8.     Judgment Creditors have obtained the Judgment against the Taliban, Al-Qaeda, and the Haqqani Network, each of which is a "terrorist party" as defined by Section 201(d)(4) of TRIA on a claim for which they are not immune under section 1605(a)(7) of title 28, United States Code, *i.e.*, the Foreign Sovereign Immunities Act ("FSIA"). Judgment Creditors seek to enforce the Judgment against the "blocked assets" of agencies or instrumentalities of one or all the Judgment Debtors. As will be shown herein, the agency or instrumentality of the terrorist party that is the subject of this motion has been designated by the Department of Treasury's Office of Foreign Assets Control ("OFAC") as a Specially Designated National ("SDN") pursuant to Russian Harmful Foreign Activities sanctions regulations. *See* 87 FR 11297; *see also* Executive Order ("EO") 14024.

9.     This motion will rely on official OFAC designations and publications, as well as the expert testimony of Brian Fonseca ("Fonseca") whose sworn testimony is attached as Exhibit B, to show that VTB Bank Europe SE, the target of this motion is an agency or instrumentality of the Judgment Debtor, the Taliban, and thus that its blocked assets are subject to execution or attachment in aid of execution.

I.     **Jurisdiction and Applicable Law.**

First, this Court has subject matter jurisdiction over Judgment Creditor's post-judgment execution proceedings pursuant to 28 U.S.C. § 1331. *See Stansell v. FARC*, No. 16MC00405LGSSN, 2022 WL 2530359, at *4 (S.D.N.Y. Mar. 29, 2022) (28 U.S.C. § 1331 supports subject matter jurisdiction in TRIA proceeding); *see also Doe v. ELN et al.*, No. 15-cv-8652 (LTS), 2017 WL 591193, at *1 (S.D.N.Y. Feb. 14, 2017), *aff'd sub nom. Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018) (same). The question of execution against accounts blocked pursuant to OFAC designations in order to collect a judgment against designated terrorist parties under Section 201 of TRIA is a federal question. *See Weinstein v. Islamic Republic of Iran,* 609 F.3d 43, 50 (2d Cir. 2010) ("[W]e find it clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment."). According to Fed. R. Civ. P. 69, "[a] money judgment is enforced by writ of execution ..." and "[t]he procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Thus, North Carolina law provides the applicable procedure, while federal law supplies the substantive rights.

Second, this Court has jurisdiction over Bank of America, N.A. in this jurisdiction as it is headquartered here, and as it was served with a Writ of Execution here. *See N. Mariana Islands v. Millard*, 845 F. Supp. 2d 579, 583 (S.D.N.Y. 2012) (in turnover proceeding pursuant to section 5225, "the court need only have in personam jurisdiction over the garnishee ...").

Third, VTB Bank Europe SE is not a state instrumentality that enjoys sovereign immunity pursuant to the Foreign Sovereign Immunities Act, but rather a mere subsidiary of a

state instrumentality. *See* Declaration of Brian Fonseca ("Fonseca Decl.") at par. 37. Subsidiaries of state instrumentalities do not enjoy the protections that a state instrumentality enjoys. 28 U.S.C.S. § 1603(b)(2); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 470 (2003) ("A corporation is an instrumentality of a foreign state under the Foreign Sovereign Immunities Act of 1976 (FSIA) (28 USCS 1602 et seq.) only if the foreign state itself directly owns a majority of the corporation's shares. Thus, a corporate subsidiary cannot claim instrumentality status under the FSIA if the foreign state does not own a majority of the subsidiary's shares, even if the foreign state does own a majority of the shares of a corporate parent one or more tiers above the subsidiary. Such an indirect subsidiary cannot come within the language of a FSIA provision (28 USCS 1603(b)(2))"). As such, there is no sovereign immunity that could serve as an impediment to the requested execution.

Thus, the court has the requisite jurisdiction, and VTB Bank Europe SE does not enjoy any immunity.

## II.   All Requirements under North Carolina Post-judgment Execution Statutes Have Been Satisfied, and TRIA Requirements Have Been Satisfied.

### A.   North Carolina Post-judgment Execution Statutes Have Been Satisfied.

According to North Carolina law, the ordinary process to enforce a judgment is that of execution against the property of the debtor. *See* N.C. Gen. Stat. § 1-302 (where a judgment requires the payment of money or the delivery of real or personal property it may be enforced in those respects by execution.); *see also*, *Vegelahn v. Smith*, 95 N.C. 254 (1886). However, where it appears that the judgment debtor does not have visible property to satisfy the judgment, North Carolina law provides for supplemental execution proceedings. *See* N.C. Gen. Stat. Article 31 Chapter 1; *see also In re J & M Supply of the Carolinas, LLC*, No. 22-00536-5-DMW, 2022 Bankr. LEXIS 3469, at *8 (Bankr. E.D.N.C. Dec. 8, 2022) ("The supplemental

5

proceedings statutes contained in Article 31 of the North Carolina General Statutes provide for 'supplemental proceedings, equitable in nature, after execution against a judgment debtor is returned unsatisfied to aid creditors to reach property of every kind subject to the payment of debts which cannot be reached by the ordinary process of execution.'" quoting *Fed. Deposit Ins. Corp. v. British-American Corp.*, 726 F. Supp. 622, 631 (E.D.N.C. 1989) quoting *Massey v. Cates*, 162 S.E.2d 589, 591 (N.C. Ct. App. 1968)). Pursuant to N.C. Gen. Stats. §§ 1-359 through 1-360.1, debtors of the judgment debtor may satisfy execution. In fact, N.C. Gen. Stat. § 1-360 is designed to reach and apply to the satisfaction of the judgment property of the judgment debtor in the hands of the third person. *See Radiance Capital Receivables Twenty One, LLC v. Lancsek*, 881 S.E.2d 883, 887 (N.C. Ct. App. 2022) (citing *Motor Fin. Co. v. Putnam*, 50 S.E.2d 670, 671 (1948).).

Here, Judgment Creditors obtained from this Court an Order for Final Execution on March 20, 2023, DE 16, and a Writ of Execution on March 27, 2023. DE 17. The Order provides that "[p]ursuant to TRIA, Judgment Debtors' blocked assets including the blocked assets of any agency or instrumentality of a Judgment Debtor, including but not limited to VTB Bank Europe SE are subject to execution or levy to satisfy the Judgment in this case." DE 17. Additionally, the Court made the preliminary finding that VTB Bank Europe SE is an agency or instrumentality of the Taliban. *Id*. The Writ of Execution specifically commands the U.S. Marshal to satisfy the Judgment: "[o]ut of the property listed below which is excepted by law from the exemptions: [f]rom the blocked assets of the judgment debtor and *its agencies and/or instrumentalities*, as those terms are defined in the Terrorism Risk Insurance Act ("TRIA"), *including but not limited to VTB Bank Europe S.E.*" DE 17 (emphasis added).

**B.** **TRIA Provides for Execution against the Blocked Assets of Non-party Agencies or Instrumentalities of Terrorist Party Judgment Debtors.**

### 1.    The Four Requirements of TRIA Are Met.

The execution may be made, provided that the following requirements are met:

(1) a person has obtained a judgment against a terrorist party;
(2) the judgment is either
  (a) for a claim based on an act of terrorism, or
  (b) for a claim for which a terrorist party is not immune under § 1605(a)(7);
(3) the assets are "blocked assets" within the meaning of TRIA; and
(4) execution is sought only to the extent of any compensatory damages.

*See Weininger*, 462 F. Supp. at 479; TRIA § 201. Judgment Creditors meet all four requirements.

### i.    Judgment against Terrorist Parties.

The judgment debtor Taliban indeed qualifies as a "terrorist party" under the relevant

statutory definition. Section 201 of TRIA provides:

(d) Notes Definitions.--In this section, the following definitions shall apply:
(4) Terrorist party.-- The term "terrorist party" means a terrorist, a terrorist organization **(as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))**), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

TRIA § 201(d) (emphasis supplied). Section 212(a)(3)(B)(vi) of the Immigration and

Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)) provides:

(vi) "Terrorist organization" defined. As used in this section, the term "terrorist organization" means an organization—
   (I) **designated under section 219 [8 USCS § 1189]**;
   (II) **otherwise designated**, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or
   (III) **that is a group of two or more individuals**, whether organized or not, **which engages in**, or has a subgroup which engages in, the activities **described in subclauses (I) through (VI) of clause (iv).**

8 U.S.C. § 1182 (emphasis supplied).

Those subclauses define the term "engage in terrorist activity", and state that it means:

    (I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;
    (II) to prepare or plan a terrorist activity;
    (III) to gather information on potential targets for terrorist activity;
    (IV) to solicit funds or other things of value for—
    (aa) a terrorist activity;
    (bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or
    (cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;
    (V) to solicit any individual—
    (aa) to engage in conduct otherwise described in this subsection;
    (bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II);
    or
    (cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or
    (VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—
    (aa) for the commission of a terrorist activity;
    (bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;
    (cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or
    (dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv).

The Taliban thus qualifies as a terrorist party on two grounds. First, the Taliban qualifies under 8 U.S.C. § 1182(a)(3)(B)(vi)(III) because it is "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv)." The acts for which Judgment

Creditors obtained their judgment against the Taliban undeniably include many acts on the list of activities in these subclauses. *See* Complaint at pars. 8, 19, 22,24-25, 30, 32-34, 38-44, 49, 57-64, 67, 75-82, 84, 91-99, 101-102, 106-114, 117, 122-130, 133, 139-147 and 155-163, attached hereto as Exhibit C. The Taliban thus "engage[s] in terrorist activity" and qualifies as a "terrorist party" for purposes of TRIA.

Second and alternatively, the Taliban was "otherwise designated", and so qualifies under 8 U.S.C. 1182(a)(3)(B)(vi)(II). The Taliban is a Specially Designated Global Terrorist ("SDGT") organization pursuant to EO 13268, which modified the annex to EO13224 to include the Taliban. "The term specially designated global terrorist or SDGT means any person whose property and interests in property are blocked pursuant to § 594.201(a)." 31 C.F.R. § 594.310. The list of SDGTs whose assets are blocked includes:

> (1) Foreign persons listed in the Annex to Executive Order 13224 of September 23, 2001, as may be amended; [and]
> (2) Foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury, the Secretary of Homeland Security and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States;

31 C.F.R. § 594.201(a). Subsection (2) above tracks the language of 8 U.S.C. § 1182(a)(3)(B)(vi)(II) in that it refers to a determination by the Secretary of State. Subsection (1) refers to a Presidential designation pursuant to executive order. The statutory intent of the result of either determination, however, is the same: whether an organization is designated by the President or the Secretary of State, the result is that it is designated an SDGT. It certainly seems unlikely that the statutory intent was that an SDGT designated by the Secretary of State would be a "terrorist party", but one

9

designated by the President would not be. Thus, the Taliban was "otherwise designated",

and thus qualifies as a terrorist party on these grounds as well.

### ii.    The Judgment Is for a Claim for an Act of Terrorism.[1]

The attack fits the relevant statutory definition of an act of terrorism. Section 201 of

TRIA provides:

> (d) Notes Definitions.--In this section, the following definitions shall apply:
> (1) Act of terrorism.-- The term "act of terrorism" means--
> (A) **any act or event certified under section 102(1)**; or
> (B) to the extent not covered by subparagraph (A), any terrorist activity (as
> defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8
> U.S.C. 1182(a)(3)(B)(iii))).

TRIA, Sec. 201(d) (emphasis added). This attack, which took place on January 4, 2016, was

indeed certified as a terrorist attack under section 102(1) of TRIA on April 13, 2016. This

incident is on the published list of certified acts of terrorism. *See* "International Terrorism Victim

Expense Reimbursement Program – Terrorist Incident Designation List" available at

https://ovc.ojp.gov/program/international-terrorism-victim-expense-reimbursement-

programitverp/terrorist-incident-designation-list. Had it not already been certified, this attack

would qualify under subsection (B), however such analysis is not necessary given that the attack

has been certified under section 102(1) of TRIA.

Requirements (1) and (2) are clearly met. (Indeed it is beyond peradventure that a

judgment under the Anti-Terrorism Act for injuries suffered in a massive terrorist bombing and

awarded against the well-known terrorist judgment debtors would qualify as a judgment against

---

[1] It is worth noting that the judgment itself is based on the Anti-Terrorism Act, 18 U.S.C. §
2333, and Civil RICO, 18 U.S.C. § 1961, (based upon, inter alia, predicate acts of terrorism).
The Anti-Terrorism act provides jurisdiction for actions by U.S. nationals injured by "an act of
international terrorism". Had this matter not concerned an act of terrorism, the district court
would not have had jurisdiction under the ATA in the first place.

terrorist parties based on an act of terrorism.)

### iii. The Assets Are "Blocked Assets" within the Meaning of TRIA.

According to TRIA, 28 U.S.C. § 1610, note, (d)(2):

(2) Blocked asset. The term 'blocked asset' means—
"(A) **any asset seized** or **frozen by the United States** under section 5(b) of the
Trading With the Enemy Act (50 U.S.C. App. 5(b) [50 USCS § 4305(b)]) or
**under sections 202 and 203 of the International Emergency Economic
Powers Act** (50 U.S.C. 1701; 1702)

TRIA, Sec. 201(d) (emphasis added).

On April 15, 2021, President Joseph R. Biden, Jr., acting pursuant to the International
Emergency Economic Powers Act ("IEEPA") (50 U.S.C. 1701, et seq.), promulgated Executive
Order ("EO") 14024, which blocked the property and interest in property of individuals and
entities "responsible for or complicit in, or [who] directly or indirectly engaged or attempted to
engage in," among others, the "undermin[ing] [of] security in countries and regions important to
United States national security" on behalf of the Russian Federation.

The assets here belong to VTB Bank Europe SE. On February 24, 2022, OFAC
designated, and mandated the blocking of assets of VTB Bank Europe SE pursuant to Russia-EO
14024. *See* https://home.treasury.gov/news/press-releases/jy0608 (announcing the designation of
VTB Bank Europe SE pursuant to EO 14024). Following the dictates of federal law, Bank of
America blocked and holds assets belonging to VTB Bank Europe SE. The third prerequisite to
execution pursuant to TRIA is therefore satisfied.

### iv. Execution is Sought Only to the Extent of Any Compensatory Damages.

The amount of Judgment Creditors' Judgment for compensatory damages which remains
unsatisfied and is owed jointly and severally by the Judgment debtors is, as of the filing of this
motion, $138,056,310.87, plus post-judgment interest. Execution is sought only to the extent of

this compensatory award. The amount of blocked assets of VTB Bank Europe SE held by Bank of America does not exceed the amount outstanding of the compensatory portion of the judgment. *See* Thornton Decl. at par. 7.

   2.   **Blocked Assets of a Terrorist Party Judgment Debtor or an Agency or Instrumentality of That Terrorist Party Judgment Debtor.**

   i.   **TRIA Reaches Non-Parties.**

TRIA allows terrorism victim judgment holders to execute on blocked assets of terrorist party judgment debtors, as well as their agencies or instrumentalities. *See* TRIA § 201(a); *see also Weinstein*, 609 F.3d at 50. ("Section 201(a) of TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment.").

   ii.   **An Entity That Provides Services or Is a Means through Which a Material Function Is Accomplished Qualifies as an Agency or Instrumentality; It Does Not Matter Whether the Aid Is Direct or Indirect.**

There are three independent ways in which an entity can qualify as an agency or instrumentality of a terrorist party under TRIA. Two of those are relevant here. First, an entity is deemed an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished[.]" *Kirschenbaum v. 650 Fifth Ave. & Related Properties,* 830 F.3d 107, 135 (2d Cir. 2016). Second, it will be deemed an agency or instrumentality of the terrorist party if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.; see also Stansell v. FARC*, 771 F.3d 713, 724 n.6, 732 (11th Cir. 2014) (cited with approval in *Kirschenbaum*, 830 F.3d at 135–36, 135 n.19).

Due to the absence of a definition for "agency or instrumentality" in TRIA, those terms must be given their ordinary meaning. *See Stansell*, 771 F.3d at 732 (rejecting the rigid definitions of agency or instrumentality found in the Foreign Sovereign Immunities Act). It is well-established that "indirect" connections that run across companies and pierce layers of organizations and affiliated individuals satisfy TRIA:

> nothing in § 201(a) of TRIA suggests that an instrumentality relationship with a terrorist party needs to be direct. Imagine, for example, that the FARC hires A to oversee and coordinate the laundering of its narcotics proceeds in different parts of the world. Then A subcontracts, hires, or uses other individuals or entities (B, C, and D) to carry out the money laundering operation in other countries. In that example, B, C, and D could be instrumentalities of the FARC notwithstanding their lack of a direct contractual relationship with the FARC.

*Stansell v. Revolutionary Armed Forces of Colom.*, Nos. 20-11736, 20-12467, 2022 U.S. App. LEXIS 23606, at *15-16 (11th Cir. Aug. 23, 2022). This standard reaches blocked parties even if they were never previously linked to the terrorist party.". *Stansell*, 771 F.3d at 739 ("[t]he [blocked entities] had not previously been directly linked to [the judgment debtor] by OFAC or any other executive or judicial authority.").

An entity that is part of a clandestine network that a terrorist organization taps into for support and funding is an archetypal agency or instrumentality in TRIA collection cases. *See e.g., Doe v. ELN, et al.*, Case No. 10-cv-21517 in the United States District Court for the Southern District of Florida (subsidiary of Venezuelan state-owned agency PDVSA, which was part of the network of companies used by Venezuela to launder funds that were diverted to terrorist organization FARC, qualified as "agency or instrumentality" of the FARC); *Caballero v. FARC*, No. 18-CV-25337, 2021 U.S. Dist. LEXIS 161218, at *2-3 (S.D. Fla. Aug. 24, 2021) (individual who operated currency exchange program used by terrorist party was an "agency or instrumentality" of that party under TRIA); *Caballero v. FARC*, No. 20-CV-1939, 2021 U.S.

Dist. LEXIS 250186, at *6 (D. Conn. Jan. 14, 2021) (unaffiliated corporation was "agenc[y] or instrumentality" of terrorist party which "use[d]" it "to launder money"); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) (subjecting assets of Holy Land Foundation to execution as an agency or instrumentality of Hamas based on "strong evidence" it "operate[d] as a fund-raiser for Hamas in the United States").

> ### iii. VTB Bank Europe SE Is Part an Illicit Network that Russia Uses to Provide Material Services to the Taliban, and the Taliban in Turn Rely on This Network.

Brian Fonseca, an expert in national security, terrorism, and organized crime, testifies to the broad arch of the well-documented conspiracy between the Taliban and Russia, and the role that financial institutions, including VTB Bank Europe SE, play in that conspiracy. *See* Fonseca Decl. It is a conspiracy that over time went from one in which Russia provided intelligence to the Taliban, to one where Russia provided weapons, oil tankers, and cash to help Taliban insurgents fight the war against Afghani and American troops. *See Id.* at pars. 17-28.

Despite the fact that Russia and the Taliban were once adversaries, in the 2000s, Russia became aligned with the Taliban in order "to reassert its influence in the region, complicate the U.S.–Taliban relationship, counter American advantages abroad, and interfere in American politics." *Id.* at par. 16. Further, "the Russian government has coordinated with and provided material support to Taliban insurgents in Afghanistan since at least 2007 to counter U.S. influence in places such as Afghanistan, Syria, and Eastern Europe." *Id.* at par. 17. According to publicly available reporting, sometime between 2012 and 2015 Russian support to the Taliban began including material support to Taliban insurgents. *See Id*. at par 18. In 2015, Russian Foreign Ministry spokeswoman Maria Zakharova confirmed that Moscow provided Taliban insurgents with intelligence. *See Id.* at par. 19.

Starting in 2017, United States Pentagon Officials started openly expressing concerns about Russia providing weapons, financial support, and intelligence to the Taliban. In April 2017, then Secretary of Defense James Mattis, speaking in Afghanistan, was asked to "address the influx of Russian weapons into Afghanistan…and showing up in Taliban hands in Helmand, Kandahar and Urozgan". *Id*. at par. 24. In response, he acknowledged Moscow's material support to the Taliban and stated, "we're going to have to confront Russia where what they're doing is contrary to international law…" and specifically referenced "weapons being funneled here". *Id.*

U.S. officials held congressional hearings to shed light on Russian practices of supporting Taliban insurgents. *See Id.* pars. 20-22. General John W. Nicholson, Commander of U.S. Forces in Afghanistan, stated before the Senate Armed Services Committee that Russia overtly lending legitimacy to the Taliban to undermine NATO efforts was a critical factor affecting the United States' mission in Afghanistan. *See Id.* at par. 21. General Nicholson further testified before the House Committee on Foreign Affairs that dealing with Russian involvement in the Afghan War was essential to the protection of American troops and further stated that the Russian provision of arms, ammo and money to the Taliban not only helped the Taliban inflict more casualties on Afghani and American troops, but also sought to undermine the United States and NATO while destabilizing Afghanistan and helped the Taliban gain influence in advance of an anticipated United States/NATO withdrawal. *See Id.* at par. 22. In a committee hearing titled Military Assessment of the Security Challenges in the Greater Middle East, then Commander of U.S. Central Command General Joseph Votel testified that "it is fair to assume they [Russia] may be providing some kind of support to the [Taliban] in terms of weapons or other things that may be there." *Id.* at par. 25. Similarly, General Curtis M. Scaparrotti, Commander for the U.S.

European Command and Supreme Allied Commander raised the issue of Russian material support to the Taliban before the Senate Armed Services Committee. *See Id*. Fonseca provides additional extensive corroboration, some from both Russia and the Taliban, to establish unequivocally that Russia actively supported, and supports, the Taliban, including "financial support" to Taliban operations. *Id.* at pars. 26-33.[2]

Further, VTB Bank Europe SE plays a key role in that relationship, as it is a subsidiary of an instrument of the Russian Government that Russia uses to fund destabilizing activities. *See generally Id*. pars. 34-47 and section heading thereto. VTB Bank Europe SE is a subsidiary of the Russian state-owned bank VTB Bank Public Joint Stock Company (hereinafter "VTB Bank"). *Id.* at par. 37. VTB Bank is one of the largest banks in Russia, with an extensive network of subsidiaries and affiliated companies worldwide. *Id*. at par 35. VTB Bank Europe SE "serves as VTB Bank's presence in Europe" and it is critical to VTB Bank's overall strategy of expanding Russia's reach by providing it access to European Markets and increasing Russia's revenue. *Id*. at par. 37.

VTB Bank serves as an off-the-books fund to finance Russian President Vladimir Putin's projects around the world. *See Id*. at par. 39. According to The Organized Crime and Corruption Project, VTB Bank is "Vladimir Putin's piggy bank." *Id*. Moscow's *modus operandi* is to use VTB Bank and its subsidiaries to promote Russia's foreign policy goals and fund activities akin to the destabilizing activities that Moscow has undertaken in support of Taliban operations in Afghanistan. *Id*. at pars. 39-42, 44, 46.

---

[2] While the material support to the Taliban was well-known, there was a less-documented, but believed to be true practice of special relevance to this case arising out of a Taliban bomb attack on Americans: that Russia was paying the Taliban bounties for attacks on Americans. Fonseca Decl. at par. 23.

Due to its role in nefarious funding, on February 24, 2022, the United States Department of the Treasury sanctioned "VTB Bank and its subsidiaries, including but not limited to VTB Bank (Europe) SE, pursuant to E.O. 14024 to target the core infrastructure of Russia's financial system. VTB Bank and VTB Bank (Europe) SE were blocked for being owned and controlled by Russia, as well as for acting on behalf, directly or indirectly of Russia." *Id.* at par. 45.

Fonseca concludes:

48.     It is my professional opinion that the Russian government has deep institutional ties with the Taliban and has provided material support to Taliban insurgents to carry out terrorist attacks on American citizens.

49.     Russia's use of its illicit financial network to fund destabilizing activities is pervasive and coordinated across its vast financial network. To finance destabilizing activities around the globe, the Kremlin uses financial institutions like VTB Bank and its subsidiaries, including but not limited to VTB Bank (Europe) SE, to raise money and transfer money to and on behalf of terrorist organizations like the Taliban, among others.
50.     As such, I conclude that Russia uses its illicit financial network, which VTB Bank (Europe) SE is part of, to provide material support to the Taliban, and the Taliban in turn relies on this material support to carry out terrorist attacks.

*Id.* at pars. 48-50.

Because of the role VTB Bank Europe SE plays in Russia's illicit financial network, which provides material services to the Taliban, and because of the Taliban's reliance on this network for financing, VTB Bank Europe SE qualifies as an agency or instrumentality of the Taliban. *See Kirschenbaum*, *supra*.

**C.     Notice Has Been Provided to the Garnishee, VTB Bank Europe SE and the Taliban.**

North Carolina law provides for notice in execution proceedings against third parties as follows:

Upon the issuing or return of an execution against property of the judgment debtor, or of any one of several debtors in the same judgment, and upon affidavit that any person or corporation has property of said judgment debtor, or is indebted

to him in an amount exceeding ten dollars ($10.00), the court or judge may, by order, require such person or corporation, or any officer or members thereof, to appear at a specified time and place, and answer concerning the same; provided, however, that such inquiries may, in the discretion of the court, be answered by such person or corporation, or any officers or members thereof, by verified answers to interrogatories. The court or judge may also, in its or his discretion, *require notice of the proceeding to be given to any party to the action*, *in such manner as seems proper.*

N.C. Gen. Stat. § 1-360 (emphasis added).

### 1.    Procedural History of Writ of Execution.

On March 20, 2023, Judgment Creditors filed a Motion for an Order of Writ of Execution before this Court. DE 15. That same day, an Order was issued granting the Motion and directing the clerk to issue the Writ of Execution. DE 16. On March 27, 2023, the Clerk of Court issued the Writ of Execution. DE 17. Soon thereafter, Judgment Creditors sent via FedEx the Writ of Execution to the US Marshals Service in the Western District of North Carolina. On March 28, 2023, Yvette Quesnell-Deese, the district asset forfeiture coordinator for the US Marshals service, confirmed receipt of the Writ of Execution. *See* Exhibit D. On March 29, 2023, counsel for Bank of America indicated he had been authorized to accept service of the Writ of Execution on behalf of Bank of America via e-mail. *See* Exhibit E. Subsequently, Deputy Quesnell e-mailed the Writ of Execution to Bank of America. *Id*.

### 2.    Notice to Bank of America.

Aside from formally accepting service of the Writ of Execution from the U.S. Marshals Service as mentioned above, counsel for Bank of America received an e-mail from undersigned counsel on March 27, 2023, containing a restraining notice identifying the VTB Bank Europe SE accounts subject to this proceeding and a copy of the Writ of Execution. *See* Exhibit F. No further notice is required. *See* N.C. Gen. Stat. §1-360.1.

18

### 3. Notice to VTB Bank Europe SE.

Judgment Creditors provided notice of the proceedings to VTB Bank Europe SE via process server on April 3, 2023. DE 18. The documents served were: 1) Notice of Supplementary Proceedings in English and in German; 2) Order for Issuance of Writ of Execution, DE 16; and 3) Writ of Execution, DE 17. No further notice is required. *See* N.C. Gen. Stat. §1-360.1.

### 4. Notice to the Taliban.

Judgment Creditors, in abundance of caution, provided notice of the proceedings to the Taliban via Process Server on April 3, 2023. DE 19. The documents served were: 1) Notice of Supplementary Proceedings in English and in Pashto; 2) Order for Issuance of Writ of Execution, DE 16; and 3) Writ of Execution, DE 17. No further notice is required.[3]

### D. No OFAC License Is Required Prior to Execution.

TRIA was intended to clear the way for victims of terrorist organizations to collect on them without delay or interference from the Executive Branch. Its purpose "is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties…." *Weinstein*, 609 F.3d at 50 (quoting Senator Harkin a sponsor of the TRIA 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002)). TRIA "establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that the executive

---

[3] In the instant case, Judgment Creditors established service of process on all three Judgment Debtors via publication, but all three failed to appear and were adjudged to be in default in the Northern District of Texas in case number 4:20-cv-00605. That default judgment was then domesticated in this district. DE 2. Pursuant to Federal Rule of Civil Procedure 5(a)(2), if no new claim is being asserted, no service is required on a party who is in default for failing to appear. Likewise, the North Carolina Rules of Civil Procedure provide that "no service need be made on parties in default for failure to appear. N.C. Gen. Stat. § 1A-1, Rule 5; *see also Wright v. S. R. CO.*, 141 N.C. 164, 53 S.E. 831 (1906) (concluding that notice to the Defendant is not required in supplemental execution proceedings).

branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act." *Id*. Thus, no OFAC license is required for Plaintiffs to execute on and take possession of the blocked proceeds under the TRIA, which it has recognized in similar cases. *See Castro*, 462 F. Supp. at 499 (U.S. DOJ has indicated that "[i]n the event the Court determines that the funds are subject to TRIA, the funds may be distributed without a license from the Office of Foreign Assets Control").

E.     **Doe Creditors request a stay.**

Finally, Bank of America has requested that should the Court enter an order granting this motion (which Bank of America does not consent to), that the actual turnover itself be stayed so that Bank of America have the opportunity to serve VTB Bank Europe SE pursuant to the Hague Convention, and VTB Bank Europe SE have time to reply thereto and seek relief from judgment.

While the law is clear that a TRIA judgment acts *in personam* against the garnishee only, and against the blocked assets at issue, such the owner of the assets need not be made a party or be subject to the court's jurisdiction *See* N.C. Gen. Stat. § 1-360; *see also Harrison v. Republic of Sudan*, 309 F. Supp. 3d 46, 48 (S.D.N.Y. 2018) (finding that because state garnishment law did not require jurisdiction over the judgment debtor to order turnover of assets held by a third party, court did not need jurisdiction over alleged instrumentality to order TRIA turnover); and while VTB Bank Europe SE has been provided with notice informing it that the significant funds at issue in these forfeiture proceedings were due to be executed against, and VTB Bank Europe SE has failed to respond and is in default; Doe Creditors hope to accommodate the concerns of Bank of America in this regard by allowing for it to serve VTB Bank Europe SE independently before the assets actually get distributed.

**CONCLUSION**

For the foregoing reasons, the Court should grant Judgment Creditors' Motion for Release of Funds as to the blocked assets of VTB Bank Europe SE (as an agency or instrumentality of the Taliban) which are in the possession, custody, or control of Bank of America. A proposed order is attached hereto as Exhibit G.

Dated: April 27, 2023.

Respectfully submitted,

**Winiker Law Firm, PLLC**
352 N. Caswell Road
Charlotte, North Carolina 28204
Telephone: (704) 333-8440
Facsimile: (704) 831-5274

By:    s/ *S. Frederick Winiker, III*
       S. Frederick Winiker, III
       North Carolina Bar No. 22390
       swiniker@winikerlaw.com

**do Campo & Thornton, P.A.**
Chase Bank Building
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
Telephone: (305) 358-6600
Facsimile: (305) 358-6601

By:    s/ *John Thornton*
       John Thornton
       Florida Bar No. 004820
       jt@dandtlaw.com
       *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 27, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ *John Thornton*

John Thornton